NATALIE K. WIGHT, OSB #035576
United States Attorney
District of Oregon
**JEFFREY S. SWEET, OSB #994183**
Jeff.Sweet@usdoj.gov
**NATHAN J. LICHVARCIK**
Nathan.j.Lichvarcik@usdoj.gov
**MARCO A. BOCCATO, OSB #103437**
Marco.Boccato@usdoj.gov
Assistant United States Attorneys
405 East 8th Avenue, Suite 2400
Eugene, Oregon 97401
Telephone: (541) 465-6771
Attorneys for the United States of America

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | 1:23-cr-00254-MC |
| v. | **GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE FROM THE NISSAN ALTIMA** |
| **NEGASI ISHAIAH ZUBERI, aka JUSTIN JOSHUA HYCHE,** | |
| **Defendant.** | |

Alycia Westfall and defendant, Negasi Zuberi, share two young children. All four lived together in the Klamath Falls house where Mr. Zuberi held his two kidnapping victims. On July 15, 2023, after Adult Victim 1 (AV1) escaped from the cinderblock cell in the couple's garage, Mr. Zuberi fled too.

Less than 24 hours later, Mr. Zuberi rendezvoused with Ms. Westfall and their kids at a gas station outside of Klamath Falls. They left a Nissan Altima behind and drove to Reno,

Nevada in a Honda Pilot; Mr. Zuberi is the registered owner of both cars. Police found them and arrested Mr. Zuberi later that day.

Law enforcement backtracked and found the Altima that evening, parked at a gas station in Merrill, Oregon, which is about thirty minutes outside of Klamath Falls. The police towed the Altima and held it at the Klamath Fall police station until Magistrate Judge Clarke authorized a federal search warrant two days later, on July 18.

In the car, they found a receipt for Mr. Zuberi's AAA Discount Storage space in Klamath Falls along with the access code. That receipt helped lead the FBI to Mr. Zuberi's Prowler trailer, which they searched under a separate warrant. They found firearms, ammunition, handcuffs, documents, photographs, cellphone jammers, and a taser in the Prowler. The government intends to use that evidence at trial.

Mr. Zuberi argues that the warrantless seizure of the Nissan Altima by Klamath Falls police violated the Fourth Amendment, rendering the Discount Storage receipt found in the car and the evidence found in the Prowler all suppressible fruit.

In fact, at the time that they seized the Altima, police had probable cause to believe that there would be evidence of Mr. Zuberi's crimes inside. Regardless of whether Ms. Westfall played any role in helping Mr. Zuberi commit the charged crimes, she used the Nissan Altima to meet up with and bring their children to him while he was evading the police. Mr. Zuberi had access to that car in the direct aftermath of his crimes against AV1, and police had probable cause to believe that Mr. Zuberi would drop evidence there—either intentionally or not.

### A. SEARCH WARRANT

Even if the initial seizure of the Altima was problematic (which it wasn't), the subsequent search was done with a warrant. Under the independent source doctrine, when "a valid search

warrant [is] issued wholly on information known to the officers before" an illegal seizure, evidence found "need not [be] suppressed as 'fruit.'" *Segura v. United States*, 468 U.S. 796, 799 (1984).

Here, FBI Special Agent Travis Gluesenkamp did not present any information to Judge Clarke that came from seizing or towing the Altima. He relied on information gathered in the investigation independent of that act. The most straightforward way to resolve this motion is to affirm that Judge Clarke issued a valid search warrant based on probable cause. If so, any argument about the seizure is immaterial under *Segura*.

For that reason, the following factual summary is pulled only from SA Gluesenkamp's affidavit. The government is also filing, under seal, the Klamath Falls police reports relating to the initial part of this investigation to show that these facts were known to police before the Altima's seizure.[1] *See also United States v. Bernard*, 623 F.2d 551, 560–61 (9th Cir. 1980) (when officers work as a team, one officer's knowledge is attributed to all); *United States v. Bertrand*, 926 F.2d 838, 844 (9th Cir. 1991) (applying the collective knowledge doctrine).

There are also alternative Fourth Amendment bases for denying this motion. Those are addressed below along with the additional relevant facts.

1. **Facts Presented in SA Gluesenkamp's Affidavit**

AV1 reported her kidnap and rape to Klamath Falls police on July 15, 2023.[2] She said that Mr. Zuberi kidnapped her in Seattle, Washington late the night before or early that morning.[3]

---

[1] A more detailed recitation of the charged crimes is provided in the Government's Response to Defendant's Motion to Sever. Those are not repeated here.
[2] Def. Exh. 3 at ¶ 12; Govt Exh. 3 at 9; Govt Exh. 2 at 3–8
[3] Def. Exh. 3 at ¶ 7; Govt Exh. 3 at 9; Govt Exh. 2 at 4

He drove her to his Klamath Falls house in an SUV, pulling over and raping her along the way.[4] They got to Klamath Falls in the morning of July 15 and AV1 escaped that day.[5] When she ran, she took Mr. Zuberi's gun out of his SUV, which was parked inside the garage.[6]

She was able to show police the house where Mr. Zuberi held her.[7] Based on neighbor interviews and law enforcement database checks, police identified Mr. Zuberi as an occupant of the house.[8] AV1 said she left her purse in the garage when she ran; she had a taser in it.[9] She also described Mr. Zuberi's clothes and some of the tools he used during the kidnapping.[10] Neither Mr. Zuberi nor his SUV were at the house when police searched.

Ms. Westfall came to the house when police were there. At about 7:30 pm, before the search warrant issued and while Klamath Falls police were securing the scene, Ms. Westfall drove up in a white Nissan Altima.[11] She gave false information to police about Mr. Zuberi and his whereabouts.[12] Law enforcement later learned the Altima was registered to Mr. Zuberi under his former name, Justin Kouassi.[13]

Police got a warrant and searched the house on July 16.[14] They found the cell and AV1's purse in the garage.[15] They found other evidence in the house, but did not find AV1's cellphone,

---

[4] Def. Exh. 3 at ¶ 9; Govt Exh. 3 at 9; Govt Exh. 2 at 5
[5] Def. Exh. 3 at ¶ 10–11; Govt Exh. 3 at 9; Govt Exh. 2 at 7
[6] Def. Exh. 3 at ¶¶ 11; Govt Exh. 1 at 1; Govt Exh. 6 at 3
[7] Def. Exh. 3 at ¶ 12; Exh. 1 at 2
[8] Def. Exh. 3 at ¶ 12; Exh. 1 at 4–5; Exh. 4 at 2
[9] Def. Exh. 3 at ¶ 13; Exh. 3 at 12
[10] Def. Exh. 3 at ¶ 13; Exh. 2 at 7
[11] Def. Exh. 3 at ¶ 17–18; Exh. 1 at 3; Exh. 4 at 3
[12] Def. Exh. 3 at ¶ 17; Exh. 4 at 3
[13] Def. Exh. 3 at ¶ 18; Exh. 3 at 16
[14] Def. Exh. 3 at ¶ 14; Exh. 3 at 13
[15] Def. Exh. 3 at 15; Exh. 3 at 13–14

which Mr. Zuberi had taken, or the taser she said was in her purse.[16] They also didn't find other items that AV1 described—the black and yellow taser he threatened her with, the towel that Mr. Zuberi gave her to clean herself after he raped her, the hooded sweatshirt he used to cover her face when he drove her to his house, the clothes she saw him wearing, the device he had that she described as a walkie talkie, or other evidence of the trip that they would expect to see like receipts for gas, food, or supplies.[17]

In trying to track Mr. Zuberi down, police got GPS location data for his phone.[18] They were able to track his movement from Klamath Falls to Merrill, Oregon.[19] They lost track of Mr. Zuberi's phone for a few hours and called Ms. Westfall to ask her help in locating him. She said she didn't know where he was and that she was on her way to Medford, Oregon.[20] Mr. Zuberi's phone reconnected and police tracked him to a Walmart parking lot in Reno, Nevada.[21] When local police approached to arrest him, Mr. Zuberi was holding one of his children in the car with him and Ms. Westfall was standing outside of his car talking to him.[22] The Nissan Altima was not there.

Ms. Westfall lied again, this time to the Reno police, telling them that the charges against Mr. Zuberi were being dropped.[23]

When police backtracked along Mr. Zuberi's flight route, they found Mr. Zuberi's Nissan Altima, which Ms. Westfall had been seen driving, parked behind a gas station in Merrill,

---

[16] Def. Exh. 3 at ¶ 16
[17] Def. Exh. 3 at ¶ 16
[18] Def. Exh. 3 at ¶¶ 19–20; Govt Exh. 5 at 2
[19] Def. Exh. 3 at ¶ 20
[20] Def. Exh. 3 at ¶ 21; Govt Exh. 3 at 18
[21] Def. Exh. 3 at ¶ 21
[22] Def. Exh. 3 at ¶ 23
[23] Def. Exh. 3 at ¶ 24

Oregon.[24] The GPS data showed that Mr. Zuberi waited in Merrill for 45 minutes before continuing to Reno.[25] (Merrill is about a 30-minute drive from Klamath Falls.) Based on all of this, it was clear that Ms. Westfall "rode with Zuberi to Reno, Nevada after she abandoned the [Altima] in Merrill, Oregon and lied to Law Enforcement about her location."[26]

Klamath Falls police secured and towed the Altima.[27] The FBI applied for a federal search warrant for the Altima on July 18, 2023, two days after Mr. Zuberi's arrest in Reno.[28]

SA Gluesenkamp provided the above facts as well as his background knowledge (of the somewhat self-evident facts) that people "often try to dispose of the fruits and instrumentalities used in their crimes, and one of the manners of disposal can be transferring the items to a different vehicle or premises," and that "loved ones, including spouses, may provide voluntarily, or involuntarily, assistance to their loved ones before, during, or after the commission of a crime."[29]

Judge Clarke authorized the warrant, finding probable cause that the Altima would contain evidence of Mr. Zuberi's kidnappings. This included receipts, other financial records, ownership records and other identifying papers, tasers, firearms, handcuffs, walkie talkies, clothing, towels, condoms, AV1's cellphone as well as DNA from victims.[30] Even though AV1

---

[24] Def. Exh. 3 at ¶ 25; Govt Exh. 5 at 2
[25] Def. Exh. 3 at ¶ 29
[26] Def. Exh. 3 at ¶ 29
[27] Def. Exh. 3 at ¶ 29; Govt Exh. 5 at 2
[28] By this time, police also knew the details of AV2's kidnapping in May and included a summary of those in the warrant application. *Id.* at ¶¶ 26–27. Some of those details were not learned until a follow-up interview of AV2 on July 17. Because this analysis looks from the vantage of what was known at the time of the seizure, the government asks the Court to put aside the information about AV2 in evaluating probable cause here. It can be considered under alternative arguments made below.
[29] Def. Exh. 3 at ¶¶ 29–30
[30] Def. Exh. 3 at ¶ 31; *Id.*, Att. B at ¶ 1

reported no direct contact with the Altima, there was a likelihood that Mr. Zuberi transferred his belongings into the car, including when he and Ms. Westfall tried to make their escape. In addition, SA Gluesenkamp stated, "biological evidence such as blood, hair, semen, and DNA may [have been] transferred [to the Altima] via another source."[31]

### 2. Probable Cause

The warrant application gave Judge Clarke enough to find probable cause that the Altima contained evidence of Mr. Zuberi's crimes. That decision is afforded "great deference." *United States v. Crews*, 502 F.3d 1130, 1135 (9th Cir. 2007).

AV1 accused Mr. Zuberi of kidnapping and raping her. The police were looking for a variety of evidence to tie him to those crimes—biological evidence and items.[32]

They were also looking for evidence to tie him to the Klamath Falls house that AV1 identified as the site of her capture. *See id.* (listing items like financial records, calendar and appointment books, and other documentary evidence).

Mr. Zuberi complains that the affidavit "contained few facts related to the Altima itself or why that car would contain evidence of the crimes." ECF No. 72 at 5. That's not true.

When he fled Klamath Falls, it was reasonable to believe that Mr. Zuberi would look for ways to hide or discard evidence he had with him. The affiant-agent said so. Def. Exh. 3 at ¶ 29 ("Based on my training and experience, I know subjects often try to dispose of the fruits and instrumentalities used in their crimes, and one of the manners of disposal can be transferring the items to a different vehicle or premises."). Many of the items sought were small enough for Mr. Zuberi to slip into his pocket and stash in the Altima or—for the biological evidence—to drag in

---

[31] Def. Exh. 3 at ¶ 28
[32] Def. Exh. 3, Att. B

unknowingly on his clothes or—regarding the identifying documents—to simply keep in the Altima, which was registered to him.

Ms. Westfall used the Altima. She lived with Mr. Zuberi in the house where he locked AV1 in a cinderblock cell. She lied to police about Mr. Zuberi's whereabouts and then took their two children and met up with him at the Merrill gas station where they left the Altima behind and ran to Reno in his Pilot. That was enough to establish a likelihood that Mr. Zuberi had access to the Altima as well an opportunity and motive to use it as a place to discard of or store evidence, or that he simply left it there without giving thought to its inculpatory value.

Again, the affiant-agent supported that conclusion. *See id.* at ¶ 30 (loved ones often help in the commission or concealment of crimes). The issuing magistrate judge "may rely on the training and experience of affiant police officers," including on conclusions of experienced officers about where evidence of a crime is likely to be found. *United States v. Chavez-Miranda*, 306 F.3d 973, 978 (9th Cir. 2002); *see also United States v. Fannin*, 817 F.2d 1379, 1382 (9th Cir. 1987).

The judge "need not determine that the evidence sought is *in fact* on the premises to be searched . . . or that the evidence is more likely than not to be found where the search takes place . . . [he] need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit." *United States v. Peacock*, 761 F.2d 1313, 1315 (9th Cir. 1985) (overruled on other grounds by *Gomez v. United States*, 490 U.S. 858 (1989)). Probable cause often rests "not on direct observation . . . but on the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property." *United States v. Lucarz*, 430 F.2d 1051, 1055 (9th Cir. 1970).

There was more than enough in this affidavit to support Judge Clarke's conclusion that it was reasonable to find evidence of Mr. Zuberi's crimes in the car driven by his abetting girlfriend given that he had physical access to it both before and during his flight. The Court should deny Mr. Zuberi's suppression motion on this basis.

### 3. Good Faith Exception

Even if the Court finds that the bow was not tied neatly enough in the warrant, suppression is not the appropriate remedy. The officers searched the Altima in good-faith reliance on the search warrant. *United States v. Leon*, 468 U.S. 897 (1984). There are limited circumstances which can negate good faith. *Id.* at 922–23 (excepting situations where the warrant is the product of the affiant's knowing or reckless falsehoods, the judge's abandonment of their judicial role, dearth of probable cause to the point of being "unreasonable", or facial deficiency). None are applicable, as further established in the government's response to Mr. Zuberi's *Franks* motion, and *Leon*'s good faith rule should apply here.

## B. AUTOMOBILE EXCEPTION

Even if the Court finds fault with the warrant, the inquiry isn't done. As with most warrant applications, this one contained only a portion of what the police knew at the time that they seized and searched the Altima. There was more tying Ms. Westfall and the Altima to Mr. Zuberi in this critical period. Those additional facts, in combination with what was contained in the warrant, support probable cause and make both the seizure and search of the Altima valid under the automobile exception. As an alternative ruling, the Court should find that the totality of known facts support application of that warrant exception.

### 1. Additional Facts

First, police had evidence that the Nissan Altima had been at Mr. Zuberi's Klamath Falls house while he held AV1 captive, and regularly before that. Both AV1 and Mr. Zuberi's neighbor saw a white four-door sedan in the Klamath Falls house's driveway around the time AV1 escaped.[33] The neighbor said that the white Altima had been parked in the house's driveway for the last month and a half.[34]

Second, the same neighbor said that on July 15 (the day AV1 escaped), he heard a scream and a short time later saw a woman of Ms. Westfall's description come out of the house, put two kids in the white car, get into the passenger side, and the car drove away.[35] The Honda Pilot pulled out shortly after.[36] He also said that he saw police circle the house at another point in the day and watched Mr. Zuberi, the kids, and Ms. Westfall all get into the Honda Pilot, which was then parked in the driveway.[37] They drove to the end of the block, stopped, and Ms. Westfall got out and walked back to the house.[38] When he looked again, the Altima was gone too.[39] Police noticed Ms. Westfall walk past the house after police had secured it. She was talking on her cellphone.[40] All of this shows that Ms. Westfall and Mr. Zuberi were coordinating that day before Mr. Zuberi made a run for it and they were using both available cars in concert.

---

[33] Govt Exh. 3 at 9 (AV1 said she saw a white Impala); Govt Exh. 2 at 7 (in a later statement, she described the car as white, four-door, maybe a Chevy Malibu)
[34] Govt Exh. 1 at 3
[35] Govt Exh 4 at 4
[36] *Id.*
[37] Govt Exh. 1 at 3
[38] *Id.*
[39] *Id.*
[40] Govt Exh. 3 at 12

**Government's Response to Altima Suppression Motion**                **Page 10**

Third, the search warrant affidavit carries only an echo of Ms. Westfall's lies to police about Mr. Zuberi. She came back to the Klamath Falls house twice more, at 7:30 pm and again at around 9 pm, in the Altima both times.[41] Police approached her the first time and asked questions. She said that a lot of people lived at the house but that she just rented a room and lived with her kids.[42] She mentioned Mr. Zuberi, saying that she "pretty much met this dude, and stays with him" but that she hadn't seen him "in like, I don't know, I don't know anything."[43] She mentioned "Sakima" (Mr. Zuberi's preferred name) but hadn't "seen him in four or five days," and that she wasn't dating him.[44] She said she didn't know where Mr. Zuberi was, she denied being in a car with him that day, and said that she had been in the house all day except for a trip to Walmart, so the contention that something had happened in the house "d[id]n't make sense to her."[45] As police asked more questions, she repeatedly denied knowing Mr. Zuberi well and continued to insist that she hadn't seen him. All of this contradicted statements by the couple's neighbors and facts the police already knew.

Fourth, after locating the Altima at the Merrill gas station, but before seizing it, a Klamath Falls detective watched surveillance video of Mr. Zuberi and Ms. Westfall's meet-up.[46] He saw the Honda Pilot drive into the lot at 9:26 am and park out of view. The white Nissan Altima pulled in at 9:53 am. Mr. Zuberi went into the gas station store, appeared to talk to one

---

[41] Govt Exh. 1 at 4; Govt Exh. 3 at 12
[42] Govt Exh. 4 at 3
[43] *Id.*
[44] *Id.*
[45] Govt Exh. 4 at 4
[46] Govt Exh. 5 at 2

**Government's Response to Altima Suppression Motion**                                     **Page 11**

of the clerks, and then got into the Altima himself. He moved it to a different part of the lot. The Honda drove away leaving the Altima behind.[47]

### 2. The seizure and search were lawful applications of the automobile exception.

As long as there is probable cause to search, the automobile exception permits the pre-search seizure as well as the search. *Carroll v. United States*, 267 U.S. 132 (1925); *see also United States v. Bagley*, 772 F.2d 482, 491 (9th Cir. 1985) ("the existence of probable cause alone justifies a warrantless search or seizure of a vehicle" even if "lawfully parked in a public place.") (citing *California v. Carney*, 471 U.S. 386 (1985)).

These additional facts showing Ms. Westfall's interactions with Mr. Zuberi on July 15, her repeated returns to check the police activity at the house, her lies about her relationship with Mr. Zuberi and his location, and the video evidence showing that Mr. Zuberi had direct access to the Altima—and actually got into the Altima to move it—at the Merrill gas station, strengthen the probable cause to search the Altima for evidence of Mr. Zuberi's crimes. The Court may use this additional evidence to hold that the Altima was lawfully seized and searched under the automobile exception. *See, e.g.*, *United States v. Mejia*, 782 F. App'x. 644, 645 (9th Cir. 2019) (finding it unnecessary to rule on warrant challenge because the search was independently valid under the automobile exception).

### C. SEIZURE

Even if the Court addresses the seizure and the search serially, there is still no constitutional problem. Mr. Zuberi argues that Klamath Falls police violated the Fourth

---

[47] *Id.*

Amendment in impounding the Altima because he had not abandoned the vehicle. ECF No. 72 at 4–5. Whether or not the Altima was abandoned is not a critical point.

The Fourth Amendment question is whether the pre-warrant towing of the Altima was an unreasonable seizure. It was a seizure. *Bagley*, 772 F.2d at 490 ("towing the automobile to the police lot constituted a seizure within the meaning of the fourth amendment"). But not an unreasonable one.

"Different interests are implicated by a seizure than by a search." *Segura*, 468 U.S. at 806. "A seizure affects only the person's possessory interests; a search affects a person's privacy interests." *Id.*

Assuming—as the government does for standing purposes—that Mr. Zuberi had a possessory interest in the Altima, that interest was unaffected by the short pre-warrant seizure. By the time the Altima was towed, Mr. Zuberi had been arrested in Reno. *See id.* at 813 ("The actual interference with [defendant's] possessory interests in the apartment and its contents was, thus, virtually nonexistent" given his arrest). Ms. Westfall may have wanted to make her way back to the car, but she has no standing here. *Rakas v. Illinois*, 439 U.S. 128, 132 n.2 (1978).

The critical issue is not the order of operation that the police choose to follow—seize then search, or search right away—but whether there was probable cause that evidence was in the car at the time the Altima was taken under police control. *Chambers v. Maroney*, 399 U.S. 42, 51–52 (1970) (for "constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant"); *see also Bagley*, 772 F.2d at 491 (exclusionary rule does not apply as long as no additional evidence used in the probable cause analysis came from the pre-warrant seizure) (citing *Segura*).

Incidentally, even though the government does not rely on abandonment, the circumstances support the police drawing a good-faith conclusion that the Altima was, in fact, discarded and needing to be towed. *Herring v. United States*, 555 U.S. 135, 145 (2009) (good faith test is "whether a reasonably well trained officer would have known that the search was illegal in light of all the circumstances."). Mr. Zuberi and Ms. Westfall took their two kids and left the state after police started swarming their house, which was teeming with evidence of Mr. Zuberi's violent crimes. That was enough to reasonably believe that they were not planning on coming back. Indeed, during the standoff in Reno, Mr. Zuberi stated to the crisis negotiator, "I'm fucked."

Given Mr. Zuberi's incentive to flee and hide and Ms. Westfall's active help supporting him, it was reasonable for the officers to believe that the car was intentionally discarded in the gas station parking lot, allowing the Court to uphold the seizure under *Herring*'s good-faith doctrine, if needed.

### D. INEVITABLE DISCOVERY

Finally, even if the Altima search was faulty and the storage facility receipt is suppressed, the evidence found in Mr. Zuberi's Prowler trailer should not be. The police would have found that evidence through entirely independent investigation paths. *See Nix v. Williams,* 467 U.S. 431 (1984) (explaining inevitable discovery exception to exclusionary rule).

The government must show by a preponderance of the evidence that police "would have" discovered the items at issue by lawful means. *Nix*, 467 U.S. at 444. The "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Id.* at 444 n.5.

On July 23, 2023, Mr. Zuberi called Ms. Westfall from the Washoe County Jail in Reno, Nevada. During the recorded call, Ms. Westfall said she needed the code to get "that thing" which she did not want to identify on the phone. Mr. Zuberi acknowledged he knew what she was talking about and provided the code of *xxx3#. (This was Mr. Zuberi's code to the storage facility.) Ms. Westfall sought to confirm that "it" was in his name; Mr. Zuberi became upset and told her repeatedly to "be quiet."

On September 12, 2023, just two months after Mr. Zuberi's arrest, the FBI received records from Mr. Zuberi's Key Bank account that included payment records to AAA Discount Storage. The evidence of a storage space, and Mr. Zuberi's insistence it neither be named nor discussed over the phone, would undoubtedly have resulted in its search.

### E. CONCLUSION

The Court should deny defendant's motion to suppress.

Dated: May 20, 2024

                Respectfully submitted,

                NATALIE K. WIGHT
                United States Attorney

                /s/ *Suzanne Miles*
                SUZANNE MILES
                Assistant United States Attorney