IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION


| | |
|---|---|
| UNITED STATES OF AMERICA,    ) | |
| )  | |
| Plaintiff,    ) | |
| )  | |
| v.    )   No. 1:23-cr-00254-MC-1 | |
| )  | |
| NEGASI ZUBERI,    ) | |
| )  | |
| Defendant.    ) | |


Jury Trial - Day 1

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL J. McSHANE

CHIEF UNITED STATES DISTRICT COURT JUDGE

October 8, 2024

1                       APPEARANCES

2

3     FOR THE PLAINTIFF:

4              JEFFREY S. SWEET
                 United States Attorney's Office
5              405 E. Eighth Avenue
                 Suite 2400
6              Eugene, Oregon 97401

7     FOR THE PLAINTIFF:

8              MARCO BOCCATO
                 United States Attorney's Office
9              310 W. Sixth Street
                 Medford, Oregon 97501

10

11    FOR THE PLAINTIFF:

12             NATHAN LICHVARCIK
                 United States Attorney's Office
13             405 E. Eighth Avenue
                 Suite 2400
14             Eugene, Oregon 97401

15    FOR THE PLAINTIFF:

16             SUZANNE A. MILES
                 United States Attorney's Office
17             1000 S.W. Third Avenue
                 Portland, Oregon 97204

18

19    FOR THE DEFENDANT:

20             AMY ELIZABETH POTTER
                 Angeli Law Group LLC
21             121 S.W. Morrison Street
                 Suite 400
22             Portland, Oregon 97204

23

24

25

```
 1   FOR THE DEFENDANT:

 2             MICHAEL BERTHOLF
           Law Offices of Michael P. Bertholf, LLC
 3         108 Mistletoe Street
           Medford, Oregon 97501
 4

 5   COURT REPORTER:   Lindsey A. Weresch, RMR, CRR, CSR
                       United States District Courthouse
 6                     1000 S.W. Third Avenue, Room 301
                       Portland, Oregon 97204
 7                     (503)326-8047

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Tuesday, October 8, 2024, 8:56 a.m.)

2                    P R O C E E D I N G S

3          (Whereupon, the following proceedings were held in

4     open court:)

5          THE COURT:  All right.  Is there anything we need to

6     discuss before we start bringing jurors in?

7          MR. SWEET:  Nothing from the Government, Your Honor.

8          MR. BERTHOLF:  One thing from the defense.  There is

9     a real potential that we will -- if there's a guilty finding at

10    the end of the trial, we may well have a forfeiture trial.

11         THE COURT:  Okay.  We can resolve that.

12         MR. BERTHOLF:  Just letting the Court know at this

13    point.  And we're in discussions with Mr. Zuberi, and that may

14    change.

15         THE COURT:  Okay.  All right.  Let's -- and the issue

16    around the shackles, have we resolved that?

17         MR. BERTHOLF:  It's all good.  We stood up, shook

18    them around, no sound.

19         THE COURT:  Okay.  Thank you.

20         Ms. Pew, want to bring up our first 20 jurors?

21         THE COURTROOM DEPUTY CLERK:  Yeah.

22         (Whispered discussion, off the record, 8:57 a.m.)

23         THE COURT:  And, as far as witnesses, I just want to

24    clarify:  Will I just have each side read out a list of

25    witnesses?

1          MR. SWEET:  The Government's prepared to read its,

2   Your Honor, yes.

3          THE COURT:  Okay.  Does the defense have a list of

4   witnesses or --

5          MS. POTTER:  No, Your Honor.

6          THE COURT:  Okay.  I'm just going to say -- not going

7   to call them defense or Government witnesses.  I'll just say,

8   "Mr. Sweet will read the witnesses who will be appearing."

9          MR. SWEET:  Okay.  Thank you.

10         THE COURT:  "Potential witnesses."

11         And I'll have you introduce yourselves as well.

12         (Pause in proceedings, 8:57 a.m. - 9:02 a.m.)

13         (Prospective jurors seated, 9:02 a.m. - 9:06 a.m.)

14         THE COURT:  All right.  Folks, welcome to the

15  courthouse.  I'm Judge McShane.  We have a lot to get through

16  this morning.  First of all, I want to thank all of you for

17  coming in last week and filling out the jury questionnaires.

18  Those were very helpful to all of us, and it really cuts down

19  the amount of time we have to spend this morning asking you

20  questions.

21         Again, I'm Judge McShane.  My staff -- you've met

22  Char.  Char is in charge of the jury.  If you're on this jury,

23  you will get to know Char very well.  Mr. Svelund is a lawyer

24  working for me as a federal clerk.  And we have Lindsey as the

25  court reporter, who's taking down every word we say.  So she's

1    one of the more important people in the courtroom, and she

2    needs to be able to hear you.  So if you're answering

3    questions, as best you can, if you can speak up.

4         We are selecting a trial jury of 16 people today for

5    a criminal case entitled the United States versus Negasi

6    Zuberi.  Mr. Zuberi is charged with -- with counts of

7    kidnapping -- two counts of kidnapping; traveling from Seattle,

8    Washington, to Klamath Falls, Oregon, with the intent to commit

9    unlawful sexual activity; and unlawful possession of firearms

10   and ammunition.

11        Under our system of justice, a person is innocent of

12   any crime or wrongdoing unless and until the Government proves

13   their guilt beyond a reasonable doubt.  Each juror must be able

14   to judge this case fairly and objectively.  So if anyone has

15   any knowledge or has formed any opinion about this case, that

16   should be brought to my attention.

17        I do want to introduce the parties to the case.  And

18   I'm going to have Mr. Sweet, with the Government, read the list

19   of potential witnesses who may be testifying under oath during

20   this case.  So if you could listen carefully because I'm going

21   to ask you if you know anybody involved in the case.

22        But, first, if the Government could introduce

23   themselves.

24        MR. SWEET:  Thank you, Your Honor.  Good morning.

25   I'm Assistant United States Attorney Jeff Sweet.  This is

Assistant United States Attorney Nathan Lichvarcik and

Assistant United States Attorney Marco Boccato.  We're

representing the United States.

THE COURT:  All right.  And for the defense then.

MR. BERTHOLF:  Michael Bertholf on behalf of Negasi

Zuberi, Amy Potter on behalf -- and Cheryl Oakley.  Good

morning.  Thank you.

THE COURT:  All right.  Mr. Sweet, my understanding,

you'll read the list of witnesses.

MR. SWEET:  Yes, Your Honor.  Thank you.  The

following people may be called as witnesses:  Lara Adams; AV-1;

AV-2; Kori Barnum; Tim Broadway; Bryan Chiles; Rachel Clay;

Brianna Crawford; Diego Delgado; Brandon Dougherty; Shasta

DuVal; Ashley Ensminger; Trahern Fox; Carlos Garcia; Mellissa

Geary; Austin Gilmore; Christopher Giovanetty; Travis

Gluesenkamp; Nicholas Griebel; John Hobby; Emily Keeton; Sean

Kennedy; Greg Lara; Justin Lazenby; Daniel Logan; Joel

Loudermilk; Jason Malone; Kathy Maxwell; Jennifer McAfee;

Melanie McClure; Erik Mendoza; Niya Donaldson; Christopher

Parkerson; Shelby Quick; Christina Ruelas, who works at Sky

Lakes Medical Center; Geovanni Ruelas; Nayeli Ruelas, who works

at Klamath Falls Behavioral Health; Prentice Smith; Jesse

Snyder; Dylan Staples; Robert Phillips; Stephanie Stewart;

Bradley Sticklin; Loren Summers; Amie Walton, who works

sometimes at Providence Hospital as a SANE examiner; Brenden

Westfall; Carol Westfall; Kevin Westfall; Dr. Jay Williams;

Kylie Winkle-O'Brien; Christi Winters; Tyler Young; and Chris

Zupan.

THE COURT: All right. Thank you, Mr. Sweet.

Does anyone know or recognize any of the names that

have been read out as witnesses, or do you know any parties?

Yes. And you are Ms. Smith; is that correct?

A PROSPECTIVE JUROR: Yes.

THE COURT: Ms. Smith, who do you know?

A PROSPECTIVE JUROR: Carol Westfall.

THE COURT: And is that somebody you're close with?

A PROSPECTIVE JUROR: I've worked with her. I'm in

Klamath Falls, so --

THE COURT: Okay. Anything about that relationship

with her that would make you feel like you could not be fair in

this case?

A PROSPECTIVE JUROR: We're more acquaintances than

anything, so --

THE COURT: Okay. Do you know anything about this

case?

A PROSPECTIVE JUROR: I have read some stuff in the

news. I'm from Klamath Falls, so --

THE COURT: Okay. And we may ask you some additional

questions about that, but without you maybe talking in front of

the other jurors about what you might have heard from the news.

So we'll keep that in mind.

Anybody else know any of the witnesses or parties to the case?

Yes. And you are Ms. --

A PROSPECTIVE JUROR: Groom.

THE COURT: Okay. Ms. Groom, yes.

A PROSPECTIVE JUROR: Amie Walton sound familiar.

THE COURT: Mr. Sweet, can you add some clarity to who that person might be?

MR. SWEET: Yes. She's a SANE examiner. So she performs SANE exams at various hospitals for -- regarding sexual assault.

A PROSPECTIVE JUROR: Is she a registered nurse?

MR. SWEET: She is.

A PROSPECTIVE JUROR: That works at Providence?

MR. SWEET: I know she does work sometimes at Providence, yes.

A PROSPECTIVE JUROR: I think I do know her, but more of an acquaintance. Our sons may go to school together.

THE COURT: Okay. Thank you.

Anyone else?

All right. Does anyone have -- we have one juror who has some familiarity with the case. That is Ms. Smith. Anyone else who might have read about or heard about a case involving Mr. Zuberi?

Okay.  Let's start -- why don't I just start down here.  Can I see your --

A PROSPECTIVE JUROR:  Just in the local news, like the 5 o'clock news.

THE COURT:  Anything in great detail?

A PROSPECTIVE JUROR:  I don't think so.

THE COURT:  Okay.  Anything enough that you formed an opinion about the case?

A PROSPECTIVE JUROR:  I don't think so.

THE COURT:  Okay.  All right.  And then juror -- if you could maybe just tell us your juror number while we're going down the row.

A PROSPECTIVE JUROR:  20.

THE COURT:  Okay.  Juror 20, what -- local news?  Or is this something you've looked up or know about personally?

A PROSPECTIVE JUROR:  Just local news.

THE COURT:  Okay.  And have you heard enough in local news to have formed an opinion about the case?

A PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Thank you.

A PROSPECTIVE JUROR:  21.

THE COURT:  All right.

A PROSPECTIVE JUROR:  Local news as well.

THE COURT:  All right.  And is it something you've -- did you look up additional information about the case or

1    just --

2              A PROSPECTIVE JUROR:  No, Your Honor.

3              THE COURT:  Do you have any detailed recollection of

4    the case from local news?

5              A PROSPECTIVE JUROR:  Some.

6              THE COURT:  All right.  Have you formed an opinion

7    about the case?

8              A PROSPECTIVE JUROR:  No, sir.

9              THE COURT:  All right.  Thank you.

10             Yes.

11             A PROSPECTIVE JUROR:  4.

12             THE COURT:  All right.  Juror No. 4.

13             A PROSPECTIVE JUROR:  Like the rest, local news.

14             THE COURT:  And did you, yourself, look up any

15   additional information about the case?

16             A PROSPECTIVE JUROR:  No, I did not.

17             THE COURT:  All right.  And have you formed an

18   opinion about the case based on what you saw in local news?

19             A PROSPECTIVE JUROR:  No, I have not.

20             THE COURT:  Okay.  Thank you.

21             Yes, Juror No. --

22             A PROSPECTIVE JUROR:  Juror No. 8.

23             THE COURT:  8.  Thank you.  Again, local news?

24             A PROSPECTIVE JUROR:  Local news.  I like true crime

25   stuff, so I -- when it first happened, I was really following

```
 1   it.
 2                THE COURT:  Okay.  Let me ask you this.  Have you
 3   followed it enough where -- first, can you set aside what
 4   you've seen maybe in the news and make a decision solely on
 5   what you hear in the courtroom?
 6                A PROSPECTIVE JUROR:  I'm not --
 7                THE COURT:  Sometimes they're not the same facts.
 8                A PROSPECTIVE JUROR:  Yeah.
 9                THE COURT:  The news can get it wrong.
10                A PROSPECTIVE JUROR:  Yeah.  I mean, the news could
11   definitely get it wrong.
12                THE COURT:  Okay.  Are you -- do you think you've
13   formed an opinion such that you would not be a fair juror
14   today?
15                A PROSPECTIVE JUROR:  Yes.
16                THE COURT:  Okay.  And you are juror number?
17                A PROSPECTIVE JUROR:  8.
18                THE COURT:  8.  All right.  Okay.  So, Ms. Parnell, I
19   will excuse you.
20                And Ms. Wurzell is now Juror No. 8, just so we know
21   that in our sheet.
22                So Ms. Parnell, correct?
23                A PROSPECTIVE JUROR:  Yes.
24                THE COURT:  You're free to go.  Thank you.
25                A PROSPECTIVE JUROR:  Do you want us to move?
```

```
 1              THE COURT:  You know, it helps us know where you are

 2    if -- Ms. Wurzell, right?

 3              A PROSPECTIVE JUROR:  Mm-hmm.

 4              THE COURT:  -- if we have you move to Seat 8.  Thank

 5    you.

 6              Anybody else with any familiarity generally with the

 7    case through media or news?

 8              Okay.  Juror No. 16.

 9              A PROSPECTIVE JUROR:  Just what I've seen on Facebook

10    and --

11              THE COURT:  Okay.

12              A PROSPECTIVE JUROR:  I'm from Klamath Falls, and we

13    hear about it there.

14              THE COURT:  Okay.  So you've heard about it.  Have

15    you formed an opinion about the case?

16              A PROSPECTIVE JUROR:  No.

17              THE COURT:  All right.  Thank you.

18              One thing I will be telling the jury somewhat

19    regularly, if you are on this jury, you cannot look up

20    information about this case.  When we take our next break, it's

21    very important that none of you do what we often do in this

22    world.  We get on our phones, and we wonder what the heck is

23    this about.  You cannot do that.

24              It's a -- it is an order from the Court that you not

25    look up any information about this case, that you not talk to
```

anybody about the case or have conversations, even among
yourselves yet, about the case.  It's a very important part of
this.

The attorneys and Mr. Zuberi have a right to have a
jury that makes a decision based on what is presented in the
courtroom, and what's not presented on the Internet and in the
media and from your friends and family and your social network.
That's not where we make decisions about these cases.

So with -- here's another -- just one thing I want to
clarify with the jury.  A lot of people, I know, ask, "Why am I
traveling so far for a trial in Medford, Oregon?"  I know some
of you are traveling a couple hundred miles.  The District of
Oregon is one federal judicial district.

California has four federal districts.  Washington
has two federal districts.  We're one.  We have six judges:
Four in Portland, two in Eugene.  And we have a courthouse down
here in Medford, but not a judge.  It's basically all of
Southern Oregon is the Medford region.

I'm up in Eugene.  We pull jurors from
Deschutes County, from Coos Bay, from all over the middle part
of the state.  But the Medford region that this courthouse
serves is almost all of Southern Oregon.  So I know a lot of
you have had to travel.

I know a three-week trial is a huge sacrifice to ask
of all of you.  So we really do appreciate you being here,

1  appreciate your attention.  I am going to now turn it over to

2  the attorneys, starting with plaintiff's counsel, and they'll

3  have some questions for you.

4          Have they been sworn in, Char?

5          THE COURTROOM DEPUTY CLERK:  No.

6          THE COURT:  If all of you would please stand and

7  raise your right hand.

8          (Prospective jury sworn, 9:18 a.m.)

9          THE COURT:  Okay.  Thank you.  Have a seat, please.

10          All right.  Mr. Bertholf.

11          MR. BERTHOLF:  Court, Counsel.

12          Good morning.  We did read through all of your

13  questionnaires, and I have some follow-up questions for almost

14  all of you.

15          Juror No. 3.

16          A PROSPECTIVE JUROR:  Yes.

17          MR. BERTHOLF:  You indicated that you have a trip to

18  Pen later this month.

19          A PROSPECTIVE JUROR:  Oh, Pennsylvania.

20          MR. BERTHOLF:  Okay.  When is that?

21          Oh, I'm sorry.  We need you --

22          A PROSPECTIVE JUROR:  I'm sorry.  I'm trying to

23  remember the exact date.  It's the last Tuesday of October

24  going through Halloween and the first -- so the day before

25  Election Day is when I come back, whatever date that is.

1    MR. BERTHOLF:  Okay.  So like the 28th, I think, is

2    the day --

3         A PROSPECTIVE JUROR:  Something like that, yeah.  I

4    can't remember off the top of my head.

5         MR. BERTHOLF:  We're likely to be done with trial by

6    then.  Well, we're all hoping for it.  So I don't think that's

7    going to be a problem.  So thank you.

8         And then, Juror No. 11, I think you indicated that

9    you have a trip on October 10th.

10        A PROSPECTIVE JUROR:  Yeah.  It's a weekend trip.

11        MR. BERTHOLF:  It's a weekend trip?

12        A PROSPECTIVE JUROR:  Yeah.

13        MR. BERTHOLF:  So the 10th is --

14        A PROSPECTIVE JUROR:  A Thursday.

15        MR. BERTHOLF:  Thursday.  Would you -- is this a

16   preplanned trip?  'Cause we're definitely going to be in trial

17   this Thursday.

18        A PROSPECTIVE JUROR:  It's an annual trip just to

19   Sisters, Oregon.

20        MR. BERTHOLF:  Okay.

21        A PROSPECTIVE JUROR:  A college roommate reunion,

22   so --

23        MR. BERTHOLF:  Is this something you could wait until

24   like Friday afternoon to go over?

25        A PROSPECTIVE JUROR:  Potentially, yeah.

1          MR. BERTHOLF:  Okay.  Would -- if you were on the

2     jury, would that cause you to want to not really pay attention

3     on Thursday and Friday of this week?

4          A PROSPECTIVE JUROR:  No.  It'd be fine.

5          MR. BERTHOLF:  Okay.  All right.  Thank you.

6          And then, No. 17, way over here, you indicated that

7     you -- you might have some caretaker issues.

8          A PROSPECTIVE JUROR:  Yeah.  I take care of my

9     grandmother, my parents.  They all have health issues, and I

10    have two children.

11         MR. BERTHOLF:  Okay.  And you live in the Sixes.

12         A PROSPECTIVE JUROR:  Yeah.

13         MR. BERTHOLF:  So that's a pretty ways away.  Is

14    there anybody else that can take care of your grandmother?

15         A PROSPECTIVE JUROR:  No.  I'm pretty much the only

16    one healthy enough to do any of it, so --

17         MR. BERTHOLF:  Okay.  And how many people altogether?

18         A PROSPECTIVE JUROR:  My parents live right next

19    door.  I take them to appointments and everything.

20         MR. BERTHOLF:  And how old are your parents?

21         A PROSPECTIVE JUROR:  My father is in his fifties.

22    My stepmother's close to her sixties.  My grandmother's 80.

23         MR. BERTHOLF:  Sounds like maybe your parents are a

24    little disabled?

25         A PROSPECTIVE JUROR:  Possible heart surgery for my

1  father on my birthday this month, so --

2        MR. BERTHOLF:  All right.  I would ask that this

3  juror be excused for hardship.

4        THE COURT:  We're going to put a note next to --

5  Juror No. 17, correct?

6        A PROSPECTIVE JUROR:  Yes.

7        MR. BERTHOLF:  Okay.

8        THE COURT:  And we'll consider -- a lot of it

9  depends, Mr. Bailey, on how many jurors we have left at the end

10  of the day.  But we are going to keep that in mind.  Okay?

11        MR. BERTHOLF:  Juror No. 18, you indicated that

12  you're a hunter?

13        A PROSPECTIVE JUROR:  Yes.

14        MR. BERTHOLF:  Is this trial going to affect hunting

15  season for you?

16        A PROSPECTIVE JUROR:  I don't think so.

17        MR. BERTHOLF:  Okay.  Just wanted to double-check.

18  It is -- deer season just started, so --

19        A PROSPECTIVE JUROR:  Can I go?

20        MR. BERTHOLF:  Well, we'll see.

21        No. 21, down here, you indicated that you have a

22  wedding that's on the 18th?

23        A PROSPECTIVE JUROR:  Yes, sir.

24        MR. BERTHOLF:  Is that on Friday the 18th?

25        A PROSPECTIVE JUROR:  Yeah.  I'll be flying out early

that morning.

MR. BERTHOLF:  Okay.  Is -- who's getting married?

A PROSPECTIVE JUROR:  A friend, a family friend.

MR. BERTHOLF:  Okay.  And are these tickets that you've purchased in --

A PROSPECTIVE JUROR:  Yes.

MR. BERTHOLF:  Are they refundable in any way?

A PROSPECTIVE JUROR:  Not that I know of.

MR. BERTHOLF:  Okay.  And where's the wedding at?

A PROSPECTIVE JUROR:  Idaho, Boise.

MR. BERTHOLF:  Okay.  And you fly out the morning of the 18th?

A PROSPECTIVE JUROR:  Yes, sir.

MR. BERTHOLF:  All right.  I assume that this is going to be another one that we put a hash mark next to or --

THE COURT:  Well, let me ask you, Mr. Franell, we're in trial on the 18th.  It sounds like you have a flight that morning, so you have a choice to make.  Do you want to be on the flight, or do you want to be -- stay today and possibly be on the jury?

A PROSPECTIVE JUROR:  I'd prefer going to the wedding, but I'm here if you need.

THE COURT:  Okay.  We will keep you in mind; and if we can excuse you, we will.

MR. BERTHOLF:  Thank you.

1    And then, No. 22, you indicated that you've got this

2    big cross-country move, but it's in November.

3    A PROSPECTIVE JUROR:  Correct.  Yeah.

4    MR. BERTHOLF:  So are you going to be able to get

5    your stuff taken care of over the next month?

6    A PROSPECTIVE JUROR:  I -- and I'm in Klamath Falls,

7    too.  So I don't know.  I think -- I have a lot of stuff to

8    sell and then planning a cross-country road trip, so we'll be

9    leaving in November, November 15th.

10    MR. BERTHOLF:  Is it a road trip or a move?

11    A PROSPECTIVE JUROR:  Both.

12    MR. BERTHOLF:  Both.  All right.

13    A PROSPECTIVE JUROR:  Yes.

14    MR. BERTHOLF:  Are you going to be able to focus on

15    the case if you remain -- if you would be picked for the jury?

16    A PROSPECTIVE JUROR:  I probably would not.

17    MR. BERTHOLF:  Okay.

18    A PROSPECTIVE JUROR:  Yeah.

19    THE COURT:  Okay.  We'll keep that in mind as well.

20    MR. BERTHOLF:  Yep.

21    Let's -- back to Juror No. 1.  And I'm trying to go

22    in order, but on different things.

23    A PROSPECTIVE JUROR:  Yes.

24    MR. BERTHOLF:  So your question number 32 -- and some

25    of these -- this is where I'm going to start clarifying some

things.  You -- question number 32 was "Would you view

differently the testimony of a witness who engages in

commercial sex work?"

           And you said you don't approve of that work.  If you

hear testimony from somebody that is a commercial sex worker,

are you going to give them a fair shake and -- and gauge

their -- their testimony based upon what you hear compared to

other people?  Or are you going to -- are you just going to

discount anything that person has to say?

           A PROSPECTIVE JUROR:  I don't think I could be fair,

to be honest.

           MR. BERTHOLF:  Okay.

           A PROSPECTIVE JUROR:  I don't -- I -- that is beyond

my -- my realm.

           MR. BERTHOLF:  Okay.  Would you not believe anything

that a person like that would say?

           A PROSPECTIVE JUROR:  No.

           MR. BERTHOLF:  Okay.  This person probably is a bit

of a for-cause.

           THE COURT:  All right.  Ms. Hellervik -- am I

pronouncing that right?

           A PROSPECTIVE JUROR:  Yes, you are.

           THE COURT:  Can you accept the idea that -- the

possibility that a commercial sex worker or a prostitute could

be a victim of a crime?

1          A PROSPECTIVE JUROR:  Yeah.

2          THE COURT:  All right.  And if they were to testify

3   in court, would you listen to them or would you simply discount

4   anything they would have to say?

5          A PROSPECTIVE JUROR:  I would probably listen.

6          THE COURT:  All right.  Would you write them off as

7   not credible?

8          A PROSPECTIVE JUROR:  No.

9          THE COURT:  Okay.  All right.  Thank you.

10         MR. BERTHOLF:  Thank you.

11         No. 2, you indicated that you might have some low

12  back issues.

13         A PROSPECTIVE JUROR:  I do.  I have low back issues.

14         MR. BERTHOLF:  Okay.  Are you going to be able to sit

15  for long periods of time?

16         A PROSPECTIVE JUROR:  No.

17         MR. BERTHOLF:  I'm assuming that the judge, if your

18  back gets bad, would allow you to stand up.

19         THE COURT:  Yes, Mr. Lake.

20         A PROSPECTIVE JUROR:  Well, that's no relief.

21         THE COURT:  Okay.  So let's talk about it.  I mean,

22  believe me, I know about low back issues.  There have been

23  trials where I've had to stand up here the entire time.  Are

24  you able to be on a jury -- we're going to be sitting for, you

25  know, three weeks.

1          A PROSPECTIVE JUROR:  No, sir.

2          THE COURT:  All right.  Medically you just don't

3    think you can do it?

4          A PROSPECTIVE JUROR:  No.

5          THE COURT:  All right.  Thank you, Mr. Lake.  I will

6    excuse you.

7          MR. BERTHOLF:  Thank you.

8          THE COURT:  All right.  Just to clarify then, Mr. --

9    Juror No. 16, Mr. Underwood, is now in Seat 2.  Or

10   Ms. Underwood.  I'm sorry.

11         Thank you.  I know it's not always easy to bounce you

12   around, but we keep track of you.  We have you in our charts a

13   certain way.

14         MR. BERTHOLF:  All right.  So back to Juror No. 3.

15         So you -- from your questionnaire it almost sounds

16   like you're not a real fan of prosecutors or defense attorneys?

17         A PROSPECTIVE JUROR:  Correct.

18         MR. BERTHOLF:  It sounded like you were on a -- you

19   were the foreperson of a jury in the past?

20         A PROSPECTIVE JUROR:  Correct.

21         MR. BERTHOLF:  And you didn't like how the

22   prosecutors ran their case?

23         A PROSPECTIVE JUROR:  Correct.

24         MR. BERTHOLF:  And you also indicated that you think

25   a lot of defense attorneys lie?

1    A PROSPECTIVE JUROR:  Correct.

2    MR. BERTHOLF:  With those past experiences, are you

3 going to be able to sit and listen to the facts of this case

4 fairly and give both Mr. Zuberi and the United States

5 Government a fair shake?

6    A PROSPECTIVE JUROR:  I would do my best.

7    MR. BERTHOLF:  Okay.  What about your experience --

8 well, let's talk a little bit about your jury experience.  It

9 sounds like it was not a positive experience for you.

10    A PROSPECTIVE JUROR:  No, it was not.

11    MR. BERTHOLF:  And this is going to be -- I'm

12 assuming that was a short trial?

13    A PROSPECTIVE JUROR:  Yeah.  It was a few days, like

14 less than a week.

15    MR. BERTHOLF:  Okay.  This is going to be about a

16 three-week trial.  And we like jurors going away with positive

17 experiences.  Are you going to be able to listen to everybody

18 and, again, be fair to both sides?

19    A PROSPECTIVE JUROR:  I always try to be fair.

20    MR. BERTHOLF:  Okay.  All right.  Fair enough.  Thank

21 you.

22    That gets me to Juror No. 6.

23    And you had some interesting answers to questions 43

24 and 44.

25    A PROSPECTIVE JUROR:  Interesting's a good word.

         MR. BERTHOLF:  Sometimes my tablet's a little slow.
There we go.

         So on 43 the question was "Do you believe that law
enforcement officers are more likely to tell the truth than
other witnesses?"  And you said yes, but you did go -- you
"hope that officers are more likely to tell the truth; sadly,
lack of integrity is more and more prevalent."  Can you expand
on that a little bit?

         A PROSPECTIVE JUROR:  I think we're all capable of
making decisions that we would be surprised about, given the
circumstances.

         MR. BERTHOLF:  Okay.

         A PROSPECTIVE JUROR:  That would include anybody in
any field of work.

         MR. BERTHOLF:  Okay.  What are the factors that you
use in evaluating witness testimony?  Or what are the factors
that you take into account when you, on a regular day-to-day
basis, judge somebody's credibility?

         A PROSPECTIVE JUROR:  I don't really know the answer
to that.

         MR. BERTHOLF:  Okay.  These are questions that, you
know, I --

         A PROSPECTIVE JUROR:  I mean, if you know them well,
maybe based on experience of decisions they've made.  But if
you don't know them, it --

1    MR. BERTHOLF:  And that's the hard part.  I believe

2    you did not raise your hand on whether or not you knew any of

3    the names.

4    A PROSPECTIVE JUROR:  I don't think I do, no.

5    MR. BERTHOLF:  Okay.  So all of the people that are

6    going to be testifying in this trial, if you're on the jury,

7    you'd have no clue who they are; you've never experienced them

8    before.  Can you -- what factors would you look at to determine

9    credibility?

10   A PROSPECTIVE JUROR:  Well, evidence that you're

11   giving.

12   MR. BERTHOLF:  Okay.  And what do you mean by that?

13   A PROSPECTIVE JUROR:  Well, whatever -- I would have

14   to listen to your evidence.

15   MR. BERTHOLF:  Okay.

16   A PROSPECTIVE JUROR:  And think about it.  So I don't

17   know what more to say.

18   MR. BERTHOLF:  And there -- I usually preface this,

19   and I kind of forgot, that there are no wrong answers to --

20   A PROSPECTIVE JUROR:  I understand that.

21   MR. BERTHOLF:  -- any of these questions.

22   A PROSPECTIVE JUROR:  I'm trying to understand, yeah.

23   MR. BERTHOLF:  Some of the questions I come up with

24   are crazy and not really things that people think about on a

25   regular basis, but there's no wrong answers.  We're not going

to agree on everything in life. And the whole process of this
is for us to kind of get to know about how you think about
things for a little bit.

So the other -- question 44 was "Do you believe that
law enforcement are less likely to tell the truth?" And you
said, "Hoping their goal is to support civility, starting with
themselves." Do you remember --

A PROSPECTIVE JUROR: Question?

MR. BERTHOLF: Yeah. My question is: Can you expand
on that? What was -- what are your thoughts along those lines?

A PROSPECTIVE JUROR: I don't know. I mean, I
don't -- I don't -- I mean, I hope their goal is -- I hope
their goals are good --

MR. BERTHOLF: Okay.

A PROSPECTIVE JUROR: -- to civilly --

MR. BERTHOLF: Is there a past experience where you
interacted with law enforcement that they weren't civil with
you?

A PROSPECTIVE JUROR: No, absolutely not.

MR. BERTHOLF: Okay.

A PROSPECTIVE JUROR: I think I was going back to the
thought that we're all capable of doing something -- something
that is surprisingly wrong.

MR. BERTHOLF: That makes sense.

A PROSPECTIVE JUROR: I think that's the question

that I had arrows back and forth and scribbled out a lot, so I
was having a hard time answering the question.

MR. BERTHOLF:  And that's why we really appreciate
the thoughts that everybody went into to answer the questions.

A PROSPECTIVE JUROR:  Right.  Yeah, I respect that.

MR. BERTHOLF:  Okay.  So let's talk to Juror No. --
Juror No. 12, I want to ask you the similar question that I was
just asking.  I don't believe you raised your hand on anybody
that you knew in the case.

A PROSPECTIVE JUROR:  No.

MR. BERTHOLF:  So, again, you're going to be
hearing -- if you're on the jury, you're going to be hearing
testimony from people that you don't know from Adam.  How do
you judge credibility of people in your day-to-day life?

A PROSPECTIVE JUROR:  Either what they say, their
language, their -- just their demeanor, what I pick up from
them.

MR. BERTHOLF:  What about, like, the juror just
before you was saying, something about the presentation of
evidence?  How would that play in for you -- into that?

A PROSPECTIVE JUROR:  Yes.  I take that into
consideration.

MR. BERTHOLF:  Okay.  What are the things you
consider to be evidence?  What is evidence?

A PROSPECTIVE JUROR:  Forensics.

1    MR. BERTHOLF:  Okay.  What do you mean by

2    "forensics"?

3    A PROSPECTIVE JUROR:  Things that could -- like

4    things that -- forensic evidence, such as -- I don't know how

5    to explain.  Stuff you see on CSI, things like that.

6    MR. BERTHOLF:  Okay.  CSI stuff.

7    A PROSPECTIVE JUROR:  Other evidence can be

8    testimonies.

9    MR. BERTHOLF:  Okay.

10   A PROSPECTIVE JUROR:  Testimonies, yeah.

11   MR. BERTHOLF:  Let's talk a little bit about CSI.

12   Who is really interested in CSI?  Just a show of hands:

13   Anybody watch that show?

14   You do.

15   You do.

16   You do.

17   Let's talk to you.  You're juror number?

18   A PROSPECTIVE JUROR:  17.

19   MR. BERTHOLF:  17.  What about CSI do you like?

20   A PROSPECTIVE JUROR:  The story lines basically, not

21   based off of any actual factual evidence or anything.  I'm sure

22   that they use things to mimic the process, but it's not a

23   100 percent factual basis.

24   MR. BERTHOLF:  Okay.  So you wouldn't expect a

25   similar style of stuff?

```
 1              A PROSPECTIVE JUROR:  No, not at all.

 2              MR. BERTHOLF:  Okay.  And I think down here,

 3    Juror No. --

 4              A PROSPECTIVE JUROR:  I'm No. 8 now.  It's

 5    television.  It's all dramatized.  It's a lot made up.  So I

 6    don't put much stake or much fact in it.

 7              MR. BERTHOLF:  It's all entertainment?

 8              A PROSPECTIVE JUROR:  Yeah.

 9              MR. BERTHOLF:  All right.  And I think 19.

10              A PROSPECTIVE JUROR:  Just strictly entertainment.

11              MR. BERTHOLF:  Okay.  And would you expect -- so you

12    wouldn't expect anything along those sort of lines?

13              A PROSPECTIVE JUROR:  No.

14              MR. BERTHOLF:  Let's talk to you, too.  I don't think

15    you raised your hand on whether or not you knew anybody.

16              A PROSPECTIVE JUROR:  They don't sound familiar.

17              MR. BERTHOLF:  So what are the things that you look

18    for to determine credibility of people?

19              A PROSPECTIVE JUROR:  I don't know what I would look

20    for.  Body language.

21              MR. BERTHOLF:  Okay.  What -- what do you mean with

22    "body language"?

23              A PROSPECTIVE JUROR:  I mean, I guess you just go by

24    what you feel or if you think they're lying or telling the

25    truth.  I mean --
```

1    MR. BERTHOLF:  Okay.  So it's kind of more of a gut

2   thing for you?

3            A PROSPECTIVE JUROR:  Yeah.

4            MR. BERTHOLF:  Okay.  That makes sense.

5            Juror No. 2, same question to you, what do you look

6   for in that?

7            A PROSPECTIVE JUROR:  I guess the way they present

8   themselves.  If you don't know someone, I guess you can't

9   really tell if they're telling the truth or not.  So I guess if

10  they convince you enough to believe them.  I don't know.

11           MR. BERTHOLF:  All right.  What are the factors --

12  like big decisions in your life, what are the factors that you

13  look at in making those decisions?

14           A PROSPECTIVE JUROR:  I guess gut feeling, if it

15  feels right.

16           MR. BERTHOLF:  Okay.

17           A PROSPECTIVE JUROR:  Yeah, or wrong.

18           MR. BERTHOLF:  Or wrong.

19           A PROSPECTIVE JUROR:  Yeah.

20           MR. BERTHOLF:  What are the things that make you --

21  what are the things that kind of tell you that something is

22  wrong?

23           A PROSPECTIVE JUROR:  I feel like I'm an overthinker,

24  so myself -- telling myself like, "Hmm, no, shouldn't do that."

25           MR. BERTHOLF:  Okay.  "Overthinker," what do you mean

1    by that?

2            A PROSPECTIVE JUROR:  I maybe think too much about

3    making decisions.

4            MR. BERTHOLF:  Okay.

5            A PROSPECTIVE JUROR:  Like the process of it is --

6    like, there's a process.

7            MR. BERTHOLF:  All right.  Is that a good thing or a

8    bad thing?

9            A PROSPECTIVE JUROR:  I don't know.  Sometimes, for

10   me, I feel like it's a bad thing 'cause I can't just make a

11   choice, but --

12           MR. BERTHOLF:  Okay.  What are some circumstances

13   where you just felt like you couldn't make a choice that was

14   important?

15           A PROSPECTIVE JUROR:  Hmm.

16           MR. BERTHOLF:  Or do you just -- is it times that

17   it's not really important that you have a hard time making --

18           A PROSPECTIVE JUROR:  I feel like it's when it's not

19   important.

20           MR. BERTHOLF:  Okay.  So when it's important, you can

21   come to a decision?

22           A PROSPECTIVE JUROR:  Yeah.

23           MR. BERTHOLF:  All right.  Say you were on the jury

24   then, and there's disagreements.  How would you work with that?

25           A PROSPECTIVE JUROR:  My gut feeling, I guess.

1  Whatever I felt was right.

2         MR. BERTHOLF:  Okay.  Would you be comfortable

3  explaining your views to everybody else on the panel?

4         A PROSPECTIVE JUROR:  Yes.  Yeah.

5         MR. BERTHOLF:  Okay.  All right.  Let's see.  Let's

6  go to No. 13, which is now Seat 4.

7         A PROSPECTIVE JUROR:  Well, I'm 4.  I'm not 13.

8         THE COURT:  Mr. McGoffin is now 4.  He originally was

9  13.

10        MR. BERTHOLF:  Okay.  My notes still have you as 13.

11        A PROSPECTIVE JUROR:  I can be 13.

12        MR. BERTHOLF:  Well, no, you are Seat 4.  Let me get

13 to you 'cause there was a couple of things that were

14 interesting.

15        Question number 29, which was "Do you think there

16 should be laws limiting the possession of firearms and

17 ammunition?"  And you said, "Yes, more restrictions on type and

18 amount of firearms."  Can you expand on that a little bit?

19        A PROSPECTIVE JUROR:  Well, in my opinion, I think

20 there are too many firearms in our country.  And different

21 types of firearms, I feel, aren't -- shouldn't be privy to the

22 public.

23        MR. BERTHOLF:  Okay.

24        A PROSPECTIVE JUROR:  Like military-style weapons.

25        MR. BERTHOLF:  Okay.  Like fully automatic or

1    semi-automatic?

2            A PROSPECTIVE JUROR:  Correct.

3            MR. BERTHOLF:  Or --

4            A PROSPECTIVE JUROR:  I would say military-style

5    weapons.

6            MR. BERTHOLF:  Okay.  All right.

7            A PROSPECTIVE JUROR:  Or anything that could make a

8    weapon a military-style weapon.

9            MR. BERTHOLF:  Okay.

10            A PROSPECTIVE JUROR:  I think there should be many --

11    much more restrictions on weapons in this country.  I'm not

12    against owning weapons, but I believe that they should be

13    restricted, maybe much like registered like automobiles, so we

14    know where the weapons are.

15            MR. BERTHOLF:  Okay.  All right.  And then you -- on

16    question number 43, "Do you believe that the law enforcement

17    officers are more likely to tell the truth?" you say that

18    "People misrepresent the truth sometimes."  Can you expand on

19    that a little?

20            A PROSPECTIVE JUROR:  I think we all see what we want

21    to see.  That's what I meant by that.  So, as a police officer,

22    they'll see and form an opinion for how they want to see and

23    form an opinion, if that makes sense.  They're people, like

24    everybody else.  So --

25            MR. BERTHOLF:  Okay.  Does that necessarily mean

that -- so two people witnessing a same incident -- for
example, you know, one person sees a person throw a ball.
Another person down the block has, like, a tree in the way; and
all they see is this arm move.  And he's like, "I didn't --
there was no ball."  Are either of them telling a lie?

          A PROSPECTIVE JUROR:  No, I don't think so.  No, not
in that situation.

          MR. BERTHOLF:  Okay.  So, kind of going back to that,
is somebody misrepresenting the truth in that situation?  Or
are they just giving you their observations that are slightly
different than other people?

          A PROSPECTIVE JUROR:  Yes.  I would say the latter.
They're just giving their observations, which might be
influenced by their position.

          MR. BERTHOLF:  Okay.  And how -- kind of similar
questions I've asked other people, how would you -- if there's
differences similar to that, how would you resolve those
differences listening to witnesses?

          A PROSPECTIVE JUROR:  Yeah, that'd be tough.  I'd
have to listen to the facts, I guess, and then make my mind up
from there.  It'd be difficult.

          MR. BERTHOLF:  Okay.  And I want to ask you the same
thing that I asked the lady just before.  Say there's a
difference of -- say you are on the jury and there's a
difference of opinion.  You disagree with how facts are

 1    characterized from another juror.  Are you going to be able to

 2    listen and interact and kind of talk to each other about those

 3    differences?

 4            A PROSPECTIVE JUROR:  Yes.  I think I'd be able to do

 5    that.

 6            MR. BERTHOLF:  Okay.  All right.  And how would you

 7    go about doing that?

 8            A PROSPECTIVE JUROR:  Respectively.

 9            MR. BERTHOLF:  Okay.  No. 14 -- or, well, actually,

10    5.

11            A PROSPECTIVE JUROR:  Yes.

12            MR. BERTHOLF:  Used to be 14, now No. 5.

13            Kind of the same thing, how do you judge people's

14    credibility?

15            A PROSPECTIVE JUROR:  I'm so sorry.

16            MR. BERTHOLF:  That's okay.

17            THE COURT:  It's usually my phone that's going off

18    after I tell everybody to turn off their phone.  So it's not a

19    big deal.

20            You do have about five, six minutes left,

21    Mr. Bertholf.

22            A PROSPECTIVE JUROR:  I'm sorry.  What was the

23    question?

24            A PROSPECTIVE JUROR:  Oh, my goodness.  Stop.

25            (Whispered discussion, off the record, 9:45 a.m.)

1       MR. BERTHOLF:  We live in the modern world.  It

2  happens.

3       A PROSPECTIVE JUROR:  Hi.  Okay.  What was your

4  question?  I'm sorry.

5       MR. BERTHOLF:  So in your day-to-day life, how do you

6  judge other people's credibility?

7       A PROSPECTIVE JUROR:  Oh, based on experience,

8  getting to know them, spending time with them.  And then

9  there's also facts, what you see, eyewitness account, that sort

10  of thing.

11       MR. BERTHOLF:  Okay.  Now, in this situation, if

12  you're on the jury, you're going to get to know people in a

13  very limited period of time, in a very narrow view.  How would

14  you determine credibility in -- with somebody that you don't

15  know and you don't really get to interact with?

16       A PROSPECTIVE JUROR:  Right.  I would say you'd have

17  to go by eyewitness accounts, evidence.

18       MR. BERTHOLF:  Okay.

19       A PROSPECTIVE JUROR:  Fingerprints, I mean, you know,

20  actual hard evidence.

21       MR. BERTHOLF:  Okay.  And "hard evidence," what do

22  you mean by that?

23       A PROSPECTIVE JUROR:  Fingerprints.

24       MR. BERTHOLF:  Fingerprints.

25       A PROSPECTIVE JUROR:  Just stuff like that.  That's

all I can think of.

MR. BERTHOLF:  All right.  All righty then.  Well,
didn't get to talk to everybody.  We've got a limited period of
time.  I'm sorry about that.

But we'd pass this panel for cause.

THE COURT:  All right.  Thank you.

MR. BERTHOLF:  Well, except for the --

THE COURT:  Yeah, we'll take up possible hardships.

All right.  For the Government.

MR. SWEET:  Thank you, Your Honor.

Counsel.

Good morning.  So my name is Jeff Sweet.  And my
questions for you here today are for one purpose only, and
that's to see if you can be a fair and impartial juror for both
Mr. Zuberi and for the Government.  That's all.  If I speak too
quietly, if I speak too quickly, if I ask a confusing question,
please let me know and I'll correct that.

I'm not going to argue with you.  Okay?  Our beliefs
are our own beliefs.  And I noticed -- actually, I was taking a
sip of water, and I realize you all don't have any.  And so I'm
sure if, as you're sitting here, you need some water, there's a
whole bunch of bottles here.  And if anybody wants one, just
raise your hand, and I'm sure --

THE COURT:  Okay.  Thank you.

Also, if anybody needs to take a break -- a bathroom

break, please just interrupt and we'll take a break.  We should

finish up in about 30 to 35 minutes.

MR. SWEET:  And you're not going to offend me if you

shift around or stretch or anything else, so please, by all

means.  And, as I address you, I'm going to refer to you by

your number.  I intend no disrespect.  It's just easier for

everybody to keep track of numbers.

And so, you know, the first thing I want to talk

about -- as I said, you know, I'm not going to argue with you

because our beliefs are our own.  So I do want to touch on

beliefs, and I'd like to start with Juror No. 10.

And, sir, I'm sure you know in your question -- your

questionnaire -- and thank you all for doing those.  Those were

really very helpful -- you were asked if your beliefs would

potentially impact your ability to be a juror, and I believe

you said maybe.  And I wanted to -- I wanted to ask:  Do you

have any beliefs that you think would impact you?  And what are

they, please.

A PROSPECTIVE JUROR:  I've seen questionable conduct

by policemen, by judges, by people.  So I would be watching not

only you, but the defense lawyer, the defendant, the judge,

even the people in the jury -- or in the crowd, to see what

their reactions are to things.  And, besides all of the facts,

artifacts that you have for -- I would take everything into

consideration.  So it all depends.

1    MR. SWEET:  Okay.  Well, I mean, I think listening to

2    testimony, looking at evidence, and coming to a conclusion,

3    that's -- that's exactly what you're expected to do.  So, I

4    guess, is there anything you think about your sincerely held

5    beliefs that you think would make it harder for you to give

6    every witness a fair shake or give the Government or the

7    defense a fair shake?

8            A PROSPECTIVE JUROR:  No.

9            MR. SWEET:  Okay.  Okay.  Fair enough.  Thank you,

10   sir.

11           And Juror No. 1, please.  And, ma'am, I do want to

12   follow up.  And I appreciate you -- you know, your -- how

13   direct you were earlier regarding a commercial sex worker.  So

14   I want to switch, first, to your beliefs question.  You were

15   asked if there were any beliefs that would interfere with your

16   ability.  And I believe you said, you know, yes, and you put

17   your religion.  And I want to see:  How do you think that would

18   interfere, ma'am?  Or do you think?

19           A PROSPECTIVE JUROR:  I don't know if it would

20   interfere, but it is something that I'm aware of.  You know, I

21   mean, I -- I am truthful about that.

22           MR. SWEET:  Well, thank you.  And "interfere" was the

23   wrong word.  So there are going to be a lot of witnesses coming

24   and testifying.  Are you going to give them a fair shake and

25   judge them -- not judge them -- evaluate their testimony based

on what you hear, what you observe and other evidence?

A PROSPECTIVE JUROR:  I would like to say yes, but I don't think I can.

MR. SWEET:  Okay.  And is that -- you said you'd like to say yes, but you don't think you can.  Are you concerned about that?  Are you worried that you would not be able to be a fair and impartial juror?

A PROSPECTIVE JUROR:  Yes.

MR. SWEET:  And that's regarding your beliefs, and then also you talked earlier about how you would evaluate someone who engaged in commercial sex work.  And that is something that you're concerned about as well?

A PROSPECTIVE JUROR:  Right.

MR. SWEET:  I thank you for the candor of your answers.

And, Your Honor, given that, I would ask that Juror No. 1 be excused.

THE COURT:  All right.  Thank you for being straight-up about that.  We are going to excuse you.  So you are free to go.

Mr. Bailey, that does put you up in Seat 1.

MR. SWEET:  I'd like to turn for a minute, and I want to talk about guns for just a second.  So there was a question that asked about "Do you support limitations on guns?"  And, you know, quite a few of you checked no.  And here's my --

here's my very straight question.  So I'm not talking about
bump stocks.  I'm not talking about extended capacity
magazines.

I'm talking about adding additional regulations.  I'm
talking about there are existing laws in place.  And you've
heard that one of the charges here is felon in possession of a
firearm.  Does anyone believe there should be no limitations
whatsoever; and when you heard that crime, you thought -- that
alleged crime, that shouldn't even be a crime?

So just please raise your hand if you do not believe
there should be any limitations, including felon in possession
of a firearm.

A PROSPECTIVE JUROR:  Can you define felon in
possession of a firearm?

MR. SWEET:  Okay.  Thank you.

So you will hear -- so all instructions are going to
come from the Court.  Okay?  So you're going to hear the Court
read out, "This is what the Government has to prove for a
count."  But one of them is that it is unlawful for a person to
knowingly possess a firearm, having been convicted of a felony,
and knowing that they've been convicted of a felony.  Okay?

So, sorry, I shouldn't have -- unlawful possession of
a firearm because they're a felon.  So, having heard that,
ma'am, what is your take on that?  Do you believe -- are you
concerned that that shouldn't even be a crime, that there

1    should be no limitations on guns?

2              A PROSPECTIVE JUROR:  Absolutely not.  He should not

3    be allowed to hold a firearm if he's a felon.  And I believe in

4    the right to bear arms.  It's a constitutional right.  I do

5    have some reservation about the -- the automation and the

6    military-grade weaponry.  I believe that people should be

7    allowed to own them if they're proving -- they've gone through

8    a vetting process.

9              MR. SWEET:  Okay.  Thank you, ma'am.

10             Could we pass the mic down?  Let's see.  I know

11   Mr. -- sorry.  Juror No. 1 now, sir, I know you checked

12   regarding guns.  Same question to you.  You know, in terms of

13   limitations, current laws prohibiting a felon from possessing

14   firearms, do you have any concerns about that law?

15             A PROSPECTIVE JUROR:  I honestly don't.  And for

16   felonies, you could have too many tickets and be a felon, just

17   for everybody's information.  So it kind of pertains to the

18   prior crimes, in my opinion.  So I have no -- either way 'cause

19   I don't have that information.  Until I do, I can't make a fair

20   judgment.

21             MR. SWEET:  No.  Thank you for your candor.  So you

22   said you honestly do have a problem with that limitation,

23   correct, without knowing more?

24             A PROSPECTIVE JUROR:  Yes.  I mean, it's not -- it's

25   not something that I would be able to give you a straight

answer on because, without having known all the facts or anything, it would be a hard decision to make without, you know, knowing the priors.

MR. SWEET: Okay. And Juror No. 10, I'm just going to ask you 'cause I think you had the same question. You know, I think you also had -- you checked perhaps the box on that. Felon in possession of a firearm, is that something that you believe should not even be a crime?

A PROSPECTIVE JUROR: I believe it should be a crime.

MR. SWEET: Okay. Thank you. Then would you -- so Juror No. 1 said that, you know, he would need to know more information about the nature of the felony. And that's information, you know, I'll just tell you, you may not ever get to know. So I know you said for you it matters, you know, sir, what the underlying felony would be. You may not know that.

So, Juror No. 10, if you don't know the nature of the felony, are you still able to follow the law, as given to you by the judge, regarding felon in possession of a firearm?

A PROSPECTIVE JUROR: Absolutely.

MR. SWEET: Okay. Thank you.

So -- and I'm just going to ask if anyone else -- and so Juror No. 1, I'm just going to use your example. And I appreciate that. So Juror No. 1 basically said, "If I don't know more information about the underlying felony, that would -- that would potentially be a challenge." Does anyone

else share that?

          Sir, Juror No. 3, could you elaborate, please.

          A PROSPECTIVE JUROR:  Yes.  I believe that if the

felony wasn't a violent crime, I don't believe that should bar

them from owning a firearm.

          MR. SWEET:  Okay.

          A PROSPECTIVE JUROR:  And so that was where my big

struggle was, and I think federal firearm laws are a little

overreaching.

          MR. SWEET:  Okay.  No.  Thank you for your candor.

Again, there's no right or wrong answers.

          Anyone else share those views?

          Sir.  No. 21.  Sorry.

          A PROSPECTIVE JUROR:  Yeah, I basically agree with

that for violent crimes I believe that there should be

restrictions, but a lot of federal laws are overreaching.

          MR. SWEET:  Okay.  So what if you don't get to know,

you know, you don't get to evaluate what the felony is and

whether it meets kind of your criteria?  Could you follow the

law as given to you by the judge?

          A PROSPECTIVE JUROR:  Yes, sir.

          MR. SWEET:  Okay.  Thank you.

          Juror No. 3, could you follow the law as given to you

by the judge?

          A PROSPECTIVE JUROR:  I will.

1          MR. SWEET:  Okay.  Then, actually, I don't think I

2     asked you this, Juror No. 1.  Could you follow the law as given

3     to you by the judge?

4          A PROSPECTIVE JUROR:  I could, yes.

5          MR. SWEET:  Okay.  Even if you don't have that

6     information you'd like?

7          A PROSPECTIVE JUROR:  Absolutely.

8          MR. SWEET:  Okay.  Thank you.  Thank you.

9          I want to turn for a minute to commercial sex work.

10     We talked about that a little bit earlier with -- you talked

11     about that with Mr. Bertholf.  I want to follow up.  A couple

12     of you checked that it might raise some concerns for you.

13          And I'd like to start -- sorry.  Who has the

14     microphone?  Ms. Pew.  I'd like to start with Juror No. 6,

15     please.

16          Ma'am, I believe you said -- you know, the question

17     is if someone had engaged in commercial sex work and was

18     testifying, would that impact how you evaluate their testimony?

19          A PROSPECTIVE JUROR:  I don't know what commercial

20     sex work is.

21          MR. SWEET:  Okay.  Thank you.

22          A PROSPECTIVE JUROR:  I can imagine, but I need to

23     know.

24          MR. SWEET:  Yes.  Prostitution.

25          A PROSPECTIVE JUROR:  Oh, okay.

1          MR. SWEET:  So engaging in prostitution.

2          A PROSPECTIVE JUROR:  So then the question again?

3          MR. SWEET:  Yes.  If a witness had engaged in

4     prostitution, would that impact how you evaluate their

5     testimony?  Would you be biased against them, biased for them?

6          A PROSPECTIVE JUROR:  I would hope I would be fair.

7     I -- I don't think -- I think I would try to be neutral.

8          MR. SWEET:  Okay.  You think you would try to be

9     neutral?

10         A PROSPECTIVE JUROR:  Mm-hmm.

11         MR. SWEET:  Okay.  You may have said you have no

12    respect for their judgment, but I may --

13         A PROSPECTIVE JUROR:  What did it say?  What?

14         MR. SWEET:  You know what, I think you answered my

15    question, and I may have miscounted what I'm asking about.  So

16    excuse me.  So thank you.

17         A PROSPECTIVE JUROR:  You're excused.

18         MR. SWEET:  So let's stick with that.  And I

19    believe -- Ms. Wurzell, Juror No. 8, you'd said it would depend

20    on if it were legal or not.  But the same core question, if

21    someone who had engaged in commercial sex work or prostitution

22    is a witness, is that going to impact how you evaluate them?

23         A PROSPECTIVE JUROR:  No.  No.  I just didn't know,

24    and I still don't know, if prostitution is legal in some states

25    or not.  I don't know.  But, no, I would evaluate the

information given and judge from there.

MR. SWEET: Thank you.

Who would have a hard time with listening to the testimony of someone who was working as a prostitute?

Okay. Juror No. 3. Yes, sir.

A PROSPECTIVE JUROR: I would question their credibility.

MR. SWEET: Okay. Is that a mountain that they couldn't overcome, or is it something that you would just go in being aware of and kind of look at?

A PROSPECTIVE JUROR: I honestly don't know. I would question their credibility. I know that when an interaction goes bad, sometimes the story gets a little worse to kind of make me feel like the victim. And I'd really struggle with trying to figure that out or if it was like, yeah, they were straight-up telling the truth, I mean, just to be honest.

MR. SWEET: No. Thank you. Well, can you -- so everyone's going to go in and take that witness stand and raise their hand and swear an oath. Can you evaluate the testimony of that person based on what they say on the stand and the evidence that comes in and not based on your sort of existing thoughts about that?

A PROSPECTIVE JUROR: As much as I'd like to believe that people would tell the entire truth on -- on the stand, I don't necessarily know that they would.

1        MR. SWEET:  So would you be basically inclined not to

2 believe -- would they already have a strike against them when

3 they're heading in?

4        A PROSPECTIVE JUROR:  I honestly don't know how I

5 would, you know, react.

6        MR. SWEET:  Okay.  So, Mr. Main, I'm -- forgive me

7 for one second.  I'm just going to package a few things

8 together.  So -- and you've been really direct both today and

9 on your sheet.  You said you really weren't happy about the

10 prosecutor in another case.  You raised questions about defense

11 attorneys, you know, commercial sex work, and then, I think,

12 law enforcement, you know, as well.

13        I think you may have said some law enforcement

14 officers are worse than the -- than the people that they're

15 arresting.

16        A PROSPECTIVE JUROR:  Are as bad as.

17        MR. SWEET:  Are as bad as.  Thank you.  So we're

18 going to have law enforcement officers on the stand.  I'm a

19 prosecutor.  They're defense attorneys.  They're prosecutors.

20 And you've been super direct, so I'm just going to ask you

21 directly:  Are both sides able to get a fair and impartial --

22 are you able to be fair and impartial to both sides and to

23 witnesses as a potential juror in this case?

24        A PROSPECTIVE JUROR:  I would do my best.

25        MR. SWEET:  You would do your best.  And do you think

1    you'd be able to do it?

2         A PROSPECTIVE JUROR:  I believe that I could do a

3    fair job because that's what I'm being asked to do, but I did

4    want to make the Court aware of --

5         MR. SWEET:  Okay.  No.  Thank you.  You believe you

6    can do a fair job.  Thank you.  I do appreciate you engaging in

7    that back and forth there.  Just sticking with commercial --

8    and thank you, sir.  I won't make you hold onto that microphone

9    there any longer.

10        I wanted to follow up with just a couple more people

11   on commercial sex work.  Well, let me ask this:  Does anyone

12   else have concerns about commercial sex workers -- or a

13   commercial sex worker testifying, and would that impact how you

14   would evaluate them?

15        Yes, sir.  No. 10.

16        A PROSPECTIVE JUROR:  Commercial sex workers, does

17   that mean they're illegal?

18        MR. SWEET:  Let's -- let's assume yes.  Let's assume

19   they're engaging in illegal prostitution.

20        A PROSPECTIVE JUROR:  Well, I think that would be

21   more important than the actual -- what they're doing, that

22   they're doing something illegal --

23        MR. SWEET:  Okay.

24        A PROSPECTIVE JUROR:  -- than the fact that it's sex.

25        MR. SWEET:  Fair enough.  So it's less about what

they're doing than the fact that what they're doing is illegal.
You said it better than I did.

A PROSPECTIVE JUROR:  The legal -- if they're
breaking the law, that's more important to me than what they're
doing.

MR. SWEET:  Okay.  I understand.  Thank you.

Mr. Greene -- sorry, Juror No. 12 now, I believe --
what's your take on that, sir?  If someone is a commercial sex
worker, would that impact how you would view them?

A PROSPECTIVE JUROR:  Absolutely not.  I'd look at
them as being a human and -- and it doesn't matter if that's
how they make their money.

MR. SWEET:  Okay, sir.  I'm going to ask you to hold
onto that for just a second.  I want to switch for just a
minute to, you know, law enforcement, FBI.  Any strong feelings
one way or another about either the FBI or law enforcement,
positive or negative?

A PROSPECTIVE JUROR:  I think there sometimes is
abuse of power.  But, I mean, as far as individually, if a cop
is good or bad, it's just an individual thing.  It's -- I can't
say one way or another if the police have our best interests at
heart or not.

MR. SWEET:  Is each FBI agent and each officer who
takes the stand going to get a fair shake from you, sir?

A PROSPECTIVE JUROR:  Yes, sir.

1  MR. SWEET:  Okay.  All right.  Thank you.

2  Let's stick with sort of FBI.  FBI.  There are some

3  people who've kind of had some concerns about the FBI and the

4  role of the FBI.  Who's troubled by the role of -- who's

5  troubled by the FBI right now and that it's going to

6  potentially impact you when an FBI agent takes the stand?

7  Anyone?

8  No. 1.  Juror No. 1, please.

9  Yes, sir.

10  A PROSPECTIVE JUROR:  I know that everybody has

11  probably spent more time the past several years with elections

12  and everything.  So a lot of information that you have seen,

13  given the fact that they had a lot of evidence and information

14  on different categories and processes that they should've been

15  doing, that they didn't, has really left me in a big doubt for

16  them being able to do their job correctly.

17  MR. SWEET:  Okay.  Well, thank you.  So when an FBI

18  agent, you know, walks up, takes the stand, swears an oath, are

19  they getting a fair shake from you?

20  A PROSPECTIVE JUROR:  I try to give everybody a fair

21  shake, no matter what walk of life they come from.  But

22  depending on their body language, the way they answer

23  questions, their darting of their eyes, it all boils down into

24  whether or not I can buy what they're saying, agree with what

25  they're saying or -- or be able to come to a judgment, which

is -- I don't know if I'll be able to necessarily.  It depends
on the person.  It really does.  It depends on how I perceive
them.

MR. SWEET:  Well -- and, you know, just because --
okay.  Thank you.

And does anyone -- does anyone, likewise, have the
same concerns that Juror No. 1 does?

Yes, ma'am.

A PROSPECTIVE JUROR:  I think -- I would second what
he said, because of the current political situation.  And many
have raised concerns.  It seems like there's inequity, so --
but I liked how you phrased it.  There's so much I don't know.
There's so much all of us don't know.  We don't get to know
everything.  So that raises a concern.

MR. SWEET:  No.  Thank you for sharing that.  So --
but when an FBI agent, though -- you know, they're going to
take the stand, and they're going to talk about this case.  And
that's all they're going to talk about, and that's all we're
going to talk about, nothing else.  Are you going to be able to
evaluate their testimony and base your decision on what they
say on the stand, the evidence you receive?

A PROSPECTIVE JUROR:  I believe so.

MR. SWEET:  Because body language -- I mean, look, if
you put me on the stand right now, I mean, I might twitch a
little bit or, you know, move around a little bit.  And would

you be thinking, "Oh, my gosh, that person," if they're an FBI agent, "they're being untruthful," just because of their body language?  Are they going to be hyper scrutinized by you?

A PROSPECTIVE JUROR:  They're going to be scrutinized.  Hyper, no.  But we're -- I'm going to scrutinize everybody.

MR. SWEET:  Okay.  Scrutinize everybody.  That -- okay.  And you'll give the FBI a fair shake when they're on the stand?

A PROSPECTIVE JUROR:  I believe so.

MR. SWEET:  Okay.  Thank you.  Thank you.

Who else?  Same question.  Who else?

Front row, I haven't been asking you very much.  Anything from -- from any of you on that?

Juror No. 20.

A PROSPECTIVE JUROR:  What was the question one more time?

A PROSPECTIVE JUROR:  FBI.  Do you have any -- would you give an FBI agent or a law enforcement officer a fair shake when they take the stand?  Do you have any concerns about law enforcement or the FBI?

A PROSPECTIVE JUROR:  I do not have any concerns.

MR. SWEET:  Okay.  For the rest of you, anyone have anything else on that, whether it's law enforcement, the FBI, prosecution, anyone?

Okay.  So I want to -- I want to ask a question, and
the question is this:  Is there anything that we should know
about that we haven't asked you?  It sounds like a simple
question.  Usually I ask this question, and somebody raises
their hand and says something extraordinarily relevant that we
just didn't ask.

And so that is my question.  Is there anything that
any of you have -- 'cause I haven't talked to each of you --
that we should know or we should be aware of that would affect
your ability to be a fair and impartial juror here today?

Yes, sir.  Juror No. 4.

A PROSPECTIVE JUROR:  I had mentioned that I had seen
some of this on the news.  And I saw --

MR. SWEET:  Wait, actually, sir, before you -- I just
want to ask --

THE COURT:  Right.  We just don't want you to talk
about what you may have heard or seen on the news in front of
other jurors.

A PROSPECTIVE JUROR:  On the news I saw photographs,
quite a few photographs.  So that might influence my thinking
as far as what had happened or what was happening.

MR. SWEET:  Okay.  Thank you.  And I think
potentially the Court may discuss that further.  But thank you
for raising that.  That's exactly what we're looking for.

Anyone else?  Because, again, there are things we

haven't asked.

Juror No. 22, I realize I haven't said anything to you.  Anything that we should know about?

A PROSPECTIVE JUROR:  No.  I'm -- I've seen a lot on the news, too.  Again, I don't think it necessarily -- I don't have, like, an opinion.  But I -- I have seen photographs.  I have seen articles about it.  I live in that community right now.  I won't be for -- for long, but --

MR. SWEET:  Right.

A PROSPECTIVE JUROR:  Yeah.

MR. SWEET:  Okay.  Can you set that aside and be -- base your decision on testimony and the evidence you receive in court?

A PROSPECTIVE JUROR:  I would do my best.

MR. SWEET:  Okay.  Thank you.

Juror No. 18, I believe, anything -- hmm, I'm sorry. I may have miscounted.  I'm sorry.  Back -- I did miscount. All the way in the back, please.

Anything -- and I'm sorry, ma'am.  What's your number?

A PROSPECTIVE JUROR:  18.

MR. SWEET:  18.  Thank you.  Anything we should know about, about your ability to be a fair and impartial juror?

A PROSPECTIVE JUROR:  I don't think so.

MR. SWEET:  Okay.  Okay.  Last chance for anybody

1    else.  If so, please raise your hand.

2         All right.  Thank you, all.  Pass this jury -- panel

3    for cause, Your Honor.

4         THE COURT:  All right.  Folks, we're going to take a

5    break.  Ms. Pew will take you downstairs.  Remember:  Do not

6    discuss this case with anyone, including your fellow potential

7    jurors, members of your family, people involved in the trial or

8    anyone else.  Do not allow others to discuss the case with you.

9         If you have seen something on the news or heard

10   something about the case, please do not share that with your

11   fellow potential jurors.  This also includes discussing the

12   case in Internet chat rooms or blogs.

13        If anybody does try to communicate with you, please

14   report that to the Court immediately.  Again, we don't want

15   you -- Ms. Pew will want to keep you in a specific area because

16   there are, you know, witnesses, attorneys, people in the

17   hallway, people in front of the courthouse who might be talking

18   about the case.  We don't want you to overhear that.

19        Do not read, watch or listen to any news reports or

20   other accounts about the trial or anyone associated with it,

21   including online information.  Do not do any research about the

22   trial or anyone associated with it, including any online

23   information.

24        So, with that, I am going to ask -- Mr. McGoffin and

25   Ms. Smith, I'm going to individually ask you some questions

1    about what you may have seen on the news.  So I will ask you to

2    wait in the hallway, and we'll call you in each independently.

3              David, if you'll be in charge of that.

4              And then, Ms. Pew, if you want to take the rest of

5    the jurors downstairs and get the next group ready to go.

6              And then why don't -- I'll just have Juror No. 4,

7    Mr. McGoffin, hang tight for just a moment.

8              A PROSPECTIVE JUROR:  All right.

9              THE COURT:  And Juror No. 22, Ms. Smith, we'll just

10   have you in the hallway, and we'll bring you right back in.

11             Ms. Smith, actually, Mr. Svelund is going to take you

12   back into the jury waiting room.

13             (Whispered discussion, off the record, 10:13 a.m. -

14   10:14 a.m.)

15             (Open court, jury not present, 10:14 a.m.)

16             THE COURT:  All right.  So, Mr. McGoffin, can you

17   tell us:  What did you see on the news?  What kind of

18   photographs?

19             A PROSPECTIVE JUROR:  Just photographs of where the

20   person was kept.

21             THE COURT:  Okay.  And the big question really for

22   you is -- you know, you saw something on the news.  I mean, you

23   may have had a reaction to the story.  Whatever that reaction

24   was, whatever you've seen, can you set it aside and make a

25   decision based on what you see here in the courtroom?

1        A PROSPECTIVE JUROR:  You know, I'm not sure, Judge,

2   to be honest with you.  It was -- it was pretty intense and --

3        THE COURT:  Yeah.

4        A PROSPECTIVE JUROR:  -- I didn't research it out,

5   but I'm a very visual person.

6        THE COURT:  Yeah.

7        A PROSPECTIVE JUROR:  And it really struck me.  And I

8   knew of the situation, or I read the article.  And, yeah,

9   I'm -- so, to be honest, I'm not sure.  It's -- sitting here

10  and thinking about it kind of brought up some emotions as --

11       THE COURT:  Sure.  I mean, it's hard not to form an

12  opinion when you read an article about something that, you

13  know, may well have seemed dramatic to you.  The attorneys here

14  and Mr. Zuberi need to know that, you know, the decision you're

15  going to make has not already been made.

16       A PROSPECTIVE JUROR:  Right.  It hasn't been made,

17  no.  But I just wanted to make you aware of the photographs and

18  then -- and he had asked if there was anything that wasn't

19  asked.  And I thought, for me anyway, being a visual person,

20  that was pretty intense, some of those photographs that I saw.

21       THE COURT:  Can you promise us you won't look up any

22  information about the case?

23       A PROSPECTIVE JUROR:  Oh, yeah.  I'm not a computer

24  guy, so I will not look it up.

25       THE COURT:  Can you promise you would not discuss

whatever article you've read or pictures you've seen with

fellow jurors if you are on the jury?

            A PROSPECTIVE JUROR:  Yes, I could promise that.

            THE COURT:  Any follow-up questions?

            MR. SWEET:  None for the Government, Your Honor.

Thank you.

            MR. BERTHOLF:  No.

            THE COURT:  All right.  We'll have you go back

downstairs to the -- I guess I'm not -- I'm not as familiar

with this courthouse, but back down to the first floor.

            Is that right, David?

            THE LAW CLERK:  Yes.

            THE COURT:  And then we'll bring Ms. Smith.

            Thank you, Ms. Smith.  So can you tell us a little

bit about what you may have seen or read on the Internet or in

the news media?

            A PROSPECTIVE JUROR:  Yeah.  Well, I'm trying to

remember.  It was a while ago.

            THE COURT:  Right.

            A PROSPECTIVE JUROR:  But I had heard about

potentially keeping people in a house, and I possibly know who

was renting that house.

            THE COURT:  Right.

            A PROSPECTIVE JUROR:  And so I just remember that

specifically.  So I just knew about kind of the kidnapping and

that's what the -- the news was alleging, yeah.

THE COURT:  Okay.  Based on that -- here's what the attorneys and Mr. Zuberi need to know.  Have you already made up your mind about the case based on what you've read or seen in the news?  Or are you willing to make a decision in this case based solely on what you see in the courtroom?

A PROSPECTIVE JUROR:  I would love to say that I would try my best to --

THE COURT:  Right.

A PROSPECTIVE JUROR:  -- to do it.  I don't -- I don't know.  I don't think I have made up my mind solely, but I do -- I probably do have some biases, just after reading everything.

THE COURT:  Okay.

A PROSPECTIVE JUROR:  Yeah.

THE COURT:  Can you set them aside?

A PROSPECTIVE JUROR:  I don't know.

THE COURT:  Good answer.  We don't know until we're in these situations.

A PROSPECTIVE JUROR:  Yeah.

THE COURT:  Can you promise that you will not share any of the information you may have read on -- seen in the media with your fellow jurors?

A PROSPECTIVE JUROR:  Yes.

THE COURT:  And you can promise that you won't look

```
 1   up any further information?

 2              A PROSPECTIVE JUROR:  Yes.

 3              THE COURT:  What I'm hearing, though, is you will try

 4   your best to set aside any opinion you may have formulated when

 5   you read or saw the news story, and you will try your best to

 6   make a decision based on what you hear and see in the

 7   courtroom?

 8              A PROSPECTIVE JUROR:  Yeah.

 9              THE COURT:  Okay.  Any follow-up on that?

10              MR. SWEET:  Just briefly.

11         Ma'am, so -- I'm sorry.  So you have not decided yet;

12   is that correct?

13              A PROSPECTIVE JUROR:  I have not decided.  But I am

14   not going to say that I don't have some biases that I'm coming

15   with.

16              MR. SWEET:  But you can try your best to put those

17   aside?

18              A PROSPECTIVE JUROR:  I would like to think so, yeah.

19              MR. SWEET:  And you'll work to just listen -- make

20   your decision based on the evidence received and following the

21   Court's instructions?

22              A PROSPECTIVE JUROR:  I will do my best.

23              MR. SWEET:  Thank you.

24              THE COURT:  All right.  Thank you very much.

25              MR. BERTHOLF:  Oh.
```

1          THE COURT:  So you can return to the first floor,

2  please.  Thank you, Ms. Smith.  I really appreciate it.

3          MR. BERTHOLF:  Can I ask a --

4          THE COURT:  Oh, I'm sorry.  Mr. Bertholf, I didn't

5  see you.

6          A PROSPECTIVE JUROR:  Yeah.

7          MR. BERTHOLF:  That's okay.

8          What are the biases you're coming in with?

9          A PROSPECTIVE JUROR:  Just --

10          MR. BERTHOLF:  Are you inclined to think Mr. Zuberi

11  is guilty of the crimes alleged?

12          A PROSPECTIVE JUROR:  I -- I don't know if those are

13  the right words I would -- I would say, but I would definitely

14  think that there was a possible crime committed.

15          MR. BERTHOLF:  Okay.

16          A PROSPECTIVE JUROR:  Again, I -- I try not to let

17  news articles and gossip in my community sway me, but they're

18  there.  I'm going to come with them.

19          MR. BERTHOLF:  And Klamath Falls is a very gossipy

20  community, isn't it?

21          A PROSPECTIVE JUROR:  No comment.

22          MR. BERTHOLF:  What sort of crimes do you think were

23  committed then?

24          A PROSPECTIVE JUROR:  Should I list them out of --

25          MR. BERTHOLF:  Whatever your biases are, is what we

1   need to know.

2           A PROSPECTIVE JUROR:  Yeah.  Just kidnapping,

3   possibly sexual assault and other sorts of sexual misconduct.

4   And, yeah, some of that.

5           MR. BERTHOLF:  So are you currently inclined to think

6   that he's guilty of those type of crimes?

7           A PROSPECTIVE JUROR:  I -- usually when those are

8   discussed, I have the tendency to -- to think that they may

9   have happened, not 100 percent.  I would -- I would like to

10  listen to everything.

11          MR. BERTHOLF:  All right.

12          A PROSPECTIVE JUROR:  But it's hard for me to block

13  those.

14          MR. BERTHOLF:  When you say it's hard for you to

15  block those, what do you mean?

16          A PROSPECTIVE JUROR:  I just -- I'm inclined to

17  believe women and other people who have gone through something

18  that seems pretty traumatic when I read about --

19          MR. BERTHOLF:  Okay.  And I don't think it's a secret

20  that the alleged victim is a sex worker.  Is that going to

21  complicate things in any way?

22          A PROSPECTIVE JUROR:  No, that does not.  No, that

23  won't sway my opinion.

24          MR. BERTHOLF:  But are you going to be able to listen

25  to all the evidence and put aside those biases?

A PROSPECTIVE JUROR:  I will do my best.  I like to think I would do that; but, I mean, I'm going to come with those.  So --

MR. BERTHOLF:  I understand.

A PROSPECTIVE JUROR:  Yeah.

MR. BERTHOLF:  All right.  Thank you.

THE COURT:  All right.  Thank you very much, Ms. Smith.

(Whispered discussion, off the record, 10:21 a.m.)

THE COURT:  All right.  Any -- anything for the record with regard to this group?

Mr. Bertholf.

MR. BERTHOLF:  I would ask that Juror No. 22 be excused for cause.  I'm not so sure that doing her best on leaving those biases behind is good enough.

THE COURT:  Government's thought?

MR. SWEET:  Thank you, Your Honor.  Your Honor, I think her biases are probably less strong than perhaps Juror No. 1 and Juror No. 3.  And the fact that she said she's inclined to believe women who are victims, or victims, that's -- that's really separate from any exposure to any news.

I don't think she's for cause, Your Honor.  I think she may be someone who they choose to bump.  But she was open about it.  She said she could try her best.  She wasn't listening to the news with the "beyond a reasonable doubt"

standard.  And, again, if she's for cause, then I think several others might be as well.

THE COURT:  I agree.  I think, you know, her biases is the -- just the fact that she saw a news article, she may have had an opinion about it at the time.  But she has agreed that she would do her best to set aside that opinion and weigh the case fairly.  I much prefer to hear a juror say, "I will try my hardest," than sometimes just a knee jerk, "Yes, yes, yes."

She wanted to make it clear she came having seen some things in the news.  But really I -- she seems thoughtful.  She seems more than willing to weigh the evidence, and so I will not remove her for cause.

Any other thoughts?  We have a couple people with hardships.  You know, it's, in my mind, a little late to start excusing people for hardships.  But let's see how many people we have as we go along.  We do have Mr. Franell with a flight out for a wedding.

I know Ms. Smith is moving in November.  It might not be easy for her, but I'm not inclined to release her. Mr. Bailey, there is a lot of family folks, both at the home and people he cares -- he's a caregiver, but I'm a little unclear whether he needs to be excused.  We can keep that in mind.

So I will have -- Char will be bringing up our second

group shortly.  Let's take a quick break, if anybody needs one.
Mr. Zuberi, if he needs to have a restroom break, this would be
the time.  And maybe, Mr. Svelund, if you could tell Ms. Pew
ten minutes to bring the next group up.

MS. POTTER:  Your Honor, hold on.

(Whispered discussion, off the record, 10:24 a.m.)

MS. POTTER:  So Mr. Zuberi would like to use the
bathroom, so can we make sure he's back before --

THE COURT:  Yes.

MS. POTTER:  I don't know how long that will take.

(Recess taken, 10:24 a.m. - 10:36 a.m.)

(Prospective jurors seated, 10:33 a.m. - 10:36 a.m.)

THE COURT:  All right, folks.  Thank you very much.
I'm Judge McShane.  Welcome to the federal courthouse.  Some of
you have traveled great distances.  I do appreciate it.  I will
explain that because the District of Oregon is a single federal
district -- we have six judges; we have four courthouses --
this courthouse does not have a judge who can typically sit on
a case such as this, so I come down from Eugene.

And the Medford Division that serves this courthouse
is all of Southern Oregon.  So we have people traveling from
the coast; people traveling from, you know, east of
Klamath Falls.  So we do appreciate you being here.  All of us
involved in this case really do appreciate you coming in last
week and filling out the questionnaires.  It makes the jury

selection process go much more quickly today because of that.
So thank you.

To introduce my staff -- and you'll meet a lot of
people this morning -- Ms. Pew is my courtroom deputy.  And she
will be in charge of the jury if you are on this jury.
Mr. Svelund is a lawyer working for me as a federal clerk.  He
helps me with some of the legal things I need to figure out.

And then Lindsey is our court reporter.  And she's
taking down every word that is said in the courtroom.  So we
will be asking you questions, and we will be running around
handing you a microphone so that Lindsey can hear you.

We are selecting a jury of 16 people today for the
criminal case of United States versus Negasi Zuberi.
Mr. Zuberi is charged with two kidnappings; traveling from
Seattle, Washington, to Klamath Falls, Oregon, with the intent
to commit unlawful sexual activity; and unlawful possession of
firearms and ammunition.

Under our system of justice, a person is innocent of
any crime or wrongdoing unless and until the Government proves
their guilt beyond a reasonable doubt to all of the jurors.
Each juror must be able to judge this case fairly and
objectively.  So if anyone has knowledge of or has formed any
opinion about this case, this should be brought to my
attention.

So it is important that you know who's involved in

the case. So I'm going to have the attorneys and the parties introduce themselves. I'm going to have one of the Government attorneys, Mr. Sweet, read a list of all the witnesses who may testify in this case.

So please keep an ear out because I am going to ask you if you know anybody involved in the case. So in a criminal case, it's the United States Attorney's Office that prosecutes the case. So I'll have them introduce themselves first.

MR. SWEET: Thank you, Your Honor.

Good morning. I'm Assistant United States Attorney Jeff Sweet. This is Assistant United States Attorney Nathan Lichvarcik and Assistant United States Attorney Marco Boccato. We represent the United States. Thank you.

THE COURT: All right. Thank you.

And for the defense.

MR. BERTHOLF: Michael Bertholf on behalf of Negasi Zuberi, Amy Potter and Cheryl Oakley.

THE COURT: All right. Thank you.

Mr. Sweet, I'm going to have you read the list of witnesses who may testify in the case.

MR. SWEET: Thank you, Your Honor.

They are Lara Adams; AV-1; AV-2; Kori Barnum; Tim Broadway; Bryan Chiles; Rachel Clay; Brianna Crawford; Diego Delgado; Brandon Dougherty; Shasta DuVal; Ashley Ensminger; Trahern Fox; Carlos Garcia; Mellissa Geary; Austin Gilmore;

1   Christopher Giovanetty; Travis Gluesenkamp; Nicholas Griebel;

2   John Hobby; Emily Keeton; Sean Kennedy; Greg Lara; Justin

3   Lazenby; Daniel Logan; Joel Loudermilk; Jason Malone; Kathy

4   Maxwell; Jennifer McAfee; Melanie McClure; Erik Mendoza; Niya

5   Donaldson; Christopher Parkerson; Shelby Quick; Christina

6   Ruelas, who works at Sky Lakes Medical Center; Geovanni Ruelas;

7   Nayeli Ruelas, who works at Klamath Basin Behavioral Health;

8   Prentice Smith; Jesse Snyder; Dylan Staples; Robert Phillips;

9   Stephanie Stewart; Bradley Sticklin; Loren Summers; Amie

10  Walton, who is a SANE examiner who works at Providence, as well

11  as other hospitals; Brenden Westfall; Carol Westfall; Kevin

12  Westfall; Dr. Jay Williams; Kylie Winkle-O'Brien; Christi

13  Winters; Tyler Young; and Chris Zupan.  Thank you.

14          THE COURT:  Does anyone know any of the parties

15  involved in the case or any of the witnesses?

16          Yes.  And you're juror number?

17          A PROSPECTIVE JUROR:  43.

18          THE COURT:  All right.  43.  Who do you maybe know?

19          A PROSPECTIVE JUROR:  I know Melanie McClure.

20          THE COURT:  All right.  And is Ms. McClure somebody

21  you know very well, is a close personal friend, or more of an

22  acquaintance?

23          A PROSPECTIVE JUROR:  No.  Acquaintance.  We go to

24  church together.  We have similar friends.

25          THE COURT:  Okay.  Anything about that relationship

that would make it difficult for you to be fair in a case that

you know probably very little about at this point?

A PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Thank you.

Anyone else?

Yes.  And you're juror number?

A PROSPECTIVE JUROR:  33.

THE COURT:  33.  Ms. Parker, who do you know?

A PROSPECTIVE JUROR:  I don't know how to say her

last name; but Nayeli, I know we work at the same place.

THE COURT:  Okay.

A PROSPECTIVE JUROR:  I don't know that I know her,

but I know that we do work at the same company.  So I don't

want to -- I mean, I may have seen her in passing, but I do not

know the person individually.

THE COURT:  All right.  Thank you.

Anyone else who may know any of the parties, any of

the attorneys, any of the witnesses involved in the case?

As potential jurors in this case, it is important

that you not look up information about anyone involved in the

case or about the case itself, that you not be exposed to any

media stories about the case.  So you would be instructed, as

part of this case, not to look up any information, not to talk

to others about the case.

It is important that -- for both sides to understand

that the jury will make its decision based on the evidence and
testimony presented in the courtroom and not on what you can
find out on the Internet or by looking up news stories.

Has anybody seen any news stories that might have
been associated with this case?

Okay.  We have a couple of you.  Let's see.

Juror number?

A PROSPECTIVE JUROR:  31.

THE COURT:  Without telling us what the content
was --

A PROSPECTIVE JUROR:  Yeah.  I seen it on the news
yesterday morning.

THE COURT:  Okay.  Is there anything about that story
that's going to --

A PROSPECTIVE JUROR:  No.

THE COURT:  -- where you've already formed an opinion
about the outcome of this case?

A PROSPECTIVE JUROR:  I have not.

THE COURT:  Okay.  Thank you.

And then we've got some jurors down there.  If you
could start just by telling us your juror number.  It's the
easiest way we can find you on our sheets of paper.

All right.  We have Juror No. 34, Mr. Thomas.

A PROSPECTIVE JUROR:  I saw it on the news when it
happened, and I read about it in the paper.

THE COURT:  Okay.  Without telling us what you saw or what you read, can you tell me if, when you read it, you formed an opinion about the case that's going to carry into the trial?

A PROSPECTIVE JUROR:  No, I did not.

THE COURT:  Okay.  Thank you.

Yes.

A PROSPECTIVE JUROR:  No. 23.

THE WITNESS:  Juror No. 23.  Thank you.  Did you see something in the media recently or some time ago?

A PROSPECTIVE JUROR:  I've seen a few TV and newspaper reports.

THE COURT:  Okay.  And when you saw those, did you form an opinion about the case?

A PROSPECTIVE JUROR:  No.

THE COURT:  Is there anything about what you saw in the news that's going to impact your ability to be fair in this case?

A PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.

Anyone else who may have seen or heard something in the news?

Okay.  All right.  With that, I am going to -- the attorneys are going to spend about 30 to 40 minutes each asking you some questions, often related to your questionnaires or some general questions.  We need to have you sworn in to tell

the truth.  So I will ask you to stand, and if you could please
raise your right hand.

            (Prospective jury sworn, 10:45 a.m.)

            THE COURT:  All right.  Please have a seat, folks.

            With that, I'll turn it over to plaintiff.

            MR. BERTHOLF:  Court, counsel.

            Good morning.  Thank you.  There are no wrong answers
to any of the questions that we have.  This is basically our
chance to follow up on the jury questionnaires, which we really
appreciate you taking the time out last week to fill out.  We
did read through them very carefully.  A lot of my questions
are -- and I think the Government's as well -- is going to be
following up on some of those answers.  We really appreciate
you doing that.

            So, Juror No. 23, you are ex-law enforcement.

            A PROSPECTIVE JUROR:  I am.

            MR. BERTHOLF:  And let me get to the question.  On
number 33, question 33, you said -- the question is "Do you
have any special training in scientific or forensic
investigations or analysis?"

            A PROSPECTIVE JUROR:  Yes.

            MR. BERTHOLF:  And you've got crime scene
investigation, death investigation and forensic interviewing of
child sex victims.

            A PROSPECTIVE JUROR:  Yes.

MR. BERTHOLF:  This is not a death case, so we don't need to worry about that.  Your training, is that going to affect how you look at the case and look at the evidence presented?

A PROSPECTIVE JUROR:  No.

THE COURT:  What if you disagree wholeheartedly with how the investigation went down?  Are you going to put aside your opinions on how an investigation should go and only go on the evidence submitted?

A PROSPECTIVE JUROR:  Yes.  I understand that we're only allowed to consider the evidence submitted.

MR. BERTHOLF:  Okay.  All right.  Thank you.

Juror No. 28, you -- I forgot to write the note.  There -- someone that you know sued the Klamath Falls Police Department for a false allegation of sex abuse?

A PROSPECTIVE JUROR:  No.  It was not sex abuse.  It was not a sexual --

MR. BERTHOLF:  Oh, it was not.  I misread what you wrote.  What was the suit about?

A PROSPECTIVE JUROR:  So it was like 30 years ago, and I don't exactly -- it --

MR. BERTHOLF:  Well, I guess if it's 30 years ago --

A PROSPECTIVE JUROR:  Yeah.

MR. BERTHOLF:  -- let's just cut to the chase.

A PROSPECTIVE JUROR:  Yeah.

1    MR. BERTHOLF:  Is that going to -- we've got Klamath

2    Falls Police Department -- we've got Klamath Falls Police

3    involved with the case.  Is that going to -- is this suit, 30

4    years ago, going to color how you look at and view the evidence

5    in this case?

6         A PROSPECTIVE JUROR:  No, sir.

7         MR. BERTHOLF:  Okay.  Awesome.  Thank you.

8         Juror No. 29.

9         A PROSPECTIVE JUROR:  Yes.

10        MR. BERTHOLF:  And this is where -- I'm not trying to

11   be embarrassing or anything.  We wrote questions about whether

12   or not you've been a victim of sexual or physical abuse.  And

13   you answered that you have been a prior victim of one of those

14   types of abuse.

15        A PROSPECTIVE JUROR:  Yes.

16        MR. BERTHOLF:  Is that going to color how you look at

17   this case?  'Cause there are charges of sexual abuse.

18        A PROSPECTIVE JUROR:  No.

19        MR. BERTHOLF:  Okay.  All righty.  And I guess I -- I

20   don't think that you wrote anything about whether that was

21   investigated or prosecuted.

22        A PROSPECTIVE JUROR:  I did not write anything.  It

23   was so long ago that it really -- nothing ever really happened.

24        MR. BERTHOLF:  Okay.  Was it ever reported to police?

25   Was it --

1          A PROSPECTIVE JUROR:  Absolutely.

2          MR. BERTHOLF:  -- investigated?  Was it investigated?

3          A PROSPECTIVE JUROR:  It was investigated.  It didn't

4     go any farther.

5          MR. BERTHOLF:  So no prosecution came of it?

6          A PROSPECTIVE JUROR:  No.  Counseling.

7          MR. BERTHOLF:  What's that?

8          A PROSPECTIVE JUROR:  Just counseling.

9          MR. BERTHOLF:  Just counseling for you?

10         A PROSPECTIVE JUROR:  For also the --

11         MR. BERTHOLF:  The other party?

12         A PROSPECTIVE JUROR:  Mm-hmm.

13         MR. BERTHOLF:  Okay.  Looking back on that -- it

14    sounds like it was a long time ago.

15         A PROSPECTIVE JUROR:  Yeah.

16         MR. BERTHOLF:  Is that experience going to color how

17    you view testimony in this case?  'Cause there's going to be

18    testimony about sexual abuse.

19         A PROSPECTIVE JUROR:  No, not at all.

20         MR. BERTHOLF:  Okay.

21         A PROSPECTIVE JUROR:  No.

22         THE COURT:  All right.  Thank you.

23         A PROSPECTIVE JUROR:  Mm-hmm.

24         MR. BERTHOLF:  No. 31.

25         No. 30, we'll come back to you at some point, I

guarantee you.  Well, I can't guarantee you 'cause I've only

got a limited time, but I do want to talk to you at some point.

          You saw the news story yesterday?

          A PROSPECTIVE JUROR:  Correct.

          MR. BERTHOLF:  I'm assuming then -- do you watch NBC

News then?

          A PROSPECTIVE JUROR:  I do.

          MR. BERTHOLF:  Are you going to be able to not watch

news at all if you're on the jury?

          A PROSPECTIVE JUROR:  That's kind of tough to -- no.

I imagine I'll watch the news.

          MR. BERTHOLF:  If the judge tells you not to watch

the news --

          A PROSPECTIVE JUROR:  Yeah, I know.  I mean, I'd

prefer to watch the news, Judge, if I -- if I could.

          MR. BERTHOLF:  A lot of us do.

          A PROSPECTIVE JUROR:  That's -- that's all I got to

say about that.

          MR. BERTHOLF:  But can you -- if the judge orders you

to --

          A PROSPECTIVE JUROR:  Well, if he orders me not to

watch the news, then I guess I just won't turn the TV on.

          MR. BERTHOLF:  Okay.  That's about the only way to

avoid it.  All right.  You also indicated that you have some

back issues?

1    A PROSPECTIVE JUROR:  Correct.

2    MR. BERTHOLF:  If you're on the jury --

3    A PROSPECTIVE JUROR:  These chairs are pretty

4    comfortable.  I must admit the benches downstairs are kind of

5    archaic, scary.

6    MR. BERTHOLF:  Well, they don't do trials downstairs

7    so much.

8    A PROSPECTIVE JUROR:  Thank goodness.

9    MR. BERTHOLF:  You're also the only employee at Pure

10   Water?

11   A PROSPECTIVE JUROR:  That's correct.

12   MR. BERTHOLF:  Is the business going to be able to go

13   the next three weeks --

14   A PROSPECTIVE JUROR:  Well, if it were a couple of

15   days, I would be fine.

16   MR. BERTHOLF:  Well, we've got three weeks.

17   A PROSPECTIVE JUROR:  If we're looking at a

18   three-week, yeah, that's going to be a hardship.

19   MR. BERTHOLF:  Okay.  What's going to happen?

20   A PROSPECTIVE JUROR:  Well, I have existing

21   customers.  I do bottleless watercoolers all over Southern

22   Oregon.  I have to service those at medical, dental,

23   manufacturing facilities.  If there's a problem, you know, I've

24   got to respond.  So I do have a large customer base, plus other

25   existing customers.  So it would be tough to take three weeks

1  off.

2          MR. BERTHOLF:  Okay.

3          A PROSPECTIVE JUROR:  It really would be.

4          MR. BERTHOLF:  All right.  Well, we will absolutely

5  take that into account.  Thank you.

6          A PROSPECTIVE JUROR:  Thank you.

7          MR. BERTHOLF:  No. 32, I'm going to go -- 'cause I

8  want to -- oh, 32, you answered question 29 very interestingly.

9  "Do you think there should be laws limiting the possession of

10  firearms and ammunition?"  And you said, "Loaded question, no

11  pun intended.  I like to believe systems are in place to manage

12  this sort of thing."

13          A PROSPECTIVE JUROR:  Correct.

14          MR. BERTHOLF:  Can you expand on that?

15          A PROSPECTIVE JUROR:  Yes.  I just thought that was a

16  really private question that I've never even talked to my

17  husband or my family base about.  And so I've never really

18  discussed that with anyone about my personal beliefs, gun

19  control and all that.  So I haven't processed that answer or

20  thought about that before.  And so I just really do believe in

21  our justice system and think that there probably are things in

22  place to help regulate guns and ammunition.  That's my personal

23  belief.

24          MR. BERTHOLF:  Okay.  All right.  So since reading

25  the questionnaire and answering that question, have you had

more time to think?  'Cause it sounds like you haven't really
thought about it much before last week.

A PROSPECTIVE JUROR:  Correct.

MR. BERTHOLF:  Since that time, have you had time to
think about it a little bit more?

A PROSPECTIVE JUROR:  Not really.  Just -- I don't
spend a lot of time in my head on that kind of thing, about
guns and all that.  I mean, I think about safety.  And my
husband's a hunter, and we sport shoot occasionally.  But I
haven't spent a lot of time thinking about our federal laws on
gun control.

MR. BERTHOLF:  Okay.  All right.  Fair enough.  Thank
you.

A PROSPECTIVE JUROR:  Sorry.

MR. BERTHOLF:  Let's talk to Juror No. 33.

You work at the same company as one of the witnesses,
KBBH.

A PROSPECTIVE JUROR:  Yes.

MR. BERTHOLF:  You don't really know this lady, it
sounds like?

A PROSPECTIVE JUROR:  No.

MR. BERTHOLF:  Are you going to give her testimony
any more weight because you work at the same company --

A PROSPECTIVE JUROR:  No, sir.

MR. BERTHOLF:  -- than anybody else's?

1          A PROSPECTIVE JUROR:  No, sir.

2          MR. BERTHOLF:  Okay.  Fair enough.  Thank you.

3          Oh, No. 36, you're from Cave Junction, right?

4          A PROSPECTIVE JUROR:  Yes.

5          MR. BERTHOLF:  Okay.  The one thing that really

6  popped out to me -- the first thing that popped out to me is

7  you have a very precise penmanship.

8          A PROSPECTIVE JUROR:  Thank you.  I get that a lot.

9          MR. BERTHOLF:  Well, I'm sure you do because it's --

10  it's very unique.  How did you develop that?  Where did that

11  come from?

12          A PROSPECTIVE JUROR:  When I was younger, if all the

13  letters didn't look exactly how I was shown they were supposed

14  to look, I would crinkle up my paper and start over.

15          MR. BERTHOLF:  Okay.

16          A PROSPECTIVE JUROR:  So I just stressed about it,

17  and now it's just natural.

18          MR. BERTHOLF:  All right.  And it sounds -- and I

19  think you just said it, the -- it sounds like you really strive

20  to be very precise.

21          A PROSPECTIVE JUROR:  I do, yeah.

22          MR. BERTHOLF:  And can you explain why -- what's --

23  where did that come from?

24          A PROSPECTIVE JUROR:  I'm not sure.  I just always

25  liked things to be in order.  And so, from a young age, I liked

my bed to be made a certain way and things to be done a certain

way. And I just strived for it to be as close to perfect as I

could.

MR. BERTHOLF: Okay. So if you're on this jury

panel, you're going to be discussing the case with all these

other people that may disagree with you and may not be as

precise in their thinking as you. How -- how is that going to

work for you, to work together with people like that --

A PROSPECTIVE JUROR: Oh, it'd be --

MR. BERTHOLF: -- that may not be as precise as you?

A PROSPECTIVE JUROR: -- yeah, totally fine. I like

different opinions, and I like discussing different opinions.

And I welcome it, so I know that wouldn't -- that doesn't

bother me at all.

MR. BERTHOLF: Okay. And you -- you said -- for

hobbies and interests, one of the things that you wrote was

"seeing new things."

A PROSPECTIVE JUROR: Yeah.

MR. BERTHOLF: Like what type of things? What are

you talking about?

A PROSPECTIVE JUROR: I don't know. I just love

diversity in different aspects of life, whether it's nature or

cultures, things like that. I just like to learn about new

things.

MR. BERTHOLF: Okay. Awesome. Let's see. Was there

1  anything else?

2          That's one of the cool things about the jury

3  questionnaires, is we kind of get the chance to know you a

4  little bit and then follow up on things.

5          A PROSPECTIVE JUROR:  Yeah, absolutely.

6          MR. BERTHOLF:  Sometimes my tablet doesn't like to

7  cooperate.

8          There we go.

9          And it sounds like when you -- for newspapers and

10  stuff, you said you don't really rely on any sources.  What --

11  what's your process on learning about news information?

12          A PROSPECTIVE JUROR:  By that I just meant I don't

13  take one resource when I learn about things.  Typically if I am

14  interested in learning about a topic, I don't rely heavily on a

15  specific source.  I'll just go to a few different things and

16  kind of compile information together to get my information,

17  whether it be on the TV, in news -- I'm not a huge news

18  watcher -- but information, articles that I get on social

19  media, or things that I get from friends and family, just --

20  just an accumulation of all different types of sources.

21          MR. BERTHOLF:  What's your starting point?

22          A PROSPECTIVE JUROR:  Typically whatever I first --

23  wherever I first see information.  So if I see something on

24  social media that I'm scrolling past, I might get on and Google

25  it and, like, look for different resources on Google.  I might

ask, like, a friend, "Have you heard about this?"

I might talk to my husband.  From there, I might be like, oh, I should see what the news is saying about this.  I don't have a specific, like, news channel that I watch, so whatever -- typically the first one that I see.

MR. BERTHOLF:  Okay.  Thank you.

A PROSPECTIVE JUROR:  Yeah.

MR. BERTHOLF:  No. 37.  Right next door.

You -- you stated that you might have some rotator cuff issues that could impair jury service.  Can you explain how that might impair you?

A PROSPECTIVE JUROR:  Not that it impairs my jury service.  It impairs my writing.

MR. BERTHOLF:  Okay.  So you're probably going to be able to take notes.  You're not required to.  Would you be able to take notes?

A PROSPECTIVE JUROR:  Yes.

MR. BERTHOLF:  Okay.  Well, I thought that was probably the case, but I just wanted to clarify that.

Just keep going down, No. 38.

You said that you -- when it comes to gun control issues -- and we'll probably talk a little bit more with other people about this also -- that you want red flag laws.

A PROSPECTIVE JUROR:  Yeah.  It makes sense to me.

MR. BERTHOLF:  All right.  Tell me what a red flag

1  law is.

2        A PROSPECTIVE JUROR:  Things are -- people are

3  flagged if they are unstable, mentally unstable, not able to --

4  not a good person to own a gun basically.

5        MR. BERTHOLF:  Okay.

6        A PROSPECTIVE JUROR:  You know, and they're flagged,

7  so that when they go to buy a gun, they -- they don't --

8  they're not able to.

9        MR. BERTHOLF:  All right.  So you said "mentally

10  unstable."  Are you talking mentally -- only mentally ill

11  people?  Or what -- what sort of people do you think qualify

12  for red flag laws?

13        A PROSPECTIVE JUROR:  People who have had flags

14  raised.  People who law enforcement has said, you know, "You

15  shouldn't" -- they shouldn't be able to have a gun.

16        MR. BERTHOLF:  Okay.  So is it only law --

17        A PROSPECTIVE JUROR:  The truth is I haven't read the

18  laws.  I don't know the laws.  I just, you know --

19        MR. BERTHOLF:  And -- and absolutely.  Not all of us

20  have read them.  But this is why -- I just want to know what

21  your thought process is.  Is it only law enforcement that get

22  to raise the -- in the way you're thinking about it, is it only

23  law enforcement that get to raise these red flags?

24        A PROSPECTIVE JUROR:  I don't know.  Courts maybe.

25  Maybe -- maybe even psychologists or, you know, folks like --

or people in medical -- medical people.  I don't know.

        MR. BERTHOLF:  Okay.  And --

        A PROSPECTIVE JUROR:  I don't know nothing about who -- about who makes the red flag law, you know.

        MR. BERTHOLF:  Okay.  And that's fair.  What about people convicted of felonies?

        A PROSPECTIVE JUROR:  If -- if they have -- if they've been -- depends on what felony they've been convicted of, you know.

        MR. BERTHOLF:  Okay.  Can you expand on that?

        A PROSPECTIVE JUROR:  Well, if it's been a violent felony where there was -- you know, guns were used and that kind of stuff, that might be one kind of thing.  But if it was a -- you know, they were, you know, falsifying business records or something, maybe not, you know.

        MR. BERTHOLF:  Okay.  You said a violent felony where guns are used.  What about a violent felony where no guns are used?

        A PROSPECTIVE JUROR:  I wouldn't -- I don't know.  That's, again, up to the people who make the law.

        MR. BERTHOLF:  Okay.  Well, let's pretend you're a legislator.

        A PROSPECTIVE JUROR:  Okay.

        MR. BERTHOLF:  What's your preference?

        A PROSPECTIVE JUROR:  My preference is that people

who society, I guess, think should not have a gun, should not

have a gun --

MR. BERTHOLF:  Okay.  All right.

A PROSPECTIVE JUROR:  -- you know.

MR. BERTHOLF:  So one of the things that you said

was, like, a white-collar probably shouldn't be restricted from

firearms.  And that's okay.  My question is not -- is kind of a

follow-up.  There's allegations of felon in possession of a

firearm in this case.  What if you don't know what the felony

is?

A PROSPECTIVE JUROR:  Then I couldn't -- I don't know

if the red flag law would apply to that person or not.

MR. BERTHOLF:  Well, I guess let me ask my question

specifically, which I didn't do.  Say you're on the jury.

You're asked to determine guilt or not guilt on a felon in

possession of a firearm, and you don't know what type of felony

it is.  Can you find guilt?  Or can you not come up to a

decision at all?

A PROSPECTIVE JUROR:  I think it would depend on the

evidence that was presented, you know, all the evidence that

was presented in the case.  You know, it's like I maybe could

find guilt, maybe could not find guilt.  It depends on the

evidence, I would imagine.

MR. BERTHOLF:  Well, the evidence is only that you

know that it's a felony.

```
1              A PROSPECTIVE JUROR:  The evidence is only that I
2    know it's a felony?
3              MR. BERTHOLF:  And there's a firearm.
4              A PROSPECTIVE JUROR:  And the charge is felony
5    firearm possession?
6              THE COURT:  Hold on.  I'm going to ask you not to
7    have him commit to a verdict in this case.
8              MR. BERTHOLF:  I'm not.  I'm just asking:  Can you
9    make a decision?
10             A PROSPECTIVE JUROR:  I could make a decision.  Sure.
11             MR. BERTHOLF:  Okay.  That's all I'm asking.
12             A PROSPECTIVE JUROR:  Phew.  Thank you.
13             MR. BERTHOLF:  There we go.  Okay.
14             No. 40, you indicated that you have a concert on
15   October 18th and 19th.  Tell us about that.
16             A PROSPECTIVE JUROR:  Oh, it's my sister's birthday,
17   and so we offered her a weekend in Sacramento.
18             MR. BERTHOLF:  Okay.  So would you -- say you're on
19   the jury.  Can you serve on the 18th?
20             A PROSPECTIVE JUROR:  I'm not sure.
21             MR. BERTHOLF:  That's a Friday.
22             A PROSPECTIVE JUROR:  Oh, okay.  So it's Saturday and
23   Sunday.  Sorry.
24             MR. BERTHOLF:  Oh, it's a Saturday and Sunday?
25             A PROSPECTIVE JUROR:  Yeah.  I didn't have my phone
```

1    on, so I couldn't verify dates.

2           MR. BERTHOLF: Okay. But so it's over the weekend.

3    Would you be able to travel down to Sacramento and -- and be

4    able to still focus on the case and travel back the next --

5           A PROSPECTIVE JUROR: Yeah. I would have to, yes.

6           MR. BERTHOLF: Okay. All right.

7           No. 42, you said that you have several doctor's

8    appointments. Are those things that can be rescheduled?

9           A PROSPECTIVE JUROR: I suppose. I'm going to call

10   them today if I got to be back tomorrow 'cause I have one

11   tomorrow.

12           MR. BERTHOLF: Okay. What sort of appointments?

13           A PROSPECTIVE JUROR: I've got a real bad foot and --

14           MR. BERTHOLF: Okay. Is it something that's dire,

15   that needs to be taken care of immediately?

16           A PROSPECTIVE JUROR: No.

17           MR. BERTHOLF: Okay. All right. Thank you.

18           No. 43, come all the way down.

19           You -- on the question about are you -- did -- a

20   victim of sexual abuse or physical abuse, you answered yes as

21   well.

22           A PROSPECTIVE JUROR: Yes.

23           MR. BERTHOLF: Is that something that's going to

24   affect your view of the case?

25           A PROSPECTIVE JUROR: No, not at all.

1          MR. BERTHOLF:  I'm going to ask you the same thing.

2   I don't think there was any follow-up.  Was the -- was this

3   situation investigated?

4          A PROSPECTIVE JUROR:  No.  No.  It was isolated.  It

5   was talked about a long, long time ago.

6          MR. BERTHOLF:  Okay.

7          A PROSPECTIVE JUROR:  Yeah, no, it's handled.

8          MR. BERTHOLF:  Won't affect you in this case?

9          A PROSPECTIVE JUROR:  Not at all.

10          MR. BERTHOLF:  All right.  No. 44, when I was talking

11   about firearms with the gentleman in the back --

12          A PROSPECTIVE JUROR:  Yes.

13          MR. BERTHOLF:  -- I -- you seemed to have a pretty

14   vigorous response.  What's your view on gun control issues?

15          A PROSPECTIVE JUROR:  Well, I believe in the Second

16   Amendment definitely.  But I'm kind of like the gentleman up

17   there, is that if you knew there's a violent felon, I don't

18   think they -- obviously shouldn't have guns.  But if I didn't

19   know what their crime was, then I'm kind of like him, you know,

20   no.

21          MR. BERTHOLF:  Okay.

22          A PROSPECTIVE JUROR:  But what was the other?

23          MR. BERTHOLF:  The final question was could you make

24   a decision if --

25          A PROSPECTIVE JUROR:  I could make a decision, yeah.

```
1              MR. BERTHOLF:  Okay.

2              A PROSPECTIVE JUROR:  I could do that.

3              MR. BERTHOLF:  All right.  Let's see.  No. 49 -- oh,

4    wait, no, I jumped ahead.  Sorry.  I lost my track.  Let's go

5    back to 34.

6              Well, actually, I -- you mentioned earlier you -- you

7    said that you saw information on the news.  Are you going to be

8    able to put any of that information aside and just focus on

9    this -- on what's presented in trial?

10             A PROSPECTIVE JUROR:  Absolutely.

11             MR. BERTHOLF:  All right.  And your mother was a

12   meter maid for Medford Police Department.

13             A PROSPECTIVE JUROR:  The first.

14             MR. BERTHOLF:  The first?

15             A PROSPECTIVE JUROR:  In Medford.  That's right.

16             MR. BERTHOLF:  Oh, wow.  How long ago was that?

17   That's --

18             A PROSPECTIVE JUROR:  I think the late '60s, early

19   '70s.

20             MR. BERTHOLF:  Okay.  Well, that's pretty darn

21   interesting.  How long did she work as a meter maid?

22             A PROSPECTIVE JUROR:  Oh, gosh, I don't know.  Three

23   or four years, I believe.

24             MR. BERTHOLF:  Okay.

25             A PROSPECTIVE JUROR:  Yeah.
```

MR. BERTHOLF:  All right.  Question 43, you -- which

was "Do you believe that law enforcement officers are more

likely to tell the truth than other witnesses?"  You said,

"Sometimes they have lied to get a verdict."

A PROSPECTIVE JUROR:  Correct.

MR. BERTHOLF:  Can you expand on that a little?

A PROSPECTIVE JUROR:  Well, you know, I watch a lot

of these crime shows and stuff and so forth.  And there are

times where police officers or detectives lie to suspects or

lie to them to get -- to get a conviction or get something out

of them that isn't always the truth.

MR. BERTHOLF:  Okay.  So -- now, are you talking

about true crime stories?  Or are we talking, like, Law and

Order?

A PROSPECTIVE JUROR:  True crime.

MR. BERTHOLF:  True crime?

A PROSPECTIVE JUROR:  Yeah.

MR. BERTHOLF:  Is that something that you are

interested in and watch?

A PROSPECTIVE JUROR:  I watch a lot of it.

MR. BERTHOLF:  Okay.  Is there a difference between

lying to somebody, a suspect that -- and testifying under oath?

A PROSPECTIVE JUROR:  Yeah.  Testifying under oath,

you must tell the truth.

MR. BERTHOLF:  Okay.  And that's -- I guess that was

the -- what we intended the question to be --

A PROSPECTIVE JUROR: Okay. I'm sorry.

MR. BERTHOLF: -- is do you think that law
enforcement are going to testify truthfully in court?

A PROSPECTIVE JUROR: I would hope they would, yes,
sir.

MR. BERTHOLF: Okay. Kind of going back to this, is
it fair if law enforcement would lie to somebody to try to gain
information from them?

A PROSPECTIVE JUROR: Is it fair? Well, I guess if
they were -- if they're getting information that is needed,
yes, I -- it would be fair.

MR. BERTHOLF: Okay.

A PROSPECTIVE JUROR: Yes.

MR. BERTHOLF: And how is that fair?

A PROSPECTIVE JUROR: Because suspects don't always
tell the truth; and they hem and haw, and they beat around the
bush; and you've got to ask specific questions to get the right
answer.

MR. BERTHOLF: Okay. Does anybody think that --
think a little differently, that it would -- if a law
enforcement officer would lie -- and I'm not trying to say that
this is facts in this case -- if a law enforcement officer
would lie to a suspect, is that fair? Does anybody disagree
with that, think it's unfair?

1          I -- I -- Juror -- I'm sorry.

2          A PROSPECTIVE JUROR:  No. 32.  Do I think it's fair?

3          MR. BERTHOLF:  32, is it fair?

4          A PROSPECTIVE JUROR:  Personal opinion, we shouldn't

5     be lying.  We should be telling the truth.

6          MR. BERTHOLF:  Okay.  Well, let's go back to this

7     gentleman's thing.  Suspect's hemming and hawing.  It's pretty

8     clear they're not being forthright with law enforcement, and

9     they're trying to solve a crime.

10         A PROSPECTIVE JUROR:  Would that be like coercion,

11    like tricking them into saying something?

12         MR. BERTHOLF:  Well, that's my question to you.  And

13    then -- and what's your gut answer?

14         A PROSPECTIVE JUROR:  My gut --

15         MR. BERTHOLF:  Again, this is -- there's no right or

16    wrong answers.  We just want to know how you think about it.

17         A PROSPECTIVE JUROR:  My gut says that's probably not

18    a good idea.

19         MR. BERTHOLF:  Okay.  And why not?  What's your gut

20    telling you as to why that's not a good idea?

21         A PROSPECTIVE JUROR:  'Cause it's tricking someone

22    else into thinking or believing misinformation.

23         MR. BERTHOLF:  Okay.  But isn't the other person, you

24    know, maybe hiding something bad?

25         A PROSPECTIVE JUROR:  Again, I believe our judicial

system will get to the bottom of that in some fashion or form. We're not the judge or the juror -- well, in this case we will be. But typically in life we don't get to decide that.

MR. BERTHOLF: Okay. And, ma'am, I -- purple shirt, what's your juror number?

A PROSPECTIVE JUROR: 41.

MR. BERTHOLF: Okay. 'Cause I lost -- my notes are all screwed up at this point. You had some reactions to that. What's your opinion on this subject?

A PROSPECTIVE JUROR: I think that there's policies and procedures that have to be followed during the course of an interrogation.

MR. BERTHOLF: Okay. But say -- let's just pretend that a policy and procedure is that it's okay for law enforcement to lie, like this gentleman has seen on true crime shows. Is that fair? It's the policy and procedure.

A PROSPECTIVE JUROR: Well, there's statutes also.

MR. BERTHOLF: It's following the statute. Let's say it's following the statute. It's following policy and procedure. Is that still fair?

A PROSPECTIVE JUROR: No.

MR. BERTHOLF: And why not?

A PROSPECTIVE JUROR: Because then you're treading in ethical issues.

MR. BERTHOLF: Okay.

1          THE COURT:  You have five minutes.

2          MR. BERTHOLF:  All right.  Again, I don't think

3 that's going to be evidence in this case.  But do you think

4 that law enforcement tries to be fair most of the time?

5          A PROSPECTIVE JUROR:  Yes.

6          MR. BERTHOLF:  Okay.

7          (Whispered discussion, off the record, 11:14 a.m.)

8          MR. BERTHOLF:  Well, I really appreciate everybody's

9 answers.

10         Oh, wait, actually, hold on.  I promised you, and I

11 forget your juror number.

12         A PROSPECTIVE JUROR:  I'm 30.

13         MR. BERTHOLF:  30.  All right.  Let me bring you up

14 here.  So let me look at you real quick.  Oh, you're from

15 Malin.

16         A PROSPECTIVE JUROR:  Malin.

17         MR. BERTHOLF:  I'm horrible.  I've been by there.

18 But --

19         A PROSPECTIVE JUROR:  Did you blink?

20         MR. BERTHOLF:  That's why -- that's why I called it

21 Malin, 'cause I blinked too much.

22         Where are we at?

23         30.  All right.  Oh, you are -- yeah.  It looks like

24 you're a pretty firm supporter of gun rights.

25         A PROSPECTIVE JUROR:  It is the right to bear, you

1  know.

2          MR. BERTHOLF:  All right.  So I'm going to ask you

3  kind of a similar thing that I was asking other people.  Should

4  the Government restrict firearms in any way, shape or form?

5          A PROSPECTIVE JUROR:  No, not in any way, shape or

6  form.

7          MR. BERTHOLF:  So felon in possession of a firearm

8  should not be the law of the land?

9          A PROSPECTIVE JUROR:  No.  That should be the law of

10  the land.

11          MR. BERTHOLF:  That should be the law.  But that's

12  the Government restricting firearms rights?

13          A PROSPECTIVE JUROR:  Yes, I -- okay.  Yes.  Then I

14  do.

15          MR. BERTHOLF:  Okay.  And, kind of back to this

16  gentleman, what about a nonviolent felony?  Is that something

17  that should be restricting people from owning firearms?

18          A PROSPECTIVE JUROR:  Yes.

19          MR. BERTHOLF:  Even in nonviolent?

20          A PROSPECTIVE JUROR:  I don't think there's a

21  distinction on that.

22          MR. BERTHOLF:  Okay.  I don't -- current law, there

23  is no distinction, yes.  But you're okay with that being in

24  place?

25          A PROSPECTIVE JUROR:  Yes.

```
 1              MR. BERTHOLF:  Okay.
 2              A PROSPECTIVE JUROR:  And there's age requirements
 3    and, you know --
 4              MR. BERTHOLF:  Okay.
 5              A PROSPECTIVE JUROR:  I could even say you should get
 6    a gun license.  And everybody that wants a gun, go out and take
 7    little lessons, you know.
 8              MR. BERTHOLF:  Okay.  So you are in favor of -- if
 9    the Government put in a restriction saying anybody that wants
10    to buy a firearm better go down and get some safety training?
11              A PROSPECTIVE JUROR:  I would like that.
12              MR. BERTHOLF:  Okay.
13              A PROSPECTIVE JUROR:  Sorry.
14              MR. BERTHOLF:  No.  I'm going to follow that up.
15              A PROSPECTIVE JUROR:  We have a lot of hunters, so
16    that's what -- for my culture it's for hunting, safety and
17    kids.
18              MR. BERTHOLF:  Okay.  Safety's very important then?
19              A PROSPECTIVE JUROR:  Mm-hmm.
20              MR. BERTHOLF:  Okay.  And then juror number --
21              A PROSPECTIVE JUROR:  35.
22              MR. BERTHOLF:  35, we're going to bring the
23    microphone up to you.  And I think this is probably where I'm
24    going to have to cut it off.  You had a strong reaction.
25              A PROSPECTIVE JUROR:  Well, I do feel that, you know,
```

to possess a firearm that, yes, you should be safe.  You should

have a safety course.  I just recently went through a safety

course, but that was in preparation for my concealed carry.

So, yeah, I guess that -- that would be the only way that

you're doing a safety course, yeah, I feel it should be --

that, yes, people should know about them if they're going to

own them.

MR. BERTHOLF:  Okay.  "Know about them," what do you

mean?

A PROSPECTIVE JUROR:  It's the same as if you're

going to have a firearm in the home of a child, that child

needs to know it, to learn it, to know how to use it, to

respect it.

MR. BERTHOLF:  Okay.

A PROSPECTIVE JUROR:  And I feel that -- that that

firearm should be respected by adult and child and that, yes,

learning about them should be in place.

MR. BERTHOLF:  Okay.  One quick follow-up question.

When you say respect the firearm, what do you mean?

A PROSPECTIVE JUROR:  In -- in knowing about it.

MR. BERTHOLF:  Okay.

A PROSPECTIVE JUROR:  Okay?  In learning about it,

and learning what it can and cannot do.  I feel that is

respecting the firearm.

MR. BERTHOLF:  All righty.  I appreciate that answer.

Thank you.

And I'll pass this panel.

THE COURT:  All right.  Thank you.

Mr. Sweet.

MR. SWEET:  Thank you, Your Honor.

Counsel.

Good morning.  So my questions here today really just have one purpose, and that's to see if you all can be fair and impartial jurors for both Mr. Zuberi and for the Government. Okay?  And so if you don't understand me because I'm unclear, if I speak too quickly, too quietly, please let me know.

If we ask -- if I ask a question that touches on something that is private and you'd prefer to discuss in private, please let me know.  I'm not going to argue with you. Okay?  I'm going to ask you some questions about your beliefs, but they're your beliefs.  And so I'd like to start with that.

And Juror No. -- sorry -- 43.

A PROSPECTIVE JUROR:  Yes.

MR. SWEET:  I have a question.  Your -- the questionnaire asked if you believe the Government has no authority over its citizens.  And I believe you said, "Yes, by the people, for the people."

A PROSPECTIVE JUROR:  Yes.

MR. SWEET:  And so I just wanted to follow up because really some people believe the federal government has no

1    authority whatsoever, but you're here today, so you responded

2    to a summons.  And so I just wanted to ask if you could explain

3    that a little bit more.

4              A PROSPECTIVE JUROR:  Well, I believe that we,

5    actually, as a -- the people, we actually run this country.

6    And people that are elected to man -- person certain parts of

7    the government are elected by us, the people.  So that's really

8    what I'm -- and I show up because that's my choice, is to be a

9    part of what runs our -- our society and how we choose to have

10   our government.

11             MR. SWEET:  Absolutely.  I mean, all citizens have

12   both rights and responsibilities.  And you received the

13   summons, and you responded to that summons.  And so, you know,

14   at the most basic, I guess my question is this:  There are some

15   people who simply do not acknowledge the -- either the federal

16   government or the state government and say, "They have no

17   authority over -- over me whatsoever.  The laws don't apply to

18   me."  But it doesn't sound like that's what your views are; is

19   that correct?

20             A PROSPECTIVE JUROR:  Correct.  That's correct.

21             MR. SWEET:  Okay.  Thank you.  Thank you.

22             And I wanted to ask one -- let's see.  I believe it

23   was Juror No. 37.  I just had one question, ma'am.  You said, I

24   believe, "A trial -- defense by trial is a good defense," or

25   something along those lines.  And I wanted to ask what you were

1  referring to with that.

2        A PROSPECTIVE JUROR:  I'm sorry.  Could you repeat

3  that?

4        MR. SWEET:  Yes.  You said, I believe, "Trial by jury

5  is a good defense," in response to a question.  And I wasn't

6  sure what you were referring to.

7        A PROSPECTIVE JUROR:  Well, I think it's important

8  that you are not being judged, like, singly, but you have a

9  panel of people who have various ideas.

10        MR. SWEET:  Basically acknowledging the importance of

11  the juror system and trial by jury, as opposed to by trial by

12  judge or a secret jury or something like that?

13        A PROSPECTIVE JUROR:  Correct.

14        MR. SWEET:  Okay.  Thank you.

15        I'd like to talk for a minute and follow up about --

16  there was a question regarding a commercial sex worker and

17  their testimony.

18        And, ma'am, feel free to -- you can pass that.  Thank

19  you.  I won't have you hold that.

20        There was a question about a commercial sex worker

21  and if you would view the testimony of someone who engaged in

22  commercial sex work differently, if that would impact -- if you

23  would be biased against them.  And there were some varying

24  answers of varying degrees, and I want to -- I want to follow

25  up.

1    I believe -- Juror No. 28, I believe you kind of have

2    that flagged as a -- something that you would look at.  And I

3    wanted to see:  Would that impact you, sir?

4        A PROSPECTIVE JUROR:  So I don't remember the exact

5    question.

6        MR. SWEET:  Essentially if a witness had engaged in

7    commercial sex work, would that impact how you would view their

8    testimony or credibility?  Would you be biased against them?

9        A PROSPECTIVE JUROR:  I wouldn't be biased against

10   them.  That's their testimony.

11       MR. SWEET:  Okay.  Thank you.  So that answers that.

12   And I may have misunderstood or I may have misread that, so

13   excuse me if that was -- if I did.

14       Let me see.  Well, who -- who -- who would be

15   impacted by that?  Who would be concerned if a witness had

16   engaged in commercial sex work?  Would that be something that

17   would impact any of you and how you would assess them?  Again,

18   I'm not going to argue with anybody.  I'm just -- okay.

19       A PROSPECTIVE JUROR:  (Indiscernible).

20       THE COURT REPORTER:  I'm sorry.  I can't hear.

21       THE COURT:  I think she's asking what -- so, just to

22   clarify, "commercial sex work" is just a term we tend to use

23   for prostitution.

24       A PROSPECTIVE JUROR:  Oh, okay.

25       MR. SWEET:  It's a good question.  Thank you.  Would

1    that impact you, ma'am?

2              A PROSPECTIVE JUROR:  No.

3              MR. SWEET:  Okay.  So -- and, speaking clearly now,

4    prostitution, would that impact any of you?

5              Okay.  So then I can make this a larger question.

6    Each witness that gets in the box and swears an oath and

7    testifies, are you all going to give them a fair shake,

8    regardless of what they may have done in terms of a job,

9    whether they engaged as a prostitute?  Is everyone willing to

10   base their decision on how you evaluate their testimony and the

11   evidence?

12             Okay.  Does that apply to -- does that apply to law

13   enforcement?  Anyone have concerns about a law enforcement

14   officer or an FBI agent?  Is everyone able to give them a fair

15   shake?

16             Okay.  Then let me -- let me ask about -- we'll talk

17   about the guns for just a minute.  And I know we've talked

18   about that some.  And, Your Honor -- if I may, Your Honor, I

19   just have one question.  I'm trying to recall if the Court read

20   the charges prior to this panel as well?

21             THE COURT:  Yes.  The fact that there were two

22   kidnappings, from Seattle to Washington, and the felon in

23   possession of a firearm.  I did read that introduction.

24             MR. SWEET:  Thank you, Your Honor.  Thank you.

25             So you know there's going to be a felon in possession

of a firearm charge. Evidence is going to come in through
witnesses and through exhibits. And the law, the instructions,
are going to come from the judge. You may not have answers to
every question that you want an answer to.

But my question to you is: Can you follow the law as
given to you by the judge, even when there may be things that
you would like to know? Can everyone follow the law as given
to you by the judge?

So when we were talking about -- when you were
talking about felon in possession of a firearm, I know some of
you said you -- essentially you'd like to know the underlying
felony: Is it violent, nonviolent? You may not know that.
You may just be given evidence that there is a felony, and then
whatever other evidence you receive, and then be asked to make
a decision just based on that.

Would anyone struggle -- without knowing the felony,
would you struggle to follow the judge's instructions? Please
just raise your hand.

And, ma'am, are you -- would you struggle with that a
little bit? I'm trying to --

A PROSPECTIVE JUROR: I don't know.

MR. SWEET: Okay. Well, could we pass you the mic,
please, for one second.

And I'm not trying to put you under the spotlight,
but what are your thoughts?

A PROSPECTIVE JUROR:  So could you repeat the question, please.

MR. SWEET:  I'm going to shorten it, because it was a long question.  So the ultimate question is:  Can you follow the law as given to you by the judge?  There may be some things that you would like to know that you don't know.  You're going to get a universe of facts, and that's it.  And then the judge is going to give you the law.  Would you be able to follow the law, as given, even if there were some things that you might want to know, but don't?

A PROSPECTIVE JUROR:  Yes, I would be able to.

MR. SWEET:  Okay.  Is everyone else able to do that as well?

Okay.  Thank you.

And let's see.

And, sir -- I'm sorry -- Juror No. 34 -- I'm sorry.  Not that far back.

31, how about you, sir?  I know -- I believe you had some strong -- I believe you said you support the Second Amendment.  And so just the same question:  In terms of the felony, any issues with that, if you don't know the felony?

A PROSPECTIVE JUROR:  No.

MR. SWEET:  Okay.  All right.  Thank you.  And, actually, if you could pass the mic over just one to the right.

Ma'am, you know what I'm going to ask you.  So you

1  work for a defense firm, correct?

2        A PROSPECTIVE JUROR:  Correct.

3        MR. SWEET:  As a paralegal?

4        A PROSPECTIVE JUROR:  Yes.

5        MR. SWEET:  So I know plenty of paralegals that work

6  sometimes for the DA's Office and then the defense and then

7  Oregon DOJ.  And people -- people move around.  And so would

8  you -- does that impact how you would sit as a juror for one

9  side or the other?

10        A PROSPECTIVE JUROR:  No.

11        MR. SWEET:  Okay.  Nothing going on at your defense

12  firm where you would be looking askance over at the

13  prosecution?  Or nothing going on with your thoughts, I should

14  say?

15        A PROSPECTIVE JUROR:  No.  No.

16        MR. SWEET:  That was a horrible question.  "Nothing

17  going on with your thoughts," I did not mean that --

18        A PROSPECTIVE JUROR:  I actually have a great

19  relationship with the DA in Deschutes County, so --

20        MR. SWEET:  Understand.  Okay.  Well, thank you then.

21  That answers that question.

22        And if we could just -- could we just pass it all the

23  way back over to the far left, sir.

24        And Juror No. 34?  And so I just did want to follow

25  up.  You know, I think you -- two things.  One, on the gun

laws, same question before, no concerns if you do or don't know about what the felony is?

A PROSPECTIVE JUROR: No concern.

MR. SWEET: Okay. And then when -- when you talked about law enforcement, you know, and some, you know, potential they might lie to get a verdict, you're going to hear from law enforcement, and you're going to hear from the FBI. Are they going to get a fair shake from you?

A PROSPECTIVE JUROR: Absolutely.

MR. SWEET: Okay. Okay. Then -- I want to -- I want to ask you -- thank you, sir. Feel free to pass that -- pass that over.

So my next question is a very general question. And it is essentially if there's anything that we haven't asked you that we need to know, that we should know, either party, about your ability to sit as a fair and impartial juror.

So we -- we have only touched on certain topics. And I ask this question every time. And invariably someone raises their hand, and they share something that we didn't think to ask. So I do want to ask you if you would please raise your hand if there's anything that -- actually, I'm going to -- ma'am, you've been -- you've been forthcoming with answers.

Ma'am, anything that you think we should know that we haven't talked to you about that could affect your ability to be a juror? Oh, yes, I should've --

A PROSPECTIVE JUROR:  I'm Juror No. 32.  And no.  And I don't have anything pressing on me that would affect my ability to serve as a juror.

MR. SWEET:  Okay.  Thank you.

Same question for -- same question for everyone then.  Does -- please just raise your hand if anyone has anything that you think could impact your ability to be a fair and impartial juror 'cause I haven't talked to all of you.

Okay.  Thank you, all.

Pass this panel for cause, Your Honor.

THE COURT:  Okay.  Thank you.  Folks, we are going to take a break.  We may be having a break for lunch.  I need to talk some more to the attorneys.  We're trying to select a jury as quickly as we can, so that those of you who are not going to be sitting on the panel can get back to your lives.

Remember that you are not to discuss this case with anyone, including your fellow potential jurors.  This is not the time to be talking about the case, especially I know those -- some of you have some information about this case in the media.  I'm going to ask those jurors specifically not to discuss anything they may have seen.

If anybody approaches you, please you need to -- to talk to you about the case, you need to let me know.  It is important that you're not, you know, in the hallways of the courthouse or hanging out in that front sidewalk area for

lengthy periods of time because there are, you know, people involved in the case who may be talking about the case.

We don't want you overhearing that. We don't want you discussing the case with friends or family members, including on the Internet, through chat rooms or blogs or bulletin boards, through e-mail or texting. We don't want you to read, watch or listen to any news reports or other accounts about the trial or anyone associated with it, including any online information.

Do not do any research, such as consulting dictionaries, searching the Internet or using other reference materials on your own. It is important that, if you are on this jury, the decision that you make is based on the evidence and testimony presented here in the courtroom. So please do not look up information or talk to anyone about the case.

Ms. Pew will take you downstairs right now. We'll be letting you know shortly whether we're breaking for lunch and need you back and what time. And we will do our best. We may have another panel to talk to early afternoon, which may take a little bit of time.

But I think we just have one more panel to talk to, if at all. So thank you. We'll get information to you as soon as we can. If you'll follow Ms. Pew, she will take you downstairs.

(Open court, prospective jury not present,

1  11:33 a.m.)

2          THE COURT:  All right.  Please be seated.

3          So I'm -- Ms. Pew, are they all downstairs now?

4          THE COURTROOM DEPUTY CLERK:  They're all heading

5  down.

6          THE COURT:  So, by my count, we have exactly 36.

7          MS. POTTER:  Yes, Your Honor.

8          THE COURT:  The problem with that count is there

9  are -- first of all, Juror No. 10, Mr. Bigelow, had sent a note

10 saying he cannot afford this.  I don't know what -- exactly

11 what that means, other than it sounds like he has a financial

12 concern about sitting for three weeks.

13         We have Mr. Bailey, Juror No. 17, who has family at

14 home that he's generally a caregiver for, parents in their

15 fifties.  But there was a concern expressed.  Mr. Franell has a

16 wedding on a Friday that he's flying to.  Ms. Smith is moving

17 in November.  I'm less concerned about that.  Mr. Franell is

18 No. 21.  Ms. Smith is No. 22.

19         Mr. Jacob, No. 31, did express a concern about work,

20 but it did not seem insurmountable, from my perspective.  But

21 we do have some people with some hardships.  We have

22 Mr. Bigelow, who's obviously wanting us to know right now about

23 his issues.

24         And we have, I would think, Mr. Bailey and

25 Mr. Franell in particular.  So I guess what I'm wondering is do

1    we bring up a panel at 1 o'clock and have some extras and

2    excuse some of the hardship folks, or do we go forward and

3    exercise our peremptories now?

4            Mr. Sweet.

5            MR. SWEET:  Thank you, Your Honor.

6            Your Honor, I -- as much as I would like to simply

7    move forward, I think it may be prudent to bring up the next

8    panel.  I do think Juror No. 17, who's now in seat number one,

9    it was his parents, but I think, more importantly, it was his

10   grandmother, I believe, that he also took care of.

11           THE COURT:  Right.  In the eighties.

12           MR. SWEET:  And just how many people we potentially

13   may have lost, Mr. Bigelow or not, but I -- it does seem like

14   36 is the exact number we would need to -- so that would be my

15   thought, Your Honor.

16           THE COURT:  The defense.

17           MR. BERTHOLF:  I completely agree.  These four we

18   just listed off, I think we can let them go and bring back the

19   afternoon.  I'd much rather be prudent than rush ahead.

20           THE COURT:  Okay.  Well, then I am prepared to then

21   remove Mr. Bailey.  So, just to clarify then, Marie Canoso will

22   be in Seat 1.  Mr. Franell, in Seat 21, will be removed

23   given -- I believe it was a nonrefundable ticket.

24           I guess Mr. Bigelow we didn't really have a chance to

25   talk to him about his financial concern.  The note simply says

he's now requesting deferral.  He is saying he cannot afford

this.  So if both sides agree, I will remove him.  If not --

           MR. SWEET:  Fine with -- sorry.  Fine with the

Government.

           MS. POTTER:  Fine with the defense.

           THE COURT:  All right.  We'll remove Mr. Bigelow.

           Okay.  So, Ms. Pew, we have a group coming up at

1:00, right?

           THE COURTROOM DEPUTY CLERK:  (Indiscernible).

           THE COURT:  I'm sorry.  What was that?

           We can go off the record.

                          * * *

           (Noon Recess taken at 11:38 a.m.)


                    ***AFTERNOON SESSION***

           (Prospective jurors seated, 1:30 p.m. - 1:32 p.m.)

           THE COURT:  Okay.  Please be seated, folks.

           Folks, welcome to the federal courthouse.  I'm Judge

McShane.  We are picking a jury today.  We need to pick 16

jurors to hear a case that will last over the course of the

next roughly three weeks.  We're going to try to keep things

moving.  You're the last group of jurors that we're speaking

with today.  When we're done asking you some questions, we will

be selecting the jury, so you will know shortly after we're

done speaking with you whether you will be sitting on this jury

or not.

We are selecting the jury for the criminal case of United States versus Negasi Zuberi. Mr. Zuberi is charged with two kidnappings; traveling from Seattle, Washington, to Klamath Falls, Oregon, with the intent to commit unlawful sexual activity; and unlawful possession of firearms and ammunition.

Under our system of justice, a person is innocent of any crime or wrongdoing unless and until the Government can prove their guilt to all 12 jurors who will ultimately hear the case beyond a reasonable doubt. Each juror must be able to judge this case fairly and objectively. So if anyone does have any knowledge of or has formed any opinion about this case, this should be brought to my attention.

I'll ask you about that in just a moment. It is important that we know whether you know people involved in the case, so I am going to have the parties introduce themselves. And I am going to have one of the attorneys read out the names of the potential witnesses in this case. So I want you to listen closely to those names in the event that you might know somebody involved in the case.

But, with that, I want to introduce the parties. In a criminal prosecution in federal court, it's the United States Attorney's Office, the Government, that brings the charge. And it's the defense that is defending against the charge. So

 1  we'll start with the Government.

 2          MR. SWEET:  Thank you, Your Honor.

 3          My name is Jeff Sweet.  I'm an Assistant United

 4  States Attorney.  This is Nathan Lichvarcik, also an Assistant

 5  United States Attorney.  And Marco Boccato, Assistant United

 6  States Attorney.  We represent the Government.

 7          THE COURT:  Thank you, Mr. Sweet.

 8          And for the defense.

 9          MR. BERTHOLF:  Good afternoon.  My name is Michael

10  Bertholf on behalf of Mr. Zuberi.  We have Amy Potter and

11  Cheryl Oakley defending Mr. Zuberi.  Thank you.

12          THE COURT:  All right.  Thank you.

13          And, Mr. Sweet, I charge you with reading the names

14  of the potential witnesses in this case.  Could you do that

15  now?

16          MR. SWEET:  Yes, Your Honor.

17          They are Lara Adams; AV-1; AV-2; Kori Barnum; Tim

18  Broadway; Bryan Chiles; Rachel Clay; Brianna Crawford; Diego

19  Delgado; Brandon Dougherty; Shasta DuVal; Ashley Ensminger;

20  Trahern Fox; Carlos Garcia; Mellissa Geary; Austin Gilmore;

21  Christopher Giovanetty; Travis Gluesenkamp; Nicholas Griebel;

22  John Hobby; Emily Keeton; Sean Kennedy; Greg Lara; Justin

23  Lazenby; Danielle Logan; Joel Loudermilk; Jason Malone; Kathy

24  Maxwell; Jennifer McAfee; Melanie McClure; Erik Mendoza; Nayeli

25  Donaldson; Christopher Parkerson; Shelby Quick; Christina

Ruelas, who works at the Sky Lakes Medical Center; Geovanni

Ruelas; Nayeli Ruelas, who works at Klamath Basin Behavioral

Health; Prentice Smith; Jesse Snyder; Dylan Staples; Robert

Phillips; Stephanie Stewart; Bradley Sticklin; Loren Summers;

Amie Walton, who works -- she's a SANE nurse, and she works at

hospitals, including Providence; Brandon Westfall -- excuse

me -- Brenden Westfall; Carol Westfall; Kevin Westfall; Dr. Jay

Williams; Kylie Winkle-O'Brien; Christi Winters; Tyler Young;

and Chris Zupan.

THE COURT:  Does anybody know any of the parties to

the case or any of the witnesses whose names have been read

out?

A PROSPECTIVE JUROR:  I do work with --

THE COURT:  Could you tell us your juror number?

Sorry.  It helps us, because we have you in little boxes on

pieces of paper, so --

A PROSPECTIVE JUROR:  Juror No. 68.

THE COURT:  All right.  And who do you might know?

A PROSPECTIVE JUROR:  I'm familiar with Jesse Snyder.

I work with his mother-in-law.

THE COURT:  Okay.  Is that familiarity distant enough

that it won't impact your decision-making in this case?

A PROSPECTIVE JUROR:  I believe so.

THE COURT:  Okay.  Thank you.

And we had somebody down here.

1          Yes.

2          A PROSPECTIVE JUROR:  Juror No. 62.

3          THE COURT:  Thank you.  And who do you know?

4          A PROSPECTIVE JUROR:  I believe I know Kathy Maxwell.

5          THE COURT:  Okay.  Is that an acquaintance, a friend,

6      somebody from work?

7          A PROSPECTIVE JUROR:  An acquaintance.  She's an aunt

8      of a good friend of mine.

9          THE COURT:  Okay.  Is that relationship such that it

10     would impact your ability to be fair?

11         A PROSPECTIVE JUROR:  I don't believe so.

12         THE COURT:  Okay.  Thank you.

13         Anybody else that might know anybody involved in the

14     case?

15         I'm not seeing anybody else, I don't think.

16         Couple things.  First, a number of you have traveled

17     from great distances to be here today.  I appreciate that.  I

18     know it's a big -- a big sacrifice that we ask people in

19     federal court.  This is federal court.  Our federal district is

20     the entire District of Oregon, unlike California and

21     Washington, which are split into several districts.

22         Oregon is one big district.  The Medford Division is

23     a very large region of the district.  We only have six judges,

24     currently five -- only five active judges serving the District

25     of Oregon, four in Portland and just me in Eugene.  I also

cover the Medford region, so I come down here for trials.

So the Medford region covers really most of Southern Oregon, and that's why we pull from such a large section. I know many of the jurors will be staying in Medford during the trial in hotels because they've been traveling so far. So I do appreciate that.

The other piece is one of the things you'll hear me instructing you probably over and over again, if you're called to sit on this case, is to not look up any information and to be very cautious about looking at the news.

I know there's a lot of things going on in the news that you might want to know about. This case is not one of them. I'm going to instruct you to stay away from local news, and maybe certain news media stations specifically, so that you do not gain information about the case that's not in this courtroom.

The parties are entitled to the considered decision of the jurors based on the testimony and the evidence in the courtroom, not what you can find out on the Internet or from your friends or from your social media pages and certainly not from the media.

So one question I have: Does anybody have any familiarity with this case from things they may have seen in the news media or read?

Okay. We have a number of you. So let's start in

1  the front row.

2          A PROSPECTIVE JUROR:  Yes.  I --

3          THE COURT:  Oh, and you're Juror -- actually, I

4  forgot to swear you in.  So before you answer any questions,

5  could you please stand and raise your right hand.

6          (Prospective jury sworn, 1:40 p.m.)

7          THE COURT:  All right.  Thank you.  Have a seat,

8  please.

9          All right.  Let's talk about -- what I don't want you

10  to -- if you could start by telling us your juror number.  And

11  I don't want you to tell us what you actually have seen or

12  heard in the news, just whether you have and when and where.

13          A PROSPECTIVE JUROR:  Yes, I have.  And primarily

14  from the Herald and News articles.  And I think I've seen it in

15  writing, at least one other written source, and on the radio.

16          THE COURT:  Okay.  And did you look up any

17  information about the case yourself?

18          A PROSPECTIVE JUROR:  I -- it was suggested to me

19  that a long -- when I mentioned that I had a juror summons for

20  an unusually long case, that it might be this one.  And I did

21  verify the start and end dates that were in the newspaper

22  article.

23          THE COURT:  Okay.  Did you form a strong opinion

24  about the outcome of the case when you saw the articles?

25          A PROSPECTIVE JUROR:  I wouldn't say a strong

opinion, but I had -- I had the impression that the information

was leaning in a particular way.

THE COURT:  Okay.  Do you think you can set aside

anything you may have seen or read regarding the case as you

sit as a juror on this case?

A PROSPECTIVE JUROR:  I would like to believe that I

could do that, but I have some doubts.

THE COURT:  Okay.  We may revisit that.  And I'm

sorry.  Your juror number?

A PROSPECTIVE JUROR:  72.

THE COURT:  Okay.  We might revisit that individually

after we've asked the panel some questions.

All right.  Who else maybe has seen something in

regard to the news media?

A PROSPECTIVE JUROR:  I'm Juror 71.  And, like she

said, Herald and News, social media.  I do live in that

vicinity.  I live out in Bly, which is about an hour away.

THE COURT:  Okay.

A PROSPECTIVE JUROR:  I do know that when the

incident occurred, in about that time frame, that there was,

you know, kind of an alert put out to look for a vehicle and

the situation.

THE COURT:  All right.

A PROSPECTIVE JUROR:  And I live right off of 140 in

Bly.

THE COURT:  Do you think that information that you
may have gleaned from the media is going to make it difficult
for you to be fair in this case?

A PROSPECTIVE JUROR:  No, not at all.

THE COURT:  All right.  Thank you.

All right.  Who else?  We had some people --

A PROSPECTIVE JUROR:  Juror 61.

THE COURT:  Okay.  We're going to get you a
microphone.

Let me introduce some people to you as well.  Lindsey
down here is our court reporter.  She has to report everything
that's being said in the courtroom, so that's why we're giving
you a microphone and making sure people can be heard.

Char, Ms. Pew, is my courtroom deputy.  She's in
charge of the jury.  So you will get to know her at least for
the first week of the trial.  Mr. Svelund over here is a lawyer
working with me as a federal clerk.  He helps me with legal
issues.  He figures things out for me.

So -- all right.  Juror number?

A PROSPECTIVE JUROR:  61.

THE COURT:  Thank you.  Yes, sir.

A PROSPECTIVE JUROR:  I believe I was at work on --
it was a Facebook group I belong to, Jackson County Scanner
Group, and I believe that's where I first saw the headline.

THE COURT:  Okay.  And anything about that

information that you received that may make it difficult for

you to be fair in this case?

A PROSPECTIVE JUROR:  I figure I've already made my

decision about it.

THE COURT:  So you're coming into this as a juror.

You think you've already made a decision?

A PROSPECTIVE JUROR:  Yeah.

THE COURT:  All right.  Mr. Braman, I'm going to

excuse you.  You are free to go.

All right.  We had some other folks, let's see, in

row one.

Yes.  And your juror number is?

A PROSPECTIVE JUROR:  46.

THE COURT:  46.  Ms. Bennett.

A PROSPECTIVE JUROR:  Yes, I've seen and heard -- I

live in Klamath Falls.  I've --

THE COURT:  Okay.  So you've seen some articles or

read some articles?

A PROSPECTIVE JUROR:  And read them, yes.

THE COURT:  Have you, yourself, looked up information

about the case?

A PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  And have you formed an

opinion about the case that --

A PROSPECTIVE JUROR:  I believe that I could be

biased, but I'm not sure.

THE COURT: Okay. Do you think you can set aside what you may have seen or heard in the media from what you're going to see and hear in the courtroom?

A PROSPECTIVE JUROR: I think I could try.

THE COURT: Okay.

A PROSPECTIVE JUROR: I don't know for sure.

THE COURT: We may follow up with some additional questions for you. Thank you, Ms. Bennett.

Yes, Juror No. -- this is 47?

A PROSPECTIVE JUROR: Juror 47. Correct. Same as everyone. I think I just saw a couple articles, maybe off Facebook, when it first happened.

THE COURT: It doesn't sound like then you did your own research or anything like that?

A PROSPECTIVE JUROR: I did not.

THE COURT: All right. And do you think -- whatever you may have seen, can you set it aside and -- and base a decision solely on what you hear and see in the courtroom?

A PROSPECTIVE JUROR: Yes.

THE COURT: All right. Thank you, Ms. Sachs. Thank you.

Yes, Mr. Hoskins.

A PROSPECTIVE JUROR: I'm Juror No. 48. And I watch the local news every morning. So, yeah, they've pretty much

covered the story since the arrest.

THE COURT:  Have you formulated an opinion about the case?

A PROSPECTIVE JUROR:  Pretty much, yeah.

THE COURT:  And is that opinion something that is too strongly held to be a juror in this case?

A PROSPECTIVE JUROR:  I think so.

THE COURT:  Okay.  Mr. Hoskins, I will excuse you.

All right.  And it's Juror No. 49, correct?

A PROSPECTIVE JUROR:  Yeah.  Like a lot of people, I saw the story back when it started.  I did not follow up on it at all.

THE COURT:  Okay.  And any strongly formed opinion that's going to make it difficult for you to be fair?

A PROSPECTIVE JUROR:  I don't think so.

THE COURT:  Okay.  Thank you.

A PROSPECTIVE JUROR:  Juror No. 51.  I read the Herald and News.  That's it.  No follow-up.  And depending on how well the lawyers do, I'll make up my decision.

THE COURT:  Okay.  All right.  Thank you, Ms. Owen. So I'm assuming you haven't formed a strong opinion on the case?

A PROSPECTIVE JUROR:  No, I'm good.

THE COURT:  Yes.  And juror number?

A PROSPECTIVE JUROR:  56.

1          THE COURT:  Yes.

2          A PROSPECTIVE JUROR:  When a family member heard I

3   had jury duty, federal, they forwarded me an article.  I didn't

4   really feel comfortable looking through it with much depth,

5   knowing I was being called to be a juror.  I glanced at it, and

6   that's all I really did.

7          THE COURT:  Okay.  You are the juror that everybody

8   loves.  That's exactly what we're going to be asking people to

9   do, is not to look at stories that their family sends them.  So

10  thank you very much.  I appreciate that.

11         In the back row.

12         A PROSPECTIVE JUROR:  Juror 67.  And saw local

13  news -- news stories when the story broke, when the arrest was

14  made, and no research or follow-up.

15         THE COURT:  Okay.  Any strong opinion about the case

16  from that?

17         A PROSPECTIVE JUROR:  No.

18         THE COURT:  Okay.  Thank you.

19         Anyone else in the back row?

20         Okay.  Thank you.  Folks -- oh, I'm sorry.

21         In the front here, yes.

22         A PROSPECTIVE JUROR:  I think I saw a story, and then

23  I saw an advertisement from Bertholf looking for witnesses or

24  something for -- but it may have not been this case.

25         THE COURT:  Okay.  Wonderful.  And do you have a

strongly held opinion about the case based on what you saw?

A PROSPECTIVE JUROR: No.

THE COURT: Okay. Thank you very much.

Okay. Folks, both sides will have roughly about 30, 40 minutes to ask you some follow-up questions to your questionnaires. Thank you for coming in last week. Filling out those questionnaires allows us to really compress speaking to almost exactly 100 people today to try to select a jury.

We really appreciate the time and effort you put into those questionnaires. There'll be some follow-up questions maybe with you individually about the questionnaires and some general questions, but we will start with the plaintiff -- or excuse me -- the defense. Excuse me.

MR. BERTHOLF: Thank you, Your Honor.

Counsel.

Good afternoon. Thank you for being here. This is basically just for us to kind of get to know how you think about things. There's no wrong answers to the questions. I'm not here to argue with you. All I want to know is what you think and why. Beyond that -- 'cause not everybody's a perfect juror for each case, so -- but we did read your jury questionnaires, and I do have some follow-up questions.

No. 46 -- yep, we're bringing the microphone over to you, so this is all being recorded for us. So you're the sole breadwinner for your family?

1          A PROSPECTIVE JUROR:  Yes.

2          MR. BERTHOLF:  So how large is your family?

3          A PROSPECTIVE JUROR:  My two daughters live at home,

4     and my husband and me.

5          MR. BERTHOLF:  If you would be picked on this jury,

6     would you be able to sit for three weeks?

7          A PROSPECTIVE JUROR:  I wouldn't be paying our bills,

8     so no.  I wouldn't --

9          MR. BERTHOLF:  What happened if you weren't able to

10    go to work?

11         A PROSPECTIVE JUROR:  We'd get really far behind.

12         MR. BERTHOLF:  Okay.  Would you be able to focus on

13    the case?

14         A PROSPECTIVE JUROR:  Probably not, 'cause that's a

15    big thing.

16         MR. BERTHOLF:  All right.  We will probably come back

17    to this.

18         A PROSPECTIVE JUROR:  Okay.

19         MR. BERTHOLF:  All right.  Thank you.

20         No. 49, your wife is an archeologist for the tribe?

21         A PROSPECTIVE JUROR:  Correct.

22         MR. BERTHOLF:  How did that -- tell me about how that

23    process happened.

24         A PROSPECTIVE JUROR:  What process?

25         MR. BERTHOLF:  How did -- did you grow up in

Klamath Falls?

      A PROSPECTIVE JUROR:  Yes.

      MR. BERTHOLF:  Did your wife grow up in
Klamath Falls?

      A PROSPECTIVE JUROR:  No.

      MR. BERTHOLF:  How did your wife get interested in
the tribal archeologist position?

      A PROSPECTIVE JUROR:  She had a degree.  She was
already working in Klamath Falls at the college, so she met
people through that, and that's how the -- she applied for the
job.

      MR. BERTHOLF:  Are you -- do you pay attention to
what she does?

      A PROSPECTIVE JUROR:  Do I pay attention to what she
does?

      MR. BERTHOLF:  Yeah.

      A PROSPECTIVE JUROR:  I don't have much of a choice.

      MR. BERTHOLF:  It seemed pretty fascinating to me.

      A PROSPECTIVE JUROR:  It is.

      MR. BERTHOLF:  Do you ever get to go out on digs or
anything?

      A PROSPECTIVE JUROR:  No.  There are a lot of things
that I can't talk about, about her job, actually.

      MR. BERTHOLF:  Really?

      A PROSPECTIVE JUROR:  That's correct.

1      MR. BERTHOLF:  Okay.  Well, I won't ask you about

2  that.  Yeah, it's just very fascinating.

3      No. 51.

4      A PROSPECTIVE JUROR:  Thank you.

5      MR. BERTHOLF:  You indicated that you need to get

6  your property ready for winter.

7      A PROSPECTIVE JUROR:  Yes.

8      MR. BERTHOLF:  What's -- where are you --

9      A PROSPECTIVE JUROR:  I got some of it done

10  because -- just in case of -- I drag the pasture.  I have to do

11  everything.  Get the plants covered, all of that.  And because

12  I'm coming from so far away, I wouldn't get home -- if you go

13  'til 5 o'clock on Fridays, I won't get home 'til 8:30.  And

14  then if we start Mondays and I have to leave Sunday, so you

15  just give me Saturday to get stuff done.  But I've been working

16  on it, trying to get caught up ahead of time.

17      MR. BERTHOLF:  Okay.  What -- what more do you have

18  to do?  Let's not go through what you've already done.  What

19  more do you need to get done?

20      A PROSPECTIVE JUROR:  I have another pasture to drag,

21  and then I have plants to cover and a fence to put in and stuff

22  like that.

23      MR. BERTHOLF:  Okay.  The way the weather's going,

24  probably going to stay --

25      A PROSPECTIVE JUROR:  Right.

1              MR. BERTHOLF:  -- warm for a while.

2              A PROSPECTIVE JUROR:  Right.

3              MR. BERTHOLF:  If you were picked on the jury, would

4      you be able to sit and be able to focus on that --

5              A PROSPECTIVE JUROR:  Yes.

6              MR. BERTHOLF:  -- knowing that you've only got one

7      day a week for --

8              A PROSPECTIVE JUROR:  Yes.

9              MR. BERTHOLF:  Okay.  All right.  Thank you.

10             THE COURT:  I will point out that in -- the federal

11     government does recognize Columbus or Indigenous Persons Day,

12     so we do have next Monday off.

13             MR. BERTHOLF:  Oh, that's true.

14             THE COURT:  I think the federal government is the

15     only group that --

16             MR. BERTHOLF:  No. 65, you indicated that you might

17     have some issues serving because you got some family

18     obligations?

19             A PROSPECTIVE JUROR:  Yeah.  I have to pick up my

20     nephew every day from school and take care of him.  My mom

21     works.  My dad is retired and just had a recent pretty serious

22     neck surgery.  And my sister is a recovering drug addict, his

23     mother, and she's dealing with that.  So it really solely falls

24     on me.

25             MR. BERTHOLF:  Okay.  Nobody else can --

1          A PROSPECTIVE JUROR:  I don't think for three weeks.

2          MR. BERTHOLF:  How old's your nephew?

3          A PROSPECTIVE JUROR:  Eight.  Third grade.

4          MR. BERTHOLF:  And it sounds like you walk him to

5     school and 0back and forth?

6          A PROSPECTIVE JUROR:  Yeah.  It's not very far, but

7     my dad wouldn't be able to do it with his recent surgery.

8          MR. BERTHOLF:  All right.  Just like the other juror,

9     we may come back to you on that one, but thank you.

10          No. 67.

11          A PROSPECTIVE JUROR:  Yes.

12          MR. BERTHOLF:  You -- it seems like you -- if my

13     notes are correct, you wrote that you had a coworker's son that

14     was falsely accused of assault?

15          A PROSPECTIVE JUROR:  Correct.

16          MR. BERTHOLF:  Can you tell us what that was about,

17     first of all?

18          A PROSPECTIVE JUROR:  A coworker who is a close

19     friend, her son was married and had three children and

20     accusations were made about eight years after the purported

21     date of the event.  It was a one-time event.  It resulted in a

22     very, very contentious and messy divorce.  And he did not go to

23     trial.  There was an agreement -- a monetary agreement,

24     settlement, beforehand.  But he lost all parental rights to his

25     children.

MR. BERTHOLF:  Okay.

A PROSPECTIVE JUROR:  And obviously my friend and coworker was very distraught through all of this because she lost her grandchildren.

MR. BERTHOLF:  It sounds like that was probably sexual assault then.

A PROSPECTIVE JUROR:  Yes.

MR. BERTHOLF:  We are dealing with a case where we're dealing with allegations of sexual assault.  Is your prior experience going to color your view or your listening of testimony of the people in this case?

A PROSPECTIVE JUROR:  No.  This was a totally different scenario, from what I understand.

MR. BERTHOLF:  Okay.  All right.  I appreciate that.  Thank you.

No. 71.

A PROSPECTIVE JUROR:  Right here.

MR. BERTHOLF:  It sounds like you got several animals that are ready for butcher.

A PROSPECTIVE JUROR:  I do.

MR. BERTHOLF:  Big question is:  Are you doing the butchering, or is somebody else?

A PROSPECTIVE JUROR:  My husband and I and our kids do butchering from beginning to end.  We raise our animals, put them through the meat locker when I'm sick of feeding them.

1      MR. BERTHOLF:  But do you -- what my question is --

2  is, are you -- do you physically do the butchering?

3      A PROSPECTIVE JUROR:  100 percent.  We kill.  We

4  skin.  We gut.  We process it all the way down to the bare

5  minimum.  We're waiting for the weather to get cool enough

6  'cause we don't want to run the freezer because then, you know,

7  that takes gas and all that.  It is an off-grid situation, so

8  everything is done off-grid.  It's all solar panel and

9  generator run, so it's waiting until the nights get in the

10  thirties.  That way it's cool enough to hang our animals, so

11  they don't rot.

12      MR. BERTHOLF:  Right.  Which that's probably going to

13  be --

14      A PROSPECTIVE JUROR:  Next week.

15      MR. BERTHOLF:  Next week.  All right.  Thank you.

16  That's -- I wasn't 100 percent clear, and now I am.  We'll

17  probably come back to that.

18      A PROSPECTIVE JUROR:  Okay.

19      MR. BERTHOLF:  So thank you.

20      Well, let's actually go right here.

21      No. 73, you've got the microphone.  I need you to

22  speak in there.  You indicated in your question that you got a

23  bit of a problem with the FBI.

24      A PROSPECTIVE JUROR:  No.  It's just a -- I mean,

25  they're human, and certain elements of them make mistakes.

1    MR. BERTHOLF:  Okay.  So we're going to have FBI

2  testimony.  Is that -- are you going to be able to listen to

3  them carefully and -- and -- if you're on the jury panel?

4    A PROSPECTIVE JUROR:  Yes.

5    MR. BERTHOLF:  Okay.  You're not going to assume that

6  they're --

7    A PROSPECTIVE JUROR:  No.  I'm --

8    MR. BERTHOLF:  -- feeding you a lie --

9    A PROSPECTIVE JUROR:  I'm not going to assume they're

10  going to feed me a lie.  I'm not going to assume, I guess,

11  either way.

12    MR. BERTHOLF:  Okay.  That's what we ask.

13    No. 52, I want to talk to you about a couple of your

14  questions on the questionnaire.  There we go, yeah.

15    Question number 29, "Do you think there should be

16  laws limiting the possession of firearms and ammunition?"  And

17  your answer was, "Yes, individuals should be 18 and vetted."

18  First of all, why the age of 18?

19    A PROSPECTIVE JUROR:  Well, that's our considered age

20  of adulthood.

21    MR. BERTHOLF:  Okay.

22    A PROSPECTIVE JUROR:  I just think it makes sense.

23    MR. BERTHOLF:  Okay.  Why not 21, the age where we

24  can get alcohol?

25    A PROSPECTIVE JUROR:  Because some states you can get

alcohol at 18.

MR. BERTHOLF:  Okay.

A PROSPECTIVE JUROR:  And it varies.  But I think we should all be on the same page.  I just picked 18, yeah.

MR. BERTHOLF:  Okay.  All right.  "And vetted," what do you mean by "vetted"?

A PROSPECTIVE JUROR:  That's pretty open-ended.  I -- I just see our culture going that way, that -- you know, to have some sort of agreements, some sort of lawful agreement that who --

MR. BERTHOLF:  In your perfect world --

A PROSPECTIVE JUROR:  Yeah.

MR. BERTHOLF:  -- what would you want to see as being vetted?

A PROSPECTIVE JUROR:  Okay.  No people with felonies, kind of what we have already.

MR. BERTHOLF:  Okay.

A PROSPECTIVE JUROR:  No people with mental issues or -- some assault, I would guess, too, yeah -- prior assault, yeah.

MR. BERTHOLF:  Okay.  So any -- any sort of even misdemeanor assault?

A PROSPECTIVE JUROR:  Probably not.  Probably higher than that, yeah.

MR. BERTHOLF:  Okay.  All right.  So two guys get

1    into a bar fight.  They should maybe be able to keep their

2    firearms?

3             A PROSPECTIVE JUROR:  Right.

4             MR. BERTHOLF:  As long as it's not too --

5             A PROSPECTIVE JUROR:  If it's not --

6             MR. BERTHOLF:  -- a super high level?

7             A PROSPECTIVE JUROR:  Right.

8             MR. BERTHOLF:  Okay.  Thank you.  Oh, wait.  And then

9    I've got one more.  What was the other one?  Oh, no.  Oh,

10   actually, yes.  Question 32, "Would you view differently the

11   testimony of a witness who engaged in commercial sex work?"

12   And let's --

13            A PROSPECTIVE JUROR:  Yeah.

14           MR. BERTHOLF:  I think the Government's going to talk

15   about this a little bit, too.  When we're talking about

16   commercial sex work, we're talking about prostitution.

17            A PROSPECTIVE JUROR:  Mm-hmm.

18           MR. BERTHOLF:  And that's been a question all day, so

19   let's just get that out of the way.

20            A PROSPECTIVE JUROR:  Yeah.  Okay.

21           MR. BERTHOLF:  That's what we mean.  Your answer was

22   "I may be biased about the type of people they are involved

23   with."  Can you explain that answer?

24           A PROSPECTIVE JUROR:  Again, I think, for me, it's

25   like legality.  If we're going to legalize prostitution, let's

just do it.  But since it's not legal -- I guess I'm kind of a rule-by-law person.  Since it's not legal, I have a little bias of the people who are involved on both sides of the business.

MR. BERTHOLF:  Okay.  And when you say you're a little biased, what does that bias look like?

A PROSPECTIVE JUROR:  I think it's -- the business is harmful to many people it reaches out and -- yeah.

MR. BERTHOLF:  Okay.  When you say "many people it reaches out," what --

A PROSPECTIVE JUROR:  Okay.  Families who are involved; the people who participate in both sides, their families are going to be affected; society as a whole, yeah.

MR. BERTHOLF:  Okay.  All right.  Thank you.

(Whispered discussion, off the record, 2:00 p.m. - 2:01 p.m.)

MR. BERTHOLF:  We pass this panel for cause.  Thank you.

THE COURT:  Okay.  Thank you.

Mr. Sweet.

MR. SWEET:  Good afternoon.  My questions for you today are just for one purpose, to see if you can all be fair and impartial jurors both for Mr. Zuberi and for the Government, nothing more and nothing less.  I'm not going to argue with you at any point.

And if you can't hear me, if I speak too fast, if my

question's unclear, please just let me know.  And if I ask you

something that the answer would be difficult to talk about in

front of everyone, please let me know that as well, and it can

be discussed outside of the presence of everyone else.

So the first thing I want to talk about is I just

want to ask if everyone's going to be able to give every

witness a fair shake when they're on that stand.  And that's

whether they're law enforcement, FBI, commercial sex worker or

anybody else.  That's the core question.

And I'm going to break it down just a little bit,

because your questionnaire did talk about different categories.

Some of you were very pro-law enforcement.  Some had questions

about law enforcement.  Same thing for the FBI.  And so I just

want to -- I want to talk about that a little bit.

And, sir, just because you've spoken already, if I

can just follow up with you.  And, I'm sorry, Juror No. 73?  2

or 3?

A PROSPECTIVE JUROR:  No.  73.

MR. SWEET:  73.  Thank you.

I believe you may have mentioned Klamath County

Sheriff's Office.  And Klamath County Sheriff's Office walks

up -- officer walks up; deputy takes the stand.  Are they going

to get a fair shake from you?

A PROSPECTIVE JUROR:  Yes, they will.

MR. SWEET:  Okay.  And then sounds like the FBI will

1  as well; is that right?

2          A PROSPECTIVE JUROR:  Yes.

3          MR. SWEET:  Okay.  And just from your questionnaire,

4  you know, I think you talked about accountability, and you had

5  some questions.  So there may be some -- I don't want to put

6  words in your mouth.  You said they're going to get a fair

7  shake, even if you have some potential concerns about one law

8  enforcement agency or another.  Is that fair?

9          A PROSPECTIVE JUROR:  Is it the agency or the person

10  in the agency?  I mean, one large organization, there's bound

11  to be somebody on the wrong side.

12          MR. SWEET:  Okay.  But you'll put that aside and look

13  at each person, see how they testify, look at the evidence, and

14  make your decision based from that?

15          A PROSPECTIVE JUROR:  Yes.

16          MR. SWEET:  Okay.  Thank you.

17          And that's really the core question.  And so let me

18  ask -- let me follow up with a couple others of you who had

19  similar flags.  I had flagged questions where you had that.

20          Juror No. 64, I just wanted to -- sorry.  Thank you,

21  ma'am.  I believe you had -- in terms of the FBI, the same

22  question.  An FBI agent takes the stand.  Are they going to get

23  a fair shake from you?

24          A PROSPECTIVE JUROR:  Absolutely.

25          MR. SWEET:  Okay.  And any concerns you may have

about larger issues, you could put those aside?  If you had any

concerns about the FBI as an institution or anything else,

you'd be able to put that aside?

A PROSPECTIVE JUROR:  Oh, yes, definitely.

MR. SWEET:  What about local law enforcement?  Same

question.

A PROSPECTIVE JUROR:  I love them.

MR. SWEET:  Okay.  All right.  Well, then since --

I'm just going to ask you.  "I don't believe -- I don't believe

commercial" -- so commercial sex work, again, we're talking

about someone engaged in prostitution.  If someone who engages

in prostitution takes the stand -- or engaged in it and takes

the stand, are you going to listen to them just like you'd

listen to anyone else?

A PROSPECTIVE JUROR:  Yes, I would.

MR. SWEET:  Thank you.

And I see quite a few people nodding, so I'm just

going to ask you the flip:  Is there anyone who would not be

able to evaluate someone who engaged in commercial sex work

just based on what they say?  If so, just please raise your

hand again.  I'm not going to argue with you.  We'll just talk

about it some more.  No one?  Okay.

Well, I'm going to -- and, ma'am, I'll let you pass

away -- pass the microphone back there.

Then let's -- let me ask the same question about the

FBI.  So, rather than go through individually and follow up

with some people who may have checked the box, does anyone have

concerns that when an FBI agent takes the stand, you wouldn't

be able to really evaluate their testimony just based on their

testimony, that other things would factor in for you?  Anyone?

Okay.  What about local law enforcement?  You're

going to hear from a bunch of different law enforcement

agencies.  You're going to hear from Klamath County Sheriff's

Office.  You're going to hear from Klamath Police Department.

You're going to hear from Reno Police Department.  You're going

to hear from Oregon State Police.

So any of those?  Does anyone have any concerns that

when one of those officers, deputies, agents takes the stand

that you would have some pre-existing thoughts that would

impact your ability to evaluate?

Okay.  Okay.  Mr. -- sorry.  Let me go to

Juror No. -- and I don't mean to just call you by numbers.

It's not meant to be rude.  It's just kind of how we track

everybody.

Juror No. 65, I did have a question for you, sir.  I

believe you had said -- you were asked about bias, and you

wrote something down about nonchurch members.  Do you know what

I'm talking about?

A PROSPECTIVE JUROR:  Yeah.  I guess I just have some

personal religious beliefs about people who don't believe in

1  God, but --

2           MR. SWEET:  Okay.

3           A PROSPECTIVE JUROR:  That's about as far as I want

4  to go with that.

5           MR. SWEET:  No.  And so my question is when people

6  take the stand, you know, they're not going to be asked and

7  nobody's going to be stating their religious beliefs.  So are

8  you going to be able to evaluate everyone not knowing whether

9  they do or don't --

10          A PROSPECTIVE JUROR:  Yes.

11          MR. SWEET:  No issue there at all?

12          A PROSPECTIVE JUROR:  No.

13          MR. SWEET:  All right.  Thank you.

14          Let's talk for just a second -- let's talk -- I want

15  to ask a question about guns.  And I'm going to tell you my end

16  question first.  My question is are you going to be able to

17  follow the instructions given to you by the judge even if you

18  may have some disagreements with it, okay?

19          So it's no surprise that the answers on firearms and

20  firearms laws were all over the place, in terms of what people

21  felt should happen, what people felt was right, what people

22  felt was wrong.  And so, rather than explore that with

23  everybody, I just want to know:  You've heard that there's

24  going -- there are counts of felon in possession of a firearm.

25          So the question is -- and people have expressed

strong opinions about more gun laws, less gun laws.  Are you

all able to follow the law as given to you by the judge?  Does

anyone have concerns that they couldn't do that?

Okay.  So you all took a long time writing down these

questionnaires, so I'm not going to just stand here and talk to

you to keep talking, because you really did provide helpful

information, but I do want to ask you one last question.  And I

always ask this, and someone almost always provides additional

information.

And the question is this:  Is there anything that we

should know about your ability to be a fair and impartial juror

that we haven't asked you?  'Cause we've asked you limited

questions.  The questionnaire was limited.  So if there's

anything that you think we should know that would impact that,

would you please raise your hand and we can talk about it.

Somebody may have something.

Okay.  Thank you all for your time.

Pass this panel for cause, Your Honor.

THE COURT:  Okay.  And just a few questions.  Here's

what we don't want to have happen, and it often does, is that

you folks step away.  You're waiting down in another room.

We're picking a jury.  We bring up the jurors who are going to

hear the evidence.  And somebody says, "Wait, I really can't do

this.  I just -- I'm not going to have the money.  My family

needs me.  I can't sit on this jury."

1    At that point it's too late.  We hold you here

2    against your will at that point.  I need to hear which of you

3    don't think you can do this because of conflicts.

4    Yes, Juror --

5    A PROSPECTIVE JUROR:  71.

6    THE COURT:  71.  And is that because of the --

7    A PROSPECTIVE JUROR:  It's more the financial aspect

8    of that, 'cause I can't afford to stay in a motel for three

9    weeks.

10    THE COURT:  We pay for the hotel.

11    A PROSPECTIVE JUROR:  Ahead of time?

12    THE COURT:  I can order that to happen.

13    A PROSPECTIVE JUROR:  If it can be done ahead of

14    time, that would work for me.  But, other than that, you know,

15    living two-and-a-half, three hours away -- we're on limited

16    income.

17    THE COURT:  Could we check on that, Ms. Pew?

18    THE COURTROOM DEPUTY CLERK:  Jackie's checking on

19    that.

20    THE COURT:  We are working on prepaying the hotel.

21    A PROSPECTIVE JUROR:  Okay.  'Cause if that's

22    something that can be done, then I don't have a problem.  I

23    just -- I'm not staying with my stepmom and my dad.  Not doing

24    it.

25    THE COURT:  All right.  Okay.  Other folks?

1          Okay.  Ms. Bennett, correct?

2          A PROSPECTIVE JUROR:  Just the same issue.  It would

3     be nice to be -- my work pays for me to be out of work, but not

4     the hotel room.

5          THE COURT:  Okay.

6          A PROSPECTIVE JUROR:  And so --

7          THE COURT:  We will try to get an answer for that

8     quickly, but it's my desire -- and, to be honest, I didn't know

9     this.  I thought we did prepay.  But I know there's a number of

10    people who've expressed a concern about, you know, paying

11    upfront.  And I -- I wouldn't expect everybody to be capable of

12    doing that.  So I will do my best to make that happen.

13         Otherwise, financially, I know you did talk about

14    some issues with your family.  Are you going to be able to do

15    this?

16         A PROSPECTIVE JUROR:  I believe so.  I'm the sole

17    breadwinner; but I think three weeks, we can figure it out.

18         THE COURT:  Okay.  I -- the problem is if at week two

19    you're trying to figure it out and you realize bills aren't

20    going to be paid, then it's too late.

21         A PROSPECTIVE JUROR:  Then I would prefer not to, if

22    possible.

23         THE COURT:  Okay.  Ms. Bennett, I am going to -- for

24    a financial hardship, I do want to excuse you.  I'm worried

25    that you're going to hit a really rough month if you're here

1  for three weeks.  All right.  So you're excused.  You are free
2  to go.
3          Mr. Bozenski, I'm a little concerned about the
4  eight-year-old walking to school by himself.  Are you going to
5  be able to make arrangements?
6          A PROSPECTIVE JUROR:  I don't think for three weeks I
7  can manage that.
8          THE COURT:  Okay.  And if you tell me there's just no
9  other way this child's going to get to school without you --
10          A PROSPECTIVE JUROR:  Getting to school -- he can get
11  a ride to school.  Getting home from school is the problem.
12          THE COURT:  So he's eight, and he can't go by
13  himself.  So unless you tell me otherwise, I'm going to excuse
14  you.
15          A PROSPECTIVE JUROR:  Yeah, I don't think I can.
16          THE COURT:  Okay.  You are excused.  Thank you.
17          Okay.  Other people who are just in a tight spot?
18          Yes.
19          A PROSPECTIVE JUROR:  Juror No. 66.  My mother-in-law
20  was put on hospice on Tuesday.  But my offspring is an oncology
21  nurse, and they said, "Don't worry, Mom.  You got time."  So
22  that's where we're at.
23          THE COURT:  I love oncology nurses.  I'm married to
24  one, so I -- they're the best.  Thank you.
25          Anyone else?

```
 1              Yes.  Juror number?

 2              A PROSPECTIVE JUROR:  62.

 3              THE COURT:  Okay.

 4              A PROSPECTIVE JUROR:  You've probably heard this

 5   before.  I have two small children, depend on both of our

 6   income.  I'm a mental health provider, and I see high acuity

 7   patients.  It just would be hard for me to be here, but I will

 8   be here if I have to.

 9              THE COURT:  Okay.  Are -- your -- and I think I may

10   have --

11              A PROSPECTIVE JUROR:  I wrote -- yeah, I turned in a

12   letter.

13              THE COURT:  So tell me a little bit.  These are

14   your -- you're meeting one-on-one with clients?

15              A PROSPECTIVE JUROR:  Yes.

16              THE COURT:  Are these appointments made over the

17   course of the next three weeks?

18              A PROSPECTIVE JUROR:  Yes.

19              THE COURT:  Okay.  Okay.  Ms. Meza, right?

20              A PROSPECTIVE JUROR:  Yes.

21              THE COURT:  Given that, I will excuse you.

22              A PROSPECTIVE JUROR:  Thank you.

23              THE COURT:  And I did get your letter.  I'm sorry.  I

24   should've -- we didn't get a chance to respond to everything.

25              Okay.  I'm not seeing any other hands, so I do
```

appreciate this. I'm going to remind you now that -- we're going to be on break for a bit. Myself and the parties are going to select the jurors who will be hearing the case and be with us for the next number of weeks.

It is very important that during this break, as well as any other break, if you are a juror on this case, you are not discussing the case. I know some of you have heard some stories or read some stories in the media. It's important that you not discuss those with other jurors; that you not discuss the case at all with family or friends that may be aware of the case, or family and friends at all, for that matter; that you not look up any information about the case.

It's also important that you're not in the hallways or on the sidewalk in front of the courthouse. There are witnesses, attorneys, folks involved in the case who may be out there talking among themselves. And I will continue to repeat this throughout the trial.

We want you to make your decision based on evidence that you hear in the courtroom, the testimony, the exhibits, not what other people are telling you, not what you can learn by looking things up through the media or on the Internet. So -- and even -- I know it sounds strange, but even among yourselves we're asking you not to discuss the case.

Is there anything anyone else has where they might have any concerns that they are not able to be fair in this

1  case?

2          All right.  I -- let me just -- I need to check my

3  notes very quickly.

4          Ms. Buchanan?

5          A PROSPECTIVE JUROR:  Yes.

6          THE COURT:  Which is Ms. Buchanan?

7          If I remember, you had seen some articles, correct?

8          A PROSPECTIVE JUROR:  Yes.

9          THE COURT:  I'm going to ask you to stay in the

10  hallway.  We're going to pull you and Ms. Jenkins in just

11  individually to ask you some questions about some of the media

12  stuff.  So why don't -- Ms. Buchanan, you just can stay in your

13  seat.  Everybody else is going to follow Ms. Pew back down to

14  the downstairs room.

15          And then, Ms. Jenkins, yeah, I'll have you -- you're

16  going to -- you're going to wait in our waiting room right over

17  here.

18          (Whispered discussion, off the record, 2:16 p.m.)

19          (Open court, jury not present, 2:17 p.m.)

20          THE COURT:  All right.  Ms. Buchanan, we're not

21  trying to put you on the hot seat, but it did sound like you

22  had seen some articles and read or seen in the news some

23  coverage of this case.  Can you tell me exactly maybe what you

24  may have heard or seen, if you remember?

25          A PROSPECTIVE JUROR:  There isn't one thing.  It's

just the -- the things that were being described seemed -- my
interpretation of them was that -- that the case looked pretty
one-sided.  So it's what -- my interpretation, I guess, is the
issue, rather than --

THE COURT:  I see.

A PROSPECTIVE JUROR:  I'm not -- I don't want to cast
aspersions on someone's reporting.

THE COURT:  Well, I mean, you know, you read a story,
and sometimes it certainly looks a certain way.  And I'm often
surprised when I read about cases in front of me that look very
different in the media.  Are you able to set aside what your
thoughts might have been when you saw the articles, or read
them, and decide this case just on the facts that you hear in
the courtroom?

A PROSPECTIVE JUROR:  I don't trust that I could do
that.

THE COURT:  Okay.  In that case I will excuse you.
So you are free to go.  Thank you.

All right.  And then bring in Ms. Jenkins.

Thank you, Ms. Jenkins.  If I recall, you had seen
some stories and -- either seen them on the news or read them
in the paper that had to do with this case.  Could you tell us
what you might have seen or read?

A PROSPECTIVE JUROR:  Just the situation that
occurred and that -- what he was being accused of, but that

1  doesn't mean anything in my book.

2          THE COURT:  Okay.  So that's telling me that you --

3  whatever it was you saw or read, you can set aside?

4          A PROSPECTIVE JUROR:  Oh, 100 percent 'cause

5  honestly, you know, it's all speculation.

6          THE COURT:  Okay.

7          A PROSPECTIVE JUROR:  It really is.

8          THE COURT:  Great.  Thank you.  That's all -- that's

9  all I need there.  I appreciate it.  If you want to go --

10  Ms. Pew will take you downstairs to the first floor.

11          (Open court, prospective jury not present, 2:19 p.m.)

12          THE COURT:  All right.  How much time do the

13  attorneys want to prepare for peremptories?

14          The Government.

15          MR. SWEET:  Your Honor, the Government is prepared.

16  I have two things, if I can, Your Honor, briefly.

17          THE COURT:  Yes.

18          MR. SWEET:  One is we did want to ask if we could

19  revisit Juror No. 22, who the defense objected to or asked that

20  she be removed for cause.  She was from Klamath Falls.  She was

21  the person who was moving across country, but she had also read

22  news media about this.

23          The Government objected and asked that she remain.

24  Your Honor, out of an abundance of caution, after looking at it

25  further, we are withdrawing our objection to their request that

she be removed for cause.  I realize it's the Court's decision

obviously, but --

THE COURT:  Are both sides then stipulating that she

be removed?

MS. POTTER:  Yes, Your Honor.

THE COURT:  All right.  Then Ms. Smith, Juror No. 22,

will be removed.

MR. SWEET:  Thank you, Your Honor.  Then, other than

that, the Government is prepared to proceed.  And we do have a

challenge order if -- at the appropriate time.

THE COURT:  Okay.  I do need to bring up

Juror No. 41 -- I'm sorry -- Ms. Searcy.

Char, did she speak to you?

Off the record for just a moment.

(Whispered discussion, off the record, 2:21 p.m.)

THE COURT:  Ms. Searcy, Juror No. 41, did get fairly

emotional downstairs.  I think there are a number of jurors who

are a little uncomfortable about the fact that we reimburse

them for their hotel as opposed to pay for it upfront.  She

apparently slept in a car here last night.  She didn't have

money to stay in a hotel.

I think she's also very tired.  She's the paralegal.

She was also telling Ms. Pew that she works for three judges

and had 164 cases and was concerned about missing work.  I am

certainly working with our -- our division manager on -- I'm

1    trying to order them to basically prepay for the hotel rooms

2    for these folks.

3            I just don't think it's realistic to ask people to

4    pay upfront.  If they don't have a credit card, it's almost

5    impossible for a lot of them.  So we'll do our best to do that.

6    I just want you to be aware that Ms. Searcy was pretty

7    emotional and -- and I'm not sure if that's because she slept

8    in her car last night or she really is upset about the work

9    issue or the financial issue.  But she brought those up with

10   Ms. Pew.  So I think you should be at least aware of it.

11           Is the defense ready to proceed with peremptories, or

12   do you need some time?

13           MR. BERTHOLF:  We're ready.

14           THE COURT:  Okay.  My understanding is the defense

15   has ten peremptories.  The Government has --

16           MR. SWEET:  Six, Your Honor.

17           THE COURT:  Six.

18           And, Mr. Sweet, you've helped me out with this before

19   in terms of how we take those so eventually it kind of evens

20   up:  One, one, one, one.

21           MR. SWEET:  Yes, Your Honor.  If I may hand to the

22   Court and the parties --

23           THE COURT:  Thank you.  That would be helpful.

24           (Whispered discussion, off the record, 2:23 p.m.)

25           THE COURT:  All right.  Then if the parties are

1    ready, the defense would take their first two challenges.

2              MR. BERTHOLF:  Nine.

3              THE COURT:  Let's take them one at a time, though.

4              MR. BERTHOLF:  Nine in Seat 9.

5              THE COURT:  All right.  So that's Ms. Hannah Potter

6    in Seat 9.  And that's going to bring up Juror No. 20.  Brynn

7    Rogers will move into the Seat 9.  Okay.

8              MR. BERTHOLF:  Next challenge is No. 11 in Seat 11.

9              THE COURT:  That's Laura Groom in Seat 11.  And that

10   will bring up Julie Denton in Seat 11.

11             All right.  And then the Government's first

12   challenge.

13             MR. SWEET:  Thank you, Your Honor.  The Government

14   challenges Juror No. 3 in Seat 3, Howard Main.

15             THE COURT:  Howard Main.  And that will bring up

16   Sarah Gierman in Seat 3.

17             All right.  I'll turn to the defense.

18             MR. BERTHOLF:  First challenge would be Number 23 in

19   Seat 11.

20             THE COURT:  Ms. Denton.  And that brings up Russell

21   Gann, No. 28, in Seat 11.

22             MR. BERTHOLF:  Next challenge would be No. 26 in

23   Seat 3.

24             THE COURT:  That's Sarah Gierman in Seat 3.  And that

25   brings up Sharon Horn in Seat 3.

1          Over to the Government.

2          MR. SWEET:  Thank you, Your Honor.  The Government

3   challenges Juror No. 6 in Seat 6, Ms. Degeorge.

4          THE COURT:  All right.  Ms. Degeorge.  And that will

5   bring up Susan Petterson in Seat 6.

6          MR. BERTHOLF:  We would challenge No. 19 in Seat 10.

7          THE COURT:  That's Steven Tarr.  And that will bring

8   up John Jacobs in Seat 10.

9          MR. BERTHOLF:  Next challenge would be No. 20 in

10  Seat 9.

11         THE COURT:  That's Brynn Rogers.  And that will bring

12  up Denise Wingler in Seat 9.  So that's six defense challenges.

13  We're on the third Government challenge.

14         MR. SWEET:  Your Honor, the Government challenges

15  Juror No. 12 in Seat 12, Mr. Greene.

16         THE COURT:  Greene is excused.  And then that will

17  bring up Jodie Parker in Seat 12.

18         (Whispered discussion, off the record, 2:28 p.m.)

19         MR. BERTHOLF:  Challenge 31 in Seat 10.

20         THE COURT:  So that's John Jacobs, bringing up Robert

21  Thomas, Jr., in Seat 10.

22         (Whispered discussion, off the record, 2:28 p.m.)

23         MR. BERTHOLF:  No. 33 in Seat 12.

24         THE COURT:  That's Jodie Parker.  And that's going to

25  bring up Monica Tibbetts in Seat 12.  That's peremptories used

by the defense.  We're on the fourth peremptory for the
Government.

        MR. SWEET:  If we could have just one moment,
Your Honor.

        Your Honor, the Government challenges Juror No. 34 in
Seat 10, Mr. Thomas.

        THE COURT:  All right.  That brings up Allison Davis
in Seat 10.

        MS. POTTER:  Sorry.  Just a moment, Your Honor.

        (Whispered discussion, off the record, 2:30 p.m.)

        MR. BERTHOLF:  We're going to say satisfied at this
point.

        THE COURT:  Okay.  So we're satisfied then at --
through 36.

        All right.  Then for the Government.

        MR. SWEET:  Just one second, Your Honor.

        THE COURT:  So, just so we understand, by saying
"satisfied," you'll only be able to use your peremptories
against anybody now coming onto the jury panel.

        MR. BERTHOLF:  Yes.  Yes.

        THE COURT:  All right.

        MR. SWEET:  Government's satisfied, Your Honor.

        THE COURT:  All right.  So that leaves as our four
current alternates Mary Cremisio, Henry Kimsey-House -- let me
just ask the parties:  Ms. Searcy, given her emotional state,

1    my thought is to -- we have plenty of people here -- to excuse

2    her.

3            MR. BERTHOLF:  Yes, please.

4            MR. SWEET:  We concur.

5            THE COURT:  Okay.  The Court will excuse Ms. Searcy.

6    So then Douglas Franklin would be alternate three.  And then

7    Laura Babb would be alternate four.  So let's say that they'll

8    be in that order:  Alternate one, two, three and four.  Both

9    sides have two peremptories towards the alternates, and we'll

10   replace them as alternate -- for instance, if one side wishes

11   to strike Mr. Kimsey-House, Ms. Olivas would be alternate two.

12           MR. BERTHOLF:  We would strike 38, Seat 14.

13           THE COURT:  I'm sorry.  38, Mr. --

14           MR. BERTHOLF:  38.  Yes.

15           THE COURT:  38, Kimsey-House.  Alternate two then

16   becomes Ms. Olivas.

17           To the Government.

18           MR. SWEET:  Your Honor, the Government's striking

19   Juror No. 44, Ms. Olivas.

20           THE COURT:  That brings Maribeth Bishop as alternate

21   two.

22           MS. POTTER:  Just one moment, Your Honor.  Thank you.

23           (Whispered discussion, off the record, 2:33 p.m.)

24           MR. BERTHOLF:  We'll go with satisfied at this point.

25           THE COURT:  All right.  The Government has a

```
 1    remaining peremptory.
 2            MR. SWEET:  If we could have just one second,
 3    Your Honor.
 4            THE COURT:  Yeah, take your time.
 5            (Pause in proceedings, 2:34 p.m.)
 6            MR. SWEET:  Your Honor, the Government bumps
 7    Juror No. 45, Ms. Bishop.
 8            THE COURT:  All right.  And that brings Emryn Sachs
 9    as alternate two.  And the defense could move against her.
10    Jonah Hakanson would be our next alternate.
11            MR. SWEET:  We will strike 47.
12            THE COURT:  And that does put Jonah Hakanson as
13    alternate two.
14            All right.  So give me just a moment to go through my
15    list, and then I'm going to go over it with you to make sure
16    we're all -- we all have the same list of seated jurors.
17            Okay.  So let's go through the jurors that we are
18    going to seat.  I have Juror No. 1 is Marie Canoso.
19            MR. BERTHOLF:  Your Honor, if I could ask that you
20    use the numbers to make sure --
21            THE COURT:  Yes.  No. 18, Marie Canoso is our
22    Juror No. 1.  Juror No. 16, Dulce Underwood de Dios is
23    Juror No. 2.  Number 26 -- no.  No, that's wrong.  Excuse me.
24            THE COURTROOM DEPUTY CLERK:  29.
25            THE COURT:  Yes, I know.  Don't -- I have my notes.
```

1    Juror No. 29, Sharon Horn, is in Seat 3.  Juror 13,

2  Michael McGoffin, is in Seat 4.  Juror No. 14, Joy Denn, is in

3  Seat 5.  Juror No. 30, Susan Petterson is in Seat 6.

4  Juror No. 7 is Daniel Hildebrandt in Seat 7.  Juror No. 8 is --

5  well, Juror 15 is Juror No. 8, Pamela Wurzell.  Juror No. 32 is

6  in Seat 9, Denise Wingler.  Juror 36, Allison Davis, is in

7  Seat 10.  Juror No. 28, Russell Gann, is in Seat 11.

8  Juror No. 35, Monica Tibbetts, is in Seat 12.  Alternate one is

9  Mary Cremisio.  Alternate two is Jonah Hakanson.  Alternate

10  three is Douglas Franklin.  Alternate four is Laura Babb.

11    Is the Government confirming that's the correct

12  group?

13    MR. SWEET:  Yes, Your Honor.

14    THE COURT:  Defense?

15    MR. BERTHOLF:  Yes.  Thank you.

16    THE COURT:  Okay.  So, you know, instructions are

17  probably about a -- maybe a 20-minute exercise.  You know, the

18  parties had talked about going into opening statement.  Is that

19  something they still want to do?  We're at -- what?  20 minutes

20  to 3:00, it looks like, if that clock's right.  It's 2:30 now.

21    What are your thoughts, for the Government?

22    MR. SWEET:  Yes, for the Government, Your Honor.

23    THE COURT:  The defense?

24    MR. BERTHOLF:  Yes, for the defense.

25    THE COURT:  All right.  I'm really amazed you folks

proved me wrong. I did not think we'd get to opening

statements today. I appreciate the speed at which you're

working and the fact that you're obviously all very prepared.

Let's take a break. If people need to use the restroom, let's

do that now.

Char, I don't want you to bring up our jurors until

you get word from us. I want to make sure that Mr. Zuberi is

seated. And I think you can go excuse those other -- the other

folks.

(Whispered discussion, off the record, 2:40 p.m.)

THE COURT: Unless it's -- you have an objection, my

thought is I'll go down and just call out just the names of the

jurors who are going to sit on the case with Ms. Pew. That

way, when there's two of us, we don't make a -- I just want to

make sure no mistakes are made. And I'm not going to speak to

them any further. Ms. Pew will then let the other jurors --

excuse them at that time. Okay?

MR. BERTHOLF: Sounds good. Thank you.

THE COURT: All right.

MR. SWEET: Thank you.

(Recess taken, 2:40 p.m. - 2:54 p.m.)

(Open court, jury present, 2:54 p.m.)

MR. SWEET: Because of the nature of this case and

the number of case agents, we'd ask that both Special Agent

Giovanetty and Special Agent Gluesenkamp be allowed in the

1    courtroom for witnesses.

2              THE COURT:  Yes.

3              MR. SWEET:  Thank you.

4              THE COURT:  I know they're going to have to

5    coordinate the folks; and I assume you have them in a certain

6    place in the courthouse, as opposed to just the hallway.

7              MR. SWEET:  Your Honor, they will be -- during the

8    trial they would be -- you know, as case agents, they would be

9    in the courtroom, in the front row, during the trial.

10             THE COURT:  Okay.  That's perfectly fine.  And do you

11   have somebody that's going to bring witnesses in?  Is that

12   going to be them or --

13             MR. SWEET:  We'll have multiple people, Your Honor.

14   We have other agents available, as well as staff at the

15   U.S. Attorney's Office.

16             THE COURT:  Okay.

17             MR. SWEET:  Thank you.

18             THE COURT:  And you folks have been talking among

19   yourselves about which witnesses are up tomorrow morning, so --

20             MR. SWEET:  We will give the defense everyone for

21   tomorrow.

22             THE COURT:  Okay.

23             (Whispered discussion, off the record, 2:56 p.m.)

24             THE COURT:  And, just for the audience, we do rise

25   when the jury enters and exits the courtroom.

1          (Whispered discussion, off the record, 2:56 p.m. -

2     2:57 p.m.)

3               (Pause in proceedings, 2:57 p.m. - 2:59 p.m.)

4               (Open court, jury present, 2:59 p.m.)

5               THE COURT:  Please be seated everyone.

6               Of course, I'm asking everyone to be seated, but I'm

7     going to ask your jurors to please rise to take your oath as

8     jurors.

9               (Jury duly sworn and empaneled, 3:00 p.m.)

10              THE COURT:  All right.  Folks, please have a seat.

11              So I'm going to begin by reading to you some

12    instructions about your role as jurors and how jurors are to

13    conduct themselves during a trial.

14                        PRELIMINARY INSTRUCTIONS

15              THE COURT:  You are now the jury in this case, and I

16    will give you these preliminary injunctions.  At the end of the

17    case, I will give you some more detailed instructions that will

18    control your deliberations.

19              When you deliberate it will be your duty to weigh and

20    evaluate all of the evidence received in this case and, in that

21    process, to decide the facts.  To those facts as you find them,

22    you will apply the law as I give it to you, whether you agree

23    with the law or not.  You must decide this case solely on the

24    evidence and the law before you.

25              You need to perform these duties fairly and

impartially.  You should not be influenced, for instance, by

any person's race, color, religious beliefs, national ancestry,

sexual orientation, gender identity, gender or economic

circumstances.

Also, do not allow yourself to be influenced by

personal likes or dislikes, sympathy, prejudice, fear, public

opinion or biases, including unconscious biases.  Unconscious

biases are stereotypes, attitudes or preferences that people

may consciously reject, but may be expressed without conscious

awareness, control or intention.  Like conscious bias,

unconscious bias can affect how we -- how we evaluate

information and make decisions.

This is a criminal case brought by the United States

Government.  The Government charges the defendant, Mr. Zuberi,

with two counts of kidnapping, one count of transportation for

sexual activity, four counts of possessing either firearms

and/or ammunition.

Mr. Zuberi has pleaded not guilty to the charges and

is presumed innocent unless and until the Government proves

Mr. Zuberi guilty beyond a reasonable doubt.  In addition,

Mr. Zuberi has the right to remain silent and never has to

prove innocence or present any evidence.

To help you follow the evidence, I will give you a

brief summary of the elements of the crimes that the Government

must prove to make its case.  And you'll get these -- you know,

1    instructions about the charges in much more detail at the end

2    of the case.

3            But, with regard to kidnapping, to prove each

4    kidnapping charge, the Government must prove beyond a

5    reasonable doubt that Mr. Zuberi seized, confined, decoyed,

6    kidnapped, abducted or carried away the named victim and held

7    her against her will, and that he did one or more of the

8    following:  He transported the victim across state lines; he

9    traveled in interstate commerce in committing the offense; or

10   he used an instrumentality of interstate commerce in

11   furtherance of committing the kidnapping.

12           Transportation for sexual activity:  To prove this

13   charge, the Government must be prove beyond a reasonable doubt

14   that Mr. Zuberi knowingly transported AV-1 in interstate

15   commerce with the intent that she engage in a criminal sexual

16   activity.

17           Possession of firearm or ammunition:  To prove each

18   of the four counts of prohibited firearm or ammunition

19   possession, the Government must prove beyond a reasonable doubt

20   that Mr. Zuberi knowingly possessed each firearm or ammunition

21   alleged, which I will specify in the final instructions; that

22   each alleged firearm or ammunition had been shipped or

23   transported one -- from one state to another or from a foreign

24   nation to the United States; and that at the time of the

25   alleged possession, Mr. Zuberi was legally prohibited from

1  possessing firearms or ammunition and he knew about his

2  prohibited status.

3           So what is evidence:  Evidence consists of the sworn

4  testimony of any witness, the exhibits that are received into

5  evidence, and any facts to which the parties agree.  Facts to

6  which parties agree are called stipulations.  And there may be

7  some stipulations that I will read out to you that you may

8  accept as fact.

9           Exhibits are simply physical things.  They are going

10 to be anything from charts, photographs, maps, videotapes,

11 things that you will see or -- or read or hear that are

12 received into evidence.

13          Modified evidence:  During the trial the Court may

14 receive evidence in a modified form.  This evidence may have

15 been edited because it contained irrelevant or otherwise

16 inadmissible material.  Do not speculate about the substance of

17 what may have been removed or modified or why it was modified.

18 You should not consider evidence to be of greater or lesser

19 evidentiary value based solely on the fact that it has been

20 modified.

21          What is not evidence:  The following things are not

22 evidence, and you must not consider them as evidence in

23 deciding the facts of this case:  The statements and the

24 arguments of the attorneys.  They're intended to help you

25 understand the evidence, but their statements and arguments at

the beginning and end of the case are not evidence.

Questions and objections of the attorneys are not evidence. Testimony that I instruct you to disregard you cannot use as evidence. And then, of course, anything you may see or hear when the court is not in session, even if what you see or hear is done or said by one of the parties or by one of the witnesses.

Direct and circumstantial evidence: Evidence may be direct or circumstantial. Direct evidence is the proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is indirect evidence; that is, it is proof of one or more facts from which you can draw another fact.

You are to consider both direct and circumstantial evidence. Either can be used to prove a fact. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to be given -- to give any evidence.

So an example, I mean, that we often use is if you go outside and you step out into a rainstorm, you've personally seen that it is raining, and that is direct evidence that it is raining. If, on the other hand, you're inside the house and a friend comes over to visit, they're dripping wet, they have a wet umbrella in their hand, you may draw the circumstantial inference that, in fact, it's raining outside. So

circumstantial evidence and direct evidence may both be used to prove a particular fact.

Ruling on objections: There are rules of evidence that control what can be received into evidence. When a lawyer asks a question or offers an exhibit, and the lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object.

So if I overrule an objection to a question or an exhibit, the question may be answered or the exhibit can be received. If I sustain an objection to a question or an exhibit, then the question may not be answered; or if it's an exhibit, it would not be received into evidence, and you would not be considering it.

Sometimes things don't go as smoothly as all that. There are times where questions are asked and answers are given before an attorney has an opportunity to object. There may be times where I will sustain an objection to a question, but you've already heard the answer. I will then turn to you, and I may ask you to disregard that answer.

I am not a magician at Hogwarts. I cannot make it fall out of your head. The fact is you've heard something; but I will ask you, when it comes to finding the facts in this case, you may not use anything I've asked you to disregard.

Credibility of witnesses: In deciding this case, you may have to decide which testimony to believe and which

testimony not to believe.  You may believe everything a witness says or part of it or none of it.

In considering the testimony of any witness, you may take into account the following:  One, the witness' opportunity and ability to see or hear or know the things testified to; two, the witness' memory; three, the witness' manner while testifying; four, the witness' interests in the outcome of the case, if any; five, the witness' bias or prejudice, if any; six, whether other evidence contradicted the witness' testimony; seven, the reasonableness of the witness' testimony in light of all of the evidence; and any other factors that may bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event, but remember it differently.  You may consider these differences, but do not decide the testimony is untrue simply because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.  On the other hand, you may think the witness testified untruthfully about some things, but told the truth about

others.  You may accept the part you think is true and ignore

the rest.  Again, you must avoid your biases, conscious and

unconscious.

The weight of the evidence as to a fact does not

necessarily depend on the number of witnesses to testify to it.

What is important is how believable the witnesses are and how

much weight you think their testimony deserves.

With regard to conduct of the jury, keep in mind --

first, keep an open mind throughout the trial and do not decide

what the verdict should be until you and your fellow jurors

complete your deliberations at the end of the case.

So the one thing that the 16 of you have in common is

this case.  It's the one thing I'm going to ask you not to talk

about during your breaks, during any time when you're back in

the jury room.  We don't want you to begin that deliberation

process yet.

It seems like it would make sense if you -- you'd

hear a witness; you'd go back during a break and say, "Hey,

what did you guys think of that witness?"  We don't want you to

begin that deliberation process.  So please don't start talking

or evaluating the case together until you've heard all of the

evidence, the closing arguments of the attorneys and

instructions.

It's also important that you cannot be exposed to

other information about this case or to the issues it involves

during the course of your jury duty.  So I know I've already
told you a little bit about this earlier when we were
conducting the jury questions; but please do not communicate
with anyone in any way, and do not let anyone else communicate
with you in any way, about the merits of the case or anything
to do with the case.

This restriction includes discussing the case in
person, in writing, by phone, tablet or computer, or any means
via e-mail, text messaging, Internet chat room, blog, website
or application, including, but not limited to, Facebook,
YouTube, Twitter, Instagram, LinkedIn, Snapchat, TikTok or any
other forms of social media.

This restriction also applies to communicating with
your fellow jurors, again, until I give you the case for
deliberation.  It applies to communicating with everyone else,
including your family members, your employer, the media or
press, and people involved in the trial, although you may
notify your family and your employer that you have been seated
as a juror in the case and how long you expect the trial to
last.

But if you are asked or approached in any way about
your jury service or anything about this case, you must respond
that you have been ordered not to discuss the matter.  In
addition, you must report the contact to the Court.  Because
you will receive all the evidence and legal instruction you

properly may consider to return a verdict, do not read, watch,
listen to any news media accounts or commentary about the case
or anything to do with it.

Do not do any research, such as consulting
dictionaries, searching the Internet or using any other
reference materials.  Do not make any investigation or in any
way try to learn about the case on your own.  Do not visit or
view any place discussed in this case.

And do not use the Internet or any other resource to
search for or view any place discussed during the trial.  Also,
do not do any research about the case, the law, or the people
involved, including the parties, the witnesses or the lawyers,
until you've been excused as jurors.

If you happen to read or hear anything touching on
this case in the media, turn away -- don't read it, don't
listen -- and report to me as soon as possible.  These rules
protect each party's right to have this case decided only on
the evidence that has been presented here in court.

Witnesses here in court take an oath to tell the
truth, and the accuracy of their testimony is tested through
the trial process.  If you do any research and investigation
outside the courtroom or gain any information through improper
communications, then your verdict may be influenced by
inaccurate, incomplete or misleading information that has not
been tested by the trial process.

1     Each of the parties is entitled to a fair trial by an

2     impartial jury.  And if you -- and if you decide this case on

3     information not presented in court, you will have denied the

4     parties a fair trial.  Remember you have taken an oath to

5     follow these rules.

6         It is very important that you follow these rules.  A

7     juror who violates these restrictions jeopardizes the fairness

8     of the proceedings, and a mistrial could result that would

9     require the entire trial process to start over.  So if any

10    juror is exposed to outside information, please report it to

11    the Court immediately.

12        I can assure you the people involved in the case are

13    polite people who would normally greet you if they saw you on

14    the street or if they happened to see you in a restaurant

15    during the lunch break.  They are all under instructions -- the

16    lawyers, the witnesses, the parties, Mr. Zuberi -- to not have

17    any kind of communication with jurors, even chitchat about

18    Ducks football or the weather.

19        They're not going to -- they're not going to

20    acknowledge you.  So please do not hold that against them that

21    they're being rude.  They are under very strict instructions

22    not to have any communications with jurors, so keep that in

23    mind.

24        You know, Medford is not a giant city.  There's only

25    so many restaurants, and on some days many of them are closed.

1    So you may find yourself in circumstances where you may be near

2    somebody involved in the case.  They need to ignore you, and

3    you need to ignore them.

4          At the end of the trial, you will have to make your

5    decision based on what you recall of the evidence.  We do have

6    a court reporter, but there is not going to be a transcript

7    available for you to read.  So please pay close attention to

8    the testimony as it is given.

9          You have notepads and pens.  You are more than

10   welcome to take notes.  Do not let your note-taking interfere

11   with your being attentive.  When you leave during the day or

12   for recesses, your notes should be left either in the jury room

13   or on your chair in the courtroom.

14         And I think Ms. Pew will make a chart with where you

15   are all sitting now so that we know where you are.  Whether you

16   take notes or not, you should rely on your own memory of the

17   evidence.  Notes are to only assist your memory, and you should

18   not be overly influenced by your notes or the notes of a fellow

19   juror.

20         We will now go into opening statement of the

21   attorneys.  The opening statement, again, is not evidence, but

22   is to lay out what the attorneys believe the evidence will be

23   over the course of the next several weeks.  The Government will

24   then present evidence, and counsel for Mr. Zuberi may

25   cross-examine any witnesses they call.

And then Mr. Zuberi, if he chooses to offer evidence, counsel for the Government may cross-examine their witnesses. After the evidence has been presented, I will instruct you on the law that applies to this case. The attorneys will make closing arguments. And at that point you will begin your deliberations.

With regard to your verdict -- we generally start at 9 o'clock in the morning. We finish generally around 5:00. There are 15-minute breaks in both the morning and the afternoon. Shortly, when we take our -- probably break for the day, Ms. Pew will show you where the jury room is. You won't be going back down to the first floor.

We have a jury room off the courtroom here where you will meet in the morning. It is important that you're in that jury room, not wandering the hallways of the courthouse. We have witnesses and parties to the case. It's true of the open area in front of the courthouse.

If you are a smoker and it's time to take a smoke break, if you could get away from that front area of the courthouse. It's just sometimes where people tend to congregate and talk. So please avoid that area.

If at any time you need to take a break, please don't be uncomfortable. Just raise your hand. Tell us you need to take a break, and we will be taking a break. There are times where I need to talk to the lawyers outside of your presence.

This is a small courtroom. You know, I know on TV they come up to the bench and they whisper to each other. It's a little hard for us to do that without you hearing us. So there may be times where I will step into the hallway with the attorneys to have a short discussion. There may be times where I'll ask you to return to the jury room, so I can have a discussion with the -- with the attorneys.

We rely on the attorneys to ask questions of the witnesses. You know, you are not an inquisitional body; but there may be times where you're listening to a witness and you think there's an important question that should be asked that's not being asked.

You are permitted to write down that question. If you just hold it up, Ms. Pew will take that question from you. Keep in mind that witnesses -- you know, some witnesses are coming from distances; and often when they're done testifying, they're leaving and not coming back.

So if there's a question of a particular witness, hold that question up. Ms. Pew will give it to me, and I will take a look at it. If it's the kind of question that can be asked, I will pass it on to the attorneys and they can choose to ask it.

They're under one rule; and, that is, they don't get to stand up and say, "I have the most remarkably astute question from a very intelligent juror." They will simply ask

it or not ask it.  There may be another witness who's going to

cover that issue.

There are times where I may look at the -- you know,

to give you an example, say a drunk driving case.  When I was

in state court, I did a lot of those cases.  And invariably one

of the jurors would ask, "Has he ever been convicted of drunk

driving before?"

You're not allowed to ask that question.  So I would

just put that one away.  So, again, if there's something that

you feel is -- you really feel needs to be asked, you can write

that down, and the attorneys will ask it if it's appropriate.

All right.  With that, if anybody needs a break,

now's the time to go.  But today we're really just planning on

going into our opening statements and probably finishing with

that.  Does anybody need to take a break right now?  I will

take silence as a no.

The Government has the burden of proof.  They have

the absolute burden of proving beyond a reasonable doubt that

these charges are, in fact, true.  So they will go first,

followed by the defense, if they choose to give an opening

statement.  But we will hear first from the Government.

And it would be probably helpful to reintroduce

yourselves when you come up to the jury so that they can take

note of your names.

MR. LICHVARCIK:  May it please the Court, counsel,

1  members of the jury.

2                    OPENING STATEMENT

3       MR. LICHVARCIK:  Again, an introduction, my name is

4  Nate Lichvarcik.  I'm with the U.S. Attorney's Office.  I'm an

5  Assistant United States Attorney.

6       Handcuffs to bind the hands, leg irons to bind the

7  legs, cell phone jammers designed to cut off a cellular phone's

8  ability to communicate, a Taser to control a person, and a

9  firearm when a little more control is necessary.  And a plan

10  written down, blue pen on a piece of paper, found in his

11  bedroom with a title, "Operation Take Over.  Leave phone at

12  home.  Make sure they don't have a bunch of people in their

13  life.  You don't want any type of investigation."

14       And a cell handcrafted, concrete cinderblock by

15  concrete cinderblock, no doorknobs on the doors, no door

16  handles on the doors, just locks, because, as the evidence is

17  going to show, when he goes and kidnaps a woman and brings her

18  back home he needs somewhere to keep her.

19       Power, control and sexual domination.  That's what

20  this case is about.  It's about a man who took these items,

21  came up with that plan, kidnapped two different women, in two

22  different places, at two different times, and raped them.

23       Now, during the course of this trial, you're going to

24  hear all about what Negasi Zuberi did last summer, 2023.

25  You're going to hear and see about it through approximately

450-plus exhibits.  You're going to hear and see about it through approximately 50-plus witnesses.

His charges:  Kidnapping two different women, transportation of one of them across state lines for a criminal sexual purpose, four counts of being a felon in possession of firearms or ammunition.

Let me now introduce you to the first witness that you're going to meet tomorrow morning, AV-1.  AV-1 is a 22-year-old woman.  She grew up and lives in the Washington area.  She dropped out of school around the age of 15.  She worked a few restaurant jobs, and then she found out there was a way to make better money than that because men pay good money for sex.

You see, in 2023 AV-1 engaged in commercial sex work.  And on July 14th of that year, she woke up.  She went about her day.  It was a Friday.  And, as she got ready, she had no idea there was a man, Negasi Zuberi.  He goes by other names that you're going to hear during trial:  Sakima Zuberi, Justin Kouassi, Justin Hyche.

He lived down in Klamath Falls, this house, 1336 North Eldorado.  Mr. Zuberi rented this house.  He lived upstairs with his two children and a woman named Alycia Westfall.  You'll hear some things about their relationship.

Downstairs of the house, he subleased two rooms to two men.  We'll talk more about this house later on.  But, for

now, just know Mr. Zuberi had put the finishing touches on something in the garage.  He made sure that the garage windows were covered, so no one could see in.

Back to Seattle.  AV-1 knew none of those things. She never even heard of Klamath Falls, as you're going to hear. She knew it was the weekend.  She knew there was a lot of money to be made.  She recently had her nails done, as she'll describe.  She had picked out a black body suit, and she headed to The Blade.

The Blade is a part of Aurora Avenue up in Seattle that's known for men seeking sexual pleasure.  Now, around 11:00 p.m. -- again, this is July 14th, 2023 -- she was at this corner, and she saw a Honda Pilot pull up.  Driver's window rolled down.  It was Negasi Zuberi.

He mumbled something about sex.  They agreed on $100, and AV-1 voluntarily got into the Honda Pilot.  Mr. Zuberi drove around the corner, pulled into an alleyway, and then AV-1 noticed something.  She'll tell you it seemed small at the time.

She tried to send a text message, but the message wouldn't send.  She figured it was probably just a place without cell reception.  Went in the back seat of the Honda Pilot; had sex, like Mr. Zuberi had paid for.  And then once they finished, things took a turn.

And that's when AV-1 looked up, and Mr. Zuberi was

pointing a yellow and black Taser at her and said, "I'm a
police officer.  This is a sting operation."  Cuffed her
wrists, cuffed her ankles, told her, "I'm taking you to a
secure location."

Also said, "You notice how your cell phone stopped
working?  I have a device that shuts off cell service."  And
she'll describe how he held something up.  It was large.  It
had antennas.  She didn't know what it was.  And he drove away
with her cuffed in the back seat.

And AV-1 will tell you in vivid detail what happened
in the Honda Pilot for the next hours.  She'll tell you things
like how she repeatedly begged, "Where are we going?  What are
you going to do with me?"  And he'd say things like, "We're
going to a secure location."

At times he reassured her, "Why would I hurt a
princess like you?"  As the miles accumulated and the hours
went by, AV-1's panic increased.  Still driving, as the sun
started coming up, she'll tell you how she noticed a shift in
Mr. Zuberi's mood.

They pulled over.  There was an empty lot surrounded
by trees.  She'll tell you how he got out.  He went to the
bathroom.  And then he came back around to her door, opened the
door, looked at her and said, "Suck it."  She's cuffed at the
wrists.  She's cuffed at the ankles.  She's scared.

She's going to describe how she looked up, and his

eyes were bloodshot.  He looked angry to her.  And she went down to her knees, and she did as she was ordered.  She's going to tell you then how Mr. Zuberi turned her around and raped her from behind.

Back on the road.  AV-1's going to tell you how she saw a Love's truck stop and at that point how Mr. Zuberi made her lay down in the back, cover her face with a sweatshirt with the hood facing backwards -- remember that.  You'll hear about that again -- and then pulled out of Love's.

Drove for a short time from Love's.  AV-1 couldn't see 'cause her face was covered, but she felt Zuberi back into what felt like a garage and close the door.  He said, "This is the transportation center," and walked her into a room.  She's going to tell you how hot it felt, ridiculously hot.

He took the sweatshirt off, and she looked around. It was not like anything she had seen before.  One chair, one light, no windows.  She'll describe it for you.  AV-1 saw a black metal door with bars and a black mesh metal screen, actually.  There were no locks -- or sorry -- locks, no doorknobs, just locks, with Styrofoam on the inside.

Mr. Zuberi brought in a fan, a jug of water, and he locked her in.  So there she is locked in the room alone.  No idea what town she's in, what city she's in, what state she's in.  She's been up for a really long time; and she'll tell you how she fell asleep on the floor, wakes up.

The room feels even hotter, and her panic redlined at that point. That's when she's going to tell you how reality felt like it kicked in. That's when she realizes this isn't a transportation center. He's not a police officer. And you're going to hear how her basic survival instincts served her, and she took action. She'll describe it for you.

She bit off her nails, the tips of them, and she started punching the metal screen door, tears up her knuckles. She was able to get the metal screen of that black door to break away. And AV-1, she'll tell you, was around 120 pounds last year. And she was actually able to squeeze her body through that narrow black opening. And you'll see the door. I'm going to bring the door in.

She's out in the garage. She sees the Honda Pilot in the garage. She's looking for her purse, looking for her phone, can't find them, but she finds a gun in the car's driver seat. And she'll tell you she grabs and she goes. Opens the side garage door and runs outside.

Scales this fence. You're going to hear how this fence, it had a latch. It was possible to just open up the latch and open the door. But, in her panic and in her fear, she scrambled up over the fence with gun in hand.

She's going to tell you how she ran out into the street, wearing next to nothing, in a town she's never been to in her life. And she flags down the first car that she sees.

Meet Mellissa Geary from Depot Bay Oregon. Mellissa Geary's in Klamath Falls for a convention.

She's driving to the convention that morning down a residential street, Eldorado Street, that you'll hear about. So the last thing she expected to do, she'll tell you, is to run into a woman screaming and bleeding.

And she'll tell you what that was like. She'll tell you how it got her heart racing, how the woman actually tried to crawl into the driver's window, yelling, "He raped me. He raped me." And she drove her to a nearby KFC and called 9-1-1. You'll hear the 9-1-1 call.

Sheriff's officers responded. You'll see body cam footage of that response. Here are some photographs from it. That's AV-1 in the black body suit in the back of the patrol car. Lower right corner, she's holding the gun that she took from the garage.

Now, as you'll hear, Mr. Zuberi is a felon. So the gun and the ammunition that she took from the garage is the basis for one of the firearms counts. Officers took AV-1 to the hospital. They treated her, and they launched a full-scale investigation.

Once treated, she showed officers where the house was. This is a photograph of her in her blue hospital gown pointing out the Eldorado house. Two officers walked up to the front door. And they'll tell you, you'll hear them testify, no

one seemed home.  The front door was actually a little bit
open.  It was ajar.

They could see through some windows of the house, but
not the garage.  That night they executed a search warrant.
And officers will explain to you what they found, what it felt
like in there.

You'll see some of the body cam footage of them going
into the garage, and it was just like AV-1 described.  It was
that concrete cell, that one room, the doors with no handles,
no doorknobs, just deadbolts.  They found blood on the black
metal door.  They found blood swiped across the doorframe.
They found blood on the doorknob.  They found blood on the
wooden fence.  You'll hear about that.  You'll hear from DNA
expert.

Next to the cell, inside the garage, they found a
workbench.  On it were handcuffs, leg irons.  There was
ammunition on and around the workbench as well.  And that
ammunition forms the basis for another felon in possession of
ammunition count.

In the back of the garage, near this black suitcase,
they found, on top, a purse.  And they opened it, and they
looked inside and found a credit card with the name [redacted].
 That's AV-1's mom.  She borrowed her credit card.  That's
AV-1's purse.

Now, you'll hear how they searched the rest of the

house at Eldorado.  I'm not going to cover everything right

now.  Previewing some of the main parts, some of the highlights

they found in Mr. Zuberi's bedroom, that Operation Take Over

note that I read earlier.  They found another notebook, this

blue one right here, opened it up.

And inside, a July 23 date, a sentence about raising

an army, targets.  And, underneath targets, women are listed.

They found police patches in the master bedroom.  They found

ammo cans full of ammo.  The ammunition in the master bedroom

forms the basis of another felon in possession of ammunition

count.

Inside one of the ammo cans, they found handcuff keys

and a set of keys that worked for the black metal security door

in the garage.  They found a firearm case.  Oh, another pair of

handcuffs in the master bedroom.  They found a firearm case in

the master bedroom closet that matches the firearm that AV-1

took from the garage by serial number, make and model.

So you're going to hear all about what law

enforcement found when they searched the house.  And you're

also going to hear about what they didn't find.  Yellow and

black Taser that she described, didn't find it.  Devices that

have an antenna at the top and seem to cut off cell signals,

didn't find it.  AV-1's cell phone, didn't find it.  They will

be found.

After searching the home, you're going to hear how

FBI was able to piece together and track Mr. Zuberi's cell
phone and map his travel. And you'll see maps of that at
trial. You're going to see generally it showed Mr. Zuberi
traveling from Klamath Falls all the way up to Seattle on the
night that AV-1 was kidnapped, and then from Seattle all the
way back down to Klamath Falls.

You're going to see video surveillance that they
found of that same travel. Mr. Zuberi pictured here. You'll
see the video at trial of him the morning of at a Safeway in
the Portland area. You're going to see surveillance video of
him that evening heading north in Washington.

You're also going to see surveillance video of when
he's back down at the Love's truck stop near Klamath, and
you'll see the video surveillance. You'll see a driver wearing
a white T-shirt. No one in the passenger seat. And this is at
the same time that AV-1 will tell you that she's handcuffed and
legs are cuffed in the back seat of a Honda Pilot.

You're also going to hear about what Mr. Zuberi did
in the immediate hours after AV-1 escaped the cell. A lot
going on here. Don't try to digest it now. But, for present
purposes, I'll highlight some pieces. You're going to hear
that the 9-1-1 call from the KFC happened around noon.

And what you're going to hear, in general, is that
Mr. Zuberi left the Eldorado home and never came back. You're
going to hear evidence about how he went to a trailer multiple

times.  You're going to hear evidence about how he purchased

bleach.  You're going to hear evidence about how he searched

for flights that night from Reno to New York, searched flights

from Reno to Turkey.

And you're going to hear how that night he left the

state, left Klamath Falls, crossed over the border down into

California, into a town called Tulelake.  You'll see

surveillance video down in Tulelake, too.  Next morning you'll

hear about how he left Tulelake, crossed back over into the

Oregon border, to a town called Merrill.

And you're going to hear how he met up with Alycia

Westfall, the woman that he lived with, and his kids in

Merrill; and how they left a car at the Merrill gas station,

piled into the Honda Pilot -- video surveillance footage at the

Merrill gas station as well -- and then headed down to Reno.

The car that they left at the Merrill gas station is

this Nissan Altima.  And you're going to hear that law

enforcement searched that with a warrant, and they found some

paperwork inside.  And that paperwork was for a place called

AAA Storage.  It had an address in Klamath Falls.  It had a

unit number, RV106.  It had a gate access code of star 2153

pound.

Law enforcement found this interesting especially

when they heard a recorded phone call between Mr. Zuberi and

Alycia Westfall, in which he's trying to give that pass code to

Alycia. Those are photographs of AAA Storage. Listen.

(Audio recording played in open court, 3:42 p.m.)

MR. LICHVARCIK: Law enforcement went to AAA. They found out that Mr. Zuberi rented a space there, had been paying, and he had a trailer. They got a search warrant for that, and they found some things. Inside they found name-change paperwork, changing his name from Justin Kouassi to Negasi Zuberi.

They'll later find a selfie that he took of himself inside the trailer. And the evidence will show what they found in there. Right next to the door, right next to that red and black bag right there, sitting on the counter, one yellow and black Taser; on the floor, two different cell phone jammers, found along with a black backpack, black gloves, black hat, another box of handcuffs.

Two more pairs of handcuffs are found, silver and black ones. Remember the silver. We'll talk about those in a bit. And firearms and ammunition are found at the trailer, which, since he's a felon, formed the basis of another firearms and ammo charge. But still no AV-1's cell phone. It wasn't at the house. AV-1's cell phone was not at the trailer.

All right. To find AV-1's cell phone, we've got to go to Reno, specifically a Walmart parking lot in Reno, Nevada, July 16th, where FBI was able to locate Mr. Zuberi by tracking his cell phone. Short clip of law enforcement pulling up.

1    You'll see a lot of videos of this incident during trial.

2            (Video recording played in open court, 3:44 p.m.)

3            MR. LICHVARCIK:  Mr. Zuberi is in the driver seat.

4    It's the middle of summer, triple digits in Reno.  And there's

5    a stand-off, approximately one hour.  He refused to get out of

6    the car.  Reno PD, you'll hear, brings in a hostage negotiator.

7    You'll meet him, and some of the Reno officers as well, who's

8    actually able to FaceTime with Mr. Zuberi.

9            At one point Mr. Zuberi takes this knife, and he

10   starts slicing his lower left leg while he's in the car.  He

11   FaceTimes with the officers.  He shows them the injuries.  He's

12   bleeding on the car floor, bleeding on the car door.  He's

13   bleeding on the car seat.  They're big gashes.  And he tells

14   law enforcement he's trying to kill himself, and he can't even

15   do it right.

16           (Video recording played in open court, 3:45 p.m.)

17           MR. LICHVARCIK:  Now, finally, the stand-off ends.

18   Mr. Zuberi gets out -- and you're going to see video footage of

19   this -- he gets out; and one of the first things that he does

20   is take the cell phone out of his pocket, remove it from the

21   protective covering, which he throws onto the ground, take the

22   cell phone up near his head and throw it on the concrete.

23           Once in custody, he makes some interesting

24   statements.  You'll see a few of those.  I'm not going to play

25   them all.  We'll preview.  His mind is working.  He's trying to

figure out how law enforcement found him so quickly in Reno,
and he talks about his knowledge of cell phone tracking.
Listen.

(Video recording played in open court, 3:45 p.m. -
3:46 p.m.)

MR. LICHVARCIK: When told he's being arrested for
some other violation, you can actually see his mind working and
puzzling in the videos. And he blurts out, "What about the
other shit?" And then says, "Is your camera on?" Watch.

(Video recording played in open court, 3:46 p.m. -
3:47 p.m.)

MR. LICHVARCIK: FBI got a search warrant for that
Honda Pilot in Reno, and they found some things. In the visor
area, handcuff key. In the back, a bottle of bleach cleaner.
Found tire spikes. And in a bag in the back seat, inside they
found some men's clothing, binoculars, flashlight, zip ties,
men's cologne and a cell phone, AV-1's cell phone.

Now, the evidence will show that after AV-1 escaped
from the cell FBI learned of another woman. The evidence will
show how in May, two months prior, of 2023, another woman got
into that Honda Pilot, how Zuberi used a yellow and black Taser
with her, cuffed her hands, cuffed her legs and raped her.

I'd like to introduce AV-2, 22 years old, lived in
Klamath last May, 2023. And she's out this night with her good
friend, Jenny, who you'll meet. Jenny's boyfriend in the

middle and Diego on the far left. You'll meet Diego as well.

They were out in -- at The Pikey, which is an Irish pub in

downtown Klamath.

It's got a laid-back atmosphere. AV-2 will tell you

how she just worked a full shift at the restaurant, and she was

tired and didn't want to go out. But she had promised Jenny

she would, and she wanted to follow through on that promise.

AV-2 only had two drinks that night. She's a social person.

She'll tell you how she knows The Pikey bartenders, the

bouncers. Here's AV-2 and Jenny out that night.

(Video recording played in open court, 3:49 p.m.)

MR. LICHVARCIK: It was a fun, light-hearted evening

in Klamath until it wasn't, 'cause at The Pikey that same

night, Negasi Zuberi. AV-2 will come in here and tell you how

she made eye contact with him at the bar. It was an

uncomfortably long period of time, and she looked away.

She never spoke with him. Multiple witnesses, her

friends will come in here and tell you that. After midnight --

now the clock has struck from May 5th to May 6th -- Mr. Zuberi

left The Pikey with his roommate, Erik Mendoza, and a girl,

which was also captured in surveillance video.

Zuberi left The Pikey. He dropped those two at home,

at Eldorado. And then he turned right back around by himself

and came back to The Pikey. For AV-2, as the evening wound

down, her friend, Jay, had invited her to a party at his house.

1  It was a few blocks away.

2       So Jay was going to give her a ride.  By the time

3  AV-2 said her goodbyes inside the bar, she went outside and Jay

4  was gone.  You'll actually see video surveillance of that, too,

5  of her walking outside, putting her hands up, and then walking

6  back towards the door of The Pikey.

7       Showing up outside The Pikey at 1:08 a.m., Zuberi.

8  Surveillance video shows that, too, shows him walking towards

9  The Pikey, where AV-2 is standing.  Take a look, focusing on

10  the lower left-hand side of your screen.

11       (Video recording played in open court, 3:51 p.m.)

12       MR. LICHVARCIK:  Then the surveillance video shows

13  the two of them walking away together, shows no aggression, no

14  force.  AV-2 will tell you she recalls walking down the street

15  with him, with her alongside.  But she doesn't remember what

16  happened next.

17       She doesn't remember getting into the car.  As you'll

18  hear in a moment, Mr. Zuberi hit her in the head a lot that

19  night.  So the next thing she does recall is being in the Honda

20  Pilot with him.  And AV-2 will tell you in vivid detail what

21  happened as she was in that Honda Pilot with him.  She'll tell

22  you how she was -- how he was driving erratically.  She was

23  asking him to slow down.  He wouldn't.

24       At one point she tried to open up the door, and he

25  sped up even faster.  And she started screaming.  She was

1  panicking, kept screaming, and that was making him angry.  He

2  ended up pulling over into a more remote area of Klamath, got

3  out of the car; and, AV-2 will tell you, came out and pointed a

4  yellow and black Taser right at her.

5         And this time he fired it.  AV-2 will tell you how

6  the prongs came out, hit her in the side of the rib.  And

7  she'll tell you what it felt like, and it wasn't good.  Once

8  the Taser was done, AV-2 will tell you she remembers still

9  screaming.

10        And that's where Zuberi came up to her and repeatedly

11  just started punching her in the head, to the point where she

12  felt woozy.  He put cuffs on her.  She distinctly remembers

13  black cuffs on the wrists, silver on the ankles.  She remembers

14  the ankles so well 'cause they were quite rigid.

15        Drove back to town.  And AV-2 will tell you then

16  Mr. Zuberi covered her face with a sweatshirt backwards and

17  backed in the Honda Pilot into the garage, uncovered her face.

18  AV-2 looked around.  She'll tell you how she saw a pile of

19  cinderblocks piled up along the side of the garage, tell you

20  how the side door of the garage was covered with a blanket.

21        In the garage, hands cuffed, legs cuffed, she'll tell

22  you how he made her get out of the Honda Pilot and try to walk

23  around with these rigid silver cuffs.  And she'll tell you what

24  that was like, how he laughed at her, how he put her back in

25  the Honda Pilot and kept saying, "Do you want to have sex?  Do

you want to have sex?  If so, you won't get hurt."

         And she eventually gave in.  And Mr. Zuberi raped her

vaginally, anally.  At one point Mr. Zuberi forced her to get

on top to have sex, told her to make it look real, like she was

enjoying it.

         He took out his cell phone and videotaped it; and

threatened her that if she ever reported it to law enforcement,

he'd play that video in court.  Law enforcement found that

video in Zuberi's iCloud, as you'll hear.  An FBI agent will

describe it for you, but the United States will not play that

video in court.

         Zuberi told her how he had friends that were going to

come over and rape her; and then said he was kidding, just

wanted to see what her reaction would be like.  At one point

AV-2's going to tell you how Zuberi drove her back out of the

garage, back out to the rural area, said he needed to find some

of the Taser evidence.

         She'll tell you how he pulled over, got out of the

car, grabbed something, came back and said, "You're lucky,"

returned to the garage, sexually assaulted her again.  Finally,

put the sweatshirt back on her face backwards and left 1336

Eldorado.

         AV-2's going to tell you how during the drive Zuberi

apologized to her, kept offering her money.  She refused.  He

drove her to a Chase Bank, as AV-2 will describe, that was

1  right next to a Subway.  And Zuberi went to the ATM and gave

2  her $300 cash and then dropped her near her house.

3          Terrified, humiliated, AV-2 went home and documented

4  her injuries in both photographs and videos.  Here's a couple

5  of them.  She documented where she was hit in the back side of

6  the head, some of the facial injuries she incurred, some of the

7  wounds that you'll be able to see in this and other videos on

8  her hands, some of the defensive wounds while she was being

9  hit.

10         You'll hear from a close friend of hers named Geo

11  Ruelas.  You'll hear from Geo's mom and Geo's sister 'cause

12  they saw AV-2 immediately afterwards.  And they'll come in and

13  tell you how they noticed her face, how they saw how she was

14  disoriented, confused, seemed concussed to them.  They saw AV-2

15  wincing in pain in her rib area, and they took her to the

16  hospital.

17         Now, AV-2 was so frightened and scared that she

18  couldn't even tell Geo what Zuberi had done.  You're going to

19  hear that she made up a story about riding in a car with a

20  fictional friend who hit her, nothing about a man raping her,

21  kidnapping her.  And AV-2 continued that lie with hospital

22  staff as well.

23         In the days that followed, though, AV-2 had heard his

24  name and found Zuberi on social media and reported to law

25  enforcement.  And AV-2 will tell you how, from her perspective,

1  local police did not take it seriously, didn't follow up.  And

2  it left AV-2 really frustrated and helpless.

3        But you'll also hear how when FBI and Klamath Falls

4  detectives became involved they learned more about that night,

5  and you'll hear that evidence.  I'll give you an example.  They

6  learned through GPS tracker data -- again, no need to digest

7  this map right now.

8        But just know they were able to piece together that

9  after leaving The Pikey that night the GPS data actually has

10  Mr. Zuberi head straight out to a rural area of Klamath, go

11  back to the Eldorado home, back out to the rural area, back

12  home again.

13        You'll see a photo that they found in his iCloud

14  account in which cinderblocks were stacked in the area where

15  AV-2 described seeing them.  $300 that was withdrawn from

16  Mr. Zuberi's account, they were able to confirm, at the Chase

17  ATM in Klamath, right there next to Subway.

18        And those silver handcuffs that were found in the

19  trailer, the one that AV-2 had trouble walking around in,

20  you're going to hear that DNA was found on them linked to AV-2,

21  as an expert will talk to you about, by a likelihood ratio of

22  880 billion.

23        You're also going to get to hear evidence, from a

24  big-picture standpoint, of what Mr. Zuberi did in the days and

25  the weeks after AV-2 says that he kidnapped her and raped her.

You're going to hear, for instance, that the incident with AV-2 was on May 6th with those small, little, tight cuffs. You're going to hear evidence on May 15th is when Mr. Zuberi purchased leg irons.

You're going to hear AV-2 tell you how Mr. Zuberi told her when she was in the garage that "I don't know what I'm going to do with you. I don't know where I'm going to keep you." And the evidence will show that after that incident Mr. Zuberi got busy at Home Depot loading up on cinderblocks, insulation, building materials.

You're going to hear all about the cell that he put together in the next months. You won't tour it. You're not going to see it dropped into the courtroom. It's tons of cinderblock and screws and wood, but you will see a lot of photos. You will hear a lot of testimony, receipts and measurements.

You'll hear from a -- the landlord, actually, of the house, who rented the house to Mr. Zuberi. He's actually a licensed contractor of 35 years. And he and his son spent hours dismantling that cell. And they'll talk to you about its construction and how long it took them and how they had to haul it away.

Speaking of that cell, some other pieces of evidence you're going to hear, you're going to hear a recorded phone call in which Mr. Zuberi tries to say that what he built was a

1  music studio.  Listen.

2          (Audio recording played in open court, 4:00 p.m.)

3          MR. LICHVARCIK:  Despite what he says in that call,

4  you're going to see some messages, ones that he wrote like this

5  one in February, in which he said, "Do you know what materials

6  are used for prison and jail floors?"  Like this one in April,

7  "Do you know a way to build a block structure without making it

8  permanent?  And is it strong?  Would a person be able to

9  destroy it with their hands?"

10         Other things you'll hear, you'll hear from an array

11  of experts:  DNA, fingerprints, handwriting, to name a few.

12  You're going to hear from law enforcement in Reno, Klamath,

13  Medford.  Financial records, Amazon purchase history.  And,

14  finally, you're going to see some firearms evidence, in

15  addition to the guns and ammunition that we've already

16  discussed.

17         You're going to see other evidence of his possession

18  of firearms, like this video that was caught inside of his

19  kitchen.  Pay attention to his right hand.

20         (Video recording played in open court, 4:01 p.m.)

21         MR. LICHVARCIK:  You'll see multiple selfie videos,

22  one pointing the gun at the camera and whispering "pow" at the

23  end.  Watch.

24         (Video recording played in open court, 4:01 p.m.)

25         MR. LICHVARCIK:  The evidence will show a phone call

Mr. Zuberi made in which he gives his opinion of what his

chances are of being convicted of the gun charges.  And he

says, "It's already a guaranteed conviction.  The gun charge is

not a what-if.  It's not 'I can fight it.'  It's a guaranteed

conviction."  His words.

(Audio recording played in open court, 4:02 p.m.)

MR. LICHVARCIK:  I'm going to end with one more

statement of Mr. Zuberi, in which -- he's in Reno.  It's during

the stand-off.  And you'll hear how Mr. Zuberi is speaking with

a hostage negotiator.  And the hostage negotiator is telling

Mr. Zuberi, which you already got a quick glimpse of, "I just

talked with the detective in Oregon, and I've got some

information for you."  Listen to how Mr. Zuberi responds.

As we cue it up, Mr. Zuberi responds by saying, "The

information in Oregon is I'm fucked."

(Audio recording played in open court, 4:03 a.m.)

MR. LICHVARCIK:  On behalf of the United States and

my colleagues -- Jeff Sweet, Marco Boccato -- we're honored to

appear before you and present this case over the next several

weeks.  And at the end we're going to ask you to find

Mr. Zuberi guilty; guilty of the firearms and ammunition

charges, guilty for kidnapping AV-1 and transporting her across

state lines for criminal sex, and guilty for kidnapping AV-2.

Thank you.

THE COURT:  All right.  Thank you, Mr. Lichvarcik.

 1          Folks, we're going to take a quick break so the
 2     defense can set up.  I do want to make sure that Ms. Pew gets
 3     the information she needs from some of you who might be staying
 4     in hotels tonight.  We want to get that information sooner than
 5     later and make sure you know where you're staying and what you
 6     need to do.  So I'll have Ms. Pew take you back to the jury
 7     room on this floor momentarily.  We'll have you back out in
 8     about ten minutes.
 9          Please rise for the jury.
10          And, again, this is not the time to be talking about
11     the case or looking up any information about the case.
12          (Recess taken, 4:05 p.m. - 4:18 p.m.)
13          THE COURT:  All right.  Please be seated, everybody.
14          Thank you, folks.
15          We'll now hear from the defense.
16          MS. POTTER:  May it please the Court, counsel,
17     members of the jury.

18                         OPENING STATEMENT

19          MS. POTTER:  There's an old expression.  I'm guessing
20     you've heard it.  You might have even used it.  "Don't make a
21     federal case out of it."  But that's exactly what happened to
22     Mr. Zuberi.  The Government has taken the accusations of two
23     women and turned it into an epic case.  You saw the timelines
24     and the boards.
25          Basically shortly after Klamath Falls Police began

investigating AV-1's accusations in July, they called the FBI.
And this went from a simple case to a full-blown investigation
into everything Mr. Zuberi ever said, did or thought.  And the
Government took that and is trying to turn this into a case
where Mr. Zuberi is portrayed as someone who's hunting women.
But, again, that is not what the evidence will show.

You heard the Government's theory of the case.
During that time the Government told you about AV-1 and AV-2's
accusations; but they also spent time talking about things that
Mr. Zuberi wrote in his journal, and what happened when he was
arrested in Reno, and a list of women he had in a journal.

The question for you in this case is why?  Why spend
so much time talking about things that have nothing to do with
the allegations of the two women?  Well, I'm going to talk a
little bit about that in a moment, but the bottom line is that
the evidence will show that there are a lot of things about the
two women's allegations that just don't make sense.

And so the Government is offering a bunch of other
evidence that it will try to argue is evidence of guilt.  That
evidence doesn't show that beyond a reasonable doubt Mr. Zuberi
committed a kidnapping.  I do suspect, though, that after
listening to the Government you may not like Mr. Zuberi very
much.

But you're not here to decide whether Mr. Zuberi is
someone you want to hang out with or have a beer with.  You're

here to decide whether the Government has proven beyond a
reasonable doubt; and to do that, you have to evaluate all the
evidence.

And, again, a lot of it is just not going to make
sense.  So as you listen to all the evidence in this case, what
we are asking you to do is pay attention to what the witnesses
are saying and ask yourself, "Does this make sense?  Is it
credible?"

Again, my name is Amy Potter.  And myself, along with
Mr. Bertholf and Ms. Oakley, we represent Mr. Zuberi.  So I'm
not going to be up here for nearly as long.  I don't have a lot
of exhibits and boards.  What I want to do is go over some of
the evidence the Government talked to you about, because not
everything is as clear-cut as it might have seemed.

Now, there are seven charges in this case.  You heard
that from the Government.  Four have to do with whether
Mr. Zuberi possessed guns and ammunition that were found at his
home and in his trailer.  I'm not going to spend a lot of time
discussing those.

I do want to point out one fact, though.  Most of
those guns and ammunition were left behind by a former tenant.
Why do I think that's important for you to pay attention to?
Because you might have thought, "Oh, this is part of this
Operation Take Over.  This is stuff he collected as part of
this."

          So just listen carefully to that evidence.  And
whether there was ammunition in his bedroom or in a trailer has
nothing to do with proving a kidnapping case.  The core of this
case is the allegations that Mr. Zuberi kidnapped and
transported AV-1 for illegal sexual activity and kidnapped
AV-2.

          And at the end of this case, whether you like
Mr. Zuberi or not, or agree with everything that he did in May
and July, when you separate out all the white noise, the answer
to the question of whether the Government proved those charges
beyond a reasonable doubt will be no.

          So I'm going to start with AV-2.  AV-2 claims that
Mr. Zuberi kidnapped her.  And you will hear from AV-2, and you
will also hear what she said about this incident over time.
Now, the Government has told you a little bit about this.  It
was Cinco de Mayo.  She was with friends drinking at The Pikey.
So was Mr. Zuberi.  Maybe they both had a little too much to
drink.  But in the end Mr. Zuberi ends up giving her a ride.

          Now, AV-2 has said she has no recollection of getting
into the car, but they ended up driving somewhere out of town.
Maybe they got lost.  At some point she's going to -- you're
going to hear that she tried to jump out of the car and that,
in response, Mr. Zuberi tried to tase her and punched her
multiple times in the face and the neck.

          She also, you'll hear, at one point said he pistol

whipped her.  Now, the Government showed you some of the
pictures in opening of those injuries.  You'll probably see
those pictures multiple times during trial.  It's up to you to
evaluate whether those pictures are consistent with being
punched with a closed fist multiple times as described.

You will also hear from the doctor that evaluated her
at the hospital a couple days after the incident.  This was her
second trip to the hospital.  You'll hear about the story she
told about what had happened.  And you'll hear that over
time -- that's not the first time she talked about it -- it
changes just a little bit.

You will be the ones that evaluate that.  But turning
back to the allegations of that night, after AV-2 says that
Mr. Zuberi beat her and tased her, they go back to the garage
and she says he forced her to have sex with him.

Now, I want to be clear we're not disputing that they
had sex.  We simply say it was consensual sex.  You'll hear
AV-2 say she said yes, but it was because she was threatened.
Now, why are we talking about this?  Because all of this goes
to AV-2's credibility.

But I want you to remember that Mr. Zuberi is not
charged with rape.  He is charged with kidnapping her.  So you
will hear AV-2's story, but you will also see a brief video of
AV-2 and Mr. Zuberi having sex that evening.  I get that that
may be uncomfortable, but we have to present that because it

goes to her credibility.

The video is brief, but in it you'll hear AV-2 tell Mr. Zuberi he's attractive.  And then you'll hear her ask him to stop taping.  And you know what?  He does.  So after allegedly kidnapping her, tasing her, punching her and pistol whipping her, when she asked him to stop videotaping, he did.

So after you hear the testimony and see the video and the pictures of the injuries, you'll have to evaluate AV-2's claims and decide did the Government prove beyond a reasonable doubt that she was kidnapped.  And when you consider that charge, in addition to the evidence, consider what happened at the end of the night.

Mr. Zuberi gives her some money after she tells him a story about her sick dog.  And then he drops her off near her home.  So ask yourself, as you listen to that, how many kidnappers drop their alleged victims back home?  So that's the allegation for May.

There's also an allegation that Mr. Zuberi kidnapped AV-1 in July.  As the Government said, you're going to hear from AV-1.  She was a commercial sex worker, and he went to Seattle and paid for sex.  It's not in dispute.  You may not like that he paid for sex, but he's not being charged with that.

He's being charged with kidnapping and transportation for illegal sex.  Why?  Because AV-1 said he told her he was an

undercover cop and forced her to go back with him to Klamath.
She also says he forced her to have sex with him during that
trip, and she says once they got back to Klamath he put her in
a cinderblock structure that was built in the garage in order
to keep her there.

When she gets in the structure, she describes it as
being hot, feeling claustrophobic. But then she goes inside
and falls asleep. She may still think he was an undercover
cop, but she decides to take a nap. Does that make sense? But
before we get to what happened next, I want to talk to you for
a moment about this structure.

The Government called it a cell, but it's simply a
cinderblock structure for music or extra space. Just remember
there are reasons to have a structure other than the story the
Government has told. And think about that as you hear all the
evidence.

So, returning now to AV-1, when she wakes up from her
nap, she says she feels trapped and she tried to escape. She
said she beat on the walls and eventually broke through the
door. You'll see that door. And you saw the pictures of the
hand with what she says are the injuries from that. It will be
up to you -- you're going to see -- the door, itself, is going
to be here. You're going to look at everything. Does that
make sense?

So we have an incident in May and an incident in

July, a woman Mr. Zuberi met at a bar and a commercial sex
worker from Seattle.  You may be wondering:  Why is it one
case?  Again, making a federal case out of it.  And to tie them
together, you heard some references to things that are the
same:  The use of a hoodie, some handcuffs.

And so while you're listening to that evidence over
the span of the next few weeks, think about it:  The hoodie and
the handcuffs, is that enough to make it similar, to make it
this grand plan, this Operation Take Over?  Look, I'm not going
to dispute Mr. Zuberi had a hoodie.  He had handcuffs, and he
had Tasers.  But just owning those things doesn't make you a
kidnapper.

Now, you may be thinking:  Who owns multiple
handcuffs and Tasers?  The reality is there are people in this
country who think society may collapse or end up in some sort
of civil war.  And they gather up a lot of stuff, from items to
protect themselves to food like Top Ramen, so that it will last
for a long time.

You may not share that belief, and you may have
strong opinions about people who believe that, but they exist.
And so consider that as you hear the evidence.  You know all
those writings the Government showed you, the references to the
Operation Take Over, the list of women?  Again, they say that's
a plan.

I think it could also just show a person who's

preparing for a very different time.  You need to evaluate that

evidence throughout this case.  When I -- when you look at

those things, for example, the Operation Take Over, also think

does it really prove what happened?  'Cause the very first line

is "Leave your cell phone at home."

Well, you'll learn very quickly Mr. Zuberi did not

leave his cell phone at home when he went to Seattle.  So maybe

that's not a plan for what happened in July.  The Government

also told you that they're going to bring a bunch of experts

here:  DNA, fingerprints, handwriting.

A lot of us have seen CSI or Dateline.  We even

talked about it in one of the panels.  It's easy to assume that

scientific evidence is the linchpin of any case, but that's not

the case here because we don't dispute that Mr. Zuberi had sex

with AV-1 or AV-2.  We don't dispute that they were in his car.

We don't even dispute that they took the car back to his house.

So the fact that there's DNA, of course there's DNA.

But the fact of that DNA doesn't prove beyond a

reasonable doubt that there was a kidnapping.  Same thing with

fingerprints.  Of course Mr. Zuberi's fingerprints are on

things.  Again, it doesn't prove kidnapping.  There's some

other things the Government talked about, and you'll see during

this case, that are kind of outside the two main allegations.

They talked about the arrest in Reno and the mention

that he threatened suicide.  I want to talk for a minute about

1  Reno 'cause you're going to see a lot about Reno over this

2  case.  As you listen to the evidence about Reno, I just ask you

3  to consider this:  Mr. Zuberi is an African American male.

4  He's at a Walmart parking lot.

5          Police car drives up.  Officer gets out and starts

6  screaming, "Get out of the car, get out of the car."  Within

7  seconds there's -- you'll see videos.  There's multiple

8  officers pointing guns at the car, screaming, "Get out, get

9  out," and not -- he's asking what's going on, and they're not

10 telling him.

11         And I want to be clear:  I am not criticizing the

12 Reno Police Department.  They had their job to do.  I'm just

13 saying, as you watch that, consider the perspective of

14 Mr. Zuberi as he's sitting in that car.  Maybe there are other

15 reasons just not to jump out right away.

16         The claims about suicide are similar.  As you listen

17 to those statements, consider whether, instead of the

18 Government's theory, it's evidence of his belief that the cops

19 are simply out to get him and he was despondent.  Given the

20 great lengths the Government has gone in this case, maybe he

21 had a reason to feel that way.

22         Now, I was a lot shorter.  I didn't probably cover

23 every single allegation the Government made.  But I hope I

24 highlighted some of the key things for you to listen to and

25 consider as the evidence is presented because remember the

Government has the burden of proof here.

They must prove beyond a reasonable doubt that
Mr. Zuberi is guilty of kidnapping and transporting AV-1 for
illegal sex, of kidnapping AV-2, and of possessing firearms and
ammunition.  Mr. Zuberi does not have to prove anything.  And
while you may, again, after you hear all the evidence in this
case, conclude you don't like Mr. Zuberi very much, that is not
proof beyond a reasonable doubt that he committed the crimes
the Government has charged him with.

So listen carefully to the witnesses and examine the
evidence closely and consider:  Does the story the Government
is trying to sell you make sense?  Does the evidence prove
beyond a reasonable doubt that Mr. Zuberi is guilty of the
crimes charged?  We believe at the end of the case the answer
will be no.  Thank you very much.

THE COURT:  All right.  Thank you.

Folks, we are going to break for the day.  I know
it's been a long day of waiting.  We've made it through opening
statements.  Tomorrow morning we will begin at 9:00.  We'll
begin really as soon as all of you are gathered together in the
jury room.

Please go directly to the jury room when you get
here.  If you could be here a little before 9 o'clock, we will
start as close to 9:00 as we possibly can, as soon as we --
you're all accounted for.  Again, this is not the time to be

discussing the trial among yourselves or with anyone else.

I am going to ask you to avoid looking at local news at this time. Certainly there's news out there you might be interested in. I mean, there's a hurricane hitting Florida. There's a lot going on in the election news. It's okay to peruse some specific news.

But if you see any headlines or anything that looks like this case, I'd ask you to turn away from it and not read or view any news stories that might be related to this case. If you do read or view a story related to this case, you need to let me know.

If anybody contacts you or tries to talk to you about this case, you need to let me know. But, with that, we will see you back here tomorrow morning at 9 o'clock. Thank you very much.

(Open court, jury not present, 4:34 p.m.)

THE COURT: All right. Is there anything we need -- please be seated.

Is there anything we need to discuss for the record from the Government?

MR. SWEET: Nothing related to opening, Your Honor. Just a small logistical matter.

THE COURT: Yes.

MR. SWEET: Your Honor, tomorrow for a witness and some other times, we'd like to use the podium when addressing

the witness.  I'd just like to confirm --

THE COURT:  That's fine, yes.

MR. SWEET:  Thank you.

And then there is one brief matter which I need to
follow up with the defense on; and perhaps if we could talk to
Your Honor tomorrow morning, maybe ten minutes before.  I don't
think it would take very long, but there's something we need to
discuss.

THE COURT:  Okay.  I'll be here before 9:00.  I'll
just plan on being here certainly by 8:30, and we can have any
discussion we need to have.  Is that going to be on the record?

MR. SWEET:  Ultimately, yes, Your Honor.

THE COURT:  Okay.

MR. SWEET:  Perhaps initially not; and then,
ultimately, yes.

THE COURT:  All right.

MR. SWEET:  Thank you.

THE COURT:  From the defense, anything we need to
discuss?

MS. POTTER:  No, Your Honor.

THE COURT:  Okay.  I want to thank both sides.  I
mean, really the preparation going into, I think, jury
selection and your opening statements, really you both have a
lot to be proud of that we got this really to the jury on the
very first day.  So I'm impressed with the preparation both

1  sides have put in.  So thank you very much, and we'll see

2  everybody tomorrow.

3                          * * *

4              (Court adjourned, 10-8-24 at 4:36 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3          United States of America v. Negasi Zuberi

4               Case No. 1:23-cr-00254-MC-1

5                  Jury Trial - Day 1

6                   October 8, 2024

7

8          I certify, by signing below, that the foregoing is

9    a true and correct transcript of the record, taken by

10   stenographic means, of the proceedings in the above-entitled

11   cause.  A transcript without an original signature,

12   conformed signature, or digitally signed signature is not

13   certified.

14

15   /s/Lindsey A. Weresch, RMR, CRR, CSR

     _____
16
     Official Court Reporter        Signature Date: 3/3/2025
17   Oregon CSR No. 14-0427         CSR Expiration Date: 6/30/2026

18

19

20

21

22

23

24

25