1             IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF OREGON

3                   MEDFORD DIVISION

4

5  UNITED STATES OF AMERICA,        )
                               )
6        Plaintiff,          )
                               )
7        v.                )   No. 1:23-cr-00254-MC-1
                               )
8  NEGASI ZUBERI,              )
                               )
9        Defendant.          )

10

11

12

13                  Jury Trial - Day 2

14              TRANSCRIPT OF PROCEEDINGS

15        BEFORE THE HONORABLE MICHAEL J. McSHANE

16      CHIEF UNITED STATES DISTRICT COURT JUDGE

17                 October 9, 2024

18

19

20

21

22

23

24

25

```
 1                     APPEARANCES

 2

 3   FOR THE PLAINTIFF:

 4            JEFFREY S. SWEET
              United States Attorney's Office
 5            405 E. Eighth Avenue
              Suite 2400
 6            Eugene, Oregon 97401

 7   FOR THE PLAINTIFF:

 8            MARCO BOCCATO
              United States Attorney's Office
 9            310 W. Sixth Street
              Medford, Oregon 97501
10

11   FOR THE PLAINTIFF:

12            NATHAN LICHVARCIK
              United States Attorney's Office
13            405 E. Eighth Avenue
              Suite 2400
14            Eugene, Oregon 97401

15   FOR THE PLAINTIFF:

16            SUZANNE A. MILES
              United States Attorney's Office
17            1000 S.W. Third Avenue
              Portland, Oregon 97204
18

19   FOR THE DEFENDANT:

20            AMY ELIZABETH POTTER
              Angeli Law Group LLC
21            121 S.W. Morrison Street
              Suite 400
22            Portland, Oregon 97204

23

24

25
```

```
 1   FOR THE DEFENDANT:

 2           MICHAEL BERTHOLF
             Law Offices of Michael P. Bertholf, LLC
 3           108 Mistletoe Street
             Medford, Oregon 97501
 4

 5   COURT REPORTER:   Lindsey A. Weresch, RMR, CRR, CSR
                       United States District Courthouse
 6                     1000 S.W. Third Avenue, Room 301
                       Portland, Oregon 97204
 7                     (503)326-8047

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

<u>GENERAL INDEX</u>

2                                          <u>Page No.</u>

3 October 9, 2024, Proceedings              220

4 Reporter's Certificate                   435

5

                      * * *

6

7

<u>WITNESS INDEX</u>

| For the Plaintiff | Direct | Cross | Redirect | Re-Cross |
|---|---|---|---|---|
| AV-1 | 222 | 292 | 310 | |
| Mellissa Geary | 316 | | | |
| Shasta DuVal | 326 | 338 | | |
| Amie Walton | 339 | 356 | | |
| Austin Gilmore | 360 | 371 | 372 | |
| Chris Zupan | 373 | 424 | 432 | |

                      * * *

1           (Wednesday, October 9, 2024, 9:04 a.m.)

2                     P R O C E E D I N G S

3           (Whereupon, the following proceedings were held in

4      open court:)

5           THE COURT:  Please remain seated.  Thank you, folks.

6           Yes, you can bring the jury in.

7           We're going to bring the jury in.  Everybody's ready?

8           MR. SWEET:  Yes, Your Honor.

9           MR. BERTHOLF:  Yes.

10          (Pause in proceedings, 9:04 a.m. - 9:05 a.m.)

11          THE LAW CLERK:  Please rise for the jury.

12          (Open court, jury present, 9:06 p.m.)

13          THE COURT:  Please be seated, folks.  Thank you.

14          All right.  Good morning, everybody.  Thank you for

15     your timeliness today.  We are going to get started in just a

16     moment.  I do want to ask if any of you did, by any chance,

17     look at any news articles or listen to any news stories

18     regarding the case either this morning or last night after we

19     broke.

20          I'm not seeing any hands going up.  Thank you.  I

21     appreciate that.  We'll continue with that rule.  But, with

22     that, again, the Government has the burden of proof, so they

23     have to present their case.  So we'll hear from their first

24     witness.

25          MR. SWEET:  Thank you, Your Honor.  The Government

```
 1  calls AV-1.
 2          THE COURT:  Okay.  Good morning, AV-1.  If you just
 3  want to follow Mr. Svelund, he'll get you where you need to be
 4  at the witness stand.  And I'll ask you to remain standing,
 5  once you step up, for just a moment.
 6          If you'd raise your right hand.
 7                          ADULT VICTIM 1
 8  Was thereupon called as a witness on behalf of the
 9  Government; and, having been first duly sworn, was examined
10  and testified as follows:
11          THE COURT:  If you'd like to have a seat.
12          And if you could state your first and last name for
13  us, spelling both.
14          THE WITNESS:  AV-1.
15          THE COURT:  Folks, we're going to take a quick break
16  until we get our technical -- AV-1, can you try again, just to
17  see?
18          THE WITNESS:  AV-1; [redacted].
19          THE COURT:  Okay.  Thank you, AV-1.
20          I think maybe we fixed the mic problems.  But if they
21  come back up, we'll take a quick break and call our IT person.
22          All right.  Mr. Sweet, go ahead, please.
23          MR. SWEET:  Thank you, Your Honor.
24
25
```

1  <u>DIRECT EXAMINATION</u>

2  BY MR. SWEET

3  Q.  Good morning, AV-1.

4  A.  Good morning.

5  Q.  Are you able to hear me okay?

6  A.  Yes.

7  Q.  And you're welcome to scoot the microphone closer to you,

8  if that's more comfortable.

9       At any time if you want to take a drink, you've got a

10 bottle of water just there to your right.  Okay?

11 A.  Okay.  Thank you.

12 Q.  AV-1, how old are you, please.

13 A.  22.

14 Q.  And what state do you live in?

15 A.  Washington.

16 Q.  Were you born in Washington?

17 A.  Yes.

18 Q.  And have you lived there your whole life?

19 A.  Yes.

20 Q.  AV-1, in July of 2023, were you engaged in commercial sex

21 work?

22 A.  Yes.

23 Q.  And where were you doing that?

24 A.  Seattle.

25 Q.  And was there a specific location in Seattle?

1    A.    Aurora Avenue.

2    Q.    AV-1, I'm going to pull up an exhibit, which is Government

3    Exhibit 1, and we're going to see if it shows up on your

4    screen.

5            MR. SWEET:  Pull up Exhibit 1, please.  I don't know

6    that it's --

7    BY MR. SWEET

8    Q.    Do you see anything on your screen?

9    A.    Yeah, I see it.

10   Q.    Okay.  And do the -- okay.  I think everybody can see

11   that.  Okay.  And just so we get comfortable with this map --

12   so this is a touch screen.  Would you mind just drawing a

13   circle on your screen for Seattle, please.  We should be able

14   to see that.  And we do.  Okay.  We see a pink circle.  Do you

15   see a pink circle on your screen?

16   A.    Yes.

17   Q.    Okay.  So let's go to Exhibit 2.  And this should be --

18   okay.  What are we looking at a map of here?

19   A.    Seattle.

20   Q.    Okay.  So, ignoring that one circle, could you circle

21   generally the area of Aurora Avenue?

22   A.    It's around --

23   Q.    And if I can orient you, do you see the -- okay.  Sorry.

24   There we go.

25            Okay.  So north of the Space Needle, north of

1  Downtown Seattle; is that right?

2  A.   Yeah.

3  Q.   Okay.  So let's take a look at Government's Exhibit 4-3,

4  please.

5         And, as that pulls up, I'd like to ask you -- okay.

6  What are we looking at here?

7  A.   Aurora Avenue.

8  Q.   Okay.  Does Aurora Avenue have a nickname?

9  A.   The Blade.

10 Q.   Okay.  And is that a common area for commercial sex work?

11 A.   Yes.

12 Q.   And when I say "commercial sex work," essentially I mean

13 prostitution and those going to seek to engage with a --

14 someone who's working in prostitution?

15 A.   Yes.

16 Q.   Okay.  So, in terms of commercial sex work, is that

17 something you'd done before July of 2023 as well?

18 A.   Yes.

19 Q.   So I want to back up for just a minute, AV-1.  Did you

20 leave high school when you were young?

21 A.   I did.

22 Q.   About how old were you?

23 A.   About 15.

24 Q.   And did you start working other jobs after you left high

25 school?

1   A.   Yes.

2   Q.   Without -- you don't have to name any names; but, just

3   generally, what kind of work did you do?

4   A.   Food service.

5   Q.   Could you tell the jury what led to you starting in

6   commercial sex work?

7   A.   Just being around the wrong people, kind of being

8   pressured into it.  It was a trend.  And the fast money seemed

9   nice.

10  Q.   Okay.  How old were you when you first started, about?

11  A.   18.

12  Q.   Was there a period of about a year or so when you stopped?

13  A.   Yes.

14  Q.   And did you ultimately get back into it, though?

15  A.   Yes.

16  Q.   Okay.  Let's -- I'd like to turn to July 14th, 2023.  And

17  so, AV-1, I'm going to take a drink for just a second.  So I

18  want you to feel free to open up that bottle of water -- now's

19  a good time to do that -- and take one yourself.

20       And please do that at any time.

21  A.   Okay.

22  Q.   Okay.  So let's -- excuse me -- let's go back to

23  July 14th, 2023.  Do you remember that night?

24  A.   Yes.

25  Q.   Did you have a plan that night to go out and work on The

1  Blade?

2  A.   Yes.

3  Q.   Could you tell us a little bit about, just generally, what

4  you did that night?  What did you do to get ready?

5  A.   I showered, did my hair and makeup, and picked out my

6  outfit.

7  Q.   And what about your nails?  Had you had your nails done

8  recently?

9  A.   Yeah.  I think I had gotten my nails done the day before.

10  Q.   And so you did that.  And did you -- did you go to The

11  Blade?

12  A.   Yes.

13  Q.   Just roughly, what time did you arrive?  Or was it night?

14  Was it afternoon?

15  A.   Around 10:30, 11:00 p.m.

16  Q.   Okay.  I'd like to pull up Exhibit 479-4, please.

17         And we'll give it just a second to load.

18         Okay.  Could you tell the jury what we're looking at

19  here?

20  A.   That's Aurora Avenue.

21  Q.   Okay.  So is the cross street that runs left to right, is

22  that Aurora Avenue there?

23  A.   Yes.

24  Q.   Do you recognize this -- this photo?

25  A.   I do.

1   Q.   Okay.  Can you tell us where you were working, where you
2   were standing that night?  And show us, actually.
3   A.   I was standing in this area.
4   Q.   Okay.  Kind of near where that woman is in that picture?
5   A.   Yeah.
6   Q.   Okay.  More or less next to the stop sign?
7   A.   Yes.
8   Q.   Let's just -- to get some more views of that, let's go to
9   the same exhibit but dash two, please.
10          We're going to look at a couple of these here, AV-1.
11          Okay.  So if you're at the stop sign, what are we
12  looking at here?
13  A.   109th Street and Aurora Avenue.
14  Q.   So basically if you're standing at the stop sign, you're
15  looking down Aurora Avenue one direction; is that right?
16  A.   Yes.
17  Q.   Okay.  Let's go to dash five, please.
18          And what about here?
19  A.   That's the other way down Aurora Avenue.
20  Q.   Okay.  And one more, please, dash one.
21          Okay.  So is that basically across the street from
22  the stop sign, kind of looking towards where you were standing?
23  A.   Yes.
24  Q.   Is there -- is there a lot of vehicle traffic out there,
25  AV-1?

1    A.    Yes.

2    Q.    And we know you were standing by the stop sign.  So I want

3    to ask you:  Were there other women around there as well?

4    A.    Yes.

5    Q.    Was there a person who we've previously described, and you

6    asked me to refer to, as your pimp?  Was he in the area as

7    well?

8    A.    He was.

9    Q.    Okay.  Was he -- could you -- just generally, where was

10   he?

11   A.    He was down there.

12   Q.    Okay.  So he was down that street?

13   A.    Mm-hmm.

14   Q.    So I want to ask you -- if we could pull up Exhibit 191,

15   please.

16          Sometime around or after 11:00 p.m. -- and if we

17   could clear the -- clear the screen, please.

18          Around or after 11:00 p.m. -- thank you, Ms. Pew.

19          Did you encounter that man that's on your screen?

20   A.    Yes.

21   Q.    Can you tell us how that happened?

22   A.    He came down 109th Street and stopped next to me.

23   Q.    Were you the first person he talked to?

24   A.    I don't think so.

25   Q.    And after he may have talked to someone else, you said he

1  stopped next to you -- let me ask you this.  What kind of

2  vehicle was he in, if you recall, just generally?

3  A.   An SUV.

4  Q.   What happened then?  He stops.  He pulls up in an SUV.  He

5  stops.  Then what happens?

6  A.   He -- I think he asked me how much.  Or, no, he asked me

7  if I had a room.  And I said yeah.  And I asked him if he

8  preferred to go to the room or a car date.  And he said it

9  didn't matter and then asked me how much.  I told him, and then

10 I got in the car.

11 Q.   So you said he asked you how much, and you told him.  Do

12 you recall how much you told him?

13 A.   140.

14 Q.   And did he offer -- was that -- did that price work, or

15 did he offer a different price?

16 A.   He offered 100.

17 Q.   Okay.  And what did you say?

18 A.   I said sure.

19 Q.   Could you tell us, please, what that would -- so you said

20 he offered $100 or -- for what, please.  Could you tell us?

21 A.   Full service protected sex.

22 Q.   And when you say "full service," could you explain -- let

23 me ask you this -- well, could you explain what full service

24 means, please.

25 A.   It means vaginal and oral.

1   Q.   Protected?

2   A.   Yes.

3   Q.   For both?

4   A.   Yes.

5   Q.   Did you get in his car?

6   A.   I did.

7   Q.   And then what happened?

8   A.   Then he -- we drove off.  And he took a right onto Aurora

9   Avenue Ave.; and then, short after, took another right; then

10  parked down an alley.

11  Q.   Did he choose the location or did you?

12  A.   He did.

13  Q.   So he's parked down in an alley.  Then what happens?

14  A.   Then I -- we climbed in the -- the very back, the third

15  row of his car, and did the act.  And then --

16  Q.   AV-1, can I pause you for one second?

17  A.   Mm-hmm.

18  Q.   Thank you.  So you climbed into the back of the car.  Let

19  me ask you this.  When -- when he got to the alley -- I'm just

20  going to pull up -- let me pull up Exhibit 62, please.

21       I'm just going to ask you if this looks like --

22  consistent with the area that -- I'm sorry.  Excuse me.  6-2.

23  Sorry.  That was my -- so does this look like a daytime photo

24  of the alley?

25  A.   Yes.

1  Q.   So he parks.  Are the doors open or locked?  Do you know?

2  A.   I think he might have locked them.

3  Q.   When you got there, did you make -- once you parked, did

4  you make any effort to communicate with anyone?

5  A.   I did.  While we -- while we were driving to this

6  location, I was texting my pimp at the time.  And I noticed

7  that my message wouldn't send.  And my -- then I tried to call

8  him, and my call wasn't going through.  My phone had just

9  completely stopped working.  So then I powered it off to

10  restart it.  And -- yeah.

11  Q.   Did you think anything of that at the time?

12  A.   I did.  I thought it was weird.  I thought maybe my

13  service had run out or something.

14  Q.   So you're in the alley.  And what did you do with your

15  phone?  You power your phone off.  Do you recall what you did

16  with it?

17  A.   I placed it on the seat next to me or in -- maybe in my

18  purse.  I'm not sure.

19  Q.   Okay.  So you had a -- you had a purse with you then?

20  A.   Yes.

21  Q.   Can you tell us generally some things that you had in that

22  purse?

23  A.   I had a Taser, pepper spray, some money, my phone.

24  Q.   So you turn your phone off.  You leave your phone.  And I

25  believe you said you -- you went into the back seat or towards

1    the back; is that correct?

2    A.   Yes.

3    Q.   And did the man go with you as well?

4    A.   Yes.

5    Q.   Do you recall how many rows were in that SUV?

6    A.   Three.

7    Q.   All right.  Let's pull up Exhibit 8 for just a moment,

8    please.

9         Do you recall which row you went to?  Does this look

10   sort of consistent with a three-row SUV, what you're seeing?

11   A.   Yes.

12   Q.   Okay.  Which row did you go to, please.

13   A.   The very back.

14   Q.   So you both are in the back row.  At some point was there

15   an exchange of money?

16   A.   Yes.  That happened as soon as we parked, I believe.

17   Q.   And can you tell us how that happened?

18   A.   He just handed me a $100 bill, and I put it in my purse.

19   Q.   And so I believe you may have said earlier that this is a

20   car date, is what you referred to it as?

21   A.   Yes.

22   Q.   Okay.  A car date for full service protected sex; is that

23   right?

24   A.   Yes.

25   Q.   Was there anything else discussed, other than that?

1    A.   No.

2    Q.   Was there any discussion of going anywhere else?

3    A.   No.

4    Q.   Was there any discussion of role play?

5    A.   No.

6    Q.   Was there any discussion of you going out of the state

7    with --

8    A.   No.

9    Q.   AV-1, did you perform oral sex on the man?

10   A.   I did.

11   Q.   And had -- was he wearing a condom?

12   A.   Yes.

13   Q.   And then, after that, did you and the man have sex?

14   A.   Yes.

15   Q.   Was that sex both -- let me rephrase.  Was the oral sex

16   consensual?

17   A.   Yes.

18   Q.   And, after that, you had vaginal sex; is that right?

19   A.   Yes.

20   Q.   Okay.  Was that consensual?

21   A.   Yes.

22   Q.   Can you tell us what happened after that?

23   A.   He finished, and he -- I think he -- he opened the door

24   and threw something out, or pretended to throw something out.

25   I thought it was the condom.  And then he told me that the

1   condom had broke.  And then he grabbed a towel from the front

2   and handed it to me.  And when I was wiping myself off, I was

3   looking down.  And then when I looked up, he had a Taser

4   pointed in my face.

5   Q.   Could you describe the Taser?

6   A.   It was black and yellow, like police grade.  He told me

7   that it was a sting operation, he was an undercover cop, and

8   don't move.  And then he proceeded to put cuffs on my wrists

9   and ankles.

10  Q.   Were you saying anything?

11  A.   I was saying, "What do you" -- I was just saying, "What do

12  you mean?  What's going on?"  And it just didn't -- he did not

13  seem like a cop.  And I was saying, "Well, are you -- are you

14  going to let me go?  You just -- you know, you just nutted

15  inside me."  And it just didn't make any sense.

16          And he was saying something like, "That wasn't

17  supposed to happen.  I wasn't supposed to go that far.  But

18  we've been watching you, and you were a target.  You've been a

19  target all along," stuff like that.

20  Q.   Did he say he was also looking at your pimp?

21  A.   Yeah.  He said that his partner or somebody had taken him

22  or caught him.

23  Q.   So your hands are in handcuffs?

24  A.   Yes.

25  Q.   And can you describe what was put on your ankles?  Were

1   they just handcuffs, or were they different?

2   A.   They had a small -- a short chain in the middle.

3   Q.   Okay.  Longer than the ones on your wrists?

4   A.   Yes.

5   Q.   Where are you in the car at this point?

6   A.   I'm still in the very back.

7   Q.   So you're in the very back.  You're in handcuffs.  You've

8   seen the Taser.  Then what happens?

9   A.   I just let him put the cuffs on me, and then he climbs in

10  the front.  And then we pull off, and he starts going towards

11  the freeway.  And I'm asking if I can -- I'm just asking what's

12  going on, like -- I don't remember exactly what I was saying.

13  And he was saying that he's going to let me go, but he has to

14  take me to a secure location.  And I kept asking if I can get

15  my phone.  And he said, "We'll get it to you.  I'll get it to

16  you."

17  Q.   Did he mention anything about your phone service?

18  A.   I think so.  I think he said -- that's when he said, "Did

19  you notice that your phone stopped working when you got in the

20  car?"  I said, "Yeah."  He said, "I have a device that shuts

21  off all cell phones."

22  Q.   Did he show you anything?

23  A.   I don't think so.

24  Q.   Did you see a device?

25  A.   Yeah.  I saw something on the floor.  I didn't know what

1  it was, though.

2  Q.   Can you describe generally what you saw?

3  A.   It was sort of like a large walkie-talkie-looking thing.

4  Q.   Okay.  Was there anything on the top of it that you

5  noticed or anything -- a part of it that you noticed?

6  A.   Like spikes or something.

7  Q.   Did you see any other handcuffs?

8  A.   I think there might have been a pair on the -- on the

9  floor maybe.  I'm not sure.

10  Q.   So how are you feeling at this point?  So you're in the

11  car.  You're in handcuffs.  Your cell phone wasn't working.

12  You've seen the Taser.  How are you feeling?

13  A.   I'm scared.

14  Q.   What were you thinking?

15  A.   I was just thinking I can't believe this is happening.

16  And I just wanted to go home.  I just wanted to get out of the

17  car.

18  Q.   At some point you -- so you said he was driving towards

19  the freeway.  Then what?

20  A.   We got on the freeway.  And he starts asking me questions

21  and -- like personal questions, like my birthday, my zodiac

22  sign, if my hair was real, stuff like that.

23  Q.   He asked if your hair was real?

24  A.   Yes.

25  Q.   Did he talk to you at all or ask you about people in your

1  life?

2  A.   Yeah.  He asked if I had people close to me, who I lived

3  with, if I had any kids, yeah.

4  Q.   Did you see a gun at some point?

5  A.   Yeah.  That's when he picked up a gun from -- on the floor

6  by his feet and flashed it to me.  He just said -- he said, "So

7  you know I'm -- I'm serious," when he flashed it.

8  Q.   Did he point it at you, or did he just show it to you?

9  A.   He just showed it to me.

10  Q.   Did he say that he was a different kind of cop from other

11  cops or something like that?

12  A.   Yeah.  He said those exact words.

13  Q.   Best as you recall, what did he say?

14  A.   He said, "I'm a -- I'm a different kind of cop.  I'm not

15  like -- I'm not like all the other ones."

16  Q.   Was he saying he was better or worse?  Did he say how he

17  was different?

18  A.   I don't remember.

19  Q.   Did you think he was a police officer?

20  A.   No.

21  Q.   At some point did you get on the -- well, were you on the

22  freeway at some -- at some point?

23  A.   Yes.

24  Q.   Headed which way?

25  A.   South, I believe.

1   Q.   And are you paying attention to where you're driving as

2   you're going?

3   A.   Yes.  We're headed towards -- back towards Tacoma.  And I

4   was asking where we're going.  I kept asking that over and over

5   again.  And he just kept telling me, "We're going -- we're

6   going to Tacoma."  And then when we'd get to Tacoma, he'd say,

7   "We're going to -- we're going a little further and further."

8   Q.   And do you know the Seattle, Tacoma, Washington, area

9   well?

10  A.   Yes.

11  Q.   Okay.  So what happens when you reach -- so you said you

12  go to Tacoma.  He says, "We're going further."  Then what?  So

13  you're going further.  And then what's happening?

14  A.   There's just more talking, just more questions.  I don't

15  remember exactly what he was asking me, just more random

16  personal questions.  At that point I -- I kind of calmed down a

17  little bit 'cause he seemed strangely friendly and like he was

18  trying to make me feel comfortable.

19          And then -- yeah.  So we were just driving.  And I'm

20  still asking where we're going, how much longer.  And he's just

21  saying a little further and another hour.  And then at that --

22  when he said an hour, I kind of start freaking out 'cause I'm

23  like, "Where -- where are you taking me?"

24  Q.   So you had said you'd calmed down a bit.  So prior to

25  calming down, can you describe your emotional state?  How are

1  you -- what are you doing?  Are you loud?  Are you crying?  Are

2  you yelling?  What are you doing?

3  A.   I don't -- I think I was kind of -- I don't remember if I

4  was -- I don't think I was crying at first.  I was just really

5  confused.  And I wasn't freaking out, but I was scared.

6  Q.   Did you ask him to let you out, to let you go?

7  A.   Yeah.

8  Q.   And what would he say?

9  A.   He said -- he said, "I will."  He kept saying he was going

10 to.

11 Q.   Did he?

12 A.   No.

13 Q.   So you said you calmed down, but then after -- at some

14 point after Tacoma, you started to get upset again?

15 A.   Yeah.

16 Q.   Can you tell us about that?

17 A.   I just was trying to get him to tell me where we're going.

18 And I was getting a little loud.  And he just wouldn't tell me.

19 Q.   So, AV-1, can you compare -- when you say you were getting

20 loud, can you compare how you were in that car to how you are

21 now?  So do you -- let me -- okay.  I'm going to ask you that.

22 A.   I was -- I was much louder than this.

23 Q.   Okay.  AV-1, do you try hard to put on a calm exterior?

24 A.   Yes.

25 Q.   Are you trying to be as calm as you can today?

1  A.   Yeah.

2  Q.   Is that because you're nervous?

3  A.   Yeah.

4  Q.   And do you try to put a brave face on?

5  A.   Yes.

6  Q.   What about when you're in that car?  I want you to just

7  describe:  Were you yelling?  Were you -- how were you?

8  A.   I wasn't -- I wasn't really freaking out yet.  I was still

9  trying to keep my cool at that point.

10 Q.   Do you freak out later?

11 A.   I do.

12 Q.   Okay.  We'll get to that.

13      Is there a point at which there was a stop at a rest

14 area?

15 A.   Yes.

16 Q.   Do you know generally what area that was?

17 A.   Around Lacey.

18 Q.   Can you tell us -- so is Lacey in Washington?

19 A.   Yes.

20 Q.   Can you tell us where that is?  Near Olympia, Tacoma?

21 A.   It's before Olympia, after Tacoma.

22 Q.   Okay.  Heading south, it's after Tacoma, before Olympia.

23 Okay.  So what happens at the rest area?

24 A.   I think I told him I have to go to the bathroom.  And he

25 stopped and got out.  And he went -- he went pee behind the --

1  or on the side of the car.  And then he said he was going to go

2  to a different location to let me go.

3  Q.   So he didn't go into a restroom?

4  A.   No.

5  Q.   So he said he would go to a different location to let you

6  go.  Then what happens?  Do you leave the rest area?

7  A.   Yes.

8  Q.   And have you gotten out of the car at all at this point?

9  A.   No.

10 Q.   Are you in handcuffs and leg irons the entire time?

11 A.   Yes.

12 Q.   Okay.  You leave the rest area.  Then what happens?

13 A.   Then we drive for maybe another two minutes.  And he takes

14 the next exit and pulls into an empty parking lot, like an

15 office business -- office building or something.  And he lets

16 me out of the car, and he -- he -- he helps me take off my

17 outfit, or pull it down, and lets me go pee on the -- on the

18 ground next to the car.  And he's standing over me, watching.

19 And he's looking around, acting super paranoid.

20 Q.   When you say he was acting super paranoid, can you

21 describe that?

22 A.   Just looking around and kind of shaky.

23 Q.   And is there a point at which he stopped to get gas?

24 A.   Yes.

25 Q.   Okay.  Did he let you go to the bathroom before or after

1  he stopped to get gas, if you remember?

2  A.    Before.

3  Q.    Did you have -- did he offer you any food?

4  A.    No.

5  Q.    Was -- did anybody know where you were, AV-1?

6  A.    No.

7  Q.    So you go to the bathroom, back in the car.  What happens?

8  A.    We -- he starts going back towards the freeway.  And I

9  think I ask him again, "Can you tell me where we're going now?"

10  And he just keeps saying again, "I have to -- I'm taking you to

11  a secure location, and then I'm going to release you."

12          So then we get back on the freeway going south,

13  almost to Olympia, I think.  And he's still asking me

14  questions, questions about who I was with.  And he's saying

15  that his partner had him -- he was with him and -- yeah.

16  Q.    Did it make sense to you?

17  A.    No.

18  Q.    At some point did you become -- I think you said earlier

19  "freaking out"?

20  A.    Yeah.  We were driving for -- he -- I asked how much

21  longer, and he said another -- I think at that point he said

22  another two hours.  And then I -- I kind of lost it a little

23  bit.  And I said, "What do you mean two hours?  Like, where are

24  we going?  Are you -- are you" -- I asked him, "Are you

25  kidnapping me?"  And he said no.

1    And, in my mind, I -- I knew that he was, but I

2  didn't really want to believe it.  And when I asked that, he --

3  he could -- I could tell he -- he knew that I was, you know,

4  like -- I don't know.  He just kept looking at me in the

5  rearview mirror.  And at that point he saw -- he could see on

6  my face that I was really scared and worried.  And he let me

7  climb over the seats and get in the front seat to calm me down.

8  Q.   You're still cuffed, hands and feet?

9  A.   Yeah.

10  Q.   Did you ask him if he was going to kill you?

11  A.   Yeah.  He said no.  He said, "Why would I kill you?  Why

12  would I hurt you?  You're too valuable.  Why would I hurt a

13  princess like you?"

14  Q.   Did you ask him what he meant when he said you're too

15  valuable?

16  A.   No.

17  Q.   Why not?

18  A.   I just -- I don't know.  I didn't want -- I didn't want to

19  know.

20  Q.   Did you think you knew the answer?

21  A.   Mm-hmm.

22  Q.   You're in the front.  You're cuffed.  You've asked him if

23  he's going to kill you?

24  A.   Mm-hmm.

25  Q.   Then what?

1    A.   I don't -- I don't know what -- we're just still driving.

2    And I'm -- I'm in the front seat at that point.  And he's

3    still -- we're still talking.  He's -- I think he -- he's on

4    his phone, and he played some music.  He let me play music.  He

5    was asking me about -- still asking me questions.

6              And I -- I was -- he's -- he was really good at

7    making me feel calm.  And, like I said, he was just strangely

8    friendly and just didn't seem to pose a threat.  And -- yeah.

9    Yeah.

10   Q.   Did you ask repeatedly to be let out or let go?

11   A.   Yeah.  I just kept asking, "Are you going to let me go?

12   When are you going to let me go?"  And he was saying -- he was

13   asking if I had anybody that could come get me.  And I said

14   yeah.  And then he was talking about police and saying how

15   police are -- they're -- just talking bad about them, saying

16   that they do a whole bunch of illegal stuff.

17             And he was telling me about himself and just telling

18   me stories about stuff that he'd done and -- I don't know --

19   just weird -- weird stuff.

20   Q.   Did he ask you if your mom would come get you if it came

21   to it?

22   A.   Yeah.

23   Q.   And what did you say?

24   A.   I said yes.

25   Q.   Did he say why he was taking you to a secure location?

1    A.   Because -- because he had taken -- taken things too far

2   and he wasn't -- back in the alley he wasn't supposed to go

3   that far, and he couldn't let me go then because people were

4   watching us.  And, yeah, he -- he was a cop and he -- he

5   couldn't -- he was already breaking rules by doing what he did

6   and just -- yeah, the whole story just didn't make any sense.

7    Q.   So you've gone through Tacoma?

8    A.   Mm-hmm.

9    Q.   You've gone to a rest area near -- was it Lacey, you said?

10   A.   Yes.

11   Q.   You've driven, and you move up to the front.  What's sort

12   of the next major point or next major step that you can think

13   of?

14   A.   We -- he pulls into -- he takes a right down some -- some

15   road.  And it's like an open empty lot, and there's nobody

16   around.  It's almost -- we'd been driving for about maybe four

17   or five hours.

18   Q.   Is it dark at this point, or is it starting to get light?

19   A.   It's starting to get light.

20   Q.   Okay.  And is this after going to a gas station?

21   A.   Yeah.

22   Q.   Okay.  So after going to a gas station and before you get

23   there, at -- it's starting to get light.  At some point did the

24   energy start to change?

25   A.   Yeah.  That was after --

1  Q.   Okay.

2  A.   -- we had stopped at the -- after we had made a stop.  And

3  he parked and got out of the car and went behind it and peed.

4  And I looked down at his phone, and I saw that he had the -- he

5  had it open.  And I -- I thought about calling for help, but

6  I -- I looked around, and there would've been no point.  I was

7  in the middle of the nowhere.

8       And he had on his maps, and it said two hours away

9  from our -- our destination.  And it said -- it said Oregon.

10 And I was so -- I was so scared.  I didn't know where he was

11 taking me.  I don't know what he could be planning to do.  And

12 so he came -- or I had asked him to loosen my cuffs before we

13 stopped.

14      And he came around to my -- my door.  And he told me

15 to stand up, and then I thought he was going to loosen my

16 cuffs.  And he said -- he -- he pulled his penis out and said,

17 "Suck it."  And I looked at him and I said, "Are you serious?"

18 because he didn't have a condom on at that point.  So -- and

19 he -- he said yes.

20      And he -- I did it, because I looked up at him and he

21 looked crazy.  He didn't look like this, you know, nice,

22 friendly guy anymore.  He looked insane.  So I just did what he

23 said.

24 Q.   And then what happened?

25 A.   I gave him oral with no condom.  And then he turned me

1  around and pulled my outfit down, and he tried to put himself

2  in my butt.  He tried to do anal.  And I said no.  I begged him

3  no.  He said, "Why?"  I said 'cause I -- I had never done that.

4  I don't do that.

5          And he -- he said, "Please, come on.  Just -- just

6  the tip," or something.  And I said, "No, no, please."  And I

7  was -- I was pleading.  I was begging.  And he said "Okay.

8  Fine," and just put it in my vagina.

9  Q.   Did he have sex with you then?  Did he assault you then?

10 A.   Yes.

11 Q.   How?

12 A.   Ah --

13 Q.   Was he -- was he physical with you during that assault?

14 A.   Yeah.  He was rough.

15 Q.   Can you explain by "rough"?

16 A.   He just was forceful and aggressive.

17 Q.   Are you in handcuffs still?

18 A.   Yes.

19 Q.   Leg irons?

20 A.   Yes.

21 Q.   Off the side of the road?

22 A.   Yes.

23 Q.   Did you consent to that?

24 A.   No.

25 Q.   Did you consent to being in Oregon?

1  A.   No.

2  Q.   You said, when he told you to suck it, you looked at his

3  eyes and decided to do it; is that right?

4  A.   Yes.

5  Q.   And then you pleaded with him not to make you have anal

6  sex; is that right?

7  A.   Yes.

8  Q.   Were you scared?

9  A.   Yes.

10 Q.   Were you scared when he had -- when he raped you

11 vaginally?

12 A.   Yes.

13 Q.   Can you tell us what happened after that?

14 A.   He finished inside of me and then pulled my outfit back

15 up, and I got back in the car.  He told me to get in -- back in

16 the third row.  And so I climbed over the seats and got in the

17 back.  And then he got back in the car, and we started driving

18 again.

19        And his whole demeanor had changed after that.  He --

20 he looked crazy, and he had bloodshot eyes.  He kept looking at

21 me in the rearview mirror, just staring at me.  He looked

22 scared, nervous, paranoid.  He was -- he wasn't being nice

23 anymore.  He wasn't trying to make me feel calm.  He was -- he

24 was acting completely different.

25 Q.   What kind of road are you on?

A.   We were on, I think, like a two-lane -- two-lane road with

just trees on both sides.

Q.   Did you see any towns?

A.   No.

Q.   Did he have a backpack?

A.   Yes.

Q.   Do you remember what color?

A.   I think it was black.  Or, no, sorry, it was like a --

like a colorful kind of -- yeah, different colors.

Q.   At some point did -- did he grab some tin foil?

A.   Yeah.  I -- I saw him go in the middle console and grab

some tin foil and do something with that.  I don't know what he

did.

Q.   Did he say anything about what he was doing?

A.   He said it was some police trick.  I think he might have

been wrapping my phone in tin foil.  I don't know.

Q.   Did he have your phone up there?

A.   Yes.  He had my phone and my purse.  He was looking --

he -- I think he started looking through it at that point.

Q.   At some point did he start talking to you about death?

A.   Yes.  He said he -- he was saying, "Don't be afraid."  He

could tell that I was scared.  He was -- when he was watching

me through the rearview mirror.  And he kept saying, "Don't

be -- don't be afraid.  We're -- we're all going to die.

Everybody dies.  You're -- I'm going to die.  You're going to

1  die."

2           And I said, "Why are you -- why are you saying that

3  to me?  Why are you saying that?"  He was saying -- he just was

4  like, "I'm just trying to calm you down or make" -- I don't

5  know, something like that -- "make conversation.  I can tell

6  you're nervous."

7  Q.   Did him telling you that "You're going to die, we're all

8  going to die" calm you down, AV-1?

9  A.   No.

10 Q.   AV-1, at what point did you get the most upset in the car

11 or the loudest?

12 A.   Probably back when I was asking him if he was going to

13 kill me or kidnap me or if he was kidnapping me and asking -- I

14 asked him if he was going to kill me.  That's when I got the

15 most upset.

16 Q.   Was your voice raised?

17 A.   Yes.

18 Q.   Were you yelling or screaming?

19 A.   Yeah.

20 Q.   Were you crying?

21 A.   Yes.

22 Q.   Were you pounding on things or hitting things?

23 A.   I think so.  I think I was hitting the seats.

24 Q.   So, AV-1, if, on a scale of one to ten, right now your

25 level is a two or three, what was your level in the car?

1    A.    About an eight.

2    Q.    Is that when you described that you were freaking out?

3    A.    Yes.

4    Q.    Did it change anything when you freaked out?  Did he let

5    you go?

6    A.    No.  He just let me climb in the front.

7    Q.    Did he ever take you out of your handcuffs or leg irons?

8    A.    No.

9    Q.    Did he ever let you make a phone call?

10   A.    No.

11   Q.    Would you like to take a drink of water, AV-1?

12   A.    (No audible response.)

13   Q.    So, AV-1, you're on the two-lane road driving.  He's

14   talked to you about death.  At some point -- well, do you

15   recall, generally, when did things start to change?  What --

16   what was the next big event?

17   A.    The next -- the next thing was we stopped at Love's --

18   Love's gas station.  I think I told him I had to -- had to go

19   to the bathroom again.  And he -- he told me he -- he needed me

20   to put some -- he was going to give me some clothes to put on

21   because people -- he said he didn't want anyone to be tempted,

22   so I needed to put some clothes on.

23         So we got off the freeway, and he pulled into -- he

24   told me to lay down in the back and put a sheet over myself.

25   And then -- so I did.  Then I saw that we were at Love's.  And

1  he parked.  And then he came -- I think he came in the back and

2  gave me some clothes and helped me put them on.

3         He didn't -- he put the sweatshirt on backwards and

4  then told me I had to put the hood over my face when we got to

5  our destination.  He didn't put -- I don't think he put the

6  pants on me -- I'm not sure -- and said I could -- said I could

7  go to the bathroom when we got there.

8         And I'm still asking, "Where -- where are we going?"

9  And he told me that it was a -- a transition center, like

10 where -- where people go instead of jail, like when they're

11 about to be released or something, and said there were other

12 people there, just -- he was going into detail about this place

13 that didn't even exist.

14 Q.   What kind of detail?

15 A.   Saying that some people that worked there had gotten fired

16 for raping the girls and talking about there's cameras; they've

17 gotten new staff, so there was nothing to -- there was nothing

18 to worry about.

19 Q.   Did you ask if you would be raped there?

20 A.   Yes.  He said no.  And -- but that's why I needed to put

21 on the clothes, so nobody would be tempted.

22 Q.   And when you were at the Love's, you said he parked.  Did

23 you see anything around you, any other -- could you see any

24 vehicles?

25 A.   No, 'cause I was laying flat.  I could just see the -- the

1  sign.

2  Q.   At some point did you see semitrucks parked?

3  A.   I did.

4  Q.   And was that at Love's as well?

5  A.   I'm not sure.

6  Q.   And when first pulling into Love's, which -- do you recall

7  which row of the vehicle you were in?

8  A.   The third row.

9  Q.   And were you lying down?

10 A.   Yes.

11 Q.   So you said after he stopped he put a hooded sweatshirt

12 over you.  Were your hands cuffed or uncuffed?

13 A.   They were cuffed.

14 Q.   So were your arms through the sleeves?

15 A.   Yes.  No.  Sorry.  No.  My arms were not.

16 Q.   And you said -- at what point did -- did the hood go over

17 your face backwards?

18 A.   Before he let me out of the car.

19 Q.   All right.  So you leave Love's.  And what happens then?

20 A.   He said we're about five minutes away from where we were

21 going.  Then we -- we got somewhere.  He stopped.  And he -- he

22 came in the back, and he handcuffed -- he took one of my cuffs

23 and cuffed it to the side of the car.  And so my hands were up

24 like -- up like this (indicating).

25        And he said he'd be right back.  And he left for

1    about a minute and came back.  And he backed in, and it got

2    dark.  And he -- he -- he closed the door.  It was -- I could

3    see a garage door.  And so he -- he came in the back.  I -- I

4    think he had put the hood over my face when he had gotten out

5    of the car before.

6          So he came back there and helped me out.  He -- I

7    couldn't see anything.  He -- I could just feel -- he helped me

8    out of the car, and I could feel stuff all around me.  I was

9    stepping over stuff, and he was walking me -- I could feel

10   him -- I was walking around the car.  And then he walked me

11   into this room, and I immediately felt the temperature change.

12         It got super hot.  It was about 100 degrees in that

13   room.  And he took my -- he took the hood off my face.  And I

14   saw it was just this little, tiny room.  And I said, "What is

15   this?  I can't -- I can't be in here.  Are you going to leave

16   me in here?"  And he said -- he said, "It's okay.  You'll be

17   okay."

18         I said, "I can't.  I can't stay in here.  I'm going

19   to freak out.  I'm claustrophobic."  And I said, "What is

20   this?"  He said, "It -- this is just for interrogations.

21   You're not going to be in here that long.  And it's hot in here

22   because it makes people sweat.  It makes them want to tell the

23   truth."

24         And then he -- he took my handcuffs off when I was

25   in -- in the room, and he took the leg irons off.  And there

1    was just a chair.  And there were cords hanging from the walls,

2    like -- like there was a light bulb just hanging there, plugged

3    in.  So I -- he told me to sit down, so I sat on the chair.

4            And I was just trying to -- I knew that he was going

5    to lock me in there.  And I was just trying to calm down and

6    trying to -- trying not to have a panic attack.  And he said

7    that he was going to go talk to some people.  I said, "Are you

8    going to let me go?  Am I going to -- am I going to get out of

9    here?"  And he said, "Yeah, there's nobody else" -- he said

10   there was other people there, said he was going to get me a

11   uniform and bring me some paperwork.

12   Q.   Okay.  And did he -- he took your handcuffs off.  He took

13   your leg irons off.  Did he leave the room?

14   A.   Yeah, he did.  I asked him for some water.  And I asked

15   him if he could cool the room down, like bring in a fan or

16   something if I had to stay in there.  And he -- so he -- but,

17   before he left, he -- he said he had to lock the door, so he

18   was -- he was trying to close it, but it wouldn't close.  So he

19   went and he grabbed a drill.

20           And there was -- there was a -- like a tarp over the

21   doorway, so I couldn't see anything past the room.  So he came

22   back with a drill.  And I -- I kind of gasped or, like, you

23   know, I was like, "Whoa."  He noticed.  And he said, "Don't --

24   calm down.  It's -- I'm -- I'm -- it's not what you think.

25   This isn't Texas Chainsaw Massacre," and kind of chuckled.

1          And then he used the drill to tighten the screws on

2   the door so it would close.  And I said, "Can you just please

3   go get me water?  It's so hot in here."  And he said, "Yeah,

4   but I need to lock this door.  I can't leave until I lock these

5   doors."

6   Q.   Had you -- once he put you in there, had you asked to be

7   let go again?

8   A.   Yes.

9   Q.   Were you asking that repeatedly?

10  A.   Yes.

11  Q.   Did he ever let you go?

12  A.   No.

13  Q.   I'm going to pull up Government's Exhibit 36-1.

14          Can you tell us what we're seeing here?

15  A.   That's the room that I was in.

16  Q.   Is that the chair that you were talking about?

17  A.   Yes.

18  Q.   And we'll get to the fan in a second, but you talked about

19  a cord and a light bulb.  Is this -- at least for that part, is

20  that what you saw?

21  A.   Yes.

22          MR. SWEET:  And could you go to the next one, dash

23  two.

24          And let's go to 37, please.

25

BY MR. SWEET

Q.   So what are we looking at here, AV-1?

A.   That's the door to the room.

Q.   When you were in the room -- well, let me -- was there one door or two?

A.   There was two.

Q.   Can you describe what each door was made of?

A.   The first door was like a gate, a metal gate.  And then the second -- and there was Styrofoam in between.  And then the second door was a white wooden door.

Q.   When you were in there, did the metal door -- was it open like that?  In other words, were there space that you could put your hands through that metal door?

A.   No.

Q.   What was there?

A.   There was -- there was nothing.  It was just a -- a lock. There wasn't handle on the door or anything.

Q.   Was there, like, a metal mesh?

A.   Yes.  There was a -- oh, yeah, there was a mesh screen in between the bars.

Q.   Let's go to 38-1, please.

     So if we're looking at the bottom of that photo, does that show at least the bottom part of that mesh?

A.   Yes.

Q.   We're going to get it in a minute.  But did you knock down

1  the top part, AV-1?

2  A.   Yes.

3  Q.   And so you said there was no door handle on the metal

4  door?

5  A.   No.

6  Q.   When he left, did he lock that metal door?

7  A.   Yes.

8  Q.   Was it --

9  A.   I -- sorry.  I didn't know at the time how many doors were

10 there.  I -- I just heard him -- I heard a bunch of keys.  He

11 had a lot of keys, and I heard them jingling and heard him

12 locking multiple doors.

13 Q.   Was there a deadbolt on that metal door?

14 A.   Yes.

15 Q.   And you had said that there was -- after the metal door,

16 there was a white door with Styrofoam in between; is that

17 right?

18 A.   Yes.

19      MR. SWEET:  Could we zoom in on the left part of

20 that, towards the white door, the inside of the white door.  A

21 little lower, too.

22 BY MR. SWEET

23 Q.   Okay.  Is that the Styrofoam you're talking about?

24 A.   Yes.

25 Q.   Let's go to 42, please.

1        What are we looking at here?

2   A.   That's the other wooden door.

3   Q.   That's the other door, and it's wooden?

4   A.   Yes.

5   Q.   Okay.  Was that door locked?

6   A.   Yes.

7   Q.   With a deadbolt?

8   A.   Yes.

9   Q.   Any door handle?

10  A.   No.

11  Q.   While we're in there, let's -- I'd like to -- can you --

12  let's pull up 44, please.

13       Did you look around?  Did you look around when you

14  were in there?

15  A.   I did.  Yeah, I was -- I noticed all the Styrofoam on the

16  walls.  And I was kind of walking around the room.  This was

17  after I -- I had fallen asleep because I was so tired.

18  Q.   Okay.  Well, then I'll back up then.  Thank you.

19       Let me go to one more.  So -- actually, that's good.

20       So you'd asked for a fan, and you'd asked for water;

21  is that right?

22  A.   Yeah.

23  Q.   Okay.  He left and locked the doors.  Am I -- is that

24  correct?

25  A.   Yes.

1  Q.   Okay.

2  A.   I also had to -- I still had to pee.  And he said he

3  was -- he brought back a -- he brought back a bucket for me to

4  pee in.

5  Q.   Okay.  And did you?

6  A.   Yes.

7  Q.   And then what happened?  Well, let me back up.  So you've

8  asked for the jug.  You've asked for water.  He leaves.  Tell

9  us what the next step was.

10  A.   He brings me water and a bucket.  And then I'm just

11  sitting in the chair, drinking water.  And I'm asking him, "Am

12  I -- can I -- if I have to stay here, are you going to -- can I

13  just go to a different room?  Why do I have to be in this room?

14  It's so hot."

15       And he said he was going to look for a fan or an air

16  conditioner or something, and told me he was going to -- he

17  just talking about people, "There's people I need to go

18  talk" -- he needs to go talk to, and they need to process my

19  information.  He was going to come back with paperwork.  And he

20  said I wasn't going to get a uniform because there were no

21  female inmates.  So he left again.  He came back with a fan,

22  and I think he brought me my inhaler 'cause he had seen it in

23  my purse.

24       And he said I was going to need that.  He didn't want

25  to -- if -- in case something happened, he wanted -- he thought

1   I should have it.  So -- and then he left again.  He said he

2   was going to go talk to the people.  And he came back with a

3   piece of paper with handwritten questions on it, questions like

4   address, have I had my -- have I been vaccinated, do I have all

5   my shots, do I have any STDs, am I HIV positive, things like

6   that.  And I just -- I just wrote down random stuff.

7   Q.   Did you say anything to him about the paperwork?

8   A.   I did.  I -- I said, "What is this?  Why -- why did you --

9   why are there handwritten questions on here?"  And I don't

10  remember what he said.  So I just -- I just wrote some random

11  stuff down.  I -- I answered -- I -- I think I put -- I

12  don't -- I put a fake address.  I put, no, I'm not HIV

13  positive.

14       I answered the questions truthfully, except for the

15  personal details about my address and stuff.  And he said that

16  he had to go process that, and it would take about 30 minutes

17  and he'd be right back.  And then he left again.

18  Q.   Throughout this, are you asking him to let you go?

19  A.   Yes.  And asking him how long I'm going to be in here,

20  "When -- when -- what are -- what's going -- what are you

21  doing?  I don't understand what -- why I'm in this room.  Like,

22  why" -- I just wanted to -- I was just worried about the heat

23  at that point.

24       He -- he wasn't -- he wasn't being violent or

25  anything.  He wasn't acting like he wanted to hurt me at that

1  moment, so I -- but I just -- I was just worried about the heat

2  of the room and how small it was.  That's what I was most

3  concerned about.  And I just wanted to get out of the room.

4  Q.   And, AV-1, because the next part is going to go on for

5  quite a bit, I just want to ask if you need a break now,

6  because the next part we'll be talking for quite --

7  A.   Yes.

8        THE COURT:  Our court reporter's going to need a

9  break.  So, folks, we'll take a 15-minute morning break.  We'll

10 have you return to the jury room.

11       AV-1, you can stay there for just a moment.

12       (Open court, jury not present, 10:13 a.m.)

13       THE COURT:  We'll be in recess until 10:30.

14       (Recess taken, 10:13 a.m. - 10:49 a.m.)

15       THE COURT:  All right.  Char, do you want to bring

16 the jury in?

17       (Open court, jury present, 10:50 a.m.)

18       THE COURT:  All right.  Mr. Sweet, if you'd like to

19 continue with direct examination.

20       MR. SWEET:  Thank you, Your Honor.

21 BY MR. SWEET

22 Q.   AV-1, when we stopped, you were in a small concrete room

23 and it was hot.  The man had left.  And I want to ask you:

24 Before you went to sleep, did he come back into the room?

25 A.   I don't remember.  I just remember him bringing the paper.

1  And then I think he came back in one more time and said they

2  were still processing paperwork and told me that he had to go

3  handle some other stuff and to just try to get some sleep,

4  somebody should be in to talk to me soon.

5  Q.   Did you know who was coming to talk to you?

6  A.   No.

7  Q.   Did anybody come to talk to you?

8  A.   No.

9  Q.   So what -- at that point what are you thinking?

10 A.   I'm thinking I'm -- I can't really think clearly because I

11 had been up all night.  So I just wanted to sleep.  I just --

12 he brought in a blanket, and I just laid it down on the -- on

13 the ground and fell asleep immediately.  I just figured I'd --

14 figured I'd -- I'd handle -- I'd -- I don't know.  I -- maybe I

15 just needed sleep, and I could think about what -- what to do

16 when I woke up.  I just needed to get some rest.

17 Q.   Was it a concrete floor?

18 A.   Yes.

19 Q.   And he brought you a blanket?

20 A.   Yes.

21 Q.   And did you go to sleep?

22 A.   I did.

23 Q.   Do you have any idea how long you were asleep?

24 A.   About an hour or two.

25 Q.   Did something wake you up?

1    A.    No.  I just woke up on my own.

2    Q.    Okay.  Tell us about that.  You woke up.  Tell us what

3    you're thinking.

4    A.    I woke up, and I -- I had forgotten where I was.  So I

5    woke up, and reality just hit me.  And it was even hotter than

6    before.  It was probably about 100, 102 degrees in that room.

7    And the air was so thick, I couldn't breathe.  So I immediately

8    woke up and started pouring water on myself and drinking water.

9          And that's when everything kind of hit me.  And I --

10   I just -- I stood up, and I lost it.  I started freaking out

11   and crying and just saying, "Oh, my God.  Oh, my God.  I got to

12   get out of here."  I'm screaming.  I'm -- I'm crying.  I'm

13   yelling for help.

14         I'm walking around the room, tapping on the walls,

15   seeing if there's any weak spot, so I can try to get out.  And

16   I see the Styrofoam all over the walls, and I -- you know, I --

17   I realize it's -- I know that it's for the -- to keep the sound

18   in for screaming.  And I'm looking at the ceiling, and it's

19   just -- everything's solid.  It's just -- everything's solid

20   around me.

21         So I -- I put -- I put my ear on the -- I put my head

22   on the ground and kind of like scream under the door.  And I

23   can just hear my voice just trapped in the room.  Like, the

24   sound is not going anywhere.  I can tell there's nobody --

25   there's nobody coming for me.

1    I'm screaming and I'm -- then I sit down on the -- on

2    the ground and I'm -- I have my feet on the walls, and I'm

3    pulling at the bottom of the door.  And I'm pulling with all my

4    strength, and it's not -- it not -- it's not even moving.  So

5    then I stand up, and I'm still just -- I'm just extremely just

6    irate.  I'm screaming, crying.

7    I'm pacing back and forth, trying to figure out what

8    to do.  And so eventually I just -- I -- I start punching the

9    door with my right hand.  I'm punching the metal -- the bars.

10   I don't -- I'm just so out of control and -- that I just -- and

11   I'm so angry and scared and just panicking so much.

12   I just start punching the door.  And I think my hand

13   started bleeding.  And so I -- I realize -- I know that I can't

14   punch through metal bars.  So I -- I turn around, and I -- I

15   had long acrylic nails on.  So I -- I bite them off one by one.

16   And then I just start beating on the -- on the mesh screen part

17   of the door.

18   And I'm just screaming, yelling for help.  I'm

19   saying, "I got to get out of this room.  I got to get out of

20   here."  And, finally, it -- I just -- I'm hitting it so hard,

21   it just breaks off.  And then I break down -- I break through

22   the Styrofoam, and I break through the -- the second white

23   door.

24   And it breaks -- breaks open and comes off, and just

25   the cold air hit me.  And it was just -- I wasn't fully out,

1    but that was just such a relief 'cause I can -- I can breathe.

2    And then I see if I can fit through the opening of the door.  I

3    put half my body through, and I see that I can.

4            So then I turn around and grab the pants that he had

5    given me, and I put them on 'cause I was pretty much naked from

6    the waist down.  I had a -- like, a body suit on.  So I put

7    those on, and then I squeezed through the opening.  And I --

8    I'm scraping up my -- my legs going out.

9            And I fall down on my hands, and I finally get

10   through.  I fall onto the ground.  And then I get up, and I

11   move the -- the tarp or curtain out of the way, and I see that

12   I'm in a garage.  I see the car that I was in.

13           And I remember the gun that he had showed me.  So I

14   go to the driver-side door and open it.  And I look under the

15   seat, and I see the same gun.  So I -- I took the clip out.  I

16   saw that there was bullets.  So I put it back in and then put a

17   bullet in the chamber.

18           And then I took -- I looked to my right, and I

19   just -- I'm looking -- I'm just looking real quick to see if I

20   could see my phone, and I don't.  I do see my Taser on the --

21   on the seat.  So I just grab the gun and ran out.  I see a -- I

22   see a door.  It's unlocked.  I run out.

23           And I see that it's really hot.  I feel it's really

24   hot outside.  And I see I'm at a house.  And there's a fence, a

25   wooden fence.  And I just jump over that.  I'm barefoot, gun

1    still in hand.  And I just run to the street, and I see a car

2    coming towards me.

3              And I'm screaming, "Please help me.  Help me.  Stop.

4    I've been kidnapped.  I need help."  And it's -- it's an older

5    lady.  And she tells me to get in her car.  And she says,

6    "We're going to -- I'm going to take you to a Fred Meyer or

7    something and call the police.  I just want to get you as far

8    away from this house as possible."

9    Q.   Okay.  And did you get in her car?

10   A.   Yes.

11   Q.   And did she drive you?

12   A.   Yes.

13   Q.   Were you looking around as you were driving away?

14   A.   Yeah.  I looked back at the house.

15   Q.   Did you notice anything as you're driving away, out

16   towards -- towards where you ultimately stopped?  Did you see

17   anything?

18   A.   No.  I just see that that fence is -- it's covering the

19   house.

20   Q.   Okay.  Did you go by a school or a park or anything?

21   A.   Oh, yeah.  I -- I glanced to my left, and I saw a

22   playground.

23   Q.   How were you feeling at this point?

24   A.   I was relieved that I was out of the house, but I was

25   still hysterical because I just wanted to -- I just -- I

1  didn't -- I didn't know where I was.  I was still scared.  I

2  couldn't believe how far away from home I was.  And I -- I

3  couldn't believe I had made it out of there.

4  Q.  Did you know what city you were in?

5  A.  No.

6  Q.  Had you ever heard of Klamath Falls before?

7  A.  No.

8  Q.  Did you even know what state you were in?

9  A.  No.

10  Q.  Did anybody else know where you were at that point, your

11  family, your friends?

12  A.  No.

13  Q.  When you escaped, did you have your shoes with you?

14  A.  No.

15  Q.  Did you have your purse?

16  A.  No.

17  Q.  Your phone?

18  A.  No.

19  Q.  Your Taser?

20  A.  No.

21  Q.  Your money?

22  A.  No.

23  Q.  Any ID?

24  A.  No.

25  Q.  AV-1, can I bring in a door and have you show us?

1    A.    Yes.

2              MR. SWEET:  Your Honor, with the Court's permission,

3    we'll bring in the door, show it to the jury, and then ask AV-1

4    to come down.

5              THE COURT:  Okay.  AV-1, you will have to keep your

6    voice up as much as you can if you're down there speaking.

7    Okay?

8    BY MR. SWEET

9    Q.    So this is Government's Exhibit 117.  AV-1, does this look

10   like the metal door?

11   A.    Yes.

12   Q.    And is this the metal mesh that you broke down?

13   A.    Yes.

14   Q.    And what do we see down there at the bottom, the white

15   part?  I'm going to stand this back, AV-1.  Would you mind

16   coming down?

17   A.    (Witness complied.)

18   Q.    What do we see at the bottom that's white?

19   A.    Styrofoam.

20   Q.    Okay.  Could you speak up, please.

21   A.    Styrofoam.

22   Q.    Okay.  So, AV-1, we're going to put this here.  And can

23   you step back for just one second?

24   A.    (Witness complied.)

25   Q.    So you're in the cell?

1    A.    Mm-hmm.

2    Q.    When you're in the cell, how is this mesh?

3    A.    It's covering the whole thing.  It's covering the whole

4    door.

5    Q.    You said first you were punching with your fist?

6    A.    Yeah.  First, I was -- I got on the ground and put my feet

7    on each side of the wall.  And then I was pulling from the

8    bottom.  I was -- I was screaming through here.  And then I

9    was -- I started punching -- like, I was just going like this

10   (indicating).  And then, eventually, I just started beating on

11   this part and broke through.

12   Q.    Was this deadbolt -- was the door locked?

13   A.    Yes.

14   Q.    Tell us about your nails.  Why did you bite off your

15   nails?

16   A.    'Cause I couldn't punch with long nails.  I couldn't make

17   a fist.

18   Q.    So you literally just bit each nail off?

19   A.    Yes.

20   Q.    And they were long acrylic nails?

21   A.    Yes.

22   Q.    So you bite your nails off.  And then how did you punch?

23   I'll hold this, so you can show --

24   A.    First, I started punching like this.  I was just -- 'cause

25   I was -- I was angry, and so I'm just punching.  And then I --

1  I realize I can't punch through these (indicating).  And I see

2  this (indicating).  So I, like, go and bite each of my nails

3  off.  And I start banging on it like this (indicating) until it

4  breaks through.

5  Q.   Okay.  So we're going to lower this mesh part.

6        So the mesh part is broken.  Was the Styrofoam

7  extended up?

8  A.   Yes.

9  Q.   Okay.  So after the mesh is down, what did you -- what did

10  you do next?

11  A.   Then I -- there was another wooden door, and I kept doing

12  this (indicating) until I broke that.

13  Q.   Did you break -- was the wooden door -- was the deadbolt

14  extended?  Was it -- was it dead bolted shut?

15  A.   Yes.

16  Q.   And did you actually break that wooden door out?

17  A.   Yes.

18  Q.   Then what did you do?

19  A.   I crawled through here (indicating).

20  Q.   So, AV-1, are you comfortable putting your -- your head

21  through here?

22  A.   (Witness complied.)

23  Q.   So I'm going to ask you -- and I'm going to ask this.

24  Have we talked about the question I'm going to ask you?  Has

25  your body changed?  Have you put on some weight since then?

1    A.    Yes.

2    Q.    Okay.  Were you -- okay.  Were you skinnier then than you

3    are now?

4    A.    Yes.

5    Q.    Okay.  Are you comfortable putting your head through?

6    A.    Sure.

7    Q.    Okay.  And what about your earrings?  Do you want to --

8    A.    (Witness complied.)

9    Q.    Okay.  So you put your head through.  Thank you.  You put

10   your head through.  And then -- thank you.

11         Was it hard to get out?

12   A.    Yeah.

13   Q.    Was it tight squeeze?

14   A.    Yes, it was.

15   Q.    Can you tell us how -- did you go out head first?

16   A.    Yeah.  Yeah.  I put my head through first, to see if I

17   could fit, and then went and put my pants on.

18   Q.    And you'd mentioned that you may have cut your leg or hurt

19   your leg going out.  Do you know what it was that --

20   A.    I think it was -- it was scraping on -- these (indicating)

21   were scraping me, and my knees were hitting the bars.

22   Q.    Okay.  Thank you, AV-1.  You can go ahead and go back up.

23   Thank you.

24         I'm going to show you a few pictures.

25         MR. SWEET:  Your Honor, may I approach and show AV-1

1  a few items?

2          THE COURT:  Yes.

3  BY MR. SWEET

4  Q.   AV-1, we've talked about some items.  And please take a

5  drink, if you need a drink.

6  A.   Okay.

7  Q.   We've talked about a few items during this case.  And I'm

8  going to show some and ask if they look familiar to you.  I'm

9  going to show you what's marked as Government's Exhibit 340.

10  Can you see that?

11  A.   Yes.

12  Q.   Does that look like something you'd seen before?

13  A.   Yes.

14  Q.   Okay.  Tell us where.

15  A.   In the car.

16  Q.   You described sort of a device, maybe a walkie-talkie

17  device with spikes.  Is that what you're talking about?

18  A.   Yes.

19  Q.   When you were in the car, did you see one of the -- one

20  device or more than one, if you recall?

21  A.   I think just one.

22  Q.   You talked about a Taser.  I'm showing you what's marked

23  as Government's Exhibit 334.  Does that look familiar to you?

24  A.   Yes.

25  Q.   Does that look like the Taser that you saw?

1  A.   Yes.

2  Q.   The Taser that he pointed at you?

3  A.   Yes.

4  Q.   AV-1, I'm showing you what's marked as Government's

5  Exhibit 111 and 112.  There are two things in there.  One them

6  has a long chain.  Does this look familiar to you?

7  A.   Yes.

8  Q.   What does that look like?

9  A.   The handcuffs and leg irons.

10  Q.   And, AV-1, the handcuffs that you were in, do you recall

11  if they had a chain between them?  Or were -- did they have

12  something solid?

13  A.   I think a chain.

14  Q.   So they were ones that were more like the black pair with

15  the chain, not the silver pair --

16  A.   Yes.

17  Q.   -- with the bar?

18       And that was Government's Exhibit -- Exhibits 335 and

19  336.

20       AV-1, I'm showing you what's marked as Government's

21  Exhibit 115.  What is this, please.

22  A.   My purse.

23  Q.   Where did you last see your purse, AV-1?

24  A.   In the car.

25  Q.   AV-1, did the FBI show you a phone yesterday?

1   A.   Yes.

2   Q.   And whose phone did they show you?

3   A.   Mine.

4   Q.   How do you know?

5   A.   The lock screen.

6   Q.   Okay.  So they powered it on and showed you the home

7   screen lock, lock screen page?

8   A.   Yes.

9   Q.   Was that picture one that you recognized?

10  A.   Yes.

11  Q.   AV-1, I do want to show you a few other photos.  Could I

12  show you Exhibit 43-1, please.

13       MR. SWEET:  And could we zoom in on the jamb part?

14  BY MR. SWEET

15  Q.   AV-1, you referenced breaking out a door with a deadbolt.

16  A.   Yes.

17  Q.   Did you do that?

18  A.   I did.

19  Q.   And I'm going to show you 38-2.

20       MR. SWEET:  If we could zoom in on the left half of

21  the door only.

22       And a little -- sorry.  Just the whole door.

23       (Whispered discussion, off the record, 11:11 a.m.)

24  BY MR. SWEET

25  Q.   Does this show back in the actual garage?

1    A.   Yes.

2    Q.   Did you break that metal screen out?

3    A.   Yes.

4    Q.   I'm going to turn to where you stopped.  So --

5         MR. SWEET:  Thank you for those.  And after this

6    we'll do 10 in just a moment.

7    BY MR. SWEET

8    Q.   So, AV-1, you're in the car now with the woman who picked

9    you up.  Okay?

10   A.   (No audible response.)

11   Q.   Do you recall where she stopped?

12   A.   I think it was a KFC.

13   Q.   And once she stopped, what did you do?

14   A.   She called the police.  And I asked to use her phone.

15   Q.   And did you use her phone?

16   A.   Yes.

17   Q.   Okay.  Who did you call?

18   A.   I called my mom, but she didn't answer 'cause she was at

19   work.  So then I called my aunt and my brother.

20   Q.   Did you tell them -- just generally speaking, what did you

21   tell them?

22   A.   I told them I had been kidnapped from Seattle and taken to

23   Oregon.

24   Q.   Did you ask for someone to come get you?

25   A.   Yes.

 1   Q.   Did law enforcement show up to the KFC?

 2   A.   Yes.

 3   Q.   I'd like to pull up Government's Exhibit 10.  And it's a

 4   video.

 5        AV-1, do you recall talking with a law enforcement

 6   officer at the KFC parking lot?

 7   A.   Yes.

 8        MR. SWEET:  Your Honor, Government's Exhibit 10 was

 9   not previously admitted.  I spoke with defense counsel this

10   morning.  With AV-1 testifying, I understand there's no

11   objection to it being admitted.

12        THE COURT:  It'll be received.

13        (Government's Exhibit No. 10 received.)

14        MR. SWEET:  Thank you.  If we could pull up

15   Government's Exhibit 10, the video.  And let's go generally to

16   the part right before the sergeant gets to the door.

17        And, actually, let's pause there for just one second.

18   BY MR. SWEET

19   Q.   The woman that we just saw --

20        MR. SWEET:  Sorry.  This is me changing things.

21   Could we back up just a little bit?

22   BY MR. SWEET

23   Q.   The woman we see there, is that the woman who picked you

24   up?

25   A.   Yes.

1        MR. SWEET:  Okay.  And let's go forward, please.

2   BY MR. SWEET

3   Q.   Okay.  So what we're going to do, AV-1, is -- let me ask

4   you:  Did you -- did you tell the law enforcement officer what

5   happened once -- once she arrived?

6   A.   Yes.

7   Q.   Okay.  I'm going to play a video.  Okay?

8   A.   Okay.

9        MR. SWEET:  Okay.  Government's Exhibit 10.

10       (Video recording played in open court, 11:14 a.m.)

11       MR. SWEET:  Would that be better if it were louder or

12  quieter?  It's fine?  Thank you.

13       THE COURT:  It's okay.

14       (Video recording played in open court, 11:15 a.m. -

15  11:18 a.m.)

16  BY MR. SWEET

17  Q.   AV-1, I'm going to pause for one second.  Sergeant DuVal

18  asked you if you had all your stuff, and then you turned to get

19  something.  What did you turn to get?

20  A.   The gun.

21  Q.   And where did that gun come from?

22  A.   The front seat of his car.

23  Q.   And whose gun was that?  Was that your gun?

24  A.   No.

25  Q.   Okay.  Let's go ahead.

1          (Video recording played in open court, 11:18 a.m. -

2     11:19 a.m.)

3     BY MR. SWEET

4     Q.   And, AV-1, I don't mean to embarrass you.  But is what

5     you're wearing in this photo -- if you take off the sweatpants,

6     is that what you were wearing in the car the whole way down?

7     A.   Yes.

8     Q.   Is that what you were wearing on the side of the road when

9     he raped you?

10    A.   Yes.

11         (Video recording played in open court, 11:19 a.m.)

12    BY MR. SWEET

13    Q.   AV-1, where did you go after that?

14    A.   To the hospital.

15    Q.   And did you tell the sergeant some information about what

16    you saw when you were escaping?

17    A.   Yeah.

18    Q.   And did she try and drive through a certain neighborhood?

19    A.   Yeah, she did.  She drove right past the house, but I

20    didn't recognize it immediately.

21    Q.   And so when you got to the hospital, were you treated at

22    the hospital?

23    A.   Yes.

24    Q.   And so the officer, the sergeant who just picked you up,

25    did she take some photographs of your injuries?

1    A.    Yes.

2    Q.    AV-1, did you speak to a lot of law enforcement that day?

3    A.    Yes.

4    Q.    Did other law enforcement take pictures of your injuries

5    as well?

6    A.    Yes.

7    Q.    And then at another hospital entirely, did they take

8    pictures as well?

9    A.    Yes.

10   Q.    Once you got to the hospital, did you make some phone

11   calls there as well?

12   A.    I did.

13   Q.    And whose -- whose phone would you -- whose phone did you

14   use?

15   A.    I used the hospital phone.

16   Q.    And so, AV-1, I'd like to -- I'd like to show you just a

17   few photos.  I'd like to show you Government's Exhibit 15,

18   please.

19          Okay.  AV-1, is this you at the hospital?

20   A.    Yes.

21   Q.    Can I show you some photos of injuries?

22   A.    Yes.

23   Q.    16, please.

24          MR. SWEET:  And could we zoom in on her --

25   particularly her right hand?

1  BY MR. SWEET

2  Q.   AV-1, can you describe what we're seeing?

3  A.   My knuckles from breaking through the mesh door.

4        MR. SWEET:  And can you zoom in on the tips of her

5  nails, please.

6  BY MR. SWEET

7  Q.   And it looks like -- I see jagged.  Could you tell us what

8  we're seeing here?

9  A.   My broken acrylic manicure.

10  Q.   Did you bite those off?

11  A.   Yes.

12  Q.   Okay.  Let's go to the next photo, please.

13        MR. SWEET:  Okay.  Zoom in on her wrist, please, sort

14  of the wrist.

15  BY MR. SWEET

16  Q.   Do you know how you got these specific injuries, AV-1?

17  A.   From beating on the screen door.

18  Q.   And the next photo.

19        MR. SWEET:  And let's zoom in on the wrist and palm

20  and hands.  Thank you.

21  BY MR. SWEET

22  Q.   Did you have cuts on the palms of your hands, AV-1?

23  A.   Yes.

24        MR. SWEET:  Try zooming in on her right palm, please.

25

1  BY MR. SWEET

2  Q.   AV-1, when you were breaking out of the cell, did it hurt

3  at the time?

4  A.   Yes.  Well, not at the time because, like, I couldn't feel

5  anything.  My adrenaline was pumping.

6  Q.   You said you couldn't feel anything because your

7  adrenaline was pumping?

8  A.   Yes.

9  Q.   Did it hurt afterwards?

10 A.   Yes.

11 Q.   Next photo.

12       Did you scrape your arm coming out?

13 A.   I think so.

14 Q.   And let me just ask you:  Do you recall how you got each

15 and every scrape and scratch and bruise and cut?

16 A.   No.

17 Q.   Okay.  Next one, please.

18       AV-1, did you scrape your back?

19 A.   Probably.

20       MR. SWEET:  Zoom in on that middle part of her back,

21 please.

22 BY MR. SWEET

23 Q.   Was it a tight squeeze when you went out through that

24 door?

25 A.   Yes.

1  Q.  AV-1, I know you said you're 22 now.  How old were you at

2  the time of this?

3  A.  21.

4  Q.  And, AV-1, I asked you if multiple people came.  At some

5  point did you change from the white hospital garb to blue

6  hospital garb?

7  A.  Yes.

8  Q.  Okay.  And over -- you know, over a little bit of time,

9  did your -- did your wounds change?  Did they either scab up or

10 change?

11 A.  Yes.

12       MR. SWEET:  Zoom in on her right hand, please, the

13 knuckles.

14       And the next one.

15       And it takes just a second for them to load.

16       Okay.  And we'll just go to the next one, too.

17 BY MR. SWEET

18 Q.  I'm going to show you -- actually, let me pause for just a

19 second.  So when you're with the first sergeant -- so you're in

20 the hospital.  You said you -- you said you made some phone

21 calls.  Do you know who you called -- or a phone call.  Do you

22 know who you called there?

23 A.  I called my pimp.

24 Q.  Okay.  And did you tell him generally what happened?

25 A.  Yes.

1  Q.   Did you tell him where you were?

2  A.   Yes.

3  Q.   And then did law enforcement start asking you questions to

4  try to figure out where the house was, who the person was?

5  A.   Yes.

6  Q.   Okay.  And did you talk to them about that?

7  A.   Yes.

8        MR. SWEET:  Let's go to 17, please.

9  BY MR. SWEET

10  Q.   Okay.  And so after -- so the sergeant who picked you up,

11  was she a man or woman?

12  A.   A woman.

13  Q.   Okay.  And then after that, did two male officers come in?

14  A.   Yes.

15  Q.   All right.  Were you -- did you try and draw the

16  residence?

17  A.   Yes.

18  Q.   Okay.  And the next one.

19        And did you do your best to describe the man?

20  A.   I did.

21  Q.   What are you doing here, if you know?

22  A.   I'm describing him, I believe.

23  Q.   And how did you describe him, generally?

24  A.   Receding hair line, bags under eyes, and looked young and

25  old at the same time.

1    Q.    Looked young and old at the same time?

2    A.    Yes.

3    Q.    And did you describe his -- his hair to them as well?

4    A.    Yes.

5    Q.    AV-1, can I show you just a picture of just the -- the

6    one-piece garment that you were wearing?

7    A.    Yes.

8          MR. SWEET:  Okay.  19, please.

9    BY MR. SWEET

10   Q.    Okay.  Is that what you were wearing, AV-1?

11   A.    Yes.

12   Q.    AV-1, after law enforcement took some photographs and

13   talked to you about the house and the man, what happened next?

14   A.    They said that they needed to transfer me to another

15   hospital 'cause they didn't have a forensic nurse and they

16   needed to do a rape kit.  And then they took me -- they asked

17   me if I could identify the house.  I said yes.  So they took me

18   driving around.

19   Q.    So they asked you if you could identify the house that you

20   escaped from?

21   A.    Yes.

22   Q.    And were you willing to do that?

23   A.    Yes.

24   Q.    Did you want to do that?

25   A.    No, but I did.

1  Q.   Okay.  Why didn't you want to do that?

2  A.   'Cause I didn't want to go back near the house.

3  Q.   Were you scared?

4  A.   Yes.

5  Q.   You said they went driving around.  Were you able to

6  identify the house?

7  A.   Not at first, but I eventually did.

8  Q.   Did you get out of the car -- excuse me -- out of the

9  police car to identify the house?

10 A.   Yes.

11 Q.   Were you with officers the entire time?

12 A.   Yes.

13 Q.   Once you looked at the house, were you confident that you

14 had identified the right house?

15 A.   Yes.

16 Q.   What did you do after that, AV-1?

17 A.   I got back in the -- in the police car and waited for them

18 to take me to the other hospital.

19 Q.   AV-1, I'm going to show you one more -- excuse me -- set

20 of photos.

21       MR. SWEET:  It's Exhibit 18, please.

22 BY MR. SWEET

23 Q.   Okay.  Can you tell us what we're seeing here?

24 A.   That's me standing in front of the house with an officer.

25 Q.   And the next one, please.

1          AV-1, I'm looking at your body language.  Were you --

2     were you comfortable standing out there?

3     A.    No.

4     Q.    Next one, please.

5          Is that the house, AV-1?

6     A.    Yes.

7          MR. SWEET:  Thank you.

8     BY MR. SWEET

9     Q.    AV-1, do you remember clearly all the details of the

10    garage?

11    A.    No.

12    Q.    Once you got out, once you got out of that room, did you

13    look around the garage very much?

14    A.    No.

15    Q.    I'm going to show you -- I'd like to show you 33, please.

16          Do you recognize that, though?

17    A.    Yes.

18    Q.    Did you look back briefly when you were in there?

19    A.    I don't remember.  I might have looked -- glanced back and

20    then just ran.

21    Q.    Did you know whether or not your purse was in a corner in

22    the garage?

23    A.    No, I didn't.

24    Q.    When you left that garage, could you tell me every item

25    that you had on you, please, or with you.

1  A.   I didn't have anything, except the gun.

2  Q.   The gun in your hand, the one-piece garment and the

3  sweatpants?

4  A.   Yes.

5  Q.   AV-1, were you later driven to Medford?

6  A.   Yes.

7  Q.   And why was that?

8  A.   They didn't have a forensic nurse at the other hospital.

9  Q.   And did you get a forensic exam in Medford?

10  A.   I did.

11  Q.   And more photographs of your injuries?

12  A.   Yes.

13  Q.   And did you get medication?

14  A.   Yes.

15  Q.   Can you tell us some of the medication you got?

16  A.   I got antibiotics for STDs.  I got a Plan B, and I got HIV

17  prep.

18  Q.   How long were you on the HIV prep for?

19  A.   A month.

20  Q.   And was that to keep you from getting HIV?

21  A.   Yes.

22  Q.   Did that medication affect you?

23  A.   Yes.

24  Q.   How?

25  A.   It made me feel horrible the whole time.  It gave me -- it

1  would make my heart pound.  It would make me sick.  I couldn't

2  really eat.  I was in and out of the hospital that whole month

3  due to constant panic attacks and stomach problems.  I was sent

4  home with anti-anxiety medication every time.  And then when I

5  would run out, I would have really bad withdrawals and have to

6  go right back.  And I still have side effects from the

7  medication to this day.

8  Q.   Was it hard for you to deal with what happened afterwards?

9  A.   Yes.

10  Q.   Is it still hard?

11  A.   Yes.

12  Q.   AV-1, when you agreed to have sex with that man in

13  Washington, was there an agreement for anything other than what

14  you described of oral sex and vaginal sex?

15  A.   No.

16  Q.   Was there any discussion of leaving the area?

17  A.   No.

18  Q.   Was there any discussion of role playing?

19  A.   No.

20  Q.   Did he ask if he could pretend to be a police officer?

21  A.   No.

22  Q.   Did he ask if he could handcuff you?

23  A.   No.

24  Q.   Put you in leg irons?

25  A.   No.

1    Q.    Point a Taser at you?

2    A.    No.

3    Q.    Drive you out of state?

4    A.    No.

5    Q.    Rape you by the side of the road?

6    A.    No.

7    Q.    Put you in a room?

8    A.    No.

9    Q.    Lock you in it?

10   A.    No.

11   Q.    Was any of those things I just described -- were any of

12   those with your consent?

13   A.    No.

14   Q.    AV-1, after you got out of that room and you went into the

15   car, you took a gun.  At that time did you think about what you

16   would do with that gun if he came in?

17   A.    I would've pointed it at him.

18   Q.    And if he kept walking at you?

19   A.    I would've shot him.

20   Q.    Is the man you would've shot in the room today?

21   A.    Yes.

22   Q.    Point to him, please.

23   A.    (Witness indicating.)

24         MR. SWEET:  AV-1's pointing at Negasi Zuberi.

25         Thank you, AV-1.

```
 1                THE WITNESS:  Thank you.

 2                THE COURT:  Cross-examination.

 3                (Whispered discussion, off the record, 11:36 a.m.)

 4                THE COURT:  I'm sorry.  Yes.

 5                A JUROR:  I'm so sorry.  I really have to go to the

 6      bathroom.

 7                THE COURT:  We're going to take a break.  Thank you.

 8                (Recess taken, 11:36 a.m. - 11:37 a.m.)

 9                (Open court, jury not present, 11:37 a.m.)

10                THE COURT:  Please be seated.

11                How long do you think for cross-examination?

12                MR. BERTHOLF:  Probably going to be more than 15

13      minutes.

14                THE COURT:  Okay.

15                MR. BERTHOLF:  It's really hard to gauge, but

16      probably half an hour to 45 minutes.  We are slightly ahead of

17      schedule at this point.  We thought that the Government would

18      be done with their direct right around noon.

19                THE COURT:  Okay.  Well, I mean, one option is we can

20      break now and start right at 1 o'clock.

21                MR. BERTHOLF:  If I had my druthers, that would be

22      my --

23                THE COURT:  What are your thoughts, Mr. Sweet?  Do

24      you want to check with AV-1?

25                MR. SWEET:  May I inquire?
```

1          THE COURT:  Yeah, let's go ahead and -- we're off the

2    record.

3          (Recess taken, 11:38 a.m. - 11:52 a.m.)

4          (Open court, jury present, 11:52 a.m.)

5          THE COURT:  All right.  Please be seated everyone,

6    folks.

7          We are going to go into the lunch hour a bit.  I

8    would like to finish up AV-1's testimony.  It'll take a little

9    bit of time, and then I promise we will break for lunch.  It'll

10   be later than we normally would.

11         If we'd like to go ahead then with cross-examination.

12                      <u>CROSS-EXAMINATION</u>

13   BY MR. BERTHOLF

14   Q.   Good morning, AV-1.

15   A.   Good morning.

16   Q.   I know it's been a really long morning for you, and I just

17   have some follow-up questions.

18   A.   Okay.

19   Q.   On the night on July 14th, you said that you got dressed.

20   Tell me about what you dressed -- what was your clothing when

21   you left your apartment?

22   A.   It was the body suit I had on, and then a pair of sweats I

23   had -- I had on just to leave the house, and then I -- and then

24   some strappy sandals.  And then I took my sweats off before I

25   got out of the car.

1   Q.   Okay.  Strappy sandals.  Can you describe those for us?

2   A.   They were just sandals, and then they had a strap that

3   wraps around your ankle.

4   Q.   Okay.  Any heel to the sandals?

5   A.   No.  They were flats.

6   Q.   They were flat.  What color?

7   A.   Black.

8   Q.   Okay.  And you said you arrived at The Blade around

9   10:30 or 11:00?

10  A.   Yeah.

11  Q.   About how long were you there until Mr. Zuberi stopped to

12  talk to you?

13  A.   Maybe about 45 minutes.

14  Q.   Okay.  And you said that he came down 109th Street?

15  A.   Yes.

16  Q.   And did you understand what he was telling you when he

17  rolled down his window and started talking to you?

18  A.   Yes.

19  Q.   Was he speaking through the passenger window or the

20  driver's window?

21  A.   The passenger.

22  Q.   All right.  So the passenger was on -- was the closest

23  door to you?

24  A.   Yes.

25  Q.   And then he asked you if you had a room?

1    A.    Yes.

2    Q.    But he then said he'd go wherever you wanted to go?

3    A.    Yeah.

4    Q.    So was it you that chose to stay in the car, or was it

5    Mr. Zuberi?

6    A.    It was -- it was me.  I just wanted to make it quick.

7    Q.    Okay.  And he -- you quoted him 140?

8    A.    Yes.

9    Q.    Did you ask for the money before you got in the car?

10   A.    No.

11   Q.    But he only had 100?

12   A.    That's what he said.

13   Q.    Okay.  And is that typical -- is that okay typically for

14   somebody that's doing the line of work that you were at that

15   time?

16   A.    Yes.

17   Q.    To accept less?

18   A.    It's a negotiation thing.

19   Q.    Okay.  Did he lock the doors right away, as you were

20   driving away?

21   A.    I don't know.

22   Q.    Was this a car that -- well, do you know that -- you

23   testified that the doors were locked?

24   A.    They were locked when we parked.  I -- I don't remember

25   when he locked them, but I -- I believe I did pull on the

1 handle, and they were locked.

2 Q.   Okay.  Why did you pull on the handle?

3 A.   To see if I could get out.

4 Q.   Okay.  At the time that you realized they're locked, what

5 did you do?

6 A.   I don't remember.

7 Q.   Did that concern you?

8 A.   It did.  I -- I wondered why they were locked.

9 Q.   Okay.  And did you ask him anything at that time?

10 A.   I don't think so.

11 Q.   Okay.

12 A.   I don't know why I didn't.

13 Q.   You testified earlier that you -- that you -- while

14 driving from the corner of 109th and Aurora to the alley,

15 that's when you tried texting.  Is that what your memory is?

16 A.   Yeah, around that time.

17 Q.   I'm sorry?

18 A.   Around that time.

19 Q.   Around that time.  But it was while you were driving?

20 A.   Yeah, I was in the car.

21 Q.   And you also tried calling?

22 A.   Yes.

23 Q.   Who did you try to call?

24 A.   My pimp.

25 Q.   Okay.  Why were you trying to call him?

1   A.   I was letting him know where I was going.

2   Q.   Okay.  Is that standard procedure?

3   A.   Yes.

4   Q.   Okay.  And then it sounds like you turned your phone off?

5   A.   I -- I was going to restart it to see if that would make

6   my messages send and my calls go through.

7   Q.   So did you do the restart or just turn it off?

8   A.   I think I turned it off and then powered it back on.  I

9   don't -- I don't remember, actually.  I think I just turned it

10  off, and I -- I didn't end up powering it back up, but I was

11  planning to restart it.  And then I guess I got distracted.

12  Q.   Okay.  What kind of phone was this?

13  A.   An iPhone.

14  Q.   An iPhone typically has a restart function to it, doesn't

15  it?

16  A.   I -- I don't know.  I just turn it off and turn it back

17  on.  I don't know if it has a restart button.

18  Q.   Okay.

19  A.   Or I didn't know how to do that at the time.

20  Q.   Do you know how to do that now?

21  A.   No.

22  Q.   Okay.  You said in your phone that you -- I'm sorry.  I

23  misspoke.

24       You said in your purse you had a Taser?

25  A.   Yes.

1    Q.   Can you describe that Taser for us?

2    A.   It was purple with rhinestones on it.  It looked like a

3    mascara or a lipstick.

4    Q.   Okay.  And you also had pepper spray?

5    A.   Yes.

6    Q.   You're -- at this point you're not able to talk to your

7    pimp, and you're also locked in the car.  Did you think about

8    taking those out?

9    A.   No, because I didn't feel threatened.

10   Q.   Okay.  Your phone's in the purse?

11   A.   Yeah.  It was next to me.

12   Q.   All right.  And is your purse on the seat or on the floor?

13   Or where's your purse at this point in time?

14   A.   When I was in the front seat, it was next to me.  And

15   then -- then it was -- it stayed in the front seat.

16   Q.   Okay.  'Cause the next thing is that you climbed over the

17   seat to the --

18   A.   Yes.

19   Q.   -- next row?

20   A.   Yes.

21   Q.   And then you climbed over that row into the back row?

22   A.   Yes.

23   Q.   And that's where the exchange of money happened?

24   A.   The exchange of money happened in the front seat.

25   Q.   That happened in the front seat.  Okay.

1       Okay.  So I'm just going to jump ahead a little bit
2  to you're driving away at this point.  He had shown you the
3  Taser, and you're driving away.  Are you still in the back
4  seat?
5  A.   Yes.
6  Q.   Is this where you saw the device that was on the floor?
7  A.   Yes.
8  Q.   Okay.  So it was in the third row?
9  A.   I think it might have been in the second, and I saw it on
10 the floor in front of me, like over the seat.
11 Q.   Okay.  So -- but it was on the floor behind the driver's
12 seat?
13 A.   Yeah.
14 Q.   Was that where it was for the entire time?  Did you ever
15 see it anywhere else?
16 A.   I don't think so.
17 Q.   Did you ever see it -- did it move at all?
18 A.   I don't think so.
19 Q.   Okay.  But you did see some other handcuffs on the floor?
20 A.   That, I'm -- I'm not sure about.  I might be thinking
21 about the handcuffs I saw in the -- the middle console when he
22 opened it.
23 Q.   Okay.  Tell me about that.  When did you see these
24 handcuffs?
25 A.   That was further forward, when I had -- when he let me

1  climb in the front after I got scared.  He was -- he opened his

2  middle -- the middle console, and he was showing me the

3  contents.  And I had seen handcuffs in there.

4  Q.   Okay.  Can you describe those handcuffs for us?

5  A.   They were silver.

6  Q.   Did they have a chain?

7  A.   I don't remember.

8  Q.   Okay.  What else was in the middle console?

9  A.   He had pills, weed.

10 Q.   Okay.  Did he offer any of those to you?

11 A.   I think he offered me some pills.

12 Q.   Okay.  Do you know what kind of pills they were?

13 A.   He said they were Xanax.

14 Q.   Okay.

15 A.   And I don't know what they were.  I don't know if they

16 were.

17 Q.   Did you say no?

18 A.   Yeah, I said no.

19 Q.   Okay.  About how much weed do you think was in there?

20 A.   I don't know.  A couple grams.

21 Q.   Okay.  Was it one bag?

22 A.   I don't know.

23 Q.   Okay.  Was it in a bag?

24 A.   I think so, yeah.  A baggie, a jar or something like that.

25 Q.   Okay.  And I realize this is a while ago and your memory's

1  not perfect.  I'm not expecting you to remember everything

2  perfectly.

3         When you got to the rest area, you said that

4  Mr. Zuberi was acting super paranoid and looking around and he

5  was kind of shaky?

6  A.   Yes.

7  Q.   At that point were you still in the far back seat?

8  A.   Yes.

9  Q.   Okay.  And was this at a point where you came out of the

10 vehicle, or did you -- where you stayed in the vehicle at this

11 point?

12 A.   I stayed in at the rest -- while he went to the bathroom.

13 Q.   Behind the vehicle?

14 A.   Yeah, on the side.

15 Q.   So did he -- did he let you climb up to the passenger

16 seat?

17 A.   Not at that time.

18 Q.   Okay.  When did that occur?

19 A.   While we were driving.

20 Q.   Okay.  So were you climbing over the seats while you were

21 on the road?

22 A.   Yeah.

23 Q.   Okay.  And this is before he took you out and told you to

24 suck his penis?

25 A.   Yeah.

1    Q.   Okay.  You said that during this time period that he was

2    just driving and you were -- he was in the driver's front seat,

3    and you were in the passenger front seat?

4    A.   Yes.

5    Q.   And that he was on his phone occasionally?

6    A.   Yeah.

7    Q.   Is that correct?

8    A.   Yes.

9    Q.   Okay.  And that he was playing some music?

10   A.   Yes.

11   Q.   And he let you play music as well?

12   A.   Yes.

13   Q.   Was that on his phone?

14   A.   Yeah.

15   Q.   Okay.  At this point did you think about texting or

16   calling somebody?

17   A.   I was sitting right next to him.  I didn't want to do

18   that.

19   Q.   Okay.  You're playing music on his phone, though?

20   A.   Yeah, 'cause I -- I was -- he was -- he was -- we were

21   having a normal conversation.  He seemed like a -- a normal

22   person.  Like --

23   Q.   Okay.

24   A.   -- it was just -- I don't know.  Like, I wasn't scared at

25   that moment.

1   Q.   Okay.  Is your phone -- is your purse still in the front

2   seat?

3   A.   My purse is down by his feet.

4   Q.   Okay.  When did he move the purse --

5   A.   I --

6   Q.   -- over to the driver side?

7   A.   Probably when I was still in the back.

8   Q.   Okay.  But it was down there where you could reach it?

9   A.   No.  I couldn't reach it.  It was -- I wasn't going to

10  reach over him to grab my purse and -- what was I going to do?

11  Grab a Taser and try to tase him and -- he could easily grab

12  the gun and shoot me.

13  Q.   Okay.  So where at beneath his feet is the purse?

14  A.   I don't know exactly.  It's on his left side.  I'm in --

15  in the passenger seat.

16  Q.   Okay.  Okay.  So we're driving, driving.  And one of the

17  things that Mr. Sweet asked you was what was the next major

18  thing, and you said that he pulls and takes a right and goes

19  down to a road to an empty lot?

20  A.   Yes.

21  Q.   And this is about four or five hours after you left

22  Seattle, and it's starting to get light?

23  A.   Yes.

24  Q.   Mr. Zuberi parked and got out of the vehicle?

25  A.   Yes.

1    Q.    You're in the passenger seat at this time?

2    A.    Yes.

3    Q.    And you said that you looked at his phone?

4    A.    Yeah.

5    Q.    Did you reach for your purse at this point in time?

6    A.    No.

7    Q.    Would you have been able to use your phone to make a phone

8    call?

9    A.    I don't think -- I don't know, 'cause his phone was

10   working, but I -- I feel like I didn't have time to do

11   anything.  I would've had to turn it on, see if it was working

12   and then try to make a call.

13   Q.    Okay.  But his phone was working?

14   A.    Yeah.

15   Q.    How do you know it was working?

16   A.    'Cause he had the GPS on.

17   Q.    Okay.

18   A.    I picked it up and was thinking about making -- calling

19   9-1-1 or someone, but, again, I didn't see the point.  I was in

20   the -- what was I going to tell them?  I mean, it would've --

21   we would've been gone by the time they traced the call.

22   Q.    Okay.  And you said that -- that you were two hours from

23   your destination?

24   A.    Yes.

25   Q.    Is the information you saw?

1    A.    Yeah.

2    Q.    And that it said you were in Oregon?

3    A.    I didn't -- I didn't -- I don't think it said I was in

4    Oregon.  I just saw two hours and a couple minutes from our

5    destination.  I thought it said -- I'm thinking -- I know that

6    I was in Oregon now.  That's why I said that.

7    Q.    Okay.

8    A.    But, no, his phone didn't -- I didn't see that it said

9    Oregon.

10   Q.    At one point you said that he pulled out -- I think -- it

11   was a small piece of tin foil?

12   A.    I just saw tin foil.  It was -- it was pretty large.

13   Q.    Okay.  Was it -- did he take it off of a roll or --

14   A.    Yeah.  He took it off of a roll.

15   Q.    Okay.  But you didn't see what he did with it?

16   A.    No.

17   Q.    Okay.  Were you in the front seat at this time or the back

18   seat?

19   A.    The back seat.

20   Q.    Far back.  When -- when you got into the vehicle, how did

21   you get into the back seat?  Did you go through the front

22   passenger door and climb over all three seats?  Or tell me how

23   you got in the back seat.

24   A.    I went in the passenger and climbed over the seats.

25   Q.    Okay.  So at the -- was it at the Love's that he gave you

1  the clothing?

2  A.   Yes.

3  Q.   And you were able to put your sweatpants on?

4  A.   Ah --

5  Q.   Or did he put the sweatpants on?

6  A.   I think he -- he put them on.

7  Q.   Okay.  Can you tell us how he put the sweatpants on?

8  A.   He --

9  Q.   Did he slide up both legs at one time, or one leg and one

10  leg?

11  A.   Yeah, I think he did have to -- I don't know if he did

12  undo a cuff.  He might have.  I don't remember.  But, yeah, I

13  don't remember.  I just know I -- I was -- he put the

14  sweatshirt over both my arms and then the hood on the -- on --

15  over my face.

16  Q.   Okay.  Sweatshirt over both your arms.  Is this a zip-up

17  hoody or --

18  A.   It's a pullover.

19  Q.   It's a pullover sweatshirt.  Were your arms inside the

20  body of the sweatshirt?

21  A.   Yeah.

22  Q.   Okay.  Did you take that sweatshirt off or did he?

23  A.   He did.

24  Q.   Where?

25  A.   In -- inside the room.

1    Q.    Okay.  How far did you -- well, I'm going to let that one

2    go.

3            So let's talk about the metal gate.  It sounds

4    originally you were punching with fists head-on?

5    A.    Yeah.

6    Q.    But then you were kind of pounding on it like this

7    (indicating)?

8    A.    Yes.

9    Q.    From -- from the metal door that we saw, it looked like

10   there was some Styrofoam that was on -- that was glued to the

11   inside of that.  Is that what you remember?

12   A.    Yes.

13   Q.    When you got the metal grating broken off, did you -- is

14   that when you pushed it down, or was it later?

15   A.    That -- I pushed the Styrofoam down right when I got

16   through the metal, the --

17   Q.    Okay.  Did you push the metal grate down before you were

18   able to open the door, the wooden door?

19   A.    I think so.

20   Q.    Okay.  With the wooden door, how did you strike that door?

21   Was it with your fists or hands or straight-on?  How did you

22   strike that door?

23   A.    Like this (indicating).

24   Q.    So like with your --

25   A.    With --

1    Q.    The outside of your --

2    A.    With this part (indicating), this whole part.

3    Q.    Okay.  So kind of the ball of your hand, the opposite side

4    of your thumb?

5    A.    Yeah.

6    Q.    Okay.

7    A.    And these knuckles.  I was just pounding on it.

8    Q.    And were you pounding on the Styrofoam with some of the

9    metal grate in front, or was the metal grate completely down?

10   A.    I don't know.  I -- I don't know.

11   Q.    Okay.

12   A.    Probably -- the metal grate was probably all the way down.

13   I think I had to move it -- push it down so I could fit through

14   the opening.

15   Q.    Did you push that down before or after you were able to

16   open the wooden door?

17   A.    Before.

18   Q.    Okay.  You said that Mr. Zuberi brought back a bucket for

19   you to urinate into?

20   A.    Yes.

21   Q.    Can you describe that bucket for us?

22   A.    It was a white bucket, like a --

23   Q.    Like a bucket that -- like a pail that you would carry

24   water in?

25   A.    Like a round cement bucket or something.  It didn't have a

1    handle.

2    Q.    No handle.  Okay.  But it was just an open top.  It wasn't

3    like a bottle.  It was a bucket?

4    A.    Mm-hmm.  Yes.

5    Q.    A bucket?

6    A.    Yes.

7    Q.    Okay.  He brought you a piece of paper with handwritten

8    questions?

9    A.    Yes.

10   Q.    And you said you wrote some random stuff on that?

11   A.    I wrote -- I wrote down -- I wrote a fake social security.

12   I answered the HIV questions, the questions if I had, like,

13   injections or whatever, I answered those truthfully.  And then

14   I wrote down the -- my old address that was on my ID.  That was

15   my old address.  It wasn't updated.

16   Q.    Okay.  And I -- I -- sometimes I don't hear super great.

17   Did you write your personal social security number on it or a

18   fake social security?

19   A.    I changed some of the numbers.

20   Q.    Okay.  And did he take that out of the structure, or did

21   it stay in there?

22   A.    The paper?

23   Q.    Yes.

24   A.    He took it.

25   Q.    Okay.  Did you ever see that paper again?

1   A.   No.

2   Q.   Before you -- well, not before -- while you were trying to

3   beat down the door, you said that you bit the -- your long

4   acrylic nails off?

5   A.   Yes.

6   Q.   And we saw the kind of jagged edges.  Where did those go?

7   A.   On the floor.

8   Q.   On the floor.  Did you take them with you?

9   A.   No.

10  Q.   When did your shoes come off of your feet?

11  A.   When I got into the room.  Before I laid down, I took them

12  off.

13  Q.   Okay.  So you took -- you personally took them off in the

14  room?

15  A.   Yes.

16  Q.   Okay.  And did you injure your knees climbing through the

17  door?

18  A.   Yes.

19  Q.   And if I -- if I saw correctly -- I didn't get a perfect

20  angle -- but was it from sliding over the bottom bar in that

21  little frame where you climbed through?

22  A.   Yes.

23  Q.   Okay.

24          THE COURTROOM DEPUTY CLERK:  Does somebody have a

25  cell phone by one of the microphones?

1          MR. BERTHOLF:  Oh.

2          THE COURTROOM DEPUTY CLERK:  Thank you.

3    BY MR. BERTHOLF

4    Q.   Okay.  When you went in the car, you said you saw your

5    Taser -- the purple lipstick Taser, you saw that in the seat of

6    the car?

7    A.   Yes.

8          MR. BERTHOLF:  I think that's all.  Thank you for

9    your time.

10          THE COURT:  All right.  Mr. Sweet, any redirect?

11          MR. SWEET:  Just briefly, Your Honor.

12                        REDIRECT EXAMINATION

13    BY MR. SWEET

14    Q.   AV-1, I just have a couple questions.  You mentioned that

15    there was a discussion back on Aurora Avenue of whether it

16    would be in a room or in a car.  Did I get that right?

17    A.   Yes.

18    Q.   Okay.  Did -- did the man talk to you later about how that

19    would've changed if -- if you had said -- or how that could've

20    changed?  Did that topic come up later?

21    A.   I think he said that they wouldn't -- he wouldn't have

22    been able to get me to -- if we had went to a room.

23    Q.   And did he mention that he had tried with other women that

24    night?

25    A.   Yeah.

1   Q.   Best as you can recall, what did he say?

2   A.   I think he said they -- that he'd -- he talked to some

3   other women or picked up some other women or something like

4   that, but I was his -- their main target.

5   Q.   And in terms of being in the vehicle, did you climb

6   between -- were you able to climb between the seats to go back

7   and forth from the rows?

8   A.   No.

9   Q.   You had to actually go over the seats?

10   A.   Yes.

11   Q.   Was that hard to do with -- with handcuffs and leg irons?

12   A.   Yes.

13   Q.   AV-1, just to be clear, I know you were trying to remember

14   the handcuffs with the sweatpants and the leg irons.  From the

15   time you were put in handcuffs -- from the time he put you in

16   handcuffs and leg irons in Seattle until the time he put you in

17   that room, did those handcuffs ever come off?

18   A.   No.

19   Q.   Did the leg irons ever come off?

20   A.   No.

21   Q.   I have a question about the -- about the -- about the

22   doors.  So you described the metal door, correct?

23   A.   Yes.

24   Q.   There was Styrofoam on the -- sort of glued to one side,

25   the other side from you of that metal door?

1   A.   Yes.

2   Q.   Then there was Styrofoam on the side facing you of the

3   wooden door?

4   A.   Yes.

5   Q.   And then the wooden door?

6   A.   Yes.

7   Q.   Okay.  As you're -- I'm just going to ask you.  Do you

8   recall all the details of how you were able to break out and

9   the order and where the Styrofoam went and where the mesh went?

10  A.   No.

11  Q.   Was it hard to do what you did?

12  A.   Yes.

13  Q.   You talked about the man bringing you a fan; is that

14  correct?

15  A.   Yes.

16  Q.   And water?

17  A.   Yes.

18  Q.   And a blanket?

19  A.   Yes.

20  Q.   Was that before or after he said to you, "I don't want to

21  hurt a princess like you"?

22  A.   After.

23  Q.   Was it before or after he told you that you were too

24  valuable to harm?

25  A.   After.

1   Q.   When you were in the car, were you trying to keep things
2   calm?
3   A.   Yes.
4   Q.   Did you want to make the man angry?
5   A.   No.
6   Q.   Were you afraid of what might happen if he caught you
7   making a phone call?
8   A.   Yes.
9   Q.   Were you afraid what might happen if he caught you trying
10  to escape?
11  A.   Yes.
12  Q.   Did he ever mention anything to you about whether there
13  would be anywhere for you to go if you did get out?
14  A.   He said there was nothing for miles and that I would
15  starve before anybody got to me or before I got anywhere.
16  Q.   Did it look to you like there was nothing for miles when
17  you were out on that country road?
18  A.   Yes.
19  Q.   AV-1, was it hard for you to escape from that room?
20  A.   Yes.
21  Q.   Why did you try so hard?
22  A.   'Cause I knew I needed to get out of there and I was
23  determined to get out of there alive.
24  Q.   What did you think would happen if you didn't get out of
25  there?

1  A.    That he would -- I don't know.  He -- I don't know -- he

2  would hurt me or do -- I didn't know what he was going to do.

3  I really don't know.

4  Q.    Did you think he was going to ever let you out?

5  A.    No.  I think he was just going to keep me in there.

6         MR. SWEET:  I have no further questions.

7         THE COURT:  All right.  Thank you, AV-1.

8         Folks, we are going to break for lunch now.  We're

9  almost at 12:30.  So let's break 'til 1:45.  Be back in the

10  jury room at 1:45.  And we'll start then with our next witness.

11         Please stand for the jury.

12         (Open court, jury not present, 12:23 p.m.)

13         THE COURT:  Anything we need to discuss?

14         MS. POTTER:  No, Your Honor.

15         MR. SWEET:  Your Honor, may AV-1 be excused?

16         THE COURT:  She may be excused.

17         AV-1, please stay in touch with folks at the

18  U.S. Attorney's Office in case you're needed.

19         MR. SWEET:  And, Your Honor, just to be clear, after

20  now AV-1 will be leaving the area.

21         THE COURT:  All right.

22         MR. BERTHOLF:  We don't have any problem with that.

23         THE COURT:  She is then released from her subpoena,

24  yes.

25         MR. SWEET:  Thank you, Your Honor.

1           THE COURT:  Okay.  We'll be in recess 'til 1:45.

2    Thank you, folks.

3                          * * *

4           (Noon Recess taken at 12:24 p.m.)

5

6                      ***AFTERNOON SESSION***

7           (Open court, jury present, 1:45 p.m.:)

8           THE COURT:  All right.  Thank you, folks.  Please be

9    seated.

10          Our next witness for the Government.

11          MR. LICHVARCIK:  The United States calls Mellissa

12   Geary to the stand.

13          THE COURT:  All right.  Thank you.

14          Ms. Geary, if you'd step up over here to my right, up

15   to the witness stand.

16          And if you'll remain standing for just a moment, I'll

17   have you sworn in.

18          Thank you.  Raise your right hand.

19                    ***MELLISSA GEARY***

20   Was thereupon called as a witness on behalf of the

21   Government; and, having been first duly sworn, was examined

22   and testified as follows:

23          THE COURT:  You can have a seat.

24          And if you could, if you could state your first and

25   last name, spelling both for our court reporter.

1    THE WITNESS:  Mellissa Geary; M-e-l-l-i-s-s-a,

2    G-e-a-r-y.

3    THE COURT:  Thank you, Ms. Geary.

4                    DIRECT EXAMINATION

5    BY MR. LICHVARCIK

6    Q.   Ms. Geary, would you please introduce yourself to the jury

7    by letting them know where you're from and what you do.

8    A.   My name's Mellissa Geary.  I'm a mom and a wife, and I

9    work as a peer support specialist.  I live in Depot Bay,

10   Oregon.  And we happened to be in Klamath Falls -- my husband's

11   an artist, and we were doing a Comicon there that weekend.

12   Q.   All right.  Thank you.  And by "that weekend," you're

13   taking us back to July 15th of 2023; is that right?

14   A.   Yes.  July 15th.

15   Q.   And, as you just mentioned, you and your husband were down

16   there for a convention?

17   A.   Yes.

18   Q.   Okay.  And what is a Comicon convention?

19   A.   My husband makes pop culture-type art, like Star Wars,

20   Star Trek.  And it's very popular at Comicons, and so that's

21   what we were doing there that day.  It was a small one-day show

22   at a community college.

23   Q.   And you've been to a number of Comicon --

24   A.   Yes.

25   Q.   -- conventions over the years, right?

1  A.   Yeah.  He's been doing it for about ten years.

2  Q.   How many?  Give us a rough estimate.

3  A.   I've probably been to 70 over the last ten years.

4  Q.   Is part of Comicon conventions sometimes people like to

5  get dressed up as different characters?

6  A.   Yes.

7  Q.   All right.  Did you pick a character that day?

8  A.   Yes.  I was dressed up as Rosie the Riveter that day.

9  Actually, it's something that I do.  She's a pretty fierce

10 symbol of women and women's power, so that's what I was dressed

11 up for that day.  So --

12 Q.   All right.  I'm going to show you a photograph in a

13 moment.

14       What was that outfit?  Can you see the picture in

15 front of you?

16 A.   My screen is blank.

17       (Whispered discussion, off the record, 1:48 p.m.)

18 BY MR. LICHVARCIK

19 Q.   And -- but, in terms of Rosie the Riveter outfit, is this

20 the complete outfit?

21 A.   No.  I don't have my head thing on.

22 Q.   Was that the red bandanna?

23 A.   The red polka-dotted bandanna.

24 Q.   Okay.  So that morning -- where were you staying when you

25 got into Klamath?

1  A.   We were staying at the Shilo Inn.

2  Q.   Okay.  And the convention was what day?

3  A.   It was July -- Saturday, July 15th.

4  Q.   Okay.  And so you woke up at the hotel, at the Shilo Inn.

5  And what did you do that morning?

6  A.   That morning I took Mike, my husband, over to the

7  community college.  He needed a few hours to get set up.  I

8  came back and got ready.  And then I -- I headed over to the

9  community center.  Do you just want me --

10  Q.   Yeah.  So when you -- you went back after you dropped your

11  husband off.  And describe what the day was like -- what the

12  morning was like.

13  A.   I showered.  I got ready.  I stopped at McDonald's and got

14  Mike a soda.  I stopped at Dutch Bros and got a drink.  And my

15  window was still rolled down.  And I was driving down just a

16  beautiful residential street, and I see a girl running towards

17  me.

18       And, all of a sudden, she's in my driver's window.

19  And she says, "He's going to kill me.  He's going to kill me."

20  And I say, "Get in.  Get in.  Get in."  And she got in behind

21  me, and we just started driving.  She was hysterical, and

22  she -- I have never seen somebody so afraid in my entire life.

23       I mean -- and she crouched down behind my seat, and I

24  think I said -- I told her what my name was.  And I told her

25  she was going to be safe and we were going to get her someplace

1  safe.  She said --

2  Q.   And, Ms. Geary, if I could -- so, again, you were driving

3  down the residential street.  And so what was the first thing

4  that you saw, as you were driving, that caught your attention?

5  You described this woman.  Where was she -- did you see where

6  she was running from?

7  A.   I did not.  I don't recall which house she came out of.

8  It seemed like she was in the street, and then she was almost

9  in my car.  It all happened so quickly.

10 Q.   And how familiar are you with Klamath Falls?

11 A.   Not very familiar at all.

12 Q.   So, for instance, did you know the name of the street that

13 you were driving down at that time?

14 A.   I don't.

15 Q.   Do you recall about how far away you were from the Shilo

16 Inn?

17 A.   Maybe two or three minutes.

18 Q.   Driving time?

19 A.   Yes.

20 Q.   Okay.  So you saw her.  Do you recall what she was

21 wearing?

22 A.   She had on a body suit with grommets along it.  I remember

23 her -- she had manicured hands, but they were all -- like,

24 she -- she'd been -- her hands were all cut up and -- but I

25 noticed her nails, and she had had on a body suit.

Q.   Okay.

A.   I'm certain of that.

Q.   And when you saw her running, was she actually -- did she run out into the street?

A.   I'm not sure.

Q.   Okay.

A.   I don't recall.

Q.   Because when you saw her, you ended up stopping the car, right?

A.   I did stop the car, yes.

Q.   Okay.  Now take it from there.  So you stop the car.  You said your window was rolled down?

A.   Yeah.  My driver's window was rolled down.  She -- like I said, I thought -- I thought she was going to come in the window.  And she said, "He's going to kill me."  And she got in the car and --

Q.   Why did you think she was going to come in the window?

A.   She was so frantic and hysterical.  It felt like I was going to pull her in -- I mean, she was so scared.  I mean, she was so scared.  I mean, it was just -- I -- I can't even describe it, I mean, the fear -- the fear on her face.  And, I mean, she thought someone was going to kill her.

Q.   Now, did you actually get out of the car?

A.   No.  No.  She got right in, and I just started driving.

Q.   Okay.  And where did you go to?

1    A.    I'm not sure the name of the highway, but I cut to the

2    right.  There's like a main road, and I just drove.  The first

3    place I stopped was KFC.

4    Q.    Now, did you -- once she got into the car, did she say

5    anything?  I know you had said already he -- she thought

6    someone was going to kill her, but did she say anything once

7    she got into the car?

8    A.    She asked me what day it was.  She asked me what -- where

9    she was at.  She didn't know the day.  She didn't know what

10   state she was in.  I believe she said, "I thought it was

11   Thursday."

12          I told her -- you know, I just was like, "My name's

13   Mellissa.  It's going to be okay."  I asked her what her name

14   was, and she told me it was AV-1.  This all happened so very

15   quickly, and it was very -- I feel like I was hysterical.  I

16   mean, it's hard -- I mean, and I -- yeah, so --

17   Q.    And did she say anything about being raped?

18   A.    She said, "He raped me."  Twice she told me that he raped

19   her.

20   Q.    Did she say anything else that you remember while you were

21   driving in the car?

22   A.    That he was going to kill her and that he may have been

23   chasing her.  I mean, that -- like I said, she got in, and I

24   just drove.  So I -- I don't know.

25   Q.    And so once you got to the KFC, what did you do?

1    A.    I called 9-1-1.

2    Q.    Okay.  Have you recently listened to those 9-1-1 calls,

3    which are marked Exhibits 9-1 and 9-2?

4    A.    Yes.

5    Q.    And were those fair and accurate recordings?

6    A.    Yes.

7          MR. LICHVARCIK:  Okay.  I've spoken with defense

8    already, Judge.  Move for their admission.  And defense is

9    aware we'll be playing the ones with the transcripts alongside

10   them.

11         MS. POTTER:  No objection, Your Honor.

12         THE COURT:  All right.  They'll both be received.

13   Thank you.

14         (Government's Exhibit Nos. 9-1 and 9-2 received.)

15   BY MR. LICHVARCIK

16   Q.    Before we play it, how many times did you call?

17   A.    I called twice.

18   Q.    Why?

19   A.    They didn't respond quickly enough, in my opinion.

20   Q.    Okay.  All right.  We'll play the -- we'll play 9-1 for

21   you right now.

22         (Audio recording played in open court, 1:54 p.m. -

23   1:55 p.m.)

24   BY MR. LICHVARCIK

25   Q.    All right.  So after that 9-1-1 call, you've already said

1  you waited for what felt like around 15 minutes or so?

2  A.    She -- AV-1 asked me if she could use my phone to call her

3  mom.  And I -- she got back in the car.  I let her have my

4  phone for about ten minutes.  Like I said, I didn't feel like

5  they responded quickly enough, so I called back.

6  Q.    Now, during this time did you have an opportunity to

7  observe any injuries that AV-1 --

8  A.    I had noticed that her -- she had had, like, some bruising

9  and scratching around her neck, on her hands and her wrists.

10 And she had had blood in between her legs.  I had noticed that

11 when she was approaching my car.

12 Q.    Okay.  But you don't know where that blood came from?

13 A.    I do not.  I do not.

14 Q.    Okay.  And then eventually you said you had to call 9-1-1

15 a second time; is that right?

16 A.    I did call, yes.

17 Q.    All right.  We'll play Exhibit 9-2.

18        (Audio recording played in open court, 1:56 p.m.)

19 BY MR. LICHVARCIK

20 Q.    Okay.  So after that second call, what happened?

21 A.    The sheriffs came a few minutes later, and they talked to

22 me.  And they talked to AV-1 and moved her from my vehicle to

23 their vehicle.  And they got some information from me, and then

24 they told me I could go.  And I went to the community college.

25 Q.    Okay.  We're going to play the first portion of Exhibit

1    10, which is already in evidence.  If you could watch this,

2    please.

3              (Video recording played in open court, 1:56 p.m. -

4    1:58 p.m.)

5    BY MR. LICHVARCIK

6    Q.   Now, there's a phone ringing on there.  Do you recall

7    that?

8    A.   Yes.  I had given AV-1 my phone to call her mother, and

9    she'd given it back to me when the sheriffs came.  And her mom

10   was blowing up my phone, trying to find out where her daughter

11   was.  That's what you're hearing, her mom trying -- is my

12   phone, her mom trying to figure out what was going on.

13   Q.   After you left, what was the condition of the back seat of

14   your car?

15   A.   It was messy.  There was blood on the seat.  I think she

16   had used one of my husband's shirts to wipe some stuff off.  We

17   got back home.  I cleaned it up, and I -- I washed the shirt

18   and everything.  But, yeah, there was blood in the back seat of

19   my car.

20   Q.   So when you were driving down that residential

21   neighborhood, you know, you had a choice.  You could've

22   stopped, or you could not have.  Why'd you stop?

23   A.   I have a daughter who's 20 and a daughter who's 17.  I

24   would want someone to stop for them.  I would never not stop

25   for somebody.  She was only 20 years old.

1          MR. LICHVARCIK:  All right.  Thank you, Ms. Geary.

2          THE WITNESS:  You're welcome.

3          THE COURT:  Any cross-examination?

4          MS. POTTER:  We have no questions, Your Honor.

5          THE COURT:  All right.  Rosie the Riveter from Coos

6   Bay, thank you.  You're free to go.

7          Your next witness.

8          MR. SWEET:  Thank you, Your Honor.  The United States

9   calls Sergeant Shasta DuVal.

10         THE COURT:  All right.  Sergeant, if you want to head

11  over here to the witness stand to my right, your left.

12         If you want to remain standing for just a moment,

13  once you step up.

14         And raise your right hand.

15                        ***SHASTA DuVAL***

16  Was thereupon called as a witness on behalf of the

17  Government; and, having been first duly sworn, was examined

18  and testified as follows:

19         THE COURT:  Go ahead and have a seat.

20         If you could state your first and last name, spelling

21  both for our court reporter.

22         THE WITNESS:  Shasta DuVal; S-h-a-s-t-a, D-u-V-a-l.

23         THE COURT:  Thank you.

24

25

DIRECT EXAMINATION

BY MR. SWEET

Q.    Are you employed as a sergeant with the Klamath County

Sheriff's Office?

A.    Yes.

Q.    And were you the first responding law enforcement officer

to meet AV-1?

A.    Yes.

Q.    Could you tell us first just about your background,

please.

A.    I've been employed with the Sheriff's Office since 2014.

I started as a reserve volunteer deputy.  I was hired in 2015

full-time.  I spent some time on patrol, was a school resource

officer, moved to detectives.  And I was actually promoted to

patrol sergeant about two weeks prior to this happening.

Q.    So were you on duty on July 15th, 2023?

A.    Yes, I was.

Q.    And at 12:09 p.m. were you dispatched to the KFC?

A.    Yes, I was.

Q.    And was that in Klamath Falls, Oregon?

A.    Yes.

Q.    Was that dispatch based on a 9-1-1 call that came in?

A.    Yes.

Q.    And what was the time of that 9-1-1 call, please.

A.    My call notes say 12:11.

1  Q.   You were -- you were dispatched at 12:08, though; is that

2  correct?  Or, sorry, you were dispatched at 12:09?

3  A.   That's what the call notes originally said.  That's what

4  my report says.  But the calls notes state 12:11.

5  Q.   So in -- let's talk about what you did.  Where did you go,

6  please.

7  A.   I went to KFC, and I met with Melissa and AV-1.

8          MR. SWEET:  I want to pull up -- I'd like to pull up

9  11-6, please.

10  BY MR. SWEET

11  Q.   So you get to the KFC.  You said you met Mellissa.  Is

12  that Mellissa Geary you're seeing there?

13  A.   Yes.

14  Q.   And did you get kind of the core details from her as to

15  why she was calling 9-1-1?

16  A.   Yes.

17  Q.   And what did you do next?

18  A.   After I spoke with Mellissa, I went and spoke with AV-1

19  sitting in the back seat.

20  Q.   Do you recall the first thing she said to you?

21  A.   Yeah.  She said she was scared.

22          MR. SWEET:  And I'd like to pull up -- I'd like to

23  pull up the video.

24  BY MR. SWEET

25  Q.   So let me ask you this:  Were you recording your

1  interaction with both Ms. Geary and AV-1?

2  A.   Yes.

3  Q.   And I'd like to pull up that video.  And what I'm going to

4  ask you to do is we're going to go to the part where you

5  approach the back of the vehicle to talk to AV-1, play a little

6  bit, and then I'm going to stop.  I just want to ask you to

7  tell the jury what you're seeing, what you're observing, what

8  it meant to you.  Okay?

9  A.   Okay.

10        (Video recording played in open court, 2:02 p.m. -

11  2:03 p.m.)

12        MR. SWEET:  Okay.  I'm going to pause here for a

13  second.

14  BY MR. SWEET

15  Q.   So, Sergeant DuVal, tell the jury what you're observing.

16  A.   Immediately I'm noticing some injuries on her.  She has

17  some marks on her wrists that are pretty consistent with either

18  handcuffs or some kind of ligature marks on her wrists.  I

19  notice her knuckles are red and bruised, and there's fresh

20  blood on her fingers as well.

21        I also noted on her toenails, they were kind of tore

22  up.  And it appeared to me that they were of -- they're

23  shellac, so it's like a gel coating.  It's a lot more durable

24  and pretty uncommon to see them tore up like that.  And then I

25  saw some bruising on her forearms and her back.

1    Q.    And what about her clothes?  Did you draw any conclusions

2    about her clothes?

3    A.    She had no shoes on, and she also had a thong body suit

4    with her sweatpants.

5            MR. SWEET:  Let's play a little more, please.

6            (Video recording played in open court, 2:04 p.m.)

7            MR. SWEET:  Pause again.

8    BY MR. SWEET

9    Q.    Could you tell us -- now, we've talked about her hands,

10   her wrists, her feet and her clothes.  Tell us something else

11   you're observing in terms of -- whether it's her demeanor, her

12   manner of talking, information.

13   A.    She wanted to tell me everything.  It was like a word

14   vomit, as if she wanted to just tell me exactly what happened

15   as quick as possible, so this could be resolved as quick as

16   possible.

17           MR. SWEET:  And a little more, please.

18           (Video recording played in open court, 2:05 p.m.)

19   BY MR. SWEET

20   Q.    All right.  I'm going to pause here for a second.

21           Thank you.

22           So, hearing this, did you make a decision as to what

23   you were going to do?

24   A.    Yes.

25   Q.    What was that?

1  A.   I wanted to take her up to the hospital to get medically

2  evaluated.

3  Q.   So your first priority is to the hospital?

4  A.   Mm-hmm.

5  Q.   What's your next priority?

6  A.   Identify where she was taken and where she had been picked

7  up.

8  Q.   And did you -- so did you take steps to get her to the

9  hospital?

10  A.   Yes.

11  Q.   Okay.  So I want to jump before that.  Did something

12  happen when you asked her if she had anything in the car?

13  A.   Yes.

14  Q.   Okay.  So let's go ahead and play that part.

15        (Video recording played in open court, 2:06 p.m.)

16  BY MR. SWEET

17  Q.   All right.  So we just heard you, "Oh, okay."  Tell the

18  jury what happened there.

19  A.   I thought that her belongings were going to be, like, the

20  clothing next to her.  I looked, I think, to Mellissa; and I

21  looked over, and she retrieved the gun.  That was the first

22  time she'd been -- she'd brought up the firearm to me.

23  Q.   Did you have any idea there was a gun in the car?

24  A.   No.

25  Q.   You sounded surprised?

1    A.    I was.

2    Q.    And she handed it to you?

3    A.    Yes.

4    Q.    And -- and I'm just going to ask:  It looks like you

5    just -- you just grabbed the gun; is that correct?

6    A.    Yes.

7    Q.    Because you handled it right away, did you end up having

8    to do anything regarding DNA?

9    A.    Yes.  I gave some swabs from the inside of my mouth.

10   Q.    Okay.  And what's the purpose for that?

11   A.    Elimination swabs, 'cause I had touched it and transferred

12   my DNA to it.

13   Q.    Just so your DNA could be ruled out or acknowledged that,

14   yes, this contributor would be you, as needed?

15   A.    Yes.

16          MR. SWEET:  Okay.  So let's -- let's play from here

17   then, please.

18          (Video recording played in open court, 2:08 p.m.)

19   BY MR. SWEET

20   Q.    So did you secure the firearm?

21   A.    Yes.

22   Q.    And did you ultimately enter it into evidence?

23   A.    Yes.

24   Q.    Did your -- well, we'll come back to that in just a

25   minute.

1       So what did you do then regarding AV-1, in terms

2  of -- where did you take her, please.

3  A.   Oh, AV-1.  I apologize.  I took her through a route that I

4  believe Ms. Geary had described to the hospital.

5  Q.   Okay.  And so you got some information from Ms. Geary.

6  And did you also talk to AV-1, who was in the back of your car

7  there, about any information she may have that would let you

8  figure out the route?

9  A.   Yes.  I mostly used Ms. Geary's information.  And once we

10 got to the school, I believe AV-1 was the one who told me about

11 the school.  Then that's when she said, "We're definitely in

12 this area."

13 Q.   Okay.  So let's -- let's back up just a little bit then.

14 What was the information from Ms. Geary that you -- that you

15 clued in on?

16 A.   That she was in town for the Comicon; was staying at

17 Shilo; and after leaving Shilo, she went to Dutch Bros.  I knew

18 those to be within close proximity.  After Dutch Bros she

19 traveled through the residential area.  I knew that that route

20 would likely be Eldorado.

21       MR. SWEET:  Okay.  Let's pull up Exhibit 513 and --

22 excuse me -- yes, 513.

23 BY MR. SWEET

24 Q.   And this is -- well, tell us what you're seeing here.

25 A.   A map of Klamath Falls.

1    Q.   Okay.  And there's some locations that we've discussed

2    that are on here.  Can you -- this is a touch screen.  Just in

3    case they can't see, can you circle the KFC where you started,

4    please.

5    A.   (Witness complied.)

6    Q.   And -- okay.  So Ms. Geary said that she was at the Shilo

7    Inn.  Let's go ahead and circle -- and you can circle the dot

8    where the actual Shilo Inn is.

9    A.   (Witness complied.)

10   Q.   Thank you.

11        So she said it was through -- she started at Shilo

12   Inn, and she went through a residential neighborhood; is that

13   right?

14   A.   Yes.

15   Q.   And what was the other information?  Was there something

16   about a school that was said by one of them?

17   A.   Yes, that it was near a school.

18   Q.   And so you'd figured out that Eldorado was a likely

19   street, based on what you -- the information you had?

20   A.   Yes.

21   Q.   So tell the jury -- one more question, actually.  You're

22   headed to where at this point?

23   A.   Sky Lakes.

24   Q.   Okay.  Could you circle -- so is Sky Lakes -- is that the

25   hospital?

1    A.    Yes.

2    Q.    All right.  Could you circle -- okay.  So pretty much very

3    close to Shilo Inn?

4    A.    (Witness complied.)

5    Q.    All right.  So you're heading from KFC to Sky Lakes

6    Medical Center, and you decided to drive on which street?

7    A.    On North Eldorado.

8    Q.    And, as you're driving, you said something about a school.

9    What was that?

10   A.    It's Roosevelt Elementary School.

11   Q.    And what was it -- when you're driving by the school, what

12   happened?  Did somebody say something?

13   A.    Yes.  AV-1 said, "It was somewhere in this area."  I could

14   see her behind me, and she's checking the houses.  She couldn't

15   identify exactly which one, but she was looking and said, "It's

16   definitely in this area."

17   Q.    And what were you -- as you're driving and she's looking,

18   was there something you were trying to do or not do?

19   A.    I didn't want to make it look like we were looking.  So I

20   was trying to just make my way to Sky Lakes.  If she could

21   point out anything on the way, without me slowing down or

22   stopping to alert anybody, then great.  But if not, we'd have

23   Ms. Geary to work with still.

24   Q.    So you were trying to avoid tipping off the person?

25   A.    Yes.

1  Q.   And you said that said, "We're near," or something to that

2  effect, near Roosevelt Elementary?

3  A.   Yes.

4  Q.   Is Roosevelt Elementary near 1336 North Eldorado?

5  A.   Yes.

6  Q.   Within a few blocks or something like that?

7  A.   Yes.

8  Q.   All right.  And so could you circle 1336 Eldorado, the red

9  dot, please.

10  A.   (Witness complied.)

11  Q.   Okay.  Did you call other law enforcement officers as

12  well?

13  A.   I did.

14  Q.   And who did you call, and why?

15  A.   I spoke with my lieutenant first.  Because of the

16  information, I wanted him to be aware.  And then, after that, I

17  contacted one of the police department officers.

18  Q.   So with Klamath Falls Police Department?

19  A.   Yes.

20  Q.   And what happened when you got to the hospital?

21  A.   AV-1 was placed into a room, and then I met with a couple

22  of the officers that responded.

23  Q.   Do you recall who it was?

24  A.   Officer Trippet and, I believe, Gilmore.  Sergeant Zupan

25  showed up, and then I later spoke with Detective Loudermilk.

1  Q.  All four of them are Klamath Falls PD?

2  A.  Yes.

3  Q.  And is the reason they were involved because it's in city

4  limits?

5  A.  Yes.

6  Q.  Did you talk to AV-1 when she's in the hospital room?

7  A.  Yes.

8  Q.  And what were you talking to her about?

9  A.  Trying to make sure she remained calm.  I walked in on a

10  phone call at one point.  I tried to stay out of it as much as

11  possible, because I knew at that point I was going to be

12  separating and it would be a police department case.

13  Q.  Did you talk to her a little bit about a description of

14  the male she was talking about?

15  A.  Yes.

16  Q.  Did you take some photos of -- of AV-1?

17  A.  Yes, I did.

18  Q.  What were you photographing?

19  A.  Her injuries.

20  Q.  Her hands?

21  A.  Yes.

22  Q.  Other parts of her body as well?

23  A.  Yes.

24  Q.  Once -- once KFPD arrived and -- did you kind of brief

25  them about -- about what you learned and what you'd observed?

1    A.    Yes.

2    Q.    And did they essentially take over?

3    A.    Yes.

4    Q.    So I'd like to wrap up with -- and go back to the -- go

5    back to the pistol.  So what did you do -- what did you do with

6    the pistol?  You've got the pistol.  It's in evidence.  Tell us

7    what you did with it.

8    A.    I photographed it.  I removed the magazine, did a round

9    count.  Then I later provided it to Detective Loudermilk.

10   Q.    And did you document the serial number?

11   A.    I did.

12   Q.    Could you tell us, please, what the serial number was for

13   that pistol.

14   A.    Yes.  It's Mary George 735197.

15   Q.    Okay.  So Mary George would be MG for -- okay -- for

16   non-law enforcement people, like myself.

17         Okay.  And you said 19 rounds of ammunition?

18   A.    Yes.

19         MR. SWEET:  Your Honor, may I approach?

20         THE COURT:  Yes, you may.

21   BY MR. SWEET

22   Q.    Sergeant DuVal, I'm going to show you what's marked as

23   Government's Exhibit No. 13.

24         And could you please identify Government's Exhibit

25   No. 13.

1    A.    It's the Springfield Armory with the same serial number.

2    Q.    Okay.  First two letters are Mary George?

3    A.    Mary George.

4    Q.    Is this the pistol that you -- that AV-1 handed you?

5    A.    Yes.

6              MR. SWEET:  Thank you.  I have no further questions.

7              THE COURT:  All right.  Any cross-examination?

8                        CROSS-EXAMINATION

9    BY MR. BERTHOLF

10   Q.    You said you took photographs of AV-1's injuries.

11   A.    Yes.

12   Q.    You said the hands and other body parts.  What other body

13   parts?

14   A.    Ah --

15   Q.    Oh, I'm sorry.  Oh, wait.  Let me bring this a little

16   closer.

17            What other body parts did you photograph?

18   A.    I think her feet and her legs.

19   Q.    Okay.  What areas of her legs?

20   A.    I don't remember.

21   Q.    Okay.

22   A.    Probably where there were bruises.

23   Q.    Where there were bruises?

24   A.    Or marks, yes.

25             MR. BERTHOLF:  Okay.  I think that's all.  Thank you.

1          THE COURT:  Any redirect?

2          MR. SWEET:  No.  No.  Thank you.

3          THE COURT:  All right.  Thank you, Sergeant.  You're

4     free to go.

5          THE WITNESS:  Thank you.

6          THE COURT:  Our next witness.

7          MR. BOCCATO:  The Government calls Amie Walton to the

8     stand.

9          THE COURT:  Ma'am, if you'll head right up here to

10    the witness stand, here to my right.

11         And step on up.  If you'll remain standing for just a

12    moment, I'll have you sworn in.  Raise your right hand.

13                        ***AMIE WALTON***

14    Was thereupon called as a witness on behalf of the

15    Government; and, having been first duly sworn, was examined

16    and testified as follows:

17         THE COURT:  You can have a seat.

18         And if you could please spell -- state and spell both

19    your first and last name for our court reporter.

20         THE WITNESS:  Amie Walton, A-m-i-e; Walton,

21    W-a-l-t-o-n.

22         THE COURT:  Thank you.

23                      DIRECT EXAMINATION

24    BY MR. BOCCATO

25    Q.   All right.  Ms. Walton, where do you work?

1  A.   I work full-time at Providence Medford Medical Center.

2  Q.   What do you do for Providence?

3  A.   I am a nurse manager for all of the heart and vascular

4  departments there.

5  Q.   And how long have you been doing that for?

6  A.   The management role, two years.

7  Q.   Can you briefly describe your work experience as a nurse?

8  A.   Yes.  I started working as a nurse in 2007 at Salem

9  Hospital.  I worked there starting in 1999, actually, as a

10 nurse assistant and all through nursing school.  Started as an

11 RN in 2007 and worked there for 21 years, until we moved here

12 to Medford, with orthopedics, neuro and endoscopy unit.

13 Q.   Thank you.

14      Do you have any, like, specialty areas of practice?

15 A.   Endoscopy has been my specialty.  And I have an advanced

16 certification in gastroenterology nursing.

17 Q.   Are you also a sexual assault nurse examiner?

18 A.   Yes, I am.

19 Q.   And is that commonly referred to by the acronym SANE?

20 A.   Yes.

21 Q.   And is that also referred to as a forensic nurse?

22 A.   Yes.

23 Q.   All right.  How long have you been a forensic nurse?

24 A.   For adults, I have been doing this for a little over two

25 years.  I joined a pediatric group as well, and I've been doing

1  that for a little over a year.

2  Q.   And is there, like, a certification process to become a

3  forensic nurse or a SANE?

4  A.   Yes.

5  Q.   Did you receive a certification?

6  A.   I did, yes.

7  Q.   And approximately how many of these forensic exams do you

8  do per month?

9  A.   Per month, I would -- it varies, but I'd say approximately

10 10 to 20 a month, between adults and pediatrics.

11 Q.   And what is -- I guess, for the jury, what is a forensic

12 nurse or a -- or what is a sexual assault forensic examination?

13 A.   It's a comprehensive examination of a patient who has

14 survived a sexual assault.

15 Q.   And, roughly, how long does one of those examinations

16 take?

17 A.   A simple one could be two to three hours.  I know some can

18 take up to six to eight hours for a full exam.

19 Q.   And we're going to talk about AV-1's examination here

20 soon, but how long did her examination take?

21 A.   I want to say it took at least six hours, and I had

22 someone helping me.

23 Q.   And are you part of the Jackson County Sexual Assault

24 Response Team?

25 A.   Yes.

1  Q.   Do you receive call-outs?

2  A.   Yes.

3  Q.   And how do you receive those call-outs?

4  A.   We have a service that calls us.  It's called Medical

5  Messenger.  So the hospitals that we respond to in Jackson and

6  Josephine County have that number; and they call them, and they

7  call us.

8  Q.   Were you called out to do a forensic examination of AV-1?

9  A.   Yes, I was.

10  Q.   And where did you conduct that examination?

11  A.   I conducted that at Providence Medford Medical Center.

12  Q.   And why did this happen at Medford, as opposed to

13  Klamath Falls?

14  A.   Yeah, I was called originally a couple hours before she

15  arrived at Medford.  Klamath County does not have a forensic

16  program, and it's not uncommon for the surrounding areas that

17  don't have forensic programs to bring them to us.

18  Q.   Did anything about this SANE examination or forensic

19  examination stand out to you?

20  A.   It was the most horrific exam I've ever done.

21  Q.   And approximately when did you start this examination on

22  September -- or on July 15th?

23  A.   Would it be okay if I refer to my notes?

24       THE COURT:  Yes, that's perfectly fine.

25       THE WITNESS:  Okay.  I remember it was in the

1  evening.

2        I think I started somewhere around 5:00 p.m. or so.

3  BY MR. BOCCATO

4  Q.   Okay.  And we -- when you conduct a forensic examination,

5  do you use a form?

6  A.   Yes.

7  Q.   All right.  And does that form include, like, a certain --

8  certain steps?

9  A.   Yes.

10 Q.   And what are those steps that you need to follow -- or

11 that you follow?

12 A.   Well, we initially start with a history and physical.  We

13 go over the patient's history with them, a head-to-toe physical

14 assessment, evidence collection.  We administer medications.

15 We do an HIV risk assessment, pregnancy screening.  Often, if

16 the patient wants it, we do pregnancy prophylaxis.  And we

17 photograph any injuries.

18 Q.   And did you follow the SANE steps when you examined AV-1?

19 A.   Yes, I did.

20 Q.   So is one of the steps in the examination, like, a

21 head-to-toe examination?

22 A.   Yes.

23 Q.   And did you do that same head-to-toe examination in this

24 case?

25 A.   Yes, I did.

1    Q.   And during that head-to-toe examination, did you take any

2    pictures?

3    A.   Yes, I did.  I think I took about 60 pictures of her

4    injuries.

5    Q.   And we'll talk about those pictures a little bit more in a

6    moment, but do you also document the injuries themselves?

7    A.   Yes, I do.

8    Q.   How do you document them?

9    A.   There's multiple areas that we document them.  There's a

10   body gram that we document on.  There's a log injury form that

11   we fill out, and the photographic evidence.

12   Q.   Okay.  And you said a body gram.  What is a body gram?

13   A.   It's basically like a -- just a picture of a body that we

14   can note where the injuries occurred.

15   Q.   And you also mentioned like an injury log.  Is that -- can

16   you describe what that is?

17   A.   Yeah.  So it will correspond to the body gram and the --

18   and the photographs.  It is numbered, injuries one through

19   however many you have.  And you document which part of the body

20   gram you documented on.  And there's a key code for the type of

21   injury and a place to put if there was pain associated with the

22   injury.

23   Q.   And then do you also describe the injury as well?

24   A.   Yes.

25   Q.   And how many injuries did you document in this case?

1   A.    I believe 20.

2   Q.    When you take pictures, do you just take one picture of an

3   injury?  Or do you take multiples pictures of that injury?

4   A.    It's standard to take three pictures of each injury.  So

5   we will start with a zoomed-out picture, so you can tell what

6   part of the body we are photographing; and one picture that is

7   zoomed in on the injury; and then we use a measuring device, so

8   you can see the size of the injury.

9   Q.    I'm going to show you a series of photos that have been

10  marked as Exhibit 485.  And have you had an opportunity to

11  review those photos?

12  A.    Yes, I have.

13          MR. BOCCATO:  Your Honor, I think Exhibit 485 was, I

14  guess, conditionally admitted.

15          MS. POTTER:  No objection.

16          THE COURT:  All right.  With this foundation, then

17  they're admitted.  Thank you.

18          (Government's Exhibit No. 485 received.)

19          MR. BOCCATO:  Thank you, Your Honor.

20  BY MR. BOCCATO

21  Q.    So were these the -- some of the photos taken as part of

22  your -- of the forensic examination?

23  A.    Yes.

24  Q.    All right.  Let's start again with 485-1.

25          MR. BOCCATO:  David, could you zoom in a little bit

1    on -- actually, we'll leave it there for now.

2    BY MR. BOCCATO

3    Q.    What injuries did you document in the -- were you

4    documenting with this photo?

5    A.    So this photo shows injuries one through four on my log,

6    the first one being two abrasions, two centimeters in length.

7    And those are the abrasions at the base of the toe.  I --

8    Q.    And feel free to circle that one.

9    A.    Okay.  (Witness complied.)

10   Q.    Thank you.

11   A.    Sorry.

12   Q.    What other injuries did you document?

13   A.    The second injury is multiple small abrasions,

14   .5 centimeters in length, to the left fourth toe.  Would you

15   like me to circle?

16   Q.    Circle or arrow, whatever makes the most sense.

17   A.    (Witness complied.)  Okay.

18   Q.    Thank you.

19   A.    And the third, on the left foot dorsal surface, an

20   abrasion of 2.5 centimeters in length (drawing).  The fourth

21   injury, on this one you can't see real well.  Over here is a

22   left lateral ankle bruise, three centimeters.

23   Q.    Did AV-1 indicate any pain associated with these injuries?

24   A.    She did with the first three.  She rated it -- all three

25   of those four-out-of-ten pain.

1  Q.   And how does the zero-to-ten scale work?

2  A.   So we ask the patient to rate how bad the pain is for them

3  on a scale one -- or zero to ten, with zero being no pain at

4  all and ten being the worst pain imaginable.

5  Q.   And she rated the first three injuries four?

6  A.   She did.

7  Q.   Let's go to the next photo.

8       And you want to clear that on your screen.

9  A.   Okay.

10  Q.   All right.  Does this document the same three injuries --

11  A.   Yes.

12  Q.   -- that we just talked about?

13       And what is the difference between this photo and the

14  photo we just saw?

15  A.   I believe it's just to zoom in a little bit more, so you

16  can see in more clarity.

17  Q.   All right.  Let's go to the next photo.

18       All right.  What injuries were you documenting with

19  this photo?

20  A.   I believe that shows one through six.  So the ones we

21  already talked about, plus four through six.  Would you like me

22  to go over those?

23  Q.   Yes, please.

24       And, just for the record, on the screen is

25  Exhibit 485-3.

1  A.   So injury number four was the left lateral ankle bruise,

2  three centimeters.  Number five was the left anterior shin

3  bruise measuring 1.5 centimeters.  And number six was the left

4  medial shin bruise, 1.5 centimeters.

5  Q.   And did she -- AV-1 note any pain regarding injuries five

6  and six?

7  A.   She did not have pain associated with those.

8  Q.   Thank you.

9        MR. BOCCATO:  Can you go to Exhibit 485-4?

10 BY MR. BOCCATO

11 Q.   What injuries were you documenting in this photo?

12 A.   I believe seven and eight.

13 Q.   Okay.  What did you note regarding seven and eight?

14 A.   Seven was a left knee with multiple red spots,

15 one centimeters each.  And eight, I documented left inner knee

16 bruise measuring 2.5 centimeters.

17 Q.   And did AV-1 indicate any pain associated with these

18 injuries?

19 A.   No pain.

20 Q.   Let's move to Exhibit 485-4.  Oh, sorry, 5.  I apologize.

21       All right.  What injuries were you documenting in

22 this photo?

23 A.   I believe that's nine and ten.

24 Q.   What did you note regarding nine and ten?

25 A.   Nine was a right shin, four bruises, one centimeter.  And

1  number ten was a large reddened area to lower knee,

2  five centimeters.

3  Q.   Okay.  Did she note any pain regarding those bruises?

4  A.   No pain with those.

5  Q.   Let's go to 485-6.

6        On this photo what were you documenting here?

7  A.   Well, you can see nine on there as well, but I was trying

8  to show 10 and 11.

9  Q.   And I think we talked about 10.  What -- what did you note

10  regarding 11?

11  A.   Large bruised, hard, raised area, five centimeters.

12  Q.   Can you circle that for me?

13  A.   (Witness complied.)

14  Q.   And did AV-1 indicate any pain associated with this

15  injury?

16  A.   She did.  Five-out-of-ten pain there.

17  Q.   Thank you.

18        All right.  Let's go to 485-7.

19  A.   Do you want me to clear?

20  Q.   Sure.  Thank you.

21  A.   Oh.

22        THE COURT:  Thank you, if you can, yeah.

23        THE WITNESS:  Okay.

24  BY MR. BOCCATO

25  Q.   Ms. Walton, on 485-7 what injuries were you trying to

1    document here?

2    A.    It looks like 11 and 12.  In that bruised area, that's the

3    bottom of some scratches.  There were four parallel scratches

4    that were 20 centimeters in length.  And I do have a better

5    picture of the full length.

6    Q.    All right.  Well, let's go to that better picture.

7          MR. BOCCATO:  Go to 485-8, please.

8    BY MR. BOCCATO

9    Q.    And I think -- I think we might even have another

10   photograph of this injury.  But what -- what -- tell me about

11   the injury you were indicating here.

12   A.    That would be the -- the zoomed-out picture to show that

13   it's a leg and in proximity to where I'm going to zoom in each

14   individual injury.  So that is showing 10, 11 and 12.

15   Q.    Okay.  Let's go to the next picture, 485-9.

16         And is -- what injury are you documenting here?

17   A.    That is 12 zoomed in.

18         MR. BOCCATO:  And can you zoom in on this?

19         (Whispered discussion, off the record, 2:34 p.m.)

20   BY MR. BOCCATO

21   Q.    And did AV-1 indicate any pain associated with this

22   injury?

23   A.    She rated that three out of ten.

24   Q.    And I think you noted:  Were all those scratches kind of

25   in a straight parallel line?

1  A.   They were.

2  Q.   Let's move to 485-10.

3       All right.  What injury were you documenting here?

4  A.   Injury 13, right-hand knuckles, digits two through five

5  with one centimeter lacerations.

6  Q.   And, real quick, what is a laceration?

7  A.   I documented that as a laceration because, as you can see,

8  there's tissue missing and the edges are not nicely touching,

9  where a scrape or a cut would have a clean edge.

10  Q.   All right.  Let's go to 485-11.

11       MR. BOCCATO:  All right.  And, David, could you zoom

12  in a little bit on that?

13  BY MR. BOCCATO

14  Q.   All right.  Is that the same injury we just talked about?

15  A.   Yes, it is.

16  Q.   Did AV-1 indicate any pain associated with that injury?

17  A.   Yes, she did.  This was one of her more painful injuries.

18  This was a seven-out-of-ten pain.

19  Q.   Thank you.

20       Let's go to the next photo.

21       MR. BOCCATO:  Can you zoom in on the fingernails?

22  BY MR. BOCCATO

23  Q.   What injury, Ms. Walton, were you documenting here?

24  A.   This was not per se an injury, but I wanted to photo

25  document she had torn all of her acrylic nails.  And she said

1  at times she had to bite them off in order to claw out of room

2  that she was in, out of the doorway.  And you can see how

3  they're jagged and cut.  They were long nails prior.

4  Q.   Did she note any pain on her nails?

5  A.   No pain.

6  Q.   Let's go to the next.

7        That was 485-12.  We're on to 485-13.

8        What injury were you documenting here?

9  A.   This was injury 15.

10 Q.   What did you note regarding injury 15?

11 A.   At the base of fourth and fifth digit on the right hand,

12 one centimeter abrasions.

13 Q.   And what's, you know, just an abrasion?

14 A.   That's similar to a laceration.  These ones weren't quite

15 as deep, and you can see the edges a little bit better on

16 those.

17 Q.   And did AV-1 indicate any pain regarding that injury?

18 A.   No pain.

19 Q.   We'll go to 485-14.

20        What injury were you documenting in this photograph,

21 Ms. Walton?

22 A.   That's number 17, multiple small abrasions,

23 .5 centimeters, with redness and swelling.

24        MR. BOCCATO:  And, David, could you zoom up on this?

25        Thank you.

1   BY MR. BOCCATO

2   Q.   Did AV-1 indicate any pain associated with this injury?

3   A.   She did.  She rated that a three out of ten.  And I

4   remember, as we were documenting this injury, she was saying

5   how the handcuffs had done that to her.

6          MR. BOCCATO:  David, could you go to 485-15?

7   BY MR. BOCCATO

8   Q.   What injury were you documenting here, Ms. Walton?

9   A.   18.  That is a contusion to the right upper arm.  It was

10  quite large, eight centimeters.

11         MR. BOCCATO:  And I think we have a zoomed-up picture

12  next, if we could go to 485-16.

13         And could you zoom in on that photograph?

14  BY MR. BOCCATO

15  Q.   Did AV-1 indicate any pain associated with this injury?

16  A.   Yes.  This was also one of her more painful injuries,

17  seven-out-of-ten pain.

18  Q.   Next one.

19         What did you document here?

20  A.   That is number 20.  Knuckles two through four on the left

21  hand with cuts, 0.5 centimeters.

22  Q.   So this is just her other hand?

23  A.   Correct.

24  Q.   Did AV-1 indicate any pain associated with this injury?

25  A.   She rated it two out of ten.

1    Q.    Thank you.

2          So, in addition to taking the photographs and doing

3    the head-to-toe exam, did you also collect DNA evidence?

4    A.    Yes, I did.

5    Q.    And did you collect that from AV-1?

6    A.    Yes, I did.

7    Q.    And which DNA evidence did you collect?

8    A.    If I can refer to my report -- it's standard to do hair

9    strands, oral swabs, external labial, internal vaginal and

10   cervical swabs, rectal swabs.  And I believe I did bilateral

11   neck and bilateral breast, but I'd like to confirm.

12   Q.    Feel free.

13          (Pause in proceedings, 2:41 p.m. - 2:42 p.m.)

14          THE WITNESS:  It says head hair, oral swabs, external

15   genitalia, vaginal and cervical, anal.  And I performed a crime

16   light visual of her entire body to see if there was any

17   fluoresce of bodily fluids.

18   BY MR. BOCCATO

19   Q.    After you collected that DNA evidence, what did you do

20   with it?

21   A.    I sealed it per protocol and hand-delivered it to law

22   enforcement.

23   Q.    In addition to your examination -- and I just -- did you

24   also provide her with any medications or any treatment?

25   A.    Yes, I did.

1  Q.   What medications did you provide her with?

2  A.   I gave her three antibiotics for sexually transmitted

3  infection prophylaxes.  Do you want me to list those?

4  Q.   Yes, please.

5  A.   I gave her azithromycin, one gram; Rocephin, 500

6  milligrams; and Flagyl, two grams.  I also gave her a Plan B,

7  per her request.  And she wanted to have HIV prophylaxis

8  medication.

9  Q.   With that HIV prophylaxis medication, are there any side

10  effects?

11  A.   Yes, there are.

12  Q.   What are those side effects?

13  A.   It's an intense antiviral.  It makes people very sick --

14  headache, nausea, vomiting -- for a 28-day course.  We provided

15  her with the full course to take home.

16  Q.   Thank you.

17  A.   Yes.

18  Q.   So we didn't go into detail; but earlier in your

19  examination, is there a period of time where you interview or

20  speak with the -- the individual being examined?

21  A.   Yes.

22  Q.   And do you document what they say and what they told you?

23  A.   Yes, I do.

24  Q.   Okay.  Did you document quite a bit of -- I think -- how

25  many -- I hate to ask you this on the spot, but did you take

1    multiple pages of notes regarding AV-1's statement to you?

2    A.    I believe I handwrote five full pages of narrative.

3    Q.    So based on your training and experience, are you able to

4    say whether the injuries AV-1 described to you were consistent

5    with the injuries you observed?

6    A.    They were consistent.

7            MR. BOCCATO:  Thank you.

8            THE COURT:  All right.  Cross-examination.

9            MS. POTTER:  Thank you, Your Honor.

10                    CROSS-EXAMINATION

11   BY MS. POTTER

12   Q.    Good afternoon.  My name's Amy Potter.  I just have a

13   couple of questions for you.  So, just to clarify, your job is

14   you're a SANE forensic nurse examiner, correct?

15   A.    That is one of my jobs, yes.

16   Q.    And you do not do a criminal investigation?

17   A.    Correct.

18   Q.    Okay.  And so Mr. Boccato just mentioned that you

19   interviewed the victim, AV-1, prior to or during the exam; is

20   that correct?

21   A.    Correct.

22   Q.    And so when you talk about remembering the exam, that

23   includes what she told you happened, correct?

24   A.    Yes.

25   Q.    But you don't do any investigation into what she told you

1  happened?

2  A.    No, I don't.

3  Q.    So you didn't go to the scene?

4  A.    Nope.

5  Q.    You didn't examine the door?

6  A.    No, I did not.

7  Q.    Okay.  And with those cuts specifically, you can't tell by

8  viewing a cut exactly how someone obtained it, can you?

9  A.    No.

10  Q.    Okay.  Going to the pain scale, you're -- you're also a

11  nurse in your regular job?

12  A.    Yes.

13  Q.    The pain scale is not just for these exams, is it?

14  A.    No.

15  Q.    And in your training and experience, as a nurse in

16  general, do people have very different pain thresholds?

17  A.    It's very subjective, yes.

18  Q.    Okay.  I asked you about injuries.  In terms of bruises,

19  you don't know how a bruise was obtained when you saw it, do

20  you?

21  A.    No.

22  Q.    And you don't know when it was obtained?

23  A.    No.

24  Q.    Okay.  You conduct the sexual exam, the DNA portion of the

25  exam, based on the statements that are given to you by the

1    victim, correct?

2    A.    It can be guided by the -- the statements, but the exam

3    itself is pretty standardized.

4    Q.    But it's because they reported an assault?

5    A.    Correct.

6    Q.    Okay.  Thanks.  It was a poor question on my part.  I

7    agree.

8              But you can't tell, from doing that, whether someone

9    had consensual sex or not --

10   A.    Correct.

11   Q.    -- correct?

12             And you can't tell when?

13   A.    Correct.

14   Q.    And you can't tell where?

15   A.    Correct.

16   Q.    Okay.  We talked about some medications.  Is that pretty

17   standard to offer to any victim of a -- or of someone who

18   reports to be a victim of a sexual assault?

19   A.    The antibiotics, yes.  The -- the Plan B is offered.  And

20   the HIV prophylaxis, we do have a screening tool to try to

21   identify who may be high risk.  Personally I always leave it up

22   to the victim to determine if they want that medication or not.

23   I just help to try to guide them by the risk assessment.

24   Q.    And -- okay.  Just one second.

25             (Whispered discussion, off the record, 2:47 p.m.)

1          MS. POTTER:  We have nothing further for this

2   witness, Your Honor.

3          THE COURT:  All right.  Mr. Boccato, any redirect?

4          MR. BOCCATO:  No redirect, Your Honor.

5          THE COURT:  All right.  Thank you very much.  We

6   appreciate your time.

7          THE WITNESS:  Thank you.

8          THE COURT:  You are free to go.

9          And our next witness.

10         MR. SWEET:  Thank you, Your Honor.  The United States

11  calls Officer Austin Gilmore.

12         THE COURT:  Folks, my plan is to break around 3:15.

13  But if anybody needs a break sooner, please do not hesitate to

14  raise your hand.

15         Mr. Gilmore, if you'd like to step up to the stand to

16  my right.

17         If you'll remain standing for just a moment.  Raise

18  your right hand.

19                        ***AUSTIN GILMORE***

20  Was thereupon called as a witness on behalf of the

21  Government; and, having been first duly sworn, was examined

22  and testified as follows:

23         THE COURT:  If you'd have a seat.

24         And if you could please state both your first and

25  last name, spelling both for our court reporter.

1      THE WITNESS:  Yep.  My name is Austin Gilmore,

2  A-u-s-t-i-n, and then G-i-l-m-o-r-e.

3      THE COURT:  All right.  Thank you.

4              DIRECT EXAMINATION

5  BY MR. SWEET

6  Q.  Officer Gilmore, how are you employed, please.

7  A.  I'm employed with Klamath Falls Police Department.

8  Q.  Were you one of the first Klamath Falls police officers to

9  respond to the hospital and talk to AV-1?

10 A.  That's correct.

11 Q.  And did you interview her at least briefly there?

12 A.  I did.

13 Q.  Did you document her injuries?

14 A.  I did.

15 Q.  Did you accompany her to try and locate the residence?

16 A.  I did.

17 Q.  Let's back up, and let's start then -- just briefly, could

18 you tell the jury your background, please.

19 A.  Yep.  So I have been employed with Klamath Falls Police

20 Department since 2021.  I was a reserve officer there for about

21 two years until I got hired on full-time at the beginning of

22 2023.

23 Q.  And were you on duty on July -- well, actually, one

24 question.  What is your -- what is your current assignment now?

25 A.  I'm in the patrol division.

1  Q.   In July of 2023, patrol as well?

2  A.   Correct.

3  Q.   Were you on duty on July 15th, 2023?

4  A.   I was.

5  Q.   Was that a Saturday?

6  A.   It was.

7  Q.   So could you tell the jury how you became involved with

8  this case, please.

9  A.   Yep.  So I became involved when my sergeant notified me

10 that there was a report of an incident at Sky Lakes Medical

11 Center.

12 Q.   And who is your sergeant, please.

13 A.   Sergeant Trahern Fox.

14 Q.   And what were you asked to do?

15 A.   I was asked to go up there and interview AV-1.

16 Q.   And did you respond to the hospital?

17 A.   I did.

18 Q.   When you got there, did you -- did you talk to any other

19 law enforcement that was there?

20 A.   Yes.  I spoke with Sergeant DuVal of the Klamath County

21 Sheriff's Office initially, before going into the hospital

22 room.

23 Q.   And did she kind of give you a summary of what --

24 basically a summary of what she had learned?

25 A.   Yes.

1  Q.   And was that essentially kidnap, rape, imprisonment and

2  escape?

3  A.   That's correct.

4  Q.   All right.  So what did you focus on doing?

5  A.   My main focus initially was to try to locate the residence

6  in question.

7  Q.   And what was your thought about that?

8  A.   It was a little difficult at first because AV-1 had not

9  been to the Klamath Falls area, and the other person that

10  picked her up in the middle of the street was also not from the

11  Klamath Falls area.  So it was kind of hard to try to narrow

12  down where this incident occurred at that residence.

13  Q.   And how did you go about that?

14  A.   Initially, started to figure out different ways to try to

15  locate the residence with the statements she provided, that she

16  ran out onto a flat street, there was a school around her.  And

17  then kind of started talking about the description of the

18  residence in question, with a newly built fence that comes kind

19  of all the way out to the sidewalk and encloses the entire

20  rocked front yard.  And then I had her draw a picture of it.

21  Q.   And did you -- let's talk about her injuries.  Did you

22  document -- did you document some of her injuries?

23  A.   I did, with my department-issued cell phone.

24       MR. SWEET:  I'd like to pull up -- the jurors have

25  already seen some of these, so I'm not going to go through all

1 of them.  But I'd like to pull up 16-2, please.

2          And, actually -- yeah, that's good.  Can you leave

3 that up?  Thanks.

4 BY MR. SWEET

5 Q.   What -- so you're photographing her injuries.  You're

6 trying to get a description of the residence.  Did you also

7 talk to her, AV-1, about what had happened?

8 A.   I did.

9 Q.   So -- and did what she tell you kind of shape what you

10 were photographing and -- and your follow-up investigation?

11 A.   It did.

12 Q.   All right.  Could you summarize essentially what AV-1 told

13 you?

14 A.   In summary, she advised she was picked up from Aurora,

15 Washington, in Seattle; put in handcuffs; brought down to

16 Klamath Falls; and put into a so-called dungeon, a chamber; and

17 then that she -- there was, like, a wire mesh door that she

18 broke out of.  And that was kind of consistent with her

19 injuries on her hands.

20 Q.   So were you looking for injuries consistent with being in

21 handcuffs or leg irons for an extended period of time?

22 A.   Yep.

23 Q.   Did she describe biting off her nails to you?

24 A.   I don't recall that, no.

25 Q.   So let's take a look at 16-2.

1          MR. SWEET:  And could you zoom in on the wrists,

2     please.

3     BY MR. SWEET

4     Q.   As -- as -- and let's go to 16-8 as well.

5          As you're looking at her injuries, did you see

6     abrasion -- sorry, 16-8 as well.  Thank you.

7          As you're looking at her injuries, did you see marks

8     on her wrists consistent with abrasions or potentially an

9     extended period in handcuffs?

10    A.   I did.

11    Q.   And do you know approximately what time you were at the

12    hospital?

13    A.   I believe approximately 1:40-ish, around that time.

14    Q.   What about her -- so we talked about her wrists.  Did you

15    photograph her ankles and feet as well?

16    A.   I did.

17    Q.   Okay.  Let's look at 16-11, please.

18          MR. SWEET:  And could you zoom in on the ankles and

19    feet?

20    BY MR. SWEET

21    Q.   And so is -- let me just ask you this.  Do you photograph

22    a lot of injuries?

23    A.   I do.

24    Q.   Do injuries appear the same in person as they do in

25    photographs?

1   A.   Not always, no.

2   Q.   Does lighting affect them?

3   A.   It does.

4   Q.   Okay.  What about for, like, red marks and bruises:  With

5   a bright light, do sometimes those get washed out?

6   A.   Yes, it does.

7   Q.   Let's go to 16-12.

8           Did you notice -- and right ankle.

9           Did you notice bruising or swelling on her ankles?

10  A.   I did.

11  Q.   I'm going to show you 17-3 and ask you -- so what other

12  law enforcement officer were you with?

13  A.   Officer Anthony Trippet.

14  Q.   What are we looking at here?

15  A.   That is a picture of me taking a photograph of AV-1.

16  Q.   Essentially that was captured from Officer Trippet's body

17  camera?

18  A.   Correct.

19  Q.   So she described to you what happened.  Did she give you a

20  description of the man?

21  A.   Yes, she did.

22  Q.   And what was that description?

23  A.   The description was approximately a 5'6" to 5'7"

24  light-skinned male with curly dark hair, kind of a receding

25  hair line, had freckles on his face.  And she gave me the

1  quote, "He looked young and old at the same time."

2  Q.   And was she saying a light-skinned African American male?

3  A.   That's correct.

4  Q.   So you have a description now.  You've talked to her about

5  her injuries.  Was Sergeant Fox able to provide a little more

6  information on potential locations for the residence?

7  A.   At this given time?

8  Q.   Sometime before you get to the house.

9  A.   I -- unknown.

10 Q.   You don't recall?

11 A.   I don't recall, no.

12 Q.   And I'm sorry.  Did you say -- I couldn't hear if you

13 said, "I don't know," or --

14 A.   I don't recall.  Sorry.

15 Q.   Okay.  So did you ask AV-1 if she'd be willing to go try

16 and find the residence?

17 A.   Yes, I did.

18 Q.   And was she?

19 A.   She did.

20 Q.   Who went, please.

21 A.   I went, Officer Trippet went, and AV-1 went.

22 Q.   Was anybody else either there when you got there or did

23 anybody else show up from KFPD?

24 A.   Yes.  Detective Joel Loudermilk was there, as well as

25 Student Resource Officer Tyler Young.

1    Q.   And did Sergeant Fox show up at some point?

2    A.   He did.

3    Q.   Let's take a look at 18-2, please.

4         What are we looking at here?

5    A.   So this is a picture -- or a snapshot from my body-worn

6    camera footage.  Officer Trippet will be the officer standing

7    next to AV-1.  And then over to my left, that is Detective

8    Loudermilk.

9    Q.   All right.  Holding the camera in his hand?

10   A.   Correct.

11   Q.   And what residence are you at here, please.

12   A.   That would be 1336 North Eldorado Avenue -- Boulevard.

13   Correction.

14   Q.   I'm sorry.  Could you say that again?

15   A.   1336 North Eldorado.

16   Q.   So just for -- just so we all know where we're talking

17   about, I'd like to just go to a map.

18        MR. SWEET:  Let's pull up -- let's pull up 23-2,

19   please.

20   BY MR. SWEET

21   Q.   So what is this a map of?

22   A.   That would be a map of Klamath Falls.

23   Q.   And is the red dot -- sort of the top center left, is that

24   the area of 1336 Eldorado?

25   A.   Yes.

1           MR. SWEET:  Let's go to 24, please.

2    BY MR. SWEET

3    Q.    And what does the red dot here show?

4    A.    That shows the 1336 North Eldorado.

5    Q.    And what is the sort of park or open area behind the

6    residence?

7    A.    That is a -- that's just a park, a local park nearby.

8    Q.    Just in terms of the street, I'd like to show you 25-1,

9    please.

10          What does 25-1 show?

11   A.    That is Del Moro Street and North Eldorado Avenue.

12   Q.    So we're looking --

13   A.    It'd be north.

14   Q.    Okay.  Looking north down Eldorado Street?

15   A.    Mm-hmm.

16          MR. SWEET:  And 28-1, please.

17   BY MR. SWEET

18   Q.    And what is this here?

19   A.    That is the front of the residence.

20   Q.    And 28-3, what is that, please.

21   A.    That is a picture of the two single-car garages.

22   Q.    And, just for perspective, I'd like to pull up --

23          (Whispered discussion, off the record, 3:00 p.m.)

24          MR. SWEET:  27, please.  Let's do the first part of

25   27.

1  BY MR. SWEET

2  Q.   Could you tell us what this depicts?

3  A.   So this depicts the entire residence in whole.  You have

4  that front fence that kind of incases the front of the

5  property.  And then this would be the backyard of the property.

6        MR. SWEET:  And that's good.  Thank you.

7        You can take that down.  Thank you.

8  BY MR. SWEET

9  Q.   So, Officer Gilmore, after -- let me back up.  Did AV-1

10 identify 1336 North Eldorado as the residence she escaped from?

11 A.   She did.

12 Q.   So what did -- what did you do next?

13 A.   At that point Officer Trippet and I did scene security and

14 locked down the residence to make sure nobody went in and out

15 of it.  And we switched off from time to time:  One of us was

16 in the front; and one of us was in that back alleyway, which

17 you saw in that exhibit from earlier.

18 Q.   So one of you was in the front of the residence; one of

19 you was in the back?

20 A.   Correct.

21 Q.   And what time -- what time did you start doing scene

22 security?

23 A.   I believe at approximately 2:59 p.m.

24 Q.   And do you know what time you actually first arrived at

25 1336?

1  A.   I don't recall the exact time.

2  Q.   So what -- what about AV-1?  So once she identifies the

3  house, what was done regarding AV-1?

4  A.   AV-1 was transported to the Klamath Falls City Police

5  Department.

6  Q.   And was that to talk with another officer?

7  A.   I believe so, a detective.

8  Q.   So after -- did detectives essentially take over this

9  investigation?

10  A.   At that point, yes.

11  Q.   Did you have -- as you're talking to AV-1 and as you're

12  out there with her at the residence, how would you describe her

13  attitude or her demeanor?

14  A.   Very calm.

15  Q.   Was she willing to provide you information?  Was she

16  interested in providing you information?

17  A.   Yes, she was.

18  Q.   Did you previously describe her as determined?

19  A.   I do, yep.

20  Q.   Or do you believe she was determined?

21  A.   I do.

22        MR. SWEET:  Thank you, Officer.  I have no further

23  questions.

24        THE COURT:  All right.  Any cross-examination?

25        MR. BERTHOLF:  A couple of questions.

<u>CROSS-EXAMINATION</u>

BY MR. BERTHOLF

Q.   It sounds like you just described AV-1's demeanor as being very calm?

A.   Mm-hmm.

Q.   And that she was willing to provide information?

A.   Correct.

Q.   And I think you said determined?

A.   (Witness nods head.)

Q.   When you asked her to help go look for the house, was she calm at that time?

A.   Yes.

Q.   Was she determined?

A.   Yes.

Q.   So she wasn't hesitant to go to the house?

A.   Not that I recall, no.

Q.   When you got to the house, was she still determined?

A.   I didn't speak with her once we got to the house.

Q.   But you were interacting with her.  We see you looking at her on the photograph that we just got from your body cam.

A.   Correct.  I was standing there, yes.

Q.   So was she still determined at that time?

A.   I believe so.

          MR. BERTHOLF:  Okay.  I think that's all.  Thank you.

          THE COURT:  Any redirect?

1    <u>REDIRECT EXAMINATION</u>

2    BY MR. SWEET

3    Q.   Officer Gilmore, when you first met AV-1, was she

4    frightened?

5    A.   Yes.

6    Q.   Injured?

7    A.   Yes.

8    Q.   Scared?

9    A.   Yes.

10           MR. SWEET:  Nothing further.

11           THE COURT:  All right.  Thank you, Officer.  You are

12   free to go.

13           Folks, let's go ahead and take our afternoon break.

14   We'll be in recess for about 15 minutes.  Then we'll start with

15   some more witnesses.  Thank you.

16           (Recess taken, 3:05 p.m. - 3:24 p.m.)

17           MR. LICHVARCIK:  The United States calls Sergeant

18   Chris Zupan.

19           THE COURT:  Zupan?

20           MR. LICHVARCIK:  Zupan, Z-u-p-a-n.

21           THE COURT:  Sergeant Zupan, come on up.  We are

22   waiting for one juror, so we're going to -- oh, there we are.

23   Thank you.

24           If you'd like to step up here, remain standing for

25   just a moment, I'll swear you in.  Raise your right hand.

1 ***CHRIS ZUPAN***

2 Was thereupon called as a witness on behalf of the

3 Government; and, having been first duly sworn, was examined

4 and testified as follows:

5         THE COURT:  If you'd have a seat.

6         If you could state your first and last name, spelling

7 both for our court reporter.

8         THE WITNESS:  My name's Chris Zupan, Z-u-p-a-n.

9                 DIRECT EXAMINATION

10 BY MR. LICHVARCIK

11 Q.  Sergeant Zupan, if you could please introduce yourself to

12 the jurors.  Tell them what position you hold and give them

13 some of your work experience.

14 A.  Yes.  So I'm a -- my name is Chris Zupan.  I'm a detective

15 sergeant with Klamath Falls Police Department.  I've been a

16 police officer for about 27 years, spent eight years with the

17 County Sheriff's Office in Klamath Falls prior to transitioning

18 over to the Police Department.

19         Spent about ten years of my career working narcotics.

20 During that time we were also part of the Major Crime Team,

21 investigating major crimes, such as robberies, homicides.

22 After transitioning to the Police Department, I've also been a

23 member of a gang unit, a street crimes unit.

24         And then promoted in 2009 to corporal, 2018 to

25 sergeant, spent about two years as a patrol sergeant, then

1  moved up to our Detective Division, where I run all our major

2  crimes.

3  Q.   And you may have mentioned it.  What did you do before

4  your law enforcement experience?

5  A.   I spent four years in the Marine Corps.

6  Q.   Now, back in July of 2023, what was your position?

7  A.   I was detective sergeant running our Criminal Division.

8  Q.   And can you kind of describe that position?

9  A.   Yeah.  I oversee our -- we have three detectives --

10 criminal detectives, two narcotics detectives.  The narcotics

11 team's ran by another sergeant, but I still oversee the

12 detectives from our agency.

13        And then I oversee the three detectives from Klamath

14 Falls Police Department, as well as two school resource

15 officers, who spend the summer as adjunct detectives.  My

16 main -- my main priority is assigning cases, assisting with

17 cases and overseeing cases.

18 Q.   So taking you back to July 15th, 2023, how did you become

19 involved in this case?

20 A.   Sometime in the early -- late morning, early afternoon, I

21 received a phone call.  I remember it was my wife's birthday,

22 so we were sitting on the -- out by the pool.  I received a

23 phone call from Trahern Fox, who was -- I think he was an

24 acting sergeant at the time, if not a patrol sergeant,

25 explaining a situation where they had a female at the hospital,

that had been picked up by a female, reporting that she had

been kidnapped out of Seattle, Washington, transported to

Klamath Falls, and held against her will inside of a homemade

cell.

Q.   So it was your day off?

A.   Yes, it was.

Q.   Does your team always call you on your day off?

A.   Yeah, frequently.

Q.   What'd you do after you got that call?

A.   Due to the severity of it, I called out the on-call

detective, which is -- at that time was Detective Joel

Loudermilk.

Q.   Okay.

A.   I asked him to go ahead and respond, get an overview of

what was going on, and give me a call back.

Q.   Then what?

A.   Shortly after, Detective Loudermilk called me back,

explained the circumstances, advised that they were able to

point out the location where this occurred.  Due to him

starting to be able to find some consistencies in what she was

saying to believe that this had occurred in Klamath, I called

out Tyler Young, who's one of our SROs, again, an adjunct

detective when he's not doing school resource stuff, to assist.

And I responded as well.

Q.   And where did you go?

1    A.   I responded initially to the scene, if I remember right.

2    Q.   And what was the scene?

3    A.   1336 Eldorado Avenue.

4         MR. LICHVARCIK:  Okay.  Pull up 513.

5    BY MR. LICHVARCIK

6    Q.   What was going on when you responded?  I'm showing you

7    513, by the way.  And I'll also put it on a board.

8         MR. LICHVARCIK:  Counsel.

9         MS. POTTER:  (Counsel nods head.)

10   BY MR. LICHVARCIK

11   Q.   All right.  What was going on at Eldorado when you

12   responded?

13   A.   Currently had officers on scene.  I asked two of them to

14   stay on scene to just confirm that nobody came or went from the

15   house.  I asked Joel Loudermilk, or Detective Loudermilk, to

16   proceed to the police department, assisted by Detective Brandon

17   Dougherty with the Oregon State Police, to start writing a

18   search warrant into the residence.

19   Q.   Okay.  What'd you do then?

20   A.   Ah --

21   Q.   Did you eventually respond and meet with the victim?

22   A.   I did.  I responded back to the police department after

23   situating stuff at the residence.

24   Q.   Okay.  And did you sit in on that interview?

25   A.   Most of it, yes, I did.

1  Q.   Okay.  Without going into any details, what were the main

2  points of what you heard?

3  A.   Like I said before, basically what I had learned from the

4  beginning, that a female by the name of AV-1 had been taken

5  from Seattle, Washington, transported to Klamath Falls, where

6  she was held against her will.

7  Q.   Did you learn in that interview about how she got out?

8  A.   Yes, I did.

9  Q.   How?

10  A.   She explained that there was two doors inside her --

11  holding her inside the cell.  One of them she described as a

12  security screen door with mesh on it.  She told us that she had

13  punched and punched and punched until it broke, and then busted

14  out the second door where she was able to squeeze through an

15  opening approximately this big (indicating).

16       After escaping the cell, there was still the vehicle

17  that she was transported in inside of the garage.  She said she

18  went into the vehicle -- never really gave us a reason to go in

19  the vehicle, but she said she went into the vehicle to look

20  for -- trying to -- and she noticed some of her property in

21  there, but then remembered that the gun that was used was in

22  there.

23       She located the gun inside of the car.  She stated

24  that she checked it, put the magazine back in and racked it.

25  No round came out of the chamber, but she put one into the

1   chamber.  She then exited the side door of the garage, which

2   led her into a courtyard.  She hopped the fence of the

3   courtyard, immediately ran into the street and flagged down the

4   first vehicle that she saw coming down the street, screaming

5   for help.

6   Q.   Did you see any injuries that day when you sat in on that

7   interview?

8   A.   Yes, I did.

9   Q.   And what were they?  Again, not -- you don't -- no need to

10  get specific, but what --

11  A.   She had some pretty extensive scrapes to her -- all --

12  both her knuckles, on her inner fingers, as well as the

13  knuckles up top, where the skin was peeled back.  There was

14  dried blood on almost all eight knuckles.

15  Q.   And was that consistent with what -- the story that she

16  was telling?

17  A.   Yes, it was.

18  Q.   Did you end up hearing something about a Love's gas

19  station that day?

20  A.   Yes, I did.

21  Q.   What was it?

22  A.   During the interview with AV-1, she stated, prior to

23  ending up at the house, they had stopped at a Love's gas

24  station.  And while there -- while in route there, Mr. Zuberi

25  placed a -- asked her to put a sweatshirt on backwards, where

1  he put the hood over -- she put the hood on over her face

2  backwards, so she couldn't see where she was at.

3          He asked her to lay down in the back of the vehicle.

4  So with that information -- we were still trying to confirm

5  everything that she was saying -- I responded up to Love's

6  truck stop, where I met with the manager and asked if I could

7  look at the surveillance from that morning.

8  Q.   And, looking at 513, do you see -- and you can mark on

9  your screen.  If you could draw a small circle around 1336

10 Eldorado.

11 A.   (Witness complied.)

12 Q.   And then if you could draw another circle under the Love's

13 that you responded to.

14 A.   (Witness complied.)

15 Q.   So how far away is that about from Eldorado?

16 A.   Distance-wise, maybe two miles.  Time-wise, yeah, a couple

17 minutes.

18 Q.   Okay.  And were you eventually able to find some

19 surveillance footage?

20 A.   That morning, I was not.  Our timeline was a little off.

21 And I started looking at the video from just shortly before

22 8:00, 8:00 a.m., to about 10:00 a.m. and was unable to find it

23 at that time.

24 Q.   And that was 8:00 a.m. for the morning that you were

25 actually at Love's, so July 15th?

1  A.   That day, yes.

2  Q.   Okay.  And why were you zeroing in on the morning?

3  A.   Just based on her timeline, on what time they left

4  Seattle, and that it was light when they got to Klamath Falls.

5  Q.   And what was it you were looking for when you were looking

6  through the surveillance video?

7  A.   Looking for some type of a gray SUV that she described

8  coming through the parking lot.

9  Q.   Did you eventually find something?

10  A.   Yes, I did.

11  Q.   Okay.  Can you describe it?

12  A.   Yes.  I witnessed a gray Honda Pilot driving from

13  Highway 97 onto the road that leads to OIT and then turning

14  into the Love's.  I lost sight of it as it's coming into the

15  Love's, due to where the camera was on the front of the

16  building.  And then I can see it coming from the north into the

17  parking lot, driving around the gas pumps, and then proceeding

18  in front of the front doors before I lose sight of it again.

19  Q.   Okay.  We're going to play 261-2, a portion starting

20  around 30 seconds, if you can look at your screen.

21       (Video recording played in open court, 3:34 p.m.)

22  BY MR. LICHVARCIK

23  Q.   And you can tell us what we're seeing here.

24  A.   So if you look to the top right of the overhang to the --

25  oh, there's the vehicle coming through already.  It came from

the right.  It's traveling around the pumps.  It proceeds to

make a left turn and then continue in front of the store to the

right, where I lose view of it.

Q.   And then what time was that at?

A.   I believe it was at 6:59.

Q.   A.m., the morning of?

A.   Yes.

Q.   On July 15th?

A.   Yes, sir.

Q.   Okay.  I'll play a portion of 261-1, starting at 20

seconds.

A.   So this is the same time, 6:59.  It proceeds in front of

the store, just from a different camera view, from inside of

the store instead of the one on the outside.

Q.   It's quick.  We'll play it one more time, starting at 20

seconds.  So we'll see it through the inside of the store, and

we'll see a vehicle pass by outside; is that right?

A.   Yes, sir.  And that's the vehicle.

Q.   Okay.  And that was approximately at the time that AV-1

said she was where in the Honda Pilot?

A.   In the back seat.

Q.   Okay.  Hands and legs free at that point, according to

her?

A.   I don't believe so.  I believe she was still -- stated

that she had shackles on her ankles, as well as handcuffs on

1 her hands.

2 Q.   All right.  And eventually then you went to the house at

3 1336?

4 A.   Yes, I did.

5 Q.   All right.  Can you kind of describe the scene and some of

6 the things that you saw happening there?

7 A.   Yeah.  We had two officers, one sitting on the front of

8 the house, one sitting on the back of the house, just to

9 confirm that nobody was going to come or go from the residence.

10 I grabbed a couple energy drinks, I think, from Pilot 'cause I

11 knew they'd been out there a little while, and proceeded there

12 where I could give them something to drink, check on them, make

13 sure things were good.

14      While I was there, we engaged in some casual

15 conversation.  And a vehicle pulls into the driveway.  That

16 vehicle was a longer-haired male, which we believed would

17 probably be one of the roommates, which turned out to be.  At

18 the same time we were in the driveway talking to him, or

19 getting him out of the vehicle, so one of the officers could

20 interview him, I recognized a dark-complected female drive by,

21 slow down in front of the residence.

22      It looked like she was beginning to turn into the

23 residence.  And I just flagged her over and asked her if she

24 lived there.  She told me that she did.  I asked her if she'd

25 be willing to come over -- pull in the driveway and talk to me.

1    Q.    If I can just stop you and -- and just ask you to do what

2    I need to do a lot, and that's slow down sometimes, you as

3    well, 'cause the court reporter is taking notes.

4              You mentioned that you saw a dark-complected female

5    there?

6    A.    Yes.

7    Q.    Did you -- who was -- who did that end up being?

8    A.    It ended up being Alycia Westfall Zuberi.

9    Q.    Okay.  All right.  I'm showing you 488.  Do you recognize

10   that?

11   A.    Yes.  That's her on that day.

12   Q.    Okay.  Did you end up talking to her that day outside?

13   A.    Yes, I did.

14   Q.    Okay.  How long, and can you describe how that went?

15   A.    I probably talked to her for five to ten -- five minutes,

16   ten minutes.  I asked her to step out and chat with me.  She

17   stepped out of the vehicle.  She asked me what was going on.  I

18   explained to her that we just had some questions about what

19   was -- an incident that occurred at the house.  She kind of was

20   asking me questions back, trying to figure out what I knew.

21   Q.    Let me ask again to just slow down just a touch.

22   A.    I asked her who all lived at the residence.  She told me a

23   lot of people lived there, gave me a couple names of some

24   people, including a, quote, "fat guy."  I asked her if she was

25   familiar with a dark-complected male.  She told me maybe, she

1   might know him.

2          At this point I already knew from prior calls, prior

3   contacts that our officers had dug up, that we were potentially

4   looking for an individual by the name of Sakima Zuberi.  When I

5   initially asked her her name, she told me it was "Alycia Zuber"

6   and then stopped -- correction, "Alycia West" and then stopped

7   and said her last name was Zuberi.  So I had reason to believe

8   at that point that it was his girlfriend or wife.

9          I asked her about that individual.  She told me she

10  didn't really know him, that it was a rental situation.  She

11  just rented a room there with her two kids.  I began asking her

12  about access to the house.  I got a lot of "I don't knows, I

13  just don't know" from her.  And then when I questioned about

14  the male, Mr. Zuberi, she stated that she hadn't seen him in a

15  couple days.

16  Q.   So you ended up basically stopping that interview?

17  A.   Yes, I did.

18  Q.   And why was that?

19  A.   Because the questions I was asking her were -- very

20  clearly she was not giving me information about what she knew.

21  She was denying knowing Mr. Zuberi.  There was a lot of

22  information she was not divulging, and basically trying to

23  divert my questions and not be honest with me.  Through years

24  of doing this, at some point I could interview her for three

25  hours, and I'd probably be at the same place I was.  So I just

1    chose to stop talking to her at that point.

2    Q.   Okay.  And then what did -- did Detective Loudermilk then

3    work on a search warrant?

4    A.   Yes, he did.

5    Q.   He eventually got it?

6    A.   Yes, he did.

7    Q.   Was it that night, July 15th, or the next?

8    A.   I believe it was early the next morning.

9    Q.   Okay.  So July 16th?

10   A.   Yes.

11   Q.   Tell us a little bit about that.  How many people went out

12   for the search warrant?

13   A.   I can't remember the exact count.  I would estimate

14   probably ten -- ten of us that morning.  Some of us in plain

15   clothes, some of us in uniform.

16   Q.   What were you looking for?

17   A.   Evidence that -- that AV-1 had described, such as

18   handcuffs, shackles, her clothing, two different Tasers, one

19   that she had stated she had in her purse, as well as one that

20   she stated Mr. Zuberi had.  She mentioned capsicum in her

21   purse, her purse in general, a rag that she described after

22   they had sexual intercourse that he handed her from the front

23   to clean herself up with.

24   Q.   Any kind of devices with antennas on them?

25   A.   She described a device that she thought was a cell

phone -- or described as a cell phone jammer, a small box with
several antennas coming off of it.

Q.   Okay.  I'm going to play for you a portion and may stop
it.  This is Exhibit 92-1 of the search warrant.

          (Video recording played in open court, 3:42 p.m.)

BY MR. LICHVARCIK

Q.   Who's that right there opening the gate?

A.   This is us entering the enclosed front patio through the
gate.

Q.   And what's standard practice before executing a search
warrant?

A.   So knock and announce.  You'll hear us knock, try to give
at least 15 to 20 seconds --

Q.   Sorry.  That's my fault.  I've actually been asking
questions while the dog's barking, which I think is going to
get me in a lot of trouble.

          So, sorry, we'll stop it before I ask any questions.
And there won't be audio playing after this.

          So what's standard procedure when you execute a
search warrant?

A.   Standard procedure is we want to allow -- case law states
that we allow a homeowner a reasonable amount of time to get to
the front door, to answer the door.  Given that it was 1 or
2 o'clock in the morning at that point in time, you would
assume that somebody was sleeping.  So we're going to allow 15

1    to 20 seconds for somebody to be able to get out bed, hear us

2    knocking on the door, and answer that front door prior to

3    making entry on our -- on our own.

4    Q.   Okay.  Thank you.  We'll let the video play for a few more

5    seconds.

6              MR. LICHVARCIK:  Go ahead.

7              (Video recording played in open court, 3:43 p.m.)

8    BY MR. LICHVARCIK

9    Q.   Okay.  The unmistakable sound of the dog barking, can you

10   describe that?  What was going on?  Where was the dog?

11   A.   I think at that point the dog was still in a dog crate

12   right next to the front door.  At some point during this event,

13   we were able to coax him kind of into a little fenced area.

14   But I believe, at that point in time, he was still in the crate

15   at the front door.

16             We were just stacked up at the front of the residence

17   with the -- whoever we determined to be first in through that

18   front door and who was going to breach, if we needed to, if it

19   was locked, stacked at the front of the residence, while other

20   individuals were covering the kitchen window, the window to the

21   garage and the window into, I believe, the side door entrance

22   into the kitchen.

23   Q.   Okay.  But the dog was in the crate?

24   A.   Yes.

25   Q.   And then you all eventually let it out?

1    A.    Yes.

2    Q.    All right.  Did you have any problems with the dog?

3    A.    Ultimately, no.  I mean, we thought it was going to be

4    mean.  We didn't want to leave it in the crate because it was

5    hot, and it needed water and food.  So we basically pulled it,

6    ran out the gate, shut the gate real quick.  And it ran around.

7    And then we coaxed it into a side area with some treats and

8    food, and threw some pallets up to put it in there, and got it

9    some water and food.

10   Q.    What kind of dog was it?

11   A.    A pit bull mix.

12   Q.    Okay.  So where we stopped the video here, the lights look

13   to be on inside.  Is that -- is that how it was when you --

14   A.    Yes, it was.

15   Q.    Okay.  Was anyone home?

16   A.    Nobody was at the residence when we went in, no.

17   Q.    Okay.  All right.  So the first things that you all did --

18   I think you touched on it -- were clear the house for people,

19   right?

20   A.    Correct.

21   Q.    Okay.  I'll play a short clip here.  And this should be no

22   sound, so you should be able to narrate over this.  What are we

23   seeing here?

24   A.    So what you're seeing is myself, A.J. -- Officer Davila

25   and Officer Young enter the kitchen, checking the office area,

1  just to confirm that there's nobody inside.  Other members --

2  or other officers are working on the rest of the house:

3  Bedrooms, living room and the downstairs portion of the house.

4  Q.   Okay.  And, ultimately, what did you do after you cleared

5  the house?

6  A.   Got everybody out of the house, and then we moved to the

7  locked garage door.

8  Q.   Okay.  And were you there -- now, this body camera is not

9  yours, right?

10  A.   Correct.

11  Q.   Do you know whose it?

12  A.   Yeah.  That's Trooper Dougherty or Detective Dougherty

13  from the Oregon State Police.

14  Q.   Okay.  But you were out there during the entirety of the

15  search?

16  A.   Yes, I was.

17  Q.   Okay.  What were your first impressions when you entered

18  the garage?

19  A.   Well, when we opened the garage door, I was first or

20  second in.  I could see a brick structure built inside the

21  garage.  And I was taken aback a little bit.  You know, you --

22  I sat in an interview with her, listened to her tell what

23  happened.  And then, I guess, walking into that garage was kind

24  of a reality check to me, to see something like that.  I -- as

25  much as I was expecting it, I can say that I wasn't really

1  expecting it.  And so it just took me aback to see that, and it

2  was a little creepy.

3  Q.  And why do you say you weren't expecting to see something

4  like that?

5  A.  It just -- my visual of what it was -- I had never seen

6  anything like it before, I mean, other than pictures, movies.

7  I guess I pictured kind of a janky little cell that somebody

8  was in.  I didn't think it was as elaborate as it was.

9  Q.  And I'm showing on the board here -- this is a -- this is

10  marked as 505-1.  And what it is, is a compilation of

11  Government's Exhibits 34, 38-1 and 42.

12        Looking at the top of that, is that the structure

13  you're describing that you first saw when you entered?

14  A.  Yes, it is.

15  Q.  Can you talk to us a little bit about what the temperature

16  was like when you entered the garage?

17  A.  It was overwhelmingly hot.  Mid-July in Klamath Falls is

18  generally nineties, but probably even more so.  Because we did

19  the search warrant in the middle of the night, it had cooled

20  down a little bit outside.  But I remember walking into the

21  garage and feeling how hot it was in there compared to outside.

22  Q.  Okay.  We're going to continue playing 92-1 at 9:09.  And

23  there's no volume here, so you can narrate what we're seeing.

24  A.  So that's me looking at the structure.  The doors to it,

25  the interior security screen door.

1    Q.    Okay.

2    A.    I'm seeing the bottles of water, the fan, things that she

3    had described in the interview being inside of that cell.

4    Q.    And what are we seeing on the walls there?

5    A.    That would be just Styrofoam.

6    Q.    And what stood out again?  You touched on, I think, the

7    chair and the water bottle.  What else stood out in there?

8    A.    The fan on the floor, the two water bottles and the chair.

9    Q.    And why did those stand out?

10   A.    Because she mentioned those items when she was giving her

11   interview.

12   Q.    Okay.  Now, can you describe the two doors?

13   A.    Yes.  So the initial door on the outside was a wooden core

14   door with a plexiglass window in it, which had been covered

15   with film.  If I recall, it had foam on it.  And then the

16   interior was a security screen door that you would see standard

17   at -- on the outside of a house for the interior door.

18          The interesting part about it was that the security

19   door was on the inside and it swung inward, which would make it

20   nearly impossible to kick it outward.  I also noticed there was

21   no door handles on the security screen door.  It was simply

22   just a deadbolt lock with a key mechanism on it.

23   Q.    All right.  And drawing your attention to 38-1, on the

24   lower right of that, which door is that?

25   A.    The security screen door is the lower right.

1   Q.   The black one?

2   A.   Black door, yes.

3   Q.   How many door handles on that one?

4   A.   None.

5   Q.   How many doorknobs?

6   A.   None.

7   Q.   How many deadbolts?

8   A.   One.

9   Q.   Okay.  On the lower left is Exhibit 42.  And what is that

10  one?

11  A.   It is a -- the first door that you came to prior to

12  getting to the security screen door.

13  Q.   Same questions.  Door handles?

14  A.   No.

15  Q.   Doorknobs?

16  A.   No.

17  Q.   Deadbolts?

18  A.   Yes, sir.

19  Q.   Now, this black security door, was it open or was it

20  locked?

21  A.   It was open at the time we got there.

22  Q.   Okay.

23  A.   As you saw in the video, that's how we found it.  It was

24  open approximately a foot.

25          MR. LICHVARCIK:  Okay.  And pause it there.

BY MR. LICHVARCIK

Q.   And the white door, was it open?

A.   Yes, it was.

Q.   And what did you see about how that had been opened?  Did you notice if anything had been broken?

A.   Yes.  The interior -- well, the locking mechanism or the frame of the -- I'll say the wood core door was broken open.  And the security screen door -- I'm sure most everybody has seen a security screen door -- that has the screen, which is welded on the outside of the door, had been pushed open and bent over, so completely folded down halfway.

Q.   And was that consistent with what you had heard AV-1 say?

A.   Yes, it was.

Q.   Now, hard to see on here, and we'll just start playing this, but if you could describe what you're doing, if anything, with the mesh metal on the door.

A.   So because it had been bent over and she had told us that she was punching it with her knuckles, I was looking at the interior side of it, where it was bent over, to see if I could locate any blood on the -- on the screen portion of the door.

Q.   All right.  For lack of a better reference, below your chin in that still shot there, what are we looking at on the doorframe?

A.   I'm not sure in this one.  Either there's some blood on the doorframe -- I'm either looking at that or the screen on

1    the screen door.

2    Q.   I mean actually in relation to -- do you see the -- yeah,

3    we're going to blow it up here.

4    A.   Oh, where the -- if you -- if you look at that location

5    right there, where a deadbolt would go in, you can notice that

6    on the left side of it, it's busted out, which would be

7    consistent with a closed deadbolt; if somebody were to force

8    that door open, it would blow out that piece of wood.

9    Q.   And was that consistent with where the deadbolt on

10   Exhibit 42 in the lower left would have locked that door?

11   A.   Yes.

12             MR. BERTHOLF:  And excuse me.  Could we take a short

13   break?

14             THE COURT:  Yes.  To talk to me?  Or we just need a

15   break?

16             MR. BERTHOLF:  Just need a break.

17             THE COURT:  All right.  Folks, we'll take a short

18   break.  Let's take five minutes.

19             (Recess taken, 3:53 p.m. - 4:00 p.m.)

20             THE COURT:  All right.  Please be seated, everybody.

21             And, Mr. Lichvarcik, if you'd like to continue with

22   direct.

23   BY MR. LICHVARCIK

24   Q.   So I believe we covered how that door lock fit into that

25   broken slot there that you covered in pink, and we'll continue

1  playing the video.

2           If we could please clear the pink.

3           All right.  Now, you and your team did you go into

4  the cell fully?

5  A.   Yes, we did briefly.

6  Q.   But did you grab and collect evidence inside?

7  A.   I did not.

8  Q.   Why not?

9  A.   Once we located that and saw what was on the table next to

10 it and other items that AV-1 described during the interview, I

11 made the decision to contact the Oregon State Police Crime Lab

12 to come process the garage.  So I told everybody, "Just leave

13 stuff in place.  Don't touch anything, and we'll process it in

14 the morning."

15 Q.   Okay.  And you mentioned Styrofoam.  What are some

16 different places we're seeing Styrofoam on this, where we

17 stopped it?

18 A.   There was Styrofoam on the doors.  There was Styrofoam on

19 the walls.  There was some Styrofoam on the ceiling of the

20 cell.  There was also a package of unused Styrofoam that was

21 outside of the cell in the garage.  There was thick foam

22 padding on top of the cell that wasn't the hard, breakable

23 Styrofoam, but more of a -- it was a couple inches thick of, I

24 guess, what you would put on a -- similar to what you would put

25 on a bed to soften a bed or a mattress.

1    Q.    How many musical instruments in the cell?

2    A.    None.

3    Q.    Any musical equipment?

4    A.    No.

5    Q.    All right.  All right.  You spoke about some things that

6    are next to it, that were next to the cell outside.  First of

7    all, what are we looking at here, the red thing?

8    A.    That's a blanket covering an outside -- an exterior window

9    on the south side of the residence.

10   Q.    How many windows do you remember there being in the

11   garage?

12   A.    I believe there was three windows:  Two of which I could

13   see from the inside; one of which I couldn't, because the cell

14   blocked it, and you could see it from the outside.

15   Q.    Okay.  So out of the three windows, how many of them, if

16   you remember, had coverings over them?

17   A.    All of them.

18   Q.    All three?

19   A.    Yes, sir.

20   Q.    And that's you pointing.  Do you know what you're pointing

21   at there?

22   A.    I don't remember what I was pointing at.

23   Q.    Now, the blue thing, what are we looking at there?

24   A.    Are you talking about the blanket?

25   Q.    Yep.

1  A.   It's a blanket that's attached on top of the cell and then

2  slung over the door, the open door.

3  Q.   If you're able to say, do you know if you pulled that

4  blanket down, what would it -- what would it do?

5  A.   If that door was shut, it would cover the -- the door if

6  it was closed.

7          It's just officers looking in the attic to confirm

8  nobody else is up there.

9  Q.   Anything that stood out about the construction and the way

10  the blocks were stacked?

11  A.   Yeah.  It was interesting to me.  General construction,

12  you would interlace the bricks together.  So I found it an

13  unusual way to stack it or make the cell, but it appeared to

14  work.

15  Q.   All right.  Not a normal question to ask, but how much do

16  you weigh?  How tall are you, and how often do you work out?

17  A.   I'm 6'3", 200 pounds, and work out five times a week.

18  Q.   All right.  Did you push that cell or test the strength of

19  it?

20  A.   Yes, I did.

21  Q.   Tell us about that.

22  A.   In all honesty, it wasn't for any other purpose than my

23  own interest, just 'cause I build stuff.  So I was curious to

24  know how strong it was with the -- with the bricks stacked

25  straight up and down versus interconnected.  So I leaned on it

1   and pushed on it to see if there was any flex.  At one point I

2   think I reached up top and kind of pulled on it to see if that

3   wall would just flex in any way, and it didn't move whatsoever.

4   Q.   So how would you describe it in terms of --

5   A.   It was sturdy.  It was built strong.  It was sturdy.

6   You're not going to push your way out of it.

7   Q.   Okay.  We're going to switch over to Exhibit 92-2,

8   starting at 3:51.

9            And while we get this ready, what was next to the

10  cell outside the door?

11  A.   Oh, the -- a -- so if you're staring at the door of the

12  cell, if you look in the exhibit on the top, on the left-hand

13  side, there's a small table, just off to the left, on the other

14  side of that ladder.

15  Q.   All right.  And you were pointing to Exhibit 34.

16           We'll play now a short portion of 92-2 and stop at

17  3:56.

18  A.   This is the table.  There is handcuffs and leg irons,

19  which AV-1 described in the interview, as well as a drill that

20  she described during the interview.  She told us that when she

21  was initially put in there, he was unable to lock the door.

22  And so he retrieved a drill and either some screws or nails,

23  and fixed whatever the problem was, so that he could then close

24  and lock the door.

25  Q.   And the black things that we're looking at to the left of

1  the drill, circular with a chain?

2  A.   Oh, yeah, the leg irons.

3  Q.   Okay.  To put this into perspective, again, looking at 34,

4  this is -- what we're looking at on the video is actually the

5  drill right here on the left of 34; is that right?

6  A.   Yes.

7  Q.   And the leg irons are down to the left of the drill?

8  A.   Yes, they are.  And the leg irons are easily identifiable

9  compared to handcuffs.  Handcuffs have two to three links on

10  the inside or a hinge, where leg irons have a longer chain to

11  allow somebody to be able to walk slightly if they were in

12  them.

13  Q.   Okay.  We're now going to go back, and we'll play it

14  starting at 4:18, back to the cell.  And we'll stop right

15  there.

16        Now, what do you see on the bottom of that black

17  metal screen and the white stuff?

18  A.   So that's more of the one-inch Styrofoam.

19  Q.   And what was that attached to, if anything?

20  A.   So it was attached to the whole outer portion of the door

21  initially, but it's broken off there.

22  Q.   The black door?

23  A.   Yes.

24  Q.   Okay.  And then on the left of that, we see the broken

25  Styrofoam.  Give us the context of that broken Styrofoam again,

1  from this vantage point.

2  A.   That would've been where the door was -- the exterior --

3  the wooden door was closed.  I think when the lock broke, it

4  busted that piece out.

5  Q.   All right.  Now --

6  A.   If you --

7  Q.   Let me pause it right there.  What do we see on the

8  doorjamb there?

9  A.   So right in the center of the screen, above the screws,

10  you'll see blood smear on the doorframe.

11  Q.   At least what you thought was blood smears at the time,

12  right?

13  A.   Yes.

14  Q.   And where else did you see blood, apart from the -- that

15  doorjamb area, where else did you see what was consistent with

16  blood?

17  A.   So I located what I thought was consistent with blood on

18  the screen of the -- on the screen that was folded down.  I

19  located a substance consistent with blood on the door handle of

20  the garage -- exiting the garage.

21  Q.   Okay.  And did you later see anything on the wooden gate

22  outside?

23  A.   Yes.  It was brought to my attention later, when it was

24  light outside -- actually, it would've been that night.  We

25  were able to look at it with flashlights.  You could see some

1    blood on the exterior fence, where we entered to go into the

2    house originally, where that gate was, just off of that gate.

3    Q.   All right.  And what are we looking at here?

4    A.   That's just to -- if you were inside of the cell, that

5    would be to the right.  Just framing, Sheetrock and more of

6    that one-inch foam.

7    Q.   Okay.  Continuing to play it.

8              How many water bottles were in there?

9    A.   If I recall, there was two:  One on the chair and one on

10   the floor.

11   Q.   And while we're finding 7:09, do you remember anything

12   about the ceiling of the cell, its construction?

13   A.   It was constructed of two-by-fours and plywood.

14   Q.   Okay.  All right.  We'll play here for eight seconds at

15   7:07.  And what are we watching you do here?

16   A.   I was looking behind the cell to see if there was anybody

17   or anything back there.  That's where I pulled on the cell to

18   see the sturdiness of it.

19   Q.   All right.  So we're going to hear from other detectives

20   about things that were found; but, you know, you were a -- you

21   were sort of supervising the team, right?

22   A.   Yes, I was.

23   Q.   In general, are you able to discuss what was found, big

24   picture?

25   A.   Yes, I can.

1    Q.    Okay.  Could you just summarize it briefly?

2    A.    Yeah.  In the -- the house is a -- I guess, would be

3    considered like a four-bedroom house.  So upstairs there's a

4    living room, a kitchen, a small office off the kitchen.  Then

5    you go down the hallway.  There's a large bedroom at the end of

6    the hallway on the left, which we would consider a master

7    bedroom.  There's no bathroom, but it's the largest bedroom in

8    the house.

9         And then there's a bedroom at the end of the hallway.

10   The bedroom at the end of the hallway had some kids' bunkbeds

11   in it.  Clearly a smaller kids room based on the decor, the --

12   Q.    And I'll go ahead and interrupt you 'cause I do -- I am

13   going to ask you to kind of walk us through the house in a

14   little bit through the two different floors that you were just

15   touching on.

16        But, in terms of seizure of items, if you can just

17   big-picture summarize what you recall the team finding.

18   A.    So in bedroom number one, on the board there, is what we

19   considered the master bedroom.  We located several items of

20   paperwork identifying Sakima Zuberi and Alycia Westfall Zuberi,

21   identifying that as the room that they stayed in.

22        We found another set of handcuffs in that room, found

23   a gun box in that room, which was later ran through dispatch

24   and found to be consistent with the firearm that AV-1 had in

25   her possession upon her getting picked up.

1      We found a bulletproof vest or -- plate carrier with

2 a bulletproof -- with three AR magazines in it; located police

3 patches -- police-identifying patches inside the room.  Tyler

4 Young brought attention to a notebook that had some drawings in

5 it.

6 Q.  And we'll hear from Tyler Young as well later.

7      Okay.  Let's -- what about -- do you remember

8 anything being found in the back of the garage related to AV-1?

9 A.  Yes.  There was a black purse in the back right corner.

10 If I was facing the cell, if I looked in the back right corner

11 of the garage, there was a black purse located on top of a

12 suitcase.  And inside of that purse had a credit card with a

13 name of [redacted] on it.

14 Q.  And what was the significance of that?

15 A.  That was AV-1's mother's name.

16 Q.  And so whose purse was that?

17 A.  It was believed to be AV-1's.

18 Q.  Okay.  All right.  Let's -- so, Sergeant, I will ask you

19 now to talk generally about the layout of the house.  And,

20 again, we've seen this drone video once.  But, just generally

21 speaking, how many floors are there to the home?

22 A.  It's a two-story home.  From Eldorado it looks like a

23 single story home; but it's built on a hill, so on the back

24 side is the lower level of the residence.

25 Q.  On the left is the what?

1    A.    On the left would be the two -- the two-car garage.

2    Q.    Okay.

3    A.    As you proceed to the right, if you stop the video, to the

4    right of the garage doors is the fence and the opening leading

5    to the front door.  This interior fenced area is where we led

6    the dog into.

7    Q.    Now, if I can pause, too, so the bedroom then that we're

8    looking at on the portion of the house in this drone video

9    that's closest to us, which bedroom is that on Government's

10   Exhibit 93-1?

11   A.    On the left side would be the children's room.  And on the

12   right side corner, facing us, in the back of the house would be

13   bedroom number one.

14   Q.    So bedroom number two was the children's room?

15   A.    Yes, facing the front of the house and us.

16   Q.    And bedroom number one was that master bedroom you were

17   referring to?

18   A.    Correct.

19   Q.    And those are on the first floor.  And then you said

20   there's a lower floor?

21   A.    Yes.

22   Q.    Okay.  And what are we seeing here?

23   A.    So the top left window would be the window to bedroom

24   number one.  The second-to-the-left window would be the living

25   room window.  The third window on the top would be where the

1  kitchen table was, or the kitchen.  The fourth window over,

2  that's sunk back, would be above -- or in the little office

3  area.  And the fifth window to the right on the top would be a

4  garage window.

5  Q.   So the window all the way to the right on the drone video

6  at this point, you said, is to the garage?

7  A.   Yes, it is.

8  Q.   Okay.  So if someone were to crawl out of the back window

9  then of the garage, would they be at the ground level and be

10 able to drop down?

11 A.   No.  It'd be a lengthy drop down.

12 Q.   It'd be what?

13 A.   A lengthy drop to -- from the second story.

14        MR. LICHVARCIK:  And, Your Honor, may I ask Sergeant

15 Zupan to come down so that he can point out areas of the room?

16 I'm going to play videos on the screen for the jury, and he's

17 going to be able to point out on this map where we are in the

18 house.  And we're going to do a walk-through.

19        THE COURT:  Okay.  We can do that.  Sure.

20 BY MR. LICHVARCIK

21 Q.   Okay.  Sergeant, if you could please step down.

22        Okay.  Now, in terms of being able to see a screen,

23 you should be able to see the screen by the court reporter

24 right there.  And then we'll just need to make sure you're

25 probably standing where I'm standing so that the jury can be

1  here.  And then I'll stay out of the way, frankly.

2        So on the screen right now, what are we looking at?

3  And if you could orient the jurors to the 93-1 map.

4  A.   Okay.  So right there we're looking at the opening, if you

5  were -- once this door's open and you're looking in this door

6  right here, you're looking back into this area right here.

7        MR. LICHVARCIK:  Okay.  Go ahead and play it.

8        THE WITNESS:  So that's us entering the house, into

9  the kitchen, turning towards the kitchen area.

10 BY MR. LICHVARCIK

11 Q.   Okay.  So that's the kitchen area?

12 A.   Yep.

13 Q.   And that window then looks out to what?

14 A.   The window leads into that enclosed front porch, which

15 would be right here.

16        MR. LICHVARCIK:  Okay.  Please continue playing.

17 BY MR. LICHVARCIK

18 Q.   Now --

19 A.   That is the back office.  That's this office space here.

20 And then that's the cabinet right here.

21        MR. LICHVARCIK:  All right.  So right there, pause.

22        THE WITNESS:  Is the back office.

23 BY MR. LICHVARCIK

24 Q.   Okay.  Thank you.  And then if we can -- we'll probably

25 just have to keep our voices up a little bit as well, since

1   we're away from microphones.

2           MR. LICHVARCIK:  All right.  Keep playing, please.

3   BY MR. LICHVARCIK

4   Q.   Is this still the back office area?

5   A.   Yes, sir.

6           So this is leading through the kitchen and into this

7   dining area.  That table that you see right here would be this

8   table right here.  That would be the third window that I

9   described right here.

10  Q.   Okay.  Thank you.

11  A.   Continuing into the living room portion here.  The couch

12  you see on your screen would be this couch here.  And the big

13  window -- the second window would've been the big window right

14  up here.

15  Q.   So the window on the left of the video that we're watching

16  is the -- is the window to the backyard; is that right?

17  A.   Yes.  Correct.

18  Q.   Okay.  Continuing through.

19  A.   So we're wrapping around the living room, heading towards

20  the stairwell and front door.  So this is a cabinet that's

21  right here.  And then that closet is right behind the front

22  door right here.  It pans to the left.  You'll see the front

23  door.

24  Q.   Okay.

25  A.   Panning more left, that's the hallway leading down towards

1  the bedrooms.  You can see the bookcase right here.  And on the

2  other side of that is the stairwell leading downstairs.  So

3  we're continuing down the hallway, moving towards the closet

4  here.  And then past the closet would be bedroom number one, is

5  what you're seeing right now.

6  Q.   Okay.  So this is bedroom number one, which you determined

7  was the master bedroom; is that right?

8  A.   Yes, sir.

9  Q.   What's that sign on the master bedroom wall?

10 A.   "Become a Hacker."

11        So that would be this closet right here.  As you

12 enter the front door, it wraps around.

13 Q.   Okay.  And, as you mentioned, a number of items were

14 seized in this master bedroom?

15 A.   Yes.

16 Q.   You don't have to detail them now.

17 A.   Exiting the master bedroom.  Move back down the hallway to

18 this bathroom here.

19 Q.   Where are we right now?

20 A.   Coming back out of the hallway towards the front door,

21 wrapping the corner into the living room, and now turning back

22 and going down the stairs.

23        MR. LICHVARCIK:  Okay.  All right.  We'll now play

24 163-3, although please don't play it yet.

25

1  BY MR. LICHVARCIK

2  Q.   And so downstairs goes to the downstairs, correct?

3  A.   Correct.

4  Q.   All right.  This is 93-2, the lower floor.

5        MR. LICHVARCIK:  And we can go ahead and play that.

6  BY MR. LICHVARCIK

7  Q.   And if you could orient the jurors while we're --

8  A.   So we're coming down the stairs here.  So the visual you

9  see right here is from the top of the stairs looking down.

10        (Whispered discussion, off the record, 4:21 p.m.)

11        THE WITNESS:  Yeah, that's correct.

12  BY MR. LICHVARCIK

13  Q.   Okay.  So we're now playing.  We're going down the stairs.

14  A.   So the closed door that you see directly ahead is this

15  bedroom.  I lost where --

16  Q.   Yep.  So --

17  A.   So we're wrapping around the stairs here.  And this is a

18  view from standing right here, looking back this direction.

19  Q.   Okay.  Thank you.

20  A.   We're turning around, looking into bedroom number three.

21  Q.   Okay.  And now these are the lower bedrooms, right?

22  A.   Yes, they are.

23  Q.   Okay.  So can you kind of describe where bedroom three is

24  and bedroom four are, in relation to where the garage is.  And

25  I'll put this -- so this is the first floor here.  So can you

eded

1  orient the jurors to where -- how bedroom three and bedroom

2  four relate to where the garage is?

3  A.   So if you were to overlay the first floor on top of the

4  second, the garage would be where this utility storage room is.

5  Bedroom three would be below bedroom one, and bedroom four

6  would be below bedroom two.  So bedroom three would be the

7  furthest distance from the garage.

8  Q.   And also on a different floor, so it also -- it's --

9  A.   Correct.

10  Q.   -- separated by the stairs as well, right?

11  A.   Yes, sir.

12  Q.   Okay.  All right.  Go ahead.

13  A.   So, again, we're still in bedroom three.

14  Q.   And it was determined that bedrooms three and four were

15  occupied by people who were doing what?

16  A.   They were subleased out to two individuals who didn't know

17  Mr. Zuberi or one another.

18        That is bedroom four.  So we exited bedroom three,

19  came around and into bedroom four.

20  Q.   Do you recall the bedrooms being that messy when you did

21  the search?

22  A.   Yes.

23        Bedroom four had a lot more property in it.  I could

24  maybe have been there a little longer.

25  Q.   So this is one of the renter's rooms.  We do see some

1  guitars there, right?

2  A.   Yes.

3         So we've exited the bedroom, and now we're coming

4  back this direction, passing the bathroom.

5  Q.   Now, did law enforcement -- sorry.  If you could orient us

6  now what we're looking at.  Pause.

7  A.   So we're coming around this corner here and looking into

8  what is labeled as the lower sunroom, is what you're seeing

9  with the tile floor.

10 Q.   Okay.  Big picture, did your team find anything of

11 evidentiary value in the lower floor?

12 A.   No.

13 Q.   Okay.

14 A.   That goes into this little laundry room closet here, the

15 door that was open.

16 Q.   Are we now in the lower sunroom there by the windows?

17 A.   Yes.

18        We're coming out of the sunroom and moving towards

19 the laundry room.

20 Q.   Okay.  Now, the laundry room, what room is above the

21 laundry room?

22 A.   The kitchen.

23 Q.   Okay.

24 A.   Just past the laundry room goes into a utility room.  It's

25 actually not quite this big.  That's cut off about right here.

1    And inside there, there was like an old oil tank for maybe an

2    oil heater.  And nothing of really value in there.

3    Q.   And what's above the utility storage room?

4    A.   That would be the garage.

5    Q.   Okay.  And you didn't find any indications that anyone was

6    living in the utility storage room below the garage, did you?

7    A.   No, I did not.

8    Q.   Okay.  All right.  Thank you.

9         (Whispered discussion, off the record, 4:26 p.m.)

10   BY MR. LICHVARCIK

11   Q.   All right.  Thank you very much.  If you'll return to the

12   stand.

13   A.   Thank you.

14   Q.   All right.  One more short video, if we're able to endure

15   it.  This is of outside.  We're going to play 163-1.

16        (Video recording played in open court, 4:26 p.m.)

17   BY MR. LICHVARCIK

18   Q.   And please go ahead and narrate for us, speaking slowly.

19   A.   So that's walking up the driveway and entering through the

20   gate into the enclosed front porch.  That's the dog kennel I

21   spoke of earlier.  The front door to the residence that leads

22   into the living room and the hallway.  This would be the window

23   into the kitchen.  This is the door entering into the kitchen,

24   and then the door to the left would be the door entering into

25   the garage.

1    Q.   Okay.  And that's the door that you all used to enter the

2    garage to -- when you executed the search warrant?

3    A.   Yes, it is.

4    Q.   And this is the door entering the kitchen?

5    A.   Correct.

6    Q.   All right.  And which -- what is this?

7    A.   So that's a picture, where you see the number C, where

8    blood was located on the fence.

9    Q.   Okay.  And we -- it may be -- you know, would it be

10   correct to say that that might not be where actually blood was

11   finally determined, that that was a location where blood might

12   be?

13   A.   Correct.

14   Q.   Okay.  Go ahead.  Where are we going now?

15   A.   Leading down to the backyard on the south side of the

16   house.  If we were to stop the video right here, just above

17   where we're walking down there is the window with the red

18   blanket that we saw from inside of the garage; and then another

19   window that's behind the cell, that you can't see from inside

20   the garage.

21   Q.   And so, again, for orientation, right now walking down on

22   the left side of the garage; is that right?

23   A.   Yes, sir.

24   Q.   Down to the lower level.

25             MR. LICHVARCIK:  Okay.  Go ahead and keep playing,

1  please.

2          THE WITNESS:  Proceeding into the top tier of the

3  backyard.

4  BY MR. LICHVARCIK

5  Q.   All right.

6  A.   The windows you're looking at there, the one furthest to

7  the right upstairs would be the one into the dining room.  And

8  the one straight ahead on the left would be the --

9  Q.   And so this is essentially --

10  A.   -- living room.

11  Q.   The back of the utility storage room?

12  A.   Yes.

13  Q.   And the garage is up above; is that right?  To the right

14  of that?

15  A.   Correct.  The window below is the -- what you consider the

16  sun -- lower sunroom, just behind the utility room.

17  Q.   Okay.  Thank you.  All right.  We're going to try to run

18  through a number of exhibits and do them in a relatively rapid

19  fashion, not talking rapidly, but showing exhibits and maybe

20  just a sentence or so about what it is.  And then I may stop

21  and ask one or two questions about different exhibits, but

22  we're going to try to run through these relatively quickly.

23  Okay?

24  A.   Yes, sir.

25  Q.   All right.  And we'll start with 31-1.

1  A.   Picture leading into the kitchen and the garage from the

2  enclosed patio.

3  Q.   Okay.  31-2.

4  A.   Picture closer up showing the door to the garage, and then

5  to the right is the kitchen.

6  Q.   And I know I'm probably going to challenge you a little

7  bit, but feel free to even shorten the descriptions, if you

8  can.

9  A.   Okay.

10  Q.   31-3.

11  A.   Open door to the garage.

12  Q.   31-4.

13  A.   Same picture, just showing the covering that's covering

14  the window to the garage.

15  Q.   31-5.

16  A.   Further back, same picture.

17  Q.   32-1.

18  A.   Same door that we were just looking at, but from the

19  inside of the garage, with the covering.

20  Q.   32-2.

21  A.   The covering that was covering the window of the garage.

22  Q.   32-3.

23  A.   Outside looking into the garage with an open door.

24  Q.   32-4.

25  A.   Another photo from inside the garage looking out.

1    Q.   33.

2    A.   Picture of the cell and the table on the left with the

3    items on it.

4    Q.   79-1.

5    A.   From the left of the garage, looking down the side of the

6    house.

7    Q.   79-2.

8    A.   Another picture of the south side of the house, coming

9    down the stairs.

10   Q.   80.

11   A.   That's the window above the table next to the cell on the

12   inside that you saw the red blanket hanging over.

13   Q.   The white stuff, lower left of that?

14   A.   Styrofoam.

15   Q.   85.

16   A.   That's the back side of the cell and the window that you

17   can see from the backyard, that top right window.

18   Q.   34.

19   A.   Another picture of the cell.

20   Q.   36.

21   A.   The inside of the cell.

22   Q.   And we'll run through a few of these rapidly.  And these

23   are all the inside of the cell?

24   A.   Yes.

25   Q.   Okay.  38-1.

1    A.    Security screen door with the clear picture of the screen

2    bent down.

3    Q.    38-2.

4    A.    Same picture.

5    Q.    Same from a different angle?

6    A.    Yes.

7    Q.    38-3.

8    A.    Same picture from a different angle.

9    Q.    Okay.  39.

10   A.    A picture of the doorframe and interior of the cell.

11   Q.    40.

12   A.    A picture looking at the outward door with the open lock

13   into the cell.

14   Q.    41.

15   A.    The -- what would be considered a closed deadbolt on the

16   exterior door to the cell.

17   Q.    42.

18   A.    Same picture from the other side.

19   Q.    43-1.

20   A.    Where the deadbolt broke out the frame on the doorframe.

21   Q.    Okay.  43-2.

22   A.    Another picture from a different view.

23   Q.    44.

24   A.    The ceiling construction of the cell from the inside.

25   Q.    45.

1    A.    Interior of the cell.

2    Q.    46-1.

3    A.    Interior of the cell.

4    Q.    46-2.

5    A.    Interior of the cell.

6    Q.    48-1.

7    A.    From the outside looking into the cell.

8    Q.    49-1.

9    A.    Another picture looking into the cell.

10   Q.    51-3.

11   A.    From the driveway looking into the enclosed porch.

12   Q.    52-1.

13   A.    From inside the enclosed porch looking out to the driveway

14   with the gate closed.

15   Q.    55-1.

16   A.    Looking into the cell from the garage.

17   Q.    55-2.

18   A.    The security screen door with the screen bent down.

19   Q.    55-3.

20   A.    Same picture, just a closer view.

21   Q.    55-4.

22   A.    Same picture, closer view.

23   Q.    56-1.

24   A.    The exterior door, the foam on the inside of the exterior

25   door.

1 Q. 56-2.

2 A. Same picture, just closer.

3 Q. 56-3.

4 A. Picture of the closed deadbolt on the exterior door.

5 Q. 57.

6 A. Security screen door of the cell.

7 Q. 58 --

8 A. The interior of the cell.

9 Q. -- dash one.

10   59.

11 A. Picture of the roof and side wall of the interior of the

12 cell.

13 Q. 60-1.

14 A. Officer Fox opening the gun case.

15 Q. 60-2.

16 A. The gun case that was located in bedroom one.

17 Q. 79-1, I believe we saw that already.

18   79-2, I believe we saw that already.

19 A. I need to correct myself.  Earlier I spoke of two windows

20 on that side.  There's apparently just one.

21 Q. Thank you for that clarification.

22   80.

23 A. A picture of the window from inside that leads into the

24 garage with the red --

25 Q. 81-1.

1    A.    Door to the kitchen.

2    Q.    81-2.

3    A.    Door to the garage.

4    Q.    82-1.

5    A.    Open door to the garage.

6    Q.    Getting close to done.

7          82-4.

8    A.    The interior door handle with a -- what we believed to be

9    blood.

10   Q.    Now, this was the -- sorry.  To go back to that one, that

11   was the door handle on the door that entered and exited the

12   garage, right?

13   A.    Correct.

14   Q.    All right.  Thank you.

15         Next photo, 83.

16   A.    Looking into the garage from the enclosed porch.

17   Q.    84.

18   A.    When you step inside the garage from the patio.

19         MR. LICHVARCIK:  Now, if we can zoom in to the -- to

20   the back of that.

21   BY MR. LICHVARCIK

22   Q.    And so does that look familiar at all, that black suitcase

23   on the right?

24   A.    Yes.  What you see on the right of the screen is a black

25   suitcase with a black purse on top that we located the credit

1  card with the name of [redacted].

2  Q.   Okay.  And 87.

3  A.   The cell and the back of the cell.

4  Q.   Okay.  All right.  After searching the house, can you give

5  a big-picture overview of what you and your team did then?

6  A.   After we searched the house and seized items from the

7  house, I had officers stay on the house for the night, to

8  include myself as one of the rotating officers, to confirm --

9  we placed evidence tape over the back door -- to confirm that

10 nobody would be able to -- so we would know if somebody came or

11 went, but we still held officers out there throughout the

12 night.

13 Q.   And, sorry, I meant to ask.  After searching the house --

14 you know, again we'll cover -- we covered some general things

15 that we found.  Were there some things that you and your team

16 didn't find?

17 A.   Correct.

18 Q.   And can you summarize those?

19 A.   We didn't locate either one of the Tasers.  We didn't

20 locate the pepper spray.  We didn't locate Ms. Westfall's

21 shoes.  We didn't locate the rag that was used to wipe herself

22 up.  We did not locate the cell phone -- what she described as

23 a cell phone jammer.

24 Q.   And I think you said "Ms. Westfall's shoes."  Did you mean

25 AV-1's?

1    A.    I'm sorry.  AV-1's shoes.  I apologize.

2    Q.    Okay.  I think you mentioned -- were you looking for a

3    particular color Taser that she had said was used?

4    A.    Yeah.  She described the one that Mr. Zuberi had as yellow

5    and black, and she described hers as pink.

6    Q.    Okay.  Did you find the yellow and black one at the house?

7    A.    We did not.

8    Q.    Did you find her cell phone at the house?

9    A.    We did not.

10   Q.    And those -- some kind of devices with big antennas, were

11   those at the house?

12   A.    No, they were not.

13   Q.    Okay.  So you locked down the house.  And then, again,

14   staying big picture, what did you and the team do?

15   A.    At that point we put the officers on the house to watch

16   the house.  Officer Loudermilk put out probable cause for

17   arrest on Mr. Zuberi, and we secured for the night.

18   Q.    Okay.  At some point did you call the FBI?

19   A.    Yes, we did.

20   Q.    Okay.  Let me ask you.  How many times in your -- how long

21   have you been in law enforcement?

22   A.    26-plus years.

23   Q.    And how many times have you called the FBI for assistance

24   in an investigation?

25   A.    Personally, never.

1    Q.   So this was the first time?

2    A.   Yes, sir.

3    Q.   Have you ever heard the term "turning a case into a

4    federal case"?

5    A.   Yes, sir, I have.

6    Q.   What does that mean to you?

7    A.   Making a bigger deal out of it than it is.

8    Q.   Okay.  Why'd you call the FBI?

9    A.   That morning, once the crime lab arrived, I responded back

10   to the scene.  And myself and the chief of police were in my

11   car, and we were discussing the case.  He was asking a lot of

12   questions, kind of where we were at on it and what resources we

13   had.  We were a little undermanned.  We had some people on

14   vacation.

15          Not to mention the severity of the case, coming from

16   another state into Klamath Falls, and concerns of -- generally

17   because of the severity of the case.  I've never handled a case

18   similar to this before.  Many homicides and many kidnaps, but

19   not one where somebody was literally held inside of a cell

20   inside of their garage.

21          I didn't want to miss anything.  And with the

22   resources and abilities we have and -- and the ability to

23   locate Mr. Zuberi at the time, I discussed with my chief the --

24   if it would be in our best interest to call them and see if

25   they have some resources that they could help with.

1    Q.   At that point you made the call to FBI, how many states

2    did you think were involved in -- in -- in this possible crime?

3    A.   At least two.  At least Oregon and Washington.

4    Q.   And did you learn soon after there would be another state

5    involved?

6    A.   Yes, I did.

7    Q.   What state was that?

8    A.   Nevada.

9            MR. LICHVARCIK:  All right.  Thank you, Sergeant.

10           THE COURT:  All right.  Any cross-examination?

11                      CROSS-EXAMINATION

12   BY MR. BERTHOLF

13   Q.   You testified earlier that AV-1 told you that she punched

14   and punched the doors?

15   A.   Yes.

16   Q.   Did she describe anything other than a punch to you?

17   A.   I don't recall.

18   Q.   Okay.  And you saw extensive scrapes to her knuckles?

19   A.   Correct.

20   Q.   I think you said all eight knuckles?

21   A.   From my memory, it looked like all her knuckles were

22   scraped up, without looking at a picture of it.

23   Q.   Okay.  That's your memory?

24   A.   Yes.

25   Q.   Did you -- you said you leaned on the structure that was

1  in the garage?

2  A.    Yes, I did.

3  Q.    From the outside?  The only picture we saw, it looked like

4  you were only on the outside pushing on it?

5  A.    That's correct.  I did.

6  Q.    Did you go inside the structure to try and push on it?

7  A.    No.  Again, I didn't -- we knew the crime lab was going to

8  come.  I didn't want to mess the interior of that cell.  I did

9  it simply just to -- for curiosity, to see.

10  Q.    I understand.

11          On the inside of the cell, we saw that there was some

12  what appeared to be drywall?

13  A.    Correct.

14  Q.    And there's some Styrofoam?

15  A.    Correct.

16  Q.    But the entirety of the walls are not covered in

17  Styrofoam?

18  A.    Correct.  Well, from the outside, no, I -- yeah.

19  Q.    Well, we were looking just earlier at pictures from the

20  inside of the structure.

21  A.    Correct.

22  Q.    And we could see that the -- that there was some Styrofoam

23  attached to the drywall?

24  A.    Yes.  There was a couple pieces hanging down from the

25  ceiling on the side.

1  Q.   Yeah.  And -- but the Styrofoam did not cover all of the

2  entirety of the interior of the walls?

3  A.   No, it did not.

4  Q.   And, in fact, we saw some Styrofoam that were -- was in

5  the ceiling?

6  A.   Correct.

7  Q.   But not the entirety of the ceiling?

8  A.   Correct.

9  Q.   And the ceiling, again, was two-by-fours and plywood?

10  A.   Correct.  But there was foam on top.

11  Q.   And foam.  But I'm talking on the inside right now.

12  A.   Okay.

13  Q.   There's some Styrofoam in the slats between the

14  two-by-fours?

15  A.   Yes, that's correct.

16  Q.   Okay.  But it wasn't -- it looked like it was still in the

17  middle of construction?

18  A.   Correct.

19  Q.   And we -- we saw two water bottles -- or, well, you

20  described that you saw two water bottles inside the structure?

21  A.   Yes.

22  Q.   Did you see a bucket?

23  A.   I did not.

24  Q.   Did you see a bucket inside the garage?

25  A.   I recall that there was one in the garage, but I don't

1  remember where.

2  Q.   Okay.  Do you recall anything in the bucket?

3  A.   No.

4  Q.   Okay.

5  A.   I don't know that I even looked.

6  Q.   Did you look inside the purse that was on the suitcase?

7  A.   Yes, I did.

8  Q.   And what all did you find in there?

9  A.   The credit card.  And I want to say that there was a

10 condom in there --

11 Q.   Okay.

12 A.   -- if I remember right.  But the credit card with

13 [redacted]'s name on it, or [redacted].

14 Q.   Okay.  Any cash?

15 A.   I'm sorry.

16 Q.   Any cash?

17 A.   No cash.

18 Q.   All right.  And, as we walked through the house, in the

19 master bedroom you said you found a bunch of stuff?

20 A.   Correct.

21 Q.   Paperwork that Mr. -- that appeared to be associated with

22 Mr. Zuberi?

23 A.   Correct.

24 Q.   And this gun box?

25 A.   Yes.

1    Q.    And some police patches?

2    A.    Yes.

3    Q.    Any police badges?

4    A.    No.

5    Q.    Any police uniforms?

6    A.    No.

7    Q.    As we looked at this video walking through --

8          MR. BERTHOLF:  And, actually, can we maybe put up

9    this 93-1 again?

10          MR. LICHVARCIK:  That?

11          MR. BERTHOLF:  Yep.

12   BY MR. BERTHOLF

13   Q.    We walked through -- you walked through the house kind

14   of -- oh, wait.  This is the lower floor that I -- oh, I put

15   the right one up there.  I've got the wrong one on my screen.

16          (Whispered discussion, off the record, 4:45 p.m.)

17   BY MR. BERTHOLF

18   Q.    As we're walking through, it looked like the first thing

19   we saw was the office?

20   A.    Yes.

21   Q.    Anything of evidentiary value found in the office?

22   A.    No.

23   Q.    Kitchen, we walked through there, yes?

24   A.    Yes, we did.

25   Q.    Did we find any evidentiary value in the kitchen?

1    A.    I don't believe so.

2    Q.    As we walked through the dining area, did we find anything

3    of evidentiary value in there?

4    A.    I don't believe so.

5    Q.    All right.  As we walk through the living room, did you

6    find anything of evidentiary value in there?

7    A.    I seized a cell phone from under a table that was in front

8    of the couch.

9    Q.    Okay.  And then we walked past the bathroom into the

10   master bedroom.

11   A.    Yes.

12   Q.    And we just talked about finding a bunch of stuff in

13   there.  We stopped and looked at a sign that said "Become a

14   Hacker."  Is that of any evidentiary value?

15   A.    Interesting, but no evidentiary value.

16   Q.    Okay.  Interesting, but no evidentiary value?

17   A.    From the perspective I was looking at, yeah, no.

18   Q.    Okay.  And then we walked down the stairs.  Anything of

19   evidentiary value on the stairwell that we walked down?

20   A.    No.

21   Q.    Bedroom three turned out to be somebody that was renting

22   the place?

23   A.    Yes.

24   Q.    And nothing of evidentiary value in there?

25   A.    No.

1    Q.    Bedroom four, kind of the same thing?

2    A.    Yes, sir.

3    Q.    We looked through the laundry room and the lower sunroom?

4    A.    Correct.

5    Q.    Anything of evidentiary value in either of those?

6    A.    No.

7    Q.    How about the closet under the stairs?

8    A.    I don't believe so.

9    Q.    Okay.

10   A.    I didn't search that personally, so I can't attest to

11   that.

12   Q.    Okay.  And then in the utility storage room, which is a

13   little bit smaller than on the map we're looking at, nothing of

14   evidentiary value in there?

15   A.    No.

16   Q.    Just some dead plants, it looked like?

17   A.    Correct.

18   Q.    We went to the outside and -- of the house, going to the

19   front, and we went around the garage and went down those

20   stairs --

21   A.    Yes.

22   Q.    -- on the outside of the garage.

23         Anything of evidentiary value in the driveway?

24   A.    No.

25   Q.    Anything of evidentiary value going down the stairs to the

1  back?

2  A.   No.

3  Q.   In the backyard -- is that where the dog was, or was the

4  dog in the closed-in porch up front?

5  A.   He was in the closed-in porch.

6  Q.   On the front part?

7  A.   Yes.  Correct.

8  Q.   Okay.  I was just a little confused as to where the dog

9  was.  Thank you.

10         In the backyard area, we saw the windows.  Anything

11  in those windows -- other than the Styrofoam that we saw on the

12  garage window, anything of evidentiary value?

13  A.   No.

14  Q.   Anything in the backyard that is helpful to the case?

15  A.   No, I don't believe so.  I just want to clarify I didn't

16  seize all of the evidence, so I can only speak for myself.

17  Q.   I understand.  And I'm only asking for you to tell what

18  you know.

19         MR. BERTHOLF:  I think we can put these down now.

20  BY MR. BERTHOLF

21  Q.   So you said you were looking -- you were looking for

22  things described by AV-1 --

23  A.   Yes.

24  Q.   -- is that correct?

25  A.   Yes, sir.

1  Q.   Okay.  One of the things that you said you were looking

2  for was pepper spray?

3  A.   Yes.

4  Q.   And there were two Tasers described to you?

5  A.   Yes.

6  Q.   One was a yellow and black Taser?

7  A.   Yes.

8  Q.   And you said that she told you that her Taser was pink?

9  A.   If I recall, yes.

10  Q.   Okay.  And you didn't find either of those in the house?

11  A.   Correct.

12         MR. BERTHOLF:  I think that's all.  Thank you.

13         THE COURT:  Thank you.

14         Any redirect?

15                    REDIRECT EXAMINATION

16  BY MR. LICHVARCIK

17  Q.   So Mr. Bertholf just asked you about a lot of places where

18  items weren't found of evidentiary value.  So the flip of that

19  is where were -- what rooms were the main places where items of

20  evidentiary value were found?

21  A.   Mr. Zuberi's bedroom and the garage.

22         MR. LICHVARCIK:  That's all, Your Honor.

23         THE COURT:  All right.  Thank you very much, sir.

24  You're free to go.

25         THE WITNESS:  Thank you, Your Honor.

1    THE COURT:  Folks, we're very close to 5 o'clock.  I

2    think we're moving along at a very good pace, so we will

3    continue doing that tomorrow.  Again, there has been coverage

4    in the news media about the case.  You will hear me continue to

5    tell you this.  Please do not look up any information about the

6    case.  Do not ask other people about the case or discuss the

7    case with anyone.  Please use great caution in looking at the

8    news.  Avoid local news.

9         Certainly there are other issues you may be

10   interested in.  A hurricane is apparently landing in Florida.

11   But please, when you're looking at the news, be very cautious

12   about anything that might look like this case.  And please do

13   not read or watch anything that might be associated with it.

14   But, with that, thank you.  We'll see you back here tomorrow

15   morning at 9 o'clock.

16        (Open court, jury not present, 4:52 p.m.)

17        THE COURT:  All right.  Be seated.

18        Anything we need to discuss for the record?

19        MR. SWEET:  Nothing for the Government, Your Honor.

20        MS. POTTER:  Nothing for the defense, Your Honor.

21        THE COURT:  All right.  I appreciate having the

22   witnesses lined up and ready to go.  It feels like we are on a

23   good pace.

24        MR. SWEET:  We are ahead of schedule.

25        MR. BERTHOLF:  Yes.  We are definitely ahead of

```
 1   schedule.
 2            THE COURT:  Always good to hear.
 3            MR. BERTHOLF:  Not, like, a super amount, but --
 4            THE COURT:  Well, let's keep aiming for that.
 5            All right.  Thank you very much.  I appreciate it.
 6                              *  *  *
 7            (Court adjourned, 10-09-24 at 4:53 p.m.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

C E R T I F I C A T E


United States of America v. Negasi Zuberi

Case No. 1:23-cr-00254-MC-1

Jury Trial - Day 2

October 9, 2024


I certify, by signing below, that the foregoing is
a true and correct transcript of the record, taken by
stenographic means, of the proceedings in the above-entitled
cause.  A transcript without an original signature,
conformed signature, or digitally signed signature is not
certified.


/s/Lindsey A. Weresch, RMR, CRR, CSR
_____

Official Court Reporter          Signature Date: 3/3/2025
Oregon CSR No. 14-0427           CSR Expiration Date: 6/30/2026