IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION


UNITED STATES OF AMERICA,            )
                                     )
        Plaintiff,                   )
                                     )
        v.                           )    No. 1:23-cr-00254-MC-1
                                     )
NEGASI ZUBERI,                       )
                                     )
        Defendant.                   )



Jury Trial - Day 3

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL J. McSHANE

CHIEF UNITED STATES DISTRICT COURT JUDGE

October 10, 2024

```
 1                        APPEARANCES

 2

 3   FOR THE PLAINTIFF:

 4            JEFFREY S. SWEET
              United States Attorney's Office
 5            405 E. Eighth Avenue
              Suite 2400
 6            Eugene, Oregon 97401

 7   FOR THE PLAINTIFF:

 8            MARCO BOCCATO
              United States Attorney's Office
 9            310 W. Sixth Street
              Medford, Oregon 97501

10

11   FOR THE PLAINTIFF:

12            NATHAN LICHVARCIK
              United States Attorney's Office
13            405 E. Eighth Avenue
              Suite 2400
14            Eugene, Oregon 97401

15   FOR THE PLAINTIFF:

16            SUZANNE A. MILES
              United States Attorney's Office
17            1000 S.W. Third Avenue
              Portland, Oregon 97204
18

19   FOR THE DEFENDANT:

20            AMY ELIZABETH POTTER
              Angeli Law Group LLC
21            121 S.W. Morrison Street
              Suite 400
22            Portland, Oregon 97204

23

24

25
```

```
 1   FOR THE DEFENDANT:

 2           MICHAEL BERTHOLF
             Law Offices of Michael P. Bertholf, LLC
 3           108 Mistletoe Street
             Medford, Oregon 97501
 4

 5   COURT REPORTER:   Lindsey A. Weresch, RMR, CRR, CSR
                       United States District Courthouse
 6                     1000 S.W. Third Avenue, Room 301
                       Portland, Oregon 97204
 7                     (503)326-8047

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

GENERAL INDEX

                                                        Page No.

October 10, 2024, Proceedings                              440

Reporter's Certificate                                     687

                              * * *

WITNESS INDEX

For the Plaintiff        Direct    Cross    Redirect    Re-Cross

Carlos Garcia              442      467

Trahern Fox                470      488

Joel Loudermilk            489      533

Carol Westfall             539

Kevin Westfall             551      569       574

Bradley Sticklin           575      584       585

Tyler Young                587      605       609

Brandon Dougherty          611

Jesse Snyder               624      638

Christopher Parkerson      640      644

Stephanie Stewart          645      659       662

Loren Summers              664      681       685

                              * * *

(Thursday, October 10, 2024, 9:07 a.m.)

**P R O C E E D I N G S**

      (Whereupon, the following proceedings were held in open court:)

      THE COURT:  Okay.  Do we need to discuss anything before we bring the jury in?

      MR. SWEET:  Nothing from the Government, Your Honor.

      MR. BERTHOLF:  Nothing from the defense.

      THE COURT:  Okay.  Let's bring the jury in.  Thank you.

      MR. SWEET:  And, Your Honor, at the appropriate time, actually, if we could have the Court read a stipulation regarding the felony conviction.

      THE COURT:  Yes.  Do I have that?

      MR. SWEET:  We will -- and it does not have to be right this second, Your Honor, but --

      THE COURT:  We'll get it.

      MR. SWEET:  I should've said that before I sat down and said "nothing."  Thank you.

      THE COURT:  All right.  Thank you.

      (Whispered discussion, off the record, 9:08 a.m. - 9:09 a.m.)

      (Open court, jury present, 9:09 a.m.)

      THE COURT:  Please be seated, everyone.

      Good morning, folks.  Thank you again for your

1  timeliness.  Ms. Moore's going to be taking over for Ms. Pew.

2  Ms. Pew had a family matter she had to attend to immediately

3  last night, so she's returned to Eugene.

4          So same question I asked you yesterday morning:  Has

5  anybody read or heard any media articles regarding the case?

6          A JUROR:  Your Honor, I -- the news came on, and a

7  picture of him flashed.  And then I heard the case started

8  before I got to the remote and I turned the TV off.

9          THE COURT:  Okay.  Thank you.  I appreciate that.

10  That's exactly what we're asking you to do.  And it is very

11  much appreciated by the parties, I'm sure, that you did that.

12          All right.  With that, we're going to return to

13  testimony.  We are moving along at a good pace.  I think we

14  might even be a little ahead of schedule.  The attorneys are

15  working very hard, even in the evenings, to make sure they are

16  getting the case to you as quickly as they can.  So we will

17  return to witnesses.

18          The next Government witness, please.

19          MR. LICHVARCIK:  United States calls Carlos Garcia.

20          And while Mr. Garcia walks in, Ms. Moore, I just want

21  to make sure the juror monitors are also working.  I forgot to

22  check.

23          THE COURT:  Mr. Garcia, if you'd like to step up to

24  the witness stand over to my right.

25          If you want to remain standing once you come up, I'll

1   swear you in, if you'd like to raise your right hand.

2                           ***CARLOS GARCIA***

3   Was thereupon called as a witness on behalf of the

4   Government; and, having been first duly sworn, was examined

5   and testified as follows:

6              THE COURT:  All right.  If you would like to have a

7   seat.

8              If you could please state your first name and your

9   last name.

10             THE WITNESS:  My name is Carlos Garcia.

11             THE COURT:  All right.  And could you spell Garcia

12  for our court reporter.

13             THE WITNESS:  G-a-r-c-i-a.

14             THE COURT:  Okay.  Thank you, Mr. Garcia.

15                        DIRECT EXAMINATION

16  BY MR. LICHVARCIK

17  Q.   Mr. Garcia, would you please introduce yourself to the

18  jurors and let them know where you live.

19  A.   I'm Carlos Garcia.  I live in Klamath Falls, Oregon.

20  Q.   And specifically what address?

21  A.   1346 North Eldorado Avenue in Klamath Falls, Oregon 97601.

22  Q.   I'd like to show you Exhibit 27.

23             And, as it's playing, do you recognize this?

24  A.   Yeah, that's my -- my house on this side.

25             MR. LICHVARCIK:  Okay.  Pause right there.

BY MR. LICHVARCIK

Q.   Which house is this that we're looking at right here?

A.   That's my neighbor's house.

Q.   Do you know the address by any chance?

A.   Ah --

Q.   If you don't, that's okay.

A.   1336 or something.  Like, that number's in my mind.

Q.   And your house is -- in this image your house is to the right of this house; is that correct?

A.   Well, the way that I'm seeing, it's on the right.  But it's kind of like on the left on this one, so --

Q.   Okay.  We'll continue playing this for a few more seconds, and we'll pause it right there.

        Okay.  So now we're seeing a house -- again, on this image it's on the right of this image.  Is that your house with the green grass in the front?

A.   Yes.

        MR. LICHVARCIK:  Okay.  Play a little bit more.

        And then stop it right there.

BY MR. LICHVARCIK

Q.   Okay.  So what's in between your house and your neighbor's house at 1336?

A.   The fence.

Q.   Okay.  Now, how long have you lived in that house?

A.   I've been living there for 22 years.

1        MR. LICHVARCIK:  Exhibit 24.

2    BY MR. LICHVARCIK

3    Q.   And were you living there then back in July of 2023?

4    A.   Yeah, I was living there.

5    Q.   And do you see Exhibit 24?  If you can tell where your

6    house is here at the corner and circle it on your screen.  You

7    can actually touch your screen.

8    A.   (Witness complied.)

9    Q.   Okay.  And you've marked the corner there of Painter and

10   North Eldorado?

11   A.   Yes.

12   Q.   And back in July of 2023, who was your neighbor living in

13   that house that we saw in the drone video?

14   A.   It was Sakima.  He introduced to us like Sakima.  And his

15   wife and two kids.  And I guess there were some random guys

16   renting or living downstairs.

17   Q.   And do you see Sakima in the courtroom today?

18   A.   (Witness indicating.)

19   Q.   And what color shirt is he wearing?

20   A.   White.

21        MR. LICHVARCIK:  Okay.  Would the record reflect

22   identification of Mr. Zuberi?

23        THE COURT:  Yes.

24   BY MR. LICHVARCIK

25   Q.   You mentioned that he was there with someone you thought

1 was his wife?

2 A.   Yes.

3 Q.   Did you know her name?

4 A.   She introduced to us like Alycia or Alicia.  Alycia, I

5 think.

6 Q.   And showing you 488, do you recognize that?

7 A.   Yes.  That's her, Alycia.

8 Q.   Okay.  Do you recall about when -- when Mr. Zuberi moved

9 in next door to you?

10 A.   What is that?

11 Q.   Do you remember about when he moved into that house next

12 door to you?

13 A.   I think early in the year, maybe after Christmas break,

14 sometime like -- that's what I -- what I'm thinking maybe, on

15 the first month of the 2024, if I remember right.

16 Q.   Well, this is 2024.

17 A.   I meant 2023.

18 Q.   Okay.  So early part of 2023?

19 A.   Yeah.

20 Q.   Okay.  Do you recall what kind of car that he drove?

21 A.   He used to drove, like, a Honda Pilot.  It was like a

22 silver color.  And also they used to have a white car, like a

23 Camry or --

24 Q.   I'm showing you Exhibit 193-1.  Do you recognize that?

25 A.   Yeah.

Carlos Garcia - D

1    Q.    What is that?

2    A.    That's the car they used to drive, especially Sakima.

3    Q.    And let me show you Exhibit 277.  Do you recognize this

4    car?

5    A.    Yeah.

6    Q.    And --

7    A.    It looks like it, yeah.  The Utah plates, yeah.  It's a

8    white car.

9    Q.    You said the Utah plates you recognize?

10    A.    Yes.

11    Q.    And if you remember, do you recall where the Honda Pilot

12    was generally parked?

13    A.    It was parked on the driveway most of the time or close to

14    the fence.

15    Q.    Okay.

16    A.    And this white car was on the other garage door, in front

17    of the garage.

18    Q.    Okay.

19    A.    And I guess one of the guys that used to live there, he

20    used to park on the street.

21    Q.    Now, did you interact much with Mr. Zuberi when he -- in

22    the time between when he first moved in, in early 2023, and

23    going through the summer, did you have much interaction with

24    him?

25    A.    Not really.

1    Q.    How would you generally describe him as a neighbor?

2    A.    Quiet.  And he was working on the back of his house, on

3    the yard, about every time that I used to go out to work on my

4    yard or do something, and he was there just like this

5    (indicating).  But that was it.  And he goes back inside to his

6    house and -- and after I go back inside of my house, he just

7    continue doing whatever he was doing with his backyard or

8    something.

9    Q.    You mentioned a car parking kind of in front of the

10   garage.  I'm showing you 28-3.  Is this the garage you were

11   talking about?

12   A.    Yes.

13   Q.    All right.  Now, did you ever see that garage -- when he

14   was living there, did you ever see that garage open?

15   A.    Yes.

16   Q.    Okay.  When, and what did you see in there?

17   A.    When he first move in, there was nothing, just like

18   belongings, like -- maybe like furniture a little bit or power

19   tools for working or toys from his kids and -- but it was

20   pretty much, like, empty kind of.  For the first few months

21   that he used to live there, it was like -- the doors were open

22   sometimes, not all the time, but sometimes.  There was nothing

23   there.

24   Q.    Right.

25   A.    And --

1    Q.    Did you notice that that changed at some point?

2    A.    Yeah.  Like maybe the last couple months that he -- he was

3    living there, they were, like, closed all the time.

4    Q.    So in the last couple months that he was living there, up

5    through July, you don't remember those doors being open at all?

6    A.    No.

7    Q.    Now, could you see -- let me show you 496-3.  What are we

8    looking at here?

9    A.    It's kind of like his front porch from -- and that door,

10   that you can see between there, that goes to the house garage.

11   Q.    And can you circle which door you're talking about on your

12   screen?

13   A.    (Witness complied.)

14   Q.    Okay.  And so we're looking now from the perspective of

15   where?

16   A.    From my front yard.

17   Q.    From your front yard?

18   A.    Yeah.

19         MR. LICHVARCIK:  And if we could remove the pink from

20   the screen, please.

21   BY MR. LICHVARCIK

22   Q.    So what are we looking at here, 496-2?

23   A.    That's kind of like from my front yard pretty much.  And I

24   can see the fence they -- the owners of the house built for,

25   like, a patio for that house or whatever and -- and the

1  driveway.  This is looking south.

2  Q.  Okay.  So that's the view from your yard, looking over

3  into his --

4  A.  Yeah, looking to his -- that property and looking south.

5  Q.  As you described earlier, if you walked up to that fence,

6  then you'd be able to see that door to the garage?

7  A.  Yes.  Oh, yeah, like from --

8  Q.  Did you ever see that door to the garage, that you had

9  just circled in pink a little bit ago, did you ever see that

10  open?

11  A.  Sometimes before.  But, like, I guess, like the last --

12  before he -- he move out or whatever, I think it was like open,

13  but it was like a blanket hanging or dark blanket.  I don't

14  know.  And before that, it wasn't nothing there.

15  Q.  And when you say "before that," what do you mean?  Before

16  when was there not --

17  A.  Before like the last couple months I see him, like, open,

18  like, a little bit and -- but there was nothing hanging there.

19  And in the last couple months, I think I see it, like, once or

20  twice, but it was like -- like something hanging.  Like, if you

21  opened the door, it was like a blanket to block something.  I

22  don't know.

23  Q.  And once that blanket was hung on that door, were you then

24  able to see in --

25  A.  No, you cannot able to see what was inside, not even when

1  the door was open.  That thing or blanket, it was blocking
2  whatever.
3  Q.  Did you ever see him hauling anything to the house?
4  A.  To be honest, I never see him hauling anything.  I see,
5  like -- like, by the fence door, like, pallets or, like,
6  barrels, like big barrels, that I was like, "What the heck is
7  that for?"  But I don't know.
8  Q.  And what do you mean by pallets?
9  A.  Like those pallets where you can carry like -- I don't
10 know -- like boxes or heavy stuff, you know.
11 Q.  Kind of wooden pallets?
12 A.  Yeah, like wooden pallets.  Yeah.
13 Q.  But you never saw cinderblocks or anything like that?
14 A.  Not that I remember.
15 Q.  Okay.
16 A.  They were, like, empty, but -- like, by the fence or on
17 the floor.
18 Q.  Now, let me take you back to July 15th of 2023.  Do you
19 remember that day?
20 A.  Yeah.
21 Q.  Okay.  Tell us what was going on that morning.
22 A.  That day, I went to visit my mom.  And my wife and my
23 kids, they stay home.  And I was coming back home from my mom's
24 house.  It was around noon or five minutes after noon.  And I
25 park on my side door where -- pretty much on this carport

1    (drawing).

2    Q.    And let me stop you right here.  So, first of all, what

3    are we looking at in 496-1?

4    A.    That's kind of, like, my house on the corner.  And that's

5    Painter going down straight, and Eldorado.

6    Q.    And then you just circled something around the driveway

7    there?

8    A.    Yeah.  That's where I normally park because I don't have a

9    garage, so I park -- in that carport is my wife's car and my

10   pickup.  So I park on this side of the -- on the Suburban.  And

11   when I was -- my mom gave me something to take home.  So I have

12   something on my hands, and I grab my key to open the doorknob

13   with my key downstairs.

14           And I heard, like, a car.  So I just look.  And it

15   was, like, a random car.  So I keep -- continue -- like I had

16   hard trouble putting my key into the hole.  And I heard like --

17   like a female voice, like, screaming for help, like, "Help.

18   Help."

19           And I was like, "What the heck was that?"  And -- and

20   I pause for like -- or froze for like few seconds.  I go,

21   "Something -- somebody's screaming for help in front of my

22   house or" -- and so I heard like, "Help," again.  So I put

23   everything down.

24           And I start walking kind of, like, fast.  And where

25   you guys see, like, this pole, I kind of stand up, like, next

1  to the pole, like, "What just happened?"

2          And there was a car on this area on the street, like

3  a random car.  The car that I just see like a few seconds

4  before, it was stopped in the middle of the road.  And I guess

5  that it was a lady, a white lady.  And I guess she was closing

6  the door of that car and -- on the passenger side, the back

7  seat -- like, in the back seat.

8          And she went around the car, and she start driving

9  south.  And I was like, "Something happened here," you know,

10 but -- somebody was asking for help, but I was like -- I didn't

11 see anything around, you know, like, on my neighbors' house

12 or -- I was like, "What just happened here?  Somebody was

13 asking for help."

14 Q.  Now, do you know about what time of day that was?

15 A.  It was like noon to five minutes after noon, like 12:05 or

16 so.

17 Q.  And how were you -- how are you sure about that?

18 A.  Oh, because I look on my phone.

19          MR. LICHVARCIK:  Okay.  And if we could clear the

20 pink, please.

21 BY MR. LICHVARCIK

22 Q.  And, you know, you showed us how you went up and -- after

23 you heard the sounds, and went up by the telephone pole.

24 Where -- where were you hearing the sounds from while you were

25 down in the driveway?

1  A.   I heard the sounds -- like, they were coming, like, around

2  this area (drawing).  I heard the sounds.  And I was, like -- I

3  was trying to open the door that we have, like, somewhere here

4  (drawing).

5  Q.   Okay.

6  A.   And that's when I heard the sounds, like, pretty clear,

7  kind of like between Sakima's house and my house pretty much.

8  And -- but it didn't sound like my wife's scream or any of my

9  kids.  It was like a female voice.

10  Q.   So what did you do then?  After you ran up, you saw this

11  car stopped, someone get out, and then the car left, what'd you

12  do then?

13  A.   I -- there was a young lady jogging on the -- across my --

14  on the street.  I saw her, like, coming down.  And she kind of,

15  like, crossed where I was standing.  And I went like, "What has

16  happened?"  And she just smile and keep jogging.  I was like --

17  I thought she saw something, you know, like -- but she was

18  jogging or running.

19        Maybe she was, like, far way when -- but I was

20  standing there for like a couple minutes.  Maybe she didn't see

21  anything.  I don't know.  But I thought she saw anything or --

22  and she just keep running.  And I went back inside my house.

23  And I asked my wife and my kids, "Did you guys hear somebody

24  screaming for help just in front of our house?

25        "No."  They were, like, watching TV, like, loud, you

Carlos Garcia - D

1  know, or -- and my wife was doing laundry or something

2  downstairs.  And she say, "I didn't hear anything."  And the

3  kids, I guess not.  And they -- "Who was screaming?"  And --

4  they were asking me.  I said, "It was a female asking for help

5  right in front of our house."

6  Q.   What did you do then?  After you went inside, what did you

7  do?

8  A.   What I did is, like, I told my wife and my -- and my kids,

9  "Just go" -- I told my kids to go downstairs.  And I say,

10  "Something is going on here."  I -- this is like one of those

11  times that you can feel in your heart, you know, like,

12  something is not right; something happened here.

13  Q.   Why did you tell the kids to go downstairs?

14  A.   Because I don't know if something was going on around the

15  neighbor's house or something, you know.  And -- and then I

16  told my wife and the kids, "I'm going to sit on the front

17  porch."  And I feel that something happened.  It's like -- I

18  don't think I'm getting crazy, that I'm hearing voices, you

19  know.  And I -- and after I was sitting on my porch bench, I

20  noticed -- I notice a --

21  Q.   And let me pause you real quick.  I'm going to show you

22  496-4.  And, sorry, thank you for clearing the pink.

23        What are we looking at here?

24  A.   That's my porch.  And that's the bench that I'm talking

25  about, is like here (drawing).

1    Q.    Okay.  And that's where you were sitting when you came

2    out?

3    A.    Yes.

4    Q.    And you were kind of looking around?

5    A.    Yeah.

6    Q.    All right.  Sorry to interrupt you.  What did you see?

7    A.    From there, when I went outside, before I sit and I look

8    around and -- I didn't see the neighbor's car, like the guy

9    that used to park in the front or Sakima's Pilot or -- the gray

10   one, I didn't see him.

11          And I see only the white car, like, parked there.

12   But I didn't see any movement around the street or them.  And

13   then I -- then the next thing, I think I saw the sheriff

14   driving by.  And they kind of slow down right in front of

15   Sakima's house, like looking.  And I was like, "Something

16   happened.  Why are they slowing down and looking towards the

17   house where Sakima used to live?"

18   Q.    And about how long -- you said that you looked at your

19   phone when you heard -- after you heard the screams; and it was

20   sometime, you know, soon after noon.  How much after that --

21   what time do you think it was about when you saw the sheriff's

22   car driving by?

23   A.    Maybe ten minutes later or so.  15 for the most.

24   Q.    And you mentioned that Honda Pilot was not there in the

25   driveway?

1   A.   No.

2   Q.   You mentioned something about the white Nissan Altima.

3   Where did you see it?

4   A.   It was on the driveway, on the front of the -- like, the

5   two garages are here and the house this way (indicating).  It

6   was parked in front of this.

7   Q.   And what did you see after you saw that sheriff's vehicle

8   driving by?

9   A.   I -- they went by.  And I think, like two blocks later

10   maybe, they make, like, a U-turn.  And they drive south again,

11   and they slowed down.  And I think it was a male officer and,

12   like, female passenger, if I'm not wrong.  Like, they were

13   looking to the house.  Like, I don't know who the female was or

14   whatever.

15         And -- and then they kind of, like, park for a little

16   bit, like on this area of the street.  And then they take off,

17   the sheriff.  And then later I saw Alycia, Sakima's wife,

18   through the fence, like -- because it has, like, some holes

19   through the fence.  And I feel, like, somebody was -- like,

20   movement.  And so I look, and it was Alycia.

21         And she -- she just hang out, like, a purse, like a

22   black purse, on the fence.  Like, if I'm not wrong, it was like

23   this pole here (drawing).  She hang out the purse there, and

24   she went back inside.

25   Q.   And I'll pause you there.  Did you -- can you describe at

1  all the passenger in the sheriff's vehicle that you saw at all?

2  A.   I think it was a female white person.

3  Q.   Okay.

4  A.   But I don't recognize, like, who was it.  Like, I don't

5  know.  I don't know.

6       MR. LICHVARCIK:  I don't believe this next exhibit is

7  in evidence yet, so this is going to just be shown to the

8  witness.

9  BY MR. LICHVARCIK

10 Q.   Okay.  Let me show you what's marked for identification as

11 519.  All right.  Mr. Garcia, do you recognize this?

12 A.   Yeah, that's the purse that she hang out on the -- on the

13 fence.

14 Q.   And is that -- does that accurately depict where you saw

15 the purse and what the purse looked like that day?

16 A.   Yeah.  It was, like, the purse that Alycia hang out.  I

17 thought she, like, wash it and just hang it, like, to dry.  It

18 was, like, sunny, you know.  But I saw when she hang out that

19 purse on the fence.

20      MR. LICHVARCIK:  Okay.  Move to admit Exhibit 519.

21      MS. POTTER:  No objection, Your Honor.

22      THE COURT:  All right.  519 will be received.  It can

23 be published.

24      (Government's Exhibit No. 519 received.)

25

BY MR. LICHVARCIK

Q.   Okay.  Now we're about to describe things that you saw next.  Before we get into the details -- oh, sorry, you had something you wanted to say.

A.   Yeah.  Like, after she went back inside, I see, like, a city police car drive by and then back again and -- and slow.  And they were looking at Sakima's house again.  Like, so I was like -- I had the feeling like I'm right, like something happened, you know.  Like, something just happened.  Like --

Q.   Now we're going to describe some of the things that you saw next in some detail.  But, before we do, can you just give a big-picture overview of generally, you know, just in two sentences or so, of kind of what happened over the next hour or so?

A.   Yeah.  And then after the police took off, I was still, like, sitting outside.  And then Sakima show up in his Pilot, but kind of like -- I don't know.  He was in a rush or something.  But he normally park, like, straight in front of his garage.

         And this was -- he was kind of, like, a little bit, like, sideways because he got, like, plenty of room between where he parks on the driveway and -- and, like, the fence.  It was, like, a little wider for him.

Q.   Okay.  So the first thing you saw was, you said, Sakima arrive in the Honda Pilot?

1    A.    Yes.

2    Q.    And I'm showing you 28-3.  And where did he -- where did

3    he park?

4    A.    Yeah.  He -- he normally park like straight here

5    (drawing), but this time he was kind of like -- like this

6    (drawing), like -- not -- maybe like over here, kind of like

7    that (drawing), like -- and -- and I wasn't -- but I -- I

8    thought it was -- just, like, he was getting home to get

9    something or -- I don't know.

10   Q.    Did you just turn around and go inside and -- at that

11   point and just not come back out again?

12   A.    Yeah.  It looks like everything normal.  His wife -- he,

13   like, was on the patio for a little bit.  I don't -- I couldn't

14   see if he was loading something with his wife or -- into the

15   car.  And I think later he take off.  And then, like, five to

16   ten minutes later, he come back.  And he park the same -- kind

17   of the same way.  And then I was like -- I don't know.  And I

18   see the police, the sheriff, again.

19   Q.    Let me pause you.  You said he left.  What car did he

20   leave in?

21   A.    The Pilot.

22   Q.    Okay.  And then you said he came back.  And what car did

23   he come back in?

24   A.    In the Pilot.

25   Q.    And the whole time while all this is happening, where are

1  you at?

2  A.    I was on my porch.

3  Q.    Okay.  Why didn't you just go back into your house?

4  A.    Because after I saw the police driving so slow, I think

5  something was going on.  You know, I -- those screams from --

6  asking for help, I was like, "I think I was right.  I heard

7  something, you know."

8          And I didn't went back inside until, like, I think,

9  like, my family is safe, you know.  And -- and I -- and after

10 he take off, he come back.  And I -- I saw the sheriff drive by

11 again -- I don't know if it was the same one -- and then take

12 off.  And after like ten minutes or so, I didn't see any

13 movement from his house or sheriff or police, city police, so I

14 went to get my lawnmower.  And I -- and I was like, "Something

15 isn't -- doesn't feel right here," you know, so --

16 Q.    Let me ask you.  When do you normally like to mow the lawn

17 on a Saturday?

18 A.    In the evening.

19 Q.    Why?

20 A.    'Cause it's cooler and --

21 Q.    Why did you decide to mow the lawn over the lunch hour?

22 A.    Because I feel that something was going on around my

23 neighbor's house or -- because it was now my target.  It was,

24 like -- Sakima's house, because the police -- city police and

25 sheriffs, they were looking at that house and driving by so

Carlos Garcia - D

1  slow.  And after they pass the house, they drove like normally,

2  back to the normal speed of the street.  And I guess I need to

3  find out what's going on, if my family is safe, you know.

4  Q.   How long does it normally take you to mow the lawn?

5  A.   Like -- if I do it quick, maybe like 15, 20 minutes.

6  Q.   How long are you mowing the lawn that day?

7  A.   Maybe like half an hour.

8  Q.   All right.  Why don't you tell us -- so you got the

9  lawnmower, and you brought it up.  What did you see next?

10 A.   When I was mowing the grass, I did the side on Painter

11 Street, and then the one between the sidewalk and the street.

12 And then I went back inside on my front yard.  And I was doing

13 that, like -- I was, like, maybe, like, halfway.  And then I

14 see -- now, before -- before I went inside, I think they moved

15 the white car into the street.

16 Q.   Do you have any idea who moved the white car into the

17 street?

18 A.   I didn't see.  I didn't see.  But they move it, like -- I

19 see the car.  It was like -- I don't know.  It got, like, dark

20 windows or whatever.  But I see they move the car, like, on the

21 street and -- just to clear the driveway.  And I was -- for a

22 second I was like, "Why do they move it there?  Normally the

23 guy that lives downstairs, with the long hair, parks there."

24 And it was -- I was just, like -- I don't know why they moved

25 the -- the car.  But it's their property, you know.

1    And so I keep cutting the grass. And when I was like

2  halfway, I saw Alycia with like a little basket or container

3  and -- and then -- then the two kids -- I think they used to

4  have, like, two little boys. And -- and she opened the

5  passenger side on the back seat and -- and the kids went

6  inside. And I tried to say hi to Alycia, you know, when I

7  was -- because I was facing that way. And she didn't reply

8  back, like wave at me or anything.

9  Q.   What did she do?

10  A.   I don't -- she just was opening the door, and she was --

11  she had her cell phone, like -- like, she was kind of like

12  pointing it at me, like recording me or -- I don't know. I

13  feel like that. But when I got closer to the fence, I went

14  like -- smile and say hi. And then she went like this

15  (indicating) and kind of, like, smile pretty quick, like

16  (indicating).

17  Q.   Are you able to show us on 25-3 where the white car was at

18  this time where you saw Alycia kind of getting in with the

19  kids?

20  A.   Yeah. They moved the car where this car is, kind of like

21  right there (drawing). And it was facing south. And she was

22  opening the -- the sidewalk doors, like on the passenger side,

23  like on the back seat.

24  Q.   And then what happened to that white car after Alycia and

25  the kids got in?

A.    The kids went in the back.  And Alycia opened the front
door on the passenger, and she was a passenger on the -- and
the car took off south.  But I guess they make, like, a U-turn.
And they start -- when I was heading -- like, cutting the
grass, like, towards the north, I saw the car going towards
north, like I assume they drove south a little bit and make,
like, a U-turn and -- and I saw the container in her arms.

      I thought, like, maybe they're going to go to a
picnic with his kids or something to the park, Moore Park or
something.  And -- but after -- after I cut my grass -- so I
didn't see any more movement.  And it was the -- Sakima's truck
or Pilot car on -- the SUV on the driveway.  And they took off
on the -- on the -- in the white car.  I assume he was driving
because she was the passenger, you know, and the kids in the
back.

Q.    Did you see the white car return?

A.    Yeah.  When I was -- when I done, I was about ready to put
my lawnmower in the backyard.  That is -- I don't know if --
and -- it's kind of, like, my door for that fence is next to
the -- where the Suburban is, in the carport.  So I normally
stop there all the time and get the bag and dump it to the
trash can.  And when I was about ready to grab the bag, I
heard, like, a car, like -- like, a car door slam.  And it was
parked here (drawing).

Q.    Okay.  And you're drawing a circle on the right of 25-3?

Carlos Garcia - D

1   A.   Yeah.  It was the white car, their car, 'cause I see the

2   Utah plates.  And I was looking, like, this direction, this way

3   (drawing) -- or I don't know.  Like --

4   Q.   So at this point you had taken your grass clippings down

5   to the right of your carport area?

6   A.   Yeah.

7   Q.   Okay.

8   A.   And then -- and then I saw the -- I heard the -- like, the

9   door slam.  And I look, and it was their car, like, parked over

10  where I put the circle.  And then Alycia came out of the car by

11  herself from the passenger side door.  And I was like, "Why are

12  they parked there, instead of, like, at their house?"

13       And she started walking across the street towards my

14  sidewalk.  And I say, "Why -- if Sakima was driving, why they

15  don't park in front of their house and drop her there?"  It's

16  closer, you know, instead of, like, two houses or -- up.

17  And -- and then I heard the car took off.

18       And Alicia -- or Alycia start walking and -- and I

19  couldn't see her what she did after that because I -- I dumped

20  the trash -- or the grass into my garbage container.  And then

21  I went to put the lawnmower back.

22       And, before that, I told the kids, because they had a

23  bunch of cans to sell, so I told the kids, "I'm going to load

24  my pickup with those bags, so we can clear the backyard a

25  little bit, and then you guys can have some money," you know.

1  And so I load my truck.  And it was like around 1:00 p.m. or

2  so.  So when I took off, I start driving south on Eldorado.

3  South is where -- where that red car is.

4  Q.  Can you draw an arrow showing the direction?  When you're

5  referring to south, which way are you referring to?

6  A.  So I was heading south (drawing), this way, from here.

7  And when I -- after I load the truck and get the kids ready,

8  when I start driving south, I didn't see the SUV either.  So I

9  don't know.  After he drop her and she start -- she took the

10  other car and he took off with the other -- with the two kids

11  in the white car and -- and I assume she drove the -- the other

12  car because --

13         MR. LICHVARCIK:  Okay.  If we could clear the pink,

14  please.

15  BY MR. LICHVARCIK

16  Q.  And so if you could, again, draw on this clean slate where

17  the white Altima was when it came back, when you were dropping

18  off the glass clippings.

19  A.  The white Altima was -- when she got out of the car?

20  Q.  Yeah.

21  A.  It was in front of this other house over here (drawing).

22  Q.  And can you draw a line showing where you saw Alycia

23  Westfall get out and walk towards?

24  A.  She was walking, like, over these rocks to the sidewalk,

25  cross the street, and just started going to the -- my sidewalk.

1  And I guess she went to her house.

2  Q.  And then what happened to the -- to the white car then?

3  A.  After she got out of the car, the car just took off.

4  Q.  Okay.  And then you said you threw some of the cans in

5  your truck and drove south, as you showed us?

6  A.  Yeah.

7  Q.  What time about was that?  Do you know?

8  A.  Maybe after I saw her walking, maybe like ten minutes

9  later for the most.

10  Q.  And when you saw her walking at first, where had you last

11  seen the Honda Pilot?

12  A.  It was still in the driveway.

13  Q.  And then when you pulled around with the cans and drove,

14  where was the Honda Pilot?

15  A.  I think it was gone.  I think both of the cars were gone.

16  Q.  Now, before today, after this day, did you ever see Sakima

17  Zuberi again?

18  A.  No.

19  Q.  Okay.

20  A.  Yeah.  The last time that I saw him maybe is when he took

21  off in the white car with the kids.  I assume he was the driver

22  and -- because it was only his wife and she was a passenger, so

23  I don't think they had a -- the car will drive by itself.

24        MR. LICHVARCIK:  Okay.  Thank you.  No further

25  questions.

 1          THE COURT:  Any cross-examination?

 2          MS. POTTER:  Yes.  Thank you, Your Honor.

 3                    CROSS-EXAMINATION

 4     BY MS. POTTER

 5     Q.   Good morning, Mr. Garcia.  My name's Amy Potter.

 6     A.   Hi, Amy.

 7     Q.   Hi.  Just a couple questions.  So I just want to kind of

 8     walk through what happened that morning.  So you're -- you're

 9     coming back from your mom's, correct?

10     A.   (Witness nods head.)

11     Q.   So you have to say yes or --

12     A.   Yes.

13     Q.   Sorry.  I can tell, but she can't tell.

14               So you're coming home from your mom's.  You get out

15     of your car.  Yes?

16     A.   Yes.

17     Q.   And you're carrying stuff?

18     A.   Yes.

19     Q.   And you go to your front door?

20     A.   Yes.

21     Q.   And that's when you hear someone scream, "Help me"?

22     A.   Yes.

23     Q.   And you think that's about 12:00 to 12:05?

24     A.   Yes.

25     Q.   So you stand out there for a few minutes to look around,

1  right?

2  A.   Oh, yeah.

3  Q.   About five minutes?

4  A.   Yeah.  Like, when I will run to the front of the street,

5  maybe like couple of minutes, and I didn't see anything.  I

6  went inside the house and ask my wife and the kids if they

7  heard anything, but they didn't hear anything.  So that's when

8  I decide to go outside on -- right away, like --

9  Q.   Okay.  So -- and let me just back up.  So you did see

10  the -- you thought it was a Subaru drive away?

11  A.   I think it was a green olive Subaru, if I'm not wrong.

12  Q.   And then you saw there was a white woman driving?

13  A.   Yes.

14  Q.   Okay.  So you go inside.  How long are you inside with

15  your wife and children?

16  A.   Maybe like a minute, or whatever it takes me to open the

17  door and -- and talk to them and -- maybe one or two minutes.

18  Q.   And then you come back outside on your porch?

19  A.   Yes, to the front, my front door.

20  Q.   And you stay out there?

21  A.   Yes.

22  Q.   And then you see the Pilot come back?

23  A.   Yeah.  After like -- after I heard the screams, maybe like

24  10, 15 minutes later.

25  Q.   Okay.  You saw it come back?

1   A.   Yes.  That was the first time.  And then he --

2   Q.   So that was the first time you had seen the Pilot that

3   morning?

4   A.   It was like around 12:15, 12:20.

5   Q.   I'm not going to walk you through every time you saw the

6   cars from then, but I want to go to that last time 'cause I

7   think I heard you say something and I just want to clarify.

8   You assumed Mr. Zuberi was driving the Altima at the end?

9   A.   At the end, yes.

10  Q.   But you did not see him?

11  A.   No.

12  Q.   Okay.

13          MS. POTTER:  Nothing further, Your Honor.  Thank you.

14          THE COURT:  Any redirect?

15          MR. LICHVARCIK:  Nothing further, Judge.

16          THE COURT:  Thank you very much, sir.  You're free to

17  go.

18          I apologize, but I need to take a quick break, so

19  we'll be in recess for maybe just five, ten minutes.  Thank

20  you.

21          (Recess taken, 9:46 a.m. - 9:57 a.m.)

22          THE COURT:  All right.  Please be seated.

23          Our next witness, please.

24          MR. SWEET:  Thank you, Your Honor.  The United States

25  calls Klamath Falls Police Department Sergeant Trahern Fox.

1          THE COURT:  All right.  Thank you.

2          Officer, if you'd like to step up here to the witness

3   stand.

4          Step up and remain standing for just a moment.

5          Please raise your right hand.

6                          ***TRAHERN FOX***

7   Was thereupon called as a witness on behalf of the

8   Government; and, having been first duly sworn, was examined

9   and testified as follows:

10          THE COURT:  All right.  Have a seat.

11          If you could please state your first and last name,

12   spelling both for the court reporter.

13          THE WITNESS:  Trahern Fox, T-r-a-h-e-r-n.  Last is

14   Fox, F-o-x, like the animal.

15          THE COURT:  All right.  Thank you.

16                    <u>DIRECT EXAMINATION</u>

17   BY MR. SWEET

18   Q.   Good morning, Sergeant Fox.

19   A.   Good morning.

20   Q.   Are you employed as a sergeant with the Klamath Falls

21   Police Department?

22   A.   I am.

23   Q.   And tell us, please, just briefly:  What's your

24   background?

25   A.   I've worked patrol.  I got hired coming up on 21 years

1  ago.  I work with the SWAT team.  I'm the team leader.  I'm a
2  canine handler.  Both of those, I was hired on in 2006 for
3  those positions.  And I'm also the canine coordinator for the
4  department.
5  Q.  And when did you start working as patrol sergeant?
6  A.  Oh, approximately two years ago.
7  Q.  So I want to ask you, in terms of the investigation of the
8  kidnapping of AV-1, were you involved with the initial
9  response?
10 A.  Yes.
11 Q.  And did you also participate in clearing the house during
12 the execution of a search warrant?
13 A.  I did.
14 Q.  I'm going to focus on those two things.  So I'd like to go
15 back to Saturday, July 15th, 2023.  Were you on duty that day?
16 A.  I was.
17 Q.  And how did you first learn of this investigation?
18 A.  I was contacted by the Klamath County Sheriff's Office, a
19 lieutenant, regarding their sergeant that was investigating a
20 person that claimed they had been abducted from the Seattle
21 area, sexually assaulted and held captive in a house in the
22 Klamath Falls area.  It was an unknown area.  The victim had
23 subsequently escaped from the residence and was picked up by a
24 passing motorist.
25 Q.  What did you do with that information?

A.    I contacted the sergeant who was out with the victim,

Shasta DuVal, and I spoke to her.  And I asked her if she could

tell me the basics of the facts -- or the basic facts of the

case, what they had so far.

She stated that the female, AV-1, had indicated that

she had engaged in a proposition of sex for money up in the

Seattle area; and that at one point a male had produced a

firearm, stated that he was with the police, that she was under

arrest, and that he was going to be transporting her to another

facility for processing.

They took quite a long ride together.  And at some

point in time during that, during the travel, she was sexually

assaulted and, ultimately, ended up in a residence in

Klamath Falls.  She had stated that they had pulled in -- they

were in a light-colored SUV.  They had pulled into the garage.

The garage door had gone down.  He had removed her

from the vehicle and placed her in a concrete-type room and

left her there and stated that he would be back.  She had

stated that she basically had fallen asleep for a few hours

and, after she woke back up, came to the realization that she

didn't believe that he was an actual police officer and started

to yell and scream and bang on the door, a security door that

was on the front of the room.

She had beaten on the door, subsequently creating

enough space that she could push herself through the hole in

1  the security door, exited into the garage, attempted to get

2  into the vehicle there, located the firearm that he had

3  produced initially, took that with her, and exited through a

4  man door, and climbing over a fence and exiting the residence,

5  where she was picked up by the motorist.

6  Q.   And so, with that information, did you dispatch two of

7  your patrol officers to go to Sky Lakes Medical Center?

8  A.   I did.

9  Q.   And did you also work to try to determine the location of

10  the residence?

11  A.   Yes.  The area, it was -- it was -- well, let me back up

12  just a little bit.  When I had spoken with Sergeant DuVal, she

13  had another deputy that she was working with the motorist to

14  try and backtrack because the motorist was not from

15  Klamath Falls, so she was unable to provide exact details of

16  where it was.

17        She was backtracking with that motorist to try and

18  narrow down the search area for where AV-1 was located

19  initially, where she had been running down the street.  At the

20  same time I asked Officer Gilmore, that was up at the hospital,

21  to try and ascertain information regarding where -- a

22  description of the residence so we could also narrow that down.

23  Q.   And so let me follow up on one part of that.  So Sergeant

24  DuVal, who -- who met with AV-1 at the Klamath -- excuse me --

25  at the Kentucky Fried Chicken -- Sergeant DuVal took AV-1 to

1    the hospital; is that correct?

2    A.    Correct.

3    Q.    And then Sergeant DuVal had another Sheriff's Office

4    deputy take Mellissa Geary, the woman who picked her up, to go

5    try and find the residence.  Am I understanding that?

6    A.    Correct.  Deputy Ashley Ensminger.

7    Q.    And do you know what area they drove around?

8    A.    It was the Pacific Terrace Hot Springs area.  It's a

9    residential area on the east side of Klamath Falls.

10   Q.    And is Eldorado Street in that area?

11   A.    It is.

12   Q.    So you dispatched officers to Sky Lakes Medical Center.

13   Did you go there as well?

14   A.    I did.

15   Q.    Tell us -- if we could focus on steps that you did to try

16   to narrow down which residence it might be and what you learned

17   with that.

18   A.    Well, I had Officer Gilmore speaking with her.  I didn't

19   want too many people discussing the things with her and getting

20   saturated.  While he was doing that, Deputy Ensminger had

21   relayed to Sergeant DuVal that they had believed that the area

22   that she was picked up in was Eldorado and Painter Street,

23   which is roughly in the 13-, 1200 block of -- of North

24   Eldorado.

25   Q.    Is that an area you're well familiar with?

1   A.   Yes.  I'm very familiar with it.

2   Q.   And did you receive -- well, tell us about -- in terms

3   of -- was there information from Officer Gilmore that helped

4   you narrow it down even further?

5   A.   Yes.  I was canvassing the area for either a light-colored

6   SUV, and then she also stated that there was a lighter-colored

7   vehicle parked in the driveway.  It was a two-car driveway.

8   Q.   And, actually, if I may pause you for one second, when you

9   say "canvassing the area," were you driving around Eldorado?

10  A.   I was physically driving the area.  Correct.

11  Q.   And what -- were you in a patrol car?

12  A.   Yes, I was.

13  Q.   Klamath Falls Police Department patrol car?

14  A.   Black and white.

15  Q.   Okay.  Thank you.  Please continue.

16  A.   I continued to canvass the area.  And then he provided the

17  information that the victim had stated that there was a tall

18  wooden fence located in the front yard that she scaled to climb

19  over, to get out after she exited the residence.  I'm only

20  familiar with two residences in that area that have a large

21  wooden fence.  It's relatively rare to have that because our

22  code technically prohibits that.

23  Q.   So did you narrow it down to two residences that matched

24  that description?

25  A.   There was.  There was one across the street from Roosevelt

1  Elementary School, which I believe was 1132 North Eldorado.

2  And the second residence was 1336 North Eldorado.

3  Q.   So from the description that AV-1 provided to you and your

4  knowledge of the area, you were able to narrow it down to two

5  residences, one of which was 1336 North Eldorado?

6  A.   Correct.  It was almost right in that exact area of where

7  she identified that she had picked up the victim.

8  Q.   So we're going to -- we're going to jump ahead a little

9  bit because the jurors have heard from Officer Gilmore, and he

10 described being at the hospital with AV-1 and then taking her

11 out to 1336.

12        Did you -- were you at 1336 as well when AV-1 came

13 out to identify the residence?

14 A.   Yes.  We asked AV-1 to come out with us.  She was riding

15 with Officer Gilmore and Officer Trippet in their patrol

16 vehicle, I believe.  And then Detective Loudermilk and myself

17 were in our own vehicles, also canvassing the area, driving the

18 area.  She identified 1336 North Eldorado as the residence that

19 she had been held at.

20 Q.   And at some point did you and Detective Loudermilk knock

21 on the door of the residence?

22 A.   We did.  Detective Loudermilk, Detective Young, myself and

23 Officer Gilmore approached the house for a knock-and-talk and

24 attempted to make contact with any residents inside the

25 location.

1    Q.   What was your goal?

2    A.   To attempt to identify -- due to the victim had positively

3    identified that it had occurred here, to identify anybody that

4    was inside the residence and possibly apprehend them.

5    Q.   I'm going to show you Government's Exhibit 26.  Were you

6    wearing a body camera video?  Or were you recording?  Did you

7    have some recording device?

8    A.   I believe I did on the first part of that day.

9    Q.   Let's take a look at Exhibit 26, play that.  And there's

10   no volume for the first part.  So who -- what are we seeing

11   here?

12   A.   That's Detective Loudermilk in front of me, I believe,

13   approaching the residence at 1336.

14   Q.   If I could pause it for one second.

15         So, just looking at the time, are you able to tell us

16   what time it is?

17   A.   3:28 p.m.

18   Q.   All right.  Let's continue.

19         And is something -- if we could pause it here for one

20   second.

21         We're going to play this.  Does something happen on

22   the way in here?  Is there some startling event for Detective

23   Loudermilk?

24   A.   Just to the left of his left thigh there, there's a dog

25   crate.  There's a large pit bull that's inside.  And he barks

1  and lunges inside the crate at Detective Loudermilk.

2  Q.   Detective Loudermilk had apparently not seen that, as he's

3  walking in, yet?

4  A.   No.  He's -- he's not familiar with dogs either.

5  Q.   Well, let's see his reaction.  Okay.

6       (Video recording played in open court, 10:08 a.m. -

7  10:09 a.m.)

8  BY MR. SWEET

9  Q.   And let's pause here.

10      So, Sergeant Fox, were you -- the front door to the

11 residence, was that what -- let me back up.

12      What door was Detective Loudermilk knocking on?

13 A.   He was knocking on the main entrance door to that

14 residence.

15 Q.   And the one we can kind of see in your body camera here,

16 looking straight at us, what door would that be?

17 A.   Well, just to the right of that, in that window that I was

18 in front of, is the kitchen area.  And then it pours into this

19 other area, which appeared to be some sort of pantry area.

20 This door here exited out because there was no direct doorway

21 into the garage.  So this doorway would open up.  You would

22 step out.  And at my 9 o'clock, there's another door, and

23 that's how you would enter the garage.

24 Q.   So was the door that's in front of us on the screen -- was

25 that door covered, or were you able to see in the house?

1   A.    I was able to see inside.

2   Q.    How about the door to the garage?

3   A.    That was obscured.  I believe it had a dark-colored -- it

4   appeared to have a shower curtain that was draped just behind

5   it, but close to the door, where you couldn't look in, around

6   or down or anything else.  Everything was obscured inside.

7   Q.    Let's go ahead.

8          (Video recording played in open court, 10:10 a.m.)

9   BY MR. SWEET

10  Q.    And, Sergeant Fox, was there an area you were -- or you

11  were particularly interested in?

12  A.    It was inside that doorway and also inside the garage,

13  that that's where I had piqued interest, due to the fact that

14  she stated she had been held inside the garage.

15  Q.    This is fairly brief.  We'll keep going with this one.

16          (Video recording played in open court, 10:10 a.m. -

17  10:11 a.m.)

18  BY MR. SWEET

19  Q.    So tell us -- tell us about the door being partially

20  opened here.

21  A.    Well, I believe it was just cracked.  It appeared to be

22  closed when Officer -- when Detective Loudermilk knocked on it.

23  When he was knocking loudly, it kind of swung open somewhat.

24  Q.    Okay.

25          (Video recording played in open court, 11:11 a.m. -

1  11:12 a.m.)

2  BY MR. SWEET

3  Q.   Did anybody come to the door, anybody respond to the

4  knock?

5  A.   It was absolutely dead quiet.

6  Q.   So, Sergeant Fox, I'm going to jump ahead then --

7  actually, one more thing on this.  In terms of -- what was your

8  next step?  So you've knocked and talked.  Nobody's responded.

9  What was -- what was the next step?

10  A.   The next step, we rallied up, and we talked to Detective

11  Sergeant Zupan.  And they decided they were going to write a

12  search warrant into the residence, to gain entry.

13  Q.   And had you assigned officers to secure the residence

14  during that time?

15  A.   Yes.  We had maintained -- once we identified the house,

16  we established perimeter security around the house.  And they

17  were left there until the search warrant could be executed.

18  Q.   At that point did you -- did you return to sort of your

19  standard supervisory duties?

20  A.   I did.  That afternoon -- typically in the afternoons

21  calls for service tend to pick up.  So I continued doing the

22  supervisory duties and other stuff and helping out where I

23  could.  I believe I finally went off duty about 6:30 to 7:00,

24  somewhere in that area.

25  Q.   Then at what point do you return back?  What point do you

1  become involved again?

2  A.    I told them if they needed any assistance in executing the

3  search warrant, they could reach out to me.  They did so at

4  approximately 12:40 a.m. that evening, stating that they had

5  the search warrant signed and that they were going to execute

6  it, if I could come out.  I responded directly from my

7  residence to 1336 North Eldorado.

8  Q.    And is your involvement partially because you're a SWAT

9  team leader -- you're the SWAT team leader?

10  A.    Yes.

11  Q.    So in terms of the execution of the search warrant, could

12  you explain -- could you explain how it works, in terms of --

13  what's the first step?  You got a search warrant.  You're going

14  to execute it.  Just tell the jury kind of what happens.

15  A.    Typically we'll gather up all the officers that are

16  involved.  I believe we had Detective Zupan -- or Detective

17  Sergeant Zupan, Detective Young, Detective Loudermilk, OSP

18  Detective Brandon Dougherty and several patrol officers.  I was

19  also there because I was familiar with the case and the house

20  and the layout.

21        We'll approach the house.  We make our announcements.

22  We knock on the door.  If anybody comes to the door, we'll

23  contact them.  We'll read the warrant to them.  But no one was

24  there.  We entered the house, and we start documenting -- we'll

25  check and clear the house to make sure that no one is inside

1    after we don't have any answer at the front door.

2    Q.   So the clearing, is the clearing of the house sort of a

3    separate -- or initial phase before a full search?

4    A.   Correct.  You want to establish and make sure there aren't

5    any other individuals in the house that could pose a threat to

6    you or anyone else.

7    Q.   And was your role more that night involvement with the

8    initial clearing and then scene security, as opposed to sort of

9    a detailed search?

10   A.   Yes.  I think that's a fair statement.

11   Q.   Okay.  I'm going to focus you in on just a few things.

12   Did you clear the master bedroom or --

13   A.   I did.

14   Q.   -- a bedroom?

15   A.   We actually flowed through and cleared the bedroom.  I

16   think I came back and I -- we started out in the upstairs.  We

17   did the initial clear of that.  I went downstairs and did the

18   initial clear of all the bedrooms and other rooms downstairs.

19   Then I returned up for a secondary search.

20   Q.   I'd like to just pull up Government's Exhibit 60-1.  What

21   are we seeing here, please.

22   A.   That is the upstairs bedroom or the master bedroom of the

23   residence.  That was after I had located a handgun hard case

24   that was inside the open closet just to the back of me.

25   Q.   Okay.  So you said you located the case in the closet.

1   And what did you -- what did you do with it?

2   A.   I placed it on the bed, right where it is right there.  I

3   opened it up to see if there was a firearm located inside.

4   Q.   And did you find one?

5   A.   No.  It was empty.

6   Q.   And why were you looking for a firearm inside?

7   A.   The female had indicated that there was a firearm used

8   initially, and also that Detective DuVal had recovered said

9   firearm from the victim.  And it was a handgun.  It was a

10  Springfield Armory 9-millimeter, if I remember correctly.

11  Q.   And after you determined there was no firearm in the case,

12  did you do something with the case?

13  A.   I notified the detectives.  One was behind me.  There was

14  another one.  Detective Loudermilk was the case agent on it.

15  He came in.  I believe he later took photos.  We placed it back

16  where I had initially observed it, inside the open closet.  And

17  he took pictures of that as well, where it was originally

18  located.

19  Q.   Let's take a look at 61, please.

20       So what are you seeing with 61?

21  A.   That is -- that appears to be the case right there that I

22  discovered and that I opened up.

23  Q.   Essentially, would that be put back -- photographed after

24  being put back as to where you found it?

25  A.   Correct.

1    Q.    Were there items in the room that caught your attention?

2    A.    There were other items in the room.  There was some boots.

3    There was some -- there was police patches on the other side of

4    this closet.  It was a two-part closet off to the left there.

5    There was some darker boots.

6          And then later I think there was a Cordura holster

7    for a handgun.  There was also a baton case that was Cordura.

8    And then other officers found things like handcuffs and things

9    like that.  There was an upper receiver for an AR-15.

10   Q.    And could you look at 64-1?

11         Is that the closet -- sort of the two-part closet you

12   were describing?

13   A.    Yes, that's the left side there.

14   Q.    And some of the items you described, you had said that you

15   saw an upper receiver.  Could you explain what that is, please.

16   A.    That's the barrel assembly and the bolt carrier group in

17   the front fore end of what would be an AR-15 rifle.

18   Q.    And let's go to 64-2.

19         What else do you see in here that -- that you were

20   talking about?

21   A.    Police patches.  You have a scope.  You have magazines

22   that would operate on an AR-15 style rifle, some --

23   Q.    Could you circle them, please.

24   A.    -- miscellaneous ammunition.

25   Q.    We'll all be able to see that.

1  A.   (Witness complied.)

2  Q.   Thank you.  Okay.  Scope, magazines, patch.  Okay.

3       And then what are you circling in the bottom right?

4  A.   Ammunition.

5  Q.   So why did a police patch and -- well, actually, let me

6  ask you -- let me show you another one.  Let's do Exhibit 78,

7  please.

8       Were items that you found -- were they placed

9  somewhere in the room?

10 A.   Yes.  They were placed on the bed.

11 Q.   And what's the -- what is on top of the hard case there

12 that we see?

13 A.   That is a duty-type belt with a handcuff case.  It appears

14 to have mag pouches next to it, maybe a baton holder.

15 Q.   And in the top right?

16 A.   That is the upper receiver, the barrel assembly for an

17 AR-15 style rifle.  Just below that are the magazines.

18 Q.   And what about sort of -- sort of blurry, but in the far

19 right of the corner on the bed?

20 A.   That is the police patches, large and small.  They're

21 panels that are typically affixed to a uniform or a vest.

22 Q.   I'm sorry.  If you look at the California license plate

23 and you go straight north --

24 A.   Oh.

25 Q.   -- at the top.

1   A.   Boots, on the upper right.  I apologize.

2   Q.   No.  No.  What -- you explained those boots to me.  Could

3   you -- what about those boots, if anything, caught your

4   attention?

5   A.   They're typically indicative of somebody that uses uniform

6   boots, law enforcement or security or the like, Cordura with

7   black leather, able to be polished.

8   Q.   So why are you -- why were you paying attention to those

9   boots, the holster, the police patches?

10  A.   It was consistent with the statements that the victim,

11  AV-1, had made, that the suspect had identified himself as a

12  police officer and stated that she was under arrest and that he

13  was going to be transporting her to another processing

14  facility.

15  Q.   After -- after you cleared the house and observed these

16  items, what did you do after that?

17  A.   There was more and more evidence that was being discovered

18  in there.  And other detectives rotated in.  And that wasn't my

19  primary duty there, so I rotated out to maintain front scene

20  security for the front of the house and overwatch on the garage

21  where -- the inside, where they had located the -- the

22  cinderblock cell that he had created.

23         So I maintained that.  The dog was out making some

24  noise in the front crate.  I ended up making up a quick

25  barricade with pallets and other stuff, and I let the dog out

1  and provided the dog some water and let him take a break.

2  Q.  And so the search warrant is executed after midnight; is

3  that correct?

4  A.  Correct.

5  Q.  And when you executed the search warrant -- when law

6  enforcement executed the search warrant, the dog was still in

7  the crate?

8  A.  Correct.  It had been a long day.  It was approximately --

9  it was in the mid 90s.  I don't know exactly.  But it was a

10  very warm day.  And, as far as I knew, the dog hadn't had any

11  water or feed or had taken any breaks for at least 12 hours.

12  Q.  Did you see inside the crate?

13  A.  Ah --

14  Q.  Was there water in the crate?  Let me ask that.

15  A.  No.  There was no water.  There was no bowl of water or

16  anything like that.  There was just the dog.

17  Q.  And you were -- you were a canine handler; is that

18  correct?

19  A.  I still am.

20         MS. POTTER:  Objection, Your Honor.  Relevance.

21         THE COURT:  Sustained.

22         MR. SWEET:  That's my last question.  Thank you.

23         THE COURT:  All right.  Any cross-examination?

24         MS. POTTER:  Just one second, Your Honor.

25         (Whispered discussion, off the record, 10:23 a.m.)

1          CROSS-EXAMINATION

2     BY MS. POTTER

3     Q.    Just one question, Sergeant Fox.  You mentioned the scope

4     could fit on an AR.  It could fit on a lot of types of

5     firearms, correct?

6     A.    Yes, it could.

7               MS. POTTER:  Okay.  That's all.

8               THE COURT:  All right.  Thank you, Sergeant.  You're

9     free to go.

10              THE WITNESS:  Thank you.

11              THE COURT:  Our next witness.

12              MR. SWEET:  Thank you, Your Honor.  The United States

13    calls Klamath Falls Police Department Detective Loudermilk.

14              THE COURT:  Detective, if you'd like to step up here

15    to the witness stand.

16              Please remain standing for just a moment.  Raise your

17    right hand.

18                            ***JOEL LOUDERMILK***

19    Was thereupon called as a witness on behalf of the

20    Government; and, having been first duly sworn, was examined

21    and testified as follows:

22              THE COURT:  If you'd like to have a seat.

23              If you could please state and spell both your first

24    and last name.

25              THE WITNESS:  Joel Loudermilk.  First name, J-o-e-l.

1  Last name is Loudermilk, L-o-u-d-e-r-m-i-l-k.

2  THE COURT:  Thank you.

3  DIRECT EXAMINATION

4  BY MR. SWEET

5  Q.  All right.  Good morning, Detective Loudermilk.

6  A.  Good morning.

7  Q.  How are you employed, please.

8  A.  I'm a major crimes detective with the Klamath Falls Police

9  Department.

10 Q.  And are you the lead detective for Klamath Falls for the

11 investigation of the kidnapping of AV-1?

12 A.  Yes.

13 Q.  Tell us your background, please.

14 A.  I've been in law enforcement for approximately 30 years.

15 I was briefly an officer in Texas; deputy sheriff in Durango,

16 Colorado.  And I've been with the Klamath Falls Police

17 Department for 22 years.

18 Q.  And when did you join the Detectives Division?

19 A.  January of 2022.

20 Q.  So let's turn back to July 15th, 2023, on Saturday.  How

21 did you become involved in this investigation, please.

22 A.  I got a text message from my detective sergeant, Chris

23 Zupan, asking me to respond to Sky Lakes because there was a

24 report they got from patrol of a reported kidnapping and rape.

25 Q.  And so, Detective Loudermilk, because the jury's heard

1  from a lot of different officers, there's parts of this initial

2  section that we'll just touch on briefly.  So you were asked to

3  report to the hospital.  Did you?

4  A.   Yes.

5  Q.   And did you -- when you got there, did you receive an

6  update from some other law enforcement?

7  A.   Yes.

8  Q.   Just generally, was it -- can you tell us who you spoke

9  to?

10  A.   I remember talking with Shasta Peterson with the Klamath

11  County Sheriff's Office, who told me how she responded.  And I

12  also briefly spoke, I think, with the officers that were there.

13  I think it was Gilmore and then AV-1.

14  Q.   All right.  And is Shasta -- I believe you said Peterson.

15  Does she also go by Shasta DuVal?

16  A.   Yes.  I'm sorry.  That was her maiden name, Peterson.

17  Sometimes I revert back to that.  But, yes, Sergeant DuVal now.

18  Q.   All right.  So you're at the hospital.  You've got an

19  update on the information.  Did you speak with AV-1?

20  A.   Yes.

21  Q.   And having done that, what did you decide to do?  What are

22  your priorities?

23  A.   I asked her and the doctors that had been treating her if

24  she was medically okay to leave the hospital and get released.

25  And they said that her injuries were minor, didn't need medical

1   treatment right then.  And so we got her released from the

2   hospital, and I requested that -- that officers transport her

3   to the area where she was picked up so -- to try and identify

4   what house she said that she had escaped from.

5   Q.   All right.  So she's medically stable and fine.  You want

6   to identify the house.  What else are you focused on doing?

7   A.   I'm focused on -- on locating the house, determining that,

8   and then getting a security perimeter around the house.  And

9   after that we transported AV-1 back to the police department,

10  where another officer got a more detailed interview from her,

11  while I started preparing a search warrant for the residence.

12  Q.   And was -- and I'm going to jump back just a second.  So

13  you've gotten a summary from Sergeant DuVal.  You got a summary

14  from your officers.  You got a summary from AV-1.  Were those

15  summaries consistent?

16  A.   Yes.

17  Q.   And in terms of trying to get to the house, why were you

18  in such a hurry?

19  A.   Because she was talking about being transported from

20  Seattle to Klamath Falls overnight and arriving here sometime

21  around dawn and her, like, falling asleep.  And I was making an

22  assumption that if -- if she had been up -- awake all night,

23  the suspect was probably up all night.  And he might still be

24  sleeping and not be aware that she had -- she had fled, and he

25  might still be at the scene.

1    Q.   So you're trying to see if you could catch him when he's

2    still asleep?

3    A.   Yes.

4    Q.   So you respond out to -- so did you go to 1336 North

5    Eldorado?

6    A.   Yes.

7    Q.   All right.  And, actually, we've seen the body camera

8    video of you with Sergeant Fox.  Tell us -- just tell us

9    briefly:  So when you walk up to the front door and you knock,

10   what happens with the door, as you're knocking on the door?

11   A.   It -- it -- it -- it -- it slid open slightly.  Like, when

12   I knocked on it, it just cracked probably two, three inches.

13   Q.   So was the door fully closed when you knocked on it?

14   A.   No, I wouldn't think so.  I don't think the front door had

15   actually latched.

16   Q.   All right.  So the house has been identified.  The scene

17   has been secured.  And you said AV-1 was transported back to

18   KFPD for an interview?

19   A.   Yes.

20   Q.   So what is your next priority?  What are you going to do

21   next?

22   A.   We were getting a more detailed statement from AV-1.  And

23   my main priority then was starting to prepare a search warrant

24   for the residence.

25   Q.   And is preparing a search warrant -- is that really a

1  multihour process?

2  A.    Yes.  I think it took me over six.

3  Q.    Not like on TV?

4  A.    No.

5  Q.    So you said that -- who was interviewing AV-1?

6  A.    That would be Tyler Young.  He's a school resource officer

7  who is part of the Detective Division.

8  Q.    And as he's interviewing AV-1 and as you're working on the

9  search warrant, are you checking with Officer Young or -- or

10 after he interviews AV-1, are you getting information from that

11 interview as well?

12 A.    Yes.  He -- after -- I believe he completed an interview

13 with the -- AV-1, and then came and gave me a fairly detailed

14 synopsis of the interview.  And I -- I started writing that,

15 and I would ask him questions to confirm that we had -- that

16 what I understood he was telling me was correct, those kinds of

17 things.

18 Q.    So could you tell the jury some of the things that --

19 you're preparing this search warrant for a house.  What is some

20 of the evidence that you're looking to see if you can find in

21 that house?

22 A.    Well, based on her description, we are interested in

23 looking in the garage where she said she was held.  And she

24 made descriptions about some type of remodeled room that was in

25 the garage, and so we're looking for evidence if there was such

1  a room.

2        And also she had described being restrained with

3  handcuffs and leg irons.  I think she referred to them as,

4  like, ankle cuffs.  But based on her description, I knew what

5  she was talking about were leg irons.  And she described a

6  drill that -- that the suspect had used to somehow secure and

7  make a door on this room work.

8        And she said she had her purse with her.  And she

9  described the vehicle that -- that she was transported in was

10  some type of tan-ish, possibly gray SUV.  She thought it might

11  be a Toyota.  We were looking for that vehicle.

12        We were looking for items that she last saw inside of

13  the vehicle, like property items that belonged to her.  She

14  described some type of walkie-talkie with multiple antennas

15  coming out of it, and a Taser and other handcuffs of different

16  types and --

17  Q.  Was there a color to the Taser?

18  A.  From my memory, what I was told was --

19  Q.  You can refer to your report.

20  A.  -- was black -- mostly black with yellow.  And it looked

21  like some type of handgun.

22  Q.  Okay.  So did you obtain a search warrant?

23  A.  Yes.

24  Q.  And did Klamath Falls Police Department execute that after

25  midnight?

1    A.    Yes.

2    Q.    So we're now into early morning hours of July 16th; is

3    that correct?

4    A.    Yes.  Right -- if my memory serves, right about 12:46,

5    12:47 a.m. is when we were approaching the house.

6    Q.    So Sergeant Fox just described clearing the house for the

7    search warrant.  Were you involved in the initial clearing?

8    A.    No.  I stayed outside with Detective Dougherty.  We were

9    watching a side door that gave access to the side of the

10   garage, not the two front roll-up doors, but a side door.  And

11   we stayed there, to where we could see both the front door and

12   the side door.

13   Q.    And so is that the side door that was to the -- like the

14   person door to the garage?

15   A.    Yeah.  It was a -- it was a pedestrian man door on -- if

16   you're looking at the house, it would be on the right side of

17   the garage, next to the attached rest of the residence.

18   Q.    Was that door covered with a curtain or some covering?

19   A.    Yes.  It was a blanket or -- or something that covered the

20   glass -- upper glass portion of the door.

21   Q.    So did you enter the garage?

22   A.    Yes.

23   Q.    Tell us about that, please.

24   A.    Sergeant Zupan went first, Detective Dougherty, and I

25   believe I was fairly close behind him.  We came in.  We were

first making announcements and looking for humans, any possible

threat.  And after we looked through that, we started examining

the -- the -- the garage more.  And that's when I saw the

structure.

Q.   What was your reaction?

A.   I was -- I was somewhat taken aback because I -- based on

the descriptions that were coming from AV-1, I was kind of

picturing something else, other than a free-standing structure.

I thought she was talking about some remodeled room that was

off of a garage.  But then when I saw it, I -- it -- I could

tell what she was referring to.

          And when we saw the two doors, there was an inner

door, which was like a metal -- black metal -- I would say it's

like a security outer screen door of a residence that has a

deadbolt.  And that was -- that was mounted to where it was --

you would have to be pull -- be inside and open it up inwards.

And there was a -- kind of more of a regular standard house

door that was mounted that was opening outward.  And --

Q.   If I could pause you for one second.

          So you said that metal security door opened inward

into the cell.  What -- what significance, if any, does that

have for you?

A.   Well, a door, how it's -- how it's mounted, it makes it --

depending on which way you're doing it, it makes it difficult

to force open if you're going -- if it's closed up against a

whole framed doorjamb.  And typically outer -- outer doors will

open inward into the house, to where someone can't barricade

someone inside from the outside.

And, as a police officer for this many years,

we've -- we've forced entry into multiple houses before.  And

it's much easier to kick a door inward that opens inward into

the house than outside 'cause you're not fighting the entire

doorframe.

Q.   When you see metal -- have you encountered metal security

doors as a police officer?

A.   Yeah.

Q.   Are they typically on the exterior of the door, or are

they more on the inside of the house?

A.   They're typically on the out -- it's the outside, to where

it's a -- it's a secure metal door that allows air flow.  It

acts like a regular screen door, but it's more secure.  And

it'll have like a deadbolt lock, and that's usually mounted on

the outside of a residence and on the outside from the regular,

you know, front door of a residence.

Q.   So is where it mounted -- was where it's mounted make it

harder to kick in?

A.   Yes.

Q.   So did you see door handles on either of the doors to the

cell?

A.   Ah --

Q.   If you don't recall, that's fine.  We've got plenty of

photos.

A.   Yeah.  I think -- I can't specifically recall.  I remember

that there was a deadbolt, a key deadbolt on the security --

black security door.  And there was also a deadbolt lock on the

white exterior door, and the deadbolt was still in the extended

position.  And where it met up with the doorframe, it appeared

to have been forced open, with broken wood around the receiver

of the deadbolt.

Q.   What was the temperature of the garage, if you noticed?

A.   It was probably high 80s at that time.  And keep in mind

this was after midnight.

Q.   Did you look elsewhere in the garage, and was there

anything you noticed?

A.   Yes.

Q.   All right.  What did you see and where?

A.   Well, apart from the concrete block structure that was --

it appeared to have been built free-standing on the cement slab

of the garage, on top of the garage [sic], there was like a

plywood roof.  And then on top of that, there was a mattress

and other items on top.

       There was an exterior blue blanket that was draped

over the front of the outer door of the structure.  There was a

blue ladder to the left of the door of the structure.  And next

to that blue ladder, there was a table.  It looked like some

1  kind of, like, table where you put tools and work items and

2  things like that.

3        On that, I saw an electric drill, which it was -- we

4  had a general description of, you know, an electric hand drill

5  being used.  And I saw one consistent with that.  But right

6  next to it, around it, I saw a pair of black metal handcuffs

7  and a pair of black metal leg irons.

8  Q.   So when you say "leg irons," what's the difference between

9  leg irons and handcuffs, please.

10  A.   Handcuffs are used obviously to secure someone's hands.

11  In law enforcement you typically handcuff someone behind their

12  back, and that limits their motion and prevents somebody from

13  attacking you with their hands.

14        Leg irons are used to restrict someone's movement, to

15  keep them from fleeing.  And we generally use those for

16  prisoner transports, somebody that's already in custody,

17  usually from a facility to a courthouse, or wherever else we're

18  taking them.

19        And I've used them in patrol if we had to have

20  someone that was in custody that we had to take from, like, an

21  interview room at the police department and have them lead us

22  to where they left a murder weapon or some other piece of

23  evidence.

24        If we're asking them to show us something, we would

25  want them in leg irons because we're taking them outside of a

1  secure facility into some open area.  And it prevents them from

2  running away from you effectively.  Basically it keeps someone

3  from making a long striding gait.  They can -- they can walk,

4  but they can't run effectively at all.  And it makes them much

5  easier to apprehend if they were to try to flee on foot.

6  Q.   I'm going to pull up just a few photos of the garage area,

7  and we can just move through these quickly.  I just want to

8  show you Government's Exhibit 53.

9          So does this -- tell the jury what they're seeing

10  here, please.

11  A.   That's -- it looks like some of the construction material

12  that was right outside the front of the structure.  And that

13  white rectangular --

14  Q.   You can mark it for us.

15  A.   -- piece -- like just with my finger?

16  Q.   Yeah.

17  A.   Okay.  Like that (drawing), that is a -- appears to be a

18  new, unopened package of Styrofoam insulation.  I think it

19  might be for sound insulation.  I can't remember exactly what

20  the construction purpose was listed on the label.  But it

21  appears to be the same type that was used on the interior of

22  the exterior door of the structure, meaning the white wooden

23  door that was on the outside of the structure.

24  Q.   All right.  And then let's move over towards more of that.

25  Is that that table that you were talking about a minute ago?

1    A.    Yes.

2          MR. SWEET:  All right.  And we'll go to 54-2, just

3    kind of zoom in just a little bit.

4          Okay.  And, again, you can -- and let's just try to

5    zoom in just on that area.

6    BY MR. SWEET

7    Q.    Can you circle, please, some of the things that you were

8    noticing.

9    A.    Well, like I said, the drill that was described as being

10   used to -- to secure the door, that was a hand drill that

11   seemed consistent with AV-1's statement.  This right here

12   (drawing) was the pair of leg irons, as denoted by the longer

13   chain.  A regular pair of handcuffs will have like -- I believe

14   like a three-link chain, maybe only about two inches wide.  And

15   that one's probably over 18, 20 inches.  And over here, on the

16   other side of the drill (drawing), was a pair of black metal

17   handcuffs.

18   Q.    And did you initially start to seize those -- those --

19   either the handcuffs or the leg irons?

20   A.    Yes.

21   Q.    All right.  Tell us about that, please.

22   A.    I secured those.  And I was going to put them in an

23   evidence bag 'cause I thought they might have potential DNA

24   evidence on them.  Sergeant Zupan had told me that the Oregon

25   State Crime Lab was going to process the entire garage, and

1   he'd rather that we just leave that in place.  And so I put

2   them back on the table near where I found them.

3   Q.   Then let's -- what about other parts of the garage?  Did

4   you find anything else in the garage that AV-1 had described?

5   A.   We found a purse that was -- that a -- like a debit card

6   was in the last name of AV-1.  And I believe, based on Officer

7   Young's interview, he knew that his -- her mother's name was

8   [redacted], I believe, if I remember right.  And we found a

9   debit card in the name of [redacted] in a -- in a purse that

10  was sitting on top of an old dusty suitcase.

11  Q.   And was the purse that you found on top of the suitcase in

12  the garage -- was that different from the purse that was

13  earlier hanging outside on the fence?

14  A.   Yes, I believe so.  I remember seeing the purse.  I can't

15  even remember if that got seized or not, if it was relevant.

16  But it was a different purse that was inside the garage.

17  Q.   Then let's talk about -- let's go into the house.  Did you

18  search the house as well?

19  A.   Yes.  Mainly the upstairs adult bedroom.

20  Q.   Let's focus on that.  Give me one second, and I'll get --

21  let's start with -- why don't you tell us what you -- what you

22  saw that was of significance to you.

23  A.   The main glaring thing that had been pointed out to me by

24  Sergeant Fox was a pistol case that was on the bed in the

25  bedroom, that he advised he had found inside of a -- on the

floor of a closet.  And I photographed that in place and

then -- after he put it back, to show kind of where it was when

he initially found it.  And that -- that's the label on the

outside of the gun case, denoting the serial number.

Q.   Does the serial number begin with Mary George?

A.   Affirmative.  It's this one right there (drawing).

Q.   Did law enforcement determine if that pistol case matched

the pistol that Sergeant DuVal obtained from AV-1?

A.   Yeah.  While I was on scene, I actually called dispatch

'cause I remembered Sergeant DuVal telling me that she had

taken a gun from AV-1, that AV-1 had reported she had taken

from the vehicle inside the garage when she escaped.  And I

called dispatch 'cause I knew Sergeant DuVal would've run the

serial number when she originally received it and dispatch

would probably have it on record.  And it was an exact match on

the serial number.

Q.   Was there any paperwork inside the pistol case?

A.   Yes.

          MR. SWEET:  Let's go to 63, please.

          And we're going to zoom in -- thank you.

          If we could zoom in on the top part to get -- there.

And a little lower.  Sorry.  Got to get that part in there,

too.  A little lower.  One more.

          (Whispered discussion, off the record, 10:48 a.m.)

1  BY MR. SWEET

2  Q.   Okay.  So was there anything identification-wise that was

3  on this receipt?

4  A.   Yes.  It looks like it was shipped from some type of

5  sporting good gun dealer in Texas.  And it listed "insured/ship

6  to."  And it said COD, which I assume is cash on delivery.  I

7  don't know if they even do that more, but I guess.  And it said

8  the name Prentice Smith, with a home phone number.

9  Q.   Could you circle the Prentice Smith part, please.

10  A.   (Witness complied.)

11  Q.   Did you know who Prentice Smith was at that time?

12  A.   No.

13  Q.   So pistol case with paperwork.  What else?

14  A.   Inside the bedroom -- so we're also trying to identify the

15  suspect and figure out who was living at this residence, who

16  had control over it.  So we were looking for documents,

17  identification, mail, anything with names on it.  We found

18  multiple items that were related to that.

19  Q.   Tell you what:  If you tell me an item, I'll try to pull

20  up a picture of it.

21  A.   There was a black backpack that was -- if you go inside

22  the adult bedroom door from the outer hallway, it was on the

23  floor on the left, next to some rifle magazines.

24  Q.   You stumped me on that one.  I'm not sure I have a picture

25  of that.  So let's keep going.

A.   Okay.  Anyway, there was a black nylon backpack.  And we searched -- and I searched inside that, and I found three United States passports in it.

          MR. SWEET:  Let me -- let's pull up 71, please.

BY MR. SWEET

Q.   Did you find a passport --

          MR. SWEET:  And let's just zoom in on the name in the picture, on the bottom half.  Thank you.

BY MR. SWEET

Q.   -- with the name of Justin Kouassi?

A.   Justin --

Q.   Or Hyche.

A.   Justin Joshua Hyche, H-y-c-h-e, I believe.

Q.   Did you know, at that time, the name Justin Hyche?

A.   That was one of the original names that we had -- before we had served the search warrant, that we believed might be related to the suspect's identity.

Q.   What else, in terms of identification?

A.   There were -- just off the top of my head, I think there was a -- I want to say an Alabama or possibly Georgia driver's license.  There was a Klamath County Community College ID in one of the names.

Q.   We'll pull that up for you.  Go ahead.

A.   Okay.  All right.  Yeah, that one was in the name of Negasi Zuberi.

1    And we had also previously heard of the name Sakima

2  Zuberi.  And there was also Justin Kouassi, if I'm pronouncing

3  that right.  That was also another name.  And by that time we

4  were starting to suspect that this was all the same person.

5  Q.   Did you find a check made out to Zuberi Negasi on the

6  check from Home Depot?

7  A.   Yeah.  There was a Home Depot check, and I think there was

8  a -- like, the -- an attachment that the check came with.

9  Q.   What about -- in order to sort of connect the names, was

10  there any paperwork you found that was helpful for that?

11  A.   I found -- I think it was a -- I don't remember exactly

12  the county, but it was some sort of court paperwork for a name

13  change from, I think, Hyche to Zuberi that also included Alycia

14  Westfall and their two children.

15  Q.   Let's pull up Exhibit 72.

16  A.   There we are.

17  Q.   What are we seeing here?

18  A.   The name at the top says Justin Kouassi.  And it looks

19  like that is a filed court document for a decree of changing

20  name.  And it had listed Justin's DOB, 12-11-93; Alycia's,

21  6-2-91; Zacharia's, 4-17-61 [sic].  And it was Justin Kouassi,

22  Alycia Westfall, change to Negasi Ishaiah Zuberi.  And I can't

23  see what Alycia's was changed to, but it was the last name of

24  Zuberi, if I remember right.

25  Q.   And, just to be clear, the passport photograph I showed

1  you was Government's Exhibit 71.  The Klamath County -- Klamath

2  Community College was 66.  And the paperwork from the firearms

3  manufacturer was 63.

4         So you've seen some identity paperwork.  What else

5  are you seeing?

6  A.   I was also trying to determine possible suspect vehicles

7  'cause we knew we were looking for some type of SUV that AV-1

8  said she was transported in.  She also described a -- I think

9  it was like some type of white sedan, like a Chevy Impala, was

10  parked in the driveway when she -- when she fled the residence.

11  So we were -- we were looking for what those vehicles were.

12         I found a California license plate.  If I remember

13  right, it was probably behind -- like propped up on the

14  dresser, kind of halfway tucked behind the mirror of the

15  dresser.  And I think that -- that license plate came back to a

16  Nissan Altima registered to Hyche, Kouassi, one of those names.

17  Q.   And so is the Nissan Altima -- did that catch your

18  attention?

19  A.   Yeah.  I thought that might be the white four-door car

20  that AV-1 was describing.

21  Q.   What about -- what about an effort to locate the license

22  plate or the owner of the Honda Pilot?

23  A.   I had heard from other officers and detectives that they

24  had been interviewing neighbors.  And I can't remember exactly

25  who they talked to.  It might have been a roommate or somebody.

Joel Loudermilk - D

```
 1   It might have been Mr. Garcia.  I can't exactly recall.  But
 2   there was talk about a Honda Pilot that had a Colorado
 3   personalized license plate, that said either 23 or 43, but it
 4   was spelled out in a -- some kind of combination of letters and
 5   numbers that they couldn't exactly recall.
 6            And while I was going through some of the paperwork
 7   found in the upstairs adult bedroom, I came across some sort of
 8   dog breeding kennel licensing certificates that the name of the
 9   dog breeder, something like that, was Forty3, spelled out
10   f-o-r-t-y, with the letter [sic] three at the end.
11            And that kind of keyed in with me, and so I contacted
12   dispatch and asked them to run a California -- or excuse me --
13   a Colorado DMV registration check for f-o-r-t-y with the number
14   three.  And that came back to one of the names that we had.  I
15   can't recall exactly which one, but it was either -- I think it
16   was Hyche or Kouassi.
17   Q.   So basically you see dog registration paperwork with
18   Forty3.  And then you call Colorado to run the Forty3.  And
19   then you get a name associated with Mr. Zuberi; is that --
20   A.   No, not exactly.  What I did was called our local dispatch
21   office -- or our local dispatchers at our 9-1-1 center in
22   Klamath Falls to run a computer check through Colorado's DMV
23   database for that -- for that set of letters and number
24   characters under -- for registered vehicles in Colorado.  And
25   we came up with a positive return, and it came back to a Honda
```

Pilot.

Q.   So you now -- did you now, at this point, have a

registered owner for the Honda Pilot?

A.   Yes.

Q.   And the Nissan Altima?

A.   Yes.

Q.   In terms of sort of sides of the -- of the bed, were

you -- were you able to make it a determination as to which

side of the bed seemingly belonged to which person, or male or

female?

A.   If you were standing at the foot of the bed, looking at

the head of the bed against the wall, most of the items on

the -- on your left-hand side in the nightstand seemed to be

more male-oriented.  And on the right-hand side, I remember

seeing like cosmetics and lotions and stuff like that, that

tended to be more of a -- something a female would have.  And

that looks like --

Q.   If I could pause you for just one second.

          So we're still in the master bedroom; is that

correct?

A.   Mm-hmm.

Q.   We're standing at the foot of the bed.  And if we're --

I'm going to back you up one, actually, sorry, to 76-1.

A.   It's the closest side of the bed when you come in the door

of the bedroom from the hallway.

1    Q.   Is this the side of the bed you're talking about that

2    would be on the left side if you're facing the bed from the

3    foot?

4    A.   Ah --

5    Q.   Or is that the nightstand?

6    A.   Okay.  I got confused 'cause actually that's a mirror on

7    the wall.  So, yes, this would be the nightstand.  And the bed

8    would be running along this side, going to the right

9    (indicating).

10        MR. SWEET:  Then let's go to 147, please.

11   BY MR. SWEET

12   Q.   And what side of the bed, standing at the foot, would this

13   be?

14   A.   That looks like it'd be on the right-hand side.

15        MR. SWEET:  Let's go to 148 and just zoom in a little

16   bit.

17        Okay.  And so -- and if we could go back to that

18   photo for -- just one second.

19   BY MR. SWEET

20   Q.   All right.  So basically you were looking at -- in your

21   mind, the left side of the bed was the male side of the bed.

22   The right side of the bed was the female side of the bed; is

23   that correct?

24   A.   Yes.  That was my general impression.

25   Q.   Did you find anything under the bed?

A.   I think there were three cans of firearm ammunition.  I

think there was a metal can and maybe two plastic ammo cans.

Q.   And we're going to talk to Officer Young more about --

more about those cans.

A.   Mm-hmm.

Q.   Do you recall which side of the bed those were under, the

left or the right?

A.   The left side, the male side.

Q.   And we've talked to Sergeant Fox about police patches,

duty belt.  Just generally, though, what are some of the items

that you're seeing in the bedroom that are interesting -- that

you are interested in, just touching on them?

A.   Well, we were looking for anything -- because it had

been -- AV-1 had reported that this individual had purported

himself to be a law enforcement officer and that she was under

arrest in some way.  And that's what the handcuffs were about,

and the Taser.

     And so we were looking for anything else -- any other

kind of items that might be related, that someone might use to

impersonate a police officer, you know -- you know, police

patches, badges, you know, duty belts, handcuff cases, Tasers,

radios.  These kinds of things are what we were looking for,

and we found some of that there.

Q.   And did you find -- in the house did you find receipts

from Home Depot?

A.    Yes.  That was in amongst -- you know, there was a lot of

paperwork on the dresser.  There was a small table against the

far wall.  There was also lots of paperwork in the top of the

closet where we found items.

Q.    Why was that of interest to you?

A.    'Cause I think the stuff in the top of the closet is where

I think some of the -- the dog kennel paperwork came from and

some of the name -- the other documentation and stuff was.  And

I was going -- I was searching through that, and we were still

trying to confirm the -- getting corroborative information

about who the suspect was.

        And we had multiple names, and we didn't know if we

had multiple date of births.  But we were trying to determine

are all these names the same person, and it looked like it was

consistent and that we believed it was the same person.

Q.    Were you also interested in looking for sort of

construction material for the -- what was in the garage?

A.    Yes.

Q.    And did you ultimately -- did Home Depot appear to be a

big part of that construction?

A.    At the time when I was -- when I was searching, I

remembered seeing that.  And I knew the receipts were in there,

but it got stuck in with folders of other documents that we

seized from there.  And that was ultimately -- Sergeant Zupan

asked me about it 'cause I believe Special Agent Gluesenkamp

1  had asked about it.

2          And so I came and got it out of temporary evidence,

3  found it and provided it to the FBI.  And they -- from what I

4  remember, they started running down that.  And I think,

5  subsequently, Sergeant Zupan did some other investigation for

6  Home Depot.

7  Q.   I'm going to pull up just one other thing.  Did you

8  find -- not just one other thing, but one other thing on this.

9  Did you find a pair of -- or were a pair of handcuffs found in

10 the master bedroom?

11 A.   Yes.

12 Q.   Okay.  Can you see them in this photograph?

13 A.   Yes.

14 Q.   Okay.  This is Exhibit 89 that I'm showing you.  Were they

15 in a box?

16 A.   Yes.  They appeared to be, like, newly purchased in a box.

17 Q.   Was there --

18          MR. SWEET:  Exhibit 77, please.

19 BY MR. SWEET

20 Q.   Was there -- what are we seeing here?

21 A.   That was a suitcase with clothes that was -- that was on

22 the floor.  I remember it being on the floor of the adult

23 upstairs bedroom.  And it was kind of to the right of the

24 dresser drawers, near the -- near the closet that was up

25 against the wall.

Q.   I don't think I've actually asked this.  Was anyone in the

residence when law enforcement did the search warrant?

A.   No.

Q.   Negasi Zuberi?

A.   No.

Q.   Alycia Westfall?

A.   No humans were found.  There was a dog.

Q.   You found the dog?

A.   Yeah.  Or he found me.

Q.   The -- I want to ask you -- I want to ask you about

something that we'll talk about more later, but let's pull up

Exhibit 70.  And I want to ask you about some paperwork.

          (Whispered discussion, off the record, 11:04 a.m.)

BY MR. SWEET

Q.   Tell us -- tell us what we're seeing here.

A.   That was, I believe, some registration owner documentation

of a -- about a Prowler, like a travel trailer.  I'm guessing

it was -- 1998 was a model -- model year.  I remember -- I

remember seeing it there; but that night, at that time, we

didn't have any information about a trailer.  We didn't know

where it was.  It wasn't at the residence.  It wasn't parked in

the back or anywhere in the area that we could see.

Q.   Did you later put evidence tape on a trailer associated

with Mr. Zuberi?

A.   Yes.

1  Q.   All right.  We'll get to that in a few minutes then.  I

2  did want to ask you just kind of a logistical question about

3  some of the ammunition.

4       Thank you.

5       Were there some cases of ammunition found in --

6  cases -- small boxes of ammunition found in the closet, in the

7  master bedroom closet?

8  A.   Yes.

9  Q.   Okay.  Did you put those boxes of ammunition somewhere

10 during the transport back to KFPD?

11 A.   Yeah.

12 Q.   Okay.  Just tell the jury where, please.

13 A.   I put it in one of the -- in one of the ammo cans.  I

14 think it was one of the green plastic ammo cans.  We were -- I

15 didn't seize that stuff that night.  We -- we still maintained

16 the search warrant on the residence, kept it secured.  And

17 later in the next day, on the 16th, a decision was made to

18 seize as much ammunition as we could related to firearms, the

19 12-gauge and -- that looks like .223 or 5.56 rifle ammunition.

20      We didn't find any complete firearms inside the

21 residence.  And the only firearm that was mentioned by AV-1 was

22 a handgun, which that ammunition wasn't related to.  But we

23 made a decision to seize all the ammo.  And so I had three

24 loose boxes of ammunition, and so I put those in the -- inside

25 that box in order to transport it back.  And we booked all that

1  ammunition in as evidence.

2  Q.  All right.  So when we see this photo, though, these three

3  boxes of ammunition were not originally in that plastic

4  ammunition can; is that correct?

5  A.  No.  They were photographed in the closet.  If you have a

6  picture of the closet, I can show you where they were when they

7  were originally found.

8  Q.  Okay.  I'd like to show you -- let's go to -- so 68-1,

9  just briefly, were there additional magazines of ammunition

10  that were found in the master bedroom?

11  A.  Yes.  There was those two -- that's -- that door that is

12  butting up to those two rifle magazines, that's the door that

13  leads to the outside in the -- out into the hallway.

14  Q.  Just -- if I didn't say it, that's 68-1.

15          Just since you talked about the ammunition in the

16  case, let's just see really fast -- if we can go to 64,

17  please -- we'll just see if we can -- and could you zoom in

18  right there?

19          All right.  So when you were talking about -- tell us

20  what we're seeing here.

21  A.  Those were the three boxes of shotgun ammunition that I

22  put inside the ammo can.

23  Q.  Okay.  So at this point -- so you said you searched that

24  night, and then you said the search continued the following

25  morning.  I want to go to that gap in between --

1    A.    Okay.

2    Q.    -- where we pick up for just a minute.

3          Tell us, please -- tell the jury, more or less --

4    you've seized items.  Why were you waiting to continue the

5    search the following morning?  What was going to happen?

6    A.    Well, there were two things.  One, it was pushing into

7    three o'clock in the morning, and a lot of us were really

8    tired.  Also, we were waiting on the Oregon State Crime

9    Laboratory to come and process and detail the garage.  And so

10   we still had to -- and they weren't going to be available until

11   later in the morning that day of the 16th.

12         And so I initially seized, you know, what I thought

13   was important items.  I transported them back to the police

14   department.  And we left officers there, keeping the -- the --

15   the residence secure, and not releasing it from the search

16   warrant, while a lot of us went home and went to bed and got a

17   little bit of sleep so we could come back in the morning and

18   finish.

19   Q.    And was there what you suspected to be blood in the cell?

20   A.    Yes.  I remember seeing what appeared to be some

21   bloodstains and blood smears on the inside of the cell door

22   and, like, on the doorframe.  And I think I saw -- well, it was

23   kind of hard to see because it was black; but the black metal

24   screen that had been kind of pushed down, I believe I saw what

25   looked like possible bloodstains on the screen.

And there was also what appeared to be a blood smear
on the exterior door of the garage on the inside doorknob,
which will be that side door that -- that led out to the front
part of the house, going towards the front door of the house.

Q.   And so was -- Oregon State Police Crime Lab is just better
able to process that, not to insult you, but than you; is
that --

A.   Yes.  They're specially trained to -- they search for
forensic evidence, not -- not as much, you know, physical
evidence.  They're looking for, you know, hairs, fibers,
fingerprints, DNA, bloodstains, whatever we think might
possibly be there of evidentiary value.  That's their specialty
in locating that stuff.

Q.   So I'm going to move you through a few things fairly
quickly and in terms -- in terms of this gap.  So before you --
before you stop for the night, did you have information that
Alycia Westfall, who had lived in the house, would -- someone
rented a room for her at the Maverick Motel?

A.   Yeah.  I had spoken with a next-door neighbor several
times while we were in between breaks and while we were
searching.  And she had told me that -- that Alycia Westfall
and the two children, for some reason, they didn't have any
access to any money or they needed a place to stay.  And so she
rented them a room at the Maverick Motel.

Q.   And, to be clear, the night we're talking about would've

1  been for the night of the 15th, so -- is that right?

2  A.   Yeah.

3  Q.   So did you drive by the Maverick Motel?

4  A.   Yes.

5  Q.   Were you looking to see if you could find -- what were you

6  looking for?

7  A.   I wanted to get -- I wanted to know what the plate was on

8  the white car that she was driving 'cause that was -- by this

9  time we had identified her.  She had admitted, I think, to

10  Sergeant Zupan that she lived there, and that she didn't know

11  anything was going on, and that she had driven up in a Nissan

12  Altima.

13          And so I wanted to make sure that we had that license

14  plate information.  So I drove by, and I -- I was pretty sure

15  that it was a Utah plate.  And I located the vehicle in the

16  parking lot of the Maverick Motel, and I wrote the license

17  plate number down.

18  Q.   And that was a white Nissan Altima that you found?

19  A.   Yes.

20  Q.   Did you see a Honda Pilot -- a silver Honda Pilot there?

21  A.   No.

22  Q.   Did you look?

23  A.   Yeah.  I mean, I was -- I was -- we already had identified

24  that, and I was looking for it.  But I didn't -- I didn't see

25  one there.

1  Q.   So before you went off duty, did you tell dispatch that

2  you had probable cause for the arrest of Negasi Zuberi?

3  A.   Yes.

4  Q.   So turning to technically the same day -- so we're Sunday

5  morning -- around 9:00 a.m. did you take over -- did you

6  respond back to 1336 Eldorado?

7  A.   Yes.

8  Q.   Okay.  Did OSP arrive?

9  A.   Yes.  OSP, the crime laboratory forensic specialists,

10  arrived.

11  Q.   We're going to talk to someone from the crime lab, so

12  we'll leave that.

13         And did you also continue searching the residence at

14  1336?

15  A.   Yes, a little bit later in the morning into the early

16  afternoon 'cause I initially was doing scene security, staying

17  outside, making sure no one entered while the crime lab was in

18  the garage processing.  And then I got another officer to

19  relieve me from front scene security.  And so then I went back

20  in, and I started searching more through the items that were in

21  the adult upstairs bedroom.

22  Q.   Did you find some paperwork relating to a property in

23  Bonanza, Oregon?

24  A.   Yes.

25  Q.   And later did you go to the county and confirm the address

1  for that property?

2  A.   Yeah.  I went to the county government.  I think it was

3  the Tax Assessor's Office, the Klamath County Government

4  Center.  And I asked them about the lot information.  And they

5  were able to look it up and give me owner information on it and

6  the exact plot.

7  Q.   And was that owner either Negasi Zuberi or one of his

8  names?

9  A.   Yes.  Actually, it came back to -- I think it was like an

10  LLC.  Forty3 -- I think it had the name F-o-r-t-y-3 associated

11  with it.  It was some sort of limited liability incorporation

12  paperwork.

13  Q.   Okay.  I want to touch, for just a second, on some other

14  items in the house.  Did -- when you were standing in the

15  garage and you're looking in that cinderblock structure, did

16  you see any recording equipment?

17  A.   In the cinderblock structure?

18  Q.   Yes, in the garage.

19  A.   No, not that I remember.

20  Q.   Any musical equipment?

21  A.   No.

22  Q.   Any microphones?

23  A.   No.

24  Q.   Did it appear to be used as a sound studio?

25  A.   No.

Q.   When you're in the house, did you find -- did you find a
music case or a case for a musical instrument?

A.   Yeah.  It looked to me like it was a rectangular, flat
electric guitar case.

Q.   Did you open it?

A.   Yes.

Q.   What was in there?

A.   Some random items.  I think there was a belt and -- it
wasn't a guitar in there.  It was other unimpressive pieces of
property.  I can't remember exactly what was -- what was in
there.  There were small, little items inside -- inside the
case.

Q.   All right.  So we're going to switch then -- well, let me
ask you this.  As you're wrapping up the search, did you
find -- at 1336 did you find a yellow and black Taser?

A.   No, I did not.

Q.   Did you find sort of walkie-talkie-looking devices with
spikes?

A.   No.  And can I add something?

Q.   (No audible response.)

A.   Not that it's related, but we also -- there was a lot
of -- a lot of shotgun and rifle ammunition, and there was an
upper -- like an AR receiver and upper barrel in the bedroom.
But there were no complete firearms, but there was a lot of
ammunition for those types of firearms.  And we didn't find

1  those -- find those firearms.

2  Q.   So you were looking for guns, but you didn't find guns

3  consistent with the ammunition?

4  A.   Right.

5  Q.   So did you ultimately head back to Klamath Falls Police

6  Department?

7  A.   Yes.

8  Q.   And was the FBI assisting in trying to locate Mr. Zuberi?

9  A.   Yes.

10  Q.   And was the FBI providing location data associated with

11  his cell phone?

12  A.   Yes.  When I got back, there was -- sometime after noon, I

13  believe -- and they -- I had learned that they had already had

14  a possible suspect cell phone number, that they got an active

15  trace ping on, and that it was getting close to and going into

16  the Reno, Nevada, area.

17  Q.   And what did KFPD do with that information?

18  A.   We were -- we contacted -- I believe it was Chief

19  Dentinger that had called and contacted Reno PD and asked for

20  an outside assist to try and locate where the cell phone was

21  pinging.  We -- I made sure they were getting a description of

22  both vehicles because both vehicles, at that time, we did not

23  know where they were.

24       The white Nissan was no longer at the Maverick Motel,

25  and the Honda Pilot was still outstanding.  So we were trying

1   to have them look for both vehicles 'cause at that point we

2   didn't know which one they were in.

3   Q.   And were you asking Reno PD to arrest Mr. Zuberi if they

4   located him?

5   A.   Yes.

6   Q.   So did you call Alycia Westfall?

7   A.   Yes.

8   Q.   And were you partially trying to locate -- or were you

9   trying to locate Mr. Zuberi and see if you could find out some

10  information about where he was?

11  A.   Yes.  And I was trying to find out where -- where her and

12  the Nissan Altima were.  And I talked to the -- I had gotten

13  her number from the next-door neighbor, who had been telling me

14  she was in contact with her while arranging all this -- you

15  know, the Maverick Inn motel accommodation for her.  And she

16  told me that she had spoken to her, and she had mentioned

17  something about being over in --

18          THE COURT:  Sir, I'm going to have you really focus

19  on the questions.  We're saying a lot.  These are pretty direct

20  questions.

21          THE WITNESS:  Okay.

22          THE COURT:  Will you ask the question?

23  BY MR. SWEET

24  Q.   Did you call Alycia Westfall?

25  A.   Yes.

Q.   Okay.  And did you ask her where she was?

A.   Yes.

Q.   And did she ultimately -- did she say -- did she give you

a location at some point in the conversation?

A.   Yeah.  She mentioned she was on her way back from Medford.

I told her that we had released the residence, and she was okay

to return to her residence.  And -- and I asked her

specifically where she was, and she ultimately told me that she

was coming back from Medford.

Q.   Soon after that, did Klamath Falls Police Department

receive a phone call from Ms. Westfall's phone number?

A.   I received it on -- yeah, I received it -- the same number

that I had used to call her, that I got from the neighbor, that

same number rang, and I answered it.

Q.   And -- okay.  So you get a call from Alycia Westfall's

phone number.  And who's on the other line?

A.   A Reno police officer.

Q.   So you spoke to Ms. Westfall.  She said she's in Medford.

Not long after, you get a call from that same phone number; and

it's a Reno Police Department detective?

A.   Yes.

Q.   Okay.  Did you learn whether or not Mr. Zuberi had been

taken into custody?

A.   Ah --

Q.   Not maybe right then, but within the next hour or two?

1    A.   Ultimately, yes.

2    Q.   So we're just going to jump through a few final things.

3    Did you receive evidence from Sergeant DuVal, the pistol and

4    the ammunition?

5    A.   Yes.

6    Q.   And did you participate in a second search of 1336

7    Eldorado with the FBI?

8    A.   Yes.

9    Q.   Okay.  We're going to talk more with the FBI about that.

10   But even after that second search, was there still things that

11   law enforcement was looking for?

12   A.   Yes.

13   Q.   Did that include the Taser?

14   A.   Yes.

15   Q.   Did -- okay.  This is going to be confusing.  The landlord

16   of 1336, what are their names?

17   A.   It was Carol Westfall, and I can't remember her husband's

18   first name, but I think it was also Westfall.

19   Q.   Okay.  Are those Westfalls separate from Alycia Westfall

20   that we just spoke about?

21   A.   I definitively confirmed that there is no relation.

22   Q.   So did you receive a call from either Carol or Kevin

23   Westfall regarding some property from 1336?

24   A.   Yes.

25   Q.   And is this after they had basically taken the property

1 back?

2 A.   Yeah.  It was -- it was several days later.  I can tell

3 you exactly, if you need to know.

4 Q.   And we're going to talk to Ms. Westfall later.  So did

5 Ms. Westfall have some -- and we're going to talk to her about

6 the details -- did she have some items of property in a

7 vehicle?

8 A.   Yes.  She had a -- two bags of -- of items and garbage and

9 stuff that were in the back of, I think it was, her husband's

10 pickup truck.

11 Q.   And I'm sorry.  This was Carol Westfall we're talking

12 about?

13 A.   Yes.

14       MR. SWEET:  All right.  90-1, please.

15 BY MR. SWEET

16 Q.   And, again, Ms. Westfall's going to talk about it, but

17 did -- was Carol Westfall saying she received these from Alycia

18 Westfall?

19 A.   Yes.

20 Q.   And what are we seeing here in 90-1?

21 A.   Those were the two bags of property, garbage, that she

22 told me she had gotten from Alycia Westfall, I think it was,

23 the night before.

24 Q.   All right.  Were you interested in seeing what was in

25 those bags?

1    A.    Yes.

2    Q.    And did Carol Westfall essentially turn those over to you?

3    A.    Yes.

4          MR. SWEET:  90-2, please.

5    BY MR. SWEET

6    Q.    Did you find identification items in those bags?

7    A.    Yes.

8    Q.    Did that include a passport -- 90-3, a passport in the

9    name of Prentice Smith?

10   A.    Yes.

11   Q.    And the name Prentice Smith, we saw it earlier.  When

12   was -- where did we see it earlier?

13   A.    That was in -- that was the name on the receipt that was

14   inside the handgun case, that was found in the upstairs adult

15   bedroom.

16         MR. SWEET:  91, please.

17   BY MR. SWEET

18   Q.    And was there a significant amount of identification

19   items, mail, that sort of thing?

20   A.    Yeah.  Certificates, mail, these kind of things, the U.S.

21   passport, all that same name.

22   Q.    Did you seize those items?

23   A.    Yes.

24   Q.    So we have sort of two more steps, and then we're -- we're

25   wrapping up.  That is -- so you've said that the Taser still

1  hasn't been found.  The walkie-talkie-type device hasn't been

2  found; is that correct?

3  A.   Yes.

4  Q.   Was the Nissan Altima located?  And we're going to talk to

5  that officer.  So was the Nissan Altima located?

6  A.   Yes.

7  Q.   And was a search warrant obtained for the Nissan Altima?

8  A.   Yes.  That was a federal FBI search warrant, I'm sure.

9  Q.   And was there paperwork found --

10       MR. SWEET:  277, please.

11 BY MR. SWEET

12 Q.   Was there paperwork found in that Nissan Altima?

13 A.   From what I understand, yes.

14 Q.   Okay.  Are we looking --

15 A.   I don't have direct knowledge of that.  I didn't see it

16 myself, but yes.

17 Q.   Okay.  Are we looking at the Altima here?

18 A.   Yes.

19 Q.   So, as a result of -- of the search of the Altima, did the

20 FBI ask you to go over to AAA Discount Storage and follow up?

21 A.   Yes.

22 Q.   And did you?

23 A.   Yes.

24 Q.   And were you able to determine if there was a space rented

25 at AAA Discount Storage by Negasi Zuberi?

A.   Yes.  I went and contacted the clerk who was working at the -- at the mini storage place and asked.  And there had already been contact, and they knew what I was talking about. And they -- I followed them -- they were in their own vehicle, and I followed them.  And we drove around to the back of the property.  And that employee was going to show me where this trailer -- the trailer space was that was rented under that name.

Q.   And did they show you the trailer space?

A.   Yes.  I think it was listed as RV106, if that is right.

Q.   Did you take a picture of the trailer in that space?

A.   Several.

Q.   And --

A.   That's not my picture, but yes.

Q.   That's not the picture you took.

        MR. SWEET:  If we could take that down, please.  One second.  I gave you the wrong number.

        If I could have just one second.

        Let's take a quick look at 290, please.

BY MR. SWEET

Q.   What are we seeing here?

A.   That's the trailer.

Q.   And did you take that picture?

A.   I believe I did, yes.

Q.   Were you -- so what did you do?  So you're there.  You

1  find a trailer.  You believe it's associated with Mr. Zuberi or
2  in a space rented by him?
3  A.   Yes, that was the -- that was the trailer that was in that
4  space.  That was, I think, 106.  And there was a Washington
5  license plate on the back of it.
6  Q.   Did you do anything to the trailer?
7  A.   I put Klamath Falls police evidence tape over both the
8  doors, because at that time it was deemed that we couldn't
9  secure it and tow it from that particular location because it
10 was presumptively already somewhat secure; and that they were
11 going to obtain a search warrant, but it might take a day or
12 more to do that.
13 Q.   So you put -- okay.  So because it wasn't going to be
14 secured, you put evidence tape on what?  Doors to the trailer?
15 A.   Yes.
16 Q.   And, last thing, were you later present when -- was a
17 search warrant executed on the trailer?
18 A.   Yes.
19 Q.   FBI search warrant?
20 A.   Yes.
21 Q.   Were you present there?
22 A.   Yes.
23 Q.   Were some of the items that you'd been looking for in
24 Mr. Zuberi's residence located?
25 A.   Yes.

1    Q.   Black and yellow Taser?

2    A.   Yes.

3    Q.   Walkie-talkie-looking device with spikes?

4    A.   Yes.  And when I first saw it -- 'cause I didn't have a

5    real clear picture of exactly what she was referring to at the

6    time, when I saw it, I recognized that was probably what she

7    was referring to 'cause it had multiple, multiple antennas

8    coming out of the top of it.  And do we have a picture of that?

9    Q.   We do.

10   A.   Right.  And I later, like, Googled -- did a Google search

11   of that and found -- and found that it was some type of cell

12   phone jamming device, which I had never even heard of that kind

13   of device existing before.  So --

14   Q.   And I just showed you -- 308 was the first photo I showed

15   you.  And now I'm showing you 318.  And -- excuse me -- 315.

16            MR. SWEET:  And 312, please.

17   BY MR. SWEET

18   Q.   What are we seeing here?

19   A.   That looks like a Taser.  It's not a law enforcement grade

20   Taser, but I think it's made by Taser International.

21   Q.   In the trailer were some things found that you'd been

22   looking for at 1336?

23   A.   Yes.  Like I said, there was -- there was that item.  I

24   think there was some -- the walkie-talkie cell phone jammer

25   there.  I think there was a black sheet that I remember that --

1  pretty consistent 'cause I remember from the description that

2  AV-1 had mentioned being told to cover herself with a black

3  sheet in the back of the car during the transport, so we were

4  looking for that.  Some type of dark-colored sheet was there.

5  There were also, I think, three long guns, if memory serves:  A

6  bolt action rifle, a 5.56 AR-style rifle and a shotgun.

7  Q.   Do you know if AV-1's phone was found in the trailer?

8  A.   I don't know that.  And I don't think it was.

9         MR. SWEET:  That's all I have.  Thank you.

10        THE COURT:  All right.  Cross-examination.

11                CROSS-EXAMINATION

12  BY MR. BERTHOLF

13  Q.   I just have a couple of questions for you.  Let me get to

14  them.  You said when --

15        (Whispered discussion, off the record, 11:31 a.m.)

16  BY MR. BERTHOLF

17  Q.   You said when you were searching in the adult bedroom, you

18  found this -- and you took photographs at the time -- this

19  paperwork for the Prowler trailer, 1998?

20  A.   Yes.  There was -- it was like -- that folder was inside

21  another, like, soft-sided folder that was in something that

22  came out of the closet.

23  Q.   At the time were you even -- was that even a thing that

24  you were thinking about?

25  A.   Not particularly.  Like I said, we -- there was no mention

of a -- like, a camp trailer being used or -- you know, she

wasn't supposed to be transported in that or hidden in that or

anything.  It was never mentioned in the information we got

from AV-1.  And it indicated that they possibly owned a

trailer, but it wasn't parked at the location.

Q.   Okay.  And so you said that you were looking for certain

things in the house.  And one of the things was a drill?

A.   Yes.  It was some sort of hand drill that she described as

being used by the suspect to secure the -- the door on the

structure.

Q.   Do you recall what -- what was your understanding at the

time of how that drill was used?

A.   It was a brief mention relayed to me through Tyler Young,

that she had mentioned that the suspect had somehow used the --

like some sort of hand drill to make a lock function somehow

on -- on one of the doors to the structure, but there wasn't a

great deal of detail about that.  It was just mentioned in her

overall story about what happened.

Q.   Okay.  To -- to effectively -- well, let me ask you this,

make sure you have the knowledge.  Do you own an electric

drill?

A.   Several.  Battery and corded.

Q.   I kind of assumed so, living in Klamath Falls.

     So to use an electric -- let's go with the battery.

I mean, they work pretty much the same, whether they're corded

1    or battery, right?

2    A.    Yeah.

3    Q.    Okay.  So to effectively use a drill, you have to put a

4    bit in?

5    A.    Of some type, yes.

6    Q.    Of some type.  Tell us what a bit is.

7    A.    Well, for, like, a -- for a battery/corded drill, a bit is

8    either some sort of cutting implement, like a drill bit that

9    you would -- and there's all kinds of different drill bits that

10   you would drill through metal or through wood or -- and there's

11   pilot bits to create larger holes.

12           And -- but I -- I use, like, an electric battery

13   handheld drill a lot for driving screws.  And there's, like,

14   a -- either a flathead or a Phillips head bit can be put in

15   that to screw in or screw out screws, like building two pieces

16   of wood together --

17   Q.    Okay.

18   A.    -- something like that.

19   Q.    So the first bit that you were describing makes holes in

20   things?

21   A.    Drills, yeah, holes in stuff.

22   Q.    Okay.

23   A.    Everybody -- people know this --

24   Q.    No, I --

25   A.    -- in general.

1    Q.   We're -- sometimes, in a court of law, we have to assume

2    that people don't know anything.  And sometimes it's an -- it

3    seems like an exercise in futility to talk about things that we

4    all assume we all know.

5             But the -- the second type was -- you described it as

6    a Phillips or flathead?

7    A.   Well, there's -- yeah, there's -- there's a myriad of all

8    kinds of -- there's grinding --

9    Q.   Torques?

10   A.   All kinds of stuff, but -- yeah, but primarily I use mine

11   a lot for, you know, putting screws in stuff, taking screws

12   out, those kinds of stuff.

13   Q.   Okay.  This was a long-winded --

14   A.   Yeah.

15   Q.   -- in advance, to go to the entire point of this, which

16   is, to use a drill, you have to put something into it to make

17   it useful?

18   A.   Sure.

19   Q.   Okay.

20   A.   Yes.

21   Q.   Finally, the thing that you just said, you were -- you

22   found in the trailer -- or, at least it was found in the

23   trailer, a black tarp thing or -- tell us a little bit more

24   about that.

25   A.   Like I said, I haven't seen those photographs, like the --

1   the FBI took photographs of that.  And I was kind of there to

2   observe.  I never went in the trailer.

3   Q.   Okay.

4   A.   And I was more observing from the outside and noting what

5   they were taking out.

6   Q.   Did you see them take this black thing out?

7   A.   I -- it's been a year, but I think I recall some kind of a

8   black sheet that might have been taken out.  I don't know if we

9   have photographs of that or not, if they exist or if my

10  memory's right.  But there was multiple items that were inside

11  the -- inside the trailer.

12  Q.   But this was significant to you because of AV-1's

13  statement?

14  A.   I thought it might be possibly corroborative, just because

15  I remembered in her statement that she mentioned being told to

16  cover up with some kind of dark-colored black sheet --

17  Q.   Okay.

18  A.   -- something like that.

19          MR. BERTHOLF:  That's all.  Thank you.

20          THE COURT:  Any redirect?

21          MR. SWEET:  No, Your Honor.

22          THE COURT:  All right.  Thank you very much,

23  Detective.  You can step down.

24          All right.  It's close to 11:40.  I just -- I have to

25  break at about five to noon to make it to this meeting.  Do we

1　have somebody we can put on briefly?  We can start somebody, if

2　you'd like, but I will have to break.

3　　　　　MR. BOCCATO:  We have one witness who's going to be

4　somewhat quick.  I don't know if we can get her, though.  We

5　can start her and, I think, just --

6　　　　　THE COURT:  Okay.  Why don't we at least start.

7　　　　　Folks, we will be breaking a little bit before noon.

8　Also, I have a 1 o'clock hearing unrelated to this matter.  So

9　we probably won't be reconvening after lunch until 1:30.  Is

10　everybody okay right now to go forward with maybe another ten

11　minutes?

12　　　　　MR. BOCCATO:  Your Honor, the Government calls Carol

13　Westfall to the stand.

14　　　　　THE COURT:  Okay.  Ms. Westfall, if you'd like to

15　come up to the witness stand here to my right, your left.

16　　　　　If you'd like to step up and remain standing for just

17　a moment, and I'll have you raise your right hand.

18　　　　　　　　　　　　**_CAROL WESTFALL_**

19　Was thereupon called as a witness on behalf of the

20　Government; and, having been first duly sworn, was examined

21　and testified as follows:

22　　　　　THE COURT:  If you'd like to have a seat.

23　　　　　And if you could state and spell both your first and

24　last name for the court reporter.

25　　　　　THE WITNESS:  It's Carol Westfall, C-a-r-o-l;

Westfall, W-e-s-t-f-a-l-l.

THE COURT:  All right.  And, Ms. Westfall, we're

going to start with some testimony.  We may have to break right

before noon because I have to get to a meeting, so that may

require you to come back after the lunch hour.

But go ahead, Mr. Boccato.

MR. BOCCATO:  Thank you, Your Honor.

<u>DIRECT EXAMINATION</u>

BY MR. BOCCATO

Q.   Ms. Westfall, do you have any water up there?

A.   I do.

Q.   Perfect.  Thank you.

A.   Thank you.

Q.   And I'm reminded 'cause my water's over here.

So, Ms. Westfall, do you -- do you work?

A.   I do.  I am the mayor of Klamath Falls.

Q.   Nice.  How long have you been the mayor of Klamath Falls?

A.   This is my eighth year.  It's the second term, two terms.

Q.   Very nice.  And how long have you lived in Klamath Falls?

A.   We've lived in Klamath Falls for 20 years.

Q.   And are you the owner of 1336 North Eldorado in

Klamath Falls?

A.   Yes, my husband and I.

Q.   And we'll talk with your husband probably after lunch, but

what does your husband do?

A.    He is a contractor.

Q.    And is this -- Exhibit 28-1, is that 1336 North Eldorado?

A.    Yes, it is.

Q.    And how long have you been renting out that residence?

A.    We've had that property for about 18 years.

Q.    Okay.  Before renting -- did you -- and we're going to get into some more details here, but did you ultimately rent this property to Mr. Zuberi?

A.    Yes, we did.

Q.    Before you rented the property to Mr. Zuberi, did you do anything to the home?

A.    Yes.  We had the new roof put on.  We painted the inside and the outside.  We did new landscaping, put in a patio and a patio on the bottom -- on the second floor.

Q.    Did you do anything to the garage before you rented it to Mr. Zuberi?

A.    No.  The garage stayed the same.

Q.    Okay.  I'm going to show you Exhibit 495.

      MR. BOCCATO:  Can you zoom in, please.

BY MR. BOCCATO

Q.    Can you identify these photographs for me?

A.    This is the garage.

Q.    And who took this photo?

A.    I did, with my camera.

Q.    And let's go to 495, the next page, dash two.

A.    Yes.  This is another part.

Q.    Okay.  And then we'll do the last photograph, 495-3.

A.    And that's looking at it from the door going into the garage.

Q.    All right.  Thank you.

And is this essentially the state the garage was in when you rented it to Mr. Zuberi?

A.    Yes, it was.

(Whispered discussion, off the record, 11:42 a.m.)

BY MR. BOCCATO

Q.    We saw a number of windows in the garage during those photos.  Were all those windows uncovered when you rented it to Mr. Zuberi?

A.    Yes, they were uncovered.

Q.    Then I want to show you what's been marked as Exhibit 31-4.  Can you identify this part of the residence?

A.    Yes.  This is the doorway to go into the garage.

Q.    And that sheet there, was that a sheet -- something that you put there?

A.    No.

Q.    All right.  So, again, overall, what kind of condition was the residence in when you rented it to Mr. Zuberi?

A.    It was in pristine condition.

Q.    All right.  No large structures in the garage?

A.    No.

1  Q.   And did you leave any, like, firearms or ammunition in the

2  residence?

3  A.   Not at all, no.

4  Q.   During the winter of 2023, did you list 1336 for rent?

5  A.   Yes, I did.

6  Q.   Did you list the home on Craigslist?

7  A.   Yes.

8  Q.   And did Mr. Zuberi reach out to rent the property?

9  A.   Yes, he did.

10 Q.   Was he one of three or four other candidates?

11 A.   Yes.

12 Q.   And did you do kind of a little lookup online and --

13 A.   I did.

14 Q.   -- Google him, for lack of a better term?

15 A.   Yes, I did.

16 Q.   What did you learn about him?

17 A.   I learned that the company had -- the company was, in

18 fact, as he stated.  It was a property management company, and

19 he worked there.  And --

20 Q.   So you looked him up and found that there was a property

21 management company that he apparently worked at?

22 A.   Right.

23 Q.   Did he agree to pay rent for the property?

24 A.   Yes, he did.

25 Q.   And how much was that?

A.   2,000.

Q.   Did he represent himself to be a low-impact tenant?

A.   Yes, he did.

Q.   I'm showing you what's been -- or I'd like to show you what's been marked as Exhibit 474.

Now, can you identify this document for me?

A.   This is our rental application.

Q.   Okay.  Did you have a chance to review this document prior to --

A.   I did.  And this is actually -- this isn't the -- this is the rental agreement.

Q.   Okay.  And this exhibit, does it include about three -- a total of three different agreements?

A.   Yes.

Q.   What are those three agreements?

A.   It is the rental agreement, the terms and pet agreement.

Q.   So I want to talk a little bit about the -- the lease term beginning.  When did Mr. Zuberi start renting 1336 North Eldorado?

A.   It was February 1st, 2023.

Q.   And, as tenants, does it list Negasi Zuberi and also a -- like, another name or another last name?

A.   Ah --

Q.   Or another --

A.   Well, are you --

Q.   On tenants, what does it list up there?

A.   It lists Negasi Zuberi, and then it has Sakima.

Q.   Thank you.

Was Negasi Zuberi the only adult that was --

A.   Yes.

Q.   -- on the lease?

A.   Yes.

Q.   Did Negasi Zuberi indicate that it was just him and his two children?

A.   Yes.  That was the extent of the people staying there.

Q.   And did Mr. Zuberi have any authority to sublet the residence?

A.   Not at all.

Q.   Did you later learn that he subletted the residence without permission?

A.   Yes, I did.

Q.   And I'd like to go to page -- let's do seven of that exhibit.

Now, what is this document?

A.   This is the application.

Q.   Okay.  And who filled this application out?

A.   Negasi.

Q.   Does it indicate where he was working at the time, towards the -- if you can zoom in -- where he -- his employment?

A.   Forty3 Rentals, yes.

1  Q.  Who does he list as his supervisor?  Can you read that?

2  A.  Ashley.

3  Q.  And there's a telephone number associated with that.  Did

4  you ever reach out to Ashley?

5  A.  I did not.  I just looked them up online.

6  Q.  And, just to clarify, there's an Ashley [sic] Westfall in

7  this case.  Are you related at all to Ms. Westfall?

8  A.  No, I am not.

9  Q.  Okay.  And just to clarify, too, is Mr. Zuberi -- the

10  individual you rented to, is he in the courtroom here today?

11  A.  Yes, he is.

12  Q.  Is he wearing the white shirt?

13  A.  Yes, he is.

14  Q.  Thank you.

15       MR. BOCCATO:  Can we go to the next page?

16  BY MR. BOCCATO

17  Q.  Did Mr. Zuberi list any personal property, if you go down

18  to the personal property section?

19  A.  I believe it was the Honda Pilot.

20  Q.  All right.  And what does he indicate regarding that Honda

21  Pilot, like the year, the license number and the -- the state?

22  A.  Yes, it does.

23  Q.  All right.  What -- can you just tell us, for the jury,

24  what that says?

25  A.  It's 2012 for the year.  The license plate is C61757 and

1    is registered in Washington.

2    Q.    All right.  Now I'd like to jump ahead to Exhibit 34.

3              Can you identify this for me?

4    A.    Yes.  This is the cell he built.

5    Q.    What was your first reaction when you saw this structure?

6    A.    Shocking.

7    Q.    There's some sheets hanging.  Do you see the red sheet

8    kind of towards the left?

9    A.    Yes.

10   Q.    Can you just circle that for me really quick?

11   A.    (Witness complied.)

12   Q.    Again, is that anything that you hung up?

13   A.    Not at all.

14   Q.    All right.  And it's a little bit hard to see in this

15   photo, but there aren't a lot of great photos of it, but kind

16   of a white cream-ish sheet in the back, can you circle that for

17   me?

18   A.    (Witness complied.)

19   Q.    All right.  Is -- is that something that you hung up?

20   A.    No.

21   Q.    And, finally, there's this blue sheet in the foreground.

22   Can you circle that?

23   A.    (Witness complied.)

24   Q.    Is that something that you hung up?

25   A.    No.

1  Q.   While Mr. Zuberi was renting the garage, did you ever --

2  or renting the residence, did you ever look into the garage or

3  see the garage open?

4  A.   At one point I did drive by and the garage door was open.

5  And it's one solid door.  But this blue -- blue blanket, or

6  whatever it is, just made everything black, so you couldn't see

7  anything.  You could just see the one bay was clear, but you

8  could not see anything more.

9  Q.   Okay.  So essentially this blue sheet was covering up the

10  cell in the garage?

11  A.   Yes, it was.

12  Q.   After Mr. Zuberi was arrested and Alycia Westfall moved

13  out, did you help get rid of the cell?

14  A.   I did not -- did not touch it.  It was my husband and son.

15  Q.   Perfect.  I'd like to show you what's been marked as

16  Exhibit 90-1 --

17       MR. BOCCATO:  And, Your Honor, I have just probably a

18  couple more minutes.  We could do it right after lunch.  We

19  could -- I don't know how much cross we would have.

20       THE COURT:  Do you have much cross?  Unfortunately,

21  we'd have to finish in five minutes.  I'm the host of the

22  meeting.  I have to get everything set up on the phone.

23       MR. BOCCATO:  All right.  We will be done in five

24  minutes, Your Honor.

25       THE COURT:  All right.

BY MR. BOCCATO

Q.   Does this -- was there a period of time, I think approximately July 25th, that Alycia Westfall reached out to you about trash at the property?

A.   Yes.

Q.   What did she tell you?

A.   Well, she told us that, you know, there was a lot of trash and stuff.  And we went ahead and said, "We can help you clean it up," because we did not want the house in that condition.

Q.   Did you go and pick up some trash?

A.   We did.

Q.   Was -- were there -- was there some trash that she -- you know, she let you know that was more significant than others?

A.   Yes, she did.  I was working downstairs.  There was a bunch of trash and pizza boxes and all sorts of stuff.  And so I was pulling it up and giving it to my husband in a bag, and he was tying it off and throwing it in the truck.

        And so at one point she said, "Could you throw away this particular box?"  It was in the dining room in the corner.  And I said, "What's in the box?"  And she said, "There's evidence."  And I said, "I'm not touching anything.  If you want to throw anything away, you're welcome to.  But I'm not touching anything."  And so I just went downstairs, and I continued to pull up bags.

Q.   Did that -- did those bags eventually get into the back --

1  or what did you do regarding that --

2  A.  Well, what we did is we -- we asked her -- that we were

3  going to -- told her that we were going to be taking everything

4  to the dump, and so all of it was being put -- I believe it was

5  on the trailer.  It was -- there was a trailer, and we were

6  filling it up.  And so it was just going to be dumped.

7  Q.  Okay.  So then what did you do next, once it was on the

8  trailer or the truck?

9  A.  Well, it was late in the evening.  We weren't able to go

10  to the dump that night, so it was going to happen in the

11  morning.  We were going to take it in the morning, so -- but I

12  did tell my husband, "When you go to dump, if there is one -- a

13  cardboard box with a certain paper on top or something, save it

14  because she had told me that was evidence," and we needed to

15  turn that into the investigator.

16  Q.  Did you call law enforcement, or did your husband call law

17  enforcement?

18  A.  I did call law enforcement.

19  Q.  Okay.  Did law enforcement come out and collect the

20  evidence?

21  A.  Yes, they did.

22  Q.  And is this essentially a photograph of --

23  A.  Yes.  Those were the -- that's the truck bed, my husband's

24  truck bed, and those are the boxes.

25  Q.  Okay.  In those black bags?

1  A.    Yes.

2  Q.    All right.  Thank you.

3         Oh, and just to clarify, with that blue sheet, was

4  that the only other time you saw the garage door open while

5  Mr. Zuberi was renting?

6  A.    I believe so.

7         MR. BOCCATO:  Okay.  Thank you.  No further

8  questions.

9         THE COURT:  Any cross?

10        MR. BERTHOLF:  No.

11        THE COURT:  Thank you very much, Mayor Westfall.

12  Thank you for joining us.  I think we'll be hearing from your

13  husband in the afternoon.

14        MR. BOCCATO:  Yes, Your Honor.

15        THE COURT:  Folks, I'm going to race out, but you're

16  excused.  I do have a 1 o'clock matter unrelated to this case,

17  so 1:30 back after lunch, okay?  All right.  Thank you.

18                       *  *  *

19        (Noon Recess taken at 11:54 a.m.)

20

21                   *AFTERNOON SESSION*

22        (Open court, jury present, 1:24 p.m.:)

23        THE COURT:  All right.  Please be seated, everybody.

24        Thank you, folks.  We're going to go right into our

25  next witness.

1          Next witness for the Government.

2          MR. BOCCATO:  The United States calls Kevin Westfall

3     to the stand.

4          THE COURT:  Mr. Westfall, if you'd like to step up to

5     the witness stand here to my right.

6          Go ahead and step up.

7          And if you'd like to remain standing for just a

8     moment, I'll swear you in.

9                          ***KEVIN WESTFALL***

10    Was thereupon called as a witness on behalf of the

11    Government; and, having been first duly sworn, was examined

12    and testified as follows:

13         THE COURT:  If you'd like to have a seat.

14         And if you could please state your first and last

15    name, spelling both for our court reporter.

16         THE WITNESS:  My name is Kevin, K-e-v-i-n.  Last name

17    is Westfall, W-e-s-t-f-a-l-l.

18                       <u>DIRECT EXAMINATION</u>

19    BY MR. BOCCATO:

20    Q.   Mr. Westfall, good afternoon.

21    A.   Good afternoon.

22    Q.   Do you work?

23    A.   A lot.

24    Q.   What kind of work do you do?

25    A.   I'm a building contractor.

1    Q.   All right.  How long have you been a building contractor?

2    A.   35-plus years.

3    Q.   All right.  Are you a licensed contractor?

4    A.   Yes.

5    Q.   In which states?

6    A.   California and Oregon.

7    Q.   So I know you've done it for 35 years, but can you kind of

8    explain the work that you've done over those 35 years?

9    A.   I've done a lot of custom homes, a lot of remodels, some

10   light commercial work, kitchen remodels, bathroom remodels,

11   things of that nature.

12   Q.   And how long have you done that work in the Klamath Falls

13   area?

14   A.   On our own account, we've been doing it for about 25

15   years.  Outside work, I've been doing it about eight to ten

16   years.

17   Q.   And did any of that -- so has that work just been, like,

18   building houses and --

19   A.   Yes.

20   Q.   Did you ever have to take apart houses, or do any

21   demolition?

22   A.   Yes, on occasion we do.

23   Q.   And are you --

24        MR. BOCCATO:  Can you go to 28-1?

25

BY MR. BOCCATO

Q.   Are you the owner of 1336 North Eldorado Street in Klamath Falls?

A.   Yes.  My wife and I own the property.

Q.   Is that a picture of the property?

A.   That is.  That is a picture.

Q.   All right.  And did you rent that property to Mr. Zuberi?

A.   Yes, we did.

Q.   And prior -- you know, just prior to Mr. Zuberi renting the property, what was the condition of the residence?

A.   It was in need of repairs and maintenance upgrades.  We put a new roof on it.  We painted the exterior, the interior, and put a new fence out front, poured a concrete patio in the front and concrete patio in the back.

Q.   Did you do that yourself?

A.   Yes.  I did not do the roof.  We contracted that out, but everything else -- well, I had painters come in, too, and do a lot of the painting.

Q.   Did your son help you with that, or did you --

A.   A little bit with the concrete.

Q.   And we'll talk about your son in a minute, but what's your son's name?

A.   Brenden.

Q.   After you had done that work to the property, what -- what was the condition of the property?

1  A.    It was in very good shape.

2  Q.    All right.  And when the property was turned over to

3  Mr. Zuberi, did you leave anything at the residence, any

4  ammunition or firearms?

5  A.    No.

6  Q.    I'd like to show you Exhibit 495.

7        And, just for the record, the last picture that we

8  showed was Exhibit 28-1.

9        Does this picture show kind of the condition of the

10  residence prior to you -- or condition of the garage prior to

11  giving it to Mr. Zuberi?

12  A.    Yes.

13  Q.    All right.  We see a couple windows there.  Were there any

14  coverings over those windows?

15  A.    No.

16  Q.    Kind of same questions.  Does this show the condition of

17  the garage prior to transferring it to Mr. Zuberi?

18  A.    Mm-hmm.

19  Q.    No coverings over the windows?

20  A.    No.

21  Q.    Okay.  All right.  And does this show, again, the

22  condition of the garage prior to transferring to Mr. Zuberi?

23  A.    Yes.

24  Q.    All right.  And no covers, again, over the windows?

25  A.    No.

1  Q.   And it looks like I see some paint cans and a shop vac

2  maybe.  Are those yours?

3  A.   Yes.

4  Q.   Did Mr. Zuberi move in around February 1st of 2023?

5  A.   Yes.

6  Q.   And when he did move into the residence, what was your

7  kind of role as a landlord?  What kind of things did you do?

8  A.   I met with him, collecting rent and things of that nature.

9  Anything that needed to be done on that scope, I dealt with it.

10  Q.   Did you help with repairs or anything that was --

11  A.   Yeah, I -- any repair work we had to do -- we had several

12  things we had to do.  We had to do some work on the dishwasher,

13  had some issues with that.  And then we had to do some work on

14  our -- some service work on our boiler room downstairs, our

15  heater.  And those would be hired professionals from the

16  outside, beyond my scope of capability.

17  Q.   And Mr. Zuberi is -- the individual you rented to, is he

18  in the courtroom today?

19  A.   Yes, he is.

20  Q.   Is it the individual in the white shirt?

21  A.   Yes.

22  Q.   Thank you.

23       So does the garage in 1336 actually have a heating

24  system?

25  A.   It had a radiator-type heater that was tied into our

1    geothermal heat system, and it was in the right-hand corner of

2    the garage as you walk in.

3    Q.    On the morning of July 15th, did you receive a call from

4    Mr. Zuberi about that heating system?

5    A.    Yes, I did.

6    Q.    Tell me a little bit about that call.

7    A.    I wasn't able to answer it right away, but I did call him

8    back later in the day.  And he wanted to know how to turn the

9    heat down.  On that radiator there's a valve that has to be

10   turned down to shut off, and it was not in the "off" position.

11   So the garage was rather warm.

12   Q.    Okay.  So he initially called you.  And so tell me a

13   little bit how the calls back and forth went.

14   A.    I just received a call.  I didn't return the call 'til

15   like midafternoon.  And then when I called back, I explained to

16   him you just have to turn the valve -- excuse me -- turn the

17   valve down, and that would reduce the heat flowing through the

18   radiator.

19             MR. BOCCATO:  All right.  Can you go to Exhibit 32-4?

20   BY MR. BOCCATO

21   Q.    I'm showing what's been marked as Exhibit 32-4.  Can you

22   identify this area for me?

23   A.    Where the valve is?

24   Q.    Just generally the area.  Then we'll talk about the valve

25   in a second.

1    A.    You've got your electric meter off to the right up here,

2    and then the pipe's coming in through the basement area, the

3    copper pipe.  And then there's the valve right there for the

4    heater.

5            MR. BOCCATO:  Can you zoom into the valve?

6            (Whispered discussion, off the record, 1:42 p.m.)

7            THE WITNESS:  Should I put my finger on it?

8    BY MR. BOCCATO

9    Q.    Yeah.  Actually, why don't you circle it.  This is a --

10   hey, you can do the touch screen without the instructions.

11   A.    Yeah.

12   Q.    What is the condition of the valve?  Is it in the "on" or

13   "off" position?

14   A.    It's in the "off" position.

15   Q.    Okay.  And do you also see that sheet covering the doorway

16   to the right of the screen?

17   A.    Mm-hmm.

18   Q.    Can you circle that sheet for me as well?

19   A.    (Witness complied.)

20   Q.    Did you put that sheet up there?

21   A.    No.

22   Q.    Okay.  All right.  So --

23           MR. BOCCATO:  You can turn off that.

24   BY MR. BOCCATO

25   Q.    After you learned of the kidnapping that occurred, did

1   you, later on, enter into the residence?

2   A.    The garage, yes, we did.  The neighbor had told us that we

3   might want to come up and take a look.

4              (Whispered discussion, off the record, 1:43 p.m.)

5   BY MR. BOCCATO

6   Q.    And I'm showing you what's been marked as Exhibit 34.  Is

7   this the -- did you see this in the garage when you entered in?

8   A.    Yes.

9   Q.    What was your reaction when you saw this?

10  A.    Rather surprised.

11  Q.    Had you given Mr. Zuberi permission to do anything like

12  this in his garage?

13  A.    No.

14  Q.    Just a couple more things I want to touch on.  Do you see,

15  like, a red sheet on the left?

16  A.    Yes, right here.

17  Q.    Can you circle that as well?

18  A.    Yes.

19  Q.    Did you put that up there?

20  A.    No.

21  Q.    See that blue blanket hanging?

22  A.    Yes.  On the door?

23  Q.    Yes, sir.

24  A.    Yeah.

25  Q.    Can you circle that, too?

```
 1   A.    Sure.

 2   Q.    Did you give Mr. Zuberi permission to do that?

 3   A.    No.

 4   Q.    And then, finally, in the back there's kind of a

 5   cream-colored sheet.

 6   A.    Ah --

 7   Q.    Kind of the back corner.

 8   A.    Oh, yes.  I see it, yes.  Circle that?

 9   Q.    Yes, sir.

10   A.    (Witness complied.)

11   Q.    And did you hang that?

12   A.    No.

13   Q.    While Mr. Zuberi was renting the residence, did you ever

14   see the garage up?

15   A.    I don't recall ever seeing it up.

16   Q.    So you don't ever recall seeing the cell that's on

17   Exhibit 34?

18   A.    No.  The first time we saw it was when we were notified.

19   Q.    Did you reach out to the FBI or -- well, strike that.

20         Did you ask the FBI permission to take the cell down?

21   A.    Yes.  We got their permission.

22   Q.    All right.  Why did you want to take the cell down?

23   A.    Well, the main thing is there was two young children

24   living in the house, and we were concerned about safety, was

25   our main concern.
```

Q.   Did anyone -- did you take the reins of tearing that cell
down?

A.   Yes, we did.

Q.   Did you have anyone to help you?

A.   I had one of my sons help me.

Q.   And which son was that?

A.   Brenden.

Q.   Does he have kind of a similar expertise in construction?

A.   It's getting better.

Q.   All right.

A.   We're very good at demolition.

Q.   All right.  Very good.  All right.  Can you describe the
process on how you took down the cell?

A.   It was pretty -- pretty basic, caveman style.  I took a
small sledgehammer and larger sledgehammer to it.  And we were
careful to take small sections at a time out and --

Q.   Why did you use a sledgehammer to take the cell down?

A.   It was the most appropriate tool for the job.

Q.   So was it something that you could've just tooken your
hands and pushed down or ripped down?

A.   Not quite.  It was a little tougher than that.

Q.   All right.  Do you recall the construction of the cell?

A.   I do remember that the -- the blocks were concrete masonry
units.  They were about 8-by-8-by-16, hollow cell.  They were
constructed -- the majority of them were constructed with, it

1  looks like, four points of construction adhesive on each block

2  and stacked vertically on top of each other, which is not the

3  normal style of construction.

4         Usually they're offset.  One goes over the middle of

5  the next one and -- whoops, excuse me -- all the way up.  And

6  then there was a foam -- heavy foam pad on top of the roof.  I

7  think several of them were up there.  But the whole perimeter

8  of the cell was out of the concrete block.

9  Q.   Was there anything on the inside of the cell?

10 A.   There was two-by-four framing, and then there was

11 Sheetrock over that.  And I think that was pretty much the

12 basis of the interior.

13 Q.   Okay.  Did you notice any, like, soundproofing withinside

14 the cell itself?

15 A.   Just the ceiling.

16 Q.   Okay.

17 A.   The roof was -- had layers of -- two layers of foam on

18 top.

19         MR. BOCCATO:  Let's go to 35-1.

20         355-1.  Sorry.

21         (Whispered discussion, off the record, 1:48 p.m.)

22 BY MR. BOCCATO

23 Q.   So I'm showing you what's been marked as 355-1.  Can you

24 identify this photo for me?

25 A.   Yes.

Kevin Westfall - D

1  Q.   What is this photo?

2  A.   This is -- this photo was taken after probably -- what? --

3  three quarters of the cell block walls were taken down.  And

4  there were -- it shows, on the left-hand side, some framing

5  lumber, two-by-fours and then, in the middle, a piece of

6  oriented strand board laying on top of some block rubble.

7  Q.   Did you take this photo?

8  A.   I believe my son did.

9  Q.   So there are -- in kind of the back of the picture, you

10  see a stack of cinderblocks that are -- that are still upright.

11  Could you circle those for me?

12  A.   Mm-hmm.

13  Q.   All right.  And, actually, the -- they're kind of up --

14  there's another stack of cinderblocks that are kind of up in

15  the air?

16  A.   Just behind them a little bit?

17  Q.   Yeah, just behind that.  Could you circle those ones as

18  well?

19  A.   Sure.

20  Q.   So for the stack that you just circled, why aren't those

21  cinderblocks falling on the ground?  Why are they still

22  upright?

23  A.   It was the corner of the building, and we hadn't attended

24  to it yet with the sledgehammers.

25  Q.   No, but is there -- what's holding those cinderblocks

1  together?  Is it the two-by-fours, the --

2  A.   It was the adhesive that was applied to the corners of the

3  block.

4  Q.   And then -- so those -- even after you've knocked down --

5  or started to knock down the structure or the cell, the

6  adhesive was still keeping the cinderblocks affixed to each

7  other?

8  A.   Yes.

9        MR. BOCCATO:  And let's go to 355-2.

10  BY MR. BOCCATO

11  Q.   All right.  Is this another photo that was taken of the

12  cell?

13  A.   Yes.

14  Q.   All right.  And who took this one?

15  A.   I believe my son took it.

16        MR. BOCCATO:  And go to the next one.

17  BY MR. BOCCATO

18  Q.   Is this another photo that was taken by your son?

19  A.   I believe so.

20  Q.   And, for the record, this is 355-3.

21        Mr. Westfall, do you see those kind of foam mats,

22  like, on the ceiling and then on the -- the back wall?

23  A.   Yes.

24  Q.   What were the -- what were those?  Do you remember?

25  A.   It was kind of a high-density foam.  I don't remember the

1 exact, you know, name of it.  But it was just some type of

2 high-density foam that looked like it had a lot of sound

3 absorption capability.

4         MR. BOCCATO:  Let's go to 355-4.

5 BY MR. BOCCATO

6 Q.   Do you see -- I'm showing you what's been marked as 355-4.

7 Did your son take this photo as well, you believe?

8 A.   I believe so.

9 Q.   All right.  And can you circle another one of those kind

10 of foam -- foam boards?

11 A.   Sure.

12 Q.   All right.  And does this look like the condition the cell

13 was in when you first examined it?

14 A.   Mm-hmm.

15         MR. BOCCATO:  And, finally, let's go to 355-5.

16 BY MR. BOCCATO

17 Q.   All right.  Is -- is this another picture of the cell?

18 A.   Mm-hmm.

19 Q.   And in this picture can you see the -- kind of the cream

20 or off-white sheet?

21 A.   Yes.

22 Q.   On the back?

23 A.   Mm-hmm.

24 Q.   And, again, you didn't hang that sheet?

25 A.   No, we did not hang those sheets.

1        MR. BOCCATO:  All right.  Then let's go to 355-6.

2    BY MR. BOCCATO

3    Q.   Can you describe what's going on in this picture?

4    A.   It looks like I took the sledgehammer to the top two rows

5    and kind of loosened them up a little bit.  And you'll see, on

6    the white painted area, that's the doorjamb that was put in for

7    the -- for the door to the unit.

8    Q.   So when you were taking down the cell, did you have -- did

9    you kind of work in sections?

10   A.   Yeah.  Started up higher and worked our way down, kind of

11   around the perimeter.

12        MR. BOCCATO:  Let's go to 355-7.

13   BY MR. BOCCATO

14   Q.   And what is this a picture of?

15   A.   This is a picture of me administering a little punishment

16   to the block wall.

17   Q.   All right.  Next, I want to go to Exhibit 356.

18        Can you identify these for the record?

19   A.   This is a -- some notes I took on the -- the demolition of

20   the cell.  It identifies me as KCW and my son as BFW -- I'm

21   sorry -- BGW.  I need to get these glasses on.  Excuse me.

22        Basically the time frames that we worked on it, doing

23   the demolition.  And I think we put a total of about 11

24   manhours in that day.  And then we loaded the trailer up late

25   in the afternoon and went to the dump the next morning to

1  unload the -- the block.

2          MR. BOCCATO:  All right.  And these -- this exhibit

3  was kind of conditionally admitted if the witness testifies.

4          MR. BERTHOLF:  No objection.

5          MR. BOCCATO:  All right.  The Government moves to

6  introduce Exhibit 356.

7          THE COURT:  It'll be received.

8          (Government's Exhibit No. 356 received.)

9  BY MR. BOCCATO

10  Q.   So you said you put about 11 manhours into the demolition?

11  A.   Yes.

12  Q.   How many times did you end up heading to the dump?

13  A.   We took one -- pretty much strictly a load of concrete

14  block and rubble.  And then the other one was just

15  miscellaneous stuff, the two-by-fours and other accessory parts

16  to the -- to the building.

17  Q.   And we're going to talk about those dump receipts a little

18  bit more in a minute.  But did you take any other trash to the

19  dump from 1336 North Eldorado?

20  A.   On this teardown?

21  Q.   Not on this teardown, but separately after.

22  A.   There was a little bit after that, yes.

23  Q.   Can you tell me about that, that you took to the dump?

24  A.   There was some items, I think, that came out of the house,

25  that they -- or Alycia had rounded up and stuff.  And -- and

1    there was -- I think there might have been some food items,

2    too, that they needed to get rid of.  But there was some stuff

3    removed from the house -- or on the patio.  There was some

4    items on the patio we wanted to clean up.

5    Q.   So some of those items you just took to the dump?

6    A.   Yes.

7    Q.   But there are other items that you actually called the

8    police on?

9    A.   Yes.  My wife did.

10   Q.   And was that concern -- was the reason she called the

11   police concern it could be evidence?

12   A.   Possibly, yes.

13   Q.   All right.  I'm now showing you what's been marked as

14   Exhibit 357.  Can you identify this document for me?

15   A.   Yes.  It's a dump weigh tag, where it showed we hauled

16   about 8600 pounds of concrete rubble and that -- at -- at

17   4.31 tons on that load.

18   Q.   Okay.  And was this just purely from the cell in the

19   garage?

20   A.   Yes.  Yes.

21   Q.   And was this load just 100 percent concrete?

22   A.   Yes.

23   Q.   Let's go to the next -- or next page.

24         All right.  Can you identify this page?

25   A.   Yes.  It's the -- the extra material that was hauled to

1  the dump from that cell.  There was a lot of loose concrete

2  rubble in there.  And I guesstimated about 4- to 500 pounds of

3  this load was concrete block residue.

4  Q.    Okay.  I see a little note.  So you noted that 4- or

5  500 pounds was going to be concrete residue?

6  A.    Yes.

7  Q.    All right.  So -- and I hate to ask you to do math on the

8  stand, but what was the total weight of -- from the first

9  receipt to the second?  And I can go back --

10  A.    1760 plus -- what was it?  8620, was it?

11  Q.    Yeah.

12  A.    Does that sound right?

13  Q.    It does sound spot on.

14        MR. BOCCATO:  We can go back to the last page.

15  BY MR. BOCCATO

16  Q.    So it was over 10,000 pounds?

17  A.    That sounds like it, real close.

18  Q.    And is that over 5 tons that you took to the landfill from

19  the cell?

20  A.    Yes.

21        MR. BOCCATO:  No further questions.

22        THE COURT:  Cross.

23        MR. BERTHOLF:  Couple of questions.

24

25

1

2  BY MR. BERTHOLF

3  Q.   You said that you saw high-density foam on the inside of

4  the structure?

5  A.   It was that compact -- it's more of a compressed -- the

6  foam was on top.  There was high -- on the lid there was a lot

7  of heavy, heavy foam, heavy-duty foam.

8  Q.   Okay.  But then Mr. Boccato showed you a picture of the

9  inside, and it looked like there was some foam.

10  A.   More of a -- I wouldn't call -- maybe "foam" is not the

11  most accurate term to describe it, but some type of rigid

12  insulation.

13  Q.   Okay.  And did I hear you correctly that has some

14  sound-dampening capability?

15  A.   Yes, it does.

16  Q.   Okay.  The construction of this structure, the exterior

17  were these 8-by-8-by-16 cinderblocks?

18  A.   Yes.

19  Q.   And on the interior it looked like there was -- at first

20  we could see some --

21  A.   Sheetrock.

22  Q.   -- drywall?

23  A.   Sheetrock, yes.

24  Q.   Sheetrock?

25  A.   Mm-hmm.

Q.    Behind the Sheetrock was?

A.    Majority of it had two-by-fours flat attached to the wall,

the cinderblock wall.

Q.    How were they attached to the cinderblock wall?

A.    I think there was a combination probably of adhesive and

some -- some type of nail or a screw.

Q.    Okay.  On the top of the structure, it looked like it was

a combination of plywood and two-by-fours?

A.    Yeah.  And then the foam on top.

Q.    And foam on top?

A.    Yeah.

Q.    From the photograph that we saw -- what was that?  Oh,

355-7 -- you called that -- you said -- I'm not going to show

you the photograph.

A.    Okay.

Q.    I think you'll remember which one this is when I say that

was the one that looked like you were showing some punishment

to the wall?

A.    Yeah.

Q.    Okay.  On that it looked like -- that was -- looked like

it was at the very beginning of you taking down this structure?

A.    Mm-hmm.

Q.    Yes?

A.    I believe so, yes.

Q.    Okay.  But in that photograph the plywood and the

1  two-by-fours are still on the top of the structure?

2  A.   Mm-hmm.

3  Q.   Is that correct?

4  A.   I believe they are.  They show it that way in the picture,

5  yes.

6  Q.   Okay.  And it looked like there was still a lot of the

7  two-by-fours on the inside?

8  A.   Mm-hmm.

9  Q.   Yes?

10  A.   I believe so.

11  Q.   Did you take down -- but it looked to me like the

12  Sheetrock had already been taken out?

13  A.   I don't recall exactly, on the dismantling, of the exact

14  order.  But basically I took the sledgehammer to the top rows,

15  just to test how it was put together.

16  Q.   Okay.  Did you -- before you started pounding the rest of

17  it down, did you take out the supporting structure of the -- of

18  the two-by-fours?

19  A.   Yes.  We tried to clean all that stuff out before we start

20  taking the blocks down.

21  Q.   Did you take the roof --

22  A.   Yes.  Yes.

23  Q.   Okay.  In the first photograph that we saw, it looked like

24  they -- that the plywood was piled on top of the -- the broken

25  pile of cinderblock?

1   A.   Yeah.  I think we had maybe set it aside and then pulled

2   it over.  We wouldn't work underneath plywood loosely like

3   that.

4   Q.   Okay.  I just wanted to make sure.

5   A.   Yeah, no problem.

6   Q.   Okay.  Without the supporting structure of the

7   two-by-fours, was it a little easier to take down?

8   A.   It made it a little easier, yes.

9   Q.   Okay.  Did you examine at all the integrity of the

10  doorjamb?

11  A.   Lightly, yes.

12  Q.   "Lightly," what do you mean?

13  A.   I mean, I didn't, you know, dissect it or anything.  But I

14  looked at it, saw where it was -- how it was put together

15  and --

16  Q.   Okay.  But you don't know -- you can't really tell us how

17  strong of a structure that was?

18  A.   I don't think it was terribly strong 'cause it looked like

19  the door had been pushed through -- pushed off the latches and

20  stuff.

21  Q.   Okay.  And I think one of the questions Mr. Boccato asked

22  you very early on -- we were looking at these sheets, curtains

23  on the windows of the garage.  And Mr. Boccato asked if you

24  gave -- gave Mr. Zuberi permission to put up those sheets on

25  the windows.

A.   I don't know if we gave him permission, but they were put

up.  We did not put up -- put them up.

Q.   I guess my question for you is:  Is it typical -- would it

be typical for a tenant to ask permission to put up window

coverings?

A.   Just -- in the house, yes.  Outside in the garage, we --

we never would notice it 'cause when you drive by, you can't

see the windows really.

Q.   Okay.  So when a tenant rents from you, they're not

allowed to change the curtains in the house?

A.   We usually like to ask -- have them ask for permission

before they do anything like that.

Q.   Okay.  Is that in the rental agreement?

A.   I'm not positive.

Q.   Okay.  Is it standard for the rental agreement to have --

to ask for permission or talk to you about permanent changes to

a structure?

A.   Yes.

Q.   Okay.  What about nonpermanent changes?

A.   Yes.  We like to -- we like to have the tenants ask for

permission for really any changes, even painting.

Q.   Okay.  And is that in the rental agreement?

A.   Yes, it is.

          MR. BERTHOLF:  Okay.  I think that's all.  Thank you.

          THE WITNESS:  Mm-hmm.

1          THE COURT:  Any redirect?

2          MR. BOCCATO:  Briefly, Your Honor.

3          REDIRECT EXAMINATION

4  BY MR. BOCCATO

5  Q.   Mr. Westfall, had prior renters covered those garage

6  windows previously?

7  A.   Good question.  Maybe -- maybe one by the small access

8  door possibly, but none of the other windows had ever been

9  covered that I'm aware of.

10  Q.   I want to show you again 355-7.

11       So, just to kind of clarify, did you, I guess, take

12  your sledgehammer to the structure initially and kind of break

13  that little area out?

14  A.   Yes.  Just kind of wanted to test the strength of the

15  construction.

16  Q.   And then did you realize it was strong enough where you

17  needed to, you know, take apart the inside before you knocked

18  it down?

19  A.   Yeah.  We made it -- it made it a little safer --

20  Q.   Okay.

21  A.   -- for the block to break apart.

22  Q.   So it wasn't a situation where you just hit that structure

23  with a sledgehammer and it came straight down, right?

24  A.   No.  No.

25       MR. BOCCATO:  All right.  Thank you.  No further

1    questions.

2              THE COURT:  All right.  Thank you very much,

3    Mr. Westfall.  You're free to go.

4              THE WITNESS:  Okay.  Thank you.

5              THE COURT:  Our next witness.

6              MR. SWEET:  Thank you, Your Honor.  The United States

7    calls Bradley Sticklin.

8              THE COURT:  Mr. Sticklin, if you'd like to come up to

9    the witness stand over here to my right, your left.

10             If you'd remain standing for just a moment and raise

11   your right hand.

12                        ***BRADLEY STICKLIN***

13   Was thereupon called as a witness on behalf of the

14   Government; and, having been first duly sworn, was examined

15   and testified as follows:

16             THE COURT:  If you'd like to have a seat, I'm going

17   to have you state and spell for our court reporter both your

18   first and last name.

19             THE WITNESS:  All right.  My name is Bradley

20   Sticklin, spelled B-r-a-d-l-e-y, S-t-i-c-k-l-i-n.

21             THE COURT:  All right.  Thank you, Mr. Sticklin.

22                        DIRECT EXAMINATION

23   BY MR. SWEET

24   Q.   Good afternoon, Mr. Sticklin.

25   A.   I'm sorry?

1    Q.    I said, "Good afternoon."

2    A.    Good afternoon.

3    Q.    Mr. Sticklin, a few questions for you.  In July of 2023,

4    did you live at 1336 North Eldorado in Klamath Falls?

5    A.    Yes, I did.

6    Q.    And were you living there when the police showed up in

7    July of 2023?

8    A.    Yes, I was.

9    Q.    And do you still live in Klamath Falls now?

10   A.    I do.

11   Q.    So back in July of 2023, were you renting a room from

12   Sakima Zuberi?

13   A.    Yes, sir.

14   Q.    And do you know roughly when you started living at 1336

15   North Eldorado?  What month?  We'll just take a month.

16   A.    I'm not entirely sure, but I think it was May.  It was

17   either end of February, beginning of May -- March.

18   Q.    Okay.

19   A.    I know months.

20   Q.    End of February, beginning of March, somewhere around in

21   there.  The first few months of 2023 basically?

22   A.    Yeah.

23   Q.    So I want to talk to you about where -- which room you

24   lived in.

25              MR. SWEET:  So if we could pull up Exhibit 93.

BY MR. SWEET

Q.   Okay.  So there's kind of two parts to this exhibit.  This is the first floor.  Did you live on the first floor?

A.   No.  I lived in the basement floor.

          MR. SWEET:  All right.  Let's go to 93-2.

BY MR. SWEET

Q.   Okay.  So, just so you know, this is a touch screen, so you can mark.  Could you show the jury what room you lived in, please.

A.   Certainly, yeah.  Just kind of circle it?

Q.   Yep.

A.   (Witness complied.)

Q.   All right.  Bedroom four on this map.

          And is the person you rented from directly -- were your interactions with Sakima Zuberi?

A.   Yes.

Q.   Where did Mr. Zuberi live?

A.   Like which bedroom?

Q.   Well, let's start with which floor.

A.   It had to have been the first floor.  The only time he ever came downstairs was to do laundry, that I saw.

Q.   So, as far as you know, he lived on the first floor?

A.   Correct.

Q.   And who else lived on the first floor?

A.   There was two kids, and there was also a woman.

1  Q.  Do you know the woman's name?

2  A.  I do not know the woman's name.  I never spoke to her.

3  Q.  How about downstairs on -- in the basement?  Did any other

4  people live there?

5  A.  Yes.  There was a couple that lived in the other bedroom,

6  bedroom three, but they lived there only for a few months.

7  Then they left, and there was another gentleman that moved in

8  towards the end of my stay there.

9  Q.  So in terms of the couple that lived in bedroom number

10  three for a few months, was that Erik Mendoza?  Was -- and his

11  girlfriend?

12  A.  I know that his name was Erik.  I don't know his last

13  name, but I do know the man was named Erik.  I don't know the

14  lady's name.

15  Q.  You said he left at some point; and then somebody else

16  moved in, it sounds like?

17  A.  Correct.

18  Q.  Did you know that person's name?

19  A.  I did not.  I never met the guy.

20  Q.  Were you friends with anyone at the house?

21  A.  No.

22  Q.  Who was, if anyone, Mr. Zuberi friends with?

23  A.  It didn't seem like anyone.  There was one time I do

24  recall the girl from that couple was upstairs, just kind of

25  hanging out.

1  Q.   And so it sounds like you never really hung out with

2  Mr. Zuberi?

3  A.   Correct.

4  Q.   Did you ever talk with him about a gun?

5  A.   No.

6  Q.   Do you recall a conversation -- let me ask you this:  Did

7  he ever say anything to you about going up to a property in

8  Portland or Washington?

9  A.   Yes, he did.  Oh, and he did mention that, yes, he was

10 going to get a gun, that there was -- one of his neighbors at

11 his supposed property, where he was taking trips to, had a

12 weapon; and he needed -- he felt he needed to have one as well.

13 Q.   Did he say something about that he would have to show that

14 he had a gun, too, if you recall?

15 A.   I think he said, yeah, that he wanted to carry it around

16 and have it visible, as he was at that property, to kind of

17 show, I guess, the neighbor that he had a weapon.

18 Q.   And was that conversation towards the beginning, middle or

19 end of your time at 1336?

20 A.   Towards the beginning.  We only ever really spoke towards

21 the beginning.  Pretty quickly I just kind of kept to myself,

22 avoided really anybody else, just went to my room.

23 Q.   And in terms of the house itself, was it quiet?  Was it

24 noisy?  Was it moderate?

25 A.   It was pretty -- it was pretty noisy.  There was lots of

1  banging going on upstairs a lot.

2  Q.   Was there -- was there yelling?  Was there singing?

3  A.   Yes.  There was -- there was also yelling.  I do recall a

4  few times where Mr. Zuberi was very irate at the kids that were

5  there for losing something.  And I just remember that there was

6  excessive amount of yelling on more than one occasion.

7  Q.   In terms of -- I want to switch for just a second to --

8  did you have a car then?

9  A.   Yes.

10  Q.   Did you park in the garage?

11  A.   No.

12  Q.   Did you park in the driveway?

13  A.   No.  I parked on the street.

14  Q.   Did you ever go in the garage?

15  A.   No.

16  Q.   Did you ever see in the garage?

17  A.   No.

18  Q.   Did you walk near the person door to the garage?

19  A.   Yes.  That was the door that I went into, was the one next

20  to the garage.  I can show on the -- the floor plan, if you

21  like.

22  Q.   Sure.  Let's go upstairs.  Thank you.  You can feel free

23  to circle.

24  A.   Yes.  I would go in through that door (drawing).  That was

25  the only door I had a key to.

1   Q.   So when you would go into that door to the kitchen,

2   wouldn't you basically be walking right next to the person door

3   to the garage?

4   A.   Yes.  I would be walking right next to it.  I never tried

5   to go into it 'cause I didn't really have any reason to be in

6   there, but there was also always a curtain covering the window.

7   And the curtain was on the inside of the garage, so I couldn't

8   pull it over to take a peek or anything.

9   Q.   So you had one key, and that was the key to the kitchen

10  door?

11  A.   Correct.

12  Q.   Did your key to the kitchen door work to the front door?

13  A.   No.

14  Q.   Just in terms of cars, do you know what cars were

15  associated with either Mr. Zuberi or with the woman who lived

16  there as well?

17  A.   I think there was a silver SUV that Mr. Zuberi regularly

18  drove.  I think there was another white sedan that was there

19  sometimes, but I am not sure if that was the lady's or just a

20  second car.

21  Q.   And the silver SUV, where was -- was that typically parked

22  in one location?

23  A.   That was typically parked in the driveway.

24  Q.   Did you ever see -- did you ever see into the garage from

25  the front, like with the garage doors open?

1    A.    No.

2    Q.    Were they open a lot?  Or let me back up.  Let me rephrase

3    that.

4          So is it just because you never walked by; or any

5    time you walked by, the garage doors were closed?

6    A.    It's because they were closed.  I would regularly come in

7    the front, so I would walk past the driveway into the front

8    fence area.

9    Q.    I want to pull up -- just to identify your room, I'm going

10   to show you just a -- this is from Exhibit -- all right.  This

11   is from Exhibit 163.  It's just kind of a freeze frame.  See --

12   is this part of your room?

13   A.    It is.

14   Q.    Are those your guitars?

15   A.    They are.

16   Q.    Did you play them in the house?

17   A.    I never did play them in the house, no.  I would -- I

18   guess I did hook up my bass a couple times, but I just played

19   it through headphones, just right -- nothing on speakers.  I

20   never felt comfortable enough to make that amount of sound.

21   Q.    Did you ever talk to Mr. Zuberi about music, either your

22   musical instrument or interests or his?

23   A.    No.

24   Q.    Did he ever say anything to you that he was building a

25   sound studio?

1  A.    No.

2  Q.    Did Mr. Zuberi talk to you about going to Seattle?

3  A.    He did mention, near the beginning of when I started

4  living there -- I think it was when I was trying to make the

5  preparations -- or make the arrangements to actually move in --

6  I had to view the property -- the lady showed me the property

7  'cause he was, I believe, out in Washington somewhere, viewing

8  one of his other properties.

9  Q.    Do you remember -- do you remember the day in July when

10 the police showed up to the house?

11 A.    Like what day it was?

12 Q.    Oh, no.  I'm sorry.  Do you remember that -- do you

13 remember the existence of that day?  Is that --

14 A.    I very much do, yes.

15 Q.    Did the police contact you when you first pulled up to the

16 residence?

17 A.    Yes.  Yep.

18 Q.    And I want to ask you about that day.  It was -- I don't

19 know if you recall what day of the week it was, July 15th,

20 2023.  Do you recall, though, that day where you were that

21 morning?

22 A.    I was at work.

23 Q.    And do you know roughly -- and where did you work then?

24 A.    I worked at Fred Meyer.

25 Q.    Do you know what time you left 1336 that morning?

1 A.   That morning I would have left 9:40, 9:45.  I worked at

2 10 o'clock.  I'd usually try to leave 15, 20 minutes before my

3 shift.

4 Q.   So either that day or a day or two before, did Mr. Zuberi

5 tell you anything that he was planning on leaving the state?

6 A.   No.

7 Q.   Did he say anything about going on a cruise?

8 A.   No.

9 Q.   Did he say anything about going to Turkey?

10 A.   No.

11          MR. SWEET:  Thank you.  Nothing further.

12          THE COURT:  All right.  Any cross-examination?

13          MS. POTTER:  Just briefly, Your Honor.  Thank you.

14                    CROSS-EXAMINATION

15 BY MS. POTTER

16 Q.   Good afternoon.  My name's Amy Potter.  I just have a

17 couple questions.  So you referred to multiple times -- your

18 understanding was that Mr. Zuberi had other properties that he

19 was managing, correct?

20 A.   Yes.

21 Q.   Okay.  And that he would frequently take trips to manage

22 those properties?

23 A.   Yes.

24 Q.   Okay.  And then Mr. Sweet asked you a series of questions

25 about what Mr. Zuberi didn't talk to you about.  Do you

1  remember those questions?  Like, he said he didn't talk to you

2  about going on a cruise; and you said yes, right?

3  A.   Yeah, just now, yeah, I recall that.

4  Q.   But didn't you say earlier that you never really talked to

5  Mr. Zuberi at all?

6  A.   Yeah, not -- not past the beginning.

7  Q.   Yeah.  So you didn't, you know, check in with him on a

8  day-to-day basis about what he was doing?

9  A.   No.

10  Q.   You didn't socialize?

11  A.   No.

12  Q.   You didn't hang out in the evenings?

13  A.   No.

14  Q.   So you had no reason to talk to him about anything, other

15  than rent?

16  A.   That's correct.

17  Q.   And when you left for work that day, did you see any

18  vehicles in the driveway?

19  A.   I don't recall.

20          MS. POTTER:  Okay.  Thank you.  Nothing further.

21          THE COURT:  Any redirect?

22                    REDIRECT EXAMINATION

23  BY MR. SWEET

24  Q.   Just one question.  On that day, July 15th, 2023, did

25  Mr. Zuberi or the woman ask you to take care of their dog?

1  A.    No.

2            MR. SWEET:  Thank you.

3            THE COURT:  Any follow-up on that?

4            MS. POTTER:  No, Your Honor.

5            THE COURT:  All right.  Mr. Sticklin, thank you very

6  much.  You're free to go.

7            THE WITNESS:  Thank you.

8            THE COURT:  All right.  Our next witness.

9            MR. SWEET:  The United States call Klamath Falls

10  Police Department Officer Young.

11            THE COURT:  Mr. Young, step up to the witness stand

12  here to my right.

13            THE WITNESS:  Thank you, Your Honor.

14            THE COURT:  Please remain standing for just a moment

15  and raise your right hand.

16                            ***TYLER YOUNG***

17  Was thereupon called as a witness on behalf of the

18  Government; and, having been first duly sworn, was examined

19  and testified as follows:

20            THE COURT:  Please have a seat.

21            And if you could both state and spell your first and

22  last name for our court reporter.

23            THE WITNESS:  It's Young, Y-o-u-n-g.

24            THE COURT:  And your first name.

25            THE WITNESS:  Tyler.

1        THE COURT:  Tyler, T-y-l-e-r?

2        THE WITNESS:  Yes, sir.

3        THE COURT:  Thank you.

4                    DIRECT EXAMINATION

5    BY MR. SWEET

6    Q.    All right.  Good afternoon, Officer Young.

7    A.    Good afternoon.

8    Q.    How are you employed, please.

9    A.    I'm the school resource officer for Klamath Falls Police

10   Department.

11   Q.    And how long have you been employed with KFPD?

12   A.    I've been a cop for about ten years, but KFPD for about

13   three.

14   Q.    And before joining KFPD, where did you work?

15   A.    I was an officer and detective for the San Diego Police

16   Department in California.

17   Q.    And before that?

18   A.    Before that, I was with the United States Marine Corps for

19   six years.

20   Q.    So you said you're a school resource officer.  In the

21   summer do you have another role as well?

22   A.    Yes.

23   Q.    What is that, please.

24   A.    I fill various roles, but one of the main ones is

25   assisting detectives.

1  Q.   Were you -- were you on duty on July 15th, 2023?

2  A.   Yes.

3  Q.   And I'm going to just tell you, because the jury has heard

4  from multiple KFPD officers, I'm just going to jump to a few

5  specific areas to really focus on.

6  A.   Okay.

7  Q.   And what I'm going to ask you about mostly is your

8  observations in the garage and in the master bedroom --

9  okay? --

10  A.   Okay.

11  Q.   -- of the residence.

12  A.   Yes.

13  Q.   But, just in terms of general overview, how did you become

14  involved in this investigation?  Who contacted you?

15  A.   I was called from home by my supervisor, Detective

16  Sergeant Chris Zupan.

17  Q.   And did you go to the residence at 1336 North Eldorado?

18  A.   Yes.

19  Q.   And when you were there, did you meet AV-1?

20  A.   Yes.

21  Q.   So when you were there, is that the time when AV-1 was

22  there with Officer Gilmore, Officer Trippet, Detective

23  Loudermilk and Sergeant Fox, or at least some of those people?

24  A.   Yes.

25  Q.   So after AV-1 identified the residence, what did you do?

1  A.    She identified the residence.  I eventually put her in my

2  vehicle.  I put her in the front passenger seat, showed her how

3  to work the air conditioning.  And then, at some point, I think

4  one of the detectives knocked on the door of the residence.  We

5  didn't have any response.  And eventually I transported AV-1

6  back to the police department.

7  Q.    And back to the police department.  Then what?

8  A.    I sat down and interviewed her.

9  Q.    So -- and was it an extensive interview?

10 A.    Yes.

11 Q.    So I'm not going to ask you to recount that, but did you

12 share details from that interview with Detective Loudermilk?

13 A.    I did.

14 Q.    And is that because he was working on a search warrant?

15 A.    Yes.

16 Q.    So from the interview was there some information that AV-1

17 gave you that you followed up on with some online research?

18 A.    Yes.

19 Q.    What was that, please.

20 A.    So there was a few things.  She had described, of sorts, a

21 timeline.  You know, she had believed that she had first met,

22 you know, an individual at midnight and described being

23 transported to different locations.

24        At one of those points, she was able to look at what

25 she described as a GPS on a phone.  I was able to use the time

1  that was left on the GPS, which I think was two hours and four
2  minutes, she said, and compared that with sunrise time that was
3  listed on an open source Internet search, to be able to kind of
4  narrow down, you know, if -- the assumption here is that if the
5  GPS is finding the shortest distance or the fastest route, that
6  I could potentially identify some of the locations where stops
7  were made.

8      And one of those locations I found to be a likely
9  location of Oakridge, Oregon, based on the two hours and four
10 minutes from 1336 North Eldorado.  She also described something
11 she said looked like a walkie-talkie with several antennas
12 coming out of it.  And she had described that her cell phone
13 didn't work.

14     When I did just an open source -- I think it was
15 Google Images -- search of cell phone jammers, what I found
16 looked like a large walkie-talkie of sorts.  It was a -- had a
17 box to it, and it had several antennas sticking out the top.
18 That was by far the most common image that I found from doing
19 that search.
20 Q.  And after midnight did you participate in the KFPD search
21 warrant on 1336 North Eldorado?
22 A.  Yes.
23 Q.  All right.  So we've now gone from Saturday, the day you
24 interviewed her, to early morning hours of Sunday, July 16th?
25 A.  Yes.

Q.   So did you go into the garage?

A.   Yes.

Q.   Can you tell us -- talk us through that.  What happened?
You walked in the garage.  What did you notice?

A.   Yeah.  The moment I stepped into the garage, there was a
pretty significant increase in the temperature.  You know, I
kind of likened it to you walk into a gas station on a hot day.
You feel that refreshing air conditioning.  But I kind of
thought of it more so in reverse, the level of heat that I
experienced walking into the garage.

        You know, I then could see a cement block structure
that was on the left side of the garage as you -- as you face
it from the street.  I could see a wooden door that was on it,
the -- the -- you know, the latch only from -- from the outside
there.  And inside the room I -- forgive me.  I peered inside
the room.

        I saw one wooden chair, a cable hanging from the
ceiling, a bottle of water on the floor.  There were some --
some, looked like, Styrofoam panels kind of spaced out in the
room as well.  It was a Sheetrock room.  I remember it had some
mud over -- over some of the connecting joints where the
Sheetrock would meet.

        There were several things in the garage as well.  A
table next to the garage.  You know, I noticed a couple things
that were on the table that -- that AV-1 had described.  She

1    had described a drill.  I located a drill that was on the

2    table, just within arm distance of the door.

3          I saw two handcuffs on there, and they were both

4    black.  One was just like the ones I carry on duty that you'd

5    use for wrists.  And there was another set that had a longer

6    chain on it, something that I had seen before from jails, in

7    which you might handcuff ankles to it, again, something that

8    AV-1 had described.

9    Q.   So were you seeing a lot of things that AV-1 described?

10   A.   Yes.

11   Q.   When you first saw that cinderblock structure, what --

12   what was a thought that you had?  Did it remind you of

13   something?

14   A.   Yeah.  You know, as a kid, just before joining the Marine

15   Corps, I helped out on a construction project in which we were

16   remodeling the interior of a sound studio.  When I left that

17   job, as a -- as, I think, a 18- or 19-year-old kid, we -- I

18   left that job, and I was kind of finished after the Sheetrock

19   had been mudded and some of the sound paneling was put up.  So

20   when I first peered in there was this kind of, you know,

21   instant reminder of that sound studio.  Of course, there were

22   differences.  But that was certainly my first thought.

23   Q.   So let's talk about that a little bit.  So you spent --

24   before joining the Marine Corps, you said -- was it basically a

25   summer you spent working on a sound studio?

A.    Yeah.  I think there was a few jobs, but for at least a

few months -- my guess is two to three, at best -- we worked on

a sound studio.

Q.    Was it multiple rooms in that sound studio?

A.    Yes.

Q.    All right.  And you were engaged in the construction of

that?

A.    Correct.

Q.    And so do you have familiarity then with what is and isn't

in a sound studio?

A.    It's limited; but, yeah, some.

Q.    So could you please tell the jury some of the differences

between what you saw in the garage at 1336 and the sound studio

that you were working on.

A.    Yes.  I mean, the -- you know, I would say the most stark

contrast was the fact that the -- the room would be locked from

the outside.  There was no door handles.  You know, presumably

if one could accidentally lock themselves withinside of this

room, they wouldn't be able to get out.

          There was other differences, too.  You know, I -- the

Styrofoam that was on the walls reminded me of paneling that we

used for the sound studio there, but it wasn't -- it certainly

wasn't up to the quality or standard that I experienced in the

sound studio that I worked on.

          You know, the studio that I worked on had some kind

1  of paneling or sound-absorbing soft material that covered the

2  vast majority of the walls, not just sort of spaced out.

3  The -- there were differences in the roofing.  You know, the

4  one I worked on had a gap in the corners that -- that -- you

5  know, some of the sound guys had described to me as -- as

6  allowing sound waves to travel up in there and kind of get

7  trapped in the fabric of the ceiling.

8          Of course, there were professional, even safety

9  concerns.  The extension cord that dangled from the ceiling was

10 certainly nothing I saw at a professional sound studio.  A

11 single chair in there versus all the sound studios I worked on,

12 I got to see the finished products eventually; and they all --

13 you know, for the most part, they had more than -- than just

14 one chair.

15         You know, they had an easel, which -- that held music

16 or -- or multiple chairs so that an instruction could take

17 place.  You know, there -- I would say that it was a reminder

18 of the sound studio, but that thought was fleeting.

19 Q.   Is the -- did any of the sound studio rooms you worked on

20 have a metal security door on the interior?

21 A.   No.

22 Q.   So let's go into the inside of the house.  Did you

23 participate in the search of an upstairs bedroom?

24 A.   Yes.

25         MR. SWEET:  Let's take a look at 60-2, please.

BY MR. SWEET

Q.   And tell us what we're seeing here.

A.   Yeah.  So this was what -- what really looked like to be a master bedroom of the house.  That was that upstairs bedroom that -- that you brought up, we're looking at.  Down there at the bottom left of the photo is kind of like a nightstand, several personal effects on there.

And then obviously we have the bed here in the middle of the room.  There was some kind of window on the far side.  I don't remember if it was a sliding glass door or a window by itself.

Q.   All right.  And was there anything you observed under the bed that you can see in this picture here?  And this is a touch screen, so feel free to circle.

A.   Yeah.  I found a few boxes under the bed, two of which were ammunition cans.

Q.   And let's take a look at -- let me go to those.  Did you open those ammunition cans?

A.   I did.

MR. SWEET:  Let's take a look at 73, please, Exhibit 73.

BY MR. SWEET

Q.   And was -- were they made of different materials, the two different cans, if you recall?

A.   I think one might have been plastic, but I'm not entirely

1    certain.

2    Q.    What are we seeing in Exhibit 73?

3    A.    This main ammo can here -- you're okay with me circling

4    down here?

5    Q.    Yes, please.

6    A.    Yeah.  This main ammo can right here (drawing) is of

7    the -- you know, I mean, you can purchase these commonly at

8    outdoor stores.  But it's also the exact same model that I used

9    in the United States Marine Corps.  And that's full of what

10   would be .223 or 5.56 ammunition.  It's a very similar round,

11   and most -- most AR-15 style rifles will fire both of those

12   types of rounds.

13   Q.    In either this ammo can or the other, was there anything

14   you noticed about any of the ammunition?

15   A.    Yeah.  I can't remember if it was both, but it --

16   certainly at least one of the ammo cans was mostly full of

17   green-tipped ammunition.  That's the same style of ammunition I

18   fired as an infantryman.  And that has some form of

19   armor-piercing element within the ball round itself.

20           MR. SWEET:  Exhibit 74, please.

21   BY MR. SWEET

22   Q.    What are we seeing in Government's Exhibit 74?

23   A.    Yeah.  So this is the ammo can again.  It's just the

24   overhead view.  I had located two handcuff keys in there.

25   That's what's being held in -- I can't remember if I took the

1  photo here or not, but those were the handcuff keys that I

2  located.  There were also some other keys that I was unable to

3  establish what those went to.  I didn't try them on any other

4  locks.  And then, of course, the ammunition in the can.

5  Q.   Did you search the nightstand, as you're facing the bed,

6  to the left side?

7  A.   Yes.

8       MR. SWEET:  Let's pull up Government's Exhibit 76-1.

9  BY MR. SWEET

10  Q.   What -- tell us what we're seeing here, please.

11  A.   This is the nightstand that was next to the bed that I

12  initially described.  Here I think I did take this photo, if I

13  remember correctly.  But what's here in the middle -- I'll go

14  ahead and just kind of show right here (drawing) -- was a

15  notebook that I had located underneath some of the personal

16  effects that are on the nightstand.

17  Q.   And this photo, is -- it's a little confusing, but is

18  there a mirror in this photo?

19  A.   I do remember seeing -- oh, I can tell what's happening

20  here.  Yeah, so this is -- yeah, the --

21  Q.   You can scratch out the mirror, if you want, just so

22  everyone --

23  A.   Yeah.  Yeah.  Perfect.  So it's kind of -- I will shade it

24  right here in the background.  So you're kind of getting a

25  double view of everything on the nightstand.

1   Q.   So you said you found a notebook, and it was on that

2   nightstand?

3   A.   Correct.

4           MR. SWEET:  And let's go to 76-2.

5   BY MR. SWEET

6   Q.   Just closed, but is this -- does this look like the

7   notebook?

8   A.   Yes.

9   Q.   And did you look in that notebook?

10  A.   I did.

11          MR. SWEET:  Let's go to 76-3.

12  BY MR. SWEET

13  Q.   And we're just going to flip through a few of the pages.

14          Did you see a name on here towards the bottom?

15  A.   Yes.

16  Q.   Okay.  Could you circle the name, please.

17  A.   Yes.

18  Q.   And what are you circling?

19  A.   I'm circling what looks like the name Satima to me.

20          MR. SWEET:  And the next page, please, 74 -- excuse

21  me -- 76-4.

22          Can we zoom in on the top?

23  BY MR. SWEET

24  Q.   I'm going to ask you:  Was this notebook seized?

25  A.   Yes.

1    Q.   Okay.  Were you interested in this notebook?

2    A.   Yes.

3    Q.   Tell us why, please.

4    A.   Yeah.  I mean, there were several pages that were of, I

5    mean, significant concern.  This, of course, being one of them.

6    It says "Operation Take Over" here.  And, as I read it, in

7    handwriting, "Leave phone at home.  Make sure they don't have a

8    bunch of people in their life.  You don't want any type of

9    investigation."

10   Q.   Did you find that of evidentiary significance?

11   A.   Yes.

12   Q.   Did you find any writings about music in this notebook or

13   anywhere else?

14   A.   No.

15   Q.   So when you saw the sound studio -- excuse me -- when you

16   saw what reminded you of a sound studio, did you think about

17   how that could come up again in this investigation?

18   A.   Yes.

19   Q.   Tell us about that, please.

20   A.   Yeah.  I mean, part of my job as a detective is to

21   investigate various forms of leads, whether plausible or even

22   relatively implausible.  And, in part of doing that, one of the

23   things I try to do is -- is think to myself is there a reason

24   or maybe, for lack of a better term, an excuse that someone

25   might use to construct this studio.

1    And so I remember thinking, as I was doing the

2   search -- and I think I recall even voicing this to some of the

3   other detectives on the search -- I want to know if there's

4   musical instruments in this home because I'm concerned that

5   this might be an excuse.

6    And so during the search that was one of the things

7   that I was specifically looking for, was anything that might

8   lead to the idea that he is a musician.

9   Q.   And, as you searched through the house, did you find

10  anything that would support that he was a musician?

11  A.   You know, the closest thing that I saw was what looked

12  like a music case, something that might have once held a

13  musical instrument.  But there was -- there was no music or

14  instrument in that case.

15  Q.   And, to be clear, were you sort of being closed-minded

16  about it?  Or were there other things that you saw in the cell

17  that led you to want to address that as a potential defense?

18  A.   Well, I mean, I didn't see any music in the -- in the cell

19  itself and no instruments and no sheet music, nothing that led

20  credence to that idea.  So, no, I mean, I -- look, I do my best

21  to come at these things with an open mind.  Clearly I had

22  already spoken with the victim.  But if -- if this was going to

23  be used as an excuse, or even if it was a legitimate use, I

24  would've expected to find some sort of evidence to that.  And I

25  did not.

1   Q.   And was the torn-out screen, the kicked-out door and the

2   blood you saw -- did that all lead you towards a certain

3   conclusion?

4   A.   Yes.

5   Q.   And the handcuffs outside?

6   A.   Yes.

7   Q.   And all the other things you talked about at the

8   beginning, when you first started testifying?

9   A.   Correct.

10          MR. SWEET:  So let's go to the next page of the

11   notebook, 76-5, please.

12          And I shouldn't say necessarily "the next page," but

13   we'll continue on to the next photo of this.

14   BY MR. SWEET

15   Q.   What about this one, please.

16   A.   Yeah.  This was another concerning page in the notebook.

17   It says, "Dig a hole straight down 100 feet."  I think that

18   says, "Concrete block, rubber coat, foam insulation, waterproof

19   concrete."  And then it looks like a rudimentary diagram of

20   some sort of -- you know, what I thought was some sort of

21   bunker to be dug underground.

22   Q.   Did that strike you as a sound studio?

23   A.   No.

24          MR. SWEET:  And the next, 76-6, please.

25

BY MR. SWEET

Q.   And just what was this regarding, please.

A.   This is another page in the notebook.  There's a little

star there that says "cheap land," and then it lists several

different counties.  And then in parentheses here, it looks

like the abbreviation for different states that probably

correspond to the county, though I didn't look those up.

Q.   So, Officer, I'm going to switch gears for just one second

before I show you a physical exhibit.  I'd like to pull up

261-6, and I just want to ask you a question about the Love's

gas station in Klamath Falls.  Have you been there?

A.   Yes.

Q.   Is there -- actually, I don't even know.  Is there more

than one?

A.   There's one.

Q.   There's one.  Okay.  So what are we looking at with 262-6,

please.

A.   Yeah.  So this is a bird's-eye view of the Love's gas

station.  If I am looking at the screen here, off to the far

left is going to be Highway 97.  And then if you keep going off

to the far right, you have the OIT, Oregon Institute of Tech.

The large building -- the one we're seeing here, the large

building in the center is the Love's gas station itself.  And

although it says "Carl's Jr. Fast Food" down there at the

bottom, Carl's Jr. is actually attached and would be at the top

1     end of that gas station.

2     Q.   Okay. So is where -- the sign that says Carl's Jr., is

3     that basically where people get their gas, where -- not

4     commercial -- where civilians would get their gas?

5     A.   Yeah. Those are the pumps.

6     Q.   And then what about the back section that we're seeing?

7     A.   The back section would be like where the trucks would

8     park, the big rigs, the semitrucks.

9         MR. SWEET: So if we could go to 262-1.

10    BY MR. SWEET

11    Q.   Okay. So what are we seeing here in this -- in this

12    photo?

13    A.   This looks like the front gas pumps, like where standard

14    vehicles would pump gas.

15    Q.   And then basically directly behind this, if you were to go

16    straight backwards, it would be where the semis were; is that

17    correct?

18    A.   Yes. Yeah.

19    Q.   Thank you.

20         MR. SWEET: We can take that down.

21         Your Honor, may I approach?

22         THE COURT: Yes. You don't need to ask in the

23    future.

24         MR. SWEET: Thank you.

25

BY MR. SWEET

Q.   Officer, I'm going to show you what's marked as
Government's Exhibit 99.  And before I do that, let me ask you
this:  Are you familiar with fingerprint powder being used on
items?

A.   I am.

Q.   And what effect can that have on items?

A.   Fingerprint powder can do, I mean, a few different things.
It depends on the processing that takes place.  And I have some
level of understanding that the process that takes place on
paper tend to not be just basic powder, like, you know, that
we -- many of us have probably seen in a movie.  And some of
that processing can affect the -- the paper, right?  It might
make it brail -- or brittle, rather, or -- or stiff in
different ways.

Q.   Could it also make it look kind of dirty?

A.   Definitely, yeah.

Q.   Okay.  Let's take a look -- could you tell us what
Government's Exhibit 99 is, please.

A.   Yes.  This was the notebook I recovered from the bedroom.

Q.   Okay.  And would you just open it up and just confirm?
And you may have had an opportunity to look at this today,
but --

A.   Yes.  So the -- I believe the pages, when I found them,
were still connected to the -- the binding.  But these are --

1   these are the pages that I observed.

2   Q.   Thank you.  Let's put that back.

3          Thank you.

4   A.   No problem.

5          MR. SWEET:  Thank you, Officer.  I have no further

6   questions.

7          THE COURT:  Cross.

8                    CROSS-EXAMINATION

9   BY MR. BERTHOLF

10  Q.   Good afternoon.

11  A.   Good afternoon.

12  Q.   So you said your first initial thought when you walked

13  into that structure in the garage was it looked very similar to

14  a sound studio?

15  A.   Yeah, the one that I had worked on, yeah.

16  Q.   Who were you working for, for that?

17  A.   His name was David Necaise.  He was a general contractor

18  out of San Diego.

19  Q.   General contractor.  I assume that he probably had years

20  of experience on building music studios?

21  A.   I couldn't say how many studios he worked on, but years of

22  experience as a contractor.

23  Q.   Okay.  And we went through a lot of the differences.  What

24  was it about this structure that made you think that it looked

25  like a music studio, your first thought?

1    A.    Yeah.  The Styrofoam on the walls was the -- probably the

2    first and most significant indicator.  But then I also noticed

3    that there was something about the ceiling that -- that was

4    fabric or had some -- you know, like it was almost like a foam

5    or material or something was up there on the ceiling.

6    Q.    Okay.  And -- but -- and we've seen pictures of this, so

7    the jury's been through this already.  There was some foam on

8    the walls?

9    A.    Yes.

10   Q.    But a lot of the wall was still Sheetrock?

11   A.    That's correct.

12   Q.    So if it was to be a music studio, it wouldn't be

13   completed yet?

14   A.    I'm no expert, but that seems reasonable to me.

15   Q.    Okay.  While you were working as an employee of the

16   contractor, did -- while you were working on these music

17   studios, was all the equipment in there?

18   A.    No, not while we were working.

19   Q.    Was there any musical instruments in there while you were

20   working on them?

21   A.    No.

22   Q.    Were there any chairs or anything else in there?

23   A.    I mean, occasionally a chair, but not to -- not like

24   formal furniture, no.

25   Q.    Okay.  Do you have any knowledge of producing music?

A.   No.

Q.   So you don't know if a producer of music might not have
instruments of their own?

A.   Yeah, I suppose I don't have enough experience to speak to
that.

Q.   So you can't say whether or not this could've been a music
studio; it just appeared that maybe it might -- it was similar
to what you'd experienced in the past?

A.   Yeah, there were -- yeah, I don't want to misspeak, right?
So there was clearly similarities that reminded me of my time
there and then -- and then clearly differences.

Q.   And a lot of differences, and we've gone through those.
And we're not going to argue about whether or not there's
differences.

          The ammo -- oh, let me get back here.

          Okay.  This was green-tipped ammo.  And did you say
it was 5.56 round?

A.   I don't remember if they were all 5.56 or .223.  There is
a slight difference to those rounds.  But they all were of one
of those two calibers.

Q.   Okay.  And you said that they were -- that's the type of
ammo that you used as an infantryman?

A.   Yes.

Q.   This is ammo that you can walk down to Sportsman's
Warehouse and plop down $14 and walk home with some ammo?

1    A.    That is correct.

2    Q.    You could actually get online, put your credit card

3    information in, and have it mailed to your home?

4    A.    Yes.

5    Q.    It's not illegal in any way, shape or form?

6    A.    Correct.

7    Q.    For an average person to own?

8    A.    Correct.

9    Q.    There is nothing that is barring you or me from going down

10   and purchasing that ammo?

11   A.    Correct.

12   Q.    And being able to go out to the range and use it?

13   A.    Yes.

14   Q.    Or go out hunting with it?

15   A.    Ah --

16   Q.    If we wanted to.

17   A.    I suppose it depends on the game; but, yes, agreed.

18   Q.    Probably not the best for a rabbit, if you want to take

19   that rabbit home.

20            Oh, we were looking at this Exhibit 76.5.  And it was

21   kind of a shaft down, and you said it kind of looked like a

22   bunker?

23   A.    Yes.

24   Q.    You ever been inside of a root cellar?

25   A.    I mean, I suppose I'm familiar with them.  I'm not sure

1  I've been in one.

2  Q.   Do you know what a root cellar is?

3  A.   A vague understanding, yes.

4  Q.   Okay.  And what's your vague understanding of what a root

5  cellar is?

6  A.   Best guess here, it's an underground place where you could

7  store certain vegetables, I think.

8  Q.   Okay.

9  A.   And the idea here is, I think, to keep a constant

10 temperature.

11 Q.   All right.  Thank you.

12          MR. BERTHOLF:  Anything else?

13          MS. POTTER:  No.

14          MR. BERTHOLF:  I think that's all.  Thank you.

15          THE COURT:  Any redirect?

16          MR. SWEET:  Just briefly.

17                    REDIRECT EXAMINATION

18 BY MR. SWEET

19 Q.   Officer, Mr. Bertholf asked you if there's anything that

20 would bar you or him from going down and buying ammunition,

21 correct?

22 A.   Yes.

23 Q.   Under federal law, can a felon buy ammunition?

24 A.   No.

25 Q.   And then turning to the -- to the cell one more time, the

1  music studios that you worked on when you were younger, any

2  handcuffs or leg irons outside of those?

3  A.   No.

4          MR. SWEET:  Thank you.  Nothing further.

5          THE COURT:  All right.  Thank you.  You're free to

6  go.

7          THE WITNESS:  Thank you, Your Honor.

8          THE COURT:  All right.  Our next witness.

9          MR. LICHVARCIK:  The United States calls Oregon State

10 Police Detective Brandon Dougherty.

11         THE COURT:  If you'd like to step over here to the

12 witness stand to my right.

13         Step up and remain standing for just a moment.

14         Raise your right hand.

15                        ***BRANDON DOUGHERTY***

16 Was thereupon called as a witness on behalf of the

17 Government; and, having been first duly sworn, was examined

18 and testified as follows:

19         THE COURT:  If you'd like to have a seat.

20         And if you could state your first and last name.  If

21 you could spell both for our court reporter.

22         THE WITNESS:  All right.  My name is Brandon

23 Dougherty.  Spelling on first is B-r-a-n-d-o-n.  Spelling on

24 last is D-o-u-g-h-e-r-t-y.

25         THE COURT:  Thank you.

1    <u>DIRECT EXAMINATION</u>

2    BY MR. LICHVARCIK

3    Q.   All right.  Would you please let the jurors know where you

4    work and a little bit of your job experience.

5    A.   So currently I work for the Oregon State Police.  I'm

6    assigned to the Criminal Detective Division.  Prior to that, I

7    worked for the Klamath Falls Police Department.  I've been in

8    law enforcement since 2006.  And I've been assigned to

9    Detective Divisions at both agencies for a total of about seven

10   years now.

11   Q.   And last July 15th and 16th of 2023, were you involved in

12   the search warrant at 1336 North Eldorado?

13   A.   Yes, I was.

14   Q.   And, generally -- the jurors have already heard a lot

15   about that search; but, generally, what was your involvement?

16   A.   Regarding the search or the --

17   Q.   Yes, the search.

18   A.   Just going through the residence, looking for any evidence

19   that may have been linked to the allegations that was made, you

20   know, just trying to find any evidence that would pertain to

21   the case and verify the information we received.

22   Q.   And were you one of the first in the garage?

23   A.   Yes.  Yes, I was.

24   Q.   Wearing a body camera?

25   A.   Yes, I was.

1    Q.    And who did you enter the garage with, if you remember?

2    A.    Off the top of my head, I remember Detective Loudermilk,

3    Detective Sergeant Zupan; and I believe Detective Young, but

4    I'm not sure on that.  I remember the other two were there with

5    me for sure.

6    Q.    What do you remember about first entering?

7    A.    First entry, as you -- into the garage, correct?

8    Q.    Yeah.

9    A.    As you walk into the garage, there was a large structure

10   right kind of almost in the center of the garage.  It looked to

11   be constructed of, like, cinderblock or concrete.

12   Q.    Do you remember anything about temperature changes?

13   A.    It was warm in there.  It was much warmer in the garage

14   than outside, like almost uncomfortably warm, but very warm.

15   Q.    All right.  Let me show you Exhibit 57 on this board.

16   Does that look familiar to you?

17   A.    Yeah.  That would be the inside of the structure that's in

18   the middle of the garage area.

19   Q.    Do you remember who took this picture?

20   A.    I believe that's a picture I took with my work phone.

21   Q.    And do you recall finding anything specifically in the

22   back of the garage?

23   A.    Yeah.  So, as we looked through the garage, I did locate

24   what looked to be a woman's purse.  Do you want me to describe

25   where I located it?

Q.   Yeah, please describe.

A.   I looked through the purse to just try to see if there were any forms of identification or anything like that.  And I did find a bank card that had the last name of AV-1 on it.

Q.   All right.  And we just scanned through 86-1, 86-2, and now we're on 86-3.  Could you tell us what we're looking at there?

A.   That would be the purse I found.  Yeah, it was sitting on top of a travel suitcase.

Q.   Now, after the search were you involved in traveling anywhere to look for evidence?

A.   Yes.  Several hours later, I was asked to go to Tulelake, California, to try to do some follow-up in that area.

Q.   Do you know why you were going down to Tulelake?

A.   So -- yeah.  So when I was -- I had left the command post, went home for a bit, and was called back to assist further.  When I came back, I was told that they received information that Mr. Zuberi was potentially -- his cell phone had -- they received what are called pings in the area of Tulelake, California, in the area of the -- in Main Street in Tulelake.

Q.   And if you recall, when did you head down to Tulelake in relation to executing the search warrant of 1336?

A.   All right.  Let me look back on that.

So we executed the search warrant on July 16th at 12:45 a.m.  Like I said, after doing that, I went home for a

1    bit.  And then at approximately -- let me see -- approximately

2    3:30 p.m., I went back into work, received an assignment.  And

3    then I arrived in Tulelake, California, at approximately

4    4:21 p.m.

5    Q.   So that's still on July 16th?

6    A.   Correct.

7    Q.   All right.  Showing you Exhibit 484, can you talk to the

8    jurors about this map and distances between Klamath and

9    Tulelake?

10   A.   Yeah.  So Tulelake's a small town just south of the

11   California border.  It's probably about 30 miles from

12   Klamath Falls.  It's not particularly far.

13   Q.   And seeing the map there and the blue spots, what town do

14   you have to travel through to get down to Tulelake?

15   A.   Yeah.  You have to go through Merrill, Oregon, and then

16   you follow Highway 39 there to Tulelake.

17   Q.   Had you been there before?  Talk to us about Tulelake and

18   your experience there.

19   A.   So for me, yeah, I have been to Tulelake before.  I was

20   born and raised in Klamath Falls.  So I've been to Tulelake a

21   handful of times.  I'm not familiar with every part of it.  But

22   I have been to the town, familiar with it, familiar how to get

23   there.

24   Q.   How would you describe it as a town?

25   A.   Very small, few hundred people, maybe a few restaurants,

1 very small grocery store, almost just that -- that picture you

2 would picture of a very small town.

3 Q.   So when you headed down to Tulelake, how specific of

4 information did you have?

5 A.   So I was told that the cell phone ping was in the area of

6 319 Main Street.  So I was requested to go down to that area

7 and see if I could locate a vehicle or anything matching the

8 description of a -- what Mr. Zuberi was supposed to be driving.

9 Q.   Okay.  And what'd you find when you went down there -- or,

10 actually, first, just tell us kind of generally what you did.

11 A.   So I went down there.  I went to the area of -- right at

12 319 Main Street.  That is just the main drag that goes through

13 the center of town.  I didn't locate any vehicles matching the

14 description at all.  Tulelake's a very small town; so I was

15 pretty much able to drive through the whole town, the different

16 neighborhoods, looking for the vehicle.  Did not locate the

17 vehicle.

18        So then I got out on foot in the area of Main Street

19 and started looking for any type of surveillance cameras that

20 may be at any of the businesses in that area.

21 Q.   All right.  And on the screen is 483-2.  What are we

22 looking at?

23 A.   So that's a -- would be a small park area just off Main

24 Street there, which would also be direct -- or directly next to

25 a business at 348 Main Street.

1   Q.   And can you -- if you're able to, can you draw a line, by

2   touching your screen, and show us what you mean by Main Street?

3   A.   So, yeah, this area would be the actual Main Street that

4   goes right through the center of the Tulelake there.

5   Q.   So when you went down, where'd you park your car in

6   relation to that line that you just drew?

7   A.   It would be off the screen 'cause I parked on the 319

8   side, which is the opposing side.

9   Q.   And you walked around Main Street.  What were you looking

10  for, and what did you find?

11  A.   Yeah.  So, like I said, very small town, so I was able to

12  walk up and down Main Street and looked for any video

13  surveillance cameras.  And I did locate one at the corner of

14  this business right here (drawing), which is 348 Main Street,

15  that store right there.

16  Q.   All right.  483-3, tell us what we're looking at.

17  A.   So that's just the front entrance to the store that I

18  mentioned that had some video surveillance.  It actually had

19  external cameras that pointed -- looked like they pointed out

20  towards Main Street.

21  Q.   All right.  And we're zooming in.  Are you able to make a

22  mark on any places that you saw external video cameras?  Circle

23  them, actually.

24  A.   I believe it's this one.  It could be that; but it's one

25  of those two, and I think it's this first one right here.

Q.   And you're circling both the right and the left of the
roof there.  And you think it was the one at the right?

A.   Yes, I believe so.  Yeah.

Q.   And in which direction -- and you can draw an arrow from
that camera to show us which direction that camera was pointed
towards.

A.   Okay.  Yeah.  So, like I said, I believe it is this.  And
it goes that way (drawing).  It picks up obviously, you know,
the store's entrance; but it also points down the street,
towards Main Street there.

Q.   Okay.  And what are we looking at here?

A.   That would be another picture of the park area, which is
next to that store.  Like, this right here (drawing) would be,
like, the side wall of that store.

Q.   Of Vallarta?

A.   Yes.

Q.   Okay.  And so you found the cameras.  What did you do?

A.   I went in the store.  The store was open.  I contacted the
owner of it.  She -- I told her a little bit about the
investigation, just what I was looking -- or I was looking to
see if there was any vehicles in the area or anything.  She
told me she didn't really know how to work the video system;
but said if I knew how, go ahead.  It was actually -- their
whole video system was, like, right dead center in the store.

Q.   So what'd you do?

A.    She -- it was up high.  So she gave me a stool, and I got

up there.  It had, like, the DVR and everything with the TV

screen.  So I went -- I noticed that their time stamp was way

off, so I went back 24 hours and just started watching video.

I watched it at, like, a heightened speed -- not exactly

realtime, but a heightened speed -- and just watched it to see

if there was anything that stuck out to me.

Q.    So you actually went inside.  You got a stool.  You got on

the stool.  You went up; and you, yourself, manually pulled out

the hard drives for the -- for the camera?

A.    I didn't pull out any hard drives or anything.  It's

just -- you could actually access, record, play everything from

it right there.  And just from prior experiences, I had a

general idea of how to somewhat work it.

Q.    And what were you looking for when you were --

A.    Just to see if I could -- since it did point out toward

the street, just to see if I could see the vehicle come into

town or be anywhere in that area, since they indicated that

there was a -- multiple cell phone pings in that area.

Q.    And you don't have to draw on the screen, but does this

show kind of generally the area where the camera was filming?

A.    Yes.

Q.    Okay.  And, again, did you know what you were specifically

looking for, in terms of any types of vehicles or anything, on

the video?

1  A.   Yes.  I was looking for -- and this was relayed to me -- I

2  was looking for a silver-colored Honda Pilot with a Colorado

3  license plate.

4  Q.   Okay.  Did you have any description of the individual that

5  you were looking for?

6  A.   I was told that the vehicle was operated by Mr. Zuberi.  I

7  had seen photographs of him, but never seen him in person or

8  anything.

9          MR. LICHVARCIK:  Okay.  Let's play 263-1.

10         (Whispered discussion, off the record, 2:59 p.m.)

11  BY MR. LICHVARCIK

12  Q.   All right.  We're going to play this video, and there's

13  not going to be sound on here; so if you can describe what

14  we're looking at while it's happening.

15  A.   Yeah.  So, like I said, I went through the video and

16  just -- at quick time.  And then right here, you know, I

17  stopped the video, backed it up, and noticed that that did

18  appear to be a vehicle that matched the description of what I

19  was looking for.

20         I wasn't able to pull the video off of the DVR.  I

21  didn't know how.  So I took a video with my work phone, a video

22  of the video basically.

23  Q.   And how, if at all, were you able to determine what time,

24  for instance -- or approximately what time this video had

25  recorded that vehicle pulling in?

1  A.   I mean, I just went off of their time stamp.  And, you

2  know, I couldn't give you an exact time of when it really went

3  in.  But, I mean, if I look -- let me see here.

4       Yeah.  So, I mean, when I went there, their time

5  stamp showed it was February 9th, 2034, at 10:43 p.m.

6  Obviously that's way off.  So when I watched the video, I

7  noticed that the vehicle pulled in the area of -- via their

8  time stamp, at February 9th, 2034, 2:15 a.m.  I mean, by

9  looking at the video, it looked like it was starting to become

10 dark, so I would guess maybe 8:00 or 9:00.

11 Q.   8:00 or 9:00 p.m.?

12 A.   P.m.

13 Q.   On --

14 A.   Which would've probably been the 16th.  Yeah, the 16th

15 or -- 15th.

16 Q.   You were down there the 16th?

17 A.   Yeah.  So it probably would've been the 15th.

18 Q.   8:00 or 9:00 p.m. on the 15th?

19 A.   Yep.

20 Q.   And the last video we played was 263-1.  This is 263-2.

21 Again, no sound; so if you could narrate for us what you saw in

22 this one, 263-2.

23 A.   See, I believe in that one I was just videoing that the

24 vehicle had still been parked there quite some time.  It was

25 now daylight, but not -- and I think it's pretty hard to see on

1  this, but you can kind of see some movement within the vehicle.

2  It looks like it is, in fact, occupied.  But you can't really

3  see how many people are in it.  It just looks like there is at

4  least one person in it.

5  Q.   All right.  Same questions as we play 263-3.

6  A.   So, yeah, I documented this one because you can actually

7  see, you know, someone emerge from the vehicle, which, you

8  know, per their time stamp was February 9th, 2034, at 2:13 p.m.

9  Q.   And is that person consistent with what you had seen

10  Mr. Zuberi looking like?

11  A.   Correct.  I mean, obviously you can't say for certain that

12  that is, in fact, him; but it did match the description of the

13  photographs I had seen.

14  Q.   All right.  Three more short ones.  263-4.

15  A.   That shows the same subject that walked out of the

16  vehicle, you know, walking back towards the vehicle.  And that

17  was just -- by their time stamp was just -- he was out of the

18  vehicle for just a few minutes and then returned.

19  Q.   And what did you see him do there?

20  A.   Get -- get in the back passenger side of the vehicle.

21  Q.   All right.  263-5.

22  A.   Same thing.  Still in the back passenger side of the

23  vehicle.  It looks like some movement.  It kind of looks like,

24  you know, he moves to the front driver seat.  And then I

25  believe -- we'll wait here.

Q.    And 263-6.

A.    Okay.  And then, yeah, this is the vehicle exiting, which

would be Main Street of Tulelake.  I can't see where it goes.

But I do know, from my experience, that Main Street would lead

out to the highway.

Q.    And so, again, the approximate time frames for the -- you

first saw him arriving around 8:00 or 9:00 p.m. on July 15th.

Do you have an estimate on when -- that you believe the video

surveillance showed him leaving Tulelake?

A.    Yeah.  So, using their time stamps, on the vehicle -- the

vehicle was parked for about 12 hours.  Male subject gets out

of the vehicle, goes back to the vehicle, and then leaves

within about five minutes.  So total time in the area of

Tulelake is about 12 hours.

Q.    So, in other words, he would've been leaving the Tulelake

area around 9:00 a.m. on July 16th; is that right?

A.    Approximately.

Q.    Now -- all right.  Unlike Exhibit 57, which you took, I'm

showing you 407.  You didn't take this picture, did you?

A.    I did not.

Q.    Are you able to tell us at all where this might be from?

A.    This, to me, appears to be that park area in Tulelake,

just the photograph's taken at night, as opposed to mine that

were during the daylight.

Q.    And you don't know who took this, right?

1    A.    I do not.

2              MR. LICHVARCIK:  All right.  Thank you.  No further

3    questions.

4              THE COURT:  Any cross?

5              MS. POTTER:  No.  Thank you, Your Honor.

6              THE COURT:  All right.  Thank you very much.  You're

7    free to go.

8              THE WITNESS:  Thank you.

9              THE COURT:  Do we have another witness you want to

10   call right now?

11             MR. BOCCATO:  Yes, Your Honor.  The Government calls

12   Detective Jesse Snyder.

13             THE COURT:  Okay.  Everybody doing okay?  Or do we

14   need to take a break?  All right.  Seeing thumbs-up.  Okay.

15             (Whispered discussion, off the record, 3:04 p.m.)

16             THE COURT:  Oh, we'll take a break then.  Okay.

17   Let's take our afternoon break.  10, 15 minutes.

18             (Recess taken, 3:05 p.m. - 3:26 p.m.)

19             (Open court, jury not present, 3:26 p.m.)

20             MR. SWEET:  We were wondering if the Court would

21   order the redaction of the transcript in an ongoing way so

22   that -- in terms of the victims' names just being switched now

23   so that it will make less work on the back end.

24             THE COURT:  Yes.

25             MR. SWEET:  Thank you, Your Honor.

```
 1                THE COURT:  All right.  Bring in the jury.

 2                (Open court, jury present, 3:27 p.m.)

 3                THE COURT:  All right.  Please be seated.

 4                Again, thank you, folks.

 5                Let's move on to our next witness.

 6                MR. BOCCATO:  The Government calls Detective Jesse

 7    Snyder to the stand.

 8                THE COURT:  Detective Snyder, if you'd like to step

 9    up to the witness stand here to my right.

10                If you want to step up and remain standing for just a

11    moment.
```

<div align="center">

***JESSE SNYDER***

</div>

```
13    Was thereupon called as a witness on behalf of the

14    Government; and, having been first duly sworn, was examined

15    and testified as follows:

16                THE COURT:  Have a seat.

17                And if you could please state your first and last

18    name for the record and spell both for our court reporter.

19                THE WITNESS:  My name is Jesse Snyder.  And that's

20    J-e-s-s-e, S-n-y-d-e-r.
```

<div align="center">

DIRECT EXAMINATION

</div>

```
22    BY MR. BOCCATO

23    Q.   Detective Snyder, where do you work?

24    A.   I work at the Klamath Falls Police Department.

25    Q.   And what do you do for the Klamath Falls Police
```

1  Department?

2  A.   Currently I'm a criminal detective in the Investigations

3  Division.

4  Q.   How long have you worked with KFPD?

5  A.   12 years.

6  Q.   What else have you done for KFPD?

7  A.   So I've been a patrol officer, school resource officer,

8  prior to going into the detectives.

9  Q.   And any other law enforcement experience?

10 A.   No.

11 Q.   When did you first become involved in the Negasi Zuberi

12 investigation?

13 A.   It would've been on July 16th of 2023.

14 Q.   Did Detective Sergeant Zupan contact you and ask you to

15 respond to 1336 North Eldorado?

16 A.   Yes, he did.

17 Q.   What did he -- what did you do when you got there?

18 A.   When I got there, I basically was just scene security,

19 watching the residence to make sure no one entered it.

20 Q.   What times were you doing scene security?

21 A.   That was approximately 6:00 a.m. when I got there.

22 Q.   And when did you finish out?

23 A.   Approximately 9:30 a.m., when I was relieved by Detective

24 Loudermilk and Sergeant Zupan.

25 Q.   Were you asked again to respond to -- did Detective

1  Sergeant Zupan reach out to you again about responding to KFPD?

2  A.    Yes, he did.

3  Q.    What time did you respond?

4  A.    I responded at approximately 5:00 p.m.

5  Q.    And when you arrived was the Klamath County Major Crime

6  Team and the FBI present at KFPD?

7  A.    Yes.

8  Q.    And what was going on at that time?

9  A.    So the investigation was, I guess, full swing, if you

10  will.  A lot of different stuff going on.  They were trying to

11  locate Mr. Zuberi.  Everybody's kind of doing different things

12  at the time.

13  Q.    Did you learn that Mr. Zuberi was in possession of a Honda

14  Pilot?

15  A.    I did.

16  Q.    And did you learn that Alycia Westfall was in possession

17  of a Nissan Altima?

18  A.    Yes.

19  Q.    What did you learn about just the basic facts of that

20  Nissan Altima, like the license plate, the license plate

21  number?

22  A.    So I knew that the -- it was a white Nissan Altima with

23  a -- displaying a Utah license plate.  And that was U544PW, was

24  on the license plate.

25  Q.    Did you learn that phone pings were being obtained for

1    Negasi Zuberi's phone?

2    A.   Yes.

3    Q.   And don't go into any detail, but what do phone pings tell

4    law enforcement?

5    A.   It gives a general area of where that phone is at a

6    specific time that you -- when you look for it.

7    Q.   Did you learn anything about Mr. Zuberi's phone pings

8    being in Merrill, Oregon?

9    A.   Yes, I did.

10   Q.   I'm going to show you what's been marked as Exhibit 484.

11        All right.  Before we get into specifics regarding

12   what you learned about the phone pings, can you circle Merrill,

13   Oregon, on that map?

14   A.   (Witness complied.)

15   Q.   All right.  And tell me a little bit about Merrill.

16   A.   So Merrill is a very small town.  I think it's just -- a

17   population of just over 900 people.  Very rural community.  A

18   lot of -- a big farming community, for the most part.

19   Q.   So what did you learn about Negasi Zuberi's phone pings in

20   Merrill, Oregon?

21   A.   So we saw that his phone -- I was told in the -- in the --

22   by somebody in the Major Crimes Team that his phone did ping in

23   the area of Merrill, Oregon.  And we observed that it pinged

24   longer -- that it showed the phone was there longer than if you

25   were just driving through the town.

1    Q.   And approximately what time did it ping there?

2    A.   At approximately 9:25, 9:26, something like that.

3    Q.   And at that time did you learn where -- or about the same

4    time you were learning about the pings, did you learn where

5    Mr. Zuberi was?

6    A.   Yes.  Sometime in that time frame, I was informed that he

7    was in Reno.

8    Q.   And did you learn that Ms. Westfall was there with him as

9    well?

10   A.   Yes.

11   Q.   Did you then respond to the gas station in Merrill?

12   A.   I did.

13   Q.   And why did you do that?

14   A.   'Cause I was told that he was located in Reno in the gray

15   Honda Pilot, but I was aware that the white Nissan Altima was

16   still outstanding.  So it was something that we were still

17   looking for.

18   Q.   And, roughly, how far is the drive from Merrill -- or from

19   Klamath Falls to Merrill?

20   A.   Between 20, 25 minutes.

21   Q.   Okay.  Now, I'm going to show you what's been marked as

22   Government's Exhibit 274- 5.

23              (Whispered discussion, off the record, 3:33 p.m.)

24              (Video recording played in open court, 3:33 p.m.)

25

BY MR. BOCCATO

Q.   All right.  Can you just tell us really quick what that video is showing you?

A.   Yeah.  So that's a 360-degree view of -- it would be the north parking lot from the FastBreak store and Mobil gas station.  The building that you see here would be the actual FastBreak convenience store.  So then it's just the parking lot to the north of it.

Q.   All right.  Now I'm showing you what's been marked as 274-2.

         (Whispered discussion, off the record, 3:34 p.m.)

BY MR. BOCCATO

Q.   All right.  When you actually got to the gas station, what did you see?

A.   So I drove to that back parking lot.  It was the first area I went, and I immediately saw the white Nissan Altima with Utah plates.

Q.   Did you advise Detective Sergeant Zupan that you had found the Altima?

A.   Yes.

Q.   And did you notice that there were surveillance cameras on the outside of the convenience store?

A.   Yes, I did.

Q.   Did you ask about access to those surveillance cameras from the FastBreak manager?

A.   Yes.

Q.   Did you take a look at those surveillance cameras?

A.   Yes.  While I was still on scene there, I looked through some of the video surveillance from the parking lot area.

Q.   What are some of the things you noted?

A.   So I noted that in the -- and the video was time stamped for that day, July 16th.  And at 9:26 a.m. that morning, I see a gray Honda Pilot pull into the -- to the parking lot.

Q.   What else did you see?

A.   And then at approximately 9:53 a.m., the white Nissan Altima, I see it coming into the parking lot as well.

Q.   And then after that?

A.   I see -- there's video -- I see Mr. Zuberi go up to the white Nissan Altima briefly, it looked like -- there's no audio in the video surveillance, but it looked like maybe talked to the driver of the Altima, accessed the back seat.  Short time after that, the Nissan -- when the Nissan first got there, it was parked in a parking spot on the west side of the store.  A brief time after that, it drives around to the back, to the north parking lot.

Q.   Okay.  And did you note anything else from the -- that initial watch of the surveillance video?

A.   Yes.  It goes to the back parking lot.  Short time later, it looked like the female occupant of the car, who I believe to have been Alycia Westfall, looks like she throws something away

in the garbage can that was located right near the back door of
the convenience store.

          After a while, the car moves over to the back area of
the north parking lot near a large garbage dumpster.  For a
while there, it looked like the trunk was being opened and
closed multiple times and that figures were going from the car
to the dumpster.

          After that, eventually the car goes -- they move --
somebody moves the car.  I believe Mr. Zuberi moved the car to
a different parking spot, which is the location where I found
it.  I saw video surveillance from inside the store where it
looked like Mr. Zuberi went in and briefly contact one of the
store employees, points to the north parking lot, and then
exits the store.  And then they go out -- back outside, and
eventually both -- it looks like they both leave in the gray
Honda Pilot.

Q.   All right.  After seeing that surveillance footage, did
you do anything?

A.   Yeah.  I again contacted Sergeant Zupan, I believe, just
to let him know and give him an idea of what was going on.
I -- because of -- I saw something getting thrown into the
garbage can, I checked that.  And I was there, you know, like
6:40 p.m. that night.  But the video where something got thrown
in the garbage can was that morning.  I checked with employees.
That garbage can had been emptied into that large dumpster in

1  the back of the parking lot.  I began looking through the --

2  through the dumpster of anything that might be of evidentiary

3  value.

4  Q.   All right.  And, just real quick, I'm showing you 274-2.

5  Is that the garbage can?

6  A.   Yeah.  It would be the one not closest to us in the video,

7  but the one on the other side of the yellow railing.

8            MR. BOCCATO:  Okay.  And then do 274-3.

9  BY MR. BOCCATO

10  Q.   And did you inspect that garbage for evidence?

11  A.   Yes.

12  Q.   That dumpster?

13  A.   Yes.

14  Q.   What did you see in there?

15  A.   It was very full by the time I started looking into it.

16  The convenience store has, like, a fast food area, too.  So it

17  was pretty disgusting and full of a lot of garbage throughout

18  the day.  It was very hard to look through to find anything.

19            MR. BOCCATO:  And do 274-4.

20  BY MR. BOCCATO

21  Q.   And is this kind of the approximate area where the Nissan

22  Altima was parked?

23  A.   Yeah.  It would've been close to where that pickup is

24  parked.

25  Q.   That blue pickup?

1  A.   Yes.

2  Q.   And, just for the record, this is 274-4.

3       What did you do after that at the FastBreak?

4  A.   After looking through the garbage, we did call a tow

5  truck.  So a tow truck did come and -- and seized the Nissan.

6  Q.   Did you then leave the scene?

7  A.   Yes.

8  Q.   But did you later return to the FastBreak to obtain kind

9  of the full surveillance footage?

10 A.   I did.  I brought one of our IT employees through the City

11 of Klamath Falls, who's better with the technology part of

12 stuff and who helped me retrieve the video.

13 Q.   And were you able to kind of rewatch that surveillance

14 footage?

15 A.   Yes.

16 Q.   I'm going to show you what's been marked as Exhibit 276.

17      Have you had an opportunity to watch the surveillance

18 video from the FastBreak that we're about to pull up?

19 A.   I believe -- oh, yep.

20 Q.   And this is just surveillance footage from the FastBreak

21 of Zuberi and -- what appears to be Mr. Zuberi?

22 A.   Yeah.  That would be the east side of the -- of the

23 convenience store.

24 Q.   And does it show every second that he's at the FastBreak?

25 A.   No.  The vehicle -- for the most part, it shows them a

1    lot.  There's a point here where the vehicle goes around the

2    corner, when the Honda Pilot pulls in, and there's an area

3    behind the store that video doesn't capture.

4    Q.   Okay.  All right.  And are there certain kind of -- I

5    mean, based on your understanding of this video, are there

6    certain periods of time that are taken out, just so it's not

7    too long?

8    A.   Yes.

9    Q.   All right.  I'm going to play the video real quick, and we

10   can -- is that Mr. Zuberi's Pilot driving?

11   A.   Yes.

12   Q.   Does that appear to be Mr. Zuberi walking?

13   A.   Yeah.

14   Q.   Does it appear that he's on the phone with somebody at

15   some point?

16   A.   Yes.  Probably on speakerphone, it looks like.

17   Q.   Whose vehicle is that?

18   A.   So that would be the white Nissan Altima with the Utah

19   plates.  And that'd be Mr. Zuberi approaching the Nissan.

20   Q.   Does the Nissan Altima then move to a new part of the

21   parking lot?

22   A.   Yes.  This is where it leaves the west side of the store

23   and then travels to the north parking lot.

24           And that'd be Mr. Zuberi walking kind of to the

25   northeast in the north parking lot.

1          And that would be the same white Nissan Altima with

2     the Utah plates.

3     Q.   All right.  All right.

4     A.   And, now, in the upper right corner of the screen is where

5     you see the Nissan pull up kind of in front of the garbage

6     dumpster.

7     Q.   Okay.

8     A.   And somebody exits the car.

9               (Pause in proceedings, 3:43 p.m. - 3:44 p.m.)

10              THE WITNESS:  And this is where, I believe, something

11    gets put into the garbage.  I believe it's Alycia Westfall.

12              And at this point I believe Ms. Westfall's back at

13    the Altima, and Mr. Zuberi's again walking through the parking

14    lot here.

15              And this would be the entrance that he goes into the

16    store.

17              And that would be him in the upper right corner.  He

18    appears to be talking to the store employees, maybe pointed --

19    pointing towards that back door, which leads to that north

20    parking lot.

21    Q.   All right.

22    A.   Then he exits the store back into the north parking lot.

23    Q.   What does Mr. Zuberi and Ms. Westfall -- what do they do

24    during this period of time until essentially they leave?

25    A.   So this period of time, you see the door open multiple

times.  And then you see the trunk open multiple times.  And
then it appears they go to that dumpster area and back to the
car.  And right there is where you see it appears that the
trunk was opened for a brief time.  Somebody's at the
driver-side door still.  And then the trunk closes.

            At this point you see someone in white, who I believe
would be Ms. Westfall, go to that large dumpster.  And then
right here is where you see the car getting moved to the
parking spot in which I located the Nissan.

            And then that's where he exits the Nissan and then
walks back towards that area where the Honda Pilot would've
been parked.

            And that's the Honda Pilot leaving the parking lot.
Q.   And we're not going to talk about these, but I just want
to show you briefly Exhibit 277.  Or 275.  I'm sorry.

            Are these just screenshots of the same -- of the
video?
A.   Yes.
Q.   All right.  So let's go to 274-1.
            (Whispered discussion, off the record, 3:47 p.m.)
BY MR. BOCCATO
Q.   All right.  Can you identify this photo for me?
A.   Yes.  So this would be in Merrill.  And right at the
corner here, where it says East Front Street, that would be in
front of that FastBreak and Mobil gas station.  And it

1  intersects North Main Street, which would be the -- North Main

2  Street would be to the west of the store.

3  Q.   So which way did -- and you can use your finger to draw --

4  which way did Mr. Zuberi drive into the FastBreak?

5  A.   It would've been straight through here.

6  Q.   Okay.  And can you put a little X where he likely parked?

7  A.   (Witness complied.)

8  Q.   And why do you think he kind of parked at that general

9  area?

10  A.   'Cause you see in the video that's where he turns into.

11  And then, watching other video cameras, you don't see the Honda

12  continue on through the parking lot at that point.

13  Q.   And, again, what time did he arrive at the FastBreak?

14  A.   9:26 a.m.

15  Q.   Okay.  And when did -- can you mark where Alycia Westfall

16  or the -- the Altima drove in?

17  A.   So it would've drove into this road here (drawing) and

18  parked in this area.

19  Q.   And what time did she arrive?

20  A.   I don't recall the time on that one.

21  Q.   Okay.  Is that available kind of on the screenshots?

22  A.   Yeah.  It's on the screenshots from the video.

23  Q.   Okay.

24  A.   I believe it was 9:51 a.m.

25  Q.   Can you --

1  A.    Yeah, 9:51 a.m.

2  Q.    Perfect.

3        And can you mark on this exhibit where the Honda --

4  or, yeah, where the Pilot exited the FastBreak?

5  A.    Yeah.  So it would've exited -- it crosses the video

6  camera here and exits here (drawing) and would've had to make a

7  left-hand turn that way.

8  Q.    And approximately what time did the Honda Pilot exit?

9  A.    At, I believe -- can I refer to my report?  I think it was

10 10:09 a.m.

11 Q.    And I'll just note that we're talking about Exhibit 274-1,

12 which is a map -- or, as you stated, was a map of Merrill area.

13 A.    Yeah.

14 Q.    So roughly how long was Mr. Zuberi at the FastBreak in

15 Merrill?

16 A.    From 9:26 a.m. to 10:09 a.m.

17        MR. BOCCATO:  Thank you.  No further questions.

18        THE COURT:  All right.  Cross-examination.

19        MS. POTTER:  Just briefly.

20                    CROSS-EXAMINATION

21 BY MS. POTTER

22 Q.    Good afternoon, Detective Snyder.

23 A.    Good afternoon.

24 Q.    You saw on the video where Mr. Zuberi went in and talked

25 to the staff members, correct?

1  A.    Yes.

2  Q.    Yes.  And at that time you did not ask them what he had

3  talked to them about, did you?

4  A.    I did not.

5  Q.    Okay.  Did you later learn that he had asked for

6  permission to leave his car there until 10:00 p.m.?

7  A.    I did not learn that.

8          MS. POTTER:  Okay.  Thank you.  No further questions.

9          THE COURT:  Any redirect?

10          MR. BOCCATO:  No redirect.

11          THE COURT:  All right.  Thank you very much.

12          Next witness.

13          MR. LICHVARCIK:  United States calls Christopher

14  Parkerson.

15          THE COURT:  Sir, if you'd like to step on up here to

16  the witness stand to my right.

17          Go ahead and step up, and if you'd raise your right

18  hand.

19                    ***CHRISTOPHER PARKERSON***

20  Was thereupon called as a witness on behalf of the

21  Government; and, having been first duly sworn, was examined

22  and testified as follows:

23          THE COURT:  Go ahead and have a seat.

24          I'm going to ask you if you could state your first

25  and last name and if you could spell both for our court

1  reporter.

2           THE WITNESS:  My name is Christopher Parkerson.  It's

3  C-h-r-i-s-t-o-p-h-e-r, P-a-r-k-e-r-s-o-n.

4           THE COURT:  Okay.  Thank you, Mr. Parkerson.

5                         DIRECT EXAMINATION

6  BY MR. LICHVARCIK

7  Q.   Mr. Parkerson, were you living at 1336 North Eldorado in

8  early July of 2023?

9  A.   Yes.

10 Q.   When did you move into that place?

11 A.   It was the beginning of May of that year.

12 Q.   Okay.  How did you find it?

13 A.   Through a post on Facebook Marketplace.

14 Q.   All right.  And you were renting a room at the house?

15 A.   Yes.

16 Q.   And who were you renting it from?

17 A.   From -- well, his name he told to me at the time was

18 Sakima Zuberi.

19 Q.   Okay.  Where was your room in that house?

20 A.   It was in the basement, in the bottom corner.

21 Q.   'Cause there were two levels?

22 A.   Yes.

23 Q.   We're going to pull up a diagram.

24          So you're able to touch your screen, and you can see

25 the stairs there on 93-2.  Can you mark with a circle your

1  bedroom?

2  A.   (Witness complied.)

3  Q.   Okay.  And you've marked bedroom three.  Thank you.

4        All right.  How many times in the -- and how long, in

5  total, were you then living at that house?

6  A.   I lived there for a little over three months.

7  Q.   Okay.  And in those three months how many times would you

8  say you interacted with Sakima, as you said?

9  A.   In the first week, it was like two or three times.  And

10 after that, I saw him maybe twice.

11 Q.   Why so infrequently?

12 A.   He was just never there when I was at home 'cause I was

13 usually at work.

14 Q.   All right.  While you were down in the -- in your bedroom,

15 without getting into any specifics about anything being said,

16 did you hear anything upstairs?

17 A.   I occasionally heard him and a woman arguing.

18 Q.   Okay.

19 A.   I couldn't tell what they were saying.

20 Q.   Okay.  And could you tell -- but there were voices raised?

21 A.   Yes.

22 Q.   Equally arguing on both sides?  Could you tell?

23         MS. POTTER:  Objection.

24         THE WITNESS:  Yes.

25         MS. POTTER:  Withdrawn.

1          MR. LICHVARCIK:  I'm sorry.  Was there an objection?

2          MS. POTTER:  No, I withdrew it.

3    BY MR. LICHVARCIK

4    Q.    Now if we can go to 93-1.

5          So do you recognize this as the upper floor?

6    A.    Yes.

7    Q.    Now, how would you normally enter the house?

8    A.    For the first two days, I went in through the kitchen

9    door.  And then --

10   Q.    If you could mark that, please.

11   A.    (Witness complied.)

12   Q.    Okay.

13   A.    And then after I got my own key, I went in through the

14   main front door.

15   Q.    And were you -- and can you mark the main front door as

16   well, please.

17   A.    (Witness complied.)

18   Q.    And so after you got the key for the main front door, is

19   that -- that's the one that you primarily used?

20   A.    Yes.

21   Q.    All right.  Did Sakima give you a key?

22   A.    He gave me his key to go make a copy myself.

23   Q.    Now, next to the kitchen door, that you marked there, is

24   that door to the garage.  Do you see that?

25   A.    Yes.

1    Q.    All right.  How many times did you go into the garage?

2    A.    I never went in there.

3    Q.    All right.  How many times did you open the door to the

4    garage?

5    A.    Never.

6    Q.    How many times did you see through the -- that door's

7    window into the garage?

8    A.    Never.

9    Q.    Why didn't you look into the garage through that window?

10   A.    It was none of my business.

11   Q.    Could you see through the window, or was it covered?

12   A.    It wasn't covered, but it was -- the kind of glass it was,

13   was impossible to see through.

14   Q.    Okay.  So you couldn't see through it?

15   A.    No.

16   Q.    All right.  Do you remember what vehicles at all that

17   Sakima drove?

18   A.    No, I don't.

19   Q.    Okay.  And who else was living in the house at the time?

20   You mentioned Sakima.  Who else?

21   A.    And I believe it was his wife.  I don't know her name.

22   Q.    And was anyone in the other downstairs bedroom?

23   A.    Yes, but I never met him.

24   Q.    Okay.  Any kids that you ever saw?

25   A.    Yes.  There was two little boys.

1  Q.   Do you remember the day in July when police showed up at

2  the house?

3  A.   Yes.

4  Q.   Okay.  And then you moved out shortly thereafter?

5  A.   Right.

6  Q.   And did Sakima ever tell you that he was going anywhere

7  before police showed up?

8  A.   No.  I hadn't talked to him in a couple weeks before that.

9  Q.   And did you ever see him again, after the -- after that?

10  A.   No.

11         MR. LICHVARCIK:  All right.  No further questions.

12         THE COURT:  Cross-examination.

13         MS. POTTER:  Just a moment, Your Honor.  Sorry.

14         THE COURT:  Sure.

15         (Whispered discussion, off the record, 3:56 p.m.)

16                    CROSS-EXAMINATION

17  BY MS. POTTER

18  Q.   Have you rented other apartments before or houses, rooms?

19  A.   No.

20  Q.   This is the first time you've ever rented?

21  A.   Yes.

22         MS. POTTER:  Okay.  No further questions, Your Honor.

23         THE COURT:  All right.  Any redirect?

24         MR. LICHVARCIK:  No, Your Honor.

25         THE COURT:  Thank you very much, sir.  You're free to


1  go.

2         Do we have a next witness?

3         MR. BOCCATO:  Yes, Your Honor.  The Government calls

4  Ms. Stephanie Stewart to the stand.

5         THE COURT:  Okay.  Thank you.

6         Ma'am, you can step up to this witness stand here.

7         And if you'll remain standing.  I'll have you raise

8  your right hand.

9                    ***STEPHANIE STEWART***

10 Was thereupon called as a witness on behalf of the

11 Government; and, having been first duly sworn, was examined

12 and testified as follows:

13        THE COURT:  All right.  Have a seat.

14        If I could have you please state your first and last

15 name, and if you could spell both for our court reporter.

16        THE WITNESS:  My name is Stephanie Stewart.  First

17 name, S-t-e-p-h-a-n-i-e; last name, S-t-e-w-a-r-t.

18        THE COURT:  Thank you, Ms. Stewart.

19                    DIRECT EXAMINATION

20 BY MR. BOCCATO

21 Q.   Ms. Stewart, where are you employed?

22 A.   I'm employed by the Federal Bureau of Investigation.

23 Q.   And what is your title?

24 A.   I'm a physical scientist forensic examiner.

25 Q.   What do you do as a physical scientist forensic examiner?

1  A.   I'm assigned to the Latent Print Operations Unit, where

2  I'm a fingerprint examiner.

3  Q.   And how long have you been employed in fingerprint work?

4  A.   Approximately 17 years.

5  Q.   And what are your official duties as an examiner?

6  A.   At the FBI Laboratory, I receive evidence and I inventory

7  it.  I then process it for the development of latent prints.

8  And if I develop any latent prints, I compare those to known

9  prints that -- either manually or through our AFIS database.

10  Q.   Before we get more into your background and what you did

11  in your investigation, I'd like to just ask:  Did you find any

12  of Mr. Zuberi's fingerprints in this case?

13  A.   I did.

14  Q.   Okay.  And where were you able to find Mr. Zuberi's

15  fingerprints?

16  A.   I found -- I processed different items of evidence, and I

17  detected prints that I then compared to a known record bearing

18  the name of Mr. Zuberi.

19  Q.   Was one of the items you were able to find fingerprints

20  for Mr. Zuberi a notebook holder and a notepad?

21  A.   Yes.

22  Q.   And do your notes indicate that that was found from 1336

23  North Eldorado Avenue?

24        THE WITNESS:  May I refer to my notes, Your Honor?

25        THE COURT:  Yes.  Yes.

1          THE WITNESS:  1336 North Eldorado Avenue?  Is that

2    what you said?

3    BY MR. BOCCATO

4    Q.   Yes, ma'am.

5    A.   Yes.

6    Q.   Is that the -- I'm showing you what's been marked as

7    Government's Exhibit 76-1.  Is that the notebook where you were

8    able to find fingerprints?

9    A.   Yes.

10   Q.   Where were you able to find fingerprints on that notebook?

11   A.   I detected a few on the outside of the notebook.  I

12   believe, if I refer to my notes --

13   Q.   And, for the record, the Government is showing

14   Government's Exhibit 76-2.

15   A.   So I believe I detected four on the outside of the

16   notebook, one on the inside cover, and one on a page that was

17   contained within that notebook.

18          (Whispered discussion, off the record, 3:59 p.m. -

19   4:00 p.m.)

20   BY MR. BOCCATO

21   Q.   And, Ms. Stewart, does this look like the page of the

22   notebook where you were able to identify a fingerprint?

23   A.   Yes.  That's Item 109-1, as indicated in the bottom

24   corner, with my initials.

25   Q.   And is that a zoom-in of your initials and your marking?

A.    Yes.  The item number, the laboratory number, and my
initials.

Q.    All right.  Were you also able to locate Mr. Zuberi's
fingerprints on a plastic bag?

A.    Yes.  I detected two latent prints that I identified to
the known record of Mr. Zuberi.

Q.    And, Ms. Stewart, does that look like the plastic bag that
you later searched?

A.    I don't recall what the plastic bag looked like exactly,
other than that it was a plastic bag, grocery-style plastic
bag, like the one in the picture.

Q.    Thank you, Ms. Stewart.
          So let's talk a little bit more about your
background.  Can you tell me about your educational background?

A.    Yes.  I have a Bachelor of Science in forensic and
investigative science from West Virginia University.

Q.    What kind of training did you receive in the area of
fingerprints?

A.    At the FBI Laboratory, I received a 14-month training
program where I learned the various processing techniques used
to detect latent prints, as well as how to compare fingerprints
and latent prints.  This was done through -- in lectures, in
classrooms, oral boards, moot courts, and several comparison
tests.

Q.    And have you previously testified as an expert witness

1  before?

2  A.    Yes, I have.

3  Q.    And can you tell us:  What is a known fingerprint?

4  A.    A known fingerprint is an intentional recording of the

5  friction ridges on the end joints of the fingers.  Think, if

6  you apply for certain types of employment, you will be asked to

7  be fingerprinted, in which your fingerprints will be rolled on

8  that fingerprint card in ten blocks and then simultaneously on

9  the bottom.

10  Q.    And then what's a latent fingerprint?

11  A.    On the palm of the hand, there's a raised portion of the

12  skin known as friction ridges.  And then in between that are

13  furrows.  These friction ridges can become coated in a

14  substance, like sweat or oil; and then, when an item is

15  handled, the friction ridge arrangement could be transferred to

16  that item.  It's not typically visible and would require

17  processing, like through use of chemicals or powders, to become

18  rendered visible.

19  Q.    So a latent print is just, you know, a fingerprint that

20  you put on an item, usually unintentionally?

21  A.    Correct.  Through the course of your day, when you're

22  handling items, you may be transferring an impression of those

23  friction ridges to those items.

24  Q.    And what is the basic premise of friction ridge skin that

25  support the use of fingerprints as a means of identification?

A.    Friction ridge skin is both unique and persistent.  Unique
because it is formed in -- while you are a baby in uterus.  And
it's formed based on various genetic factors as well as
environmental factors.  Friction ridge skin is persistent in
that, once it locks into that arrangement, it stays in that
arrangement throughout life until after death.

Q.    And what process is used for fingerprint comparison?

A.    It's called the ACE process, which stands for analysis,
comparison and evaluation.

Q.    And can you tell us how you examine evidence for latent
prints?

A.    I utilize different techniques to detect latent prints, to
include different forensic light sources, different chemical
processes and different powder techniques.

Q.    And in this case did you examine multiple items for latent
prints?

A.    I did.

Q.    Did you find latent prints or fingerprints on every item?

A.    I did not.

Q.    Okay.  And do you usually find prints on every item?

A.    I do not.

Q.    Okay.  And are there sometimes cases where you find -- or
investigations where you find no prints at all?

A.    That's correct.

Q.    Why might you not find prints on an item?

A.   Typically evidence is considered to be either nonporous or

porous.  Nonporous is something like a drinking glass, or this

table in front of me, in which the latent print would sit on

top of the item.

        And then there's porous, which is where -- a piece of

paper, for example, where the latent print is absorbed into

that item, which protects it; and, therefore, it's a little

less fragile than a nonporous item.  So that's one example as

to why you might not get prints.

        Latent prints are a chance reproduction.  It's based

on the handling.  So the item that's being handled also

dictates whether or not you get a print.  For example, if the

item is smooth or not smooth, if it's curved, if it's textured,

if it's wet or exposed to the elements, there's a variety of

factors that impact whether or not a latent print is left on

that item.  And then when I do my processing techniques,

there's a variety of reasons why it may or may not detect that

latent print.

Q.   I'm going to hand you what's been marked as Government's

Exhibit 99.  It's in a plastic bag right now, and I actually

don't need you to take it out at this juncture.

A.   Okay.

Q.   But did you examine that item for latent prints?

A.   Yes, I did.

Q.   Did you do anything to that item so you could -- oh, go

1  ahead.

2  A.   For this item, in particular, it actually has components

3  of both nonporous and porous.  The cover is nonporous, in which

4  the latent prints would sit on top of the item.  And inside the

5  cover is porous.  The pages inside it are also porous.  So I

6  started by doing a visual examination, where I just simply

7  looked at it under light -- under various light and just turned

8  it, looking for latent prints.

9      Then I utilized forensic light sources.  Now, since

10  the outside is nonporous, I processed it using a technique

11  called super glue fuming, in which super glue is heated up and

12  the fumes adhere to moisture left behind in those latent

13  prints.  The inner portion and the pages were detected using a

14  chemical process.

15      And then the external portion was processed using a

16  dye stain that dyes the super glue to help visualize those

17  latent prints.  And then, finally, the pages that were able to

18  be separated from it were -- another chemical process was

19  utilized to detect latent prints.

20  Q.   And you noted earlier that you did develop latent prints

21  on Exhibit 99?

22  A.   I did.

23  Q.   And we're going to show you Exhibit 76-1.  And, again,

24  just for the record, where did you find latent prints on this

25  item?

1    A.    Based on my notes, I detected, I believe, four latent

2    prints on the outside of the cover, one on the inside cover,

3    and one on one of the pages that was contained within the

4    notebook.

5    Q.    All right.  And is there anything about the notepad that

6    would make it easier to find prints?

7    A.    The notepad -- the pages from the notepad are porous,

8    where the latent prints are then absorbed and more protected.

9    So, yes, to answer your question.

10   Q.    I'm going to show you what's been marked as

11   Government's -- so right now on the screen we have Government's

12   Exhibit 76-1.  I'm going to show you what's been marked as

13   Government's Exhibit 303.

14            All right.  And, as we stated before, is this the

15   picture of a plastic bag that looks similar to the plastic bag

16   you examined?

17   A.    Yes.

18   Q.    Did you examine a plastic bag for latent prints in this

19   case?

20   A.    I did.

21   Q.    And where do your notes say the plastic bag came from?

22   A.    Plastic bag from trailer at 2625 Unity Street.

23   Q.    What process did you use for this plastic bag?

24   A.    So this plastic bag is considered nonporous, where the

25   latent prints sit on top of the item.  So I started with the

1  visual examination, followed by the forensic light source.  I

2  then did the super glue technique I discussed earlier, followed

3  by the dye stain.

4  Q.   And did you develop any latent prints on this item?

5  A.   Yes, I did.

6  Q.   Okay.  And how many prints do you -- from your notes, do

7  you recall finding?

8  A.   I detected two latent prints on the plastic bag.

9  Q.   And were you able to attribute any of those to Mr. Zuberi?

10  A.   I identified both latent prints to the known card bearing

11  the name Mr. Zuberi.

12  Q.   And is it fairly common that you find prints on a plastic

13  bag such as this?

14  A.   This type of -- in my experience, this type of grocery

15  store shopping bag does yield prints more often than other

16  nonporous items.

17  Q.   Okay.  Is there any reason for that, or is that just what

18  you've noticed over the years?

19  A.   That's what I've observed in my 17 years of experience.

20  Q.   I'm showing you what's been marked as Exhibit 457 right

21  now.  What is Exhibit 457, for the jury?

22  A.   This is a known print -- it's actually bearing a name that

23  was listed as an alias of Mr. Zuberi's in our database.  So I

24  misspoke earlier when I said that I used -- that I identified

25  it to the card bearing Mr. Zuberi.  I identified those prints

1    to the card bearing the name Justin Joshua Hyche.

2    Q.   Okay.  And it's your understanding that's a known alias

3    for Mr. Zuberi?

4    A.   Yes.  In our database he had a few different aliases

5    listed, I believe, and this was one of them.

6    Q.   Okay.  I'm going to -- we're going to go through the

7    different pages.  What is this page on the fingerprint card?

8    A.   This was the known prints that were submitted to me from

9    the agent.

10    Q.   And, just to clarify, did you compare the latent prints on

11    Exhibit 99 and Exhibit 303, the plastic bag, with the prints on

12    this card?

13    A.   I compared either to the known print that was earlier in

14    this exhibit number or to the prints on Item 89, which these

15    are submitted -- they're considered major case prints because

16    the known print only records the end joints of the fingers in

17    the ten boxes and then the simultaneous below.

18          However, sometimes if, like, a palm print is

19    developed or a lower joint or an extreme tip, major case prints

20    are required in which all of the area on the friction ridge

21    skin of the hands is then recorded.  In my -- per my notes, I

22    also did a comparison -- a ten-print comparison of Item 89 with

23    the card we had in our system to verify it was the same

24    individual.

25    Q.   Now we're going to go to page 14 of this exhibit.  What

1  is -- Ms. Stewart, can you tell us what this is?

2  A.   Yes.  For one thing, it's sideways.  So if you turned it,

3  like, counterclockwise, that would be the correct orientation.

4  But this is a printout from our AFIS database known as NGI, or

5  next generation identification.  The image on the top with the

6  green lines around it, that was the latent print that was

7  detected on the notepad, the outside of the notepad, or the

8  notebook.

9         And I entered it into our NGI system and launched a

10  search.  And this is the candidate it returned that I

11  identified, which is the right index finger of that card

12  previously in -- on -- that you presented to me bearing the

13  name Hyche.

14  Q.   Okay.  And can you -- let's go to page 15.

15         Can you identify this photograph for us?

16  A.   Yes.  This is a latent print from the page that I also

17  submitted to our NGI, or AFIS, database.  And then this is the

18  left thumb from the card bearing the name Hyche.

19  Q.   All right.  Now let's go to Exhibit 458.

20         I'm going to show you four photos.  First off, can

21  you identify this photo?

22  A.   Yes.  This is item eight, the -- well, it's my item eight,

23  the plastic bag that we were discussing.  And in the rectangle

24  that says "FBI Laboratory," it indicates the laboratory number,

25  the date it was processed, the item, a description of the item,

1    and the processing technique used to process the item.

2    Q.   And we're going to see four photographs that are all

3    relatively similar, but have kind of different things on them.

4    What is the purpose of this first photograph?

5    A.   This is an original capture.  When I'm processing items of

6    evidence and I see something that I think is going to be a

7    latent print that I could use in the comparison process, I

8    indicate it.  And I either submit it to our Photography Unit,

9    or I utilize a camera and take pictures to capture images of

10   the latent prints.

11   Q.   And in this kind of picture, you can also see writing.  It

12   looks similar to writing that could be on a plastic bag.

13   A.   Yes.

14          MR. BOCCATO:  All right.  Could you go to

15   Exhibit 458-2?

16   BY MR. BOCCATO

17   Q.   What's the purpose of this photograph?

18   A.   This is my examination photograph.  So it has the print

19   numbering, which is the P1 and the P2, to indicate specifically

20   which print in my notes I'm referring to.  The purple and the

21   pink lines that are kind of shaping the print, that indicates

22   that this is a fingerprint.

23          And it indicates the orientation in which the

24   fingerprint should be.  So the very top of that horseshoe is

25   the upright position; and then ID, meaning identification

1  number, one to indicate the right thumb.  And then at the very

2  top, it has who it was identified to.

3  Q.   Let's go to 458-3.

4       What's the purpose of this photograph?

5  A.   This is similar to the last photograph we saw, but it's

6  just the digitally processed version without my markings on it.

7  Q.   And then, finally, we can go to 458-4.

8       And what's the purpose of this one?

9  A.   So any time that FBI Laboratory identifications are made,

10  they are subject to a verifications process, in which another

11  examiner will review my comparisons and my conclusions and

12  document their own images.  And in this case this is the

13  photograph that my verifier used, and she demonstrated her

14  documentation to support her decisions in this case.

15  Q.   Now we'll just go to 459-1.

16       Does this picture show one of the photographs on the

17  notepad?

18  A.   Yes.  This is the one from the inside cover of the

19  notepad -- or notebook.

20  Q.   Great.  Thank you.

21       And then we can go to 459-5.

22       Where is this fingerprint from?

23  A.   This is also from the notebook.  There's actually two in

24  this picture, and they're both from the notebook.

25  Q.   Okay.  Do you know where on the notebook this one's from?

1  A.   Based on the processing technique being the dye stain, I

2  believe it's on the outside cover of the notebook, but I'm not

3  sure where on the outside cover.

4  Q.   We should go to 459-7.

5       Does this 459-7 does that show you where both

6  fingerprints were?

7  A.   Yes.  The pink lines are indicating the claiming and

8  indicating the two different prints.  And then, again, you have

9  the P numbers to indicate which print had which results.  And

10  then at the bottom it says the conclusion, and it says to see

11  the printouts of -- this print is one of the prints that was in

12  that side-by-side printout that we discussed earlier.

13       MR. BOCCATO:  And, finally, can we go to 459-11?

14  BY MR. BOCCATO

15  Q.   And what is this showing you, Ms. Stewart?

16  A.   And this is my examination photo from the latent print

17  that was detected on the page from the notebook, and it was

18  also in one of those side-by-side AFIS comparison screens.

19       MR. BOCCATO:  All right.  Thank you.  No further

20  questions.

21       THE COURT:  All right.  Any cross-examination?

22       (Whispered discussion, off the record, 4:17 p.m.)

23                       CROSS-EXAMINATION

24  BY MR. BERTHOLF

25  Q.   How many items did you actually examine?

1    A.    Approximately 50 in this case.

2    Q.    50.  How many from the house at Eldorado?

3    A.    I'll have to refer to my report.

4    Q.    Please do.

5    A.    The notebook was from there.  You said Eldorado.  I have a

6    couple other items.  Let's see.  One, two -- based on reviewing

7    my documentation, it looks like only a few were from that

8    location.

9    Q.    Okay.  How about from a Nissan Altima?

10   A.    I don't see that listed here.

11   Q.    Okay.  Did you examine any items from a Honda Pilot?

12   A.    Yes, that, I did see.  I see a few items here listed as

13   coming from a Honda Pilot.

14   Q.    "A few," like more than three?

15   A.    Like one, two, three -- it looks like approximately three.

16   Q.    Okay.  How about from a Prowler trailer?

17   A.    From what?

18   Q.    A Prowler trailer, the same address where you looked at

19   the grocery bag.

20   A.    The 2625 Unity Street?

21   Q.    Yep.

22   A.    Okay.  Let's see.

23         It looks like approximately 20.  It looks like the

24   majority of the evidence came from that in this report.

25   Q.    Okay.  And the only item that you found any fingerprints

1   on from that Prowler trailer is a garbage -- or is a grocery

2   bag that, from the photograph, looked like it had garbage in

3   it?

4   A.   From that -- I also detected three latent prints on a

5   shotgun that was listed as coming from that trailer.

6   Q.   Did those match up to Mr. Zuberi?

7   A.   No.  I compared them to the known card bearing the name

8   Hyche, and they were excluded as being prints that came from

9   that card.

10  Q.   Okay.  Any other firearms did you examine?

11  A.   Yes.

12  Q.   How many other firearms?

13  A.   Okay.  There's one there.  It looks like three.

14  Q.   Did you develop any fingerprints on those three firearms?

15  A.   No.

16  Q.   Any ammunition?  Did you examine any ammunition?

17  A.   I have a cartridge case and a magazine listed.

18  Q.   On the cartridge case, did you develop any prints?

19  A.   No.

20  Q.   On the magazine?

21  A.   No.

22  Q.   All right.  In the movies we see sometimes -- and, again,

23  it's the movies, so I just want to make sure that -- I keep

24  hearing how it's -- the movies make up stuff on CSI.  You see

25  sometimes people can fake their fingerprints and put somebody

1  else's fingerprints somewhere else.  How likely is that?

2  A.   We actually did cover this in my training --

3  Q.   Okay.

4  A.   -- the whole fabrication and forgery of latent prints.

5  And we talked about some clues to look for, like the latent

6  print might look different because if it was placed there, as

7  opposed to being there naturally from someone handling the

8  item.  And also I processed all of these items, so I received

9  them in the laboratory from start to finish, as far as the

10 processing goes.

11 Q.   Okay.  So it can happen that you can fake fingerprints?

12 A.   I don't -- I mean, I can't say it can't happen, but it

13 would look fairly obvious, should something strange have

14 occurred in the deposition of those prints on the item.

15 Q.   Okay.  Oh, do we know -- can you tell us when any of these

16 fingerprints were put on those items?

17 A.   I cannot.  There's no way to detect the age of a latent

18 print.

19          MR. BERTHOLF:  I think that's all.  Thank you very

20 much.

21          THE COURT:  All right.  Any redirect?

22          MR. BOCCATO:  Briefly, Your Honor.

23                    REDIRECT EXAMINATION

24 BY MR. BOCCATO

25 Q.   Was there any indication that any of these fingerprints

1    that you found were faked?

2    A.    No.

3    Q.    And is it -- is it not -- is it unusual to have an item

4    not have fingerprints, even though someone may have handled it?

5    A.    No.  It is not unusual to not detect latent prints on an

6    item.

7    Q.    And sometimes can you detect DNA on an item and not

8    fingerprints on that item?

9    A.    I can't testify to DNA.

10   Q.    Okay.  But that's a separate specialty?

11   A.    Correct.

12            MR. BOCCATO:  All right.  Thank you, Ms. Stewart.  No

13   further questions.

14            THE COURT:  Ms. Stewart, you're free to go.  Thank

15   you.

16            (Whispered discussion, off the record, 4:23 p.m.)

17            THE COURT:  All right.  Do we have a further witness

18   today?

19            MR. BOCCATO:  Yes.  We have -- we can do one more,

20   Your Honor.

21            THE COURT:  Great.

22            MR. BOCCATO:  Ms. Loren Summers.

23            THE COURT:  All right.

24            Ma'am, if you'd come up to the witness stand here to

25   my right.

Loren Summers - D

1    Step right around here, and go ahead and come up the
2    stairs.  And I'll have you remain standing for just a moment.
3        If you'd raise your right hand.
4                    ***LOREN SUMMERS***
5    Was thereupon called as a witness on behalf of the
6    Government; and, having been first duly sworn, was examined
7    and testified as follows:
8        THE COURT:  All right.  Have a seat.
9        And I'll ask you to, please, if you could state, your
10   first and last name.  And if you could spell both for our court
11   reporter.
12       THE WITNESS:  Okay.  My name is Loren Summers;
13   spelled L-o-r-e-n, S-u-m-m-e-r-s.
14       THE COURT:  Thank you.
15                  DIRECT EXAMINATION
16   BY MR. BOCCATO
17   Q.   All right.  Ms. Summers, where do you work?
18   A.   I work for Amazon.
19   Q.   And what do you do for Amazon?
20   A.   I'm a senior manager on the law enforcement response team.
21   Q.   Okay.  What does that mean?
22   A.   Oh, well, it means that I manage a team of specialists who
23   produce data in response to law enforcement requests.
24   Q.   As part of your -- so essentially you respond to a
25   subpoena?

1  A.   Correct.

2  Q.   All right.  Do you also sometimes testify in trials, such

3  as this?

4  A.   I do.

5  Q.   Do you often testify about, you know, business records?

6  A.   I do.

7  Q.   And is that part of your job?

8  A.   Yes.

9  Q.   And prior to working for Amazon, what did you do?

10  A.   I was an investigator for the State of Washington.  And,

11  prior to that, I was in law enforcement.

12  Q.   Okay.  We're going to pull up for you what's been marked

13  as Government's Exhibit 349.

14  A.   Excuse me.  Sorry.

15  Q.   All right.  Hopefully this works.

16       All right.  Can you identify what -- what we're

17  looking at here?

18  A.   You are looking at a production produced in response to

19  CRIM number 1279000.

20  Q.   Okay.  Would this be a production that would've been

21  produced by Amazon?

22  A.   Correct.

23  Q.   And is this document called anything?

24  A.   No.  It would just be called data production in response

25  to legal process.

1  Q.  Okay.  And I guess what -- is there a function for this
2  particular document?
3  A.  Yeah.  It usually will highlight subscriber information
4  and order history as it pertains to a customer account.
5  Q.  And are the entries to this -- when are the entries
6  created for this document?
7  A.  When are they created?
8  Q.  Yeah.
9  A.  So the subscriber information is captured at the time that
10 a person creates an account with Amazon.  If they update their
11 account with Amazon, we capture that at the time.  And the
12 information pertaining to the purchases are captured at the
13 time of the purchase.
14 Q.  So they are made at or -- so the entries in Exhibit 349
15 are made at or near the time of the transactions?
16 A.  Yes.
17 Q.  And does someone make these entries?  Are they made
18 automatically?  How are the entries made?
19 A.  The data is captured from the platform.  Once -- Amazon is
20 an online marketplace.  And so when people access Amazon.com
21 and make a purchase, the purchase information is captured
22 electronically and stored in a database.
23 Q.  Okay.  And are these records made as a regular part of
24 Amazon's business?
25 A.  Yes.

1    Q.   And is Exhibit 349 -- is it kept in the regular course of

2    business?

3    A.   Yes.

4    Q.   So let's go over Exhibit 349 briefly.  This is a -- it

5    looks like -- is it an Excel spreadsheet with two separate

6    sheets there?  There's a subscription -- subscription info and

7    order history?

8    A.   Yeah, two separate tabs.

9    Q.   Okay.  Tabs.  Thank you.

10        So what does the subscription info show?

11   A.   It shows that -- the name on the account.  It shows the

12   date that the account was created and the e-mail address

13   associated with the account.  It will show various payment

14   methods used on the account and also addresses associated with

15   the account.

16   Q.   It looks like -- is one of those addresses 1336 North

17   Eldorado Avenue in Klamath Falls, towards the bottom?

18   A.   I do see a Mastercard associated with that address, yes.

19   Q.   Does it say who the account is owned by?

20   A.   Sakima Zuberi.

21   Q.   And does it show how long Mr. Zuberi has been a customer?

22   A.   Yes.  July 6th of 2019.

23   Q.   And, real quick, how are all these addresses here

24   generated?

25   A.   So there's a couple of different things that inform the

1   address section.  In most cases it's associated with the
2   customer updating the account or creating the account.  It can
3   also capture information if a customer, for instance, purchases
4   a gift for a family member and enters that address.  That will
5   be captured as an associated address to the account, and it
6   would be reflected in that area.
7              (Whispered discussion, off the record, 4:29 p.m.)
8   BY MR. BOCCATO
9   Q.  So I'm showing you part of the subscription information.
10  We're at the top of page six there.  Does it show --
11             MR. BOCCATO:  Sorry.  Back to the top of page six.
12             THE WITNESS:  Okay.
13  BY MR. BOCCATO
14  Q.  All right.  Does it again show the 1336 North Eldorado
15  Avenue address?
16  A.  It does.
17  Q.  And what's the created-on date there?
18  A.  February 2nd of 2023.
19  Q.  Thank you.
20             All right.  We're going to go to the second tab of
21  this exhibit, Exhibit 349.
22             What is the second tab of this exhibit?
23  A.  So the second tab reflects the order history on the
24  account.  In some cases it's exhaustive and shows everything
25  ever purchased on the account.  In other cases it would just be

1  a portion of time where purchases were made.

2  Q.  Does this one appear to be a pretty exhaustive account?

3  A.  You know, I don't recall looking at the history of the

4  account.  I only looked at the legal process and what was asked

5  for.

6  Q.  Okay.  All right.  All right.  Perfect.

7          Let's go to Exhibit 350.

8          Can you tell me what Exhibit 350 is for you, your

9  understanding of Exhibit 350?

10 A.  350 appears to be a subsection of the larger production

11 that was produced by Amazon.

12 Q.  Okay.  And on the far left of Exhibit 350, there's a list

13 of numbers.  Do you see that list?

14 A.  I do.

15 Q.  Does that -- is your understanding that associates with

16 specific transactions made?

17 A.  Correct, from the larger production.

18 Q.  So essentially this is -- not a summary -- but select

19 transactions?

20 A.  Snapshot.

21 Q.  Perfect.  Thank you.

22          So let's talk about a few of these transactions.

23 Let's talk about line 2329.  Do you see that line?

24 A.  I do.

25 Q.  Right.  What does that show that was purchased?

1  A.   A Lesimi ten-piece triangular tire spikes for antitheft,

2  security, emergency tool, ten pieces.

3  Q.   We're going to try to zoom in a little bit.

4       (Whispered discussion, off the record, 4:32 p.m.)

5  BY MR. BOCCATO

6  Q.   All right.  Is there also -- let's go to line 2559.  Is

7  there also -- what was the purchase for 2559?

8  A.   2559 item description is WDG, 12 pieces, triangular tire

9  spikes for antitheft security emergency tools.

10 Q.   And your understanding of these records is pretty much the

11 bare bones of the records themselves; you don't go into, you

12 know, anything besides just the description.  Is that accurate?

13 A.   Reflecting the transaction, correct.

14 Q.   And can you tell us when the tire spikes for 2559 were

15 purchased?

16 A.   Can you go back to the left?

17      Thank you.

18      It looks like those were purchased on March 2nd of

19 2023.

20 Q.   And then let's go down one line to line 2574.

21      And when did that purchase occur?

22 A.   March 16th of 2023.

23 Q.   And what was purchased there?

24 A.   Harsgs police patches, large-size embroidered patches,

25 hook and loop, for tactical vest, officer guard uniforms,

1  jacket, carrier, hat, one small and one large.

2  Q.   All right.  And let's go back up -- or up to 2431.

3           What was purchased there?  And then we'll do the date

4  next.

5  A.   LandAirSea 54 GPS tracker, waterproof, magnet mount, full

6  global coverage, 4G LTE realtime tracking for vehicle, asset,

7  fleet, elderly and more.  Subscription is required, black.

8  Q.   And what date were those purchased?

9  A.   January 22nd of 2023.

10 Q.   And then let's go to 2558.

11          What date is the purchase there?

12 A.   That is on March 2nd of 2023.

13 Q.   And what was purchased for that one?

14 A.   That is the LandAirSea 54 GPS tracker, waterproof, magnet

15 mount, full global coverage, 4G LTE realtime tracking for

16 vehicle, asset, fleet, elderly and more.  Subscription is

17 required, black.

18 Q.   And then I want to jump to some Taser purchases.  Let's

19 start with number 2165.

20 A.   Okay.  2165, purchased on 10-26 of '22.

21 Q.   And what was the description for that item?

22 A.   That is the TASER Pulse self-defense kit, including two

23 cartridges, one soft carry sleeve and one conductive practice

24 target, protect yourself with confidence.

25          MR. BOCCATO:  All right.  Scroll a little bit to the

1  right, David, please.

2  BY MR. BOCCATO

3  Q.  So now we have some more lines here, and we haven't gone

4  into depth on those lines.  Let's talk about that now.  There's

5  an -- what's -- there's an ASIN number?  Do you know what that

6  ASIN number is?

7  A.  I do.

8  Q.  What's that?

9  A.  It's an Amazon specific identification number.  And it's

10 basically an internal reference number.  When a product is

11 uploaded to Amazon, it's assigned an ASIN.  And that way we

12 have an internal tracking number that's -- that's exclusive

13 from the manufacturer's serial numbering.

14 Q.  And then there's our price, our tax, our shipping.  What

15 do those three numbers usually refer to?

16 A.  The price we pay, the tax we pay, and the amount to ship

17 the item.

18 Q.  For this particular Taser, there was nothing listed.  Do

19 you know why that is?

20 A.  I -- yes.  This is the order that was canceled.

21 Q.  Why was it canceled?

22 A.  This order was canceled -- it was automatically canceled

23 by Amazon because the payment method declined repeatedly.

24 Q.  Okay.

25 A.  Whatever card was selected didn't have enough available

1  credit to make the purchase.

2  Q.   All right.  Let's go to the -- order 2430.

3        All right.  And we'll talk about this one with a

4  little bit more detail.  When was this -- when did this

5  purchase occur?

6  A.   This purchase occurred on January 20th of 2023.

7  Q.   And what's the item description for this one?

8  A.   This is a Tile Mate --

9  Q.   Oh, sorry.  Sorry.  There's the -- sorry.  2423.  I

10  apologize.  Let's scroll over to the date for 2433.

11        Also January 20th; is that correct?  January 20th?

12  A.   It's correct.  January 20th of '23.

13  Q.   What's the description for that one?

14  A.   The TASER Pulse self-defense kit, two cartridges, one soft

15  carry sleeve, one conductive practice target.  Excuse me.

16  Q.   All right.  And then let's scroll to the left again.

17  Let's talk about some of these numbers associated with 2423.

18  We have a time.  What does the time refer to?

19  A.   That's the time that -- in UTC, that the purchase was

20  made.

21  Q.   And then we also have an IP address.  Do you know what

22  that refers to?

23  A.   That would be the location identifier for the terminal

24  that was used to make the purchase.

25  Q.   And the customer e-mail and the customer name, does that

Loren Summers - D

1  show that it came from the customer information we talked about

2  previously?

3  A.   Correct.

4  Q.   All right.  And then there's an order status, complete.

5  What does that mean?

6  A.   That means that the preauthorization was made and the

7  purchase was approved.

8  Q.   Okay.  And then there's an order number.  Is that just a

9  unique order number that's given to the item?

10 A.   Correct.  Actually, to the order.  Not to the item, but to

11 the order.

12 Q.   Thank you.

13       So -- all right.  How much was this Taser that was

14 purchased?

15 A.   It looks like our price was 409.99.

16 Q.   All right.  And how much was the tax?

17 A.   34.85.

18 Q.   So what was the total price for this one?

19 A.   $444.84.

20 Q.   Did you do any follow-up investigation regarding this

21 specific Taser purchase?

22 A.   I did.

23 Q.   Tell me what you learned.

24 A.   There was a question related to the refund column over on

25 the far right-hand side of the document on that specific line.

1  And the question was, was the item actually refunded, because

2  there's a subsequent purchase.  And so I had to kind of --

3  well, myself and my team had to dig into that to find out why

4  there was an additional replacement Taser sent to the customer

5  and ultimately a refund issued.

6  Q.   So what did you learn?

7  A.   We learned -- I'm going to refer to my notes on my laptop.

8  Q.   Thank you.

9  A.   We learned that the purchase that was completed on

10 January 20th was delivered to the customer's doorstep.  It

11 looks like it was -- I'm sorry -- authorized on the 19th,

12 completed on the 20th.  It was delivered to the customer's

13 doorstep on the 20th.

14      And then, on the 25th of January, the customer

15 initiated a refund -- or I'm sorry -- requesting a replacement,

16 claiming that the shipment was delivered but not received.  So

17 five days after it was delivered, we were notified by the

18 customer that they didn't actually receive the purchase.

19 Q.   Okay.  And is that just something where -- did you guys

20 ever get the Taser back?

21 A.   Not -- not that I'm aware of, no.

22 Q.   Okay.  Is that essentially something where the customer

23 just indicates that the item wasn't received?

24 A.   Correct.

25 Q.   All right.  And then what did Amazon do in response to

Loren Summers - D

1  that?

2  A.   We sent a replacement.

3  Q.   Is that replacement found on line 2432?

4  A.   2432.  And if you can scroll to the right, please.

5       Yes, that is the replacement Taser that was sent to

6  the customer on -- I believe it was the 26th.

7  Q.   Okay.  And is that why there's no charge associated with

8  that Taser?

9  A.   It is.  We don't charge for replacements when we're

10 replacing something that was reportedly not received or stolen.

11 Q.   Okay.  What's your understanding of what happened with

12 this specific Taser?

13 A.   So, according to the records at Amazon, that -- what we

14 call the replacement order was delivered to a household member

15 on the 26th of January.  And on the 27th of January, a refund

16 was initiated by the customer.  The item was dropped off on

17 January 27th, shipped back to Amazon, received by Amazon

18 February 5th.  And the reason for the -- the reason that the

19 customer provided requesting the refund was that the item was

20 damaged during transit.

21 Q.   Okay.  Did Mr. Zuberi then get a refund from -- a refund

22 for that Taser?

23 A.   The customer did, yes.

24 Q.   And did that refund -- was that placed on the 242 -- on

25 the prior Taser purchase?

Loren Summers - D

1    A.    Yes.  It would've gone back to the -- the refund would be

2    associated with the original purchase where the money was first

3    removed.

4    Q.    And I think that was 2423?

5    A.    2423.  Correct.

6    Q.    Thank you.

7          So, in short, were two Tasers sent to this account?

8    A.    Yes.

9    Q.    And was one of those Tasers stolen?

10         You know, did the customer claim --

11   A.    Allegedly.

12   Q.    -- that one of those Tasers was stolen?

13   A.    Yes.

14   Q.    And then did the customer return the other Taser?

15   A.    Yes.

16   Q.    All right.  And do you know if Amazon checks to see

17   whether all the cartridges for those Tasers are contained in

18   the box?

19   A.    I wasn't able to find any information on how the shipment

20   was received back to Amazon.

21   Q.    All right.  Let's go to purchase 2598.

22         And, you know, let's -- before we go too far, for --

23   let's go back to 2423.

24         What address -- can you scroll to the right -- what

25   address that was sent to?

1    A.   It looks like it was shipped to Lombard Street in

2    Portland, Oregon.  2800 North Lombard Street, Number -- I think

3    it's 307.

4    Q.   Sorry.  I think I want to just make sure you have -- it's

5    hard because we don't -- so I guess there's a billing address

6    there and then a shipping address?

7    A.   Correct.  Oh, I'm sorry.  Yes, you're correct.  I was

8    looking at the wrong one.  The item was shipped to 11324

9    Northeast 116th Court, Vancouver, Washington.

10   Q.   Okay.  And then the billing address was this Portland

11   address you just --

12   A.   And that would be the one associated with the credit card.

13   Q.   Great.  Thank you.

14          All right.  So let's go to purchase 2598, please.

15   A.   Okay.

16          MR. BOCCATO:  Or, sorry, scroll to the left.

17          Perfect.  Thank you.

18   BY MR. BOCCATO

19   Q.   When did the purchase for 3598 occur?

20   A.   April 25th of 2023.

21   Q.   And on April 25th, 2023, what was the item description

22   there?

23   A.   Heartland GreatDeals double-locking steel handcuffs,

24   police handcuffs, in black.

25   Q.   All right.  And let's scroll to the right, and we can see

1  where those were shipped to.

2         What was the shipping location for that item?

3  A.   I'm sorry.  Remind me of the line item again, the number.

4  Q.   2598.

5  A.   2598.  1336 North Eldorado Avenue in Klamath Falls.

6  Q.   All right.  And let's go to 2618.

7  A.   Okay.

8  Q.   When was the date for 2618?

9  A.   That purchase was made on May 15th of 2023.

10  Q.   And let's -- what's the description for that item?

11  A.   Yoghourds metal long handcuffs; sturdy, durable

12  double-lock steel leg cuffs, police professional, heavy-duty

13  ankle handcuffs with two keys and a holster in black.

14  Q.   All right.  And we can scroll to the right.  Where were

15  those shipped to?

16  A.   1336 North Eldorado Avenue, Klamath Falls, Oregon.

17  Q.   And who were they shipped to?

18  A.   Can you go to the right?

19         Oh, Sakima Zuberi.

20  Q.   All right.  Now I want to bring up 2634, towards the

21  bottom.  What's the date for the 2634 purchase?

22  A.   2634 purchase was June 26th of 2023.

23  Q.   Okay.  And what was purchased on June 26th of 2023?

24  A.   Rulart double-keyed deadbolt lock, keyed on both sides,

25  two-way adjustable cylinder deadbolt, privacy/passage, satin

1    stainless steel, silver single cylinder, silver double side.

2    Q.    And where was that shipped to, and who was it shipped to?

3    A.    Shipped to Sakima Zuberi at 1336 North Eldorado Avenue in

4    Klamath Falls.

5    Q.    Okay.

6    A.    From Sakima Zuberi.

7    Q.    All right.  And let's do 2636.

8         MR. BOCCATO:  Let's scroll to the left, please.

9    Thank you, David.

10   BY MR. BOCCATO

11   Q.    When was that purchase?

12   A.    June 29th, 2023.

13   Q.    Is that just three days after the 2634 purchase?

14   A.    Correct.

15   Q.    All right.  And what was purchased on that line?

16   A.    It appears to be the same item.  The Rulart double-keyed

17   deadbolt lock, keyed on both sides, two-way adjustable cylinder

18   deadbolt, privacy/passage, satin stainless, silver single

19   cylinder, silver double side.

20   Q.    And, just to clarify, does that deadbolt say keyed on both

21   sides?

22   A.    It does.

23        MR. BOCCATO:  Thank you.  No further questions.

24        THE COURT:  All right.  Do we have cross?

25        MS. POTTER:  Yes.  Just briefly.

Loren Summers - X

| | |
|---|---|
| 1 | <u>CROSS-EXAMINATION</u> |
| 2 | BY MS. POTTER |
| 3 | Q.   Good afternoon. |
| 4 | A.   Good afternoon. |
| 5 | Q.   My name is Amy Potter.  I just have a couple of questions. |
| 6 | So I notice you have your computer there.  Do you have the |
| 7 | Excel spreadsheet on the computer as well? |
| 8 | A.   I have copies of the productions.  Correct. |
| 9 | Q.   Okay.  I want to talk about Excel for just a second.  I'm |
| 10 | guessing -- does Amazon produce all their orders in Excel? |
| 11 | A.   The vast majority.  Noncontent goes out in Excel format. |
| 12 | Q.   Okay.  So are you pretty familiar with Excel? |
| 13 | A.   Hmm-mm. |
| 14 | Q.   No.  Okay.  Do you know that Excel has a bunch of lines, |
| 15 | and so each order has a line? |
| 16 | A.   Yes. |
| 17 | Q.   Okay.  And at the bottom of the spreadsheet, you can tell |
| 18 | the total number of items, right? |
| 19 | A.   Yes. |
| 20 | Q.   Okay.  And we're just working on getting our screen up. |
| 21 | Hold on one second. |
| 22 | A.   Okay. |
| 23 | Q.   But -- and I just want to tell you, if you want to do any |
| 24 | of this to double-check, as I show you what we've done, feel |
| 25 | free to look at your Excel. |

1        And so let me ask about a couple other things while

2    we're -- I'm not sure -- we're having a little technical

3    difficulty.

4    A.   Which exhibit are you going to pull up?

5    Q.   If you want to go to 349, is the original Excel.  We can

6    actually do this without showing it.

7         Okay.  Well, we can do it if you can handle Excel as

8    well as Ms. Oakley, but we'll see.

9        (Whispered discussion, off the record, 4:50 p.m.)

10       (Pause in proceedings, 4:50 p.m. - 4:51 p.m.)

11   BY MS. POTTER

12   Q.   Okay.  Can you see at the bottom of your Excel how many

13   line items there are?

14   A.   I'm currently looking at a home screen.

15   Q.   Oh, I thought you were looking at your computer.  Sorry.

16       Okay.  Can you see how many records were found at the

17   bottom, the very bottom, under order history?

18   A.   If you'll go all the way -- oh, I'm sorry.  Yeah, it looks

19   like it says 2,642 records found.

20   Q.   Okay.  And so in a basic Excel, can you sort by the

21   category of the item?  Are you aware that you can pick what

22   category Amazon notices something as?

23   A.   Yeah, filter.

24   Q.   Filter.  Filter.  Select.  Sorry.  See, my Excel is

25   probably worse than yours.

1          Okay.  So Ms. Oakley's going to click on the

2   category, and she's going to show you -- so we have filtered --

3   you have a grocery filter, right?

4   A.   Okay.

5   Q.   Okay.  So that's on right now.  So that's okay.  And then

6   I also want to show you -- we did order status because some of

7   the orders in this were canceled, right?

8   A.   Correct.

9   Q.   So we filtered just on complete orders.

10  A.   Okay.

11  Q.   So does that make sense?

12  A.   Yes.

13  Q.   So look at the bottom again.  How many items were grocery

14  items that were complete orders out of the 2,642?

15  A.   It's indicating 1,637 orders are represented here, out of

16  the 2642.

17  Q.   So over half of them were grocery items?

18  A.   Correct.

19  Q.   Okay.  And then just looking -- I'm not going to make you

20  go through this whole spreadsheet, but just some items -- for

21  example, up here, on August 3rd, 2022, 100 packs of ramen.  Is

22  that a grocery order?

23  A.   Yes.

24  Q.   And the price for the ramen itself was $29.  And then the

25  total for that full grocery order on the 3rd of August was

1  $278, right?

2  A.   Yes.  There are multiple items in that order.

3  Q.   Right.  So -- yeah.  So you have -- in this one you have

4  the price for the individual item and then how much you spent

5  total on Amazon?

6  A.   Correct.

7  Q.   Okay.  So if we scroll down a little bit more, we come

8  to -- let me just double-check my notes.  I think --

9         (Whispered discussion, off the record, 4:53 p.m.)

10 BY MS. POTTER

11 Q.   We had ramen on 7-28, 98, right?  98 packs of ramen on the

12 28th of July?

13 A.   Of 2022, correct.

14 Q.   Of 2022, yep.  And then we go down again.  We have more

15 ramen again.  Let's look at some other things.

16        So we've got -- some of it, perishable; some of it,

17 stuff like ramen that stays forever, correct?

18 A.   Correct.

19 Q.   Okay.  And we could go through the whole thing, but we'd

20 end up -- we'd look at over 1600 grocery items, correct?

21 A.   Correct.

22        MS. POTTER:  Okay.  Nothing further.  Thank you.

23 Thanks for putting up with my Excel-ness.

24        THE WITNESS:  Of course.

25        THE COURT:  All right.  Any redirect on the --

1          MR. BOCCATO:  Just briefly.

2                    REDIRECT EXAMINATION

3    BY MR. BOCCATO

4    Q.   The records you have, do they go all the way back to 2019?

5    A.   Are you referencing 349?

6    Q.   Yes, ma'am.

7    A.   Yes, they do.

8    Q.   All right.  Does it say what month in 2019?

9    A.   July 6, 2019, is the first line item on the order history.

10   Q.   Okay.  So they go back multiple years?

11   A.   Correct.

12          MR. BOCCATO:  Thank you.  No further questions.

13          THE COURT:  All right.  Thank you for joining us from

14   Amazon.

15          THE WITNESS:  Thank you.

16          THE COURT:  Is that our last -- is this our last

17   witness for today?

18          MR. SWEET:  Yes, Your Honor.

19          MR. BOCCATO:  Yes, Your Honor.

20          THE COURT:  All right, folks.  We are going to break

21   for the today.  We're a little bit before 5 o'clock, so we are

22   doing well.  We have some more witnesses coming in at 9 o'clock

23   tomorrow morning.  If you could get here just before 9 o'clock,

24   we will start.

25          I think we've talked a little bit about maybe ending

a little bit early to get some of you home who have to travel

on Friday a little early.  And, again, remember, Monday is a

holiday for almost no one except federal employees, including

the federal court.

It is -- we still call it Columbus Day in the federal

system, but many of you might know it as Indigenous Peoples

Day.  So we have one more day this week.  We are on -- on, I

think, a good -- we're moving along very well.  I will remind

you once again -- you know what I'm going to remind you of.

Please do not look at any articles, listen to any

news stories regarding the case, talk to anybody about the case

whatsoever, including among yourselves.  But, with that, we'll

see you tomorrow at 9 o'clock.  Thank you very much.

A JUROR:  But not Monday.

THE COURT:  Not Monday, no.

(Open court, jury not present, 4:56 p.m.)

THE COURT:  All right.  Thank you, folks.  We'll be

in recess.

* * *

(Court adjourned, 10-10-24 at 4:56 p.m.)

1    C E R T I F I C A T E

2

3         United States of America v. Negasi Zuberi

4              Case No. 1:23-cr-00254-MC-1

5                 Jury Trial - Day 3

6                  October 10, 2024

7

8         I certify, by signing below, that the foregoing is

9    a true and correct transcript of the record, taken by

10   stenographic means, of the proceedings in the above-entitled

11   cause.  A transcript without an original signature,

12   conformed signature, or digitally signed signature is not

13   certified.

14

15   /s/Lindsey A. Weresch, RMR, CRR, CSR

16   _____

     Official Court Reporter      Signature Date: 3/3/2025

17   Oregon CSR No. 14-0427        CSR Expiration Date: 6/30/2026

18

19

20

21

22

23

24

25