IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION


UNITED STATES OF AMERICA,           )
                                    )
        Plaintiff,                  )
                                    )
        v.                          )   No. 1:23-cr-00254-MC-1
                                    )
NEGASI ZUBERI,                      )
                                    )
        Defendant.                  )


Jury Trial - Day 4

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL J. McSHANE

CHIEF UNITED STATES DISTRICT COURT JUDGE

October 11, 2024

```
 1                        APPEARANCES

 2

 3    FOR THE PLAINTIFF:

 4            JEFFREY S. SWEET
              United States Attorney's Office
 5            405 E. Eighth Avenue
              Suite 2400
 6            Eugene, Oregon 97401

 7    FOR THE PLAINTIFF:

 8            MARCO BOCCATO
              United States Attorney's Office
 9            310 W. Sixth Street
              Medford, Oregon 97501

10

11    FOR THE PLAINTIFF:

12            NATHAN LICHVARCIK
              United States Attorney's Office
13            405 E. Eighth Avenue
              Suite 2400
14            Eugene, Oregon 97401

15    FOR THE DEFENDANT:

16            AMY ELIZABETH POTTER
              Angeli Law Group LLC
17            121 S.W. Morrison Street
              Suite 400
18            Portland, Oregon 97204

19    FOR THE DEFENDANT:

20            MICHAEL BERTHOLF
              Law Offices of Michael P. Bertholf, LLC
21            108 Mistletoe Street
              Medford, Oregon 97501

22

23    COURT REPORTER:   Lindsey A. Weresch, RMR, CRR, CSR
                        United States District Courthouse
24                      1000 S.W. Third Avenue, Room 301
                        Portland, Oregon 97204
25                      (503)326-8047
```

1                        GENERAL INDEX

2                                                    Page No.

3    October 11, 2024, Proceedings                     691

4    Reporter's Certificate                            883

5                             * * *

6

7                        WITNESS INDEX

8    For the Plaintiff      Direct   Cross   Redirect   Re-Cross

9    Kylie Winkle-O'Brien     692

10   Kathy Maxwell            697     705     706

11   Prentice Smith III       708     723     725

12   Travis Gluesenkamp       726     832     837

13   Christopher Giovanetty   838

14                            * * *

15

16

17

18

19

20

21

22

23

24

25

1     (Friday, October 11, 2024, 9:08 a.m.)

2                    **P R O C E E D I N G S**

3          (Whereupon, the following proceedings were held in

4     open court:)

5               THE COURT:  Good morning, everybody.

6               All right.  We're ready for the jury?

7               MR. BERTHOLF:  Yes.

8               MS. POTTER:  Yes.

9               MR. LICHVARCIK:  Yes, Your Honor.

10              THE COURT:  All right.  We'll bring in the jury.

11              (Pause in proceedings, 9:08 a.m. - 9:10 a.m.)

12              (Open court, jury present, 9:10 a.m.)

13              THE COURT:  All right.  Please be seated, everybody.

14              Good morning.  Happy Friday.  First of all, again, I

15    want to thank all of you.  You seem to be a very attentive

16    jury.  And it's always good to look over, seeing everybody

17    awake, paying attention to witnesses.  Sometimes I have cases

18    where people start to fade.  I do appreciate the fact all of

19    you have been working hard, paying attention.

20              I appreciate the attorneys are moving things along

21    quickly.  We might be able to break early today.  I'll have a

22    better idea of that as we move along.  But, with that -- oh,

23    has anybody read or seen any media articles over the last 24

24    hours?

25              A JUROR:  No.

1    THE COURT:  All right.  Thank you, folks.

2    With that, we'll hear from our next witness.

3    MR. BOCCATO:  Thank you, Your Honor.  The Government

4    calls to the stand Kylie Winkle-O'Brien.

5    THE COURT:  Okay.  Ma'am, if you'd like to step up to

6    the witness stand over here to my right, your left.

7    Go ahead and step up the stairs and remain standing

8    for just a moment.

9    If you'd like to raise your right hand.

10                       **_KYLIE WINKLE-O'BRIEN_**

11   Was thereupon called as a witness on behalf of the

12   Government; and, having been first duly sworn, was examined

13   and testified as follows:

14   THE COURT:  You can have a seat.

15   And I'm going to have you state both your first and

16   last name.  And could you spell both for the court reporter?

17   THE WITNESS:  Yeah.  My name's Kylie Winkle-O'Brien;

18   K-y-l-i-e, W-i-n-k-l-e-O'B-r-i-e-n.

19   THE COURT:  Thank you.

20                     DIRECT EXAMINATION

21   BY MR. BOCCATO

22   Q.   All right.  Ms. Winkle-O'Brien, where do you work?

23   A.   I currently work at our FastBreak location on Homedale

24   Road in Klamath Falls, Oregon.

25   Q.   All right.  Have you always worked at that FastBreak

1  location?

2  A.   No.  I just started there like two weeks ago, but I have

3  worked for FastBreak's company for three years.

4  Q.   Where did you work before the Homedale location?

5  A.   I worked at our Merrill location.

6  Q.   And were you working July 15th, 2023?

7  A.   Yes.

8  Q.   Were you an assistant manager -- what was your role at

9  FastBreak at that time?

10  A.   When our manager wasn't there, there would be days where I

11  would take care of the money and do our book handling.  And

12  then if another assistant manager was doing books for the day,

13  I was cooking in the kitchen.

14  Q.   And let me -- I think -- were you working also on

15  July 16th, 2023?

16  A.   Yeah.

17  Q.   All right.  So I'm going to show you what's been marked as

18  Government's Exhibit 274-2.

19       MR. BOCCATO:  274-2.

20  BY MR. BOCCATO

21  Q.   Can you just tell us what that location is?

22  A.   Yeah.  That's the back side of our store.

23  Q.   On July 16th do you recall a man coming in, in the

24  morning, and asking you if he could park his car at the store?

25  A.   Yes.  He asked me if he could park it at our store.  And I

1  told him to park in the back where my customers couldn't park;

2  and that if it wasn't picked up by 10:00 when we closed, I was

3  going to have my closer call a tow truck.

4  Q.   Did he tell you anything else?

5  A.   No.  Or, actually, he did say he was just leaving it there

6  to go to the parts store in Klamath, that something was wrong

7  with the vehicle.

8  Q.   All right.  Was that an uncommon request for you, to park

9  the car?

10  A.   No.  We have customers that ask to park their cars there

11  all the time, but we -- but it's in our policy stating that if

12  it's not picked up by the end of the work day, we were to call

13  a tow truck.

14  Q.   And, overall, was that interaction pretty brief?

15  A.   Yeah.

16  Q.   All right.  I'm going to show you what's been marked as

17  Government's Exhibit 275.

18          And, actually, let's just go straight to 276.

19          All right.  Do you see the red car, the back end of

20  that red car?

21  A.   Yeah, that's my car.

22  Q.   All right.  Thank you.

23          All right.  Let's go to 3:15.

24          (Whispered discussion, off the record, 9:14 a.m.)

25

1    BY MR. BOCCATO

2    Q.   And is that the back side of your store, the back

3    entrance?

4    A.   Yeah.

5              (Video recording played in open court, 9:15 a.m.)

6              MR. BOCCATO:  Can you pause it really quick?

7    BY MR. BOCCATO

8    Q.   So, Ms. O'Brien, can you identify the individuals in that

9    video?

10   A.   Yeah.  So on my left side, you have Ivan.  He's a cashier

11   and a fueler.

12   Q.   And it's actually touch screen.  Could you circle that?

13   A.   Oh, yeah.  Sorry.  So this one's Ivan.  And then the

14   second circle here is Brett.  They're both cashiers and

15   fuelers.  And on the back side, this is me in the orange shirt

16   in the kitchen.

17   Q.   All right.

18             (Video recording played in open court, 9:15 a.m.)

19   BY MR. BOCCATO

20   Q.   And is that the man -- can you kind of point or draw an

21   arrow to the man that came in to ask about parking his vehicle?

22   A.   Yeah, he's right there.

23   Q.   All right.

24             (Video recording played in open court, 9:15 a.m. -

25   9:16 a.m.)

BY MR. BOCCATO

Q.   And in that video does it show you pointing to the location where he can park?

A.   Yeah.

Q.   And when did you stop working for the day on July 16th?

A.   I got off at 1:00.

Q.   Okay.  So you -- when you left that day, as far as you know, the car was still there?

A.   Yeah.

Q.   All right.

A.   And so -- and then the -- the first guy I circled, Ivan, he was our closer.  And so I just told him to call -- to find a tow company to call, get the vehicle out of here if it was still here by 10:00.

        MR. BOCCATO:  Okay.  All right.  No further questions.

        THE COURT:  Any cross?

        MS. POTTER:  No.  Thank you, Your Honor.

        THE COURT:  Thank you very much for joining us.

        THE WITNESS:  Thank you.

        THE COURT:  Are you still working there?

        THE WITNESS:  No.  I work at our Homedale location as the assistant manager.

        THE COURT:  Okay.  Thank you.

        All right.  Our next witness, please.

1    MR. SWEET:  Thank you, Your Honor.  United States

2  calls Kathy Maxwell.

3    THE COURT:  Ms. Maxwell, we'll direct you right over

4  here to this witness stand to my right.

5    And go ahead and step up on the stairs, and remain

6  standing for just a moment.

7    And raise your right hand.

8                    ***KATHY MAXWELL***

9  Was thereupon called as a witness on behalf of the

10  Government; and, having been first duly sworn, was examined

11  and testified as follows:

12    THE COURT:  If you'd like to have a seat.

13    And I'll ask you to state your first and last names,

14  spelling both for our court reporter.

15    THE WITNESS:  Kathy Maxwell; K-a-t-h-y,

16  M-a-x-w-e-l-l.

17    THE COURT:  All right.  Thank you, Ms. Maxwell.

18    Counsel.

19                    DIRECT EXAMINATION

20  BY MR. SWEET

21  Q.   Good morning, Ms. Maxwell.

22  A.   Good morning.

23  Q.   Do you work at the AAA Discount Storage in Klamath Falls?

24  A.   Yes.

25  Q.   And, just roughly, how long have you worked there?

A.   Just over seven years.

Q.   And do you work in the office?

A.   Mm-hmm.  Yes.

Q.   Just generally, what -- what are your responsibilities,
please.

A.   I just answer the phones, rent out units, take care of the
tenants' questions.

Q.   Have you previously talked with the FBI regarding Sakima
Zuberi or Negasi Zuberi?

A.   Yes.

Q.   And did you have the opportunity to check and see if you
could locate rental records for Mr. Zuberi?

A.   I believe -- we have records.  They have copies of his
lease, I believe.

Q.   All right.  So what I'd like to do then is -- let me pull
up a few photos for you.  I'm going to pull up Exhibit 473,
please.

        And we're going to zoom in just a little bit to the
top part, yep.  And let's just see if -- are you able to see
that on your screen, ma'am?

A.   Yes.

Q.   And so what are we looking at here?

A.   That's our ledger history, which would indicate his rental
ledger.  The screen that's highlighted is going to have the
unit, which is RV space 106.

1   Q.   And would you mind circling that, ma'am?  You can just
2   touch the screen.
3   A.   (Witness complied.)
4   Q.   All right.  So that's the unit.  You said RV106.  Is there
5   a name on there?
6   A.   Yep.  Right above that is where the tenant name is.
7   Q.   All right.  And is that Negasi Zuberi?
8   A.   Yes.
9   Q.   Okay.  And let's see.  So this is your paperwork.  And I
10  know I kind of zoomed you in on the top.  Does this -- does
11  this -- before we move away, does this show -- what does a
12  ledger history show?
13  A.   It should show the history of his payments and any fees or
14  rents due.
15  Q.   And is there an address listed on this, in terms of the
16  tenants, for the renters?
17  A.   It should have their address.  That might be on the lease
18  agreement.
19  Q.   What about just to the right of the name?
20  A.   Oh, yep.  It's right there.
21       MR. SWEET:  Okay.  Let's -- we can zoom out of that.
22  Thank you.
23       And -- okay.  So now that you can see a little bit
24  down below, let's kind of zoom in on just the top half of the
25  financial part.

BY MR. SWEET

Q.   What is the -- what is the start date of the rental?

A.   It looks like it was November 15th of 2022.

Q.   And could you tell us:  Just generally, when somebody comes in to rent, what do you do?  How does that process work?

A.   We basically just take their ID.  We fill out their information:  Basically, name; phone number; address; e-mail, if they use it.  We generally take a photo of the ID.  I believe the one that was provided with us was a passport, I think, on this one.  And we take payment.  We do prorate the month that they move in.  So since he moved in in the middle of the month, the payment was less than normal.

Q.   And do you give -- do you give them paperwork as well?

A.   Yes.  We give them a lease summary and a payment receipt and usually a map to show them where to go to park or their unit or whatever they have in the beginning.

     MR. SWEET:  All right.  So let's back out for just a second.  And in terms of -- I want to pull up a board.

     And could you pull up 513?

BY MR. SWEET

Q.   I just want to show you, ma'am, just so we all kind of have a general sense of where -- where the storage unit is in Klamath Falls.  So this should be appearing in front of you. And depending on whichever's easier --

     MR. SWEET:  And are the jurors -- oh, sorry.  I'm

1    blocking you, sir.  I'm going to come over here.

2    BY MR. SWEET

3    Q.   Are you able to see this from where you are sitting?

4    A.   Yes.

5    Q.   Okay.  So what are we looking at here?

6    A.   That's basically the main corridor through Klamath Falls.

7    Q.   Okay.  Could you tell us what area -- what area is AAA

8    Discount Storage?

9    A.   It would be down -- probably that last spot down on the

10   bottom right corner.

11   Q.   All right.  So are you all located next to Home Depot?

12   A.   Yes.

13   Q.   All right.  So we've got a Home Depot logo there.  And

14   then you mentioned a --

15   A.   Yep.

16   Q.   -- red dot there.

17            Okay.  So that's generally the area of where AAA

18   Discount Storage is?

19   A.   Correct.

20   Q.   Okay.  I'm going to leave that up there for just a minute.

21   Let's take a look at 288-1.  Actually, I'm going to take that

22   down, ma'am, 'cause I cannot see you if I leave it up.

23            MR. SWEET:  288-1, please.

24   BY MR. SWEET

25   Q.   Okay.  What are we looking at here?

1  A.  That is our office building for the storage.

2  Q.  And let's take a look at 288-2.

3       What's --

4  A.  That is -- that is just a photo from the outside of the

5  gate of the storage units, some of the buildings that we have.

6  Q.  And 289-1.

7       What are we seeing here?

8  A.  That is basically a view from inside the gate, looking out

9  towards Home Depot, just inside, by the office.

10 Q.  So I see a -- I see a gate.  Tell us -- tell us how one

11 gets in and out of AAA.

12 A.  So if -- that yellow pole that you can see through on the

13 other side of the gate, that's our key code box just beside

14 that.  They enter a code.  The gate goes up.  They come in.

15 And then when they go to leave, they just pull up to the gate.

16 And it has a sensor that lets them out.

17 Q.  Let's go to 289-2 and see if we can see -- and go ahead

18 and circle the key pad, please.

19 A.  Oh, yeah, it's right there (drawing).

20 Q.  And then what building are we looking at behind?

21 A.  That's Home Depot.

22 Q.  Okay.  So that's Home Depot?

23 A.  Yeah.  There's a field between us, and then there's Home

24 Depot.

25 Q.  And in terms of a code, how are codes usually assigned?

1    A.    Basically we try to make it simple, so we just use the

2    last four of their phone number most of the time, unless they

3    have a preference.

4    Q.    Did you -- did you ever interact with Mr. Zuberi?  Do you

5    know?

6    A.    A couple times.  I think he came in to make a payment.  I

7    was not the one that rented the unit to him, so I didn't see

8    him initially.  But I -- he did come in once or twice and make

9    payments.

10   Q.    I'd like to show you some paperwork and see if you can --

11   it is 279-1.  We're going to zoom in on the right.  We're going

12   to zoom in on the top right part.

13          Okay.  What is this, please.

14   A.    That is a copy of the lease summary that is -- excuse

15   me -- what we would give them when they -- when they initially

16   set up a rental.

17   Q.    Okay.  And so there's something circled on there, RV106?

18   A.    Yep.  That would be his space number.  The next -- the one

19   next to it would be the gate code that was assigned.  And then

20   the $40 is his normal -- the monthly rental fee.

21   Q.    All right.  And then let's go to 279-2.

22          We'll zoom in on that top part.

23          And what is this, please.

24   A.    That would be our payment receipts.  And so that would've

25   been -- that looks like the receipt given to him when he moved

1  in.

2  Q.   Okay.  So I'd like to turn for just a second -- tell us

3  about -- you said -- so we have an RV106.  Can you

4  differentiate that versus just kind of a standard storage unit?

5  A.   Basically it's parking.  It's just outdoors.  There's no

6  cover or anything like that.  It's just a place to park a

7  vehicle.  So it's just a space.

8            MR. SWEET:  289-3, please.

9  BY MR. SWEET

10  Q.   All right.  What are we looking at here?

11  A.   That would be part of our parking storage area.

12            MR. SWEET:  Just zoom in.

13  BY MR. SWEET

14  Q.   And so is this the area where RV106 would be?

15  A.   Yes.

16  Q.   If I could have just a moment.

17            At the time did AAA Discount Storage have

18  surveillance footage of comings and goings from the gate?

19  A.   At that time, no.  We didn't have -- we had just recently

20  installed cameras.  They didn't have anything up at that time.

21  All we had was records from the gate codes.  They only go back

22  about a week at a time.

23  Q.   Okay.  So records of when that code was used would only be

24  stored for roughly a week?

25  A.   Correct.

1    Q.   So do you know:  Were you able to provide the FBI or other

2    law enforcement with any -- with any gate code for Mr. Zuberi?

3    A.   I do not believe so.  I was not able to get the records.

4    We didn't have them printed.  So I don't think I gave it to

5    them at the time they showed up.  But, like I said, I didn't

6    have any printouts.  And it's only stored for a week at a time.

7    So --

8              MR. SWEET:  Thank you.  I have nothing further.

9              THE COURT:  Any cross?

10             MS. POTTER:  Very briefly, Your Honor.

11                         CROSS-EXAMINATION

12   BY MS. POTTER

13   Q.   So the gate code, anyone can use that gate code, correct?

14   A.   If they know what it is.

15   Q.   Right.  So if I had a storage unit and I gave my code to

16   Ms. Oakley, she could go in and access my unit?

17   A.   Technically, yes.

18   Q.   Okay.  And then looking at -- well, it's still up; good

19   for me -- 289-3 --

20             MS. POTTER:  Thank you, David.

21   BY MS. POTTER

22   Q.   -- there's no security in that area -- I mean, anybody

23   could go to any trailer, correct?

24   A.   If they got through the gate.

25   Q.   If they get through the gate?

1    A.    Yeah.

2          MS. POTTER:  Those -- okay.  Nothing else.  Thank

3    you, Your Honor.

4          THE COURT:  Any redirect?

5          MR. SWEET:  Just briefly, Ms. Maxwell.

6                    REDIRECT EXAMINATION

7    BY MR. SWEET

8    Q.    Do you recall when a search warrant was executed on the

9    trailer of Mr. Zuberi?

10   A.    It was a little over a year ago.  I don't know the exact

11   dates.  I wasn't paying that close attention.

12   Q.    No, that's fine.  I'm sorry.  Do you recall that event

13   happening?

14   A.    Yes.

15   Q.    Were you around at that time?

16   A.    I believe so, yes.

17   Q.    Do you know if, prior to that, anyone did try to come

18   access AAA Discount Storage related to RV106?

19   A.    Not that I'm aware of.

20   Q.    Do you recall a significant other of Mr. Zuberi?  Did you

21   ever meet her?

22   A.    Yes.

23   Q.    Okay.  Did you ever interact with her?

24   A.    A few times, yes.

25   Q.    Do you recall if she came to try to see about the trailer?

1    A.   She did.  In fact, she actually rented another unit from

2    us at the time.  And she did ask about it.  And my response to

3    her was she would have to talk to the police.

4    Q.   Did you give her access to the trailer?

5    A.   No.

6          MR. SWEET:  Thank you.  Nothing further.

7          THE COURT:  All right.  Thank you very much.  You're

8    free to go.

9          THE WITNESS:  Thank you.

10         THE COURT:  All right.  Our next witness.

11         MR. SWEET:  Your Honor, the United States calls

12    Prentice Smith.

13         THE COURT:  Mr. Smith, if you'd like to come up to

14    the witness stand here to my right.

15         You can go ahead and step on up.  Remain standing for

16    just a moment, and I'm going to swear you in.

17         If you'd raise your right hand.

18                ***PRENTICE SMITH III***

19    Was thereupon called as a witness on behalf of the

20    Government; and, having been first duly sworn, was examined

21    and testified as follows:

22         THE COURT:  If you'd like to have a seat.

23         If you could state your first and last name, and

24    spell both for our court reporter.

25         THE WITNESS:  Prentice Smith III; P-r-e-n-t-i-c-e,

1   S-m-i-t-h.

2          THE COURT:  Thank you, Mr. Smith.

3               DIRECT EXAMINATION

4   BY MR. SWEET

5   Q.   Good morning, Mr. Smith.

6   A.   Good morning.

7   Q.   How are you employed, please.

8   A.   I work at JB Hunt as a truck driver, sir.

9   Q.   And did you used to rent a room from Negasi Zuberi or

10   Sakima Zuberi?

11   A.   Yes, sir.

12   Q.   Back up just a little bit.  Do you recall -- first of all,

13   what state was that in, please.

14   A.   Washington State, sir.

15   Q.   And roughly what time period did you rent a room from him?

16   A.   Are you looking for a specific month, date, sir?

17   Q.   Let's start with a year.  What year was it?

18   A.   2022, I believe, sir.

19   Q.   And approximately when did that end?  What month?

20   A.   Approximately November.

21   Q.   And approximately when did you start renting?  Just to the

22   nearest couple months.  I mean, it can be --

23   A.   September, August or --

24   Q.   All right.  So you were only there for a few months?

25   A.   Yes.  Correct.

1    Q.   And was the address 11324 Northeast 116th Court in

2    Vancouver, Washington?

3    A.   I believe so, sir.

4    Q.   All right.  So did you have -- did you have firearms

5    amongst your property?

6    A.   Yes, sir.

7    Q.   All right.  And just tell us briefly -- so there's a

8    house.  Who was living at that house, just generally?

9    A.   That would be myself, Zuberi, one -- or two other people,

10   one female and one male.

11   Q.   Any children?

12   A.   I believe Zuberi had two of them, two months before I

13   left, and he had a female with him as well.

14   Q.   And so did you just rent one single room?

15   A.   Yes, sir.

16   Q.   And was -- how about vehicles?  What did you have for

17   vehicles?

18   A.   I had a Silverado 2500 and a Ford Mustang.

19   Q.   Did you keep some of your property in your vehicle?

20   A.   Yes, sir.

21   Q.   And where did you keep the rest of it?

22   A.   The rest of it was in the house, sir.

23   Q.   In terms of firearms, are you experienced with firearms?

24   A.   I would say that I'm experienced.  Yes, sir.

25   Q.   Were you in the military?

1  A.   Yes, sir.

2  Q.   What branch?

3  A.   Navy.

4  Q.   How long?

5  A.   Five-and-a-half years, roughly.

6  Q.   Tell us about what firearms you had with you.

7  A.   I had a Winchester 308.  ADL, I believe.  I had an

8  AR-style rifle, a competition-style pistol and an over/under

9  shotgun.

10 Q.   And how did you -- did you buy those weapons yourself?

11 Did you buy those guns yourself?

12 A.   Yes, sir, I did.  All of them were purchased in Texas.

13 Q.   Sorry.  All of them purchased where?

14 A.   In Texas.

15 Q.   And were you the original purchaser?  Did you --

16 A.   Yes, sir.

17 Q.   -- buy them directly from either a store or manufacturer?

18 A.   Yes, sir.  From a store.

19 Q.   All right.  Let's -- I'd like to show you -- let's start

20 with the pistol.  Do you recall -- do you recall the make of

21 the pistol?

22 A.   I believe it was -- I can think of the -- what you call

23 it? -- the -- sorry -- picture, but I can't recall the name of

24 it.

25 Q.   All right.  I'm going to show you -- I'm going to bring up

1  a case.  So I'm going to bring up what's marked as Government's

2  Exhibit 100 and --

3            (Whispered discussion, off the record, 9:36 a.m.)

4  BY MR. SWEET

5  Q.   I'm going to bring up what's marked as Government's

6  Exhibit 100 and Government's Exhibit 13.  Would you take a look

7  at the case that's marked Government's Exhibit 100, please.

8  And there's a piece of paper sticking out of that.

9  A.   Yes, sir.

10  Q.   And could you take a look at the piece of paper?

11  A.   Yes, sir.

12  Q.   All right.  Is there anything about that that identifies

13  you on there?

14  A.   Yes, sir.  It says insured/shipped to Prentice Smith.

15  Q.   And who was the -- who -- is that -- is that your case?

16  A.   Yes, sir.

17  Q.   You are Prentice Smith.  And who was the -- you know, the

18  seller of that?

19  A.   Abel Allen Sporting.

20  Q.   And is that who you bought your pistol from?

21  A.   Yes, sir.

22  Q.   All right.  I want to show you what's marked as

23  Government's Exhibit 13.

24            I'll take that back.  Thank you.

25            And could you look at Government's Exhibit 13,

1  please.

2  A.    Yes, sir.

3  Q.    And what are you looking at there?

4  A.    I'm looking at a Springfield XDM 525 sporting pistol, sir.

5  Q.    All right.  And so is there a serial number on that?

6  A.    Yes.

7  Q.    Okay.  Can you give us -- can you read that out loud?

8  A.    MG735197.

9  Q.    Okay.  And how about on the case?

10  A.    MG735197.

11  Q.    Thank you.  And I'll take that back.

12        And so that was your pistol; is that correct?

13  A.    Yes, sir, that's correct.

14  Q.    Still is your pistol?

15  A.    Yes, sir.

16  Q.    All right.  Where did you last see this?

17  A.    In my closet, in the house that is in question.

18  Q.    So before we go over the other -- the other guns, tell

19  us -- you're renting a room.  Does something happen?  Is there

20  a reason -- is there a reason your pistols -- your pistol and

21  your firearms aren't with you now?

22  A.    Yes, sir.  I was kicked out of the house.

23  Q.    All right.  Kicked out.  And were you able to get any of

24  your stuff?

25  A.    No, sir.

1  Q.   Did -- did Mr. Zuberi say that there was an accusation

2  that you'd done something wrong or words to that effect?  Tell

3  us why you were kicked out.

4  A.   I was kicked out because I was under suspicion of

5  committing a crime, which was found out to be null and void.

6  Q.   Found out to be what?

7  A.   Null and void.

8  Q.   Okay.  Did -- tell us what somebody suspected you of

9  doing.

10 A.   They suspected me of stealing a catalytic converter off of

11 a 2500 Dodge Ram.

12 Q.   Okay.  Did you?

13 A.   No.

14 Q.   And did the police ever talk to you about it?

15 A.   I believe one police officer talked to me.  Yes, sir.

16 Q.   Did anything come of it?

17 A.   No, sir.

18 Q.   All right.  Did Mr. Zuberi kick you out?

19 A.   Yes, sir.

20 Q.   And where was -- so you said you had some stuff in your

21 truck, stuff in your room.  Were you able to get any of those

22 items?

23 A.   No.

24 Q.   Why not?

25 A.   Because Zuberi would not allow me time to go back and get

1  them.

2  Q.   Were you able to get anything from your room?

3  A.   Not -- not after I was kicked out.

4  Q.   So other than your firearm -- firearms, did you have some

5  other personal items in there as well?

6  A.   Yes, sir.

7  Q.   Passport?

8  A.   Yes, sir.

9  Q.   Some digital devices?

10  A.   Yes, sir.

11  Q.   GoPro camera?

12  A.   Yes, sir.

13  Q.   Mail, paperwork?

14  A.   A little bit of that, yes, sir.

15  Q.   Did you -- did you talk to Mr. Zuberi about trying to get

16  these items back?

17  A.   I did, sir.

18  Q.   Tell us about that, please.

19  A.   We talked back and forth.  It was very inconsistent

20  communication.  It was eventually concluded and came to that we

21  would meet at a storage unit in Washington at a time of his

22  disclosure, which never was disclosed.

23  Q.   And did you ask several times about -- about getting your

24  items back?

25  A.   Yes, sir, I did.

1    Q.   Do you recall roughly when the last time you all spoke

2    or -- or tried to set it up?  Was it 2023?  Was it --

3    A.   It was 2023, either January or February, sir.

4    Q.   For lack of a better way of phrasing it, did you

5    eventually give up?

6    A.   Yes, sir.

7    Q.   Let's take a look at a couple more items.  I'm going to

8    bring you up Government's Exhibit 329.

9              All right.  So I'm just going to slide this over

10   here.

11   A.   All right.

12   Q.   And go ahead and open that open up, please.

13             And tell the jury what you're seeing, and then I'll

14   hold it up.

15   A.   I have an ADL --

16   Q.   Sorry.  That's my fault.

17   A.   My fault, too.

18             It's a -- I believe it's a Winchester ADL chambered

19   in 308, sir.

20   Q.   Do you recognize that?

21   A.   Yes, sir.

22   Q.   All right.  Whose is that?

23   A.   It's mine, sir.

24   Q.   All right.  Sorry.

25             MR. SWEET:  Sorry to everyone.

BY MR. SWEET

Q.   All right.  And where did you last -- where did you last
see this?

A.   That was also in my closet.

Q.   All right.  We have two more.

         And did you and Mr. Zuberi ever talk about firearms
when you were renting there?

A.   We talked about firearms a little bit.  Yes, sir.

Q.   Tell the jury a little bit about that.  What kind of
conversation?

A.   We had a conversation about firearms and ghost guns, the
printing -- the 3D printing of pistols.

Q.   I'm going to show you -- can you identify -- I'll angle
this up a little bit.  Sorry.  You're welcome -- you can touch
it.

         Do you recognize this?

A.   Yes, sir.  It's a Stoeger Condor competition model.

Q.   All right.  And did you purchase this?

A.   Yes, I did.

Q.   All right.  Did you purchase these over the course of a
few years?

A.   Yes, sir.

Q.   Is this your gun?

A.   Yes, sir.

Q.   And did you have a case -- like a hard case as well for --

1    for one of your guns?

2    A.   I had a hard case for two of them.

3             THE COURTROOM DEPUTY CLERK:  Mr. Sweet, what exhibit

4    number was that last one?

5             MR. SWEET:  Thank you.  I apologize.  Exhibit 330.

6    Thank you.

7             THE COURTROOM DEPUTY CLERK:  Thank you.

8    BY MR. SWEET

9    Q.   I'm going to show you what's marked as Government's

10   Exhibit 328.

11            All right.  Sorry.  All right.  What are we seeing

12   here?

13   A.   That would be my AR-15-style rifle, sir.

14   Q.   And what manufacturer did that come from, or did it come

15   from a couple?

16   A.   It came from two.  The upper is from Bear Creek Armory,

17   and the lower is from Abel Arms.

18   Q.   And did you assemble that, or did you have it assembled?

19   A.   I -- the upper and lower were preassembled.

20   Q.   And you said this is from Bear Creek Arms?

21   A.   The upper is.  And the lower is from Abel.

22   Q.   And some of the other firearms, those were from Abel as

23   well; is that correct?

24   A.   Yes, sir.

25   Q.   Which ones?

1    A.    The pistol and the over/under shotgun.

2    Q.    And while we're talking about the pistol, that pistol, you

3    said it was a competition model.  What did it have in terms of

4    a sight?

5    A.    It had a fiber optic sight for quick sight acquisition.

6    Q.    Okay.  So what we're showing you here, Government's

7    Exhibit 328, is this your -- is this your rifle as well?

8    A.    Yes, sir.

9    Q.    What about ammunition?  Did you -- did you have ammunition

10    in your room as well?

11    A.    Yes, sir.

12    Q.    Okay.  A lot, a little?

13    A.    I believe it was maybe 100 rounds.

14    Q.    So this is not marked as an exhibit, but I'd just like to

15    show this -- I can show this to the defense for just one

16    second.  I just want to --

17            (Whispered discussion, off the record, 9:46 a.m.)

18    BY MR. SWEET

19    Q.    I'm just going to show you -- it's not marked as an

20    exhibit.  You said you had two cases?

21    A.    Yes, sir, that is correct.

22    Q.    All right.  And does this look like one of the cases?

23    A.    Yes, sir.  That's one of the cases.  I purchased that one

24    in California, I believe, before I left the military.

25    Q.    Before you left the military?

1  A.   Yes, sir.

2  Q.   Okay.  So I'd like to go back -- hmm, let me see.  I'd

3  like to go back to the ammunition.  You said you -- you said

4  you had about -- I'm going to write in -- I'd like to write an

5  exhibit number on this.  And this will be 525 -- 525.

6           MR. SWEET:  Your Honor, we would offer Government's

7  Exhibit 525.

8           MR. BERTHOLF:  And no objection.

9           THE COURT:  525 will be received.

10          (Government's Exhibit No. 525 received.)

11 BY MR. SWEET

12 Q.   You said you had about 100 rounds of ammunition in your

13 room.  Do you know what -- what caliber it was, what it was --

14 which guns it was for?

15 A.   As my memory serves, it was 9-millimeter.

16 Q.   Mr. Smith, did -- did -- are you familiar with the vehicle

17 that Mr. Zuberi drove in Washington?

18 A.   Yes, sir.  I believe it was a Honda CRV, gray or silver in

19 color.

20 Q.   What about a trailer?  Did he have a trailer?

21 A.   Yes, sir.  He had a travel trailer shortly before I left.

22 Q.   And did you ever talk to him about that trailer?

23 A.   I talked to him once, asking if he needed assistance in

24 moving it, as I had a 2500 Silverado that would be able to move

25 just about anything.

1    Q.   And did he need any help moving it?

2    A.   He said he did not.

3    Q.   Did you talk to him at all about what he was using the

4    trailer for?

5    A.   No, sir.

6    Q.   I'm going to play you a short video.  It's Government's

7    Exhibit 388.

8              (Video recording played in open court, 9:48 a.m. -

9    9:49 a.m.)

10   BY MR. SWEET

11   Q.   All right.  What house are we looking at there in the

12   back?

13   A.   That is the house in question, the 11324.

14   Q.   And is that where you rented from Mr. Zuberi?

15   A.   Yes, sir.

16   Q.   Okay.  And does that look like the trailer that you were

17   talking about?

18   A.   Yes, sir.

19   Q.   Let's play the rest.

20             (Video recording played in open court, 9:49 a.m.)

21   BY MR. SWEET

22   Q.   All right.  What are we seeing to the left of this, of the

23   trailer?

24   A.   To the left, I believe, is the CRV SUV that he had.

25   Q.   I'd like to show you -- I'd like to show you some photos

1   of a couple other items.

2            MR. SWEET:  Let's take a look at 89, please.

3   BY MR. SWEET

4   Q.   We're going to zoom in, kind of on the center of the bed,

5   on the blue camera.

6            All right.  Does that look familiar to you?

7   A.   That looks like the off-brand camera that I had, yes.

8   Q.   And did you give Mr. Zuberi or anyone else permission to

9   take and hold onto your camera, your guns?

10  A.   No, sir.

11  Q.   I'm going to pull up a little bit more paperwork.  One

12  second.

13           MR. SWEET:  If I could have just one second, please.

14           All right.  Let's take a look at Government's Exhibit

15  90.

16           And let's go down to 90-2.

17           And let's go to 90-3.

18  BY MR. SWEET

19  Q.   All right.  What are we looking at there, Mr. Smith?

20  A.   That would be my passport.

21           MR. SWEET:  All right.  And 91, please.

22           How about we zoom in on the mail on the top left?

23           We're going to zoom in a little bit more.

24           Let's go over to this one on the right.

25

BY MR. SWEET

Q.   Okay.  And this, please, are you able to read that?  What is that?

A.   Yes, sir.  It's Delta Dental, for my dental plan.

        MR. SWEET:  And can you back up?

BY MR. SWEET

Q.   Okay.  So the passport was yours.  What's -- there's an envelope with Gerald.  Tell us what Gerald is, please.

A.   Gerald is my middle name.

Q.   And what is that, please.

A.   That is a -- that is benefits for my 9-11 GI bill.

Q.   So are those items yours?

A.   Yes, sir.

Q.   And all these items we talked about, where is the last place you saw them?

A.   In the room.

Q.   In the state of?

A.   Washington.

Q.   Just roughly, what's the approximate value of the guns, to the nearest several hundred dollars?

A.   About a thousand, I would venture a guess.

        MR. SWEET:  All right.  Thank you.  I have nothing further.

        THE COURT:  Any cross-examination?

        MR. BERTHOLF:  Yes.

1                    <u>CROSS-EXAMINATION</u>

2    BY MR. BERTHOLF

3    Q.    Good morning, Mr. Smith.

4    A.    Good morning, sir.

5    Q.    You rented a room from Mr. Zuberi?

6    A.    That is correct.

7    Q.    I assume you signed a lease?

8    A.    No, sir.

9    Q.    No signing a lease?

10   A.    No, sir.

11   Q.    Just a verbal agreement?

12   A.    The agreement we had was verbal.

13   Q.    Okay.  And so let's talk about the value of the guns.

14   The -- you had the Condor competition shotgun?

15   A.    Yes, sir.

16   Q.    Was that a synthetic stock, or was that a wood stock?

17   A.    That is a hardwood stock.

18   Q.    Hardwood stock.  That, alone, is about $500?

19   A.    The original price of that weapon, I believe, is 7 or 800,

20   yes.

21   Q.    Okay.  7 or 800 just for that shotgun alone?

22   A.    Yes.

23   Q.    And then we've got the XDM pistol?

24   A.    Correct.

25   Q.    Those are no longer even made by Springfield, right?

1   A.   Yes, sir.

2   Q.   And that's at least another $400?

3   A.   I believe that would be correct, yes.

4   Q.   All right.  And then we've got the AR style?

5   A.   Yes, sir.

6   Q.   How much was the upper?

7   A.   The upper was about 150, I think.

8   Q.   About what?

9   A.   150.

10  Q.   One dollar and 50 cents?

11  A.   No.  $150.

12  Q.   How about the lower?

13  A.   The lower was around 2 or 300 brand-new.

14  Q.   Okay.  So we're -- and then let's talk about that case.

15  That aluminum case, that's a pretty nice case?

16  A.   Yes, sir.

17  Q.   And buying that brand-new is about $300?

18  A.   Yes, sir.

19  Q.   So altogether we're about $1,500 worth of firearms, just

20  with those; and then we've got a couple other firearms that you

21  had there?

22  A.   Yes, sir.

23  Q.   All right.  Ammunition, maybe 100 rounds?

24  A.   Yes, sir.

25  Q.   What ammo are we talking about?

1    A.    9-millimeter.

2    Q.    9-millimeter?

3    A.    Yes, sir.

4    Q.    So back then, that was what?  About 10 cents a round?

5    A.    About $20 for a box of 50, sir.

6    Q.    Okay.  There we go.  A little more expensive today, ain't

7    it?

8    A.    Yes, sir.

9    Q.    Unfortunately.

10          Sounds like Mr. Zuberi did try to work with you on

11   trying to get your property back to you?

12   A.    Yes, sir, he did.  He was a little inconsistent, though.

13   Q.    A little inconsistent, yes.  Did you ever try to get the

14   law involved?

15   A.    No.

16   Q.    Okay.  And it looks like that he actually kept your

17   property for you in case you ever contacted him again?

18   A.    Right.  As far as I could tell.

19          MR. BERTHOLF:  Okay.  I think that's all.  Thank you.

20          THE WITNESS:  You're welcome.

21          THE COURT:  Any redirect?

22                    REDIRECT EXAMINATION

23   BY MR. SWEET

24   Q.    Mr. Smith, did you ever pay your rent through firearms to

25   Mr. Zuberi?

1   A.   No.

2   Q.   Did you give him any of those items, including the

3   passport and your other paperwork?

4   A.   No, sir, I did not.

5   Q.   Did you want all that stuff back?

6   A.   Yes, sir, I do.

7         MR. SWEET:  All right.  Nothing further.

8         THE COURT:  Thank you, Mr. Smith.  You're free to go.

9         All right.  Our next witness.

10        MR. SWEET:  Thank you, Your Honor.  The United States

11  calls Special Agent Gluesenkamp.

12        THE COURT:  Raise your right hand.

13               ***TRAVIS GLUESENKAMP***

14  Was thereupon called as a witness on behalf of the

15  Government; and, having been first duly sworn, was examined

16  and testified as follows:

17        THE COURT:  Please have a seat.

18        And, again, if you could also state your first and

19  last name, spelling both.

20        THE WITNESS:  My name is Travis Gluesenkamp;

21  T-r-a-v-i-s, G-l-u-e-s-e-n-k-a-m-p.

22        THE COURT:  Thank you.

23             DIRECT EXAMINATION

24  BY MR. SWEET

25  Q.   Good morning.

1   A.   Good morning.

2   Q.   Are you employed as a special agent with the FBI?

3   A.   I am.

4   Q.   And are you the lead case agent for the FBI in the

5   investigation of Negasi Zuberi?

6   A.   Yes.

7   Q.   Did you, in the course of that investigation, investigate

8   Mr. Zuberi's travel activities and things he possessed?

9   A.   Yes.

10  Q.   Did you obtain multiple federal search warrants?

11  A.   Yes.

12  Q.   And did you interview and coordinate the interview of

13  multiple individuals?

14  A.   Yes.

15  Q.   Let's back up and start with your background.  Could you

16  tell the jury a little bit about yourself, please.

17  A.   I've been employed by the FBI for a little over

18  17-and-a-half years.  Prior to that, I was in the Army for four

19  years.  While in the FBI, I was stationed in Portland for 11

20  years.  And I've been here in Medford since 2019.

21          While I was in Portland, I was on a domestic

22  terrorism squad, investigated a lot of violent extremism.  And

23  then I transitioned to investigating all crimes aboard

24  aircraft.  And then I was the SWAT team leader for five years

25  and the primary firearms instructor for a few years as well.

1          And when I transferred down here to Medford, I mostly

2     handle more complex crimes, complex financial crimes,

3     healthcare fraud, bank robberies and violent crime.

4     Q.   Let's go to the morning of July 16th, 2023.  Was that a

5     Sunday?

6     A.   Yes.

7     Q.   Tell us how you first learned about this case.

8     A.   I got a notification from our operations center at about

9     9:50 with what's called a BOLO, or a "be on the lookout."  It

10    was notifying me of -- Mr. Zuberi had a probable cause -- or

11    there's probable cause to arrest Mr. Zuberi, and he was -- his

12    location was unknown.

13         At about noon I was called by my supervisor and

14    notified that he had received a request from the Klamath Falls

15    Police Department for FBI assistance.  And then I departed my

16    home around 12:30 to head towards Klamath Falls.

17    Q.   And roughly what time did you arrive, please.

18    A.   I got there at just a little after 2:00.

19    Q.   What was your focus?

20    A.   My focus was coordinating federal resources to help locate

21    Mr. Zuberi at that time.  Our -- my really sole goal was to

22    help find him.

23    Q.   And so when you talked about federal resources to locate,

24    could you give some examples of what those resources are?

25    A.   I was going to leverage our cell phone analysis expert,

1   who's based out of Washington, to get emergency disclosure

2   orders to geolocate his cell phone.

3           I was going to help leverage our Seattle office to

4   begin interviews, if we could locate anybody we thought needed

5   to be interviewed up in Seattle, and then leveraged our folks

6   who are very skilled at navigating social media to see if they

7   could find any indication or accounts that would show where

8   Mr. Zuberi was headed.

9   Q.   All with the goal of trying to apprehend him?

10   A.   Yes.

11   Q.   Was a decision made at some point to proceed with the case

12   federally?

13   A.   Yes.

14   Q.   Roughly, when was that decision made?

15   A.   That was made around -- it was in the late afternoon,

16   around 5:00, 5:30, somewhere in there.

17   Q.   Late afternoon, evening, sometime -- sometime that same

18   day on the 16th?

19   A.   Yes.

20   Q.   And so you talked about cell tower location data.  Who is

21   the special agent who's an expert in that?

22   A.   His name is Sean Kennedy.

23   Q.   And is he going to be testifying?

24   A.   Yes.

25   Q.   Was Mr. Zuberi located and arrested that same day?

1  A.    Yes.

2  Q.    All right.  And where was that, please.

3  A.    In Reno, Nevada.

4  Q.    And was -- prior to that, tell us just generally:  What

5  was happening with location data from the FBI?

6  A.    When an emergency disclosure is submitted, we're generally

7  trying to look at what happened in the last 24 hours as well to

8  put the pieces together, to see if somebody stopped somewhere,

9  if they bought gas, if they bought, you know, clothes at a

10 grocery store or whatever that may be.

11        So the primary task was where is he located now, and

12 we weren't getting good location data of where he was.  It was

13 very intermittent.  And based on certain cell providers, that

14 location data can be very broad, meaning 2500 meters.  And so

15 it's not real precise.  And if you're in an urban environment,

16 it's not a lot for law enforcement to work off of.  And so an

17 analysis was done of where he had spent his time in the last 24

18 hours.

19 Q.    So you were trying to locate where he was right then, for

20 one; is that correct?

21 A.    Yes.

22 Q.    And then you said, going back 24 hours, you're trying to

23 go back in order to see -- in order to see what?

24 A.    Evidence collection, to see where he would've spent time,

25 where he may have spent money, anything that could help us,

1  give us leads of where his intentions were, of where he would

2  likely be heading.

3  Q.   And so was Special Agent Kennedy receiving location data

4  from cell tower providers -- cell phone providers?

5  A.   Yes.

6  Q.   And what was being done with that information?

7  A.   I was being forwarded that information.  We then quickly

8  plot it on a map that -- they provide it in a very convenient

9  method, where we can just click on a map and it ports it into

10  Google Maps.  And then we are -- I'm relaying that information

11  to Klamath Falls Police Department, to inform their

12  decision-making.

13  Q.   And what about some of the historical data?

14  A.   We were using that for lead purposes.  If he stopped

15  somewhere, we're sending agents, if it was further north in

16  Seattle or in Central Oregon, to go to that location to look

17  for evidence.  And if it was in the Klamath Falls area, we were

18  dispatching officers to go pull video or look to see if

19  anything was dumped or anything we could find in that area

20  where the phone stopped.

21  Q.   And were you also trying to put together the route of

22  travel?

23  A.   Yes.

24  Q.   So during this investigation did you obtain multiple

25  search warrants?

1   A.   Yes.

2   Q.   Give us just an overview of the different items or

3   locations that you did search warrants on.

4   A.   We searched a Nissan Altima, was our first search warrant.

5   We then searched 1336 North Eldorado.  We then searched the

6   trailer, the Honda Pilot, cell phones for Mr. Zuberi and AV-1.

7   And we searched a property in Bonanza and digital devices,

8   which was his cell phone, Ms. Westfall's cell phone and several

9   other digital devices that were collected from the home.

10  Q.   Did you also -- did you also do a search warrant for a GPS

11  tracking service?

12  A.   Yes.

13  Q.   So let me ask this.  Do you know a lot more now than you

14  did in the first 24 hours?

15  A.   Yes.

16  Q.   So over the course of the investigation, have you been

17  able to piece together location data from multiple sources?

18  A.   Yes.

19  Q.   Can you just tell the jury -- well, are we going to be

20  talking about location data from multiple sources?

21  A.   Yes.

22  Q.   All right.  Tell the jury some of those different sources

23  of data.

24  A.   One of the sources is what's called a LandAirSea GPS

25  device.  It's a small hockey puck style device where a

1    subscription purchase -- or a subscription service can be

2    purchased to provide GPS location.  This can be attached to a

3    car.  It can be put in a backpack.  It's very mobile, and it's

4    sent to a server managed by a company called LandAirSea.

5           We had GPS device from a Garmin, like a standard

6    old-school Garmin handheld GPS, which was located in the Honda

7    Pilot.  And we had good GPS data from cell towers for both of

8    Mr. Zuberi's cell phone numbers, AV-1's cell phone number.  And

9    then we had GPS data from Ms. Westfall's cell phone, and it was

10   stored internally on her cell phone.

11   Q.   From all that different data, were you able to piece

12   together significant information regarding the movement of

13   Mr. Zuberi's Honda Pilot?

14   A.   Yes.

15   Q.   Cell phone?

16   A.   Yes.

17   Q.   LandAirSea trackers?

18   A.   Yes.

19   Q.   His significant other's cell phone?

20   A.   Yes.

21   Q.   And so do those different sources of data -- do they

22   provide data sometimes at different points in the day or in

23   different days?

24   A.   Yes.  They don't consistently provide GPS constantly.

25   LandAirSea, if it was moving, sometimes it would provide every

1    five minutes.  If it was stationary, it may provide once an

2    hour.  The cell phones are generally more robust, and they

3    provide a lot more data.  But, even then, that can be

4    intermittent, depending on the strength of your service.

5    Q.   So for the -- just to give an example, for the -- was

6    there a Garmin device in the Honda Pilot?

7    A.   Yes.

8    Q.   And might that give a data point at 12 o'clock on one day,

9    and then it's giving a data point every hour; but then another

10   device is giving data points every three hours or every 30

11   minutes?

12   A.   Yes.

13   Q.   Okay.  Let's talk about subpoenas for just a minute.  What

14   are some of the -- did the FBI obtain subpoenas for different

15   information?

16   A.   Numerous subpoenas, yes.

17   Q.   Tell the jury about some of the locations or records that

18   you subpoenaed.

19             THE COURT:  Why don't you tell us what a subpoena is

20   first.

21             THE WITNESS:  Thank you.

22             A subpoena is an order issued to a provider.  It

23   could be a cell phone provider, a bank, a shopping store.  And

24   it's basically a Government's command to provide records --

25   certified records based on our request.

BY MR. SWEET

Q.   Thank you.

     And what are some businesses -- what are some of the subpoenas that were requested?

A.   One of the first ones we issued were for bank records to get an understanding of what had been purchased in the 24 hours prior to and after Mr. Zuberi's disappearance.  And, using those records, that informed us on a lot of other subpoenas. Subpoenas to Amazon, subpoenas to places where ammunition was purchased, subpoenas to cell providers for toll records, and other financial records and accounts that were associated to Mr. Zuberi.

Q.   Were you able to determine some other addresses associated to Mr. Zuberi?

A.   Yes.

Q.   And was one of them a residence in Vancouver, Washington?

A.   Yes.

Q.   Was it 11324 Northeast 116th Court in Vancouver?

A.   Yes.

Q.   And, just generally, how did you associate Mr. Zuberi with that house?

A.   Through an open source database that tracks where people live.  Most folks can access it from their computer if you pay for a service.  FBI pays for a service to be able to research stuff like that.

Q.   Government record or records as well?

A.   Yes.

Q.   And were you in court yesterday when someone testified

from Amazon?

A.   Yes.

Q.   And she had discussed -- I believe it was Ms. Summers --

she had discussed some shipments being made to an address in

Vancouver, Washington; is that correct?

A.   Yes.

Q.   And was that address that she was discussing the same as

the one you just listed on 116th Street?

A.   Yes.

Q.   Or Court?

A.   Yes.

Q.   And does that include -- is that the address where the

Taser was shipped to as well?

A.   Yes.

Q.   What about a -- what about a P.O. box?

A.   Yes.  We located a P.O. box for Mr. Zuberi.  It was 2800

Lombard Avenue, which is an address in Portland.

Q.   And did you see that P.O. box used elsewhere?

A.   It was generally listed as Mr. Zuberi's billing address

for many of his bank records.

          MR. SWEET:  And could we pull up just briefly 279- 2?

          And kind of zoom in on the top left.

1  BY MR. SWEET

2  Q.   All right.  And do you see that address -- actually, let

3  me back up.

4           What is this paperwork for?

5  A.   This is the payment receipt for the AAA Discount Storage.

6  Q.   And what is the address listed for that?

7  A.   2800 North Lombard, Portland, Oregon.

8  Q.   So regarding cell phone tower location data, how did you

9  associate a number to Mr. Zuberi?

10  A.   If I recall correctly, the police had located the cell

11  phone number for Mr. Zuberi from their internal records.  And

12  that was provided to Mr. Kennedy before I had arrived, so that

13  process had already begun.

14  Q.   And then were there more than one number -- was there more

15  than one number associated to Mr. Zuberi's phone?

16  A.   Yes.

17  Q.   Okay.  And just -- can you just explain that briefly?  Are

18  we talking about one phone?

19  A.   Yes.

20  Q.   Okay.  But two numbers?  Go ahead, please.

21  A.   Yes.  The primary phone number we had located for

22  Mr. Zuberi was a T-Mobile number.  It was listed on most of his

23  documents.  During Mr. Zuberi's flight, we were notified by

24  Verizon Wireless they had located a number for Mr. Zuberi that

25  was also associated to the device that we were looking for.

1        And they were able to provide us that cell phone

2   number and then provide GPS location for that number.  And that

3   was what ultimately led to his location.  And what allowed this

4   to happen is, on iPhones and some Samsung phones, you're able

5   to have two SIM cards, since they're now a digital SIM card,

6   and you don't have to swap out any kind of internal memory

7   device.

8        And so you can switch between which cell provider you

9   want to use on your cell phone.  So the cell phone he was

10  carrying had two separate cell providers:  One for T-Mobile,

11  one for Verizon.

12  Q.   So I don't want to rehash the entire investigation

13  because, as you know, the jury's already heard from Klamath

14  Falls Police Department.  But with Mr. Zuberi arrested and in

15  custody in Reno -- and when did you obtain a federal arrest

16  warrant?

17  A.   I began the process of writing the federal arrest warrant

18  prior to Mr. Zuberi's arrest, and then it was finalized the

19  next morning.  So on the 17th is when we actually obtained the

20  arrest warrant.

21  Q.   So he was arrested in Reno on the 16th, Sunday?

22  A.   Correct.

23  Q.   And then you obtained a federal arrest warrant the next

24  day?

25  A.   Yes.

1  Q.  So what is -- what is the next focus then that -- what

2  were you looking to accomplish next?

3  A.  At that point we were really trying to get a bigger

4  picture of who Mr. Zuberi was, where he'd been, and expand the

5  investigation to all the places where he had lived in the past.

6  Q.  Before we talk about -- well, did you decide to do -- to

7  seek a second search warrant for a second search of his

8  residence in Klamath Falls?

9  A.  Yes.

10 Q.  Soon followed by other search warrants as well?

11 A.  Yes.

12 Q.  So before we discuss what was found there, I'd like to go

13 back in time just a little bit.  Were you able to piece

14 together information regarding Mr. Zuberi's travel from

15 Klamath Falls to Seattle, Washington, in July of 2023?

16 A.  Yes.

17 Q.  Let's pull up Exhibit 514.  And I'm going to put a board

18 up as well.

19       Okay.  So I want to talk about some of the points

20 that we have on here.  Are you able to see the screen in front

21 of you?

22 A.  Yes.

23 Q.  All right.  And I'll move this over just a little bit

24 more.

25       All right.  So in terms of what we have here --

1          MR. SWEET:  And, Your Honor, may I ask the jurors if

2     they are able to see this?

3          THE COURT:  Yeah.

4          Does it need to be blown up a little bit?

5          A JUROR:  Please.

6          THE COURT:  I'm having a hard time seeing the screen.

7          MR. SWEET:  I can move and stand out of the way.  It

8     seems people are looking at the board more than the screen, so

9     it sounds like this might be more helpful.

10          THE COURT:  I think so.

11          MR. SWEET:  I can move it even closer, if everyone

12     prefers.

13          A JUROR:  Yes.

14          MR. SWEET:  Okay.  I'm going to put this here, and

15     then I'm going to come to the other side.

16     BY MR. SWEET

17     Q.   So, Special Agent Gluesenkamp, is -- the data points on

18     here, where did these come from?

19     A.   These are derived from the two cell phone numbers

20     associated to Mr. Zuberi.

21     Q.   So this isn't based off the LandAirSea tracker devices

22     that we were talking about?

23     A.   No.

24     Q.   This is the cell phone.  Okay.

25          So what date does this show Mr. Zuberi's phone

1  basically -- what's the last data point in Klamath Falls area?

2  A.    The last data point was on 7-12 of 2023 at 9:00 p.m.  And

3  that came from the 773 T-Mobile number.  You can tell by the

4  green placard above the GPS data point.

5  Q.    Okay.  And then let's go to point two.  What are we seeing

6  at point two?

7  A.    That is a live GPS point provided.  And that puts him just

8  south of Crescent, about to turn onto Highway 58, on the 12th

9  of July at 9:47 p.m.

10  Q.    All right.  And let's just keep moving.  Three?

11  A.    Three is just outside of Eugene at 10:58 p.m. on the 12th.

12  Q.    All right.  Four?

13  A.    The next is in the Salem area on the 13th at 12:00 a.m.

14  Q.    All right.  So we just hit midnight.

15        And we're just going to zoom into the top half.

16        Okay.  And then we only have -- let me ask you this:

17  Do you have a lot more data points than the ones that are just

18  shown here?

19  A.    Numerous, yes.

20  Q.    Okay.  So, in terms of much of the day of the 14th, do you

21  know generally what area Mr. Zuberi's phone was on the 14th?

22  A.    Yes.

23  Q.    Okay.  What is that, please.

24  A.    It's in the Portland area.

25  Q.    And, actually, I should say -- and on the -- on the --

1  what about on the 13th as well?

2  A.   Well, the 13th is where it remained in the Portland area

3  for the duration of the day and then departed on the 14th.

4  Q.   And then the 14th, does his phone in the evening begin to

5  head up -- head north?

6  A.   Yes.

7  Q.   Was the FBI able to identify any -- locate any

8  surveillance footage or images that are associated with

9  location data?

10  A.   Yes.

11  Q.   Let's back up for just a second.

12      So let's take a look at some of that.  What -- what

13  about in Portland, Oregon?  Was there any consistent

14  location -- or excuse me -- surveillance video that you were

15  able to locate?

16  A.   Yes.

17  Q.   And where was that from?

18  A.   That's from a Starbucks inside of a Safeway.

19  Q.   All right.  And so if we were to look at data point --

20  well, let's just stick with -- so July 14th.  Let's go to

21  Exhibit 257.

22      And so how does it work?  So you have location data

23  that puts him in an area.  Are you also comparing that to

24  financial records?

25  A.   Yes.

1   Q.   And so what do you do?  Let's just say you find on a

2   financial record that a purchase was made at a store.  What do

3   you then try and do?

4   A.   Well, when we begin analyzing the financial records, any

5   purchase that occurred at a location on the dates in question,

6   we were dispatching an agent, setting a lead to them, to go out

7   and look for surveillance video and do anything they could to

8   locate any evidence that would show Mr. Zuberi was there.

9   Q.   Okay.  So you just said setting a lead.  Can you explain

10  the jury the difference between -- what is setting a lead?

11  A.   Setting a lead is -- obviously, the FBI is a national and,

12  in some ways, a global organization.  What we do is each office

13  generally focuses on their specific area.  So me, here in

14  Medford, I just focus on the south counties.  I'm generally not

15  going to go up into Portland or down into Redding, California,

16  to conduct an investigation since we have agents there.

17          What we do is what we call set a lead.  And we notify

18  that office that we need some action taken.  And we can say,

19  "Hey, we need it done, like, now."  Or we can say, "Hey, we

20  need it done in 60, 70 days," less priority.  So we have the

21  option to notify another office to take action.

22  Q.   Did you set a lead, or one of your other agents that

23  you're working with set a lead, for Safeway --

24  A.   Yes.

25  Q.   -- in Portland?

1              Okay.  Let's take a look at 257.

2              What are we seeing here?

3    A.    That's Mr. Zuberi with a large -- it looks like about a

4    one-gallon jug of water.

5    Q.    And where is this from?

6    A.    This should be the Safeway on Halsey.  And that -- I think

7    that's in the Starbucks counter.

8    Q.    And is that -- is that in the -- is that in the Portland

9    area?

10   A.    Yes.

11   Q.    And did you obtain -- and we're looking at one angle, but

12   did you obtain multiple different angles and views of

13   Mr. Zuberi in the Safeway?

14   A.    Yes.

15   Q.    Let's go to -- let's go to one with him exiting.  Do we --

16   let's pull that one up.

17              All right.  What are we seeing here?

18   A.    That's Mr. Zuberi exiting the Safeway.

19   Q.    And are you able to see anything under his right arm?

20   A.    It's the jug of water.  It looks like he's holding what

21   looks like a cup of coffee, but I'm not sure what it is.

22   Q.    And did that jug of water, or a similar-appearing jug of

23   water, later show up in this investigation?

24   A.    Yes.  I believe it was located in the Honda Pilot.

25   Q.    What about -- do you recall anything in the cell in the

1  garage?

2  A.   There were other jugs of water in there.  I believe they

3  were a Fiji brand.

4          MR. SWEET:  Let's take a look at 36-1.

5          All right.  And let's zoom in on the bottom left.

6  BY MR. SWEET

7  Q.   And what are you seeing there?

8  A.   I see a large gallon-size jug of water.

9  Q.   And so the video we just saw, was that from the morning of

10  July 14th in Portland, Oregon?

11  A.   I'd have to go back and look.  I can't remember if it was

12  the 13th or the 14th.

13          MR. SWEET:  Can we pull that up for just one second?

14  We can look at the time stamp in the -- sorry.  That was 257.

15          All right.  And stop.

16  BY MR. SWEET

17  Q.   All right.  What do you see -- are you able to see, in the

18  top left, the date?

19  A.   The 14th.

20  Q.   All right.  July 14th at roughly what time?

21  A.   9:57.

22          MR. SWEET:  Let's go back to 514, please.

23          And we're going to zoom in on just this part in here.

24  BY MR. SWEET

25  Q.   Okay.  So let's take a look at what's marked as point one

1  on this map.  Location data, what time do you have location
2  data for?
3  A.   That is on the 14th at 8:31 p.m.
4  Q.   And what did -- what did the FBI do with that location
5  data?
6  A.   I believe this was also associated to a purchase on his
7  bank card, and it was a purchase for gas at a Safeway gas
8  station.  I believe it was Woodland, Washington.
9        MR. SWEET:  Let's pull that up, please.  And that is
10 Exhibit 259.
11       And we'll just look at two videos here.
12       (Video audio recording played in open court,
13 10:24 a.m.)
14       MR. SWEET:  All right.  And pause.
15 BY MR. SWEET
16 Q.   Okay.  Was there a vehicle of interest that you see in
17 this video?
18 A.   Yes.
19 Q.   Okay.  Go ahead and circle it, and we'll clear it in a
20 second.
21 A.   (Witness complied.)
22 Q.   Okay.  What are we looking at here?
23 A.   It appears to be the Honda Pilot.
24 Q.   And let's go ahead, let it roll forward.
25       (Video audio recording played in open court,

1  10:24 a.m.)

2  BY MR. SWEET

3  Q.  All right.  Okay.  And does the Honda Pilot pull into the

4  gas station?

5  A.  Yes.  He's backing up.

6  Q.  And an individual get out?

7  A.  Yes.

8  Q.  And who do you believe that individual to be?

9  A.  Mr. Zuberi.

10      MR. SWEET:  And pause, please.

11  BY MR. SWEET

12  Q.  And could you circle him, please.

13  A.  (Witness complied.)

14  Q.  All right.  Thank you.

15      Let's go back to that map, 514.

16      And so you said the first data point was -- excuse

17  me -- that number one was 8:31.  Let's go to -- let's go to

18  these top -- and that one as well.

19      All right.  Looking at number two, what time do we

20  have there?

21  A.  It's 9:05 p.m. on the 14th.

22  Q.  And the next one?

23  A.  9:40 p.m.

24  Q.  Okay.  Where is the phone headed to?

25  A.  It's moving north towards Seattle area.

1    Q.    And what about point four?

2    A.    10:04 p.m.

3    Q.    And point five?

4    A.    10:44 p.m.

5    Q.    And what is point five?  Where is that located, generally?

6    A.    If you zoom in, it's in the area of Aurora Avenue.

7    Q.    And so the picture we see in the top left at night, what

8    does that show?

9    A.    That is approximately 109th and Aurora Avenue.

10   Q.    So, just to be clear on the time, so this is July 14th,

11   and that is Friday.  Is that a Friday?

12   A.    Yes.

13   Q.    And at roughly 10:44 p.m. the phone -- Mr. Zuberi's phone

14   is at Aurora Avenue?

15   A.    Yes.

16            THE COURT:  Can we break here for our morning break?

17            MR. SWEET:  Yes.  Thank you, Your Honor.

18            THE COURT:  All right.  Folks, let's take our morning

19   break.  Give our court reporter also a little rest.  And we'll

20   be in recess for 15 minutes.

21            (Recess taken, 10:27 a.m. - 10:50 a.m.)

22            THE COURT:  All right.  Thank you, folks.  Please be

23   seated.

24            We'll return to the detective's direct examination.

25

BY MR. SWEET

Q.   Special Agent Gluesenkamp, I wanted to -- so we've been talking about multiple sources of location data.  And one that you mentioned was the LandAirSea devices?

A.   Yes.

Q.   Do you know where those devices were purchased?  Were there any purchase records located?

A.   Yes.  They were purchased from Amazon.

Q.   And was that the Amazon account associated to Mr. Zuberi?

A.   Yes.

Q.   And did you -- did the FBI find records relating to a subscription for that service?

A.   Yes.

Q.   So you buy the devices, and then how does it work with the service?

A.   You have to contact the company, and then they assign a service to each device.

Q.   And will we be hearing from a representative from LandAirSea?

A.   Yes.

Q.   I'm going to show you what's marked as Government's Exhibit 491.

     And could you please identify those.

A.   These are the devices that are consistent with what was purchased from Amazon, based on the photo we had for the item,

Travis Gluesenkamp - D

1  associated to the bank records and the Amazon records.

2  Q.  Roughly the size of --

3  A.  About a third of a hockey puck.

4  Q.  Did you say a third of a hockey puck?

5  A.  I'm a Minnesotan.  I know what a hockey puck looks like.

6  Q.  Big hockey pucks in Minnesota.

7       We're going to jump ahead for one second.  Where were

8  these located?

9  A.  They were located inside the Prowler trailer at the AAA

10  Storage.

11  Q.  So we've been talking about this cellular location data

12  chart.  Were you also receiving -- not you receiving -- but did

13  the FBI afterwards locate location data from those pucks?

14  A.  Yes.  It was obtained via search warrant.

15  Q.  So when we stopped, we were up in Aurora Avenue.  And did

16  the FBI create a drone video of Aurora Avenue?

17  A.  Yes.

18  Q.  And what was that -- the route that the drone took, what

19  was that based off of?

20  A.  It was based on the description provided by AV-1 of where

21  she was taken, and then also utilizing and corroborating that

22  with the cell phone data from Mr. Zuberi's phone and AV-1's

23  phone.

24  Q.  I'd like to show you what's marked as Government's Exhibit

25  7, please.  Or play.

1    (Video recording played in open court, 10:53 a.m.)

2    MR. SWEET:  And let's pause for just one second.

3    BY MR. SWEET

4    Q.   Just to give everyone a frame of reference, could you

5    circle the area where -- the stop sign where AV-1 said that she

6    was standing, if you see it in here?

7    A.   (Witness complied.)

8    Q.   All right.  Let's go ahead and clear that.  Thank you.

9    And we'll keep playing.

10    And did she describe being picked up at the stop

11    sign?

12    A.   Yes.

13    Q.   And then what road would be on -- would we be on now?

14    A.   That's Aurora Avenue.

15    Q.   And did AV-1 describe taking a right not long after?

16    A.   Yes.

17    Q.   And what street would we be taking a right onto, if you

18    recall?

19    A.   I don't recall.

20    Q.   Okay.  Did she describe pulling into an alley?

21    A.   Yes.

22    Q.   Good.  Okay.  Let's stop there.  Thank you.

23    And we showed AV-1 a daytime photo of the alley.  Was

24    a nighttime photo also taken as well?

25    A.   Yes.

1   Q.   Who took that photo?

2   A.   It was one of our Seattle agents.

3          MR. SWEET:  Let's pull up 479-8, please.

4   BY MR. SWEET

5   Q.   All right.  What are we looking at here?

6   A.   That's the alleyway you can see in the drone video.

7   Q.   All right.  Thank you.

8          Let's -- let's -- we're going to switch to a

9   different board now.  So the first board was travel north.

10         MR. SWEET:  Let's go to 515, please.

11         Let me make sure I got the number right.  515, yes.

12  BY MR. SWEET

13  Q.   Okay.  What -- just generally, what is this map going to

14  show?

15  A.   This shows cell data that showed Mr. Zuberi's cell phone

16  traveling south.

17  Q.   Okay.  So let's start at the top.  First data point, what

18  time do we have?

19  A.   That's 11:31 p.m. on the 14th of July.

20  Q.   And what area is the phone located in?

21  A.   It's still in the south Seattle area.

22  Q.   And how about data point two?

23  A.   That is at 1:04 a.m. on the 15th of July, south of

24  Olympia.

25  Q.   And let's go back.

1          There's a photo there.  You said 1:04 a.m.  Did AV-1

2    talk about pulling into a rest area?

3    A.    Yes.

4    Q.    And does cell location data show a stop in that general

5    area?

6    A.    Yes, a brief stop.

7    Q.    And, again, Special Agent Kennedy -- I mean, who's the

8    expert, you or Special Agent Kennedy?

9    A.    Very much Mr. Kennedy.

10   Q.    And he'll be talking about this in much more detail.

11   Let's back out and go to our next point.  Let's do three and

12   four.

13          All right.  What are we seeing at three?

14   A.    This is a GPS location from the Verizon SIM card on the

15   15th at 2:19 a.m. in the Portland area.

16   Q.    All right.  So -- okay.  And then four, what area are we

17   in at four, and what time?

18   A.    Just north of Eugene.  And that is at 4:00 a.m. on the

19   15th of July.

20   Q.    And were there financial records for a gas purchase in the

21   area of Halsey, Oregon?  Not necessarily that exact date, but

22   did you find those?

23   A.    I believe those are correlated for the day prior on the

24   trip up.  I don't recall anything on the trip down.

25   Q.    Okay.  And then let's go back.  Let's take a look at just

the bottom half.

Were you able to determine -- sorry.  That came out a little too close.

What route from -- so we were on I-5 near Halsey.  What route did Mr. Zuberi's phone take to get to Klamath Falls?

A.   He took Highway 58 south of Eugene, which connects to Highway 97 from I-5.

Q.   Are you familiar with Highway 58?

A.   I've driven it many times, yes.

Q.   Can you just generally describe what kind of road that is?

A.   It's very rural, one of my favorite drives in all of Oregon.  There's a large lake up there.  But it's very remote.  Cell reception's spotty along it.  And very wooded and very treed.

Q.   For the majority of it, how many lanes?

A.   Two.

Q.   And then let's actually just go to Love's.  What about cellular location data for the Love's area?  What was -- what time and -- let me back out.  Sorry.  I misguided David.

Let's get this.

Was there cell location data for the Love's area?

A.   Yes.

Q.   And roughly what time?

A.   It was roughly around 7:00 a.m. on the 15th.

Q.   And what time -- was Love's video also located?

1  A.    Yes.

2  Q.    And what time was that?

3  A.    It was around 7:00 a.m.

4  Q.    So when you're seeing -- I mean, what are you doing?

5  You've got surveillance video.  Are you looking to correlate

6  different sources of data?

7  A.    Yes.  We used the cell phone data -- Mr. Zuberi's location

8  was still unknown -- to identify the former path.  And that's

9  when the -- the location data was relayed to Klamath Falls

10 Police Department, to inform them in their search of the Love's

11 video surveillance.

12 Q.    And when you see a correlation, does it then make you feel

13 more confident in terms of the accuracy of one source of data

14 or both sources of data?

15 A.    Yes.  We're using them to mutually support each other, to

16 make sure we have accurate correct information.

17 Q.    All right.  I want to switch for one second.  We're going

18 to stay with Love's.  I want to zoom in.  Let's go to 262-2.

19        And, just generally, what are we seeing here?

20 A.    You can see the Honda Pilot driving around the pumps at

21 Love's gas station in Klamath Falls, Oregon.

22 Q.    Okay.  And the time stamp for the -- the time for the cell

23 data we were talking about was 7:00 a.m.  And what's the time

24 stamp on this Love's video?

25 A.    It shows the 9th of July in 1971.

1   Q.   Oh, sorry.  Let's go to the small one in white above it.

2   A.   That is -- that is the July 15th at 6:59.

3   Q.   In the morning?

4   A.   If it's on military time, that'd be a.m., yeah.

5   Q.   And is it on military time?

6   A.   I don't know for certain.

7   Q.   Can you take a look before the -- is there a zero before

8   the six?

9   A.   Yes.  And it should be if it's showing a zero beforehand,

10  yes.

11  Q.   And you were in the United States Army?

12  A.   I was.

13  Q.   All right.  Let's back out.  Okay.  Let's go to 264-4.

14  Excuse me.  262-4.

15          What are we seeing here?

16  A.   It's the Honda Pilot driven by who we believe to be

17  Mr. Zuberi.

18  Q.   Do you see anybody in the front passenger seat?

19  A.   I see one individual driving the car, but nobody in the

20  front passenger seat.

21  Q.   Have you driven -- well, have you been to 1336 North

22  Eldorado?

23  A.   Yes.

24  Q.   Just roughly, how far is the Love's gas station, if you

25  know, from 1336?

1   A.   Approximately three to five-minute drive, depending on

2   traffic.  It's not far.

3   Q.   Let's -- let's take a look at -- I want to talk to you --

4   so you've identified travel up and down.  So I kind of want to

5   talk about a different stage -- another stage in the

6   investigation.  What -- what's another focus for the FBI?

7   You're piecing together travel.  What else are you trying to

8   do?

9   A.   We're querying government database records to put together

10  Mr. Zuberi's past, get an understanding of where he's been in

11  the last few years.

12  Q.   And what about -- let's take a look at -- I just want to

13  put everything in perspective time-wise.  Sorry.  I'm speaking

14  away from the court reporter.

15           Okay.  So I just want to talk big-picture steps.  Are

16  you doing follow-up on -- did you do a follow-up search warrant

17  on the house at 1336?

18  A.   Yes.

19  Q.   Was the FBI also looking to find out information regarding

20  the construction of the cell in the garage?

21  A.   Yes.

22  Q.   Follow up on other leads at the same time?

23  A.   Yes.

24  Q.   Were you made -- did you learn of the investigation

25  involving AV-2?

1  A.   Yes.  I learned it the night of the 16th.

2  Q.   And is AV-2 the woman from what's charged as the May

3  kidnapping?

4  A.   Yes.

5  Q.   So, just for an overview, for timing --

6       MR. SWEET:  Can we pull up 511 for just a moment,

7  please.

8       Excuse me.  I misspoke.  510.

9  BY MR. SWEET

10  Q.   Okay.  For an overview, in terms of timing, so AV-1 is

11  towards the far right, on July 14th; is that correct?

12  A.   Yes.

13  Q.   All right.  And what is the date for the kidnapping of

14  AV-2, please.

15  A.   That is May 6th.

16  Q.   We're going to go into more detail on Home Depot.  Can you

17  give us the date for an early purchase related to cinderblocks

18  or other items?

19  A.   Yeah.  There was a fair number of cinderblocks that were

20  purchased on April 14th from Home Depot.

21  Q.   And what -- what do we see after that, for April 25th?

22  A.   A purchase of handcuffs.

23  Q.   And May 6th?

24  A.   AV-2 is alleged to have been kidnapped.

25  Q.   And then May 15th?

1    A.    Leg irons are purchased.

2    Q.    And then just -- are there a lot of Home Depot purchases

3    afterwards?

4    A.    Yes.

5    Q.    Before we get to the search of 1336, the FBI search, I'd

6    like to turn to what happened on July 15th, 2023.  And so we're

7    going to pull up 511.

8          Did you and other agents and KFPD work to piece

9    together what happened in the hours and day and a half after

10   AV-1 ran out into the street?

11   A.    Yes.

12   Q.    Can you describe generally:  What sources of information

13   did you use to do that?  Just list some of them.

14   A.    Financial records, primarily GPS data from the Garmin

15   collected from the Honda Pilot and Ms. Westfall's cell phone.

16   And then also a LandAirSea device, but it was not as fruitful.

17   Q.    And what about -- were there physical receipts or --

18   either located or obtained from a store that were informative

19   as well?

20   A.    During the course of the search of the residence, each of

21   the vehicles, we did locate receipts that were indicative of

22   purchases during the time frame after AV-1 had escaped.

23   Q.    So let's -- let's talk about -- what time -- approximately

24   what time was the 9-1-1 call?

25   A.    It was around 12:08 p.m. on the 15th.

1    Q.    All right.  Around 12:08.  And do you recall approximately

2    what time Carlos Garcia said that he heard a woman screaming?

3    A.    He said it was around noon.

4    Q.    I see --

5              MR. SWEET:  Let's zoom in on the bottom part.  There.

6    BY MR. SWEET

7    Q.    Okay.  I see 2:30 with an arrow drawn towards a trailer.

8    Can you tell the jury what that indicates?

9    A.    That was collected from the Garmin GPS device and

10   Ms. Westfall's cell phone.  Those two devices colocated at that

11   location at that time.

12   Q.    And so the Garmin GPS device, where was that ultimately

13   located?

14   A.    Inside the Honda Pilot.

15   Q.    So when the Honda Pilot was searched in Reno, was the

16   Garmin in it?

17   A.    Yes.

18   Q.    So we're going to do a brief overview, and then we're

19   going to do a deeper dive.  So the -- at 2:30 p.m. the Garmin

20   shows the Honda Pilot at -- at where?

21   A.    The AAA Discount Storage, in the vicinity of the trailer.

22   Q.    So I don't want to do map overload, but I do just want to

23   frame one more time for everyone where things are located.  So

24   let's pull up 513.

25              Okay.  So we're looking at 513.  Towards the top

1    left, what do we see there?

2    A.    That is the Love's travel station.

3    Q.    Okay.  And down a little bit and to the right, 1336,

4    what's there?

5    A.    1336 is the Eldorado residence.

6    Q.    And then bottom -- bottom right corner is where?

7    A.    That is going to be the AAA Discount Storage, which is

8    located near Home Depot.

9    Q.    So a lot of the areas that we're going to be talking about

10   in kind of a diagonal line across Klamath Falls?

11   A.    Yes.  And then where the KFC line is located and heading

12   kind of towards that Chase Bank area.

13   Q.    Okay.  So, with that in mind, we have a 2:30 data point

14   for the Garmin in the Honda Pilot at the trailer.  Then --

15   sorry.

16            MR. SWEET:  Can we go back to -- back to the one that

17   was just up?  That is 511.

18   BY MR. SWEET

19   Q.    Okay.  After -- so we're at the trailer.  And then after

20   the trailer, what's the next data point?

21   A.    The Garmin provides a GPS location point at Love's gas

22   station.

23            MR. SWEET:  Okay.  And then back out, please.

24   BY MR. SWEET

25   Q.    And then I see something that says "cleaner."  What's

1  that?

2  A.   That is a bleach spray cleaner.

3  Q.   And what -- why is that on there?

4  A.   There was a receipt located in the Honda Pilot for a

5  Dollar General that showed that a bleach cleaner and some paper

6  towels were purchased in the afternoon about 5:00 p.m.,

7  5:30 p.m. on the 15th.

8  Q.   And did the Garmin show travel to -- was it Dollar

9  General?  Is that what you said?

10  A.   Yes.

11  Q.   Did the Garmin show travel there?

12  A.   Yes.

13  Q.   And then it looks like there are two data points for the

14  trailer.  Can you explain that generally?

15  A.   The Garmin then moved and returned to the trailer and was

16  at the trailer for 20 minutes.

17  Q.   And I should've backed up for one second.  Just in terms

18  of the times for the Garmin, was there a time for the Garmin

19  for the Dollar General?

20  A.   Yes.

21  Q.   Okay.  Can you see what that is on there?

22  A.   5:25 p.m.

23  Q.   Okay.  And then let's back out.

24       And is Special Agent Giovanetty going to talk about

25  some online searches later on?

1    A.    Yes.

2    Q.    Okay.  We're going to skip that.  And then let's just go

3    towards the --

4              (Whispered discussion, off the record, 11:12 a.m.)

5    BY MR. SWEET

6    Q.    All right.  I see a -- what do we see in terms of 8:54?

7    A.    The Garmin GPS departed the trailer and then gave us a GPS

8    point down in Tulelake, California.

9    Q.    Is Tulelake the same place Detective Dougherty -- excuse

10   me -- well, OSP Detective Dougherty was able to pull some

11   surveillance video from?

12   A.    Yes.

13   Q.    And then I see Tulelake, California, 9:10 a.m.  What's

14   that, please.

15   A.    The cell phone remained in -- it was also providing GPS

16   data at that time -- remained in Tulelake until 9:10 a.m.

17   Q.    And then where does it show it going?

18   A.    It then traveled north to Merrill, Oregon.

19   Q.    And is Ms. Winkle-O'Brien -- was she working at the

20   FastStop [sic] in Merrill, Oregon?

21   A.    Yes.

22   Q.    And Detective Snyder, did he locate surveillance video

23   from the FastStop in Merrill, Oregon?

24   A.    Yes.

25   Q.    Was there a vehicle located by law enforcement at Merrill,

1  Oregon?

2  A.   Yes.  It was the Nissan Altima.

3  Q.   And what was done with that vehicle?

4  A.   It was seized.

5  Q.   And anything else after that?

6  A.   A search warrant was executed on it on the 18th.

7  Q.   Okay.  So -- thank you.

8         Special Agent Gluesenkamp, do you have a much deeper

9  dive into this data?  Do you have a PowerPoint for that?

10 A.   Yes.

11 Q.   I think what we're going to do is we're going to pull that

12 up, and we're going to go through a few highlights of that.

13 That is not a board, so I'm going to leave that there for a

14 moment.

15        MR. SWEET:  516, please.

16 BY MR. SWEET

17 Q.   Okay.  What are we looking at here?

18 A.   This is an overview of locations where the GPS -- Garmin

19 GPS device stopped and was colocated with Ms. Westfall's cell

20 phone.

21        MR. SWEET:  All right.  Next slide, please.

22 BY MR. SWEET

23 Q.   And -- okay.  So this is based on -- I'm sorry.  This is

24 based on GPS data from Ms. Westfall's actual phone?

25 A.   Yes.

1   Q.   And the Garmin data?

2   A.   Yes.

3   Q.   I want to ask you about how you made this and what the --

4   what the route does or doesn't indicate.

5   A.   I really only plotted the point.  The route that was

6   taken, we don't know.  The data wasn't as robust, or it didn't

7   provide indication where we could see the exact route they

8   drove.  I just plugged it into the Google mapping system, and

9   then I left whichever route it picked there.  And if there was

10  an alternate route, I left that on there as well.

11  Q.   So are you -- is the starting and ending point -- are

12  those correct?

13  A.   Yes.

14  Q.   Is it possible that a different route was taken, other

15  than the blue line that shows the suggested route?

16  A.   Yes.

17  Q.   Let's go to -- I'm just going to ask you.  We don't have

18  to pull this one up.

19       Does -- did Ms. Westfall's phone and the Honda Pilot

20  show that they went somewhere for roughly an hour, roughly 4:00

21  to 5:00 p.m.?

22  A.   Yes.  This slide's showing the Garmin's activated at the

23  Love's gas station.  And then this is showing Ms. Westfall's

24  phone merging with that point.

25  Q.   And what area does it show them being at?

1  A.    The Love's travel stop.

2  Q.    And then I switched -- I'm sorry.  I switched slides on

3  you.  From about 4:00 to 5:00 p.m. roughly, where were they?

4  A.    That is Love's travel shop, and then both the devices move

5  to the Falls Taphouse.

6  Q.    Thank you.  That's 516-3.

7        And I'm going to -- so this -- this -- is your

8  PowerPoint roughly -- is it a pretty robust PowerPoint?

9  A.    Yes.

10 Q.    All right.  It is Government's Exhibit 516.  I'm not going

11 to go through each slide, but I do want to touch on a few.

12 516-5, you talked about, I think you said -- was it either a

13 Dollar General or a Dollar Tree?

14 A.    Yeah.  There was a Dollar Tree and a Dollar General that

15 both the GPS went to.

16 Q.    All right.  And this shows both devices going to where,

17 from roughly what time?

18 A.    It is moving from Love's travel stop down to the

19 Dollar Tree, and that is occurring at 5:25 p.m.  And both

20 devices are there until 5:32 p.m.

21 Q.    Let's -- let's pull up -- let's go to 516-6, please.

22        All right.  What are we seeing here?

23 A.    This is a receipt that was located inside of the Honda

24 Pilot.  It is for Dollar Tree.  And it is for a cleaner/bleach,

25 trigger 32Z, for $1.25; and then paper towels, SAS 140,

1  176-count, for $1.25.

2  Q.   Was a bottle of cleaner/bleach located somewhere in this

3  investigation?

4  A.   It was located inside the Honda Pilot.

5  Q.   When that was in Reno, Nevada?

6  A.   Yes.

7          MR. SWEET:  223-2, please.

8          Sorry.  223-2.

9          All right.  And let's go to dash four.

10  BY MR. SWEET

11  Q.   So is this in the Honda Pilot?

12  A.   Yes.

13  Q.   Is that the bleach that was in the Honda Pilot?

14  A.   Yes.

15  Q.   Okay.  Let's go back to 516-7.

16          What are we looking at here?

17  A.   The -- both devices departed the Dollar Tree and moved to

18  AAA Discount Storage.

19  Q.   And both devices are there until approximately what time?

20  A.   They arrive at around 5:37 p.m., and they're there until

21  5:52 p.m.

22  Q.   I just want to ask you a question about the LandAirSea,

23  the sort of smaller hockey pucks that we talked about earlier.

24  Were you -- you said you got a search warrant for that data; is

25  that correct?

1  A.   Yes.

2  Q.   And did you find a significant amount of sort of

3  historical data from those devices?

4  A.   Yes.

5  Q.   Showing movement in multiple -- in at least Oregon and

6  Washington?

7  A.   Yes.

8  Q.   When -- was there a point at which you no longer received

9  new data points for those devices?

10  A.   Yes.

11  Q.   When roughly -- what day did it appear they started

12  staying in one location?

13  A.   It was on the 15th.  They remained at AAA Discount

14  Storage.

15  Q.   Forever more?

16  A.   Forever more.

17  Q.   All right.  And so that would be Saturday?

18  A.   Yes.

19  Q.   So sometime on July 15th those devices just showed being

20  at AAA Discount Storage?

21  A.   Yes.

22  Q.   And just where were they ultimately found?

23  A.   Inside of the trailer.

24  Q.   Let's --

25            (Whispered discussion, off the record, 11:20 a.m.)

1    BY MR. SWEET

2    Q.   So did -- let's go from -- do the devices show leaving the

3    AAA Discount Storage?

4    A.   Yes.

5    Q.   I'll just move through.  516-8, please.  We'll move

6    through these quickly.

7         Where did they go -- where did the devices go after

8    AAA Discount Storage?

9    A.   They departed.  They briefly went to Albertsons, and then

10   they went over to a Burger King.

11   Q.   All right.  Dash nine.  Then where?

12   A.   They then move from Burger King to a Dollar General store.

13   Q.   Dash ten.

14   A.   And then it returned to AAA Discount Storage.

15   Q.   And do they then leave at different times?

16   A.   Yes.

17   Q.   Did you find any purchase information at Dollar General?

18   A.   I don't recall.

19   Q.   Let's go to 516-11.

20        All right.  What do we see here?

21   A.   This is the GPS Garmin device traveling south to 319 Main

22   Street in Tulelake, Oregon [sic].

23   Q.   And it says the GPS logs its last GPS -- or the last time

24   it's at AAA is 6:36 p.m.; is that correct?

25   A.   Yes.

1  Q.   And could you -- what does the last line indicate?  Could

2  you explain that?

3  A.   What it means is that we were able to correlate the Garmin

4  GPS points provided with the cell phone data, which means the

5  Garmin GPS and the cell phone were colocated in the same

6  location based on GPS data.

7  Q.   Okay.  So up 'til now, for a lot of this PowerPoint, we've

8  been talking about Ms. Westfall's phone; we've been talking

9  about the Garmin GPS.  And now you're saying you added in

10  Mr. Zuberi's cell phone location data as well?

11  A.   Correct.

12  Q.   And you said that showed he was in -- the phone and the

13  GPS were both in Tulelake?

14  A.   Correct.

15       MR. SWEET:  Okay.  Let's pull up 484, please.

16  BY MR. SWEET

17  Q.   And, just generally, what -- so what is the route we're

18  looking at here then, in terms of ending up to Tulelake?

19  A.   It's Highway 39.  It heads south, goes through Merrill,

20  and then ends up in Tulelake, Oregon -- excuse me -- Tulelake,

21  California.

22  Q.   And let's go to, concluding this up, 516-12.

23       Okay.  What about Ms. Westfall's phone?  Just give a

24  general overview, please.

25  A.   Ms. Westfall's phone departed and went to the vicinity of

1  13386 -- 1336 North Eldorado.  It would periodically leave, go

2  somewhere else, and then come back, leave, come back.  And then

3  it eventually ended up at a motel.

4  Q.   And last slide, 516-13.

5       What -- what hotel or -- actually, what motel was

6  that?

7  A.   That is the Maverick Motel located in downtown

8  Klamath Falls.

9       MR. SWEET:  All right.  Let's look at 481, please.

10 BY MR. SWEET

11 Q.   And what are we seeing here?

12 A.   That's the Maverick Motel.

13 Q.   So, Special Agent Gluesenkamp, are Reno Police Department

14 officers going to be testifying regarding locating and

15 arresting Mr. Zuberi in Reno?

16 A.   Yes.

17 Q.   And is an FBI special agent going to be testifying

18 regarding the search of the Honda Pilot in Reno?

19 A.   Yes.

20 Q.   All right.  So let's kind of turn back.  So you've

21 discussed travel in the hours, day after July 15th.  I kind of

22 want to go back to your investigation.  We've talked a lot

23 about a trailer.  Now, in the days after, had you located the

24 trailer yet?

25 A.   No.

1   Q.   So I want to ask you what kind of tipped you off -- what

2   tipped you off to the trailer?

3   A.   It was the search of the Nissan Altima, located a receipt

4   for a rental of that inside of there.

5   Q.   Okay.  So the search of the Nissan Altima was done roughly

6   when?

7   A.   That was done on the 18th.

8   Q.   All right.  So July 18th.  And in the Nissan Altima, you

9   said there was some -- was some paperwork located?

10  A.   Yes, paperwork for a rental of an RV space at AAA Discount

11  Storage.

12          MR. SWEET:  Let's pull up 279-1.  We'll zoom in on

13  the right.

14  BY MR. SWEET

15  Q.   And what are we looking at here?

16  A.   This looks like the rental agreement for that unit.  And

17  it has the location of the unit and then an access code and

18  then a fee that was paid for it.

19  Q.   So you found that.  Did you do anything with that right

20  away at that point?

21  A.   Yes.  We also had a receipt -- a credit card receipt

22  associated to it.  But, based on the date that it had -- it was

23  only for a month -- I didn't feel we had enough probable cause

24  at that point for a search warrant and -- or it was going to

25  require additional investigation before we could go search that

1  location.

2  Q.   So at the point when you find the paperwork, though, do

3  you even know that there's a trailer there yet?

4  A.   We have no idea of the trailer.

5  Q.   So you hadn't -- law enforcement hadn't actually gone out

6  to AAA yet and seen whether there was or wasn't something

7  there?

8  A.   No.

9  Q.   Did you even know at that point whether the rental was

10  still active?

11  A.   No.

12  Q.   Did you figure those things out?

13  A.   Yes.

14  Q.   Okay.  So before we get to the trailer, though -- so

15  you've searched the Altima.  What's -- what's the next search

16  warrant?

17  A.   The next search is the second search of 1336 North

18  Eldorado.

19  Q.   Big picture, why are you doing a second search?

20  A.   In discussion with Klamath Falls, we -- they felt there

21  were some areas they probably missed.  We also felt that there

22  was additional devices left behind, potentially digital devices

23  they had seen, but did not seize.  We also did not know if they

24  had measured the cell.  We felt that was pertinent to go back

25  there and inspect it further.

1           And then, since we had learned of a potential second

2   victim and there was a time gap between, my thinking was that

3   maybe there's another.  And I wanted to go search for evidence

4   of any victim unknown.

5   Q.   Did you obtain a federal search warrant for 1336 North

6   Eldorado?

7   A.   Yes.

8   Q.   And when was that executed?

9   A.   That was executed on the 19th of July.

10  Q.   And so Mr. Zuberi was arrested on the 16th, a Sunday; is

11  that correct?

12  A.   Yes.  Taken into custody, yes.

13  Q.   And the Altima search warrant was on the 18th?

14  A.   Yes.

15  Q.   And then the next day, the search warrant on 1336?

16  A.   Yes.

17  Q.   Did FBI take photographs of that search?

18  A.   I took videos of the exterior and interior of the house

19  and then also the garage area.

20  Q.   And did other individuals with you take photographs as

21  well?

22  A.   Yes, took photos of evidence that was going to be seized.

23  Q.   We're going to pull up these photographs.  We'll move

24  through them fairly quickly.  We'll stop on some, and we'll

25  skip forward on others.  Let's start with Exhibit 126.  So this

1  is the -- this is the run-through.

2          So, to be clear, this is from a second -- a

3  later-in-time search, correct, not the initial KFPD search?

4  A.  Correct.

5  Q.  So have some items already been seized at this point?

6  A.  Yes.

7          MR. SWEET:  Could you zoom in just on the right part

8  down here?

9  BY MR. SWEET

10 Q.  Could you tell us what we're seeing sort of to the left of

11 the WD40 can?

12         MR. SWEET:  Actually, let's back out and zoom in just

13 a little bit more, just right in there.

14 BY MR. SWEET

15 Q.  It's a little blurry, but what are we seeing in there?

16 A.  It looks like some drill bits, nails, and then it looks

17 like a concrete screw, the blue screw here (drawing).

18 Q.  So drill bits --

19 A.  Yes.

20 Q.  -- for drills?

21         Can you change the bit on a drill?

22 A.  Yes.

23 Q.  Okay.  Thank you.

24         MR. SWEET:  Okay.  And thank you, Marco.

25

1    BY MR. SWEET

2    Q.   Let's -- I want to jump ahead -- oh, actually, sorry,

3    let's take a look at the drill head.  Can you look at the drill

4    head, the drill bit area?

5    A.   Yeah, I see it.

6    Q.   Is there something in it?

7    A.   It looks like a Phillips head bit.

8    Q.   So I want to talk to you just sort of big picture.  Were

9    there items that the FBI seized --

10   A.   Yes.

11   Q.   -- during the second search?

12        Okay.  Ammunition?

13   A.   Yes.

14   Q.   Was there -- can you just tell us, generally, in the house

15   where ammunition was found?

16   A.   Generally, there was a significant amount of ammunition

17   found on this table and around it.  And then I believe there

18   was a little bit more ammunition found potentially in the

19   bedroom.

20   Q.   So where were you mostly focused?

21   A.   I remained in the garage.

22   Q.   And is Special Agent Giovanetty going to talk about items

23   from the bedroom?

24   A.   Yes.

25   Q.   All right.  So let's talk about the garage.  You said you

1   seized ammunition.  Could you just circle on here where some

2   ammunition was on the -- on the table?  Oh, this is 126.

3   A.   Here's a large box (drawing) of what was later determined

4   to be 9-millimeter ammunition.  Back here (drawing) in the

5   upper corner, this was consistent with an AK-style ammunition,

6   a 7.62-by-39.

7   Q.   And we'll zoom in on some of this in a minute with

8   different photos.  And were there -- was there a -- let's see.

9            MR. SWEET:  Okay.  And let's just go to the next one.

10  BY MR. SWEET

11  Q.   What are we seeing here?

12  A.   These were a jig -- or that is the -- it looks like the

13  deadbolt.

14  Q.   So is this just -- this is an unused deadbolt at this

15  point; is that correct?

16  A.   Yes.

17  Q.   128, what is this?

18  A.   That is the 7.62-by-39 ammunition and then a magazine

19  laying next to it.

20  Q.   129.

21  A.   That is that same ammunition laid on a flat surface.

22  Q.   130.

23  A.   That is an AR magazine, and then there's some 9-millimeter

24  ammunition next to it.

25  Q.   131.

1   A.    That is the box of 9-millimeter ammunition.

2   Q.    132.

3   A.    This was a jig or a kit to mill out an 80 percent lower.

4   This is what's commonly referred to as a ghost gun.   It's an

5   incomplete lower receiver of an AR-15 that has not been fully

6   drilled out, so it cannot function.   And it's -- the user has

7   to purchase a drill kit or a jig to be able to mill that out to

8   where they can then use it as a functioning firearm.

9   Q.    And, Special Agent Gluesenkamp, you mentioned 9-millimeter

10  ammunition being on the workbench; is that correct?

11  A.    Yes.

12  Q.    What was the caliber of the pistol that AV-1 took from the

13  pilot?

14  A.    It was a 9-millimeter handgun.

15  Q.    133.   Okay.   We'll zoom in, in a second.   Do you -- is

16  there something under the table here that we're looking at?

17  A.    Yes.   There's a box of Blazer 9-millimeter ammunition.

18  Q.    134.

19  A.    That's a close-up view of the same ammunition.

20  Q.    135.

21          Let's go to 136.

22          Okay.   What's this?

23  A.    This is a part of that -- that kit that can be used to

24  drill out the 80 percent lower receiver for the AR-15.

25  Q.    137.   Same general --

1    A.    This is a little bit different.  This is the kit, the

2    springs, the retaining pins, the trigger assembly, that is used

3    to build a functioning lower receiver for an AR-15.

4    Q.    138.

5    A.    Instructions of how to mill out the jig or mill out the

6    lower receiver.

7    Q.    139.

8           THE COURT:  Special Agent, I mean, I guess maybe this

9    is just curiosity:  Why would you do this, as opposed to just

10   to buy a fully assembled gun?

11          THE WITNESS:  This is not a controlled item.  It

12   means anybody can purchase this.  There's no background check

13   for it.

14   BY MR. SWEET

15   Q.    So there's no background check; whether you're a felon or

16   not a felon, you can buy this?

17   A.    You can order it online.

18   Q.    And then what can you do with this then?

19   A.    It's -- you, as the user, have to drill out the metal

20   space to make room for the trigger, so that a trigger could be

21   inserted into it.  It requires limited tools -- generally, a

22   drill press -- to be able to mill that area out so it's within

23   the tolerance that would allow it to be a functioning firearm.

24   Q.    And, Special Agent Gluesenkamp, there was another -- there

25   was a barrel located in the master bedroom.  Would those have

1  been able to connect up?

2  A.   I believe they would.  The 6-millimeter barrel, which was

3  located in the bedroom, I'm not as familiar with.  It's a very

4  unusual caliber.  So I do not know 100 percent certainty --

5  with 100 percent certainty that that could mirror up with this

6  lower receiver for an AR-15.

7              MR. SWEET:  And 140, please.

8  BY MR. SWEET

9  Q.   Close-up of it?

10 A.   Yeah.  This is a -- one of those 80 percent lowers where

11 it appears somebody attempted to drill out that aluminum area

12 so they could make a functioning firearm.

13 Q.   And 141.  Who was this box shipped to?

14 A.   Negasi Zuberi.

15 Q.   And let's go to 142.

16              And what was inside?

17 A.   These were part of the jig kit to mill out the receiver.

18 And I believe the 80 percent receiver was also located in that

19 box.

20 Q.   143.

21 A.   And that's a photo of that lower receiver.

22 Q.   So is this different than the one that was found on the

23 floor kind of hacked out?

24 A.   This one's still intact.  No drilling had been done to it

25 yet.

1  Q.   All right.  I'm going to switch -- I'm going to switch to

2  inside -- I'm going to go to 144.  And we can talk to Special

3  Agent Giovanetty about this one.  But, based on the items in

4  here, do you know where this photo was taken from?

5  A.   This is from the nightstand on the side of the bed that

6  was associated to the male in the room.

7  Q.   Let's just zoom in on the card.  And what does that card

8  say?

9  A.   LandAirSea.

10 Q.   Okay.  And what is LandAirSea?

11 A.   LandAirSea is the provider of the GPS service that's

12 associated to the small hockey puck devices.

13 Q.   Okay.  We're going to skip ahead.  Were there some cameras

14 located in the house?

15 A.   Yes.

16 Q.   Can you tell us if we see one of them in this photo?

17 A.   Yes.  It's right here (drawing).  And the manufacturer is

18 Blink.

19 Q.   We'll talk about it more later on, but why -- did these

20 end up being relevant, these cameras inside the house?

21 A.   Yes.

22 Q.   Did you obtain -- did you do a -- let me back up.

23         When you did a search warrant for digital devices,

24 did you locate stored data from inside -- stored video data

25 from inside the house?

1  A.   Yes.  A 256-gigabyte memory card was extracted from one of

2  these devices, which was collected by Klamath Falls Police

3  Department during their first search warrant.

4  Q.   Were there -- were there 20,000-plus short videos located?

5  A.   Yeah.  It was 17-, 18,000, yes.

6  Q.   More than 10,000?

7  A.   Yes.

8  Q.   Did you review a lot of those?

9  A.   A lot.

10  Q.   154, what are we seeing here?

11  A.   This is the camera that was located inside the living

12  room.

13  Q.   So just because we're talking about it, I do want to

14  switch for just a second to 370.  And it is -- let's -- tell us

15  what we're seeing here.  And I'm going to pause for one second.

16  Is this -- is this 1336 North Eldorado?

17  A.   No.

18  Q.   Different house?

19  A.   Yes.

20  Q.   What are we -- what are we seeing here?

21       MR. SWEET:  Go ahead and hit play.

22       THE WITNESS:  That's Mr. Zuberi and Ms. Westfall

23  seated on the couch, and that is Mr. Zuberi holding an upper

24  for an AR-15-style rifle.

25

BY MR. SWEET

Q.   And I'm going to show you what's marked as Government's

Exhibit 122.  Please identify what we're seeing here.

A.   This is a 6-millimeter ARC upper receiver for an

AR-15-style rifle.  It has approximately a 16-inch barrel.

Q.   We have another video.

And where was that found?

A.   That was found in Mr. Zuberi's bedroom closet, if I

recall.

MR. SWEET:  Let's go to 372, please.

BY MR. SWEET

Q.   Is this also from not 1336 Eldorado?

A.   Yes.

Q.   What does that appear to be?

A.   It appears to be Mr. Zuberi carrying a firearm that has a

lower receiver and also an upper receiver.

MR. SWEET:  So let's -- I'd like to jump back to the

garage.  And let's go to 156.

BY MR. SWEET

Q.   What are we seeing here?

A.   This is the back of the cinderblock structure.  The window

you're seeing would lead out to the rear of the home.

MR. SWEET:  And the next one, please.

BY MR. SWEET

Q.   What is this?  What are these, please.

1    A.    These are a collection of credit cards that were located

2    in the garage.

3    Q.    And could you read the names, please.

4    A.    The top one is Justin Kouassi.  The middle one is Negasi

5    Zuberi, and the bottom one is Justin Kouassi.

6    Q.    So let's talk about the cell itself.  Did you take efforts

7    to document it?

8    A.    Yes.

9    Q.    Describe those, please.

10   A.    I utilized a tape measurer to measure the exterior and

11   interior dimensions to capture how large it was.

12   Q.    All right.  And, beyond that, what else did you do to it?

13   A.    One of the purposes of the search warrant was to further

14   search the interior of the cell.  The drywall looked new.  And

15   so we wanted to see what was behind it; was this the first time

16   drywall had been put up; was there evidence behind the walls.

17   And so we made efforts to disassemble the interior of the cell

18   to get a look at what was behind the walls and how it was

19   constructed.

20   Q.    Let's take a look at -- let's take a look at next photo,

21   which would be 158.

22         And let's go to 159.

23         All right.  So let's back up to 158 then.

24         So, Special Agent Gluesenkamp, do you have some at

25   least basic knowledge regarding building?

1  A.   Yes.  I like to build things.

2  Q.   So tell us -- tell the jury a little bit about that, about

3  that cinderblock structure.

4  A.   So the exterior was made of vertically stacked

5  cinderblocks, which we speculated was made with a

6  construction-style adhesive instead of a standard masonry

7  mortar.

8       They were stacked vertically on top of each other.

9  And then on the interior of that was a wooden frame made of

10 two-by-fours that was framed up on the internals of the

11 structure.

12      Between the two-by-fours was installed an insulation

13 that had a soundproof rating.  And then there was drywall

14 placed on top of that.  And then the drywall had been mudded in

15 specific areas to cover up the seams and then the screw holes.

16 Q.   All right.  So when we're looking at 158, did you rip off

17 that panel that's marked with an S?

18 A.   Yes.  This is the photo I took prior to ripping off the

19 Panel S.

20      MR. SWEET:  Let's go to 159, please.

21 BY MR. SWEET

22 Q.   All right.  What's this, please.

23 A.   This is Panel S disassembled, with the drywall removed.

24 Q.   All right.  And what's behind that drywall?

25 A.   Two-by-fours and insulation.

1    Q.    And then 160?

2    A.    This is the insulation removed.  So you can see the frame

3    as it relates -- or connects to the cinderblock exterior

4    structure.

5    Q.    161?

6    A.    Same thing.  This is just a piece of drywall that had been

7    removed, and this is another wall of the structure.

8    Q.    162?

9    A.    Same thing.  We just had removed some of the insulation to

10   look at the base two-by-fours, to look for any discoloration or

11   staining.

12   Q.    All right.  And we'll do these next ones really quickly.

13   I just want to -- was the measurement of it documented?

14   A.    Yes.

15   Q.    Let's go to 353.  We're just going to move through these

16   quickly.  If there's something interesting in there, let me

17   know and I'll stop.  Otherwise, we'll just scroll through.

18   353-1?

19   A.    This is just holding the tape up to -- to show the tape

20   measurer was held on the full length of it.

21   Q.    Dash two.  And it's going to take just a second for these

22   to pull up.

23   A.    A close-up of that measurement.

24   Q.    All right.  So how long was it?

25   A.    125-and-a-half inches.

1  Q.  So 10 feet, five-and-a-half inches?

2  A.  Don't ask me to do the math.

3  Q.  Okay.  I won't.

4          All right.  Then let's go to 353-3.

5          Okay.  Dash four?

6  A.  Again showing the front width.

7  Q.  Just under 99 inches?

8  A.  Just under 99 inches.

9  Q.  Dash five.

10  A.  The heighth.

11  Q.  Dash six.  That's you in the sunglasses?

12  A.  Yes.  Thank you.

13  Q.  And how high was it?

14  A.  Just under 85 inches.

15  Q.  And dash seven.  So that was the exterior.  You measured

16  the interior as well?

17  A.  Yes.

18  Q.  All right.  And dash eight?

19  A.  That's the length of the back wall.

20  Q.  You know, and I'm going to -- I'm going to skip ahead.  So

21  basically Government's Exhibit 353, there are multiple photos

22  of you and a colleague measuring the interior as well; is that

23  correct?

24  A.  Yes.

25  Q.  All right.  Let's just take a look at the heighth on the

1  interior, 353-12.

2  A.   It's just under -- or just over 84 inches in heighth.

3  Q.   And 353-13, just tell us -- tell us what you're measuring

4  there.

5  A.   I'm measuring the width of the doorjamb.

6  Q.   Let's take a look at 353-14.

7       And I want to ask you -- and, actually -- what's that

8  black piece right at about inch 34?

9  A.   That is the metal frame from the metal security door.  The

10  metal security door, when we searched, it had been seized by

11  Klamath Falls Police Department.  So it was no longer present,

12  but the frame had remained.

13  Q.   So the deadbolt on the metal security door, where would

14  that deadbolt latch into?

15  A.   It would've latched into the metal frame associated to the

16  metal door.

17  Q.   All right.  And that frame -- that frame was not seized at

18  all?

19  A.   No.

20  Q.   So the wooden door, which -- are you familiar with the

21  wooden doorjamb that was broken out?

22  A.   Yes.

23  Q.   The metal security door would not have latched into the

24  wooden doorjamb; is that correct?

25  A.   No.

1  Q.   So you seized ammunition; is that correct?

2  A.   Yes.

3  Q.   And digital devices -- multiple digital devices seized

4  from the house?

5  A.   Yes.

6  Q.   Klamath Falls Police Department, are you familiar with

7  keys that they found in an ammunition can?

8  A.   Yes.

9  Q.   What kind of -- let me grab that can for just a second.

10      All right.  106.  I'm showing you what's marked as

11  Government's Exhibit 106.

12      MR. SWEET:  And, Your Honor, we'd like to use the

13  keys, and so we'd like to bring the door back in.

14      THE COURT:  Sure.

15  BY MR. SWEET

16  Q.   All right.  What are we looking at with -- I'm just going

17  to hand that to you -- Government's Exhibit 106?

18  A.   This is a large metal can of rifle ammunition, and then

19  inside was located a key ring that was comprised of several

20  keys.

21  Q.   And were there handcuff keys in there as well?

22  A.   Yes.

23  Q.   And there's a sticker on the front of that.  Does it

24  say -- on the can itself.  What does that say?

25  A.   "Arrow Precision."

1   Q.   And?

2   A.   "Pro2A Tactical, Exercise Your Right."

3   Q.   Okay.  So let me ask you about handcuff keys briefly.

4   Sounds silly, but are they different for every handcuff?

5   A.   No, they're universal.

6   Q.   So one set of -- do you use handcuffs?

7   A.   Yes.

8   Q.   All right.  In your line of work?

9   A.   Yes.

10  Q.   And your handcuff key will work on any law enforcement

11  officer's handcuffs?

12  A.   Yes.

13  Q.   So when an officer was testifying about the keys -- let's

14  show -- show those keys again, please.  These, actually.  Thank

15  you.  No, these are good.  So these are 105 -- or this is 105?

16  A.   Yes, 105.

17  Q.   Okay.  And this was one of several keys that were found in

18  106?

19  A.   Yes.

20  Q.   All right.  I believe the officer said they didn't know

21  what this key went to; is that correct?

22  A.   Correct.

23  Q.   All right.  Did you figure that out?

24  A.   Yes.

25  Q.   All right.  What's the -- what's the brand on the key?

1  A.   The brand is Defiant.

2  Q.   And we're going to go ahead and bring in the metal

3  security door.  Was the wooden door ever seized?

4  A.   No.

5  Q.   So were the other key -- was the other key in here ever

6  tested on the white wooden door?

7  A.   No.  There were two other keys, and they were not tested.

8  Q.   All right.  Why don't you come on down, please, and --

9        (Whispered discussion, off the record, 11:50 a.m. -

10 11:51 a.m.)

11 BY MR. SWEET

12 Q.   All right.  What -- go ahead, put that in the deadbolt.

13 A.   (Witness complied.)

14 Q.   And does that -- tell us what that does.

15 A.   It actuates the deadbolt.

16 Q.   And is there a brand on the deadbolt itself?

17 A.   There is a brand.  It's Defiant.

18 Q.   All right.  Thank you.  And that was 105?

19 A.   105.

20 Q.   And the door itself is?

21 A.   186.  Or, excuse me, 117.

22 Q.   Okay.  Thank you.  I'm going to ask someone to grab this,

23 and I'll take that back.

24        MR. SWEET:  Thank you.

25        Your Honor, we're going to move to a different area

1  entirely, and I didn't know the Court's preference on --

2          THE COURT:  Yeah, I think we can break.  We're almost

3  at 1 o'clock.

4          Folks --

5          (Whispered discussion, off the record, 11:52 a.m.)

6          THE COURT:  Folks, I'm going to keep lunch maybe a

7  little short 'til -- yes.

8          A JUROR:  Can I possibly write a question?

9          THE COURT:  Yes, you can.

10          And this witness is coming back after lunch, correct?

11          MR. SWEET:  Yes, Your Honor.

12          THE COURT:  All right.  So we'll take a look at the

13  question.  And we'll get that from you, whether it -- either

14  from the -- now or the jury room.

15          (Pause in proceedings, 11:52 a.m. - 11:53 a.m.)

16          THE COURT:  All right.  We'll take a look at the

17  questions; and if they can be asked, that will happen after

18  lunch.  But for now we'll break for lunch.  If we could have

19  you back at 1 o'clock, and we are hoping to send you all home

20  midafternoon.  Okay?

21          (Open court, jury not present, 11:54 a.m.)

22          THE COURT:  All right.  We'll reconvene at 1:00.

23  There are actually two questions.  I believe this is the

24  question written by the woman who asked, and then the gentleman

25  next to her wrote the longer question.  So I'll have you look

 1    at both of them, and you may want to address them.

 2              (Whispered discussion, off the record, 11:54 a.m.)

 3              THE COURT:  All right.  Mr. Svelund will make copies

 4    for you.

 5              MS. POTTER:  Thank you.

 6              MR. SWEET:  Thank you.

 7                            *  *  *

 8              (Noon Recess taken at 11:54 a.m.)

 9

10                        ***AFTERNOON SESSION***

11              (Open court, jury not present, 1:00 p.m.:)

12              THE COURT:  All right.  Let's bring the jury in.

13              MR. SWEET:  Actually, Your Honor, just briefly, if we

14    may, one, we are going to soon be playing a jail call.  I just

15    wanted to -- we'll be referring to it as an audio recording on

16    the record.

17              Two, in terms of the juror questions, one of them we

18    have an answer for, and we'll be addressing it with Special

19    Agent Gluesenkamp.  And we talked to the defense about that.

20    The other one, "Would any Defiant key work on any Defiant

21    lock?" we're following up on that.  And so we didn't know if

22    that's something -- and I believe the defense is fine -- if the

23    Court would simply say, "That's being followed up on.  Won't be

24    answered."

25              THE COURT:  I mean, I think you can address it at any

1  time without us commenting on it.

2      MR. BERTHOLF:  And, well, I guess, to address the

3  juror question, my recommendation would be, on the one juror

4  question, "Another witness will be answering that question.  We

5  can't answer that with this witness."

6      THE COURT:  And I've already told them that may be

7  the case, so --

8      MR. BERTHOLF:  Okay.

9      THE COURT:  Really I think that's just something you

10  can address with another witness, and I think that will answer

11  the juror's questions at the time.  I don't think we need to

12  let them know we're working on it, in other words.

13      MR. SWEET:  Then we won't do that.  Thank you,

14  Your Honor.

15      THE COURT:  All right.  We'll bring the jury in.

16      (Open court, jury present, 1:03 p.m.)

17      THE COURT:  All right.  Please be seated, folks.

18      Thank you.

19      And let's return to direct examination.

20      MR. SWEET:  Thank you, Your Honor.

21      And, Your Honor, may I read a question from the

22  juror?

23      THE COURT:  Yes.

24  BY MR. SWEET

25  Q.  The question, Special Agent Gluesenkamp, is:  Is there a

1  photo from the first search by KFPD/OSP of the workbench in the

2  garage specifically focusing on the drill?  Can you compare the

3  photo with the FBI photo from the later date?  Was there a bit

4  in both pictures?

5          I'd like to show you what's marked as Government's

6  Exhibit 92, Detective Dougherty's body camera from July 15th,

7  2023.  And we're going to play that, and then we'll --

8          (Whispered discussion, off the record, 1:04 p.m.)

9  BY MR. SWEET

10  Q.   Actually, July 16th, 2023.  All right.  And, Special Agent

11  Gluesenkamp, do you see the drill in this photo?

12  A.   I do.  It looks like it's right here (drawing).

13  Q.   And are you able to see anything at the -- at the tip of

14  the drill?

15  A.   I see something here (drawing).  I can't be certain just

16  based on the position of the photo.

17  Q.   We're going to keep playing.  We'll back up just a little.

18          How about in this photo?

19  A.   Yeah.  I can see a bit in the drill.

20  Q.   Could you circle it?

21  A.   (Witness complied.)

22  Q.   All right.  We'll play it for just another 15, 20 seconds

23  or so.

24          (Video recording played in open court, 1:05 p.m.)

25

BY MR. SWEET

Q.   All right.  We'll stop there.  And we can clear that.
Thank you.

So, Special Agent Gluesenkamp, did the FBI work to
follow up regarding materials used to build the structure in
the garage?

A.   Yes.  A subpoena was issued to Home Depot based on some
receipts we had located in the Altima.  And then there was also
Home Depot receipts seized at the residence.

Q.   And what kind of records did the FBI receive from Home
Depot?

A.   They provided detailed records of the purchases associated
to the Home Depot ID number associated to Mr. Zuberi.  They
also correlated by credit card.  And they were able to provide
the purchase records, method of payment, and then also
surveillance video of those purchases.

Q.   I'd like to show you -- I'd like to show you some stills.
Let's go to 351-2.

All right.  So were some still shots or excerpts of
surveillance video taken?

A.   Yes.

Q.   And, to be clear, so there's a -- what do you see at the
top of the -- just above the image?

A.   There's a time stamp.

Q.   Now, that was added by the Government, not -- this -- the

1  date and time is not -- Home Depot didn't give it to us looking

2  like that, correct?

3  A.    Correct.

4  Q.    All right.  Okay.  So what is the date for this one,

5  please, that's been added by the Government.

6  A.    May 17th at 2:32 p.m.

7  Q.    And what do you see?

8  A.    I see Mr. Zuberi purchasing some cinderblocks.  It looks

9  like a wire mesh and a caulking gun.

10  Q.    351-3.

11  A.    It is a large -- almost looks like a two-by-six.

12  Q.    And if I could pause for a moment.

13         MR. SWEET:  Your Honor, these -- because we needed to

14  clarify that the date was being added by the Government, these

15  actually have not been admitted yet.  And so, with the

16  clarification regarding that, the Government would offer 351

17  into evidence.

18         THE COURT:  Any objections?

19         MR. BERTHOLF:  No.

20         THE COURT:  All right.  It'll be admitted.  Thank

21  you.

22         (Government's Exhibit No. 351 received.)

23  BY MR. SWEET

24  Q.    All right.  And -- all right.  351-2, what's the date on

25  that, please.

1   A.   May 21st, 2023, at 1:51 p.m.

2   Q.   And do we have some videos as well?

3   A.   Yes.

4   Q.   We'll get to those in a minute.  Let's go to dash three --

5   or the next page, actually.

6            And what do you see here, please.

7   A.   Mr. Zuberi purchasing a ladder, and then there's also some

8   cinderblocks on the cart as well.

9   Q.   Was a blue ladder located in the garage at 1336?

10   A.   Yes.

11   Q.   Next page.

12            And here?

13   A.   The top picture, there is some two-by-fours and some

14   Sheetrock.  And on the lower photo is insulation.

15   Q.   And can you give --

16   A.   And some soundproofing boards, the Styrofoam boards.

17   Q.   Thank you.

18            And let's look at the -- look at the date and the

19   times as well, please.

20   A.   Top one is May 29th at 3:21 p.m.  And the lower one is

21   May 29th at 5:45 p.m.

22   Q.   And the person in the -- sort of the bottom right, in sort

23   of the blue, do you know who that is?

24   A.   Yes.

25   Q.   Who is that?

1    A.    That's Ms. Westfall.

2    Q.    Alycia Westfall?

3    A.    Yes.

4    Q.    Next page, please.

5          Tell us what we see.

6    A.    That is June 24th at 3:48 p.m.  Mr. Zuberi's purchasing

7    what looks like some more insulation and some two-by-fours.

8    And then the next day, on June 25th, at 7:21 p.m. there is

9    the -- again, a purchase of two-by-fours and more insulation.

10         MR. SWEET:  And I'm not sure how small it is on the

11   monitors.  Could we zoom in on the face here?

12   BY MR. SWEET

13   Q.   All right.  Okay.  And next page, please.

14         Date and time, please.

15   A.   June 29th, 7:52 p.m., purchasing some Sheetrock.  And it

16   looks like a box of screws or possibly nails in his hand.  And

17   then on the lower photo, June 30th, 12:03 p.m., and more

18   cinderblocks.

19   Q.   Next one, please.

20   A.   June 30th, 1:02, just a different angle, it looks like,

21   and three or four cinderblocks.  And then on July 2nd, 2023, at

22   3:18, it's not clear what Mr. Zuberi is purchasing.  He's just

23   standing there, and I don't see a cart or a product associated

24   to him.

25   Q.   And so what does -- what does -- the last date here was

1  July 2nd, 2023, in terms of these images?

2  A.   Yes.

3  Q.   Let's go back to the first one.

4        And so the start date, at least for these, was what?

5  A.   May 17th.

6  Q.   And we're going to -- we're going to go over some receipts

7  in a minute.  But let's go to a video, which is 351-1.  So I'm

8  going to pause for one second.

9        Is this a -- sort of a compilation of different

10  videos of -- from Home Depot purchases?

11  A.   Yes.

12  Q.   And is the date visible sort of in the bottom of the

13  screen?

14  A.   Yes.  The date and time stamp.

15  Q.   This is a several-minute video.  I'm going to let it play.

16        (Video recording played in open court, 1:11 p.m. -

17  1:12 p.m.)

18  BY MR. SWEET

19  Q.   And what's the date on this one, please.

20  A.   This is May 21st.

21        (Video recording played in open court, 1:12 p.m.)

22  BY MR. SWEET

23  Q.   Where do we see Mr. Zuberi in this video?

24  A.   He's in the lower left portion (drawing).

25  Q.   And how about here?

1  A.   He's going to checkstand two, right in the center of the

2  video.

3  Q.   And here?

4  A.   The upper right cashier's station.

5        (Video recording played in open court, 1:13 p.m.)

6  BY MR. SWEET

7  Q.   And do you know what's on top of the -- on top of the

8  first item we see, on top of the other two?

9  A.   Yes.  That's consistent with the Styrofoam soundproofing

10 board that we located in the garage.

11 Q.   And below that, it says R15?

12 A.   That is the fiberglass insulation that was located behind

13 the drywall.

14 Q.   And where would Mr. Zuberi be in this image?

15 A.   He's going to the lower left checkout station.  He's got

16 the OSB strand board.

17 Q.   So OSB strand board, is that different than particle board

18 or plywood?

19 A.   It's a board made of composite wood that's glued together.

20 Q.   And here?

21 A.   Dead center, he's on station two with some insulation and

22 two-by-fours.

23 Q.   And that's June 24th?

24 A.   June 24th.

25 Q.   And what's the date on this one?

1   A.   June 25th.

2   Q.   So when we see R15, it says -- it says -- sorry --

3   Thermafiber R15?

4   A.   Yeah.  The R rating is -- from my research, is an

5   insulation rating, but it can also be associated with a

6   soundproofing rating.  But, generally, it's a thermal

7   protection rating.

8   Q.   And what's the date on this one?

9   A.   This is 6-29 of -- at 7:52 p.m.

10  Q.   And the date on this one?

11  A.   6-30.

12  Q.   Where's Mr. Zuberi?

13  A.   He's in the lower left, check station one.

14  Q.   So this is also June 30th?

15  A.   June 30th, yes.

16  Q.   And where is he here?

17  A.   He is in the lower left self-checkout station.

18  Q.   And -- I don't know -- can you see the date on that one?

19  A.   It is June 30th.

20  Q.   What's the date on this one?

21  A.   That is July 2nd.

22  Q.   Almost done.  Is this also -- this is July 2nd?

23  A.   Yes, also July 2nd.

24  Q.   All right.  That's finished.

25           What I'd like to do is I'd like to turn to some of

1  the actual -- just some records received.

2           MR. SWEET:  Can we take a look at -- pull up

3  Exhibit 352, please.

4  BY MR. SWEET

5  Q.   Did Home Depot provide quite a few receipts?

6  A.   Yes.

7  Q.   So we're not going to run through all of them, but let's

8  go back for just a second and -- just in terms of when this is

9  taking place.  I'm going to put up the board, but we're going

10  to keep 352 up on the screens.  And I'm going to put up on the

11  board Government's Exhibit 510.

12           And so let's take a look -- so 352, page one, what is

13  the -- what is the date on that receipt?  Let's just -- let's

14  zoom in -- 'cause I know it's small, let's zoom into the top

15  part.  So does each receipt show a date?

16  A.   Yes.

17  Q.   All right.  So this one is?

18  A.   April 14th at 12:59 p.m.

19  Q.   Okay.  And let's go back out.  And then let's zoom in on

20  the purchase itself, the amount.

21           Okay.  So tell us some of the information we're --

22  let's start -- is there a customer's name on here?

23  A.   Yes.

24  Q.   All right.  Could you circle that, please.

25  A.   (Witness complied.)

1  Q.  All right.  So this is the April 14th of 2023.  Tell us

2  what this is for.

3  A.  It is for 8-by-8-by-16 concrete home -- or HW blocks, a

4  quantity of 76, with a unit price of $1.87.

5  Q.  All right.  Total of?

6  A.  $134.52.

7  Q.  Let's go to the next page, please.

8       Okay.  And let's get into the purchases.

9       And, sorry, I -- let's back out for one second.

10      Special Agent Gluesenkamp, can you give us the date

11  on this?

12  A.  May 17th at 2:52 p.m.

13  Q.  And just the three purchases.

14      And the purchases, please.

15  A.  There's an Anvil smooth rod ten-ounce caulk gun; hex wire

16  netting; and 8-by-8-by-16 concrete blocks, 12 count.

17  Q.  Was a caulk gun found on the workbench?

18  A.  Yes.  There was a caulk gun on the workbench.

19  Q.  Let's skip ahead.  And these are all in evidence.  They're

20  Government's Exhibit 352.  Let's skip ahead to a purchase --

21  it's page five.

22      And let's take a look at the top part, and let's get

23  the date, too, please.

24      Okay.  Start with when this is.

25  A.  This is on 5-24 at 2:12 p.m.

1  Q.   And more concrete blocks?

2  A.   More concrete blocks, 76 concrete blocks.

3  Q.   $135?

4  A.   Yes.

5  Q.   Let's go to the next one.

6       Date, please.

7  A.   It is May 28th at 1:48 p.m.  And it is a 106 concrete

8  blocks.

9  Q.   $187 and change?

10 A.   Yes.

11 Q.   And just in terms of timing, actually, so AV-2, what was

12 the date, please.

13 A.   May 6th.

14 Q.   And the one we just talked about, the one we're talking

15 about now is May 28th?

16 A.   Yes.

17 Q.   The one we talked about before, was that May 24th?

18 A.   Yes.

19 Q.   Let me ask it this way.  Was there a lot of activity in

20 the weeks and month, month and a half after AV-2?

21 A.   There was a flurry of purchases after AV-2.

22 Q.   So we're going to move ahead.  Let's take a look at page

23 ten.

24       And, all right, what's the date here, please.

25 A.   5-29 at 5:46 p.m.

1    Q.   And what -- what are the purchases for?

2    A.   It's a three-fourths by 14 and one-and-two-fourths EPS

3    poly insulation, six pack; Thermafiber fire/sound guard; and

4    R -- again, R15 Thermafiber sound guard.

5    Q.   And the -- and so those packs of Thermafiber sound guard

6    are almost $67 each; is that correct?

7    A.   Yes.

8    Q.   I'd like to skip ahead to -- let me ask this.  Was there a

9    lot of sound guard purchased?

10   A.   Yes.

11   Q.   Let's go to 624 -- sorry.  Page 12.

12        And can you -- if I don't zoom, are you able to see

13   the date?

14   A.   Yes.

15   Q.   All right.  Date, please.

16   A.   6-24 at 3:48 p.m.

17   Q.   First item at the top?

18   A.   Is R15 Thermafiber sound guard.

19   Q.   Next page, date?

20   A.   6-25 at 7:21 p.m.

21   Q.   First item?

22   A.   Thermafiber sound guard.

23   Q.   Page 15, please.

24        Date?

25   A.   6-30 at 12:03 p.m.

1    Q.   Second item?

2    A.   Concrete block.

3    Q.   I'd like to go to page 18, please.

4         What's the date on this, please.

5    A.   July 2nd, 3:18 p.m.

6    Q.   What is -- what is the third -- the middle item, could you

7    zoom in on that, 32?

8         What is that?

9    A.   32 light/sound reducing INT.

10   Q.   Do you know what that is?

11   A.   I don't know for certain, no.

12   Q.   And then last one.

13        Same -- what's the date?

14   A.   July 2nd, 3:28 p.m.

15   Q.   Sorry.  We'll zoom in on the time.  I think you're -- can

16   you look at the time, just -- I think you said 3:28?

17   A.   Excuse me.  3:29.

18   Q.   So just basically ten minutes after the last purchase?

19   A.   Yes.

20   Q.   All right.  And the only item?

21   A.   Defiant ABZ deadbolt double cylinder.

22   Q.   What was the brand of the deadbolt in the metal security

23   door?

24   A.   Defiant.

25   Q.   And the key that was in the ammo can?

1  A.   Defiant.

2  Q.   I'd like to move on -- thank you -- to a different area.

3       I want to turn towards the trailer.  And I am going

4  to ask what was it -- was there an audio recording that the FBI

5  listened to that prompted more follow-up regarding the trailer?

6  A.   Yes.

7       MR. SWEET:  Let's play Government's Exhibit 461,

8  please.

9  BY MR. SWEET

10 Q.   Who is this call between?

11 A.   This is a call between Mr. Zuberi and Ms. Alycia Westfall.

12 Q.   And the date?

13 A.   July 23rd of 2023.

14 Q.   So this is obviously after -- after Mr. Zuberi was

15 arrested in Reno?

16 A.   Yes.

17 Q.   And there should be -- there's a transcript up of -- on

18 your screens.  I'm just going to -- just so people know what

19 they're listening to, from AAA Discount Storage, what was the

20 code?  Were you in court when Ms. Maxwell testified regarding

21 the code?

22 A.   Yes.

23 Q.   And are you familiar with what the code actually says on

24 the paperwork for AAA Discount Storage?

25 A.    Yes.

1    Q.    Okay.  And what did it say on the paperwork for the --

2    A.    It was star 2135 pound -- 53 pound.  Excuse me.

3    Q.    Okay.  Just say it.  2?

4    A.    Star 2153 pound.

5    Q.    And that's the gate access code?

6    A.    (No audible response.)

7               MR. SWEET:  Let's play it.

8               (Audio recording played in open court, 1:26 p.m. -

9    1:27 p.m.)

10   BY MR. SWEET

11   Q.    Okay.  And were there multiple calls -- were there

12   multiple calls -- well, let me --

13              (Whispered discussion, off the record, 1:28 p.m.)

14   BY MR. SWEET

15   Q.    Oh, let me rephrase this.  We're going to play another

16   portion of this call.  Go ahead.

17              (Audio recording played in open court, 1:28 p.m. -

18   1:29 p.m.)

19   BY MR. SWEET

20   Q.    So did that prompt follow-up regarding the trailer?

21   A.    Yes.

22   Q.    Give the jury an overview of what was done.

23   A.    When we heard the call, we didn't immediately associate

24   those numbers to the paperwork.  We just had a high volume of

25   evidence at the time.  One of the agents in the office had just

1  rented a storage locker 'cause they were in the process of a

2  move, and they said that sounded just like they had a -- their

3  code for their storage facility.  And that prompted us to go

4  back and look at the paperwork.

5  Q.  Then, after you looked at the paperwork, what happened?

6  A.  After we confirmed it matched the paperwork, we then began

7  the investigation by contacting AAA Discount Storage to affirm

8  there was still something rented there.  And then Detective

9  Loudermilk went out there and observed the trailer parked in

10  the assigned spot.

11  Q.  Did you seek -- did you obtain a federal search warrant

12  for the trailer?

13  A.  Yes.

14  Q.  And the trailer, just -- I've got a different map up.

15  That's fine.

16          The trailer was at what location?

17  A.  AAA Discount Storage.

18  Q.  And when did you execute that search warrant?

19  A.  I believe it was the 28th of July.

20          MR. SWEET:  Let's pull up Government's Exhibit 291,

21  please.

22          Let's go to 290.  I'm sorry.

23  BY MR. SWEET

24  Q.  Okay.  What are we looking at here?

25  A.  That's the trailer parked in spot -- the RV spot where it

1  was assigned.

2  Q.   And the next photo, a couple different angles.

3        And what's the -- what is the name on the back of the

4  trailer?

5  A.   Prowler.

6  Q.   Okay.  And was that -- was that consistent with a folder

7  that was found at 1336?

8  A.   It was, but we did not know about that at the time.

9  Q.   Do you know about it now?

10  A.   I do.

11  Q.   And did the folder say something along the lines of

12  Prowler trailer --

13  A.   Yes.

14  Q.   -- written on it?

15        All right.  Next one, 290-3.

16        Okay.  And 290-4.

17        Okay.  So I want to talk about -- let's go to 291.

18  I'm just going to move through -- did you take a lot of -- were

19  a lot of photos taken from the search of the trailer?

20  A.   Photos and video.

21  Q.   So 291-1, just generally, what are we looking at here?

22  A.   This is just after I breached the door.  I had to use a

23  tool to pry open the door since we did not have a key.  And

24  this is the first photo taken before we even walk into the

25  facility, and that's exactly how it looked.

1  Q.   All right.  Next, 291-2.

2           All right.  And here?

3  A.   This is just a side angle looking into the entrance of the

4  trailer.

5  Q.   So I'd like you to --

6           MR. SWEET:  Let's zoom in on just even maybe --

7  BY MR. SWEET

8  Q.   Okay.  What are we seeing here?

9  A.   From the outside we saw a backpack that was interesting,

10  and then we very quickly saw a yellow and black Taser on top of

11  the bench.

12  Q.   Why was that of significance to you?

13  A.   The Taser had not been located at this time, and it was an

14  item of evidence that we were diligently looking for.

15  Q.   And we talked about LandAirSea trackers, the one-third

16  size hockey puck items.  What -- did you find those in the

17  trailer at this time?

18  A.   No.

19  Q.   Did you -- how did you later become aware of where they

20  were?

21  A.   When we first searched the trailer, we weren't aware of

22  those at the time, and it wasn't something we were particularly

23  looking for.  We were -- we didn't know exactly what they

24  looked like, I guess I should say.  We knew of it, but not what

25  they look like.  And in the review of the photos we took, we

1  then located them in the photos that we took during this day.

2  Q.   And, just generally, where were they located?

3  A.   They were located inside of this little storage cubby

4  (drawing).

5  Q.   And did another FBI agent more recently seize those from

6  the trailer?

7  A.   Yes.

8  Q.   And where was the last data point that those LandAirSea

9  trackers generated?

10  A.   It was at the AAA Discount Storage facility.

11  Q.   All right.  Let's go to the next photo.

12          All right.  So what are we seeing here?

13  A.   This is the briefcase or satchel that has a significant

14  amount of paperwork.  You can see the Taser located in the

15  center (drawing).  There's a Taser cartridge here (drawing), a

16  magazine for a handgun (drawing), a holster (drawing) for a

17  handgun (drawing), a holster for a magazine (drawing).  This is

18  a knife case (drawing).  And then underneath here is handcuffs

19  (drawing), black handcuffs.

20  Q.   And just because we will later talk about it, can you just

21  zoom in on this part?  I don't think it'll be today, but can

22  you read what that says?

23  A.   "Brush Bubbles Herbal Toothpaste."

24  Q.   All right.  We'll bring that up at a different point.

25          Did you take -- you said you took a video of going

1  through the trailer?

2  A.   Yes.  One of the other agents did.

3       MR. SWEET:  All right.  I believe that is 293.  Let's

4  play that.

5       (Video recording played in open court, 1:34 p.m.)

6       MR. SWEET:  And, actually, I'm going to pause for one

7  second.

8  BY MR. SWEET

9  Q.   Just tell us what you're doing as you're taking this

10  video.  What is the purpose of this video?  What are you doing?

11  A.   We're documenting the scene.  Because there was so much

12  stuff piled at the entry, we couldn't take the video until we

13  got in.  We very quickly identified pieces of evidence right in

14  the doorway, and so we removed those before we came in to take

15  the video.

16  Q.   All right.  We'll just let you narrate as it goes through.

17  A.   This is looking towards the back of the bathroom.  That is

18  the kitchen area.  That is the bedroom area.  That is a side

19  door.  That is a corner.

20  Q.   Let's pause right there.

21       Later on, was there a photo located in Mr. Zuberi's

22  iCloud account?

23  A.   Yes.

24  Q.   And what did -- did it appear to show Mr. Zuberi in the

25  trailer?

1    A.    Yes.

2    Q.    Okay.  Well, let's keep going.

3    A.    That's the entryway, the kitchen galley area.  And this is

4    the bathroom area.

5          MR. SWEET:  Let's go to 294.  Actually, I'm sorry.

6    Let's go to 392.

7    BY MR. SWEET

8    Q.    So I asked you about photos from an iCloud account

9    associated with Mr. Zuberi.  Did those appear to be of the same

10   trailer?

11   A.    Yes.

12   Q.    This is Exhibit 392-1.  Let's go to the next one.

13         All right.  What does that appear to show?

14   A.    It's a reflection photo of Mr. Zuberi.

15   Q.    Okay.  Thank you.

16         And 392-3.

17   A.    This is another photo located on the iCloud.  It's just

18   looking back towards the bedroom.

19   Q.    Dash four.

20         (Whispered discussion, off the record, 1:37 p.m.)

21   BY MR. SWEET

22   Q.    And, Special Agent Gluesenkamp, an iCloud account, will

23   that be addressed in more detail later by another agent?

24   A.    Yes.

25   Q.    All right.  Let's go back to where we were, which I

1  believe was 294.  So we're going to go back to the search of

2  the trailer.  What -- tell us -- tell us what you're seeing.

3  A.   So this is -- we've opened the door.  And this is, I guess

4  you could say, like the third or fourth photo in our sequence,

5  is that this is the evidence -- or the pile of evidence as we

6  located it.  So we took a photo from above to capture what it

7  looked like as it was deposited in the trailer.

8  Q.   And what does it appear to be on top, sort of the gray

9  thing with the blue -- with the blue other side?

10 A.   That's a sleeping bag.

11 Q.   And the dark navy blue on top?

12 A.   This is the -- like a black sheet.  And I'll just kind of

13 circle the sleeping bag so we know what we're talking about

14 here (drawing).

15 Q.   And when you're finding, I mean, a dark-colored sheet, did

16 that have any significance to you?

17 A.   Yes.  It was an outstanding item that had not been located

18 that was described by AV-1.

19 Q.   And, generally speaking, what did she describe?

20 A.   She described a black sheet being placed on top of her.

21 Q.   All right.  Let's go to the -- 295.

22         And let's just -- okay.  Let's go to -- and I'll let

23 you call out if you see something you want to highlight.  Oh,

24 actually, bottom -- right there.

25         What does that appear to be?

1    A.    That is a roll of tin foil.

2    Q.    Were there a lot of things that you were looking for in

3    this trailer?

4    A.    Yes.

5    Q.    Had AV-1 described tin foil?  Were you aware of --

6    A.    I was not aware at that time.  We did not have that

7    knowledge at this point.

8    Q.    Okay.  296.

9          297.

10         Okay.  What are we seeing here?

11   A.    That is the gun case on the bed that was identified as

12   Mr. Prentice's -- or Prentice Smith's.

13   Q.    And next, 298.

14   A.    Just a different angle.  You can see the gun case, the

15   satchel, and then the Taser that was located with the other

16   items.

17   Q.    299.

18         We'll keep going.

19         Next.

20         Okay.  Who's in this photo?

21   A.    That's a younger version of Mr. Zuberi and Ms. Alycia

22   Westfall.

23   Q.    Next.

24         And this?

25   A.    This was name change paperwork that was located inside of

1  that satchel bag.

2  Q.   And the name was?

3  A.   Justin Kouassi.

4  Q.   Being changed to?

5  A.   Negasi Ishaiah Zuberi.

6  Q.   Next.

7       Okay.  Next.

8  A.   More paperwork.

9  Q.   Okay.  What is 303?

10 A.   This was an item that was located pretty close to the

11 entryway.  This is a plastic bag.  And when we opened it up, we

12 could see, like, a crumbled-up paper towel, a crumbled-up

13 receipt and a used condom.

14 Q.   Was that -- the bag, and at least the used condom, sent --

15 were those items sent to the FBI for processing?

16 A.   Yes.

17 Q.   Is that the plastic bag that forensic scientist or

18 forensic examiner Stewart was discussing yesterday?

19 A.   Yes.

20 Q.   And will the condom be addressed later?

21 A.   Yes.

22 Q.   Let's go to the next one.

23       I want to highlight -- and if you can -- right in

24 just this part right here.

25       Okay.  Anything we're seeing there?

1  A.   Yeah.  It was an antenna.  It was just laying out there by

2  itself.  We had not located the device it was associated to at

3  this point.

4  Q.   All right.  Let's go to the next one.

5       Okay.  What's here?

6  A.   This is the Stoeger Condor shotgun.  It was wrapped up in

7  the sleeping bag.  And then we opened it, and we could see that

8  it was inside the sleeping bag.

9  Q.   Next.

10      That's the shotgun?

11 A.   That's just me holding the shotgun.

12 Q.   Next?

13 A.   Confirming it was loaded.

14 Q.   Okay.  So this was loaded then?

15 A.   Yes.

16 Q.   Next.

17 A.   These are the antenna devices.  They were actually located

18 in a black mesh backpack that was underneath that sleeping bag.

19 Q.   And do we kind of see -- does it look like that black --

20 is that black mesh bag kind of in the top right of that photo?

21 Or maybe --

22 A.   It could be.  It's tough to say.

23 Q.   Sure.

24 A.   I don't have a lot of clarity.

25 Q.   Okay.  Next.

1    So -- and I do want to be clear.  So those items were

2    in -- those two -- do you now know them to be cell jammers?

3    A.    Yes.

4    Q.    Those were in a black mesh backpack?

5    A.    Yes.

6    Q.    And this?

7    A.    This was the bolt-action rifle and an AR-style rifle.

8    They were both located inside of a gun case.

9    Q.    All right.  And are those the same items that Mr. Smith

10   identified as being his today?

11   A.    Yes.

12   Q.    Next.

13         Okay.  I know we've talked about this photo.  Let's

14   just zoom in on that shelf area right in there.

15         Okay.  What are we seeing kind of towards the back?

16   A.    These are the two LandAirSea GPS devices.

17   Q.    Not noticed at that time and not seized at that time,

18   correct?

19   A.    Correct.

20   Q.    All right.  This?

21   A.    That is tin foil and some tape.

22   Q.    Next.

23   A.    That is the Taser device that was found on the -- in the

24   entryway bench.

25   Q.    So was a cartridge -- was one of the cartridges in it at

1  the time?

2  A.   I don't recall.

3  Q.   Let's take a -- let's take a look at the next photo.

4  A.   Yes, it was.  We had just removed it.

5  Q.   And the next photo.

6  A.   Just another angle of it.

7  Q.   Next.

8       And these?

9  A.   These are the two pairs of handcuffs that were found

10  underneath the handgun holster.

11  Q.   Okay.  So these were -- when you walk into the trailer,

12  can you describe -- just to be clear, where were those, as soon

13  as you step in?

14  A.   As soon as you step in, immediately to your right there

15  was a small, like, coffee table bench area.  There was a laptop

16  computer.  And on top of that was the Taser, knives, handgun

17  holster, handcuffs and the spare Taser cartridge.

18  Q.   And I think you circled a pair of black handcuffs in the

19  photo.  Were they both located together?

20  A.   Yes.  Yeah.

21  Q.   Next, please.

22       And this one?

23  A.   This is the items of the black mesh backpack laid out.

24  These are all the items that were inside of that backpack.

25  Q.   So I know the jurors have seen the cell jammers.  On the

1  right side, it's a -- it's a little bit hard, but -- so I'm

2  sorry.  Backpack.  What's to the right side of the photo?

3  A.   Right here (drawing) is an unopened box of handcuffs.

4  Q.   And then black gloves and a beanie?

5  A.   Yes.

6  Q.   Next.

7       Oh, actually, one thing.  And in that backpack --

8  let's kind of zoom into that pouch area -- were there -- well,

9  it doesn't come out very well.  Were there some items in that

10 pouch?

11 A.   Yeah.  I believe there was a second cigarette lighter

12 plug-in device.  It had some small antennas on it as well.

13 Q.   Let's just grab that really fast.

14      Okay.  I'm going to just show you what's marked as

15 Government's Exhibit 343.  And what is that, please.

16 A.   This is the other antenna device that was located inside

17 the backpack.

18 Q.   And do we have -- will someone from the FBI be addressing

19 what this is?

20 A.   Yes.

21 Q.   Do you know, generally speaking, what it is?

22 A.   It was a jammer.

23 Q.   A jammer for what?

24 A.   I believe it was cell phone.  I can't remember if it was

25 cell phone or Wi-Fi.  I don't recall which.

1  Q.  Okay.  So we'll get that then from the expert.

2  A.  Yeah.

3  Q.  And next, please.

4       Okay.  So just looking at that backpack, a little

5  more visibility, too, is there -- are there some other items

6  visible in that backpack?

7  A.  Yeah.  There was spare antennas.  As you can see on the

8  larger device, some of the antennas had fallen off.  And they

9  were, like, loose inside the backpack.

10 Q.  Next.

11      Just a close-up?

12 A.  Yeah.

13 Q.  Next.

14      Next.

15      Oh, I'm not calling out exhibit numbers.  Sorry.  I'm

16 at 316.  I did one, two, and this is three.

17      Next, 317.

18      Next, 318-1, holsters?

19 A.  Yes.  Holster and then magazine holster.

20 Q.  Dash two?

21 A.  More holsters, more magazine holsters.

22 Q.  318-3?

23 A.  The AR-15.

24 Q.  So that's 319-1.

25      And then to the next one, 319-2.

1            I'll just keep going.  319-3 and 319 -- actually,

2    could we -- and let's just -- let's see.  It's upside down.

3            Okay.  And keep going.  319, dash -- 320.

4            Okay.  And what's this?

5    A.   This is the bolt-action .308 rifle.

6    Q.   And the next photo.

7            And the next.

8            And this?

9    A.   That is the Stoeger shotgun.

10   Q.   All right.  Next, 321-1 and 321-2.

11           Okay.  And 321-3.

12           322.

13           And these?

14   A.   These were some loaded magazines that were found in that

15   same area.

16   Q.   322-2.

17           322-3.

18           322-4.

19           So, Special Agent Gluesenkamp, is Special Agent

20   Giovanetty going to talk about ammunition found in the trailer

21   and ammunition found in the garage and ammunition found in the

22   bedroom?

23   A.   Yes.

24   Q.   And is he going to talk about differences, similarities,

25   calibers?

1  A.   Yes.

2  Q.   And then let's go to 323, please.

3       What's this?

4  A.   It's a rifle magazine.

5  Q.   Dash two.

6       Was it loaded?

7  A.   Yes, it was loaded.

8  Q.   And it looks like -- what's the -- the top left, would

9  that be a green tip?

10  A.   Yeah.  It's a standard M855 green tip ammunition.  And the

11  one on the right is a different kind of ammunition.

12  Q.   And dash three?

13  A.   And that's the magazine unloaded.

14  Q.   And 324?

15  A.   Those are the two rounds I removed from the shotgun.

16  Q.   325, what's this?

17  A.   This is a charcoal toothpaste with toothbrush.

18  Q.   All right.  We'll come back to that later.

19       326.

20       Okay.  So let's zoom in -- well, let me ask -- could

21  you tell us, generally, what are we looking at here?

22  A.   This was the contents of the gun case.  These were all the

23  peripheral items -- excluding a sling, these are the peripheral

24  items that were in the gun case, that black gun case.

25  Q.   All right.  Let's go to 327.  I think there's a -- okay.

1    MR. SWEET:  Can you just zoom in on the top part?

2    BY MR. SWEET

3    Q.   All right.  Who is that billed to?

4    A.   Prentice Smith.

5    Q.   All right.  From Bear Creek Arsenal?

6    A.   Yes.

7    Q.   Okay.  And next one, please -- well, actually -- okay.

8    Let's go back for -- actually, back to -- one more.  And that,

9    326.

10   Okay.  Let's zoom in on this box lid.

11   Okay.  So we will take a look -- we will talk about

12   that -- we'll talk about that later, that Remington lid.

13   Okay.  Let's back out of that.

14   And 380 -- well, had you seen a -- let me ask you:

15   At this point -- at this point you hadn't found a video of

16   Mr. Zuberi from Washington walking around the trailer; is that

17   correct?

18   A.   No.

19   Q.   I want to talk for a second about some things that -- that

20   you hadn't found yet.  Were there items that you were looking

21   for that you still hadn't found?

22   A.   Yes.

23   Q.   Okay.  At this point, AV-1's phone, had that been found?

24   A.   No.

25   Q.   Did you search the trailer before the Honda Pilot was

1    searched?

2    A.    Yes.

3    Q.    Her shoes?

4    A.    No, never located them.

5    Q.    Did you ever find her shoes?

6    A.    Never found them.

7    Q.    Did you ever find the Taser she described?

8    A.    No.

9    Q.    Or pepper spray?

10   A.    No.

11   Q.    So let's talk for just a second --

12              (Whispered discussion, off the record, 1:52 p.m.)

13   BY MR. SWEET

14   Q.    And the Taser -- so do you recall she described having a

15   Taser similar to some form of makeup?

16   A.    Yeah, like a lipstick-type Taser.

17   Q.    Let's -- let's talk about -- we have an overview of some

18   items.  This is 518.  I just kind of want to run through some

19   of the items that were found.

20              MR. SWEET:  Could you pull it up on the screen,

21   please, as well.

22   BY MR. SWEET

23   Q.    So let's just start at the bottom right, those three

24   items.  Let's start with the ones with the spikes.  Those

25   are --

1    A.    Those are the jammers.

2    Q.    Okay.  And those were located where?

3    A.    In the trailer in a black mesh backpack.

4    Q.    And then that little one was located in the trailer as

5    well?

6    A.    Yes.

7    Q.    And then bottom left?

8    A.    That is the Taser.

9    Q.    Located where?

10   A.    It was inside the trailer.

11   Q.    And the upper right?

12   A.    That is the Springfield XD handgun.

13   Q.    From where?

14   A.    That was seized from AV-1.

15   Q.    And then the handcuffs.  Now, are those handcuffs from

16   multiple locations?

17   A.    Yes.

18   Q.    Let's start with the ones that are sort of the most

19   distinct.  The silver ones, where were those found?

20   A.    Those were found in the trailer.

21   Q.    Okay.  And was one of the pair of black ones found as

22   well?

23   A.    Yes.

24   Q.    Okay.  And I should say that -- the short-chain black

25   handcuffs.

1          And -- and then the leg irons found where?

2     A.    Those are found on the bench by KFPD, or the table, right

3     outside of the cell.

4     Q.    And another pair of short-chain handcuffs?

5     A.    Also found on that same spot.

6     Q.    And then we saw an unopened box kind of spread outside.

7     Was there an unopened box of handcuffs found in the trailer?

8     A.    Yes.

9     Q.    Okay.  And then for this photo have they been removed and

10    put out here?

11    A.    I believe so, yes.  I didn't make this photo.

12    Q.    Okay.  So -- and then looking at the handcuffs closely,

13    are you able to see that -- differences between the new ones

14    and the ones that aren't new?

15    A.    Yes.  The new ones appear to have the keys attached to

16    them.  And they're very shiny, like they haven't been handled

17    or tarnished by hand grease.

18    Q.    Do they look pretty clean?

19    A.    Yes.

20    Q.    Let's zoom in on the bottom two.

21          And let's zoom in on the top.

22          Okay.  After the search of the trailer, what was the

23    next significant step that the FBI took?

24    A.    The next was the search of the Honda Pilot.

25    Q.    So we're going to have another agent discuss that in more

1    detail, but there are a few things I wanted to ask you about,

2    just so that you can connect those.

3              Let's go to 207-2.

4              Okay.  We talked about this earlier.  What is this?

5    A.   This is the Dollar Tree receipt for the cleaner bleach

6    trigger that was located inside of the Honda Pilot.

7    Q.   And 228, please.

8              And what is this?

9    A.   This is tin foil.

10   Q.   And 204-1.

11             What part of the car is that?

12   A.   That's like the little sunglass holder that some cars have

13   right above the rearview mirror.

14   Q.   And which vehicle is this?

15   A.   Honda Pilot.

16   Q.   And 218.

17             What is this?

18   A.   Those are the keys to the Nissan Altima.

19   Q.   And do you know where those keys were found?

20   A.   They were found inside the Honda Pilot.

21   Q.   And there's a key with sort of a circle to it at the top.

22   Are you able to see what that is?

23   A.   Yes, that's a handcuff key.

24   Q.   Were there additional receipts from -- were there receipts

25   from Home Depot purchases found in the Honda Pilot?

1    A.    Yes.

2    Q.    In Mr. Zuberi's house?

3    A.    Yes.

4    Q.    And the Nissan Altima?

5    A.    Yes.

6    Q.    I'd like to -- I'd like to finish up just with some

7    physical items.

8          Okay.  Mr. Lichvarcik is carrying Government's

9    Exhibit 116.  What is this, please.

10   A.    That is the white chair that was located inside the

11   cinderblock structure that was seized by Klamath Falls Police

12   Department.

13   Q.    Government's Exhibit 340?

14   A.    That is one of the jammers, which the FBI seized from the

15   trailer.

16   Q.    341?

17   A.    One of the jammers the FBI seized from the trailer.

18   Q.    334?

19   A.    The black and yellow Taser FBI seized from the trailer.

20   Q.    Absent the cartridge, correct?

21   A.    Absent the cartridge.

22   Q.    108?

23   A.    That is a police patch that was seized by Klamath Falls

24   Police Department from the master bedroom at 1336 North

25   Eldorado.

1  Q.   Well --

2  A.   I'm aware there's two of them in there, yeah.

3  Q.   So there's more than one in here?

4  A.   Yes.

5  Q.   (Counsel indicating.)

6  A.   Yes.

7  Q.   All right.  108.

8        335 and 336?

9  A.   That is a pair of black and one pair of silver handcuffs

10 that were seized from the trailer.

11 Q.   Will we be talking more in particular about the silver

12 pair?

13 A.   Yes.

14 Q.   In relation to who?

15 A.   AV-2.

16        MR. SWEET:  Thank you.  Nothing further.

17        THE COURT:  Cross.

18                    CROSS-EXAMINATION

19 BY MR. BERTHOLF

20 Q.   I got a couple questions.  Did AV-1 ever claim to have

21 been taken anywhere in Vancouver?

22 A.   No.

23 Q.   The P.O. box, the 2800 Lombard, in Portland --

24 A.   Yes.

25 Q.   -- that was investigated?

1   A.   Yes.

2   Q.   And Mr. Zuberi was still the renter of record when that

3   was investigated in late July?

4   A.   I believe so, yes.  It's been a while since I've looked at

5   those records.

6   Q.   So it was a legitimate address for Mr. Zuberi in late

7   July?

8   A.   Yes.

9   Q.   Okay.  And this is -- we've got a couple of exhibits we

10  want to look at.

11       So you talked a little bit -- you've got a little

12  construction experience, I think you said?

13  A.   Just tending to my home, yes.

14  Q.   Yeah.  Handyman-type stuff?

15  A.   Yes.

16  Q.   So have you built -- have you put together, like, a wall

17  in any -- at any time?

18  A.   I used to build fairly regularly for my parents, stacked

19  block -- or outdoor landscaping block walls for them.  I've

20  built actually a couple of those.

21  Q.   Okay.  But I'm talking like a framed two-by-four.  Do you

22  know anything about that at all?

23  A.   I've framed my garage for drywall, but I haven't built --

24  I haven't used masonry cinderblocks before.

25  Q.   Okay.  I'm not even going to go into that one.

1    A.    Okay.

2              MR. BERTHOLF:   If we could bring up Exhibit 159.

3    BY MR. BERTHOLF

4    Q.    So what are we looking at here in Government's Exhibit

5    159?

6    A.    This is -- the drywall has been removed, and this was what

7    was beneath the drywall.  And you can see vertical two-by-fours

8    and then insulation in between it.

9    Q.    Okay.  And the insulation, if I remember correctly, this

10   is that sound stuff from Home Depot?

11   A.    Yes.  The sound -- I don't remember the exact name, but

12   yes.

13   Q.    But in the name of the insulation --

14   A.    Yes.

15   Q.    -- it included sound?

16             It's got a soundproofing quality to it?

17   A.    Yes.

18   Q.    Okay.  I want to look at the two-by-fours here.  Near the

19   top, it looks like there's a gap?

20   A.    Yes.

21   Q.    Can you -- tell us what you're seeing there.

22   A.    The -- a smaller two-by-four appears to be placed on top

23   of another two-by-four.

24   Q.    Okay.  If you were -- when you were framing your garage,

25   is that something that you would've done?

1    A.    No.

2    Q.    And why not?

3    A.    It's not sturdy.

4    Q.    Okay.  Now, looking at this -- and, actually, this is

5    going to be perfect for the next part, too, so -- okay.

6          Those two-by-fours that we're seeing there with the

7    insulation between them, are they attached to the concrete

8    blocks?

9    A.    I never fully investigated that.  I don't know for certain

10   if they were attached to the concrete blocks.

11   Q.    Okay.  Did it look to you -- do you see anything in this

12   photograph that would indicate anything that would be attaching

13   to the concrete?

14   A.    No.

15   Q.    Did you ever see any adhesive attaching the two-by-fours

16   to the concrete?

17   A.    No.

18   Q.    All right.  Let's go to the lower left of this photograph.

19   And that's the -- yeah.

20          So we're seeing the base of the doorway.  Are those

21   two -- do you recall if those two-by-fours were attached to the

22   flooring?

23   A.    Are you speaking of the ones that are in the doorway or

24   the ones that are actually the base of where the vertical

25   two-by-fours are attached to?

Q.    In the doorway itself.

A.    No, I don't -- I don't -- I don't recall specifically checking if they were attached to the floor or not.

Q.    It almost looks like it's the threshold to the doorway?

A.    Correct.

        MR. BERTHOLF:  Okay.  And can we go up a little bit on that?

        Yeah, right in the center there.  Perfect.

BY MR. BERTHOLF

Q.    So where in here is the -- where the deadbolt on that security screen door would be?  'Cause I'm struggling to see that.

A.    So it wouldn't visible from this angle because the -- the bolt is going to actuate -- it's going to actuate in this direction (drawing) in the photo.  So the hole should be somewhere in this vicinity (drawing) based on the heighth of the door.

Q.    Did we ever get a good photograph of that?

A.    No.

        MR. BERTHOLF:  Okay.  I think that's all I have. Thank you.

        THE COURT:  Okay.  Any redirect?

        MR. SWEET:  Let me pull up 355-1.

        Okay.  Let's -- kind of zoom in on these -- that there.

1    (Whispered discussion, off the record, 2:06 p.m.)

2                    REDIRECT EXAMINATION

3  BY MR. SWEET

4  Q.   Taking a look at the sort of leaning block in the back,

5  tell us what we're seeing there.

6  A.   You're referring to this one here (drawing)?

7  Q.   Yeah.

8  A.   It looks like a piece of wood is stuck to a series of four

9  or five cinderblocks.

10 Q.   And does that appear that it was affixed in some way?

11 A.   It appears so.

12 Q.   Did law enforcement find concrete anchors during the

13 searches?

14 A.   Yes.

15 Q.   I'll show you what's marked as 286, Government's Exhibit

16 286.  I'm going to have to have you read these.

17      All right.  Tell us what 286 are, please.

18 A.   These are Tapcon heavy-duty, 5-inch concrete screw

19 anchors.

20 Q.   What could those be used to do?

21 A.   These would be for drilling into concrete.  They're a

22 hardened heavy-duty screw or bolt.

23 Q.   Would those bind one thing to concrete?

24 A.   Potentially, yes.

25      MR. SWEET:  That's all I have.  Thank you,

1    Your Honor.

2              THE COURT:  All right.  Thank you very much.  You're

3    free to step down.

4              And we'll call our next witness.

5              MR. BOCCATO:  The Government calls Special Agent

6    Christopher Giovanetty.

7              THE COURT:  If you want to remain standing for just a

8    moment.

9              Raise your right hand.

10                   ***CHRISTOPHER GIOVANETTY***

11   Was thereupon called as a witness on behalf of the

12   Government; and, having been first duly sworn, was examined

13   and testified as follows:

14             THE COURT:  If you'd like to have a seat.

15             And, again, if you could state your full name and

16   spell your first and last name.

17             THE WITNESS:  Christopher Giovanetty;

18   C-h-r-i-s-t-o-p-h-e-r, G-i-o-v-a-n-e-t-t-y.

19             THE COURT:  Thank you.

20                        DIRECT EXAMINATION

21   BY MR. BOCCATO

22   Q.   Special Agent Giovanetty, where do you work?

23   A.   I'm a special agent with the FBI.

24   Q.   And how long have you been a special agent with the FBI?

25   A.   A little over two years.

1  Q.   What did you do before that?

2  A.   I was still working with the FBI before that.  I was on

3  the professional staff side.  I worked in human resources and

4  then our director of intelligence.

5  Q.   Do you have any degrees?

6  A.   Yes.  I studied at Embry-Riddle Aeronautical University in

7  Florida.  I have a bachelor's in homeland security and a

8  master's in cyber security management and policy.

9  Q.   And what are your current roles as a special agent?

10  A.   I'm a criminal investigator, focusing mostly on violent

11  crimes, violent crimes against children, domestic terrorism and

12  fraud-related matters.

13  Q.   Are you in the Medford office?

14  A.   I am, yes.

15  Q.   When did you first get involved in this case?

16  A.   It should be July 16th, which was a Sunday of that week,

17  right after Special Agent Gluesenkamp got the call, in the

18  hours after that.

19  Q.   And, more or less, you've been fairly involved with this

20  kind of throughout?

21  A.   Correct.  Yes.

22  Q.   And what are a few of the things you've done in

23  furtherance of this investigation?

24  A.   So I've helped in the execution of search warrants.  I

25  interviewed both victims, AV-2 and AV-1; helped draft subpoenas

1  and review subpoena returns; and reviewed electronic device

2  data and iCloud search warrant returns.

3  Q.   Were you present for the search of the Nissan Altima?

4  A.   Yes, I was.

5  Q.   And, roughly, when was that search?

6  A.   I believe that was on Tuesday, the 18th of July.

7  Q.   I'm showing you what's been marked as Exhibit 277.  What

8  is that?

9  A.   That is the Nissan Altima.

10 Q.   And who assisted you with that search of the Altima?

11 A.   So we requested FBI Portland to send down what's called an

12 evidence response team, which is a team of experts who are

13 trained more in detailed searches.  So they sent down a team of

14 agents and professional staff on that team and searched

15 materials.

16       So they helped conduct the search.  And I was the

17 case agent on standby with them, so I stood by while they --

18 they were the hands-on ones doing the search, with all the

19 special gear.  And I sort of pointed out what items we wanted

20 to retain and seize and which items we wanted to leave behind,

21 based on what was in the warrant.

22 Q.   What are some of the items you found in the Altima?

23 A.   We found Home Depot receipts corresponding with purchases

24 that looked like they could be related to the cinderblock

25 structure.  We found a receipt for AAA Discount Storage with

1  the rental contract that included the star 2153 password on it.

2  We found the concrete screws that Special Agent Gluesenkamp was

3  just able to identify and some digital device, like storage

4  mediums.

5  Q.   I'm showing you what's been marked as Exhibit 279.  Can

6  you identify this document?

7  A.   Yep, that's the rental contract.  And receipt, I believe,

8  was attached to it for AAA Discount Storage, which shows his --

9  I'll circle it -- his unit number, RV106, and the gate access

10 password with the star 2153 pound.

11 Q.   What's this page?

12 A.   This is the payment receipt, which corresponded with

13 the -- when he signed up for it, the first payment that was

14 made.

15 Q.   Is this just kind of a map of the area?

16 A.   Yep.  This is a map of the area that they provided with

17 him when he reserved it.

18        MR. BOCCATO:  And go to the next page.

19 BY MR. BOCCATO

20 Q.   And what does this show us?

21 A.   That is one of the receipts that was found in there.

22        MR. BOCCATO:  Okay.  And can we go to the next -- it

23 should be the last page.

24 BY MR. BOCCATO

25 Q.   And what is this?

1  A.   The receipt on the left.

2  Q.   And there we go.  What is this?

3  A.   I can't tell from this photo.  Some of the items, the

4  evidence response team took pictures of them in place and then

5  pulled them out.  So I might have seen it just in its full

6  form.

7  Q.   Was the AAA Discount Storage paperwork -- was it hard to

8  obtain?  Do you remember having to dig around for it?

9  A.   I don't recall where they found it from.  They had pulled

10  it out, one of the agents, and showed it to me.

11  Q.   Let's go to Exhibit 280.  What are these?

12  A.   We see in the door is one of the Home Depot receipts.  And

13  on the left, I believe, is the paperwork that shows the

14  ownership of the vehicle.

15        MR. BOCCATO:  All right.  Can we go to the next one?

16  BY MR. BOCCATO

17  Q.   Is that just a close-up picture of the Home Depot receipt?

18  A.   Yes.  And I can see on there it's Defiant ABZ deadbolt.

19  Q.   Next one.

20        And is that, again, just another photograph of that

21  same deadbolt receipt?

22  A.   Yes.

23  Q.   All right.  Let's go to Exhibit 281.

24  A.   This is another receipt.  This one shows 8-by-8-by-8 --

25  oh, 8-by-8-by-16 concrete HW block, four at $1.87.

1  Q.   All right.  That was also located in the Altima?

2  A.   Yes.

3       MR. BOCCATO:  And can we go to Exhibit 285?

4       Oh, actually -- sorry, let's go to Exhibit 282.

5  BY MR. BOCCATO

6  Q.   What are these?

7  A.   These are those Tapcon heavy-duty concrete screw anchors.

8       MR. BOCCATO:  And then can we go to Exhibit 283?

9  BY MR. BOCCATO

10 Q.   And what is this?

11 A.   So that is paperwork associated with the Honda.  And I

12 believe -- I believe some of it -- if you could zoom in for me

13 on the one on the bottom left.

14      Yeah, so that shows just repair work that was done

15 for it.

16 Q.   Thank you.

17      So I'd like to talk to you about some of the firearms

18 that were seized in the case.  And I want to start with the

19 firearm that AV-1 brought up from the -- that she stated she

20 seized from the Honda Pilot.

21 A.   Okay.

22      MR. BOCCATO:  Can we pull up Exhibit 438?

23 BY MR. BOCCATO

24 Q.   Can you tell us what's in this photograph?

25 A.   So this is the firearm that AV-1 recovered and turned in.

1   And these are the rounds of ammo that were inside.

2   Q.   What kinds of rounds of ammunition were located inside the

3   firearm?

4   A.   Sure.  So my notes -- there was a total of 19 rounds.

5   There were eight rounds of Blazer brand 9-millimeter Luger,

6   four rounds of Hornaday brand 9-millimeter Luger, four rounds

7   of NOVX 9-millimeter Luger, and four rounds of SIG 9-millimeter

8   Luger.

9   Q.   And, just so the jury's aware -- we're going to go through

10  the remaining pages of this exhibit -- but are these just the

11  same photos on the first page, but just individually?

12  A.   (No audible response.)

13         MR. BOCCATO:  Now, can we go to Exhibit 434-2?

14  BY MR. BOCCATO

15  Q.   And is this the serial number from the pistol?

16  A.   Yes, it is.

17  Q.   Now -- so I'm going to jump around a little bit, but we'll

18  get there.

19         MR. BOCCATO:  Can we go to Exhibit 155?

20  BY MR. BOCCATO

21  Q.   What is this a photo of?

22  A.   So this is a photo of some of the books that were on the

23  desk in the upstairs bedroom that we searched during the second

24  search of the residence.  The two books on the left -- I took

25  this picture -- are the Art of War and the 48 Laws of Power.

Q.   So you took this photograph?

A.   I took this picture, yes.

Q.   And this was during, I guess, the second search by the FBI of Mr. Zuberi's residence?

A.   Correct.

Q.   So, in addition to being involved in these search warrants, did you also review Mr. Zuberi's iCloud?

A.   I did.

Q.   And I know you're not an expert in iClouds, but can you just briefly explain to the jury what iCloud is?

A.   So iCloud is like a service that Apple provides that you can basically back up your files that are on your physical devices to their cloud data.  That way you can retrieve them later.  Most common use is if you have an iPhone, you back up your iCloud data.  If you were to lose your phone, you can buy a new iPhone and just download everything right back to it.

        You can choose the settings of how often this backs up.  So some people do it every night.  Some people, every couple of weeks.  So it just kind of depends.  But Apple basically retains a copy of most of the data that is on your phone at any given time, and that way you could just put it onto a new phone as needed.

Q.   Did you search Mr. Zuberi's iCloud pursuant to a search warrant?

A.   Yes, we did.

1   Q.   All right.  And there's a lot of -- we're going to talk a

2   lot more about the iCloud later.

3          MR. BOCCATO:  But can we pull up Exhibit 395?

4   BY MR. BOCCATO

5   Q.   Is there anything that struck you about -- and where did

6   you find this picture?

7   A.   So this was in the iCloud data associated with his

8   account.  And I believe it was taken, according to the metadata

9   on the picture, in December of 2022.  And it shows the

10  Springfield XDM firearm, which, if you zoom in, you can see the

11  serial number on it.  That matches the MG735197, which is the

12  one that AV-1 turned in.  And it is on top of the same two

13  books that were found in Mr. Zuberi's bedroom.

14  Q.   Now I want to jump ahead a little bit to -- I know I'm

15  jumping around a bit -- but to the search of the Honda Pilot.

16  When, roughly, did that occur?

17  A.    It occurred over about two or three days, just 'cause of

18  the length of time it took.  But it was August 2nd to

19  August 4th, I believe.

20  Q.   And were you present for that search?

21  A.    I was not.  Another agent from our office was there with

22  an evidence response team out of the Las Vegas field office.

23  Q.   Okay.  Was any ammunition or ammunition-related things

24  found?

25  A.    Two things.  We found a single round of 9-millimeter Luger

1    in the center console by the driver seat.  And then we found a

2    shell casing for another 9-millimeter round.  I believe it was

3    the Hornaday brand.

4    Q.   Ah --

5    A.   Shell casings -- sorry -- to clarify, means there was no

6    bullet in there.  It was a fired round that -- with no actual

7    bullet on the inside.

8    Q.   Let's pull up Exhibit 206.

9         I know it's probably quite hard to see that in there,

10   but can you circle the --

11   A.   Yes.  Right there (drawing), towards the middle, is the

12   one round of the Remington 9-millimeter Luger.

13   Q.   Oh, perfect.

14        All right.  And do you have Exhibit 242 with you?

15   A.   I do.

16   Q.   What type of ammunition is Exhibit 242?

17   A.   Yep.  It's got the RP head stamp, which, according to the

18   ATF, was the Remington brand 9-millimeter Luger.

19   Q.   Does that match at all, the Remington brand 9-millimeter

20   Luger, with any of the ammunition found anywhere else in this

21   case?

22   A.   Yes.  We found that same type of ammo -- let's see -- in

23   the search of the -- when the FBI searched the residence on

24   July 19th.  In the garage on the table there was a box, a

25   250-round box, but we found only 246 rounds of that same brand

1  of ammunition in there.

2  Q.   All right.  And let's talk a little bit about the spent

3  shell casing.

4          MR. BOCCATO:  Can we go to Exhibit -- it should be

5  224.

6  BY MR. BOCCATO

7  Q.   All right.  Is that a picture of where the spent shell

8  casing was located?

9  A.   Yes.  It's kind of like in the track hidden there.

10  Q.   So probably a pretty tricky place to retrieve it from?

11  A.   From my understanding, yes.

12  Q.   All right.  What kind of ammunition is that?

13  A.   This is the Hornaday brand 9-millimeter ammunition.

14  Q.   All right.  And where do we see Hornaday brand elsewhere

15  in this case?

16  A.   Yes.  So we seized 30 rounds of the Hornaday -- oh, my

17  bad.  That's the wrong one.  Excuse me.

18          It was --

19  Q.   Well, do we see -- is there some Hornaday rounds inside

20  the 9-millimeter pistol magazine from the Springfield pistol?

21  A.   Yes.  There were four rounds inside the pistol itself.

22  And when we searched the travel trailer, we found one round

23  there as well.

24  Q.   I'm just curious.  Did you also locate -- during the

25  search of the Honda Pilot, did they also locate AV-1's phone?

1    A.    Yes.

2    Q.    All right.  I'm showing you what's been marked as

3    Exhibit 237.  Do you -- did you have an opportunity to look at

4    this phone before today?

5    A.    Yes.

6    Q.    What purpose did you -- like, why were you looking at this

7    phone before today?

8    A.    We plugged it in, to turn it on and see what the home

9    screen was, and then show that to AV-1 so that she can tell us

10   if that is what her home screen looked like, based on the

11   picture.  And she identified it as her phone, based on the home

12   screen.

13   Q.    And where exactly was that -- or where was that phone

14   located?

15   A.    In the Honda Pilot.

16   Q.    And I want to take you back to Mr. Zuberi's bedroom.  We

17   heard earlier from Mr. Gluesenkamp that there was a -- or

18   Special Agent Gluesenkamp -- that there was an empty pistol

19   case inside of that bedroom.  Tell us a little bit about any

20   ammunition located there.

21   A.    Sure.  So when the FBI searched -- oh, actually, the FBI

22   didn't seize any of the ammo from the bedroom.  That was all

23   seized by Klamath Falls Police Department during the first

24   search.  They seized a green metal ammo can that had 289 rounds

25   of 5.56 ammunition, one round of Hornaday 6-millimeter

1   ammunition, one round of 7.62 ammunition.

2           Then they also found another ammo box that had 120

3   rounds of 5.56 rifle ammunition; and then, separately, three

4   boxes of shotgun ammunition:  One with ten rounds of 12-gauge,

5   one with four rounds of 12-gauge, one with four rounds of

6   12-gauge.

7           MR. BOCCATO:  Can you pull up --

8   BY MR. BOCCATO

9   Q.   We're going to pull up Exhibit 440, please.

10          What is this exhibit showing us?

11  A.   So these are the two ammo cans that were found by the

12  Klamath Falls Police Department in the bedroom.

13  Q.   I'd like to show these to you.  Can you identify this item

14  for us?

15  A.   This is item -- Exhibit Item 106.

16  Q.   And what is Exhibit Item 106?

17  A.   This is one of the -- one of the ammo cans that was found

18  inside the bedroom.

19  Q.   Special Agent Giovanetty, what is this item?

20  A.   This is Item 104.  It's the other can that was found

21  inside the bedroom.

22  Q.   I'm going to take these separately 'cause that one's open.

23          So what were the -- again, the types of ammunition

24  located?

25  A.   So in there we found -- between the two of them there was

1    5.56 rifle ammunition, 6-millimeter ARC rifle ammunition, 7.62

2    rifle ammunition, and 12-gauge shotgun ammunition.

3    Q.   And we're going to talk more later -- we're going to talk

4    more later about connections with this specific ammunition, but

5    was this the only firearms-related items found in the bedroom?

6    A.   I believe the barrel of the -- like, the 6-millimeter

7    barrel that was shown earlier was also found in the bedroom.

8              MR. BOCCATO:  And can we pull up Exhibit 68?

9    BY MR. BOCCATO

10   Q.   Were there also magazines located in the bedroom?

11   A.   Yes.  There were magazines located here (drawing).

12             (Whispered discussion, off the record, 2:29 p.m.)

13   BY MR. BOCCATO

14   Q.   And were there magazines on the bed?

15   A.   I believe so, yes.

16   Q.   And let's go to, briefly, Exhibit 64.

17             And was there also a scope located at the residence?

18   A.   Yes.  In the closet over here, there's a scope.

19   Q.   All right.  And, to be more specific, is that Mr. Zuberi's

20   bedroom?

21   A.   Yes.

22   Q.   So we recently heard Special Agent Gluesenkamp testify,

23   but where were the rifles and shotgun located?

24   A.   In the Prowler travel trailer.

25   Q.   And the ammunition that was found in the bedroom, would

1    that have been consistent, I guess, or could you have used some

2    of that ammunition in the rifles or shotgun?

3    A.    Yes.

4    Q.    Let's pull up Exhibit 439.

5            All right.  Can you identify the items on this

6    exhibit?

7    A.    Sure.  At the top here we have the AR-style rifle.  Here

8    we have the bolt-action rifle.  And here we have the Stoeger

9    Condor shotgun.  And then over here are the types of ammo that

10   were located with -- with them in the trailer, with the two

11   rounds of the shotgun ammo actually being in the shotgun.

12   Q.    All right.  In total, how much ammunition was located?

13   A.    Sure.  So we found 63 rounds of 9-millimeter ammo, the

14   two 12-gauge shotgun rounds, and 27 rounds of 5.56 rifle

15   ammunition, which was removed from a magazine.  And, to

16   clarify, the 63 rounds of 9-millimeter ammo were also in --

17   spread across three different magazines.

18   Q.    Okay.  Can you tell us a little bit more detail about the

19   types of rounds that were located?

20   A.    Sure.  In terms of the 9-millimeter ammo, we had 27 rounds

21   of the Blazer brand 9-millimeter Luger, two rounds of the

22   Remington 9-millimeter Luger, one round of the Hornaday

23   9-millimeter Luger, 16 rounds of the NOVX 9-millimeter Luger,

24   and 17 rounds of the SIG 9-millimeter Luger.

25   Q.    Okay.

1  A.   For the shotgun shells, there was one round of the

2  12-gauge Federal and one round of the Winchester 12-gauge,

3  which matches the boxes that were found inside the bedroom.

4  There was a box of each of those.  And then, finally, the 27

5  rounds of 5.56 ammo were from Lake City Arsenal.

6  Q.   All right.  Did you also find -- in addition to the 27

7  rounds of Blazer 9-millimeter Luger ammunition that was located

8  in the trailer, was there also Blazer 9-millimeter ammunition

9  located in the -- the pistol or the pistol magazine?

10 A.   Yes.  There was eight rounds of the Blazer 9-millimeter

11 Luger there, and there was also another eight rounds in the

12 residence in the -- seized off the garage table.

13 Q.   Okay.  All right.  And with the -- I think you noted there

14 was one round of the Hornaday 9-millimeter Luger.  Where else

15 was that -- could we find Hornaday 9-millimeter Luger

16 ammunition?

17 A.   Yep.  We found four rounds in the pistol magazine that was

18 turned in by AV-1.  And it's the same type as the spent shell

19 casing that was found inside the Honda Pilot.

20 Q.   And we also see 16 rounds of NOVX 9-millimeter Luger.

21 Where else do we find that same ammunition?

22 A.   It was also found in the magazine for the pistol that was

23 turned in by AV-1.

24 Q.   And then, again, the 17 rounds of 9-millimeter Luger in

25 the trailer, where else do we find the SIG 9-millimeter Luger

1    ammunition?

2    A.    Also four rounds of the SIG 9-millimeter Luger in the

3    magazine of the pistol turned in by AV-1.

4    Q.    All right.  Let's talk a little bit about the ammunition

5    on the workbench.  Let's go to Exhibit 441.  Can you summarize

6    this ammunition for me?

7    A.    Sure.  So we have this box and its laid-out rounds.  This

8    is a -- it's a 250-round box of the Remington ammunition, but

9    four rounds are missing.  So there's 246.

10   Q.    And what we'll do is -- since there's so many photographs

11   on this, maybe we'll clear it really quick, zoom in on the top

12   half, and then we'll talk about that.  And then we can talk

13   about the bottom half.

14   A.    Sure.

15   Q.    So what do you see here?

16   A.    So here we have -- it should be the 29 rounds of the

17   7.62-by-39 rounds that were on the table.  These are

18   manufactured by Tula Cartridge Works, and it's the same as

19   these Wolf branded ones right below -- actually, my apologies.

20   That's -- please erase those.  Let me clarify that.

21   Q.    And if it would help to have the bigger picture, we can do

22   that.

23   A.    No, this is fine.  These Wolf brand here are the same as

24   these ones over here (drawing).  These are actually the 7.62

25   rounds.  These are the Hornaday 6-millimeter rounds.  And

1  there's 30 of the Hornaday 6-millimeter rounds, 29 of the 7.62

2  rounds in this little box on the right.  And then the three

3  boxes down here of the Wolf rounds, there's 50 between those

4  three boxes.

5  Q.  All right.  Let's exit out of that.

6       Let's go back to the -- and can you kind of again

7  explain -- we'll zoom in on the bottom half, just to point out

8  the three different -- or the four different types of

9  ammunition that we're seeing on the left.

10 A.  So this is the Wolf 7.62 round, similar to this one over

11 here on the right (drawing).  This one with the red tip is the

12 Tula Cartridge Works 7.62 rounds.  I can't tell from this

13 picture which of these two are the two 9-millimeter rounds, but

14 it should be the Remington and the Blazer rounds.  I just --

15 I'm not sure which one is which from here.

16 Q.  Okay.  So with the 79 rounds of Tula Cartridge 7.26 39 --

17 by 39-millimeter -- or 39 ammunition, where else do we see that

18 same type of ammunition?

19 A.  Yes.  There's -- exactly one round of that ammunition was

20 in the metal green ammo can that was found in the bedroom.

21 Q.  And we talked about, I think, the Remington Arms

22 9-millimeter Luger ammunition.  Where were the two locations

23 where we see that ammunition as well?

24 A.  We also see the 9-millimeter Luger -- there are two rounds

25 of that in the travel trailer.

1  Q.   And how about any --

2  A.   And one round in the search of the Honda Pilot.

3  Q.   Thank you.

4        And then we also talked about 30 rounds of Hornaday

5  6-millimeter ARC ammunition.  Where else do we see that same

6  ammunition?

7  A.   There was also one of those rounds inside the green metal

8  ammo can, same as the 7.62.

9  Q.   So, Special Agent, did you spend quite a bit of time

10 looking over the ammunition and comparing it?

11 A.   Correct.  Yes.

12 Q.   Based on your review of all the ammunition, is there

13 any -- really any ammunition that you found that wasn't an

14 identical type found somewhere else?

15 A.   There was not.  Every type of ammunition -- every brand,

16 to be specific, was found in another place -- at least two

17 locations, some in three or four.

18 Q.   Now, in addition to obviously the photographs that we've

19 seen so far, were also subpoenas sent to different companies

20 for -- that are related to firearms?

21 A.   Yes.

22 Q.   So I'm going to pull up what's been marked as Exhibit 442.

23        MR. BOCCATO:  And scroll down.

24 BY MR. BOCCATO

25 Q.   Can you tell us what this item is?

1  A.    Yep.  This is an order from Ammunition Storage Components

2  LLC.

3  Q.    Let's go to the next page.

4        All right.  What is being ordered here?

5  A.    It looks like it's a quantity of two 15-round 6-millimeter

6  ARC stainless steel magazines being shipped to Justin Kouassi

7  at 2800 North Lombard Street in Vancouver, Washington.

8  Q.    And it's your understanding that multiple firearm

9  magazines were located in Mr. Kouassi's bedroom and other

10 places?

11 A.    Yes.

12 Q.    Or Mr. Zuberi's bedroom and other places?

13 A.    Yes.

14 Q.    Let's go to Exhibit -- oh, let's go to the next page.

15       And go to the next one.

16       All right.

17 A.    This is an invoice from the same company, it appears.  We

18 have one 25-round 6-millimeter ARC stainless steel magazine and

19 two AR-15 30-round .223/5.56 stainless steel black magazines.

20 Q.    All right.  And does it list a phone number for -- it says

21 Justin Kouassi; but, you know, we saw with Special Agent

22 Gluesenkamp the name change paperwork not that long ago.  What

23 are the last four digits of his phone number there?

24 A.    2153.

25 Q.    Does that have any significance to you?

1    A.    Yes.  It's the same as the pin code for -- the gate code

2    that he had for the AAA Discount Storage.

3    Q.    So let's go to now Exhibit 444.

4          And this is going to be pretty tricky, so can we zoom

5    in on kind of -- well, just before we zoom in, what is this --

6    what are these two receipts?

7    A.    Yeah.  These are receipts from limitlessamerica.com.

8    Q.    All right.  And let's zoom in right here.

9    A.    We have an order of Hornaday Precision Hunter 6-millimeter

10   ARC, 103 grain, round -- a 20-round box, two at $34.95; and

11   then an order of a Magpul Industries MOE SL-M carbine stock,

12   for one at $42.95.  It's a rifle stock.

13          MR. BOCCATO:  Let's go down.

14          And let's zoom in there.

15   BY MR. BOCCATO

16   Q.    And how about this order?

17   A.    This looks to be a return of the same rifle stock to get

18   back $42.95.

19   Q.    And I'm not -- and we're going through a lot here right

20   now, but do you know where these items came from, how we got

21   these items?

22   A.    I don't recall the specific one, no.

23   Q.    Does subpoena returns make sense?

24   A.    Yes.  Yes.

25   Q.    And let's jump to 445.

1          All right.  Let's scroll up to the -- or can you tell

2     us what this item is?

3     A.    Yeah.  This is a transaction report from Sportsman's

4     Warehouse in Klamath Falls showing a purchase of three 30-round

5     AR-15 magazines.

6     Q.    Did we get this item from subpoena returns?

7     A.    Yes.

8          MR. BOCCATO:  All right.  Can we zoom in here right

9     there?  Perfect.

10    BY MR. BOCCATO

11    Q.    What does it include as a customer name?

12    A.    Sakima Zuberi.

13    Q.    And what was purchased?

14    A.    Three AR-15 magazines, 30 rounds.

15    Q.    Let's go to the next page.

16          And let's go to the next page.

17          All right.  Let's -- does this appear to be

18    another -- what is this item?

19    A.    Yep.  This is another transaction report from Sportsman's

20    Warehouse in Klamath Falls, showing another customer name of

21    Sakima Zuberi, purchasing Ruger 30-round 5.56 Meta for 25.99

22    and the Winchester 5.56 193 for 89.97.

23    Q.    And what exactly are these being -- what is being

24    purchased here?

25    A.    Yeah.  The Ruger is the Ruger ammunition and the -- I

1  believe -- I believe -- I don't actually recall what the Ruger

2  one is.  The Winchester 5.56 ammunition, I do recall.  That's

3  the 5.56 rifle ammunition.  But I can't remember specifically

4  what the code is for the Ruger 30-round.

5  Q.  And let's scroll out.

6       And can you highlight the date there at the bottom?

7  A.  It's March 14th, 2023.

8  Q.  All right.  We might go back to this page.  Let's go to

9  the next page.

10      All right.  Did you ever listen to any audio

11  recordings from Mr. Zuberi where he mentions firearms?

12  A.  Yes.

13  Q.  All right.  I'd like to play one of those recordings for

14  you right now.  I'm playing for you what's been marked as

15  Exhibit 466.

16      (Audio recording played in open court, 2:44 p.m. -

17  2:45 p.m.)

18      MR. BOCCATO:  Stop this one.

19      Let's do audio recording 466.

20      (Whispered discussion, off the record, 2:45 p.m.)

21      MR. BOCCATO:  Let's go to 499.

22      (Audio recording played in open court, 2:46 p.m.)

23  BY MR. BOCCATO

24  Q.  What was the date of this recording?

25  A.  June 22nd, 2024.

1  Q.   All right.  In addition to firearms, did you also look at

2  financial records?

3  A.   Yes.

4  Q.   Did you look at any financial records from Key Bank?

5  A.   Yes.

6  Q.   All right.  I want to just show you Exhibit 347.

7       Now, can you describe what this document is?

8  A.   Yeah.  This is an account summary for Justin Kouassi at

9  1336 North Eldorado Avenue, showing his account summary for his

10 bank account at Key Bank.

11 Q.   Okay.  Does this summary go on for multiple -- many pages?

12 A.   Yes, very long.

13 Q.   All right.  And does it really summarize his account

14 activity from about January 30th until July?

15 A.   Yes.  Yes.  It's got basically all the deposits and

16 withdrawals, locations, things where money was spent at, and

17 amounts and dates.

18 Q.   All right.  Are the dates in this account summary -- are

19 they all exact?

20 A.   No.  Oftentimes these bank summary returns that are

21 provided, the post date that you see on there is not always the

22 exact date of the transaction.  Sometimes your bank takes a

23 couple days to process the transaction.  So it just depends.

24      If you, like, line up some of the receipts, for

25 example, from Home Depot with the charges here, you'll see the

1    dollar amount is the same; but on here it might be two or three

2    days after the purchase actually happened because the bank took

3    a couple days to take it out of your account.

4    Q.    Okay.  Did you see transactions on this document from Home

5    Depot?

6    A.    Yes.

7    Q.    What about Diamond Home Improvement?

8    A.    Yes.

9    Q.    Did that Diamond Home Improvement transaction mean

10   anything to you?

11   A.    Yes.  We found, when I searched the iCloud data, a picture

12   of some screws that were purchased by Mr. Zuberi.  And the

13   picture's geolocated, so the data that is associated with the

14   file says that it was taken at Diamond Home Improvement.  And

15   it's a picture of some blue screws, and that was inside his

16   iCloud account from mid 2023.

17   Q.    Okay.  And we'll jump -- did you see any purchases from

18   Amazon?

19   A.    Yes.

20   Q.    Any purchases from AliExpress?

21   A.    Yes.

22   Q.    Were those significant to you?

23   A.    Yes.  There's a charge for $398 in the February statement,

24   which is the amount that was spent for the 16-band jammer.

25   Q.    Okay.  And, in addition to those, did you see purchases

1  relating to travel to Seattle?

2  A.    Yes.  There's purchases around the dates that correspond

3  with his trip from Klamath Falls to Seattle in July.

4  Q.    And travel back down to -- or down to Reno?

5  A.    Yep, and back down to Reno.  So stops at gas stations,

6  stops for food, a stop at a Safeway.  And then there's also

7  corresponding charges for -- in Reno in those days as well.

8  Q.    I want to talk a little bit more about some of the iCloud

9  items you saw.  I mean, frankly, did you see a lot of items

10  from the iCloud?

11  A.    Yes, 'cause essentially it'll have every picture that's

12  backed up.  So every picture, every screenshot is usually back

13  in there, so thousands of images.

14  Q.    Okay.  Were a large number of those, you know, relevant to

15  this investigation?

16  A.    Yes.  We tagged a large number.

17  Q.    Okay.  Let's go to Exhibit 377.

18        What is this -- tell us about this exhibit.

19  A.    So included with the iCloud data is also backups of

20  iMessages or -- and text messages.  So this is some of the

21  backed-up messages.  This is a text conversation between

22  Mr. Zuberi and another party that happened in the fall of 2022.

23  This actually reads from the bottom up, the way it was set up.

24        So Mr. Zuberi's phone number is on the right with the

25  blue circle and the 17, and the other party's over here on the

left with the green 14.  So Mr. Zuberi asks, "Does any of your

security colleagues have a Taser for sale?"  The other party

says, "I'd have to ask."  Mr. Zuberi responds, "Okay.  Let me

know.  I'm looking for the one that shoots, not a stun gun."

Q.  All right.  And, again, can you indicate Mr. Zuberi's

phone number here?

A.  Yes.  It's the -- right here (drawing), ending in 2153.

MR. BOCCATO:  All right.  Can we go to Exhibit -- go

to Exhibit 379, please.

All right.  Can we clear that?

BY MR. BOCCATO

Q.  And you said these read from --

A.  This one -- that was the one, I think, that was -- for

some reason, it was upside down, just the way the program

pulled it.  This one is reading from top to bottom.

Q.  All right.  We'll zoom in, maybe the -- we'll do it in

thirds maybe and then go from there.

A.  So, again, Mr. Zuberi is on the right with the 2153

number.  He asks, "Can you use reinforced concrete blocks for

an underground house?"  This -- another party says, "You mean a

CMU wall?  Yes."  And Zuberi then says, "And will this support

the weight of the dirt and rocks when it's buried?"  The other

party says, "Shotcrete or regular concrete foundation would be

the most desirable."

Then Mr. Zuberi says, "But what's the cheapest way?"

1  The other party responds, "Depends on whether it's commercial

2  or residential.  Commercial, I'd say shotcrete.  But

3  residential, it's pretty quick and affordable to run in an

4  old-school handset concrete foundation."

5       Mr. Zuberi then says, "Do you think this will support

6  being buried 100 feet deep?"  The other party says, "Depends on

7  the geographical location.  By the beach or in Portland, no."

8  Q.  And what's the date for this message?

9  A.  You'd have to close the zoom-in.

10      January 22nd.

11 Q.  All right.  Now let's go to message 380.

12      All right.  What's the date for this message?

13 A.  It says -- oh, this is from February 1st.  And Mr. Zuberi

14 asks, "Do you know what materials are used for prison and jail

15 floors?"  And the other party says, "Nah, I don't."

16 Q.  And in this case do you know what kind of flooring

17 Mr. Zuberi had in his cell?

18 A.  Concrete, I believe.

19 Q.  Just the concrete from the --

20 A.  From the cell, yeah.  Just from the -- I mean from the

21 garage.  So it's just the regular garage flooring.

22 Q.  So he never actually installed flooring?

23 A.  From my understanding, I didn't see any, no.

24 Q.  Let's go to Exhibit 381.

25      What's the date on this item or this message?

1  A.   December 28, 2022.  And this is a conversation with

2  another party where he sends a link to Alibaba, which it says

3  AliExpress here, and it includes the picture of the 16-band

4  jammer.  And we can see, up at the top, when he sends it, it

5  includes the price of $398, which corresponds with the $398

6  payment to AliExpress we found, which he doesn't actually

7  purchase it 'til February.

8          And the other party says, "Yeah, it's crazy they sell

9  them, TBH," which I know to mean "to be honest."  And

10  Mr. Zuberi responds, "I'm buying that shit."

11  Q.   And, again, is that consistent with the cell phone jammers

12  that were seized from the Prowler trailer?

13  A.   Yes.

14  Q.   All right.  Let's go to 382, please.

15          What's the date on this item?

16  A.   April 12th, 2023.

17  Q.   Okay.  And this one, does it read top down?

18  A.   Yes, this reads top down.

19  Q.   All right.  We're going to break this up again into thirds

20  as well.  Thank you.

21  A.   Mr. Zuberi asks, "Do you know a way to build a block

22  structure without making it permanent?"  The other party says,

23  "Yeah, I guess Fox Blocks."

24  Q.   And, in response to that, what does -- does Zuberi ask

25  some follow-up questions?

1  A.  Yes.  He asks, "And is it strong?  Would a person be able
2  to destroy it with their hands?"  And the other person
3  responds, "It's a Styrofoam veneer that you pour grout inside
4  of."  The other person then says, "So, no, I highly doubt they
5  could."  And then Mr. Zuberi then says, "Is this expensive to
6  build?"  The other party says, "Compared to the alternatives,
7  no."  Mr. Zuberi says, "Okay."
8  Q.  So is Mr. Zuberi concerned about building a structure that
9  someone cannot escape with their hands?
10  A.  Yes.  He says, "To destroy -- would a person be able to
11  destroy it with their hands?"
12  Q.  Let's go to Exhibit 383.
13      All right.  What's the date for this one?  Or can you
14  see a date?
15  A.  There is not a date in this one, but I remember this is
16  from December of 2022.
17  Q.  Okay.  What's going on in these messages?
18  A.  So the other party sends a picture of what appears to be
19  themselves holding a handgun.  And Mr. Zuberi responds, "Nine,"
20  question mark.  And the other party responds, "Yup."  And
21  Mr. Zuberi then says, "I got the XDM Springfield."
22      MR. BOCCATO:  Can you zoom in on that?
23  BY MR. BOCCATO
24  Q.  Is that significant to you, XDM Springfield?
25  A.  Yes.  That's the same handgun that AV-1 turned in.

1   Q.   Let's go to message 384.

2   A.   This one reads top -- bottom to top again.

3   Q.   Should we go to the next slide then or --

4   A.   Well, no, so it's broken up already into smaller pictures.

5   So this is the first set.  So it starts off here at the bottom

6   with -- this is a picture message that Mr. Zuberi sends to

7   another party and asks, "You want to trade shotguns?"  I

8   believe it's Exhibit 400, if we're going to show.

9   Q.   All right.  Let's go to Exhibit 400.

10          So, just to clarify, the picture message down here

11   is -- you believe it's this next picture?

12   A.   Yes.  I matched up the --

13   Q.   Let's pull it up, and then we can confirm --

14   A.   -- the file names.

15          It's just when we viewed it in that -- in the program

16   we use to view it sometimes, it doesn't show the picture in the

17   conversation 'cause it can't load it.  So you have to

18   separately find the file name and associate it.  So this is the

19   file name that is appearing in that conversation.  So this is

20   the picture that Mr. Zuberi sent to the other party.  And it's

21   a picture of the Stoeger shotgun, the AR-style-rifle and the

22   barrel on the bed.

23   Q.   All right.  Do any of those look familiar to you?

24   A.   Yes.  These are the ones that were taken from the Prowler

25   trailer and the barrel from the bathroom.

1  Q.  All right.  Thank you.

2        We can go back to that message.

3  A.  So essentially he sends that picture first and then asks,

4  "You want to trade shotguns?"  The other party says, "I don't

5  think you want to trade with me.  All I got is your grandaddy's

6  20-gauge pump.  Works good, just old.  What's that?  A

7  12-gauge?"

8  Q.  And just to -- do you remember when these messages were

9  sent?

10  A.  I don't recall the exact date.  I believe it was in early

11  2023, though.

12  Q.  Let's go to the next page.

13  A.  Mr. Zuberi responds, "Yes, 12-gauge.  I need a pump,

14  though."  The other party says, "I got a -- they call it the

15  public defender.  It's a handgun that shoots 45-caliber and

16  .410 shells.  I don't like it.  I mean, I thought I would like

17  it.  But it's so loud, and it's hard to find .410 shells."

18        And then they send a picture of the gun that they

19  were referring to.  Mr. Zuberi then responds, "Damn, it looks

20  nice.  I got the same problem with my AR-15.  It has

21  6-millimeter ARC ammo.  Hard to find and expensive."

22  Q.  All right.  And did you find 6-millimeter ARC ammunition

23  in this case?

24  A.  Yes, we did.

25  Q.  All right.  And did you also find an AR-15?

1    A.    Yes, we did.

2    Q.    And in that photo that we saw -- I think it was

3    Exhibit 400 -- did it show all the long guns -- or it did show

4    the -- did it show the AR-15?

5    A.    Yeah.  It showed the AR-15-style rifle and the

6    6-millimeter ARC barrel.  And also the date of this

7    conversation is here, March 29th, 2023.

8    Q.    All right.  Thank you.

9          And, just to go back again, what's the phone number

10   for Mr. Zuberi's messages?

11   A.    Yes.  It's right here (drawing), ending in 2153.

12   Q.    Let's go to, I think, a video now.  Were there any -- you

13   saw some relevant videos on Mr. Zuberi's iCloud?

14   A.    I did, yes.

15         MR. BOCCATO:  Okay.  Let's go to a video that's been

16   marked Exhibit 385.

17         (Video recording played in open court, 3:00 p.m. -

18   3:01 p.m.)

19   BY MR. BOCCATO

20   Q.    Can you describe what we saw in that video?

21   A.    It appears to be Mr. Zuberi holding a handgun that is

22   consistent with the Springfield XD.

23   Q.    Did you see a little red kind of circular -- almost like a

24   little sight there?

25   A.    Yes.  You could see the little red sights on the front.

1    Q.   Okay.  And if we could go back, I guess, to Exhibit 438, I

2    think, dash three, please.

3              And is -- what's that item?

4    A.   Yeah.  So this is the Springfield XDM, and this is the red

5    sight -- front sight.

6              MR. BOCCATO:  All right.  All right.  Let's go to

7    Exhibit 386, please.

8              (Video recording played in open court, 3:02 p.m.)

9    BY MR. BOCCATO

10   Q.   All right.  And do you know the dates for the -- some of

11   these videos?

12   A.   I believe they were in December of 2022.

13             MR. BOCCATO:  Okay.  And let's go to Exhibit 387.

14             (Video recording played in open court, 3:02 p.m.)

15   BY MR. BOCCATO

16   Q.   And what's happening in the last two videos?

17   A.   Mr. Zuberi is holding up the -- what appears to be the

18   Springfield XD, pointing it and imitating shooting it.

19   Q.   All right.  And you believe these -- those three videos we

20   just watched are from the -- what time again?

21   A.   December of 2022.

22   Q.   Okay.  Around that time frame?

23   A.   Around that time frame, yes.

24             MR. BOCCATO:  Let's go to Exhibit 388.

25             (Video recording played in open court, 3:03 p.m.)

BY MR. BOCCATO

Q.   What's going on in this video?

A.   This is Mr. Zuberi walking around the Prowler trailer and videotaping it, saying he got the RV.  This is from early November 2022, according to the file data.

MR. BOCCATO:  Okay.  Let's go to Exhibit 390.

(Video recording played in open court, 3:03 p.m. - 3:04 p.m.)

BY MR. BOCCATO

Q.   What is Mr. Zuberi saying there?

A.   That he got the Honda back.  And I believe that's in relation to getting the Honda fixed.  They were having car issues with it, and he had to have some repairs done.

Q.   All right.  Let's go to Exhibit 391.

All right.  Do you know what item this is?

A.   Yes.  This is a screenshot from Mr. Zuberi's iCloud data. And it shows a purchase order from daytonatactical.com for an 80 percent AR-15 lower receiver.

Q.   Okay.  And what was the date for this?

A.   October 22nd, 2022.

Q.   All right.  And let's go to the next page.

All right.  Was a lower receiver recovered in this case?

A.   Yes.

Q.   Where was that?

1    A.    I believe in the garage.

2    Q.    Let's go to Exhibit 392.

3          And I think we already saw this photo just -- just

4    now.  Let's go to the next photo.

5          But these are just more photos from Mr. Zuberi's

6    iCloud?

7    A.    Yes.  These were all taken around the -- I believe around

8    the same time as that video of the Prowler trailer.

9    Q.    All right.  And this photo's probably going to look a

10   little bit similar, but let's go to Exhibit 393.

11         Where is -- what is this from?

12   A.    This is also from the iCloud data.  It's a picture of the

13   Remington Model 783 FDE bolt-action rifle with scope.  And we

14   found this cardboard box cut out in the Prowler trailer.

15   Q.    What's the date of this item?

16   A.    I do not recall the exact date.

17   Q.    Okay.  We'll circle back.

18         And this is -- appeared to be exactly the same as

19   what was found in the Prowler trailer?

20   A.    Yes.  It appears to be the exact one that we found in

21   there.

22   Q.    All right.  And I think -- did Special Agent Gluesenkamp

23   just testify to that?

24   A.    Yes.

25   Q.    All right.  Let's go to Exhibit 394.

1   A.   This is another screenshot with an order from

2   pistolgear.com.  The order is for a ProMag 32-round magazine

3   for XDM 9-millimeter, which is consistent with the one that we

4   found in the Prowler trailer.

5   Q.   Okay.  What was the -- where else does a -- I guess, a --

6   oh, yeah, a 32-round -- would this round -- or this magazine

7   also fit the pistol?

8   A.   Yes.  This is for the XDM 9-millimeter that was recovered

9   by AV-1.  And this one was unique because it was the only

10  32-round magazine.  The others were smaller.

11  Q.   Okay.  So this -- again, so it was consistent with the

12  magazine found in the pistol?

13  A.   Correct.

14        MR. BOCCATO:  All right.  Let's go to 397, please.

15  BY MR. BOCCATO

16  Q.   Is this just a photo of the Discount Storage information?

17  A.   Correct.  This is a photo of the Discount Storage receipt,

18  which, based on the circles, appears to be the exact one that

19  we found later in the Altima.  But this was found on his iCloud

20  account.

21  Q.   Okay.  Is there a date for this one?

22  A.   I don't recall the exact dates on this one.

23  Q.   Okay.  And let's go to Exhibit 398.

24  A.   This is a screenshot from the iCloud account.  This is

25  from -- you can see down here -- AliExpress and the price, the

1    $398.  This information I'm boxing up here is related to the

2    16-band jammer.  It's showing the different 16 bands that it's

3    capable of jamming and the megahertz that it works at.  Yeah.

4    Q.   All right.  What was -- what's the location that's being

5    shipped to?

6    A.   Yep.  It's being shipped from China to Klamath Falls.

7    Q.   All right.

8    A.   I believe the screenshot was taken in February.

9    Q.   All right.  Thank you.

10        MR. BOCCATO:  Can you go to Exhibit 399?

11   BY MR. BOCCATO

12   Q.   What's this?

13   A.   This is a screenshot from a website with the -- an XDM

14   940-4M conversion kit available for sale, which would be

15   compatible with the XDM that was found -- or returned by AV-1.

16   Q.   All right.  Let's go back to the 394.

17        And you said -- I think I just want to clear this up.

18   There's a lot of magazines found.  Did you say this magazine

19   was initially found in the Prowler trailer?

20   A.   Yes, 'cause this is a 32-round magazine.  That's an

21   extra-large magazine.  I think the ones in the -- that were

22   found -- or turned in by AV-1 was only like a 15-or-so-round

23   magazine.

24   Q.   You don't -- but this -- yeah, you -- this was found in

25   the Prowler trailer?

1  A.    Correct.

2  Q.    Or something consistent with it?

3  A.    Something consistent with this was found in the Prowler

4  trailer.  There was one -- one of the magazines in the Prowler

5  trailer was larger, could hold 30 or so rounds, yes.

6  Q.    Okay.  All right.  And then let's go to Exhibit 403.

7         All right.  And what is this item?

8  A.    Yeah.  This is a screenshot with a receipt for a charge

9  for AAA Discount Storage.  It shows Mr. Zuberi's name, his unit

10 number, which is RV106, which is the one that we know he had on

11 the contract.  And the date is June 19th, 2023.

12 Q.    And, finally, with iCloud, I want to go to Exhibit 407.

13        Have you seen this screenshot before?

14 A.    I believe so.  It's kind of dark.  I can't --

15 Q.    Okay.  And we -- we might circle back to this one later

16 on.  We'll circle back.

17        So let's talk about -- let's go to Exhibit 211.

18        THE COURT:  All right.  Mr. Boccato, how much longer

19 do you think with this witness?

20        MR. BOCCATO:  We're going to have a bit, I think,

21 Your Honor, so we could --

22        THE COURT:  We could break, but I do want to send

23 folks home a little early today.  So let's take a break now.

24 When we come back out, we'll have a decision of how much longer

25 today.

1    (Open court, jury not present, 3:12 p.m.)

2    THE COURT:  Be seated, please.

3    You know, I'll be honest.  A lot of this is starting

4    to get fairly cumulative.  I don't think we need to see another

5    receipt from the storage facility.  We have a stipulation I

6    have yet to read that seems to take into account a lot of this.

7    How much longer are we going with this witness?

8    And I get it.  I know, without knowing a defense,

9    you're covering all your bases.  But I'm afraid some of this is

10   starting to look very repetitious.

11   MR. SWEET:  And, Your Honor, this will switch into

12   the target list, so -- back from the residence, sort of a

13   different matter.  In terms of iCloud just itself,

14   approximately how much --

15   MR. BOCCATO:  We are done with iCloud.

16   MR. SWEET:  Done with iCloud.  So the next material?

17   MR. BOCCATO:  Then we would be talking about a -- the

18   browser history on Mr. Zuberi's laptop, some recorded calls, an

19   e-mail sent, target list.  And then we would maybe briefly note

20   one thing on Amazon.

21   MR. SWEET:  And so, Your Honor, I spent longer on

22   Special Agent Gluesenkamp than anticipated.  So, frankly, I'm

23   the one who got us back --

24   THE COURT:  I'm not blaming anybody.  I know you're

25   being detailed, and I get it.

1          MR. SWEET:  I am.

2          THE COURT:  But your details are starting to blend

3    together at this point.

4          MR. SWEET:  And, Your Honor, I apologize for reading

5    that it was a juror's note.  As soon as I said that -- a

6    juror's question.  As soon as I said it, I realized I was not

7    supposed to say that.  So my apologies.

8          So, you know, we do not have to finish all of it

9    today, Your Honor.  We could certainly -- if the Court wants to

10   send the jurors home, we could do that.  We certainly can go to

11   the targets list part, which is -- the other option,

12   Your Honor, is -- is simply to send them home, and we bring him

13   back.

14         And the only reason I say that is because the targets

15   list is the subject of an evidentiary agreement between the

16   parties.  I believe it's already in good shape, but we

17   certainly can talk with the defense about that, because we have

18   discussed that language.

19         THE COURT:  I guess I don't necessarily understand

20   what the target list is.

21         MR. SWEET:  I'm sorry, Your Honor.  So in

22   Mr. Zuberi's bedroom, there was a targets list that had the

23   names --

24         THE COURT:  Right.

25         MR. SWEET:  -- had nicknames of other women.  And

1  there's an agreement between the parties in terms of how that

2  will be described.

3          THE COURT:  Okay.

4          MR. SWEET:  And so that was, frankly, what we were

5  thinking we could just do now and conclude.  But the other

6  option is, rather than keeping them for a 15-minute break,

7  bringing them back and doing that, we can simply let them go

8  and pick that up.

9          THE COURT:  Well, we're going to have to bring them

10  back just for me to give them another warning.  And I'm

11  wondering when you want the stipulation read.

12          MR. SWEET:  Your Honor, there -- if we could -- if we

13  could do that on Tuesday.  There's one small matter of the

14  stipulation that we need to discuss further.

15          THE COURT:  Okay.  Why don't we bring them out.  Do

16  you want to just finish with the target list piece?

17          MR. SWEET:  Yeah.

18          THE COURT:  And then we'll reserve the rest of the

19  special agent's testimony and then cross-examination for

20  Tuesday.

21          MS. POTTER:  I mean, I'm not going to -- I'll show my

22  cards.  At this point I don't really have anything.  So if they

23  want to end him so that he can be done, and they can put him on

24  some other time next week, that's fine with me.  So, you

25  know -- 'cause I know he's -- I already knew he was coming back

1   to do other things, so --

2         THE COURT: Yeah. I mean, if we could get them out

3   by 3:30. A lot of them are driving, you know, 120 miles, 150

4   miles home.

5         MS. POTTER: Yeah. I just want to be done -- just

6   done as quickly as possible, I think. And, Your Honor, just on

7   the other procedural note, we would just -- we would like not

8   to refer to the juror notes. You know, if they give us a note

9   and we want to incorporate it in our natural --

10        THE COURT: Right. Right.

11        MR. SWEET: I won't do that again. I apologize.

12   That was inadvertent. So then -- then we can do the targets

13   list, Your Honor, and -- we'll do that. And then, yes, if we

14   do close out Special Agent Giovanetty, frankly, it makes it

15   easier for us because there are some things that --

16        THE COURT: Let's do that.

17        MR. SWEET: Then we won't have a live witness over

18   the weekend, because there are some things we'll follow up on

19   as well.

20        THE COURT: So you'd like to finish up with --

21        MR. SWEET: If we could -- honestly, if we could

22   finish up with him now and also recall him on, you know,

23   Tuesday or Wednesday to follow up on things --

24        THE COURT: Sure.

25        MR. SWEET: -- that would probably be easier, so he's

not a witness that we have limitations on our discussions with.

        THE COURT:  Okay.  Let's do that.  And then let's just check and see --

        (Whispered discussion, off the record, 3:16 p.m.)

        (Recess taken, 3:16 p.m. - 3:24 p.m.)

        THE COURT:  All right.  We are finishing with Detective --

        MR. SWEET:  Special Agent Giovanetty.

        THE COURT:  -- Special Agent Giovanetty with no further cross-examination.  He can be recalled at a later time.

        (Open court, jury present, 3:24 p.m.)

        THE COURT:  All right.  Please be seated, everybody.

        Folks, we have completed the examination of Special Agent Giovanetty without -- and there will be no cross-examination.  He might be called later in the case regarding some other issues.  So we are finished for the day.  It's 3:30.  We do want to get you home after a long week.

        And, on behalf of all the parties, we appreciate your time and effort in this case.  We're going home now for a three-day weekend.  I would say, you know, "Happy Columbus Day."  I don't know what people actually do on a Columbus Day, other than -- it's kind of an Italian festival, if I remember.

        But please enjoy your three-day weekend.  I know some of you will be going home to family and friends.  Please do not talk to them about the case or what you've heard while in the

1  courtroom.  Please do not look up any information on the

2  Internet or view any stories or listen to any stories or watch

3  any stories in the news, radio, newspaper, Internet, all of

4  those things.

5          But, with that, we will return on Tuesday morning at

6  9 o'clock here in the courtroom.  And we'll continue at that

7  time.  Safe travels to everybody who's driving distances back

8  home.

9          (Open court, jury not present, 3:27 p.m.)

10          THE COURT:  All right.  Safe driving back, everybody.

11  Have a great weekend.

12          MS. POTTER:  Thank you, Your Honor.

13          MR. SWEET:  Thank you, Your Honor.

14                          *  *  *

15          (Court adjourned, 10-11-24 at 3:28 p.m.)

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2

3        United States of America v. Negasi Zuberi

4             Case No. 1:23-cr-00254-MC-1

5               Jury Trial - Day 4

6               October 11, 2024

7

8       I certify, by signing below, that the foregoing is

9  a true and correct transcript of the record, taken by

10  stenographic means, of the proceedings in the above-entitled

11  cause.  A transcript without an original signature,

12  conformed signature, or digitally signed signature is not

13  certified.

14

15  /s/Lindsey A. Weresch, RMR, CRR, CSR

16  _____

Official Court Reporter     Signature Date: 3/3/2025

17  Oregon CSR No. 14-0427     CSR Expiration Date: 6/30/2026

18

19

20

21

22

23

24

25