1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF OREGON

3                  MEDFORD DIVISION

4

5

    UNITED STATES OF AMERICA,            )
6                                        )
                        Plaintiff,       )  No.
7                                        )  1:23-cr-00254-MC-1
            v.                           )
8                                        )  October 17, 2024
    NEGASI ZUBERI, also known as         )
9   Justin Joshua Hyche, also known      )  Medford, Oregon
    as Sakima Zuberi,                    )
10                                       )
                        Defendant.       )
11

12

13

14

15              **TRANSCRIPT OF PROCEEDINGS**

16                JURY TRIAL – DAY SEVEN

17

18      BEFORE THE HONORABLE MICHAEL J. MCSHANE

19   UNITED STATES DISTRICT COURT CHIEF JUDGE

20

21

22

23
    **COURT REPORTER:**
24  Kellie M. Humiston, RMR, CRR
    (503) 326-8186
25  Kellie_Humiston@ord.uscourts.gov

```
 1                    A P P E A R A N C E S - i

 2

 3    FOR THE PLAINTIFF:
                              U.S. ATTORNEY'S OFFICE
 4                            By:  Jeffrey S. Sweet
                              405 E. Eight Avenue
 5                            Suite 2400
                              Eugene, OR 97401
 6

 7    FOR THE PLAINTIFF:
                              U.S. ATTORNEY'S OFFICE
 8                            By:  Marco Boccato
                              310 W. Sixth Street
 9                            Medford, OR 97501

10

11    FOR THE PLAINTIFF:
                              U.S. ATTORNEY'S OFFICE
12                            By:  Nathan J. Lichvarcik
                              405 E. Eighth Avenue
13                            Suite 2400
                              Eugene, OR 97401
14

15    FOR THE PLAINTIFF:
                              U.S. ATTORNEY'S OFFICE
16                            By:  Suzanne A. Miles
                              1000 SW Third Avenue
17                            Suite 600
                              Portland, OR 97204
18

19

20

21

22

23

24

25
```

APPEARANCES - ii

FOR THE DEFENDANT:

                        ANGELI LAW GROUP
                        By: Amy Elizabeth Potter
                        121 SW Morrison Street
                        Suite 400
                        Portland, OR 97204

FOR THE DEFENDANT:

                        LAW OFFICES OF MICHAEL P. BERTHOLF
                        By: Michael Bertholf
                        108 Mistletoe Street
                        Medford, OR 97501

1                            **INDEX**

2                                                    **PAGE NO.**

3    **PROCEEDINGS:**

4    The government rests                            1554

5    Defendant's Motion for Directed Verdict         1555

6    The defendant rests                             1559

7

8    **GOVERNMENT'S WITNESSES:**

9    EMILY KEETON
              Direct                                 1401
10
     JASON MALONE
11            Direct                                 1406

12   BRENDEN WESTFALL
              Direct                                 1413
13            Cross                                  1418

14   ROBERT PHILLIPS
              Direct                                 1420
15
     CHRISTOPHER GIOVANETTY
16            Direct                                 1429
              Cross                                  1473
17            Redirect                               1478

18   MELANIE MCCLURE
              Direct                                 1480
19            Cross                                  1497

20   TRAVIS GLUESENKAMP
              Direct                                 1500
21            Cross                                  1545
              Redirect                               1550
22

23   **DEFENDANT'S WITNESSES:**

24    (None)

25

1    (October 17, 2024, 9:13 a.m.)

2              P R O C E E D I N G S

3

4         THE COURT:  Please be seated, everybody.

5         Good morning, folks.  Again, thank you for your

6    promptness.  We were having some tech issues.  Our next witness

7    is going to appear by video.  This is an old courthouse, and it's

8    not well suited for sometimes the technological things that we

9    expect in a courthouse.

10        The good news is by this time next year, we should be

11   breaking ground on a new federal courthouse in Medford, so we're

12   very excited about that.  This area's one of the faster growing

13   areas in the -- in the district, the District of Oregon, so we

14   really do need a more modern courthouse where the judge and the

15   jury aren't walking up and down the same steps and running into

16   each other, and I think we're really looking forward to that.

17        Has anybody seen or heard any news articles on the case

18   or has anybody contacted you?  Have you discussed the case with

19   anyone?  I'm seeing everybody shaking their head, "No."  So we're

20   going to move into our first witness today.

21        Would the Government like to introduce the witness.

22        MR. SWEET:  Thank you, Your Honor.  Yes.  The United

23   States calls Emily Keeton.

24        THE COURT:  All right.  Ms. Keeton, if you would raise

25   your right hand.

1      **EMILY KEETON**

2      after having been duly sworn under oath, was examined and

3                          testified as follows:

4              THE COURT:  All right.  You can put your hand down.

5      And if you could state your first and last name and spell both

6      for our court reporter.

7              THE WITNESS:  Emily Keeton, E-M-I-L-Y, K-E-E-T-O-N.

8              THE COURT:  Thank you, Ms. Keeton.

9              Go ahead.

10             MR. SWEET:  Thank you, Your Honor.

11                     **DIRECT EXAMINATION**

12     BY MR. SWEET:

13     Q.   Good morning, Ms. Keeton.

14     A.   Good morning.

15     Q.   Could you please tell the jury what city you live in?

16     A.   I live in Klamath Falls.

17     Q.   And do you work as the manager of The Pikey?

18     A.   Yes.

19     Q.   And how long have you done that?

20     A.   Going on three years, I believe.

21     Q.   Do you know AV-2?

22     A.   Yes.

23     Q.   You know who she is?

24     A.   Yes.

25     Q.   Have you seen her over the -- let's see.  In 2023, did you

1    see her at The Pikey sometimes?

2    A.    Yes.

3    Q.    So I want to talk specifically about May 5th, 2023.  Were

4    you working that night?

5    A.    Not that night, no.

6    Q.    Were you contacted after that night, the days after, by

7    AV-2?

8    A.    Yes.

9    Q.    Could you tell the jury, what was she asking The Pikey or

10   you to attempt to do?

11   A.    She was originally asking for camera footage of the night,

12   and that was more or less it.

13   Q.    And when you say "the night," would that be Cinco de Mayo

14   2023?

15   A.    Yes.

16   Q.    And what was -- what was your response to that?

17   A.    I told her that I no longer had -- by the time she contacted

18   me directly, I no longer had the camera footage, but I was -- one

19   of my bartenders had contacted me, and I had footage from then --

20   or I reviewed the footage when they originally talked to me.

21   Q.    Was staff at The Pikey able to go through records to

22   identify a person that AV-2 was looking for?

23   A.    Yes.

24   Q.    And just generally, how were you all able to do that?

25   A.    From her description, and then I also contacted the business

1    next to us and asked for their camera footage as well.

2    Q.    And did you review that footage and -- with the police as

3    well, the Klamath Falls police, some of it?

4    A.    Briefly, yes.

5    Q.    So do you have in front of you what's marked as Government's

6    Exhibit 418?

7    A.    Yes.

8    Q.    And just because I can't pull it up right now with the

9    screen, does that show an individual in a camouflage jacket,

10   418-1, standing next to a pool table?

11   A.    Yes.

12   Q.    And does it show three individuals leaving The Pikey?

13   A.    Yes.

14   Q.    And both of those first two from Pikey surveillance footage?

15   A.    Yes.

16   Q.    And then two outside photos from a neighboring surveillance

17   camera.  Is that -- is that what you're seeing?

18   A.    Yes.

19   Q.    And then is there a man in there you came to know as either

20   Sakima Zuberi or Negasi Zuberi depicted in some of those

21   photographs?

22   A.    Yes.

23   Q.    So specifically, standing next to the pool table, is that --

24   do you know that person to be Negasi Zuberi or Sakima Zuberi?

25   A.    Negasi, yes.

1   Q.   And same -- that was 418-1.  And then the second one,

2   walking out, camouflage jacket, same question:  Negasi, 418-2?

3   A.   Yes.

4   Q.   And then 418-3, sort of a blurry photo of AV-2 and Negasi?

5   A.   Yes.

6   Q.   Okay.  And then the last one, 418-4, just the man in the

7   camouflage jacket we described as Negasi walking down the street.

8   Is that -- is that what you're seeing?

9   A.   Yes.

10  Q.   Thank you.  So I want to ask in terms of was there

11  surveillance footage from multiple cameras inside The Pikey from

12  Cinco de Mayo?

13  A.   Yes.

14  Q.   And did you and your staff review that footage?

15  A.   Yes.  I did.

16  Q.   Were you looking for Negasi Zuberi in those photographs --

17  in those -- in those videos?

18  A.   Yes.

19  Q.   Obviously you were able to provide some of those to law

20  enforcement.  Is that correct?

21  A.   Yes.

22  Q.   Did you see AV-2 at The Pikey that night on surveillance?

23  A.   Yes.

24  Q.   Did you ever see Negasi Zuberi and AV-2 interact inside

25  The Pikey on Cinco de Mayo?

1   A.   From what I saw, no.

2   Q.   And were you looking for that?

3   A.   Yes.

4          MR. SWEET:  That's all I have.  Thank you, Ms. Keeton.

5          THE COURT:  All right.  Any cross-examination?

6          MS. POTTER:  No.  No, thank you, Your Honor.

7          THE COURT:  All right.  Thank you very much for joining

8   us.  You're free to sign off.

9          THE WITNESS:  Okay.  Thank you.

10         MR. SWEET:  Thank you.

11         THE COURT:  All right.  Our next witness.

12         MR. BOCCATO:  The Government calls to the stand Jason

13  Malone.

14         THE COURT:  Mr. Malone, if you'd like to step up to the

15  witness stand here on my right.  Mr. Svelund will kind of direct

16  you around.  If you'd like to go ahead and step up the stairs,

17  remain standing for just a moment.  If you'd like to raise your

18  right hand.

19                        **JASON MALONE**

20      after having been duly sworn under oath, was examined and

21                       testified as follows:

22         THE COURT:  If you'd like to have a seat.  If you could

23  state both your first and your last name, and could you spell

24  both of them for our court reporter?

25         THE WITNESS:  Sure.  My name is Jason Malone.  That's

1    J-A-S-O-N, M-A-L-O-N-E.

2              THE COURT:  All right.  Thank you.

3                    **DIRECT EXAMINATION**

4    BY MR. BOCCATO:

5    Q.    All right.  Mr. Malone, where do you work?

6    A.    I work for JPMorgan Chase.

7    Q.    And what is your role at JPMorgan Chase?

8    A.    I am a vice-president in production management, consumer

9    banking.

10   Q.    And where are you based out of?

11   A.    Columbus, Ohio.

12   Q.    And how long have you worked for Chase Bank?

13   A.    Including my time with the predecessor, Washington Mutual,

14   I've been there about 17 years.

15   Q.    I'd like to pull up Government's Exhibit 348.  Do you

16   recognize this exhibit?

17   A.    It looks to be a declaration from one of our transaction

18   specialists.

19   Q.    All right.  And let's go to page 3 before we jump back to

20   page 1.  And is this an entry?

21   A.    It appears to be a -- an entry from our ATM transaction

22   inquiry system.

23   Q.    And is this the kind of entry that's kept in the regular

24   course of business?

25   A.    Yes.  This will be recorded for any transaction that occurs

1    at an ATM, one of Chase ATMs.

2    Q.   Let's go back to page 1 briefly.  And is this page -- does

3    this appear to be a page signifying that this is a Chase business

4    record?

5    A.   Yeah.  I don't know Kristen, but the statement appears to

6    come from Chase, yes.

7    Q.   And it includes a statement that it's a -- essentially a

8    business record?

9    A.   Correct.

10   Q.   Thank you.  Let's jump back to page 3, please.  And we're

11   going to zoom in on some of these parts, because they're very

12   hard to see, but generally does this just show a single

13   transaction?

14   A.   It looks to me to be a screen capture from a single -- a

15   single transaction in the transaction inquiry system, yes.

16   Q.   We're going to zoom in to the first two boxes.

17   A.   Uh-huh.

18   Q.   All right.  So what does the box on the far left tell us,

19   system date and time?

20   A.   That would be the localized time of the data center that

21   hosts our back-end servers that process ATM transactions.

22   Q.   And how about the time to the right?

23   A.   Again, localized, but this one will be for the -- the ATM

24   where the transaction was initiated.

25   Q.   And why is there a difference in time?

1    A.    Well, the ATM timestamp would be Pacific time, because it's

2    from the ATM in Oregon, and the other one would be three hours

3    later, because it's one of our east coast data centers.

4    Q.    Okay.  So the -- is every ATM transaction processed through

5    a data center?

6    A.    Specifically through one of Chase data centers, yes.  The

7    ATM will -- will contact the back-end system in the Chase data

8    center to request authorization for the transaction to proceed.

9    Q.    And are there any data centers in the state of Oregon?

10   A.    No.  Chase has no data centers in Oregon.

11   Q.    So to complete an ATM transaction in Oregon, you would have

12   to go to an out-of-state data center?

13   A.    That is correct, yes.

14   Q.    All right.  And it's kind of there for the jury, but can you

15   just specify exactly the transaction date -- was the transaction

16   date May 6th, 2023?

17   A.    Yes.

18   Q.    And it looks like it's about 1:36 in the afternoon?

19   A.    The AT -- the local ATM time was 1:36, correct.

20   Q.    Let's go to the next three rows, the next three columns.

21   What does the term "ID merch name" tell us?

22   A.    Well, depending on where the transaction was initiated, it

23   would be either the terminal ID, indicating the unique identifier

24   of the ATM.  Out of our approximately 15,000 ATMs, it's this one

25   in Oregon.  Could have been a merchant name, but this one wasn't

1  at a merchant, it was an ATM, so (pause) --

2  Q.   And Oregon 250, is that, like, a term -- an ID for an ATM

3  terminal?

4  A.   Correct.  So "OR" indicating it's located in the state of

5  Oregon, and then 2450 is the unique number that's assigned to

6  that ATM.

7  Q.   And what does -- based on your records, what does 2450, what

8  does that go back to?

9  A.   So I -- I previously looked this up when I was given the

10  subpoena, and I found it to be an ATM located at 2885 South 6th

11  Street in Klamath Falls.

12  Q.   With regard to -- what's the ECI number stand -- indicate?

13  A.   It's a customer identifier that we would assign to a Chase

14  customer that would allow us to associate multiple accounts to

15  the same customer, but this was not a -- a Chase account.

16  Q.   So the --

17  A.   So the ECI is not populated.

18  Q.   And then we have a card number.  We don't have to go into

19  that in too much detail, but are you able to tell whether or not

20  this comes from a Key Bank account?

21  A.   Yeah.  The first few digits, six or seven digits, kind of

22  indicate whether -- the first one, 5, indicates it was a

23  MasterCard-issued account and then the next few indicate it was

24  Key Bank.  So I think it's 44927 would always be Key Bank.  The

25  remaining numbers are specific to the customer's account.

1   Q.   All right.   Perfect.   Thank you.   And the card FIID briefly?

2   A.   Yeah.   This is just another internal Chase-designated

3   identifier that tells me that this is a MasterCard-issued ATM

4   card.

5   Q.   All right.   Thank you.   And are these two account numbers

6   blank because this was not a Chase customer?

7   A.   Correct, and the transaction type withdrawal.   So you'd

8   normally see these populated for, like, transfers or other

9   things, but -- and they would be internal Chase accounts that

10  would be listed here if it were a Chase customer.

11  Q.   All right.   Thank you.   All right.   So let's just go over

12  this part really quickly.   We have a sequence number.   Can you

13  tell us briefly what that means?

14  A.   It's a -- like, a transaction counter within the ATM.   So

15  each -- each specific transaction would increment that number.

16  So it would go 3263 for this withdrawal, and the next person that

17  came up would get 3264.

18  Q.   And the transaction type, that just -- it indicates

19  withdrawal.   That means somebody pulled money out?

20  A.   Correct.

21  Q.   The response is approved.   Does that mean it was an approved

22  transaction?

23  A.   Yeah.   So the approved would have been evaluated in our data

24  center and sent back to the ATM that, yes, I believe this is a

25  valid transaction and you're approved to distribute the money.

1   Q.   And how much money was taken out?

2   A.   It would have been a $300 cash withdrawal.  Because this was

3   a non-Chase account, there's a $3.50 transaction fee that would

4   be debited from the account but not disbursed.

5   Q.   And the reversal section is blank.  Can you tell the jury

6   why that -- it's blank?

7   A.   I mean, there was no reversal.  Reversals happen if there's

8   an issue within the ATM, money gets stuck in the -- the gears or

9   something, the ATM will recognize, "Hey, I didn't -- I didn't

10   give them the money, so I'm going to automatically reverse that

11   and credit the account to make sure the account is correct."

12   Q.   So based on this record, the account -- the transaction went

13   through?

14   A.   Yes.

15   Q.   All right.  So in short, on May 6 at -- 2023 at about

16   1:36 p.m., the account listed here withdrew $300 from Oregon ATM

17   2450, which is located at 2885 South 6th Street in Klamath Falls,

18   Oregon?

19   A.   Yes.  I believe that's a correct statement.

20   Q.   All right.  And can you briefly, and you already kind of

21   touched on it a little bit, just briefly explain the flow of an

22   ATM withdrawal transaction?

23   A.   Sure.  A customer will put their card in the machine and

24   then the machine will prompt them for their PIN.  That

25   information will then be sent to the data center to validate that

1    the PIN is accurate and will notify the ATM then that the

2    customer's allowed to proceed.

3          At that point, the customer would indicate if they

4    wanted to -- the type of transaction they want to do, withdrawal,

5    deposit, whatever.  In this case, it was a withdrawal.  And they

6    would indicate the amount they're requesting, which would then be

7    sent back to the data center for authorization.

8          Our systems in the data center in this particular case

9    would have contacted MasterCard to validate that the money was

10   available.  MasterCard would have gotten that information from

11   Key Bank, but I can't speak to that exact process, but once

12   MasterCard had confirmed availability, they would have notified

13   the system in our data center, which would have then sent the

14   communication back to the ATM authorizing it to dis- -- to

15   dispense the money.

16   Q.   All right.  Thank you so much.  I just have one last

17   question.  So just to confirm, to complete this transaction, the

18   ATM would have had to communicate with an out -- out-of-state or

19   out-of-Oregon data center?

20   A.   Yes.  Correct.  Since there are no Chase data centers in

21   Oregon to process ATM transactions, it would have had to have

22   been completed outside of Oregon.

23          MR. BOCCATO:  Thank you.  No further questions.

24          THE COURT:  Any cross-examination?

25          MR. BERTHOLF:  No.

1    THE COURT:  All right.  The one thing I love about

2  being in the courtroom, we learn very discrete pieces of

3  information, so thank you for helping us with that.

4    THE WITNESS:  All right.

5    THE COURT:  You're free to go.

6    THE WITNESS:  Thank you, sir.

7    MR. LICHVARCIK:  The United States calls Brenden

8  Westfall to the stand.

9    THE COURT:  Mr. Westfall, if you'd like to step up to

10  the witness stand to my right, David will direct you.  If you

11  want to step up the stairs for me, standing for just a moment,

12  and I'll have you sworn in.  If you'd raise your right hand.

13                        **BRENDEN WESTFALL**

14    after having been duly sworn under oath, was examined and

15                        testified as follows:

16    THE COURT:  If you'd like to have a seat.  And if you

17  could state your first and last name and spell both for our court

18  reporter.

19    THE WITNESS:  Hello.  My name is Brenden Westfall,

20  B-R-E-N-D-E-N, Westfall, W-E-S-T-F-A-L-L.

21    THE COURT:  Thank you, Mr. Westfall.

22                        **DIRECT EXAMINATION**

23  BY MR. LICHVARCIK:

24  Q.   Mr. Westfall, on the screen is Exhibit 355-1.  Do you

25  remember that day?

1    A.    I do.

2    Q.    Tell us about it.

3    A.    It was the removal of the cinderblock cell out of the rental

4    garage.

5    Q.    Who did it?

6    A.    Pardon?

7    Q.    Who did the removal?

8    A.    My father and myself.

9    Q.    And what's your dad's name?

10   A.    Kevin Westfall.

11   Q.    How did you feel that evening?

12   A.    Pretty sore, a lot of lifting.

13   Q.    355-7, what's that?

14   A.    That would be my father, and I took that photo.

15   Q.    Did you take any swings with the sledgehammer?

16   A.    Yep.  We traded.

17   Q.    Why?

18   A.    It was exhausting.

19   Q.    Do you know Negasi Zuberi?

20   A.    I do.

21   Q.    How?

22   A.    Through collecting rent when folks were out of town.

23   Q.    All right.  And rent for what?

24   A.    Rent for the home that he was renting.

25   Q.    1336 North El Dorado?

1    A.    Correct.

2    Q.    And so you generally helped your parents when they needed

3    help with the rental?

4    A.    Yep.

5    Q.    Did you ever see Mr. Zuberi hauling anything in 2023?

6    A.    I did witness him hauling something.

7    Q.    Would you please tell us about that.

8    A.    Passing Home Depot, I witnessed his silver Honda Pilot

9    towing a trailer full of cinderblock.

10   Q.    And why, if at all, did that stand out to you?

11   A.    It was rather unusual.  Given his -- I guess just building

12   material in general, it's quite a load.

13   Q.    Did you see him at Home Depot any other times?

14   A.    I did witness, passing him, he was leaving Home Depot with

15   caulking tubes with liquid nail.

16   Q.    Let's switch to May 6th.  And, actually, let's go back to

17   even the day before, May 5th, Cinco de Mayo.  Were you at

18   The Pikey that night?

19   A.    No, I was not.

20   Q.    Do you remember where you were on Cinco de Mayo?

21   A.    I was home with my newborn daughter.

22   Q.    How about May 6th, the next day?  What do you remember about

23   that, if anything?

24   A.    I was coordinating with Mr. Zuberi about collecting rent.

25   My father had told me that he was going to have rent ready about

1   1 o'clock, so I reached out to him before noon to confirm a

2   pickup time.

3   Q.   And you reached out to who before noon?

4   A.   Mr. Zuberi.

5   Q.   Okay.

6   A.   To confirm pickup time.

7   Q.   How did you reach out to him?  Do you remember?

8   A.   Through text message.

9   Q.   Okay.  And what were you -- what time were you trying to

10  schedule something for?

11  A.   Trying to confirm if the 1 o'clock appointment time for

12  picking up rent was still appropriate.

13  Q.   For May 6th?

14  A.   Correct.

15  Q.   And was Mr. Zuberi available at 1:00 p.m. on May 6th?

16  A.   No.  He had indicated that 1:00 p.m. would not work, and so

17  we postponed it till about 4 o'clock that afternoon.

18  Q.   Did you know at all what he was doing at 1:00 p.m. on

19  May 6th?

20  A.   He did indicate that, I believe, he was tired.

21  Q.   Did he say anything about what he was doing in the garage?

22  A.   No.

23  Q.   So did you end up meeting up with him that day, May 6th?

24  A.   Yes.

25  Q.   Tell us about that.

1   A.   Later that evening, I went to the house to collect the rent.

2   Mr. Zuberi opened the door, but didn't open it all the way, and

3   just poked his head out.  I could see that he was visibly tired

4   and he didn't -- I couldn't see inside the house.  He closed the

5   door to collect the rent, and then he came back out producing

6   some cash, but it wasn't the full amount.  I did confirm with him

7   the amount and that -- he indicated that we would -- he would

8   have the rest at a later time.

9   Q.   And the jury's already seen pictures of -- of North

10  El Dorado.  You say you met him at the door when he just opened

11  it and had his head out.  Which door was that?

12  A.   If you're looking at the house, it would be the formal front

13  door on the right-hand side.

14  Q.   In the gated area?

15  A.   Correct.

16  Q.   Okay.  So you left?

17  A.   Yep.  I left the house with the collected denomination and

18  went home.  And then the next day, I coordinated with him to

19  collect the remaining amount of rent.

20  Q.   Okay.  So that would have been on May 7th?

21  A.   I believe so.

22  Q.   Okay.  Tell us about what happened then.

23  A.   So I coordinated with Mr. Zuberi about collecting the

24  remaining amount of rent, and he indicated that he had the

25  remaining amount, so I drove across town to collect it.  This

1    time, instead of going to the front door and meeting Mr. Zuberi,

2    he met me out at the sidewalk to collect the rent.  He was a lot

3    more alert and attentive that day, and I collected rent without

4    issue.

5    Q.   Okay.  On the screen is 28-5.  You said he came out and met

6    you.  Where did he come out from?

7    A.   He came out probably from the gated area and met me all the

8    way out towards the front of the building by the road.

9    Q.   So that would be off the -- off to the right of

10   Exhibit 28-5?

11   A.   Somewhere, yes.

12   Q.   Okay.  And you mentioned that he was more attentive.  Did

13   anything else stand out about his actions or demeanor on May 7th

14   when you saw him?

15   A.   A lot more alert, looking around, not the Zuberi that I met

16   earlier, way less groggy.

17            MR. LICHVARCIK:  All right.  Thank you.

18            THE COURT:  Any cross-examination?

19            MR. BERTHOLF:  One quick question.

20                     **CROSS-EXAMINATION**

21   BY MR. BERTHOLF:

22   Q.   Was this -- what kind of trailer was he using?

23   A.   It looked to be a small flatbed, small-wheeled trailer.

24   Q.   Like, a black one?

25   A.   Potentially.

1    Q.   Okay.  Did it have a gate going up or did it have sides or

2    was it just a straight flatbed trailer?

3    A.   It appeared to be a flat trailer.

4    Q.   Okay.  Had you ever seen that trailer before?

5    A.   No.

6    Q.   But you don't recall the color.  Was it -- are you sure

7    about that?

8    A.   The cinderblocks were what caught my attention.

9    Q.   Okay.

10            MR. BERTHOLF:  I think that's all.  Thank you.

11            THE COURT:  Any redirect?

12            MR. LICHVARCIK:  No, Your Honor.

13            THE COURT:  Thank you, Mr. Westfall.  Appreciate your

14   time.

15            THE WITNESS:  Thank you.

16            MR. BOCCATO:  The Government calls to the stand Robert

17   Phillips.

18            THE COURT:  All right.  Mr. Phillips, if you'd like to

19   head on over to the witness stand here to my right.  Mr. Svelund

20   will direct you.  Step on up.  If you'll remain standing for just

21   a moment and raise your right hand.

22                         **ROBERT PHILLIPS**

23      after having been duly sworn under oath, was examined and

24                         testified as follows:

25            THE COURT:  If you'd like to have a seat.  And I'll

1    have you state your first and last name, and I'll have you spell

2    both of them for the court reporter.

3            THE WITNESS:  Robert Phillips.

4            THE COURT:  And if you would spell your first and last

5    name so our court reporter --

6            THE WITNESS:  Oh.  R-O-B-E-R-T, P-H-I-L-L-I-P-S.

7            THE COURT:  Thank you, Mr. Phillips.

8                       **DIRECT EXAMINATION**

9    BY MR. BOCCATO:

10   Q.   All right.  Mr. Phillips, where do you work?

11   A.   Land Air Sea Systems.

12   Q.   And can you just give the jury a brief description of what

13   Land Air Sea is?

14   A.   We provide domestic and commercial GPS services so you can

15   locate your -- your trucks in the field, your equipment, your --

16   your dog, you know, your loved ones.

17   Q.   Very nice.  And what do you do for Land Air Sea?

18   A.   I was the -- I'm the software engineer.  I've built to --

19   and launched the initial offerings for the software piece.

20   Q.   All right.  And we're going to talk about that in a minute,

21   but prior to working for Land Air Sea, what did you do?

22   A.   Other -- other companies of similar -- of similar nature.

23   In 2006, we began something called Locations, and this -- this

24   kind of opened the doors for this kind of software.  There became

25   a demand for it.  And worked for a couple companies, including

1  Rocky Mountain Tracking, before Land Air Sea called me.

2  Q.   And for how many years have you been working with GPS

3  technologies?

4  A.   25 years.

5  Q.   All right.  And can you just briefly explain to the jury

6  what GPS is and how it works?

7  A.   You have -- you have satellites in space and you have an

8  antenna on the ground.  If I can see at least three satellites,

9  now I can triangulate a position on the earth.  Once I'm sure --

10 once the device is sure of that, it will use the cellular network

11 to send that over -- over cellular data to our central servers,

12 and we'll process that data and try to make it meaningful for the

13 customer.

14 Q.   All right.  So if you're getting GPS data -- or using GPS

15 technologies, you essentially have to use a satellite in outer

16 space?

17 A.   Absolutely.

18 Q.   So I'd like to show for the jury Exhibit 490.  Can you

19 identify those two items for us?

20 A.   Yes.  That's our Model 54 tracker, one of our most popular

21 products.

22 Q.   All right.  Did you design the hardware for these products?

23 A.   No, sir.  The owner and founder of the company, Robert

24 Wagner, he's our -- he's our lead electrical engineer, he and a

25 cohort from college that he knew developed the first -- the first

1   products.

2   Q.   All right.  But did you design the software for it?

3   A.   Yes.

4   Q.   All right.  So essentially does that mean, did you design,

5   like, an app or an application that people can use to access

6   data?

7   A.   Precisely.  That's -- that's the way a customer might make

8   use of this technology.

9   Q.   And when an individual uses one of these, we'll call them a

10  puck, do those generate data?

11  A.   They will.  They're going to collect their position and

12  they're going to with -- if it's -- if we've activated it, it's

13  going to use the cellular network to send that data to us.

14  Q.   Okay.  And where is it going to send it to?

15  A.   A central server.  It is on the Amazon cloud.  I believe

16  those are housed in Ohio.

17  Q.   And does Land Air Sea have, like, a subscription service

18  that someone can sign up for?

19  A.   Yes.  Yes.  We pretty much give the hardware away, but we --

20  we require a monthly for the -- for the data.

21  Q.   All right.  And what does that -- when you subscribe to the

22  service, what -- you know, I'm sure there's different tiers and

23  different options, but generally what does the customer get?

24  A.   They can download our app where you use your laptop or

25  desktop, and you can sign in, you can view your data, you can

1    create specific alarms based on location, you can make reports on

2    past data, so on and so forth.

3    Q.   So is it fair to say that if you buy the trackers and

4    subscribe to the service, you can go onto the app or the

5    application and learn where your tracker is currently or where it

6    has been?

7    A.   Yes, sir.

8    Q.   All right.  I am going to -- let's pull up the first page of

9    Exhibit 266.  And I am going to hand this to you.  I will

10   forewarn everyone that I will not be going through this in any

11   sort of detail, but I just want to show that to you.

12           At the bottom of that exhibit, 417, can you tell me how

13   many pages that is?

14   A.   Looks like one -- one -- page 1 of 417 pages.

15   Q.   All right.  Do these pages look familiar to you at all?

16   A.   Yes.

17   Q.   What are -- what's contained in these pages?

18   A.   This would be the historical report that you -- that you can

19   get as a customer, and it represents the data we've recorded for

20   the device.  You've got your speed, heading, location, and a

21   timestamp.

22   Q.   So are the entries made in this document -- or when you get

23   this data, is it made -- are the -- when it's sent up to the

24   cloud, are those data entries kind of made in real time?

25   A.   Yes.

1   Q.   And are the data -- are the entries kind of made

2   automatically?

3   A.   Yes.  Once the data comes in, we -- we know that it's viable

4   and we should -- we should save that for the customer.

5   Q.   And you hold on to these records as kind of a regular part

6   of your business?

7   A.   Yes.  We keep -- we keep historical data for one year at

8   least.

9   Q.   We're going to jump all the way to page 407.  All right.  So

10  we see kind of in this zoomed-up portion, a few columns, and I

11  just want to briefly go over those columns with you.  The column

12  on the far left, what does that column show us?

13  A.   That would be UTC time.  That's the exact time and date that

14  we received that information.

15  Q.   I think the jury's kind of heard this before, but I just

16  want to clarify, UTC, is that Pacific time, Eastern time?  What

17  is that time?

18  A.   That's Greenwich mean time.  That's where the time zones

19  start at zero.  We work -- we work from there to create time

20  zones around the world.

21  Q.   Okay.  Is -- from Pacific time, does seven hours back sound

22  about right?

23  A.   Yes, depending on daylight savings.

24  Q.   Thank you.  So the second column, what does the second

25  column show us?

1    A.    That is the heading based on a 180-degree, you know, turn.

2    Q.    360-degree?

3    A.    Yes, yes.

4    Q.    And would true north, would that be zero?

5    A.    Yes.

6    Q.    And what's the second column show us?

7    A.    That is an estimation of elevation.  Elevation's a little

8    bit harder to triangulate, but it's usually -- usually pretty

9    damn close.

10   Q.    And then there's a speed -- or what's the next -- or the

11   one, two, three, fourth column?

12   A.    This is the speed according to the device itself.  It looks

13   like that's a ridiculous speed, but you need better resolution

14   and every 30 minutes to calculate from where I've been to where I

15   am now and how fast did it take me to get there.

16   Q.    And it looks like, I think as you noted, there's -- the

17   timeframes are every 30 minutes.  Does that sound accurate?

18   A.    Yeah.

19   Q.    And why would the timeframes be every 30 minutes?  What

20   could cause that?

21   A.    That -- that is suspicious.  That tells me that they may

22   have put it in low power mode.  That way, instead of your

23   subscribed interval of 3 or 5 or 10 seconds, now it's only going

24   to report every 30 minutes, every hour, every four hours,

25   whatever you specify.

1   Q.   And if you're in -- could you go on low power mode

2   automatically if you just -- your battery starts running low?

3   A.   No.  This is -- this is a cust- -- a user-driven event.

4   Q.   And when they're in low power mode, can the speed kind of be

5   a little bit off?

6   A.   Yeah.

7   Q.   Now let's jump to page 408.  Let's go to the (pause) --

8        All right.  And I assume you're not very familiar with

9   Klamath Falls, but does it appear the trackers have now moved to

10  the area of North El Dorado -- or sorry, the Unity Street,

11  Klamath Falls area, based on the data?

12  A.   I'm sorry?

13  Q.   I know you're not very familiar with Klamath Falls, but

14  based on just this little snippet that I'm showing you, does it

15  appear that the trackers have moved to 2661 Unity Street, Klamath

16  Falls, Oregon?

17  A.   Yes.  The -- the address is estimated based on latitude,

18  longitude.  The device itself only knows that lat and long, and

19  then we have to estimate the -- the -- the address.

20  Q.   And what's the -- and I'm sorry to ask you to do math on the

21  stand, but what's the time for that 715 entry?

22  A.   22:00.  My military time (pause) -- that's 10 o'clock,

23  10:30 p.m.

24  Q.   So UTC -- and what's the time Pacific time?

25  A.   Minus seven, it's going to be 3:00 -- 3:00 in the afternoon.

1   Q.   Thank you so much.  Right -- yeah.  Right about 3:30?

2   A.   Yep.

3   Q.   So I also want to talk to you about Google Maps.  Are you

4   familiar with Google Maps at all?

5   A.   Yes, sir.

6   Q.   How are you familiar with it?

7   A.   We use that to display -- to display a map and plot points

8   on it so you can see in context where everything is.

9   Q.   Does Google Maps, does that also use GPS technology?

10  A.   It's a map, but, yes.  They -- they -- they cater to this

11  sort of use.

12  Q.   Okay.  I'm going to show you what's been marked as

13  Exhibit 401.  And does this appear to be a Google Maps screen

14  shot to you?

15  A.   I believe so, yes.

16  Q.   And to get this route and information, would you expect that

17  the, you know, user who generated this screen shot would be using

18  GPS technology?

19  A.   It would -- yeah.  It -- I would assume so, and they've

20  requested a -- directions to a place.

21  Q.   And you provided all this data in response -- did

22  Land Air Sea provide all this data in response to a subpoena

23  request?

24  A.   Yes, sir.

25  Q.   Oh, sorry.  To some sort of formal legal process?

1    A.    Absolutely.

2    Q.    And do you remember the -- and if you don't remember, that's

3    fine.  Do you remember the -- the customer on the account?

4    A.    No.

5    Q.    You just received formal legal process and you provided that

6    process?

7    A.    Yes, yes.

8              MR. BOCCATO:  All right.  Thank you.  No further

9    questions.

10             THE COURT:  Any cross?

11             MR. BERTHOLF:  No.

12             THE COURT:  I'm just kind of curious.  Anybody can buy

13   these, right?

14             THE WITNESS:  Absolutely.

15             THE COURT:  What's your -- I guess what's your customer

16   base look like?  Is it (pause) --

17             THE WITNESS:  Our primary customer is the -- the small

18   business owner who wants to know where his equipment is, where --

19   where his people are going.  We're really trying to focus on

20   larger fleets like shuttle -- shuttle companies and (pause) --

21             THE COURT:  Parents want to know where their kids are

22   going in the car?

23             THE WITNESS:  Yes, yes.

24             THE COURT:  All right.  Thank you.  I really appreciate

25   your time.

1          MR. BOCCATO:  The Government calls to the stand

2    Christopher Giovanetty.

3          THE COURT:  Okay.  Agent Giovanetty, you are still

4    under oath in this case, so you can have a seat and take the

5    stand, and we'll continue.

6                     **CHRISTOPHER GIOVANETTY**

7     after having been previously sworn under oath, was examined and

8                          testified as follows:

9                      **DIRECT EXAMINATION**

10   BY MR. BOCCATO:

11   Q.  All right.  Special Agent Giovanetty, I'm going to talk

12   about some audio recordings that we have in this case first off.

13   So as part of your work in this case, did you listen to some

14   audio recordings?

15   A.  I did.

16   Q.  All right.  From July 28th, 2023, are there two audio

17   recordings between Mr. Zuberi and Alycia Westfall where they

18   discuss the cell in the garage?

19   A.  Yes, there are.

20   Q.  So I'd like to play for you two clips, so 462-1 and 462-2,

21   please.

22          (Playing audio, Government's Exhibit 462-1)

23   Q.  We're going to play 462, clip 2 -- or dash 2.

24          (Playing audio, Government's Exhibit 462-2)

25   Q.  All right.  Special Agent Giovanetty, I think you mentioned

1  last time you testified, have you been involved in this case

2  essentially since the beginning?

3  A.   Yes, I have.

4  Q.   And did law enforcement seize any musical equipment from the

5  Zuberi's house, vehicles, or trailer?

6  A.   No, we did not.

7  Q.   Just to clarify, this call is from July 28th, 2023?

8  A.   Yes.  These calls are from July 28th.

9  Q.   In the financial records and the Amazon records, did you see

10  any musical equipment?

11  A.   I believe all we saw were some general, like, home speakers,

12  like, a shower speaker you could put in your shower to listen to

13  music, but nothing, like, recording devices or other music

14  specialist equipment.

15  Q.   And in your iCloud reviews, did you see any messages about a

16  sound studio?

17  A.   Not that I recall, no.

18  Q.   When do you -- when does Mr. Zuberi first bring up the idea

19  of a sound studio in his garage?

20  A.   Not until after his arrest.

21  Q.   Now I want to play some more audio recordings from

22  Exhibit 463, part 1.  Did you listen to this -- another audio

23  recording from July 28th between Alycia Westfall and Zuberi where

24  they discuss the garage and who had access to it?

25  A.   Yes, I did.

1            THE COURT:  Agent, could you explain how you have

2    access to these phone calls?

3            MR. BOCCATO:  Well, I don't know if we want to --

4            THE COURT:  Okay.  Never mind.  Ignore that question.

5    Q.   Let's play part 1 -- or 463, part 1.

6            (Playing audio, Government's Exhibit 463, part 1)

7    Q.   Special Agent Giovanetty, you know, based on your work in

8    this case, did everyone have keys to the garage?

9    A.   No, they did not.

10   Q.   And could everyone enter the garage?

11   A.   Not that we're aware of.

12   Q.   Let's play the second part of 463.

13           (Playing audio, Government's Exhibit 463, part 2)

14   Q.   So just to clarify, Special Agent Giovanetty, were these --

15   this call from -- was this call from July 28th, 2023?

16   A.   Yes, it was.

17   Q.   And was Mr. Zuberi, was he informed that these calls were

18   being recorded?

19   A.   Yes, he was.

20   Q.   And it's a little bit hard to follow what's happening in

21   this call, but were you able to kind of determine what you

22   believe was -- they were talking about?

23   A.   Yes.  They were talking about the Triple A Discount Storage

24   and the travel trailer.  She mentions the dash 21, 1.  I think

25   she forgot the password, which was provided in a previous call

1   several days earlier.

2   Q.   What was that password that was provided?

3   A.   It was -- the password he provided on another call earlier,

4   which I believe was already played, it was star 2153 pound.  She

5   said dash 21, 1 here.

6        She then is asking what the location for it is.  And at

7   first Mr. Zuberi is -- appears to be -- doesn't want to discuss

8   the topic and provide more information.  He tries to provide

9   hints that, "You could find information about it in my e-mail

10  address," which I assume means the receipts that he would be

11  getting copies of, and then he goes on to provide more

12  information on the rest of this call.

13  Q.   Okay.  So tell the jury some of the other information he

14  provides in the call.

15  A.   So he will provide the -- he gives her the hint that it's by

16  the Home Depot.  I think if you were to look at Google Maps,

17  you'd see that the Triple A Discount Storage is right next to the

18  Home Depot in Klamath Falls.

19       She mentions that she needs to find it because she

20  needs to get food out of it.  When we searched the trailer, we

21  found a lot of bags of -- Amazon delivery bags full of Ramen

22  noodles and non-perishable food items.

23       (Playing audio, Government's Exhibit 463)

24  A.   So it appears at the end of it, he's trying to divert the

25  conversation again and not discuss it further.

1   Q.   All right.  So let's talk about Exhibit 465.  What -- did

2   you listen to another call from August 1st, 2023, about the

3   trailer?

4   A.   Yes.

5   Q.   Does it appear that Mr. Zuberi -- Zuberi was being kind of

6   evasive about the trailer in this call as well?

7   A.   Yes.

8   Q.   Let's play the first 15 seconds of this call.

9         (Playing audio, Government's Exhibit 465)

10   Q.   Is Mr. Zuberi trying to keep Ms. Westfall from talking about

11   the case?

12   A.   Yes.

13   Q.   Let's play it again and stop at 35 seconds.

14         (Playing audio, Government's Exhibit 465)

15   Q.   By this time, had law enforcement talked to Alycia Westfall

16   about the trailer?

17   A.   Yes.

18   Q.   What did they tell her?

19   A.   We had told her that we knew about the existence of the

20   trailer, that it was our intent to seize it, and that she was not

21   to go tamper with it in any way before we had a chance to seize

22   that.

23   Q.   Okay.  Let's go, and we can stop at 50 seconds.

24         (Playing audio, Government's Exhibit 465)

25   Q.   Did you have a type of warrant?

1   A.   Yes, we did.

2   Q.   What did you have?

3   A.   We had a federal search warrant to search the trailer and

4   seize it.  And by the time this call had occurred, we had

5   actually already seized the trailer.

6   Q.   Okay.  So when was the date of this call and when had the

7   trailer been searched?

8   A.   The date of this call was August 1st, 2023, and the trailer

9   search, I believe, was July 28th.  Yes.

10  Q.   And, Special Agent Giovanetty, we've been saying trailer,

11  trailer, trailer.  We haven't really defined the trailer.  What

12  trailer are we talking about?

13  A.   This is the Prowler Travel Trailer that was stored at Triple

14  A Discount Storage where we found the long guns, some ammunition,

15  the taser, and other evidentiary items.

16  Q.   Did you find cell jammers there as well?

17  A.   Yes.  We found the cell jammers there, the Land Air Sea

18  pucks that were discussed.

19  Q.   And play it to the end.  Thank you.

20       (Playing audio, Government's Exhibit 465)

21  Q.   Did you also review some e-mails between Alycia Westfall and

22  Mr. Zuberi?

23  A.   Yes, I did.

24  Q.   Let's jump to Exhibit 468.  When was this e-mail sent?

25  A.   July 21st, 2023, at 9:26 p.m.

1   Q.   Thank you.  What's -- what is being said by Mr. Zuberi in

2   this e-mail?

3   A.   He says:  Hi.  Please don't write anything about this case.

4   Q.   Let's go to Exhibit 470.  Did you review an e-mail from --

5   another e-mail -- or what's the date of this e-mail?

6   A.   July 27, 2023.

7   Q.   Can you read this e-mail to the jury?

8   A.   Yes.

9        Sounds good.  You need to take pictures of the

10       studio in the garage.  Make sure the garage door is

11       open and the lights are on.  Take pictures of the

12       inside and outside.  This is extremely important.  I

13       need clear pictures.  Pull down that blue blanket so

14       you can get a good picture of the studio.

15  Q.   Prior to the search of the garage by state and federal law

16  enforcement, had Mr. Zuberi done anything or taken any steps to

17  prevent people from seeing or looking inside the garage?

18  A.   Yes.  The windows were covered, the studio had the blue

19  blanket covering it so you would open the garage, you wouldn't be

20  able to see it.  You would just see the blue blanket there.

21  Q.   And as you noted earlier, did it appear that the other

22  tenants did not have access to the garage?

23  A.   Correct.

24  Q.   Let's go to Exhibit 471.  Did you -- what is the date of

25  this e-mail and did you review it?

1   A.   Yes, I reviewed it.  And this was July 28th, 2023.

2   Q.   Does this e-mail appear -- can you read that e-mail for us?

3   A.   He asks:  Who took the studio down?  I will have to subpoena

4   everyone who touched it.  That was evidence.

5   Q.   And does this e-mail appear to be connected to some of the

6   calls that we listened to earlier?

7   A.   Yes, it does.

8   Q.   And, again, is there any evidence of a music studio or

9   anything that you found?

10  A.   No.

11  Q.   All right.  Let's talk a little bit more about the Amazon

12  records.  We've already talked a lot about those, but I want to

13  just cover a few more things.  Let's go to Exhibit 350.

14       So -- and you can just -- just chat about these.  We

15  don't necessarily need to directly attach it to an exhibit line,

16  but concerning the records that we have not already discussed,

17  can you discuss a few more Amazon records that were significant

18  to you?

19  A.   Sure.  Sure.  So on July 12th of 2022, there's a purchase

20  for a Vipertek 59 billion heavy-duty stun gun.

21       On July -- oh, my bad.  On January 3rd and March 2nd,

22  there are separate orders for tire spikes.

23       On January 22nd, 2023, we have the first purchase for

24  the Land Air Sea 54 GPS tracker, and then an identical purchase

25  for another one, same model, on March 2nd, 2023.

1          On March 16th, 2023, there's a purchase for police

2   patches, large-size embroidered patches, hook and loop for

3   tactical vest, officer guard uniform, jacket, carrier, hat, one

4   small and one large.

5          On March 25th, 2023, there's a purchase for a We The

6   People brand gun holster, which is the one that was found inside

7   the travel trailer.

8          On May 10th and May 14th, there are separate purchases

9   for smaller cameras.  The first one is described as a mini trail

10  camera that is motion activated.  The second one is described as

11  a hidden closed hook camera, a mini spy camera, a man cam with

12  motion detection --

13          (Interruption by reporter for clarification)

14  Q.   Mr. Giovanetty, while you're there, could you speak a little

15  bit slower and repeat the date?

16  A.   Yeah.  The second one was the hidden closed camera, mini spy

17  camera, man cam with motion detection.

18  Q.   Can you give us the date of that?

19  A.   Yeah.  So those two cameras were purchased on May 10th,

20  2023, and May 14th, 2023, within a week of the AV-2 incident.

21  Q.   And what incident happened -- what had happened just prior

22  to May 10th?

23  A.   Yeah.  On May 5th and 6th was when AV-2 was kidnapped.

24  Q.   So I do want to -- we talked about dead bolts before, but I

25  want to show you -- I want to highlight one of the dead bolt

1    purchases.

2            All right.  So does one of the dead bolt purchases have

3    a -- there we go.  Does one of the dead bolt purchases have a

4    number or a transaction -- or a number associated with it that

5    ends in 0527?

6    A.   Yes.

7            MR. BOCCATO:  Can you highlight that, Kayla, for us?

8            THE WITNESS:  Oh.

9    Q.   Why don't you circle it.

10   A.   Right here (indicating).  And this one was on June 29th.

11   Q.   Okay.  Where was this dead bolt located?

12   A.   This dead bolt was located in the garage on the table.

13   There was a box with the dead bolts in it that was sitting right

14   on top of the Amazon shipping package, which has the tracking

15   number that corresponds with that number right there.

16   Q.   All right.  Can we actually, then, flip to Exhibit 127?  Can

17   you zoom in on the tracking number?

18   A.   This 0527, this is the rest of that tracking number.  It's

19   ripped right there.  That's where the bag is ripped open, but if

20   you flip it around, you can see the full tracking number on the

21   other side as well.

22   Q.   And where was this picture taken?

23   A.   This was taken in the garage on the table.

24   Q.   All right.  Now I'm going to hand you what's been marked as

25   Government's Exhibit 175.  Can you identify this item for me?

1   A.   This is the box with the dead bolt and the Amazon packaging

2   it came with.  And the 0527 and the rest of the tracking number

3   are on here.

4   Q.   And who is that being shipped to?

5   A.   Sakima Zuberi.

6   Q.   All right.  Did you also review data from Mr. Zuberi's Mac

7   laptop?

8   A.   Yes, I did.

9   Q.   Did you find some interesting search history?

10  A.   Yes, I did.

11  Q.   All right.  So we're going to pull up Exhibit 404.  What is

12  this?

13  A.   This is the tag, or the relevant search items we found after

14  we reviewed the data on his Mac laptop.  There's four days that

15  are important.  All the searches center around four days.  The

16  first three searches on May 22nd, 2023, are for "how to build on

17  unleveled concrete".

18  Q.   We're going to zoom in to that right now, so (pause) -- so

19  let's -- and these three searches are all about how to build,

20  again, on unleveled concrete?

21  A.   Yes.

22  Q.   All right.  Let's jump out of this and let's look at the

23  searches that occurred on June 24th.

24  A.   We have a search for a temporary security door, quick lock

25  temporary security door lock, temporary security barriers for

1    doors, Amazon.com folding security gate for door, folding door

2    gate, and the measurements, and Vevor single folding security

3    gate.

4    Q.   Perfect.  Thank you.  Let's go to the search history on

5    July 3rd.

6    A.   On July 3rd, we have searches for mud framing, how to fix

7    crooked walls, trade secrets, how to plaster old uneven walls,

8    how to render a wall, crooked walls drywall, my tip for

9    straightening a crooked wall.

10   Q.   We're going to come back to this later on, but I want to

11   jump to July 15th in a minute.  What was happening on July 15th?

12   A.   That was the day that AV-1 escaped from the cell and

13   Mr. Zuberi had left his house for the last time.

14   Q.   Let's zoom up to July 15.  Let's talk about what Mr. Zuberi

15   was searching for at that time.

16   A.   These searches at night, this would be 8:00 p.m., flights

17   from Reno to New York City, $111 cheap flights from Reno to New

18   York City, flights from Reno to Turkey.

19   Q.   And, Special Agent Giovanetty, we've talked about financial

20   records a bit already, but I want to just circle back and hit a

21   couple things that are important to highlight.  Let's go to

22   Exhibit 347, and let's go to page 7 of the records.  And it's

23   hard to see, so we'll zoom up.  There's a 3/16 purchase, 5D

24   Tactical?

25   A.   Uh-huh.

1       MR. BOCCATO:  Kayla, can you zoom in on that?

2   Q.  All right.  Tell us about that purchase.

3   A.  He spends $514.99 at 5D Tactical.  I know 5D Tactical to be

4   a company that sells the 80 percent lower receivers and other gun

5   parts, and he also had a sticker for 5D Tactical on his MacBook.

6   Q.  Can you explain to the jury what an 80 percent lower

7   receiver is?

8   A.  Sure.  So that is the lower receiver part that the -- think

9   of where the trigger is and the safety mechanism for a rifle.

10  They sell an 80 percent lower receiver.  It's not complete, it's

11  not finished, therefore, it's not regulated.  So in most states,

12  anyone could buy them, and then you could, you know, have to use

13  tools and other kits to mill out the holes and make it

14  operational.

15  Q.  So what else -- so what else would you need besides the

16  80 percent lower receiver to have a completed firearm?

17  A.  You would need an upper -- oh, you would need to complete

18  the lower receiver or (pause) --

19  Q.  Just -- if you got the 80 percent lower receiver, what's --

20  what left do you need to complete a firearm?

21  A.  Yeah.  You would need to buy a specialized kit, I think

22  they're called J kits, and a specialized drill to essentially

23  drill out the remainder of the holes, line it up correctly, the

24  rest of the pieces to assemble it, the last 20 percent, I guess

25  you would say.  These are 80 percent complete.  Then you would

1   need the rest of the firearm, like the barrel, the upper

2   receiver.

3   Q.   Is there a purpose to have an 80 percent lower receiver

4   besides to build a firearm?

5   A.   Not that I can imagine, no.

6   Q.   Let's go to a purchase that occurred on March 20th, $28.94

7   Magpul Industries.  What does Magpul Industries sell?

8   A.   They sell firearms, accessories, magazines for rifles and

9   handguns, tactical gear.

10   Q.   I want to jump ahead briefly before we come back to some of

11   the things, some of the May 5th purchases, but let's go to

12   page 26, please.  All right.  What -- tell us about these

13   transactions.

14   A.   Sure.  So these are transactions from businesses in and

15   around the Seattle area.  This was -- on July 10th is the

16   postdate.  And as I said before when I talked about financial

17   records, the postdate is sometimes a couple days after the

18   transaction actually happened.  It's just when your bank finishes

19   processing it.  So these didn't necessarily happen on July 10th.

20   They could have happened in the days prior to July 10th, but we

21   have a purchase at Sprouts Farmers in Seattle, Washington; a

22   Starbucks store in Seattle; Les Pho Thai in Shoreline,

23   Washington; The Playground in Seattle; and then a payment for his

24   Triple A Discount Storage subscription.

25   Q.   What's the -- you mentioned The Playground, but what is

1  that?

2  A.   It's a strip club in the Seattle area.

3  Q.   And does this show that Mr. Zuberi also traveled up to the

4  Seattle area on July 10th?

5  A.   Correct.

6  Q.   Okay.  Let's go to page 3 of 348.  Actually, let's go to the

7  bottom of page 15.  Let's go to the bottom of page 15, if we can,

8  and let's do the last transaction on there.

9       THE COURT:  We're getting close to a break time, so

10 whenever you think is appropriate, depending on how much time is

11 left.

12      MR. BOCCATO:  I'm just going to finish three more

13 transactions --

14      THE COURT:  Okay.

15      MR. BOCCATO:  -- and then we can take a break.

16 BY MR. BOCCATO:

17 Q.   All right.  Special Agent Giovanetty, what's the date of

18 this transaction?

19 A.   This has a postdate of May 8th, 2023.

20 Q.   And what does a postdate mean?  Like, does this mean the

21 transaction happened that day?

22 A.   Not necessarily.  It's just when the bank finished

23 processing it, it shows up in your account.  So this could have

24 happened -- in most cases, it's a couple days prior.

25 Q.   What's the date of this transaction?  Tell us about it.

1   A.   So this transaction posts on 5/8, and it's a purchase at

2   The Pikey in Klamath Falls for $21.75, which is just a couple

3   days after the May 5th to May 6th incident involving AV-2 at

4   The Pikey.

5   Q.   All right.  Let's go to the very next page.  And let's do

6   the next two transactions on top.

7   A.   For the first one, we have another purchase at The Pikey

8   with the same line, also showing as May 8th, for $9.75, and then

9   right after that, we have ATM Mac 2885 South 6th Street, Klamath

10  Falls, Oregon, for $303.50.

11  Q.   And is that consistent with the transaction from Chase

12  Bank --

13  A.   Yes.

14  Q.   -- that we just heard about?

15  A.   Yes.

16  Q.   I think we chatted about this, and I'm not sure if you have

17  the date with you, but do you recall a large transaction from Ali

18  Express?

19  A.   I do.

20  Q.   Do you have the date handy?  If you don't, that's fine.

21  A.   I believe I do.  Let me just refer to my notes.  On

22  February 9th, there was a purchase for Ali Express for $398,

23  which corresponds with the price of the 16-band signal blocker

24  that was found.

25  Q.   All right.  We're going to pull that transaction up right

1 now. Okay. And how did you find that information out? Like,

2 how did you connect these dots?

3 A. Sure. So in December of 2022, Mr. Zuberi sends -- has a

4 text message conversation with a friend where he sends the link

5 to the website for Ali Express for the tracker, showing him that,

6 to his credit, he wants to buy one of these trackers and says,

7 "I'm going to buy one of these." And in the link it says it's

8 $398.

9        Separately, when I reviewed the iCloud data, there's a

10 screen shot showing the Ali Express page that he took of that

11 tracker. It has the information for the tracker. It says, Ali

12 Express shipping from China to the United States, and the price,

13 $398.

14        MR. BOCCATO: All right. Thank you. I think this is a

15 good time for a break.

16        THE COURT: All right. Do we have any cross or

17 (pause) --

18        MS. POTTER: At this point or -- no.

19        THE COURT: Yes. Cross of this witness.

20        MS. POTTER: I -- I don't think he's finished.

21        MR. BOCCATO: So we're going to --

22        THE COURT: Oh, I'm sorry. It's a good time to take a

23 break and then you'll continue with this witness.

24        MR. BOCCATO: Yes.

25        MS. POTTER: Yes.

```
 1              THE COURT:  Thank you.

 2              Folks, let's take our morning break, 15 minutes.  Thank

 3     you very much.

 4              (Jury leaving courtroom:  10:30)

 5              THE COURT:  All right.  We'll be in recess.

 6              (Recess:  10:30 - 10:49)

 7              THE COURT:  All right.  Please be seated.

 8              We'll return to the agent's testimony.  Mr. Boccato.

 9              MR. BOCCATO:  Thank you, Your Honor.

10     BY MR. BOCCATO:

11     Q.   We're going to go to page 347.  Or actually, Exhibit 347,

12     page 3.  And can we highlight the purchase from Ali Express on

13     February 9th?

14              All right.  Is that the Ali Express purchase that we

15     were just talking about?

16     A.   Correct, the one on the bottom for $398.

17     Q.   All right.  Thank you.

18              MR. BOCCATO:  Kayla, can we just now go to --

19     Q.   And the date is -- or February 9th?

20     A.   Correct, February 9th.

21     Q.   Let's go to 381.  All right.  What do we see here?

22     A.   This is the conversation that happened between Mr. Zuberi

23     and a friend of his on December 28th, 2022, where he sends the

24     link.  And at the top here, you can see the $398 price, a

25     description of the 16-band handheld and the detector, or the
```

1  blocker.

2          The friend says, "Yeah.  It's crazy they sell them

3  TBH", which I know means "to be honest," and Zuberi responds,

4  "I'm buying that shit."

5  Q.   All right.  And where does it indicate he's going to

6  purchase it from?

7  A.   It says on the link right here, AliExpress.com.

8  Q.   All right.  Let's go to now Exhibit 398.

9          MR. BOCCATO:  Kayla, can you zoom in to the top?

10  Q.   What does that say in the search history?

11  A.   Jammer signal blocker 3g, 4g, 5g.

12  Q.   And do you remember roughly when this was generated?

13  A.   Yeah.  According to my notes, this screen shot, which was

14  found on Mr. Zuberi's iCloud account, was created on March 26,

15  2023.

16  Q.   All right.  And what's the price there in the middle?

17  A.   $398.

18  Q.   And let's go to the bottom.  What company shipped it?

19  A.   Ali Express.

20  Q.   And is this consistent with the cellphone jammer that was

21  found in the trailer?

22  A.   Correct.

23  Q.   All right.  Let's jump to Mr. Zuberi's phone.  Were you able

24  to get a full extraction of Mr. Zuberi's phone?

25  A.   The cellphone, no.  We were not able to get a full

1  extraction without the password.  We only got the partial data as

2  explained by one of our previous experts.

3  Q.   And were you able to recover some photos, though?

4  A.   Yes.  We were able to recover some photos.  Usually that's

5  very recent data from whenever the pull happened.

6  Q.   Let's go to Exhibit 407.  All right.  When was this picture

7  generated?

8  A.   According to the metadata, this picture was taken on

9  July 15th, 2023.  This was at night.  And that was the date that

10  AV-1 escaped from the cell.  It included the GPS coordinates that

11  the picture was taken.  Oftentimes if you take a picture on your

12  phone, based on your settings, it would keep the latitude and

13  longitude so it'll know exactly where it was taken, and this

14  corresponded with a location in Tulelake, California.

15  Q.   So this photo was taken in Tulelake when Mr. Zuberi was

16  essentially on the run?

17  A.   Correct.

18  Q.   All right.  Let's go to exhibit -- oh, before we go to 408,

19  I just want to let the jury know that there's a little bit of

20  blood in this photo, but 408-3.

21         So, Special Agent Giovanetty, what is -- how did we get

22  this photo?

23  A.   So this came from his phone.  And this is, I believe, from

24  the call that he was having with law enforcement during the

25  standoff in Reno when they were on Facetime.  Sometimes the phone

1    will cache screen shots of the conversation, save them for a

2    little while.  In this case, that was -- this and several other

3    images from 408 were retained from the -- his perspective inside

4    the Honda Pilot during the standoff.

5    Q.   And do we see multiple cuts there in this photo?

6    A.   Yes.  This is from Mr. Zuberi when he cut his leg as

7    described in the body camera footage.

8    Q.   All right.  I want to jump back to iCloud.  There were a few

9    iCloud messages that we didn't talk about at all and there were

10   some that we just missed some dates on.  So let's start with

11   Exhibit 354.  354-1, we talked about this yesterday, but can you

12   tell us the date when this photo was created?

13   A.   Yes.  This, according to the metadata, came on April 14th,

14   2023.

15   Q.   Let's go to the next page.  When was this photo created?

16   A.   April 4th, 2023.

17   Q.   All right.  What is going on?  There's a line there.  Can

18   you explain that?

19   A.   Yeah.  This appears to be the measurement feature that you

20   can do on a lot of phones.  I know iPhones have it.  You can

21   essentially hold it up, and some apps will use your camera to

22   detect the distance and calculate a distance for you.  So you can

23   essentially draw a line and say, "How far is this?," and get

24   measurements without using a ruler and -- a physical ruler.

25   Q.   And, again, this is found from Mr. Zuberi's iCloud account?

1  A.   Yes, yes.  This was in Mr. Zuberi's iCloud account.

2  Q.   So he appears to be measuring dimensions from --

3  A.   Yes, taking pictures inside the garage and getting

4  measurements of the floor.

5  Q.   Let's go to 354-3.  Is this a similar picture?

6  A.   Similar, and taken on the same day, April 4th, 2023.

7  Q.   All right.  Let's go to 354-4.  What is -- what is the date

8  of this picture?

9  A.   This was on May 28th, 2023.

10 Q.   And he appears to be using the same measurement feature?

11 A.   Same -- same thing, using the -- measuring the sides of the

12 blocks now constructed.

13 Q.   Let's go to 354-5.

14 A.   This one is also on May 28th, 2023.

15 Q.   Let's go to the next page.  All right.  When was this one

16 generated?

17 A.   July 2nd, 2023.

18 Q.   All right.  Do you notice anything about the construction

19 for this?  And I know you're not an expert in construction.

20 A.   Yeah.  I'm not too sure.

21 Q.   Do the walls appear to be touching each other?

22 A.   In this case, no, they're not fully touching right here.

23 Q.   Okay.

24 A.   You can see there's a gap (indicating).

25 Q.   And what about the -- is there a gap between the cinderblock

1   walls as well?

2   A.   Yes.  There appears to be a gap right here between the walls

3   (indicating).

4   Q.   Okay.  And I actually want to jump back briefly to

5   Exhibit 404.

6        MR. BOCCATO:  And clear that.  Kayla, can you highlight

7   the items that were searched for on July 3rd?

8   Q.   So around that same time that that last photo was taken,

9   what was Mr. Zuberi searching?

10  A.   Yeah.  The day after that last photo was taken, he was

11  searching for how to fix crooked walls.

12       MR. BOCCATO:  Now we can jump to Exhibit 354 dash, I

13  think, 6.  I could be wrong.  Oh, go to the next one.

14  Q.   What do you know about this item?

15  A.   Yeah.  This image within the iCloud was taken on July 2nd,

16  2023, and the metadata associated with it says that it was taken

17  at the Diamond Home Improvement, which is another home

18  improvement store in Klamath Falls, for which there are some

19  purchases on his Key Bank records.

20       MR. BOCCATO:  And can you zoom in to what those items

21  are, Kayla?

22  Q.   What does it appear that he's taking a picture of here?

23  A.   It's Power Pro concrete anchors for concrete, brick, and

24  block.

25  Q.   And were there concrete anchors found anywhere in this case?

1   A.   Yes, there were.

2   Q.   Where were those found?

3   A.   Inside the Altima.

4   Q.   All right.  Let's go to a video.  We've talked about this

5   video.  I just want to mention a couple points there,

6   Exhibit 385.  Can you tell us, based on the metadata, when this

7   video was generated?

8   A.   This one was generated on November 28th, 2022.

9            (Playing video, Government's Exhibit 385)

10           MR. BOCCATO:  Can you stop the video?

11           (Playing video, Government's Exhibit 385)

12           MR. BOCCATO:  Stop the video.

13  Q.   All right.  We're going to go back here in a minute, but

14  right here, do you note anything distinctive about this firearm

15  that he's holding?

16  A.   Yeah.  This appears to be the same as the Springfield XDM.

17  Springfields have some very distinct design choices.  This part

18  back here on the rear side (indicating), just the general shape

19  there, the undermount right here where you can add attachments is

20  pretty distinctive with the lines (indicating).

21           If you could zoom in on the trigger.  If we can clear

22  away mine.

23           So you can see right here is the trigger and then there

24  seems like there's another little part sticking out.  That's part

25  of the safety mechanism in the trigger, which that sort of

1   trigger safety is the same one that is on the Springfield XDM

2   that we recovered (indicating).

3   Q.   All right.  And let's go back maybe to about two seconds

4   into the video.  It's kind of hard to see in this video, but do

5   you notice anything red?

6   A.   Yeah, I do.  It's dark, but with a better shot, you can see

7   there's the red front sight, which is what you use to aim through

8   or aim at, which is the same red front sight that we can see on

9   the XDM.

10  Q.   Okay.  That's a little bit better.

11       MR. BOCCATO:  Can you zoom in, Kayla?

12  A.   That red little dot right there (indicating).

13  Q.   Great.  Thank you.  And let's go to 348-2.  Sorry.  Hold on.

14  We'll jump back to that one later.

15       Let's -- actually, I'm going to hand you what's been

16  marked as Government's Exhibit 13.  Can you kind of point out

17  some of these distinctive features for the jury?

18  A.   Sure.  So it'll look a little different because the slide is

19  locked to the rear here, but what I'm looking at is just this

20  general shape of the rear right here.  These little indentations

21  right here, they're for you to be able to grip and hold it back.

22  If it was steel, it wouldn't be easy.  You can sort of make those

23  out.

24       The red -- it's better to see from the front, but you

25  can sort of see the red on the front sight right there.  And then

1   in the trigger guard, there's this little part that sticks out

2   and kind of moves.  That's part of the safety mechanism.  So not

3   all firearms have a safety in the trigger, but this is one brand

4   that does.  You could see that in the video that this tiny little

5   part is sticking out.

6          And then we have the undermount right here, which we

7   use to add, like, a light attachment or something, which is also

8   pretty distinct.

9          MR. BOCCATO:  Your Honor, I understand this is a

10  firearm.  I don't know if it's appropriate to have the jury look

11  at?  No.

12         THE COURT:  I think the jury can see it from a distance

13  just fine.

14         If the jury does need to look at the firearm closer

15  during deliberations, we'll arrange that -- arrange for you to

16  have that happen.

17         MR. BOCCATO:  Thank you.

18  BY MR. BOCCATO:

19  Q.  All right.  Again, let's clarify a few more dates.  I want

20  to show you Exhibit 385.  And can you just tell us the date of

21  Exhibit 385?  Or I'm sorry.  386, the date of 386.

22  A.  Yeah.  386 was created on November 14th, 2022.

23         MR. BOCCATO:  Just play a second or two of that.

24         (Playing video, Government's Exhibit 386)

25  Q.  And does he appear to be holding a firearm in that video?

1   A.   Yes.  This is another video where he appears to be holding a

2   firearm.

3   Q.   Let's go to 387.

4        (Playing video, Government's Exhibit 387)

5        MR. BOCCATO:  Pause that one.

6   Q.   What's the date of 387?

7   A.   Also November 14th, 2022.

8   Q.   All right.  391.  What's the date for 391?

9   A.   That one's October 22nd, 2022.

10  Q.   Okay.  And just highlight the lower receiver.

11  A.   This is where he's purchasing the 80 percent lower receiver

12  from daytonatactical.com.

13  Q.   All right.  Let's go to 393.  All right.  What's the date --

14  the metadata date for this?

15  A.   November 17th, 2022.

16  Q.   Okay.  394.  What is the date for this?

17  A.   December 7th, 2022.

18  Q.   And does this appear to be a purchase of a magazine?

19  A.   Yes.  This appears to be a purchase for a 32-round magazine,

20  which is consistent with the magazine we found in the tractor

21  trailer.

22  Q.   Let's go to 399.  What's the metadata date for this item?

23  A.   March 29th, 2023.

24  Q.   All right.  And then 403.  Can you give us the date for 403,

25  please?

1    A.    June 19th, 2023.

2    Q.    And let's go to Exhibit 644.  Oh, 600 and -- oh, sorry.

3    477.

4          All right.  477.  Are you familiar with this message?

5    A.    I am.  This is a text conversation between Mr. Zuberi and

6    Brenden Westfall.

7    Q.    I think we've already just talked about this message, but

8    how did you get this message?

9    A.    This was also data from Apple from the iCloud backups of his

10    phone.

11    Q.    Do you know when this message was made?

12    A.    So it says May 6, 2023, at 6:44 p.m.; however, this program

13    is showing times in UTC time, which was explained earlier this

14    morning, so you have to remove seven hours from the time you see

15    here.  So the first message coming in at 6:44 p.m., that was

16    actually sent at 11:44 a.m.

17    Q.    When this message was sent at 11:44 a.m., was there anything

18    significant happening?

19    A.    Yes.  That is when AV-2 was still inside the garage with

20    Mr. Zuberi on the morning of May 6th.

21    Q.    Okay.  And is Zuberi trying to push to not pay his rent, or

22    pay his rent later?

23    A.    Yes.  He says, "Oh, sorry.  I slept late -- late today.  Can

24    we do 4:00 p.m.?"

25    Q.    All right.  Now, I want to talk about some iCloud data that

1    kind of deals with AV-2 a little bit and that incident.  Let's

2    jump to Exhibit 402.  Tell us about this exhibit.

3    A.    So this is a screen shot taken from one of our programs

4    that -- what we used to analyze the iCloud data, because it kind

5    of comes in a little jumbled and we have to break it down and

6    make it readable.  So what the system does is it gives us the

7    contacts from his contact lists that were saved in the iCloud.

8    And this one is titled "girl from Pikey".  It's got a phone

9    number, the last four shown here, 3567, which matched AV-2's

10   phone number that was -- that she said she provided to him.

11          And the created date, according to the data, is May

12   8th, 2023, at 4:07 a.m.  You have to take off the seven hours

13   again, so that would have been the night of May 7th is when the

14   contact would have been created.

15   Q.    All right.  And is the beginning of the number, is that

16   redacted out?

17   A.    Yes.

18   Q.    Let's go to the next page.  Is there additional information

19   that's being shared on this page?

20   A.    Yeah.  This -- this is more of the data that's shown.  As

21   you can see, we get it -- we get the data from Apple with a lot

22   of complicated strings like that and we have to have our computer

23   scientists make it readable, so that's sort of what it looks

24   like, but it includes, you know, the given name, "girl from

25   Pikey," and --

1    Q.   Was there a call that Zuberi made to this number?

2    A.   Yes, there was a call.

3    Q.   When was that call?

4    A.   I'd have to refer to my notes on the phone record, which I

5    don't believe I have in front of me, but it was -- it was at

6    1 o'clock -- it was just a little after 1 o'clock in the morning

7    on May 6th of -- not long after they would have met in front of

8    The Pikey.

9    Q.   Thank you.  Let's talk about Exhibit 401 now.  All right.

10   What is this -- where was this found?  When was it generated?

11   A.   This was found, again, on Mr. Zuberi's iCloud account.

12   According to the metadata, this screen shot of his phone was

13   taken on May 6th at 1:20 in the morning, which matches with the

14   time in the corner of 1:20 (indicating), and it appears to be a

15   Google Maps screen shot showing in the process of driving

16   somewhere with directions.

17   Q.   Did you do some follow-up work on this?

18   A.   I did.

19   Q.   Can you just describe to the jury the kind of follow-up work

20   you did?

21   A.   Sure.  So we knew that AV-2 had told us that she had been

22   shown a phone that had Google Maps open while she was in the car.

23   1:20 in the morning aligns with just after they would have left

24   The Pikey.  So the screen shot occurs when AV-2 is in the car.

25            All we can see from the screen shot, we don't have the

1   final address, but we do see that wherever they're going or at

2   least wherever -- whatever address he entered is six minutes and

3   3.1 miles away.  We tried to look up locations that made sense

4   for where they -- what address he could have put in.

5   Q.   So let's -- let's start with the first one.  Let's go to

6   Exhibit 520, please.

7   A.   So these are screen shots that I created on my own device.

8   I put the starting location here (indicating) as the exact

9   location that the screen shot started.  So on the right, you see

10   the close-up perspective.  As you can see, it's almost exactly

11   the same route traveled just from that screen.  And I entered the

12   final address as The Pikey.

13          Unfortunately, the address doesn't quite match up,

14   because this trip would take seven minutes and 3.3 miles, so from

15   my understanding is that that doesn't line up with the screen

16   shot.  Even though the initial trip, the initial travel line you

17   see on the screen to the right is the same, indicating traveling

18   back towards downtown, The Pikey couldn't have been the final

19   destination.  It's a different distance from that starting spot.

20   Q.   So Mr. Zuberi wasn't telling AV-2 that she was going to

21   go The Pike -- he wasn't headed to The Pikey?

22   A.   Correct.

23   Q.   All right.  Let's go to page 3 now.  All right.  How about

24   this one?

25   A.   So same concept.  We started at the same starting point, and

1    I put the address of 7973 Green Springs Highway.  This is the
2    location that -- according to the Land Air Sea data, the very
3    next ping right after the screen shot happened.  So according to
4    Land Air Sea, Mr. Zuberi's device was pinging at this address at
5    1:40 in the morning, so about 20 minutes after that screen shot
6    was taken.  So we know that he traveled in this direction.  This
7    direction is west of Klamath Falls, and that screen shot would
8    have happened on the -- it would had to have been traveling east
9    back towards Klamath Falls.

10         So if you look on the right, you'll see that the blue
11   line is now traveling directly to the right instead of taking
12   that little loop right here to go on the overpass.  If you take
13   that loop, that takes you back downtown.  If you go to straight
14   ahead, that's what carries you out into the more rural areas.
15   Q.   So Mr. Zuberi wasn't taking -- or didn't take AV-2 where he
16   told her he was taking her?
17   A.   Correct.  Where they actually ended up, according to the
18   Land Air Sea data, is a completely opposite direction of where
19   the Google Maps screen shots say that he had an address entered
20   for.  We also see that this distance doesn't make sense.  It's
21   5 minutes, 3.6 miles.  So that would be 6 minutes, 3.1 miles.
22   Q.   Let's go to page 5, then.  All right.  What's the next
23   address you tried?
24   A.   Yep.  We tried his home address of 1366 North El Dorado
25   Avenue.  And, again, we have a ten-minute drive, 6.1 miles.  The

1  starting track is about the same, because that would bring you,

2  you know, close to the downtown area, he wasn't too far from

3  that, but it's still too far to match up with the screen shot.

4  Q.   So Mr. Zuberi wasn't telling AV-2 that he was taking her

5  back home?

6  A.   To his home, yes.

7  Q.   All right.  And let's go to page 7 of the same exhibit.

8  A.   So in this one, AV-2 had told us that her plan was to leave

9  The Pikey and go to her friend Jay's house.  She gave us the

10  address for Jay's house, which is here, 320 North Fourth Street.

11       When I entered it with that starting location, we get a

12  drive of six minutes and 3.1 miles, which is the exact distance

13  that is seen on the screen shot in Mr. Zuberi's iCloud, and the

14  travel path on the right matches the screen shot from his iCloud

15  account as well.

16  Q.   So based on this, it appears that Mr. Zuberi was telling

17  AV-2 that she was take -- or he was going to take her to Jay

18  Rodell's (phonetic) house?

19  A.   Correct.

20  Q.   Did they go to Jay Rodell's house?

21  A.   They did not.

22  Q.   All right.  Let's go to Exhibit 522-1.  All right.  What

23  is -- what does this exhibit show us?

24  A.   So on the left, we just have another version of Exhibit 401,

25  which is the screen shot from Mr. Zuberi's iCloud.  On the right

1   is my re-creation of that with the address for Mr. Rodell's

2   house.

3   Q.   And do those appear to match pretty spot on?

4   A.   They do.

5   Q.   Let's go to 522-2.  What is this a picture of?

6   A.   I parked myself at the exact spot that that screen shot

7   would have been taken from according to the iCloud account, and

8   this is what you would see from that spot.  So on the left there

9   are, like -- there's, like, a gas station or a truck center,

10  which shows up on the map as well.

11  Q.   I want to talk about 524-1 and then 524-2.  Let's start with

12  524-1.

13          Now, before we were doing that, do you remember the

14  hand-drawn map that AV-2 drew?

15  A.   Correct.  Yes, I do.

16  Q.   Were you present while it was being drawn?

17  A.   I was there when she drew that map, yes.

18  Q.   Did you ask her to actually put it together?

19  A.   Yes.  That was one of the ones held after.  I was the one

20  that asked her to sign and date it when she finished it.

21  Q.   Okay.  And throughout this investigation, have you taken,

22  like -- have you driven around Klamath Falls quite a bit?

23  A.   Extensively.

24  Q.   Did you take a lot of pictures around Klamath Falls?

25  A.   I did, yes.

1    Q.    Okay.  So I'm showing you this picture.  This is one of the

2    pictures.  Are there any similarities between this picture and

3    the map that AV-2 (pause) --

4    A.    Yes, yes.  This looks consistent with her description of the

5    type of road she was on, a two-lane road with yellow lines in the

6    middle, and we have the gravel on the side (indicating), the

7    ditch, some grass, a fence, a field on the end.

8    Q.    But I do want to ask you, based on your time in Klamath

9    Falls and the pictures you've taken and driving around, are there

10   a lot of places in Klamath Falls that have a similar look?

11   A.    Yes.  The -- a good chunk of Klamath Falls looks exactly

12   like this.

13   Q.    With a ditch and some tall grass and a fence?

14   A.    It's a rural community, there's a lot of farm area, so

15   this -- roads that look like this are everywhere.

16   Q.    All right.  I'd like to ask you about some photos and videos

17   that were taken about AV-2 -- taken by AV-2 and the times that

18   those were taken.  So let's start with Exhibit 475-2.  We don't

19   need to play the whole thing, but we can just play a little bit.

20           (Playing video, Government's Exhibit 475-2)

21   Q.    When was this video created?

22   A.    According to the metadata, it was taken on May 6, 2023, at

23   4:31 p.m., which is right after -- just a couple hours after she

24   would have been dropped off at home.

25   Q.    And you said, "according to the metadata."  Can you explain

1   how you got this information?

2   A.   Sure.  So I believe for this one, the original file was sent

3   by her to the detective at Klamath Falls PD.  And when we get the

4   original file from a video, we get the original file straight

5   from your phone.  Your phone will save the metadata and tell us

6   what time we get that.

7          If you record your video on an application like

8   Snapchat, Snapchat might not save that metadata on the file if

9   you download it.  It's only saved in the app.

10         So for this one, we were able to get it straight off

11  the file itself.

12  Q.   Let's go to 475-1.

13         (Playing video, Government's Exhibit 475-1)

14         MR. BOCCATO:  Pause it right there.

15  Q.   When was this file generated?

16  A.   Also May 6th at 9:54 p.m.

17  Q.   All right.  Special Agent Giovanetty, I'm going to ask you

18  about a few more photographs and when those were obtained.  I'm

19  going to hand you what's been marked as Government's Exhibit 529.

20  This is a new -- I'm sorry -- a new exhibit.  I believe defense

21  has a copy.  Can you identify these photos for me?

22  A.   Sure.  So -- oh, are you going to put them on the screen?

23  Q.   No.  Not quite yet.  I just want to get them into evidence.

24  A.   Sure.  So some of the pictures and videos that AV-2 had sent

25  us initially -- I mentioned they were taken on her Snapchat

1  account and she downloaded them.  So Snapchat, I'm very familiar

2  with it, if you hit the download button and save it, your -- the

3  date of the file on your phone will show metadata for the date

4  and time you hit the download button and you saved it, because

5  that's not the original.  The original is retained with Snapchat.

6          So the only way to get the original metadata and see

7  exactly what date and time it was created is to log into the

8  Snapchat application, if it's still retained, find the file on

9  Snapchat, and it should say the date and time it was taken.

10         So in this case when we realized we needed the original

11  date and times, Detective Yahwee met with AV-2 in person.  She

12  pulled up the phone and logged into her Snapchat, and they looked

13  at each of the files.  She took pictures of the phone with the

14  files open and the dates and time on them so we could see what

15  time the Snapchat is saying these pictures and videos were taken.

16  Q.  All right.  Let's --

17         MR. BOCCATO:  The Government moves to enter those

18  exhibits.

19         MS. POTTER:  No objection, Your Honor.

20         THE COURT:  All right.  What numbers?  I'm sorry.  What

21  number are they?

22         MR. BOCCATO:  429, I believe, Your Honor.

23         THE COURT:  Okay.  429 --

24         THE WITNESS:  529.

25         MR. BOCCATO:  529.

1          THE COURT:  529 will be received.

2    BY MR. BOCCATO:

3    Q.  All right.  Let's jump to Exhibit 411.  All right.  Were you

4    able to determine the time this picture was created?

5    A.  Yes, we were.

6    Q.  All right.  Let's jump to Exhibit 529-1.  When was -- and we

7    can -- let's zoom in to this kind of area where you can see Diego

8    and the time.

9          All right.  Again, what -- what's the date and time

10   that this photo was created?

11   A.  So this was taken May 6th, 2023, at 12:48 a.m.  And you can

12   sort of see in the background here, this is Diego.  So this is

13   consistent with that picture in Exhibit 411.

14   Q.  All right.  Let's jump to Exhibit 427.

15         (Playing video, Government's Exhibit 427)

16   Q.  All right.  Were you able to determine the time that this

17   video was generated?

18   A.  Yes, we were.

19   Q.  Okay.  Let's jump to 529-2.

20         MR. BOCCATO:  All right.  Can you zoom in like we did

21   before, Kayla?

22   Q.  When was this video taken?

23   A.  May 6, 2023, again, 10:11 p.m.

24   Q.  Let's go to Exhibit 426-2.  Were you able to determine the

25   date that this picture was taken?

1   A.   Yes, we were.

2   Q.   Okay.  And then let's go to 529-3.

3        MR. BOCCATO:  All right.  Can you zoom up, Kayla?

4   Q.   What's the date and time that this was created?

5   A.   We have May 6, 2023, at 10:52 p.m.

6   Q.   All right.  Thank you.  And then, finally, let's go to

7   Exhibit 426-1.  All right.  Were you able to determine the time

8   that this photo was taken?

9   A.   Yes, we were.

10  Q.   All right.  Let's go to 529-4.  Can you tell us the date and

11  time that this photo was taken?

12  A.   We have May 6, 2023, at 10:53 p.m.

13  Q.   All right.  I want to jump back to Exhibit 402-1.  All

14  right.  There's some date and time entries at the bottom.  Can

15  you confirm that time, whether or not it's local time or east

16  coast time or --

17  A.   So this -- this time would be UTC again.  So we have to take

18  off seven hours, so this would be (pause) --

19  Q.   How do you know that information?

20  A.   Just -- we analyzed all the files when I was looking at it.

21  When I review digital data, and I'm never quite sure what time

22  zone it's in, I try to look for landmarks.

23       So in this case when we were looking through, I found

24  other pictures, other files in there that I can clearly see dates

25  and times, like, on them.  Like that screen shot of the Google

1    Maps, it says 1:20 on the screen.  I know that's accurate, as

2    iPhones keep the time properly.

3            So in this case, we were able to quickly determine,

4    based on the times, that everything was off by seven hours.  So

5    we were in UTC time, which is common for some providers to

6    provide the records in UTC, that way it's standard for everyone.

7    Q.   All right.  Can you, then, kind of just, I guess, do the

8    math and let us know what time and date?

9    A.   Yeah.  This would have been on May 7th, 2023, at 9:07 p.m.

10   Q.   So just a, you know, couple days after Cinco de Mayo?

11   A.   Yes, yes.  And this is the creation of the contact, which

12   doesn't necessarily correspond with the time that her phone

13   number was called.  Sometimes we will call people and then not

14   save the contact till later.

15   Q.   So this just shows when Mr. Zuberi created the contact in

16   this phone?

17   A.   Correct.

18   Q.   All right.

19           THE COURT:  When you say "create" a contact, can you

20   just clarify what you mean?

21           THE WITNESS:  Sure, sure.  So if I type a phone number

22   into my phone and I call it, my phone will just show the phone

23   number and it won't save it, but if I want to save that phone

24   number, usually you have to hit a button that says "create

25   contact," fill out some fields, like, give it a name or -- and

1    you can add a whole bunch of information.

2           So in this case, he would have given it the name "girl

3    from Pikey."

4           So it's not always that you're going to call a phone

5    number and then immediately save the contact.  I know I don't do

6    that all the time.

7    BY MR. BOCCATO:

8    Q.   So just to confirm, this contact would not have been on the

9    night of May 5th?

10   A.   No.

11   Q.   No.  All right.  And --

12          THE COURT:  The creation.

13          THE WITNESS:  The creation of the contact.

14   Q.   Sorry.  The creation of the contact would not have been on

15   the night of May 5th?

16   A.   Correct.

17   Q.   All right.  And the only information on that -- there's no

18   name.  It's just "girl from Pikey"?

19   A.   Just "girl from Pikey."

20   Q.   So based on the contact, you can't identify -- or based on

21   this screen shot, you can't identify it except for the phone

22   number?

23   A.   Except for the phone number, correct.

24   Q.   All right.  You know, we've talked a lot about firearms

25   already in this case, and my desire is not to repeat much of what

1   we talked about, but I do want to just show the jury the physical

2   exhibits for each count and give them the exhibit numbers so

3   hopefully they can keep them straight, Special Agent Giovanetty.

4           So can you come out here and take this cart, and we can

5   go over count by count which physical exhibits go to which

6   firearms?

7           THE COURT:  Just to clarify for the jury, at some point

8   you'll have a verdict form that will have certain counts on it,

9   and the Government is alleging certain counts apply to certain

10  firearms or ammunition.

11  Q.   All right.

12  A.   Sure.  So for Count 4, we have Exhibit 13, which is --

13  Q.   Just -- so for Count 4, the firearm and ammunition that was

14  recovered from Adult Victim 1?

15  A.   Uh-huh.

16  Q.   What firearm and ammunition was located and what are the

17  exhibit numbers?

18  A.   So we have Exhibit 13, which is the Springfield XDM.  We

19  have Exhibit 14, which is the magazine that was with the gun and

20  the 19 rounds of 9-millimeter ammunition.  And then separately

21  associated with the Pilot but not charged under Count 4, we have

22  the one round of 9-millimeter ammunition that was found inside

23  the Honda Pilot inside the glove -- or the center console.  And

24  we have the one spent shell casing that was found inside the seat

25  track in the Honda Pilot as well.

1   Q.   All right.  So for Count 5, the firearms and ammunition that

2   was recovered from the Prowler trailer, what firearms and

3   ammunition were located and what are the exhibit numbers?

4   A.   So this is Exhibit 330, the silver Stoeger shotgun.  We have

5   Exhibit 329, which is a Remington 308 rifle.  And we have

6   Exhibit 328, which is the Anderson Manufacturing AR-15-style

7   rifle.

8   Q.   Now, can you tell us the ammunition that was located?

9   A.   Sure.  Two shotgun shells, 12-gauge, found inside the

10  shotgun.  This is 63 rounds of 9-millimeter pistol ammunition,

11  which was found spread across three magazines inside the --

12  Q.   Can you give us the exhibit number for that one?

13  A.   Oh, I'm sorry.  The shotgun shells were Exhibit 337, the

14  three rounds of pistol ammo are 338.

15          And we have 339, which is 27 rounds of 5.56 rifle ammo.

16  Q.   All right.  Let's go to Count 6, the ammunition that was

17  recovered from the -- a bedroom in 1336 North El Dorado Avenue.

18  A.   Sure.  So the first item is Exhibit 100.  This is the

19  Springfield XD's box, the original one that came with it.

20  Exhibit 104 is the plastic green ammo can.  Inside of this ammo

21  can, there are 289 rounds -- oh, my bad -- 121 rounds of 5.56

22  ammo and three boxes of 12-gauge ammo, totaling 18 shotgun

23  rounds.

24          Exhibit 106 is the green metal ammo can.  This one has

25  289 rounds of 5.56 ammo, one round of the 7.62 ammo, one round of

1    the 6-millimeter ARC rifle ammo.

2            And separately, these are not part of the charge, we

3    found three loaded magazines.  These represent Exhibit 109.  Each

4    magazine had, I believe it was -- it was about 30 rounds inside

5    the magazines.  So there's three separate bags of the 5.56 ammo,

6    but these are not part of the count.

7    Q.   Finally, for Count 7, the ammunition that was located in the

8    garage in 1336 North El Dorado.

9    A.   Sure.  So Exhibit 166, we have eight rounds of Blazer

10   9-millimeter Ruger pistol ammunition.  Exhibit 167, we have three

11   boxes totaling 50 rounds of the 7.62 rifle ammunition, which

12   corresponds with the one round that was found inside the green

13   ammo can.  Exhibit 171, we have 29 more rounds of 7.62

14   ammunition.  These were found inside of a magazine in the garage.

15   This matches the Wolf ammo.  That is 171.

16           173, we have 30 rounds of 6-millimeter ARC ammunition,

17   also found in the garage spread across two magazines.  This

18   matches the -- one of the rounds in the green metal ammo can as

19   well.

20           Finally, Exhibit 174, we have 246 rounds of

21   9-millimeter pistol ammunition in its box, found on the garage

22   table.

23   Q.   All right.  Thank you, Special Agent Giovanetty.  I have

24   just one more question for you.  Let's pull up Exhibit 520,

25   page 5.  It's not going to be on your sheet.  We're going to do

1    it on the screen.  And I can actually just hand it to you right

2    here.  You don't have to (pause) --

3            So what -- what address did you actually end up putting

4    in there?

5    A.   1366 North El Dorado, so just down the street from the 1336.

6    Q.   Is that just a little typo?

7    A.   Just a small typo, but it wouldn't change the distance

8    between six miles down to 3.1 miles.

9            MR. BOCCATO:  All right.  Thank you.  No further

10   questions.

11           THE COURT:  All right.  If you'd like to retake the

12   stand.

13           And cross-examination.

14           MS. POTTER:  Yes.  Just briefly.

15                      **CROSS-EXAMINATION**

16   BY MS. POTTER:

17   Q.   Good morning, Special Agent.

18   A.   Good morning.

19   Q.   I want to just ask you a few questions.  We'll start -- I'll

20   try and go in order how you testified, but I might jump around.

21           I want to start with, you talked about the Amazon

22   purchases and not seeing any musical equipment.  Do you remember

23   that?

24   A.   Yes.

25   Q.   There was a selfie ring for -- in the Amazon purchases,

1  right?

2  A.   I don't recall seeing a selfie ring.  There was a lot of

3  records.  We filtered down to musical equipment.  I didn't see

4  that specific one.

5  Q.   Okay.  But you're aware selfie rings are often used when

6  people do, like, TikTok videos and things like that?

7  A.   They could be, yes.

8  Q.   And he did have a computer, a MacBook, correct?

9  A.   Yes.

10 Q.   Turning to, there was a call when she talked about the

11 trailer, kind of implying that maybe Alycia was going to the

12 trailer.  She asked about food, correct?

13 A.   Yes.

14 Q.   And there was food in that trailer?

15 A.   There was, yes.

16 Q.   And you've listened to lots of calls, correct?

17 A.   I have, yes.

18 Q.   And in some of the calls, Alycia talks about how she's short

19 on money, correct?

20 A.   Correct.

21 Q.   Okay.  In terms of the Internet searches we saw, the Google

22 searches --

23 A.   Uh-huh.

24 Q.   -- you self-selected which ones, I think you said, which

25 were important to your case, correct?

1   A.   Correct.  When we do -- when we do digital device review, we

2   tag -- we call it tagging.  So with the software we use, we can

3   pick which items are relevant, and that way we only retain the

4   ones that are relevant to the investigation.  So those are the

5   ones that -- that's not the full search history from that time

6   period.  It's just the ones we thought were relevant when we did

7   the review.

8   Q.   Okay.  Thank you.  And just -- and I think this was clear,

9   but just to set the stage, you participated in an interview with

10  AV-2, I believe it was on July 17th?

11  A.   I did, yes.

12  Q.   And that was you and detective -- I'm going to -- Yahwee?

13  A.   Yahwee, yes.

14  Q.   Yahwee, who is with Klamath Police Department?

15  A.   Correct.

16  Q.   And you prepared a report?

17  A.   Correct.

18  Q.   And so did Detective Yahwee?

19  A.   Correct.

20  Q.   Okay.  So talking about that interview a little bit, we

21  talked about the map that was a screen shot.  And it was --

22  basically, you think it was from the field to some location, but

23  you couldn't see it on the screen shot?

24  A.   Which -- which map are you referring to?

25  Q.   Is it 4 -- I'm looking at it right now.  401.  It's a Google

1   screen shot.

2   A.   Oh, the Google screen shot.

3   Q.   Yes.

4   A.   Yes, yes.

5   Q.   That would have been Exhibit 401.  So based on all the work

6   you did in the later exhibit in 529, you think that that is a

7   screen shot from that field area to the home of the house party?

8   A.   This is not from that field area.  So this -- this part of

9   town is still a little more populated.  You've got those gas

10  stations you can see here on the left, or the truck center and

11  gas station.  There's more residential areas here.  And there's a

12  house, like, right -- right next to the street right there.

13  That's where I was parked in front of when I took that picture.

14           Those pictures of the field area are the areas that the

15  Land Air Sea data says they were later starting at.  Like, 1:40,

16  I think, is the earliest Land Air Sea ping out there.

17  Q.   Okay.  Okay.  Okay.  I -- I was confused.  I apologize.  I

18  think I misunderstood what you said, but just in terms of this

19  screen shot from Mr. Zuberi's phone, did AV-2 ever say that she

20  saw this?

21  A.   She indicated that she saw Google Maps open on the screen.

22  She indicated, I believe her testimony yesterday, that she

23  thought that this -- that they took a wide turn that's a -- this

24  picture may not be exactly the one she saw.  I don't know if the

25  screen shot was shown to her or the live Google Maps, because

1    this image would change as soon as you take a turn or you move

2    down the street.  So I don't know exactly when in time she saw

3    the Google Maps screen shot.  All I know is that at this time at

4    1:20, Google Maps was running and an address was listed and this

5    was the directions it was saying.

6    Q.   Okay.  Going back to that interview on July 17th, at that

7    point, she never mentioned being pistol whipped, did she?

8    A.   I don't recall.  That's a long interview, and I don't recall

9    exactly in that interview if she mentioned the pistol whipping or

10   not.  She may have, but I don't -- I don't have the notes for

11   that one right in front of me.

12   Q.   Okay.  I mean, and I'm happy to give them to you.

13   A.   Sure, sure.

14   Q.   It might take -- I don't want to (pause) -- So when we say

15   "notes," this is a report you prepared, correct?

16   A.   Correct, correct.  I apologize if this takes a minute.  The

17   interview was close to two hours, so it's a lengthy report.

18        Yes.  So I don't see the references to the pistol

19   whipping in my report, no.

20   Q.   Okay.  But -- and I know you just kind of -- I probably

21   should have previewed this, but did you see a reference to the

22   army in that report?

23   A.   Not in my report.  The army was mentioned to Detective

24   Yahwee in an e-mail after our interview.

25   Q.   Okay.  But in the two-hour interview where you cover the

1    entire event, that wasn't mentioned?

2    A.    No.

3    Q.    Okay.  And, then, did you see "human shield" in that report?

4    A.    (Pause-referring).  I don't see it here, but I do recall her

5    saying it in the report -- in the greater interview in the

6    report.

7            MS. POTTER:  Okay.  I don't have anything else.  Thank

8    you.

9            THE COURT:  All right.  Any redirect?

10           MR. BOCCATO:  Yes, Your Honor.

11                    **REDIRECT EXAMINATION**

12   BY MR. BOCCATO:

13   Q.    Special Agent Giovanetty, did AV-2 reach out back to

14   Detective Yahwee regarding the "army" comment?

15   A.    She did, yes.

16   Q.    When did that happen?

17   A.    That happened -- well, I have a (pause) --

18   Q.    And when did it happen and how do you know the information?

19   How do you know this?

20   A.    We have a copy of Detective Yahwee's report where she

21   mentioned the -- that AV-2 had reached out after the interview

22   had occurred and sent -- she was sending an e-mail with the

23   copies of the pictures, because she mentioned that she had taken

24   pictures of her injuries and wanted to provide those to Detective

25   Yahwee.  And then I spoke with Detective Yahwee and confirmed

1    this today.

2    Q.   Okay.  And what did she tell Detective Yahwee?

3    A.   So in the e-mail, she says, and I quote, "He said the most

4    disturbing thing, saying he doesn't understand why people

5    shouldn't have intercourse with their own children, because they

6    are creating the perfect specimen; also, how he just wants to

7    have multiple children with multiple women for an army of his

8    own.  The, he would go back to explain why he took me, then would

9    change the reason why over and over and how I am his property

10   now."

11          And that was -- that e-mail was sent to her on

12   July 17th in the hours after we conducted the interview.

13   Q.   And did AV-2 tell you that she was tased?

14   A.   Yes.

15   Q.   And that she was assaulted?

16   A.   Yes.

17   Q.   And that he -- she recalled two sets of handcuffs?

18   A.   Yes.

19   Q.   One black, one silver?

20   A.   Yes.

21   Q.   And when she told you that, had the silver handcuffs even

22   been found yet?

23   A.   No, they had not.

24          MR. BOCCATO:  Thank you.  No further questions.

25          THE COURT:  All right.  Thank you very much, Agent

1    Giovanetty.

2           Next witness.

3           MR. SWEET:  Thank you, Your Honor.  The United States

4    calls Melanie McClure.

5           THE COURT:  Ms. McClure, if you want to head up to the

6    witness stand here to my right.  Remain standing for just a

7    moment and raise your right hand.

8                          **MELANIE MCCLURE**

9       after having been duly sworn under oath, was examined and

10                        testified as follows:

11          THE COURT:  You can have a seat.  If you could state

12   your first and last name and spell both for our court reporter.

13          THE WITNESS:  Yes.  Melanie McClure, M-E-L-A-N-I-E,

14   M-C-C-L-U-R-E.

15          THE COURT:  Thank you.

16                       **DIRECT EXAMINATION**

17   BY MR. SWEET:

18   Q.   Good morning, Ms. McClure.

19   A.   Morning.

20   Q.   And is that your water up there or --

21   A.   No.  Can I have one, please?  It is not mine.  Thank you.

22   Q.   Go ahead and take a drink now if you'd like.

23          All right.  So, Ms. McClure, were you the next door

24   neighbor to Negasi Zuberi?

25   A.   Yes.

1  Q.   Did you go out with Alycia Westfall one night, Mr. Zuberi's

2  significant other?

3  A.   Yes.

4  Q.   And did you go to The Pikey?

5  A.   Yes.

6  Q.   And was that on Cinco de Mayo 2023?

7  A.   Yes.

8  Q.   We're going to talk about that some more, but I want to talk

9  about you for just a second, please.

10  A.   Okay.

11  Q.   So tell us where you live.

12  A.   1320 North El Dorado Avenue, Klamath Falls.

13  Q.   Okay.  And about how long have you lived there?

14  A.   Let's see.  2015, so (pause) -- well, in Klamath Falls

15  entirely, it's been since 2016, so eight years, but at that

16  address, it would just be a year and a half for us, so (pause) --

17  Q.   All right.  And what do you do, please?

18  A.   I'm an occupational therapist.

19  Q.   All right.  And how long had you been doing that for, just

20  roughly?

21  A.   About 21 years.

22  Q.   So let's -- let's go back to 2023.  Were you living on

23  El Dorado before Mr. Zuberi moved in?

24  A.   Yes.

25  Q.   And did you interact with Mr. Zuberi much?

1    A.    Not much.  I mean, there was a handful of interactions.

2    Q.    How about Alycia Westfall, who shares children with

3    Mr. Zuberi, did you -- did you come to know her?

4    A.    Yes.

5    Q.    You spend some time with her?

6    A.    Yes.

7    Q.    So I want to talk a little bit about -- about your

8    interaction with her, but let's -- let's ask where -- did you go

9    over to their house much, like, inside their house?

10   A.    I went over inside, it was at least once -- twice.  Two

11   times.

12   Q.    Okay.  So let's -- let me pull up their house just for a

13   second.  Let's look at Exhibit 28, please.  So we're going to

14   see -- so under the disappearing green mark, what house are we

15   looking at there?

16   A.    That's the house they lived in, my neighbors.

17   Q.    Okay.

18   A.    Right next door.

19   Q.    And so to the far right, you have Carlos Garcia's house,

20   correct?

21   A.    Correct.

22   Q.    Okay.  And could you circle on this where your house would

23   be?

24   A.    I'm over here (indicating).

25   Q.    Okay.  So thank you.  So, actually, so right in there, so is

1    there a window kind of between your houses on Mr. Zuberi's house?

2    A.   There's a window on that garage, uh-huh.

3    Q.   Let's take a look at 79-2.  Does that show -- does that show

4    that window?

5    A.   Yes.

6    Q.   Let's take a look at Exhibit 80, please.  This might be a

7    little clearer.  Okay.  So were you ever able to see -- well, let

8    me ask you this:  Was -- was the garage door open a lot to

9    Mr. Zuberi's residence?

10   A.   No.

11   Q.   Did you ever see inside the garage?

12   A.   No.

13   Q.   What about -- what about the window?  Were you -- do you --

14   was the curtain up like this much of the time?

15   A.   No.  There was a time when it wasn't.

16   Q.   And at some point -- so what was it when -- you said the

17   time that it wasn't.  What was up at first?

18   A.   What I recall seeing was, like, some blue Christmas lights

19   that outlined the window.

20   Q.   And then at some point, what happened?

21   A.   At some point, it became that.

22   Q.   Once that curtain went up, were you ever able to see into

23   that side window --

24   A.   No.

25   Q.   -- of the garage?

1   A.   No.

2   Q.   What about, there's a person door into the garage if you're

3   headed towards the front door.  Were you able to see in the

4   garage from that person door?

5   A.   You're saying the one that enters from that patio --

6   Q.   Yes.

7   A.   -- in the front?

8   Q.   Uh-huh.

9   A.   No.  No.  I was -- no.  And I -- there was a time that I

10   stood specifically right at the entryway to -- that goes into the

11   kitchen, and to that one, no, I couldn't see in -- anything in

12   that other entryway to the garage you're talking about.

13   Q.   So let's -- let's talk -- let's talk about Ms. Westfall.

14   Was -- tell us how it came about that you and Ms. Westfall were

15   going to have a night out.

16   A.   I had -- I came over to their house one night, and I can't

17   recall if we -- I had a text conversation prior to me coming

18   over.  And it was just her and the boys there and she was

19   preparing dinner in the kitchen, and that's the time that I stood

20   right there at that door and -- in the -- in the doorway there at

21   the kitchen, and we talked for a little while.  And I invited

22   her -- I, you know, asked her if she'd done anything or went

23   and -- anywhere in the area, and she had said no.  And so I told

24   her that some friends, some female friends and I were going to go

25   out and have drinks and dinner, so (pause) --

1    Q.   And did you --

2    A.   And I invited her.

3    Q.   You invited her?

4    A.   Yeah.

5    Q.   And was -- was that around early May of 2023?

6    A.   Yes.

7    Q.   So did you reach an agreement as to the -- when you'd meet

8    and when you'd go out?

9    A.   Yes.

10   Q.   All right.  What was the planned night?

11   A.   The -- I -- I can't recall what time we had agreed on, but I

12   was running a little behind, and we texted back and forth about

13   what time.  She was asking me again what time I was, you know,

14   going to be ready, confirming the time.  And then (pause) -- I

15   mean, I told her that I was going to be a little later.  I

16   think -- all in all, I think maybe I was about 30 minutes late

17   from the original time that we had planned.

18   Q.   And this is Cinco de Mayo 2023?

19   A.   Yes.

20   Q.   So you're running a little late?

21   A.   Uh-huh.

22   Q.   And -- but the plan was on.  Is that correct?

23   A.   Yeah.  Uh-huh.  She was excited to go.

24   Q.   And so do you head over to go pick her up?

25   A.   Yeah.  And so I just walked across the little -- I mean,

1   it's -- I don't even know what you would call it.  It's a little

2   area that separates the driveways.  And so I walked over, and

3   that's when I looked at my phone at the last text that I had not

4   heard came through, and it stated that there was a change in

5   plans basically, that she couldn't go, even though she had been

6   repeatedly texting prior to, confirming the time and when I would

7   be ready and when we would be leaving.  And this last text said

8   that she had to stay and watch the boys because he needed to

9   leave.  And I just continued going over there as I read it,

10  because I was, like, this doesn't make sense.

11  Q.    And you were already on your way over?

12  A.    Yeah.  Uh-huh.

13  Q.    Just so we can see where you are, let's pull up 28-5,

14  please.  Okay.  And let's go -- okay.  So you go into the patio

15  area?

16  A.    Uh-huh.  That -- the gate that's open right there, uh-huh.

17  Q.    Okay.  And then what do you do?

18  A.    Go -- I saw her -- there's a big window then to the kitchen.

19  Yeah.  If you can show that, you can --

20  Q.    And let's go to dash 2, and dash 3.

21        Was it this door or the other door?

22  A.    This.  So this window right here (indicating) on the left.

23  I could see her, because the blinds were up.  And it's a long,

24  rectangular window.  And I could see her standing, and she was

25  ready to go.  She had her purse, you know, hanging on her -- on

1   her wrist.  And I had never seen her -- to this point, I had

2   never seen her what I call all dolled up and ready to go.  And so

3   she looked completely ready and her hair was done and everything,

4   and so I just -- you know, I waved at her, like, that I was

5   there.

6           And she stood there, she told me to -- she just, "Hold

7   on."  She stood there for a few seconds, and then she ran -- ran

8   out of the house.  And I can't remember which door she ran out

9   of, whether it's this one right here, the front entry door, or if

10  it was the door over here (indicating) that's going to be to the

11  left of that window that enters the kitchen.  And she said,

12  "Let's go.  Let's go."

13          And I'm just left standing there, because I'm

14  processing it.  I'm, like, what's going on.  And so I'm standing

15  there right in front of the front entry door, the wood door right

16  there that I circled.

17  Q.   What happens next?

18  A.   He comes to the door.

19  Q.   Who's "he"?

20  A.   What's his real name?

21  Q.   Well, did you -- what name did you know him by when --

22  A.   I -- I knew him as Sakima.

23  Q.   Okay.  And so Mr. Zuberi.  So --

24  A.   Okay.

25  Q.   So Mr. Zuberi comes out.

1    A.    Yes.  And so he's standing -- you know, he comes to the

2    door.  And I said, "Hey, I don't know what you think this is --

3    what we're doing, but we're not -- this is not going out looking

4    for men."  I just wanted to make that clear, because I did not

5    know what the definition of their relationship was at that time.

6    And all I had known was that they weren't married, per Alycia,

7    her telling me that they weren't married.

8            So I just said, "Hey, I don't know what you think this

9    is.  We're just going out to have fun.  This is a ladies night,

10   and this is not -- there's no, you know, intention of looking for

11   anything else other than having fun."

12           And he stated, "Well, I don't care if she goes out.

13   She's more than welcome to go, but when she comes back, she's

14   going to have to find another place to live, because it's not

15   going to -- she's not going to be staying here."

16   Q.    And did Alycia Westfall have her phone?

17   A.    No.  He had it.

18   Q.    Did you see him holding it?

19   A.    Yes.  And I know that he had it, because she said --

20   Q.    Well, let's stick with, so you --

21   A.    Okay.

22   Q.    -- so you see him holding her phone?

23   A.    Yes.

24   Q.    Okay.  So he says that.  He said to you what you just said.

25   What did you do?

1   A.   I said, "Come on.  Are you serious?  Like, you -- you cannot

2   be serious.  That's the mother of your children.  You're --

3   because she wants to go out tonight, you're not going to let her

4   come home?"

5   Q.   And what did Mr. Zuberi say?

6   A.   I can't remember the exact sequence of, you know, what was

7   said next, but he --

8   Q.   I'm going to ask you to say what was said as best as you --

9   A.   You are?

10  Q.   Yes.

11  A.   You want me to say it?

12  Q.   Say what was said.

13  A.   Okay.  He just kept saying, "You know" --

14       Oh, you know what?  Let me -- let me backtrack.  When I

15  said about what we were going to do, what the plans were for the

16  night, he said, "Well, we're not together anyway.  This is a

17  business relationship."

18       And I said, "Okay.  Well, I didn't know that.  And I --

19  it doesn't matter to me.  It -- that's none of my business."

20       So some more of the conversation was that he was just

21  saying negative things about her.  He brought up the fact that

22  she was Haitian and that he didn't know if she's into voodoo.

23  And he said -- for me, this was the most appalling thing, and --

24  and it stands out because it's the most appalling thing that I've

25  ever heard a male say about the mother of his children, is that

1   he said, "I don't care" -- and I could be wrong on the number on

2   this.  He said, "I don't care if she gets" -- it was either three

3   or five -- "dicks in her ass at one time tonight.  She's not

4   coming back here."

5   Q.   Was he still have -- did he still have her phone at that

6   time?

7   A.   Yes.

8   Q.   Did you try to get the phone back to Ms. Westfall?

9   A.   Yes.  And -- yeah, I did.  I negotiated.

10  Q.   What did -- what did you say?  What was the continuation of

11  the conversation with Mr. Zuberi?

12  A.   Well, Alycia had said -- because she was standing around

13  that enclosure, that wooden enclosure there in the front of the

14  patio, and she was standing outside of it.  And she said, "Well,

15  can I, you know, at least have my phone?"

16          And I said, "What?"  I was, like, "You got her phone,

17  too?"  You know, and I just -- I'm -- I'm just being honest.  I

18  was, like, "Come on."  And I was like, "Can she have her phone

19  back?"

20          And he was, like, "She doesn't need it."

21          And I said, "Well, I disagree.  She does need it."  I

22  said, "What if something happens?  What if we get in a car

23  accident?  What if someone tries to hurt us?  What -- I mean, and

24  we need help and we need to call 911?"  I was, like, "She needs

25  to have her phone.  What if she needs to communicate with you?

1    What if something happens with the boys?"  You know, I'm thinking

2    like a mom here, because I have three daughters.

3           So I don't -- I don't know -- you know, I would just be

4    speculating as to why he agreed to give me the phone and why he

5    agreed to promise to let her come back, that -- and that the door

6    would be unlocked, because I asked him multiple times, I said,

7    "I -- I need you to promise me that the door will be unlocked

8    when we come home tonight and that she's going to be able to

9    sleep here."

10   Q.   And what did he say?

11   A.   I think I probably -- I -- about three times.  And he

12   eventually said he agreed that he would -- that he promised that

13   he would.  And then I got the phone.  I got that promise first,

14   then the phone.  Then I began negotiating for the phone, stating

15   the reasons, that seemed very obvious to me, why she would need

16   to have her phone.

17   Q.   Did Mr. Zuberi give you the phone or give it to

18   Ms. Westfall?

19   A.   He gave it to me, and I gave it to her when I got in the car

20   with her to leave.

21   Q.   Where -- where was Ms. Westfall during this conversation?

22   A.   You want to pull up the picture and I can show you?  The

23   front of -- the front of the street looking at the house, the

24   first picture of the property that you showed me.

25   Q.   I'm sorry.  Were you in this area or were you farther back?

1    A.    No.  I was -- I was right in front of the door, the wooden

2    door there.  Yeah.  And that -- and he was in the doorway talking

3    to me, uh-huh.

4    Q.    And where was -- where was Ms. Westfall?

5    A.    So -- okay.  So if you -- if you take us back to the

6    original picture that you showed me when you wanted me to confirm

7    the property.

8    Q.    28.

9    A.    Yeah.  She's standing over here to the left.  Do you see

10   where the -- the house number is?

11              THE COURT:  You can draw right on it.

12              THE WITNESS:  Oh, okay.  Gotcha.  All right.  I'll do

13   that.

14              Right -- she's standing right over here on that side of

15   the fence there (indicating).

16   Q.    The inside of --

17   A.    No.  The outside.  She was not within visual sight at all of

18   me or him as we were having this conversation.  She was speaking

19   through the fence.

20   Q.    So was it -- so it was just you and Mr. Zuberi --

21   A.    Yes.

22   Q.    -- face to face?

23   A.    Yes.

24   Q.    And Ms. Westfall was out on the other side of the fence

25   speaking through the fence?

1   A.    Yes.

2   Q.    Was -- what was her demeanor?  Was she upset during this?

3   A.    You know, I couldn't see her with my eyes, but -- yeah.  So

4   she's standing -- at this conversation, she's standing right here

5   (indicating).

6         Before she had brought up the fact that he had the

7   phone, when she asked to have her phone back, she said, "Can you

8   quit talking" -- you know, she said something -- she was

9   addressing the way that he was talking about her and the comments

10  that he was making about her, and she just said some -- she was

11  trying to get him to stop.  She just said, "Can you please quit,

12  you know, talking about me like that?  You're" -- you know, I

13  don't know if she said "quit talking shit," but, you know, she's

14  referring -- she was trying to get him to stop, so --

15  Q.    And did he stop?

16  A.    No, he didn't until, you know, I got the phone back and

17  it's -- and we left, so (pause) --

18  Q.    And so you got a promise that the door would be open --

19  A.    Yeah.

20  Q.    -- you got the phone back?

21  A.    Uh-huh.

22  Q.    And did you -- and did you give the phone to Ms. Westfall?

23  A.    Yeah.  As soon as we got in the car.  And I told her that I

24  wasn't taking into account any of the things that he said about

25  her and that I wasn't judging her for any of that.

1   Q.   Did you meet up with some other women?

2   A.   Yes.

3   Q.   Okay.  And we're going to end up at The Pikey, it sounds

4   like, but just generally, where -- did you go to another place

5   beforehand?

6   A.   First, yeah.  Sidelines, uh-huh, for dinner.

7   Q.   Okay.  So you're at Sidelines.  And just kind of so we know

8   who's there, you know, it doesn't matter their names, but how

9   many people are there, please?

10  A.   So it would be Paula, Terry.  There was another gal there

11  that Paula brought, so three, Alycia and I.  So it would be five

12  of us.

13  Q.   So you're at Sidelines.  And then do you all head over to

14  The Pikey?

15  A.   Some went home.  I know that at The Pikey, it was Alycia and

16  I and Terry.  So I think it was -- well, Paula may have came and

17  stayed just for few minutes, but there were at least three of us,

18  and four for a short period of time.

19  Q.   So is it dark out now?  Is it night?

20  A.   Yes.

21  Q.   Okay.  Cinco de Mayo night, you, Ms. Westfall, and depending

22  on the timing, one or -- one or two others.  Was The Pikey

23  crowded?

24  A.   Yes.

25  Q.   So you're in The Pikey.  And does Mr. Zuberi come in?

1    A.    Yes.

2    Q.    Tell us about that, please.

3    A.    Where my friends and I, including Alycia, were sitting there

4    at the bar, and I happened to turn around at some point when I

5    heard, I don't know, the door open or, you know, movement, and I

6    just saw him come in, and it was with those -- I don't know if

7    they were a couple or what, but a male and female that were

8    residing at their place downstairs, they came in.

9    Q.    All right.  Let's pull up a picture.  418, please.  We're

10   going to go through -- okay.  Let's go to 418-2, please.  Okay.

11   What do we see here, please?

12   A.    So that is -- this looks like they were exiting.  I don't

13   know if that --

14   Q.    Yeah.  That's fine.  Don't worry about --

15   A.    Okay.  Okay.  All right.  Okay.  So, yeah.  So there's he,

16   Mr. Zuberi, and then that gal.

17   Q.    Circle Mr. Zuberi for us, please.

18   A.    Okay.  (Witness complies).  And then this gal was living

19   there and so was this male (indicating).

20   Q.    So the other two people were living at 1336 as well?

21   A.    Yes.

22   Q.    Okay.  You'd just seen them around?

23   A.    I saw them coming and going.  And Alycia had confirmed to

24   me, because I asked about them because I like to know who's

25   living next door to me.  I like to know my neighbors, for the

1    safety of my children.  I asked if those people live there.  And

2    she said, "Yeah, they do, you know, downstairs."  So (pause) --

3    Q.  So you're in The Pikey.  Mr. Zuberi walks in.  And you said

4    he was with these people, these two people here?

5    A.  I didn't -- I -- we -- he and I never spoke there.

6    Q.  All right.  So tell us what happened.  So you're in there,

7    Mr. Zuberi comes in.  I'll let you take it from there.

8    A.  We were sitting at the bar.  I saw -- and I just told her, I

9    said, "He's here."  And -- and then it was, like, "Who's watching

10   the boys?"  And so I told her, I was, like, "I'll go talk to

11   him" -- I don't -- I don't have a problem with that -- "and find

12   out."

13           And she was, like, "No.  You -- no."  She would not let

14   me.  "Don't do that.  Don't do that."

15           But at one point, I looked down the bar because he was

16   down there, so he would be down to my right, there were people in

17   between, and I just made eye contact with him so he knew that I

18   saw him there, too, and I head nod, so -- and that was it.

19   Q.  Did he respond?

20   A.  He just looked at me, too.  I mean, he -- I don't remember

21   if he nodded or not, but I just was acknowledging that his

22   presence was known.

23   Q.  Did you ever speak to him that night at The Pikey?

24   A.  No.  She went and spoke to him at some point and then came

25   back.  And I asked her what was said.  And I believe that she --

1  that she was not being honest about what he said because she

2  didn't want me to overreact.

3  Q.  Did you see Mr. Zuberi -- did you see any women hanging all

4  over him that night?

5  A.  You know, I only looked down there a couple of times, and

6  I -- I -- I wasn't keeping a long glance to study who was around

7  him, so I cannot confirm that.

8  Q.  Did -- did you and Ms. Westfall go home?

9  A.  Yes, uh-huh.

10         MR. SWEET:  Thank you.  I have nothing further.

11         THE COURT:  Any cross?

12                    **CROSS-EXAMINATION**

13  BY MR. BERTHOLF:

14  Q.  The curtain that was on the garage window, did that cause

15  you any alarm?

16  A.  It -- it didn't cause me alarm, because we are all entitled

17  to privacy.  I mean, I keep my windows covered, too, so

18  (pause) --

19  Q.  Okay.  And on May 5th, you noticed that the window in the

20  door to the garage had already been covered?

21  A.  No.

22  Q.  You couldn't see in there?

23  A.  So that, I cannot confirm.

24  Q.  Okay.  How many other times were you inside of that patio

25  area?

1    A.    Prior to that night, or what are you --

2    Q.    Yeah.  Prior to that.

3    A.    I would say two times prior to that night.

4    Q.    How about after?

5    A.    I can't recall that.  Probably another one or two times.  I

6    mean, when he was not there.

7    Q.    Okay.  And you couldn't see into the garage?

8    A.    No.

9    Q.    Or did you even --

10   A.    I --

11   Q.    -- bother to look in?

12   A.    No.  I -- no.  I'm not looking into somebody else's

13   property.

14   Q.    I'm talking through the window in the door.

15   A.    Which -- which window are we talking about?  Let's be

16   specific.

17   Q.    The door -- the door to the garage.

18   A.    Okay.  The door, the entry -- you're saying that leads from

19   the patio into the garage?  Okay.

20   Q.    Yes.  That door.

21   A.    No, I did not.  I -- I didn't look.  Again, if I'm -- I'm

22   respectful, and I'm not going to try to -- so if I was there to

23   see Alycia, I'm not trying to look at -- no.

24   Q.    And it's not uncommon for people to cover up windows to --

25   for privacy?

1    A.    Well, when you want, I guess, the things inside protected.

2    Q.    Okay.  Fair enough.

3    A.    Or hidden.

4    Q.    Or hidden.

5           MR. BERTHOLF:  That's all.  Thank you.

6           THE COURT:  Any redirect?

7           MR. SWEET:  No, Your Honor.  Thank you.

8           THE COURT:  All right.  Thank you very much for joining

9    us.  You're free to go.

10          Folks, we're at 12:10, so let's take our lunch break.

11   Why don't we get everyone back at 1:30 and we'll go from there.

12          (Jury leaving courtroom:  12:10)

13          THE COURT:  All right.  Just please be seated.

14          (Discussion off the record)

15          THE COURT:  Okay.  We'll be in recess.  Thank you.

16          MR. SWEET:  Thank you, Your Honor.

17          (Recess:  12:13 - 1:39)

18          THE COURT:  All right.  Please be seated, everybody.

19          Special Agent Gluesenkamp is already under oath in this

20   case, so if the Government would like to go ahead and inquire.

21                        **TRAVIS GLUESENKAMP**

22    after having been previously sworn under oath, was examined and

23                         testified as follows:

24          MR. SWEET:  Thank you, Your Honor.

25   /////

1     **DIRECT EXAMINATION**

2  BY MR. SWEET:

3  Q.    So, Special Agent Gluesenkamp, what I'd like to do to sort

4  of conclude on the physical exhibits matter is have you go

5  through some of the physical exhibits that we haven't really

6  addressed yet or haven't shown the jury as much.

7         So what I'd like you to do is do what we did with

8  Special Agent Giovanetty.  I'd like you to come down, please,

9  stand in a way they can see you, and let's do it sort of

10 chronologically.

11        If you could start with items from the search of 1336

12 North El Dorado, please --

13 A.    Yes.

14 Q.    -- and give the exhibit number and the evidence.

15 A.    So Exhibit 122 is the 6-millimeter upper.  Exhibit 108,

16 police patches.  Exhibit 103 is the Blink camera system.

17 Exhibit 111 and 112, a set of leg irons and a set of black

18 handcuffs.  Exhibit 115, AV-1's purse.  Exhibit 175, a Rulart

19 dead bolt lock with Amazon shipping label.  Exhibit 113, keys

20 collected from the table outside of the cinderblock structure.

21 Item 169, an AR-15 magazine.  Exhibit 109, three AR-15 magazines,

22 two that have been unopened.

23        This one's missing an exhibit number, so -- Home Depot

24 receipt.  It may have fallen off.  This one also, so I'll set it

25 down.  This is also missing an exhibit number.

1          Exhibit 285, a Home Depot receipt.  Exhibit 172, two

2    magazines that hold 6-millimeter ammunition.  Exhibit 109,

3    magazine pouches, and then there are magazines stored within the

4    magazine pouches.  Exhibit 118, a Fiji water bottle.

5    Exhibit 170, this is a magazine that stores 7.62 x 39 ammunition.

6    Exhibit 121, this is the door handle collected from the door that

7    leads into the garage, that leads to the exterior, and it had

8    blood on it.

9          Exhibit number's missing on that one.

10         And then Item 107, a set of unused, unopened black

11   handcuffs.

12   Q.   Are those exhibits all from the residence at 1336 North

13   El Dorado?

14   A.   Yes.

15   Q.   Just one clarification on one of the -- the shotgun shell

16   boxes that were in the ammunition can that Special Agent

17   Giovanetty discussed.  When Detective Loudermilk testified

18   earlier, did he say that he actually found those shotgun shell

19   boxes in the same master bedroom, but in a closet, and then put

20   them in the ammo can for transport?

21   A.   Yes.  He put them in there for ease of storage, and they

22   were collected as one item.

23   Q.   All right.  Thank you.  So what's that -- next physical

24   exhibits, where are these coming from?

25   A.   These are going to come from the Nissan Altima.  This was

1    the next search warrant executed.

2            Item 286 are the concrete anchor screws.  Item 284 is

3    in two parts -- or excuse me, three parts.  The first part is the

4    receipt to Triple A Discount Storage, which lists the access code

5    of star 2153 pound, and the payment receipts for the same storage

6    unit.

7    Q.    I'm sorry.  What was the exhibit number on those three

8    again, please?

9    A.    284.

10   Q.    Thank you.

11   A.    Moving next, the next location that was searched was the

12   Prowler trailer.

13           Item 334 is the black and yellow taser.  Item 335 and

14   336 are the silver and black handcuffs.  Item 340 is the 16-band

15   cellular jammer.  Item 343 is the small two-antenna GPS jammer.

16   Item 331 are three magazines that hold 9-millimeter ammunition.

17   Item 491 is divided into two parts.  It is the Land Air Sea GPS.

18   And 341 is the eight-band Sailor (phonetic) jammer.

19           The next location to be searched was the Honda Pilot.

20           248 is tinfoil.  239, a handcuff key recovered from the

21   sunglasses visor.  247, bleach cleaner.  235, Mr. Zuberi's broken

22   cellphone and case.  Item 240, these are the keys that contain

23   the Nissan Altima key chain -- or -- and key to activate the car.

24   Next is 251.  This is Ms. Westfall's cellphone.

25           Item 245 is a couple different paper exhibits.  One is

1    a New York state driver's license for Justin Kouassi, along with

2    a Social Security card.  Continuing 245 is a decree of name

3    change for Justin Kouassi.  Item 236 is a wallet billfold.  This

4    also contained a driver's license and credit card for Negasi

5    Zuberi.

6            Item 238 is the Garmin GPS.  Item 237 is

7    Ms. Westfall's -- correction, AV-1's cellphone.  Item 285 is a

8    Home Depot receipt and a Wal-Mart receipt.  Item 168 is a blue

9    notebook.  Item 168 is a green notebook.

10           THE COURTROOM DEPUTY:  You said "168" twice.

11           THE WITNESS:  These were collected as the same item,

12   and so they share the same item number.

13           Item 243 is a Dollar Tree receipt and Item 254 is

14   additional tinfoil.

15   BY MR. SWEET:

16   Q.   Special Agent Gluesenkamp, in regards to a black notebook,

17   it's now stickered Exhibit 99.  And before this goes to the jury,

18   we'll seal that back up with evidence tape, but could you

19   identify that, please?

20   A.   This is the notebook where the -- "Operation Take Over"

21   notebook recovered from, along with the drawing of the

22   100-foot-down underground structure.

23   Q.   And then AV-1's cellphone, that was 1B-118 for the FBI?

24   A.   Yes.  1B-118 for the FBI, with an exhibit number of 237.

25   Q.   Thank you.  All right.  Thank you.

1          Special Agent Gluesenkamp, do you have sort of an

2    unconventional level of expertise in opening doors?

3    A.    Yes.

4    Q.    Please tell the jury about that.

5    A.    As a SWAT team leader, I was responsible for all sight

6    surveys for any operations the SWAT team conducted.  Part of that

7    was gaining forced entry into every residence that we were

8    responsible to serve a search warrant or arrest warrant on.  As

9    part of those duties, I was trained and had a lot of experience

10   of assessing a door and what tool would be required to get into

11   that door.  By doing so, I'm looking at where the hinges are,

12   does it swing into the residence, does it swing out of a

13   residence, and are -- what's it made of.  And all of those would

14   inform the type of tool we would use to gain quick entry into a

15   home.

16   Q.    Let's take a look at Government's Exhibit 526, please.  So

17   this was discussed briefly with Kori Barnum.  So tell us what

18   we're looking at in terms of the black metal part of the frame,

19   please.

20   A.    So the black metal portion, I'll draw a line (indicating),

21   that is the frame of the metal door that is anchored to a wooden

22   frame that it's mounted to.  So this, when you push the door, it

23   comes with it and the door then mounts inside of that metal

24   frame.

25   Q.    So let's -- let's zoom in to -- let's go to the next slide,

1    please, dash 1.  Dash 2.  Excuse me.

2             Okay.  So tell us about this, please.

3    A.   These are the factory-drilled holes that allow a dead bolt

4    or a standard door handle latch to pass through to secure the

5    door.

6    Q.   So would a metal door have a metal frame?

7    A.   Yes.  It would defeat the purpose of having a metal door to

8    have a wooden frame.  If a burglar or someone was trying to get

9    into the home, when you strike the door, it's going to break at

10   the weakest point.  If you had a metal door, the weakest point

11   will always be the door frame, and those typically break very

12   quickly anyway, so the purpose of a metal door would be to

13   strengthen the frame to which it's mounted.

14   Q.   So if you were (pause) -- if you were inside that room and

15   that door were closed and you needed to open that door, would you

16   use a ram?  What would you use to do that?

17   A.   So if I'm inside the structure looking at the door from the

18   inside, I would assess there would be what's called an out-swing

19   door.  What that -- and the way we would frame that is the way

20   that we -- we describe the direction of the door by the way it

21   moves to or from the individual.  So this I would assess as an

22   out-swing door if I'm standing inside the structure.

23             To open that, the only tools you can use are pry tools,

24   which means a Halligan, which is a common tool firefighters use.

25   It looks like a big flat-billed hammer, and you can insert that

1    into a space and then you have to pry to gain leverage over

2    that -- over that door to pop it open.

3    Q.   If you just kind of rammed it with a -- with a battering

4    ram, what would that do?

5    A.   This door in particular has a metal flange that covers up

6    where the dead bolt arm would actuate into the door frame.  So if

7    you continue to hit it, you're just pushing that flange up

8    against the door frame over and over and over again, and you're

9    never going to be able to gain a mechanical advantage over the

10   door to push it outward.

11          And then some frames, but not this one, there was --

12   there would often be another piece of wood or something inside of

13   it to prevent the door from continuing past the close point, to

14   make it stop.

15   Q.   So if we look at sort of the bottom left of this picture,

16   are you able to see where the white door was kicked out or was

17   forced out of the jam?

18   A.   Yes.  From the perspective of being inside that room, that

19   would be an out-swing door.  Those are much easier to defeat.

20   You can use your foot.  You probably see it in movies where

21   people kick doors open.  That's usually what -- that's what

22   they're doing.  It often doesn't require a tool, but if it's a

23   much heavier door like the door to the front of your home, it

24   generally requires some additional weight behind it to -- to open

25   that door up.

1   Q.   So if you're inside that room, the metal door is an in --

2   A.   In-swing.

3   Q.   In-swing.  Okay.  And then the white would be an out-swing?

4   A.   Correct.

5        MR. SWEET:  Thank you.  You can clear that.

6   Q.   So I want to ask you a question about Defiant keys, and I'm

7   going to start with the end question and then we'll kind of walk

8   back through it.  So are Defiant keys universal?  If you have one

9   Defiant key, will it open all Defiant locks?

10  A.   No.

11  Q.   Tell us -- tell us about Defiant keys in this case, what you

12  found, what you learned.

13  A.   We tested all Defiant keys in this case.  There were four

14  that were located.  One was inside the ammo can, which you saw me

15  testify and test earlier on the mechanical door.  The other key

16  that functioned the door was located on the key ring that held

17  the Nissan Altima key.  This was seized from inside the Honda

18  Pilot in Reno, Nevada.

19       There were two additional keys.  There was one located

20  on the Nissan Altima key ring that are branded "Defiant" and one

21  that was located on the table outside of the cell that was

22  attached to the other key ring.  Those have different codes

23  written on the outside of them, and they did not function the

24  door.

25       The key that was found inside the ammo can that

1    functioned the door and the key that was attached to the Altima

2    key ring that did function the door each shared the same

3    numerical code written on the back of the key.

4    Q.   And so when you say "the Altima key ring," and you said it,

5    the Altima key ring that was found in the Honda Pilot, correct?

6    A.   Correct.

7    Q.   So let's take a look at 527, please.  So did you go ahead

8    and take photographs?

9    A.   Yes.

10   Q.   Okay.  So what are we looking at here?

11   A.   The two keys on the left are the keys that function the

12   door.  The two keys on the right are Defiant brand keys that are

13   still attached to the key ring, and they do not function the

14   door.

15   Q.   And so the two keys on the right, one of them is the

16   workbench key ring and one of them was from the Altima key ring

17   in the Pilot.  Is that correct?

18   A.   Yes.  This one (indicating) is from the Altima key ring.

19   This one (indicating) is from the workbench.

20   Q.   Then let's go to -- actually -- and so you can -- can you

21   see the handcuff key to the far right center of the Altima key

22   ring?

23   A.   Yes.

24   Q.   Okay.  Go ahead and circle that so we're (pause) --

25   A.   (Witness complies).

1  Q.  Okay.  Thanks.  Let's go to dash 2, 527-2.  Tell us what

2  we're seeing here.

3       MR. SWEET:  And let's just zoom in on those numbers,

4  please, all four.  Thank you.

5  A.  So as you can see, the two keys on the left that function

6  the door share the same code, 54355, and the two keys on the

7  right do not share that same code.  One is coded 44234 and the

8  other is coded 35341.  Neither of those keys function the door.

9  Q.  And in terms of the -- the key ring -- so the jury's seen

10 some photos of the key rings as found in the Pilot.  Do those

11 look different now in physical evidence?

12 A.  Yes.

13 Q.  Why is that, please?

14 A.  For the Altima key ring in particular, the key to the Nissan

15 Altima was removed and it was returned to Ms. Westfall so she

16 could receive the car.  Additionally, the functioning key was

17 removed and booked as a separate evidence item.

18 Q.  And was the Honda Pilot key also removed and provided to

19 another party?

20 A.  The Honda Pilot key was given to the lienholder.

21 Q.  Okay.  So basically some keys have been provided to others.

22 And then the two keys that we see tagged here, you've basically

23 split those out from where they were originally found?

24 A.  Correct.

25 Q.  Thank you.  We've -- the jury's heard a lot of talk about

1   cellphone jammers in this case.  I really have one question.  Had

2   you ever -- prior to this case, had you ever encountered

3   cellphone jammers before?

4   A.   No, I had not.

5   Q.   How long have you been in law enforcement?

6   A.   A little over 16 years.

7   Q.   So not just on a case that you were the case agent on, but

8   have you ever worked on a case with a cellphone jammer?

9   A.   No.

10  Q.   And is the district -- is the state of Oregon one judicial

11  district?

12  A.   Yes.

13  Q.   Have you had the opportunity to review a conviction document

14  for Mr. Negasi Zuberi?

15  A.   Yes.

16  Q.   Is Mr. Zuberi -- have you reviewed specifically a prior

17  felony conviction document?

18  A.   Yes.

19  Q.   And was this felony conviction on January 13th, 2021, and

20  was a corrected conviction document issued on January 21st, 2021?

21  A.   Yes.

22  Q.   I want to briefly follow up on something that Special Agent

23  Giovanetty mentioned, and that is, he discussed a purchase from

24  5D Tactical in March of 2023 of a $500-plus purchase.  Do you

25  recall what I'm referring to?

1    A.    Yes, I do.

2    Q.    So did 5D Tactical come up in other places in this case?

3    A.    Yes. We located a sticker on the outside of his MacBook

4    that was for that vendor.

5    Q.    Okay. Is that what we're seeing here, 211-2?

6    A.    Yes.

7    Q.    And then Exhibit 142, please. What are we seeing here?

8    A.    This is the kit that was purchased that contained an

9    80 percent lower receiver, and then there were some tools and

10    then a router system that was designed to help drill it out.

11    Q.    And 143, please. And what is -- what is that?

12    A.    That's the 80 percent lower receiver.

13    Q.    Did -- did you research whether Mr. Zuberi owned property in

14    Bonanza, Oregon?

15    A.    Yes.

16    Q.    And did you go to the property?

17    A.    Yes.

18    Q.    Could you just briefly describe what it is?

19    A.    It was a rural -- I believe it was a ten-acre parcel. It

20    was a rural ten-acre parcel. It was located outside of Bonanza.

21    There were several other lots that were adjoined to it. And it

22    was heavily wooded. And then we searched it very thoroughly by

23    hand, and nothing of evidentiary value was located there.

24    Q.    So at least a multi-acre property?

25    A.    Yes.

1   Q.   Let's -- let's -- I want to go to 379 for just a moment,

2   please.  So this is -- this was an exchange that -- the first

3   page was discussed, but the second page wasn't discussed.

4           So could you -- let's -- let's go to the top three

5   messages, please, including the date.  Sorry.  That was my fault.

6           Was this between Mr. Zuberi and Tyler Archibald?

7   A.   Yes.

8   Q.   And the date, please?

9   A.   January 22nd, 2023.

10  Q.   And just, was this regarding -- well, go ahead and read the

11  first one, please.

12  A.   First message:  "Can you use reinforced concrete blocks for

13  an underground house?"

14          Response:  "You mean a CMU wall?"

15          "Yes."

16  Q.   Okay.

17  A.   Go ahead?

18  Q.   Go ahead.  I'm sorry.

19  A.   "And would this support the weight of the dirt and the rocks

20  when it is buried?"

21  Q.   And then does the conversation continue?  Let's go to the

22  last two -- well, last three.  So is there a question as to

23  whether it would support being buried a hundred feet deep?

24  A.   Yes.

25  Q.   And the response?

1   A.   "Depends on the geographical location" --

2   Q.   And to be -- I'm so sorry.  Please continue.

3   A.   Oh.  "--- by the beach or in Portland.  N-O."

4   Q.   And is the person -- the ones that are indented, the ones

5   that are to the far right, is that Mr. Zuberi?

6   A.   Yes.

7   Q.   Let's go to the second page, please.  Okay.  Let's go to the

8   first three.  What does that say, please?

9   A.   "Mountains so rocky, rain forest."

10          A GPS coordinate is provided and then a Maps

11  application pin is sent.

12  Q.   And where was that pin to?

13  A.   That is the location of the Bonanza property we searched off

14  of Red Deer Lane.

15  Q.   That belongs to Mr. Zuberi?

16  A.   Yes.

17  Q.   Thank you.  So what I want to do now is I want to turn to

18  some data regarding May 5th, 2023, and I'd like you to explain to

19  the jury a little bit more about the Blink camera system that --

20  that you referenced earlier.  And we're going to be watching

21  some -- some videos.

22  A.   The Klamath Falls Police Department collected a memory stick

23  that was attached to a camera system inside of Mr. Zuberi's

24  residence.  We reviewed the videos pursuant to a search warrant

25  and we located -- there was a camera in the kitchen that pointed

1    towards the kitchen sink area and captured area around the

2    refrigerator, there was another camera in the living room that

3    looked back towards the couch that could see the pass-through

4    door that led from the kitchen to the living room, and then there

5    was a separate folder for a separate camera that was down in the

6    basement that captured activity coming and going from the slider

7    door in the basement.

8    Q.   So did you spend some time looking for camera surveillance

9    from on or around Cinco de Mayo 2023?

10   A.   Yes.

11   Q.   Did you find any?

12   A.   Yes.

13   Q.   I'd like to turn to Exhibit 358.  And before we hit "Play",

14   tell the jury --

15            MR. SWEET:  I don't know if you can just turn it on and

16   stop it for one second so we can just see.

17   Q.   Okay.  Special Agent Gluesenkamp, do you know, can you tell

18   the jury what this is going to be?

19   A.   Well, this is capturing the camera that is in the kitchen

20   that looks towards the refrigerator.

21   Q.   Okay.  And let's go ahead and hit "Play".

22            (Playing video, Government's Exhibit 358)

23   Q.   What was that, please?  Who was that and what was happening?

24   A.   That was Ms. Westfall leaving on the 5th of May.

25   Q.   And was that in the evening?

1  A.   Yes.

2  Q.   Let's do 360, please.

3       (Playing video, Government's Exhibit 360)

4  Q.   And what are -- what -- please describe this one.

5  A.   This was Mr. Zuberi in the kitchen just getting into the

6  fridge and getting a drink.

7  Q.   Was this around 7:55 p.m.?

8  A.   Yes.  This is after the previous video.  So Ms. Westfall has

9  left the home and then Mr. Zuberi is still there.

10 Q.   Did Mr. Zuberi leave the house that night?

11 A.   Yes.

12 Q.   Are there more videos than the ones we're showing here?

13 A.   There's a significant amount of videos that were captured

14 for that evening, yes.

15 Q.   So in terms of Mr. Zuberi leaving and before he went to

16 The Pikey or after he went to The Pikey, was there some back and

17 forth?

18 A.   Yes.

19 Q.   And just briefly, could you just briefly explain that in

20 terms of general movements by Mr. Zuberi?

21 A.   We do see Mr. Zuberi, what appears to be, leave for the

22 evening.  He returns at some point, and then leaves again, and

23 then returns several hours later.

24 Q.   Let's go to 363.  And do you know what time this was from

25 approximately?

1   A.   From this video, I don't recall.  This may be when he was

2   leaving for the evening.

3   Q.   Let's just briefly go to -- that was 363, if I didn't say

4   it.

5        Exhibit 418, was there -- did you review Pikey

6   surveillance video as well?

7   A.   Yes.

8   Q.   And 418-2.  So what are we seeing here?

9   A.   This is Mr. Zuberi leaving The Pikey with the two tenants,

10  and he's taking them home.

11  Q.   And approximately what time was that?

12  A.   This occurred, I believe -- let me refer to my notes

13  (pause-referring).  This -- he's departing The Pikey at

14  12:53 a.m.

15  Q.   And did you -- did he go home?

16  A.   Yes.

17  Q.   And then after Mr. Zuberi went home -- let me back up.

18       Did he return home with the two people in the video?

19  A.   Yes.

20  Q.   After Mr. Zuberi returned home, did he then go back to

21  The Pikey again?

22  A.   Yes, he returned to The Pikey.

23  Q.   So I'd like to pull up for just a moment, please,

24  Exhibit 266, page 335.  What are we -- what are we looking at

25  here?  And we're going to zoom in.  Do you know -- just in

1   general, what are we looking at?  What is -- is this Land Air Sea

2   data?

3   A.    This is Land Air Sea data.

4   Q.    Let's take a look at (pause) -- okay.  So 527 -- and we're

5   going to stop for one second.  Are these in UTC time?

6   A.    Yes.  And you subtract seven hours.

7   Q.    So when it says, the very first one, May 6 at 7:00 a.m. --

8   or 7:00 a.m., would that actually be midnight on May 6th?

9   A.    Yes.

10  Q.    So 527 Main Street, is that The Pikey or the area for

11  The Pikey?

12  A.    It's in the vicinity of The Pikey, yes.

13  Q.    And then 1374, is that in the vicinity of Mr. Zuberi's

14  residence?

15  A.    Yes.

16  Q.    So when it says 8:02, what time would that be in (pause) --

17  A.    1:02 p.m.  Excuse me.  A.m.

18  Q.    So 1:02 a.m. in the area of 1336.  And then what time does

19  it show -- the Land Air Sea data show those devices being back in

20  the area of The Pikey?

21  A.    At 1:08 a.m.

22  Q.    Thank you.  So what I'd like to do now is I'd like to --

23  let's pull up Exhibit 512.  And I'm going to put up the easel

24  and we're going to talk about some data points.

25          Let's zoom in to data point -- to the area of data

1  point 1, please.  Okay.  1:13 a.m., generally where would this

2  be?

3  A.   This data point was derived from the surveillance video

4  collected from the neighboring businesses to The Pikey, which

5  showed Mr. Zuberi and AV-2 walking down the street at 11:00 -- or

6  excuse me, 1:13 a.m.

7  Q.   So let's go to data point 2, please.  And what -- where does

8  that come from, please?

9  A.   This data point is derived from the iCloud data.  This is

10  the GPS screen shot that Mr. Giovanetty testified about that

11  places them in the vicinity of the roundabout where Highway 97

12  and Highway 66 intersect.

13  Q.   All right.  And is that the screen shot on the screen that

14  you were discussing?

15  A.   Yes.  And correction.  It's Highway 140.

16  Q.   Okay.  So that's 1 and that's 2.  Now, let's talk about --

17  so the first one was from surveillance footage, the second one

18  was based off of an iCloud screen shot.

19         Let's talk about data point 3.  And let's include the

20  box when we zoom to that.  There's an LAS below 1:40 a.m.  Tell

21  us -- tell us about that, please.

22  A.   This is a GPS point derived from the Land Air Sea data.

23  Q.   Let's -- let's take a look at -- so what we're going to do

24  now is we're going to switch to some photographs.  So let's pull

25  up 523.  So is this now headed out towards the country away from

1   downtown Klamath Falls?

2   A.   Yes.

3   Q.   Okay.  What are we looking at with Exhibit 523?

4   A.   This is a photo taken by SA Vanetty (phonetic) at that

5   specific GPS location.

6   Q.   And -- okay.  So that -- the picture we're looking at that's

7   Exhibit 523, that represents location 3 on Exhibit 512?

8   A.   Yes.

9   Q.   Was there another data point on the Land Air Sea heading

10   even further away from Klamath Falls?

11   A.   Yes.

12   Q.   All right.  And what time was that next data point, point 4,

13   please?

14   A.   That was at 2:00 a.m.

15   Q.   Let's go back to 512.  Okay.  So 2:00 a.m., Land Air Sea.

16   What -- just to back up, kind of on the far -- just to the left

17   of the screen, there's a word there.  What is that?

18   A.   "Keno".

19   Q.   All right.  So the location of sort of an area of Keno.

20        Now, I'd like to pull up Exhibit 521.  And if you could

21   tell the jurors what they're looking at with Exhibit 521.

22   A.   This is a photo taken by SA Giovanetty at the location of

23   that GPS point.

24   Q.   In terms of location data that you have, is that the

25   farthest data point away from Klamath Falls that you're aware of?

1   A.   Correct.  That was the furthest data point that Land Air Sea

2   provided.

3   Q.   So that was point 4.  Now, let's talk about point 5.  What

4   is the next -- let's go back in -- I should get all of this in

5   there.  Point 5 is what location, please?

6   A.   Point 5 is giving us a location in the vicinity of 1336

7   North El Dorado.

8   Q.   And does that include -- does that Land Air Sea tracker show

9   being in the vicinity of 1 -- 1336 North El Dorado at 3:00 a.m.?

10  A.   Yes.

11  Q.   And 4:00 a.m.?

12  A.   Yes.

13  Q.   And so this is now -- so the day before was Cinco de Mayo.

14  Is that correct?

15  A.   Correct.

16  Q.   The first data point was surveillance footage from

17  The Pikey, and then moving out into the country, and then by

18  3:00 a.m. back at 1336.  Is that correct?

19  A.   Yes.

20  Q.   And then still there at 4:00 a.m.?

21  A.   Yes.

22  Q.   And is this movement consistent with what AV-2 told law

23  enforcement?

24  A.   Yes.

25  Q.   Now, when we see 3:00 a.m., was the Land Air Sea providing

1   roughly -- was it providing limited data points at that time?

2   A.   Yes.  At this point, it was -- it became very -- every hour

3   on the hour, and sometimes it provided a point 20 minutes later.

4   It was very sporadic of when it would provide a point.

5   Q.   So we know that it's there by 3:00 a.m., but we don't know

6   if it got there at 2:59, 2:50 or 2:40.  Is that correct?

7   A.   Correct.  From that data, we do not know that.

8   Q.   3:00 and 4:00.  Now, let's go -- so 3:00 a.m., 4:00 a.m.

9   Let's go to data point -- let's go to 5:00 a.m.  So there's an

10  hour gap.  And let's go to point 6, please.

11          So what is happening at point 6?  So we were just at

12  1336.  What's happening with the data -- the device now?

13  A.   It provided another GPS point on Highway 66 away from

14  Klamath Falls.

15  Q.   Did that catch your attention?

16  A.   Yes.

17  Q.   Why?

18  A.   It -- it matched with what AV-2 was telling us about

19  departing the residence after being brought there.

20  Q.   For what purpose?

21  A.   Kidnapped and raped.

22  Q.   And then going -- but heading back out in the country, did

23  she -- what did she say about going back out?

24  A.   To go collect evidence.

25  Q.   In terms of Mr. Zuberi saying he needed to gather the taser

1   cartridge or something like that?

2   A.   Correct.

3   Q.   That was a paraphrase, but to get something related to the

4   taser?

5   A.   Yes.

6   Q.   All right.  So 6:00 a.m., back out.  And let's pull up

7   Exhibit 524.  What are we looking at here?

8   A.   This is a photo taken by SA Giovanetty at that GPS location.

9   Q.   And then point 7.  Let's go back to 512 and point 7.  At --

10  what's happening at point 7 at 6:00 a.m.?

11  A.   The Land Air Sea is now providing GPS point back at 1336

12  North El Dorado.

13  Q.   So we've discussed the movement sort of from downtown

14  Klamath Falls out to the country, back to 1336, back out to the

15  country, and returning to 1336.  I want to return for a second to

16  what was happening in 1336 North El Dorado.  Did you recover any

17  surveillance footage from the Blink system in the early morning

18  hours?

19  A.   Yes.

20  Q.   So around 2:28 -- let's take a look at Exhibit 365-1.  Tell

21  the jury what they're -- let me ask this:  Is it dark?

22  A.   Yes.

23  Q.   Very dark?

24  A.   Yes.

25  Q.   All right.  Between 365-1 and dash 2, tell the jurors what

1   you saw on that.

2   A.   A person I believe to be Mr. Zuberi based on his hair, his

3   clothes, his gait, his build enters into the kitchen, and they're

4   moving through the kitchen coming from that exterior door that

5   connects near the garage.

6   Q.   And was that approximately 2:28 a.m. --

7   A.   Yes.

8   Q.   -- according to what you could determine?

9   A.   Yes.

10  Q.   And then what about the next video a minute later?

11  A.   The next video is a person I believe to be Mr. Zuberi in the

12  same clothing, same hair, same build, same gait carrying a sheet.

13  Q.   Headed towards where?

14  A.   Towards the garage.

15  Q.   Let's play 365-1.

16          (Playing video, Government's Exhibit 365-1)

17  Q.   And that was approximately 2:28 a.m.?

18  A.   Correct.

19  Q.   All right.  Let's play 365-2, approximately 2:29 a.m.

20          (Playing video, Government's Exhibit 365-2)

21  Q.   Could -- you said you saw something being carried?

22  A.   Yes.

23  Q.   Can you circle that, please?

24  A.   (Witness complies).

25  Q.   All right.  Let's clear that.  Let's continue playing it.

1    We're just going to play it one more time.

2              (Playing video, Government's Exhibit 365-2)

3    Q.   Let's repeat that, please.

4              (Playing video, Government's Exhibit 365-2)

5    Q.   Sort of sticking in terms of data that's been recovered,

6    moving now to near noon, let's pull up Exhibit 477, and I just

7    want to ask you about -- so messages, what are these?

8    A.   These are messages between Mr. Zuberi and Mr. Brenden

9    Westfall.

10   Q.   All right.  So the jury's -- the jury's seen these.  So we

11   know we're back -- we know the devices are back at 6:00 a.m., and

12   then we see a message at 11:44 a.m.  Is that when they're

13   discussing -- there's discussion back and forth about what time

14   would work for that day?

15   A.   Well, Mr. -- Mr. Westfall sent the message at 11:44 p.m. on

16   the 5th.

17   Q.   A.m. or p.m.?

18   A.   A.m.  Excuse me.  A.m. on the 6th.  My apologies.  But

19   Mr. Zuberi does not respond right away.

20   Q.   Does he respond around 1:19 p.m.?

21   A.   Yes.

22   Q.   So we had the 11 -- 11:44 message from Mr. Westfall.

23             MR. SWEET:  You can clear that.  Thank you.

24   Q.   Did the FBI find a video, as described by AV-2, that showed

25   what she described about sexual conduct with Mr. Zuberi?

1    A.    Yes.

2    Q.    Was there a timestamp on that video?

3    A.    Yes, there was.

4    Q.    And what was it?

5    A.    It was 1:05 a.m.

6    Q.    A.m. or p.m.?

7    A.    Excuse me.  1:05 p.m. on the 6th.

8    Q.    In the daytime?

9    A.    In the daytime.

10   Q.    So 11:44 message from Mr. Westfall, 1:05 p.m. video.  And

11   AV-2 said that she was forced to make this and he made her be on

12   top.  Was she -- in the video, was she on top of him as

13   described?

14   A.    Yes.

15   Q.    1:05 p.m. video and then a 1:19 response -- 1:19 p.m.

16   response from Mr. Zuberi to Mr. Westfall.  Is that correct?

17   A.    Yes.

18   Q.    Next data point, Chase Bank withdrawal.

19   A.    Yes.

20   Q.    What time was that?

21   A.    I believe it was 1:36 or 1:38 p.m.

22   Q.    And that was a Chase Bank withdrawal for $300?

23   A.    Correct.

24   Q.    Did -- so we've talked about some -- some videos from

25   May 6th, but I want to ask you about what wasn't there.  Did

1   you -- did you review extensive surveillance video in this case?

2   A.   Yes.

3   Q.   Tell us what you didn't find.

4   A.   After the last video we watched of Mr. Zuberi carrying the

5   sheet towards the garage, there were two or three additional

6   videos.  One of them or two of them, I can't recall, contained

7   the roommate, and then one was an unidentified female wearing a

8   pink -- or Victoria's Secret-style outfit.  She mills around the

9   kitchen and then leaves.

10          Then there were no videos recorded until mid morning or

11   mid afternoon the next day.  So we saw a gap in numbers of, I

12   believe it was 20 (pause) -- 26 videos were missing, that would

13   appear to be missing.

14   Q.   What could be the cause of them missing, being -- not being

15   there?

16   A.   I think there's two possibilities.  One is the system was

17   just turned off.  The way Mr. Zuberi had it set up is that all

18   things were stored locally, meaning it wasn't sent back to the

19   Blink server, but he was receiving notifications on his phone, as

20   we can see from the GPS notifications, that he may have had the

21   ability to turn it off remotely from his phone.  The other option

22   is deleting.

23   Q.   So the data that you would expect based on the numbering was

24   not there?

25   A.   Correct.

1    Q.   You said there was a woman sort of milling about in the

2    kitchen, not AV-2.  Is that correct?

3    A.   Correct.  We'd never seen her before.  Very different build

4    than AV-2, and not seen on any previous videos or videos that

5    occurred after that, either.

6    Q.   Did you review videos from later on -- did you find videos

7    later on on May 6th?

8    A.   Yes.

9    Q.   And did it show Mr. Zuberi and Alycia Westfall?

10   A.   Yes.

11   Q.   Was there tension in the house?

12   A.   She appeared very upset with him.

13   Q.   What about May 7th of 2023?

14   A.   Yes.

15   Q.   Did the videos show an argument?

16   A.   Yes.

17   Q.   Let's take a look at 367-1.  Could you tell the jury what

18   they're going to see here?

19   A.   I believe this video's going to be of Mr. Zuberi in the

20   kitchen with a firearm.

21   Q.   And let's play.

22            (Playing video, Government's Exhibit 367-1)

23   Q.   What was that he said?

24   A.   "Where's that phone at?"

25   Q.   And let's do 367-2.

1        (Playing video, Government's Exhibit 367-2)

2   Q.   Have you zoomed in on these videos?

3   A.   Yes.

4   Q.   Okay.  Still appear to be holding a pistol?

5   A.   Yes.

6   Q.   And 367-3.

7        (Playing video, Government's Exhibit 367-3)

8   Q.   I'd like to turn -- well, while we're talking about videos,

9   AV-1 kidnapped July 14th, July 15th, 2023.  Did you look for

10  videos in the Blink system for those dates?

11  A.   Yes, we did.

12  Q.   And what did you find?

13  A.   There was none.  The camera appeared to stop recording or

14  the videos were removed, which there's no way for us to know or

15  tell forensically, but I believe the last video was recorded on

16  June 10th or June 13th.  I can't remember the exact date.

17  Q.   Somewhere around June was the last video for which you were

18  able to locate data?

19  A.   Yes.

20  Q.   So, Special Agent Gluesenkamp, from the FBI's involvement in

21  this case, it started with AV-1, correct?

22  A.   Correct.

23  Q.   Could you explain how this investigation expanded to include

24  AV-2?

25  A.   When I responded out to Klamath Falls on the 16th to help

1   locate Mr. Zuberi, they had already searched their records for

2   other contacts or other incidents that may have been associated

3   to the address where Mr. Zuberi lived, and I believe there were

4   some other search criteria that allowed them to locate the police

5   report documenting her -- AV-2's initial contact with Officer

6   Taylor Herbst.  We reviewed that report intermittently throughout

7   the evening as we were still looking for Mr. Zuberi, and I

8   immediately noted striking similarities between what AV-2

9   reported to Officer Herbst and what AV-1 had reported just a few

10  hours prior.

11  Q.   Were those, as you refer to them, striking similarities,

12  would those have been known to the public?

13  A.   No.  Nothing had been released about this case at this

14  point.  Mr. Zuberi had not yet been located.  And the report was

15  from May 11th, if I recall, that AV-2 filed.  There's no possible

16  way she could have known the facts of this case.

17  Q.   Because you're looking at information that she provided in

18  May and then you're addressing the situation that arose

19  July 14th, July 15th.  Is that correct?

20  A.   Correct.

21  Q.   So Special Agent Giovanetty talked about a July 17th

22  interview involving Klamath Falls Police Department Detective

23  Yahwee and AV-2.  Is that correct?

24  A.   Yes.

25  Q.   So -- and did you review that, AV-2's statement from that

1   interview?

2   A.   I've not reviewed the entirety of it, but I've reviewed it

3   in parts, and I rely on Mr. Giovanetty's recollection of that to

4   inform my -- my knowledge of it.

5   Q.   You were informed of the information that AV-2 provided?

6   A.   Yes.

7   Q.   So you -- when you get a statement from, you know, whether

8   it's a victim or a witness, do you automatically take those

9   statements at face value and accept everything that's been

10  provided to you?

11  A.   No, not from a witness that's reporting seeing something or

12  even a victim.  We're always going to try to corroborate that

13  information through a third-party source.

14  Q.   And did you in this case?

15  A.   Yes.

16  Q.   So you'd mentioned some striking similarities over the

17  course of this investigation.  Could you tell some of those

18  things that you did to corroborate and some of those things --

19  what is it that you observed that you thought did or didn't

20  corroborate?

21  A.   From the initial police report, what stood out was the Honda

22  Pilot for starters, the use of a small SUV with three rows of

23  seats.  Next was these handcuffs in the detention of each of the

24  victims.  Then it was the use of a black and yellow taser.  There

25  was the use of a firearm or displaying of a firearm.

1    Once AV-2 was taken to 1336 North El Dorado, she

2  reported seeing cinderblocks.  That definitely stood out as a --

3  an important fact for us as a very odd thing to note.  And then

4  based on the search warrant after AV-1's kidnapping, it made a

5  lot of sense.  There was also some additional facts about having

6  to pee in a bucket.  Both women reported that as well.

7    And then the use of tinfoil with AV-1 was not known at

8  the time, but we took note that there was an attempt to disrupt

9  the signal of a cellphone and we were aware at the time of AV-1's

10  report that there was some kind of jamming device that she

11  thought was in the car.

12    Next was the use of a reverse hooded sweatshirt.  Both

13  women had reported a sweatshirt being put on their body backwards

14  and then also being placed -- a sheet being placed over them.

15  And then also where they were placed in the car and how they

16  described being moved around in the car and what they were asked

17  to do once they got close to the residence.  Their vision was

18  obscured as they got close to North El Dorado.

19  Q.   Do you encounter the use of actual handcuffs in your

20  criminal cases often?

21  A.   I've only encountered it one other time, and it was a -- a

22  cartel homicide.

23  Q.   Where would -- what about handcuffs on both -- or handcuffs

24  or leg irons on both the wrists and the ankles?

25  A.   Never.  And this was a fact that stood out to us as well, is

1    that both women reported being handcuffed by the hands and also

2    by the feet.

3    Q.    And then the sexual assaults?

4    A.    Yes.  There were similarities in which each woman described.

5    AV-1 had told us about the vaginal rape and then also the

6    attempted anal sex, and then AV-2 said that both of those

7    occurred to her as well.

8    Q.    And were you aware that the two women from -- are from

9    different states?

10   A.    Yes.

11   Q.    Similar age?

12   A.    Yes.

13   Q.    Once you learned that and once you reviewed and had that

14   information, did that provide the kind of corroboration you were

15   looking for?

16   A.    Yes.

17   Q.    I'd like to turn for just a second to Exhibit 266, page 407.

18   So -- and this is going to be that Land Air Sea data.  So

19   there's -- and this will be brief.  Special Agent Sean Kennedy

20   discussed cellular location data.  Is that -- is that correct?

21   A.    Yes.

22   Q.    I'd like to talk about some of the Land Air Sea data.  Did

23   you locate Land Air Sea data from Mr. Zuberi's -- from a

24   Land Air Sea tracker?

25   A.    Yes.

1    Q.   Let's take a look here.  Okay.  Again in UTC.  So if we're

2    seeing July 15th at 3:00 a.m., that would be seven hours earlier,

3    correct?

4    A.   Yes.

5    Q.   Okay.  So that would be 8:00 p.m. on July 14th?

6    A.   Yes.

7    Q.   Where does the Land Air Sea tracker show the location at

8    this point?

9    A.   It's showing it traveling north.  So if you read the data

10   from top to bottom, you can see it's in Vancouver, Washington,

11   then Woodland, then Kelso, then just I-5, then Tacoma, then

12   Washington again, and then it's located on Aurora Avenue.

13   Q.   Okay.  So moving -- so it's moving north.  And for this

14   document, actually, those -- the locations in red, are those

15   hyperlinks so if you were in this on a normal computer, you could

16   click it and it would pull up a map?

17   A.   Yes.

18   Q.   So let's go to the last three.  So at 5 -- and actually --

19   okay.  Thank you.  At 5:30, so would that be 10:30 p.m.?

20   A.   Yes.

21   Q.   Okay.  At 10:30 p.m. on the 14th, what's the location that

22   it shows?

23   A.   It's I-5 North Washington, or I-5 Washington.

24   Q.   Moving down one.

25   A.   The next at 11:00 is 103rd and -- 10309 Aurora Avenue, North

1   Washington.

2   Q.   All right.  So that would be 11:00 p.m.  And is -- is Aurora

3   Avenue where AV-1 said she was picked up initially by Mr. Zuberi?

4   A.   Yes.

5   Q.   Okay.  Now, is there a gap, then, in data?

6   A.   Yes.

7   Q.   So last we saw was this was 6:00 a.m., so 11:00 p.m.  What's

8   our next data point?

9   A.   The next is going to be at 12:30.

10  Q.   So 12:30 a.m. now on July 15th, correct?

11  A.   Yes.

12  Q.   Now turn -- that would be on July 15th.  And where -- what

13  is the location?

14  A.   That is in Tacoma, Washington.

15  Q.   So the last three, basically, if we do the last four,

16  Tacoma, then we go Aurora Ave, and then we go back to Tacoma.  Is

17  that correct?

18  A.   Yes.

19  Q.   Now I'm going to pull up -- I'm going to pull up a board,

20  and let's go to Exhibit 510.  And I would like to do sort of a

21  final overview of the timeline, and I'd like to start back just a

22  little bit further than this timeline.  And I'd like to start --

23  You said earlier that Mr. Zuberi had a 2021 felony conviction.

24  Is that correct?

25  A.   Yes.

1  Q.  And then Prentice Smith, do you recall just the month and

2  year when Prentice Smith said he was evicted from where he was

3  living with Mr. Zuberi?

4  A.  Yes.  We know from text messages he was evicted on the 12th

5  of November in 2022.

6  Q.  Without his firearms?

7  A.  Without his firearms.

8  Q.  And then the videos that Special Agent Giovanetty showed of

9  Mr. Zuberi holding a pistol, month and year for those, please?

10  A.  Those were two days later on the 14th of November 2022.

11  Q.  And then Special Agent Giovanetty gave a -- discussed an

12  exhibit message with Tyler Archibald.  Mr. Zuberi said words to

13  the effect of, "I have the Springfield," or "I have" -- or "I

14  have the XDM."  Was that after, some time after that as well?

15  A.  Yes.

16  Q.  Another message, Exhibit 384, Mr. Zuberi with a family

17  member discussing trading firearms.  Was that also after

18  Mr. Smith was evicted in November of 2022?

19  A.  Yes.

20  Q.  So I'd like to turn, then, to some more messages with Tyler

21  Archibald.  And let's just zoom in on that.

22          Top three messages, please.

23  A.  So on April 12th, 2023, "Do you know a way to build a block

24  structure without making it permanent?  And is it strong?  Would

25  a person be able to destroy it with their hands?"

1   Q.   That was April 12th.  And the Home Depot purchase of

2   cinderblocks, the first one that you're aware of, what day?

3   A.   April 14th for 76 cinderblocks.

4   Q.   April 25th, purchase of what?

5   A.   April 25th, purchase of handcuffs.

6   Q.   Kidnapping and sexual assault of AV-2?

7   A.   May 6th.

8   Q.   AV-2 got in front of the jury and took small, mincing steps.

9        May 15th.

10  A.   Leg irons are purchased.

11  Q.   AV-2 reported Mr. Zuberi saying he didn't know where he

12  would keep her.  Starting May 17th, what is there significant

13  activity involving?

14  A.   There's a significant amount of Home Depot purchases for the

15  material that was used to construct the cinderblock structure.

16  Q.   June 26 purchase?

17  A.   A double-key dead bolt is purchased.

18  Q.   June 29th?

19  A.   Another double-key dead bolt is purchased.

20  Q.   Special Agent Logan discussed a Safeway receipt from Aurora

21  Ave.  Was that July 7th of 2023?

22  A.   Yes.

23  Q.   He also discussed Cody's Repair, hundreds of dollars spent

24  on the Honda Pilot.  What was the date of that?

25  A.   That was the 10th of July.

1    Q.    When did location data show Mr. Zuberi's phone leaving

2    Klamath Falls?

3    A.    On the evening of the 12th.

4    Q.    So two days after the Honda Pilot was serviced?

5    A.    Yes.

6    Q.    July 14th?

7    A.    AV-1's kidnapped.

8    Q.    Let's go to 511, please.  911 call time.

9    A.    12:08 p.m.

10   Q.    Location data showing Mr. Zuberi's devices at the trailer?

11   A.    That is 2:30 p.m.

12   Q.    Dollar Tree receipt?

13   A.    A Dollar Tree receipt is located in the Honda Pilot

14   indicating a purchase at the Dollar Tree around 5:30 p.m.

15   Q.    Special Agent Kennedy discussed AV-1's iPhone being powered

16   on in the afternoon of July 15th.  Is that correct?

17   A.    Yes.

18   Q.    Was that after she escaped?

19   A.    Yes.

20   Q.    After she was already with the police?

21   A.    Yes.

22   Q.    July 16th, Mr. Zuberi -- excuse me.  July 15th, Mr. Zuberi

23   spent the night where?

24   A.    Spent the night in Tulelake, California.

25   Q.    On July 16th, he was arrested where?

1   A.   In Reno, Nevada.

2   Q.   With whose phone in his Pilot?

3   A.   AV-1's phone.

4            MR. SWEET:  Thank you.  Nothing further.

5            THE COURT:  All right.  Any cross?

6            MR. BERTHOLF:  A few questions.

7            THE COURT:  Okay.  Folks, we're going to take our

8   afternoon break.  So, folks, we'll be in recess until 3 o'clock.

9            (Jury leaving courtroom:  2:45)

10           THE COURT:  Real quick, there is a juror with a comment

11  more than a question that I thought I would share with you off

12  the record.

13           (Sidebar not reported)

14           (Recess:  3:28 - 3:06)

15           (Jury not present)

16           THE COURT:  Anything we need to discuss?

17           MS. MILES:  Yes, Your Honor.

18           THE COURT:  All right.  Let go on the record, and

19  everybody be seated.

20           MS. MILES:  Thank you, Your Honor.  The Government has

21  concerns about the note that was written by one of the jurors,

22  and we would ask that the Court do a colloquy with that juror to

23  ensure that she can still preside over this case with -- without

24  bias and fairly.

25           THE COURT:  I'm not sure the juror actually put her or

1    his juror number on the note, so I'm not sure which juror wrote

2    the note.

3            MS. MILES:  Okay.  Could we simply ask the juror,

4    whoever submitted the note, to please come and have a

5    conversation with Your Honor?

6            THE COURT:  Okay.  I mean, it is not unusual for jurors

7    to, in a high profile case, feel a little intimidated and at

8    times frightened about what's going on in a courtroom.  I can

9    tell you the concern was -- well, why don't I -- why don't we

10   read the note into the record.  Can you hand that to me?

11           All right.  The note read:  Is that woman in the

12   audience Alycia Westfall and, if so, is she allowed to be here?

13   Feeling unsafe.

14           The woman in the courtroom was Alycia Westfall.  I

15   don't see that she's in the courtroom now.  I did see that

16   Ms. Westfall came in.  I did not see any particularly unusual

17   activity on her part other than maybe making some eye contact and

18   some eye communication with Mr. Zuberi, but there was nothing

19   about her behavior that was remarkable to me, and I was keeping a

20   pretty close eye on her and Mr. Zuberi after she came in.

21           So I certainly am not prepared to remove her from the

22   courtroom if she comes back in.  It's certainly a public

23   courtroom.  She is allowed, like any member of the public, to be

24   in the courtroom.

25           That said, we can ask the juror to come in.

1          Ms. Moore, do you know who the juror may specifically

2   be who handed up the note to David?  Do you remember?

3          MR. SVELUND:  I don't, because I know -- I thought it

4   was passed down, but I don't know who wrote it.

5          THE COURT:  Okay.

6          MS. MILES:  And, Your Honor -- excuse me.

7          MS. POTTER:  Your Honor --

8          THE COURT:  Yes.

9          MS. POTTER:  -- can we -- I'm a little uncomfortable

10  singling out a juror.  Is there any way that the Court could

11  simply reassure them?  We can -- I know the Government brought up

12  sealing the jury selection transcript so those names are not

13  public.  You know, let -- letting them know, you know, that --

14  just a more general statement to the jurors as a whole.

15         I'm a little concerned about bringing out one person

16  and specifically having them speak about this, but I just want to

17  make that record known, particularly when there isn't anything

18  specific that has caused an actual safety issue.

19         MS. MILES:  And, Your Honor, of course Mr. Zuberi is

20  free to waive the concerns that the Government has about his

21  Sixth Amendment right to a fair and impartial juror -- jury, so

22  if this is strategically not what the defendants want -- or the

23  defense wants to do, the Government will allow them to make that

24  call, but I would ask that that waiver be expressed on the

25  record.

1          MS. POTTER:  I'm not going to be able to make any

2    waiver at this point, Your Honor, of anything.

3          MS. MILES:  So the two concerns, Your Honor, if I may,

4    is --

5          THE COURT:  Yes.

6          MS. MILES:  -- whether this juror feels that they can

7    still be impartial and whether the conversation was spread among

8    the rest of the jurors.  And it's entirely in your discretion,

9    Your Honor, to question those jurors and then make a factual

10   finding about whether you believe that they can still be fair and

11   impartial, but I do think that that needs to be done.

12         THE COURT:  Well, I mean, they've heard almost all of

13   the evidence in the case, and you're asking if they can be fair

14   and impartial.

15         My fear is highlighting one juror's thoughts about

16   Ms. Westfall puts a little too much emphasis on -- on the issue.

17         Well, let's do this.  Let's -- Ms. Moore, if you would

18   ask the juror who wrote the specific note if she would come in

19   and address the matter.  Wait, wait.  I'm -- no.  I don't want to

20   do this.

21         Here's what we're going to do.  I'm going to have a --

22   I will ask the juror literally two questions, "Is this your note?

23   Are you able to be fair and impartial despite having written this

24   note?," and I will report back to you what she says.

25         The idea of bringing her in and highlighting a fear, I

1    think we may intimidate the juror more by sitting her in the jury

2    box in front of all the parties, including Mr. Zuberi and law

3    enforcement, and ask her, "Are you afraid, and what are you going

4    to do about it?"

5            MS. POTTER:  That's fine, Your Honor.

6            MR. BERTHOLF:  That was going to be my request.

7            MS. MILES:  That's fine.

8            THE COURT:  So I'll have a private soliloquy with her.

9    If one representative of each of the teams wants to come with me,

10   we can do that.

11           MS. POTTER:  I can go back.  Are you going to go or do

12   you want to go?  I'm not going to go unless you want to go.

13           MS. MILES:  I don't need to go.

14           MS. POTTER:  I don't need to go, either.

15           THE COURT:  All right.

16           (Recess:  3:12 - 3:15)

17           (Jury not present)

18           THE COURT:  I did have a colloquy with, it's Juror

19   Number 8, originally Juror Number 15, Pamela Wurzell.  I did ask

20   her if she had written the note.  She said she did.  I asked her

21   if there was anything about Ms. Westfall's presence in the

22   courtroom that would cause her the kind of fear that she would be

23   unable to be a fair and impartial juror, and she said absolutely

24   not.  All right.

25           MS. MILES:  Thank you.

1          THE COURT:  We'll bring the jury in.  And thank you

2     for -- it took me a little while to figure out maybe how to

3     proceed, but thank you for bringing it to my attention.

4          We'll bring the jury in.  And my understanding is we

5     are going to play the video involving AV-2 that is going to be

6     played under seal.  It will not be present and available to the

7     public, it will not be available to the gallery.  It will only be

8     available to the jury and it will be playing on my screen.

9     There'll be -- only if there's -- I have -- if there's some

10    question later, I probably should at least be aware of it, is the

11    only reason it's going to be on mine.

12         MR. BERTHOLF:  And, Your Honor, my intention, just to

13    let you know, was to preface playing it with the jury to let them

14    know that the only people watching it are you and them.

15         THE COURT:  Okay.  I'll do that.

16         MR. BERTHOLF:  If -- if that work -- or do you want to

17    do that or do you want me to?

18         THE COURT:  I can do that.

19         MR. BERTHOLF:  Okay.

20         THE COURT:  Are we going to go right into that next?

21         MR. BERTHOLF:  That's going to be the first thing

22    after -- we've been discussing for days the best way to go about

23    this, and we think getting that out of the way first and then

24    going to the rest of the cross.

25         THE COURT:  Okay.  Let's do that.

1           (Jury entering courtroom:  3:17)

2           THE COURT:  All right.  Please be seated, everybody.

3           All right.  Folks, part of the cross-examination of

4    Detective Gluesenkamp, one of the exhibits -- The exhibit number

5    is?

6           MR. BERTHOLF:  It's going to be 1001.

7           MS. POTTER:  Defense exhibit.

8           MR. BERTHOLF:  Defense Exhibit 1001.

9           THE COURT:  Okay.  Defense Exhibit 1001 is going to be

10   played.  The only people viewing the video will be yourselves,

11   the jury, and myself on the bench.  No other members of the

12   gallery or public, or even the attorneys, will be viewing the

13   video.

14          This is the view of -- the video that AV-2 had referred

15   to that was taken as part of this.  So -- and then we will

16   commence with cross-examination.

17          MR. BERTHOLF:  So defense would offer Defense

18   Exhibit 1001.

19          THE COURT:  Any objection?

20          MR. SWEET:  No, Your Honor.

21          THE COURT:  All right.  Defense Exhibit 1001 will be

22   received.

23          MR. BERTHOLF:  And then we would ask that it be

24   published.

25          THE COURT:  It will be published.

1           (Playing video, Defendant's Exhibit 1001, under seal)

2           MR. BERTHOLF:  There is some audio, Your Honor.

3           THE COURT:  Is there a reason why the audio's not

4    coming up?

5           THE COURTROOM DEPUTY:  It may be because I have the

6    court blocked from the outside, because I'm blocking the sound to

7    the outside.

8           (Pause in proceedings)

9           THE COURT:  All right.  Folks, we have a technical

10   issue regarding the public line --

11          THE COURTROOM DEPUTY:  Okay.

12          THE COURT:  -- which we will simply turn off.

13          (Pause in proceedings)

14          (Playing video, Defendant's Exhibit 1001, under seal)

15          THE COURT:  All right.  Cross-examination.

16                       **CROSS-EXAMINATION**

17   BY MR. BERTHOLF:

18   Q.   Special Agent Gluesenkamp, earlier you were asked how the

19   investigation expanded to include AV-2?

20   A.   Yes.

21   Q.   And you indicated that Klamath County Police Department had

22   already searched records for things related to Mr. Zuberi?

23   A.   Yes.

24   Q.   And that included the reports.  Specifically, you mentioned

25   the report from Officer Herbst?

1    A.    Yes.

2    Q.    I'm assuming that as the lead special agent in this case,

3    that you at least touched or reviewed or had other people read

4    through all the reports regarding AV-2?

5    A.    Yes.

6    Q.    And have you had a chance to look at the report from Officer

7    Young of the Klamath Falls Police Department from May 9th of

8    2023?

9    A.    Yes.

10   Q.    And on May 9th, Officer Young did try to contact AV-2?

11   A.    Yes.

12   Q.    And she did not want to talk to him or interact with him in

13   any way?

14   A.    Yes.  I believe that's correct.

15   Q.    All right.  And then it was two days later that Officer

16   Herbst talked to AV-2?

17   A.    Yes.

18   Q.    Between May 11th and July 17th -- well, did you get a chance

19   to review all of the -- well, CAD reports.  Tell us what a CAD

20   report is.

21   A.    A CAD report is a call log record.  So once an incident's

22   begun, like, a call's initiated to the police or somebody else

23   calls the police on someone else, a call report is initiated and

24   that incident is assigned an incident number.  And then as the

25   officer's responding, every time they call in the radio, they

1  document what they're doing, a record is created that's called a

2  CAD.

3  Q.  So when AV-2 called the Klamath Falls Police Department, it

4  appears probably May 9th, that was when the CAD record began for

5  her case?

6  A.  Yes, yes.

7  Q.  Okay.  Between May 11th and July 17th, how many times did

8  she contact Klamath Falls Police Department according to the CAD?

9  A.  I don't recall offhand.

10  Q.  Okay.  On -- I believe your testimony was that the reason

11  that Detective Yahwee and Special Agent Giovanny (sic.) were sent

12  to speak with her was only as a result of this investigation?

13  A.  Correct.

14  Q.  It was not because she'd made several calls?

15  A.  No.  Our interest in speaking with her on the 17th was

16  solely because of the report created by Officer Herbst.

17  Q.  Okay.  And on July 17th, Detective Yahwee did seize clothing

18  that AV-2 was wearing that day on -- on the day that she claims

19  that Mr. Zuberi raped her?

20  A.  I'm -- I'm sorry.  Which date are you referring to?

21  Q.  So on July 17th of 2023, Detective Yahwee received some

22  clothing from AV-2?

23  A.  I don't have any knowledge of that.  Sorry.

24  Q.  Okay.  It is an exhibit.  We'll just discuss that in

25  closing.

1   A.   Okay.

2   Q.   Do you know -- do you recall if any testing of clothing of

3   AV-2 was ever done?

4   A.   No.

5   Q.   No shirt was reviewed by either FBI lab or Oregon State lab?

6   A.   No.

7   Q.   Nor a jacket or shoes?

8   A.   No.

9   Q.   Okay.  Did you -- have you reviewed the report from

10  July 10th of 2024 when Detective Yahwee went back to meet with

11  AV-2?

12  A.   July 10th?

13  Q.   Of this year.

14  A.   I don't recall reading that report, no.

15  Q.   Okay.  Before I move on, do you utilize these reports in

16  working a case and learning about what's going on with the case?

17  A.   Yes.

18  Q.   So this is something that you would rely upon to further an

19  investigation?

20  A.   Yes.

21  Q.   Okay.  I'm going to bring you up the report and see if that

22  can assist in any way.  Do you want to quickly scan through that

23  to see if you've read that, if that can help you in any way?

24  A.   Yes.  (Pause-referring).  Yes.  Okay.

25  Q.   All right.  So he did meet with her on July 10th of this

1   year?

2   A.   Yes.

3   Q.   And from that report, it sounds like they had an appointment

4   to meet a week before?

5   A.   Yes.

6   Q.   But she missed it because she was sleeping?

7   A.   Yes.

8   Q.   And on that day is when Detective Yahwee went through the

9   Snapchat with her to look at some timestamps?

10  A.   That's correct.

11  Q.   And one of the images that was placed into evidence by

12  Detective Yahwee was -- had a date and timestamp for May 25th of

13  2023.  Is that correct?

14  A.   That's correct.

15  Q.   In fact, there were two from that same date?

16  A.   Correct.

17  Q.   And then there was also an image of injuries with a date

18  stamp of July 17th of 2023?

19  A.   Yes.

20  Q.   AV-2 claims that this all occurred and that she took her

21  photographs on May 6th?

22  A.   Yes.

23           MR. BERTHOLF:  That's all I have.  Thank you.

24           THE COURT:  Okay.  Any redirect?

25           MR. SWEET:  A few things.  First, Your Honor, in terms

1   of the Government showed what was marked as Government's

2   Exhibit 527, key photos, that actually had not been admitted.  I

3   would move to admit that at this time.

4            MR. BERTHOLF:  No objection.

5            THE COURT:  It'll be received.

6                    **REDIRECT EXAMINATION**

7   BY MR. SWEET:

8   Q.   Special Agent Gluesenkamp, Mr. Bertholf asked you about

9   Officer Young and him going out to see AV-2 on, it was May 9th,

10  2023, correct?

11  A.   Correct.

12  Q.   Wasn't that -- wasn't Officer Young's visit actually in

13  response to a concerned citizen call and not a call by -- by AV-2

14  herself?

15  A.   I believe so.  It's been so long since I read the report, I

16  don't recall specifics of it.

17  Q.   When Mr. Bertholf asked you regarding the FBI and the KFPD's

18  interest in AV-2, the Klamath Falls Police Department, once the

19  detectives learned, were they also -- were they then pursuing

20  investigation against Mr. Zuberi for the kidnapping and rape of

21  AV-2?

22  A.   Yes.

23  Q.   Separate entirely from that of AV-1?

24  A.   Yes.

25  Q.   Was the FBI interested in AV-2's case as it related to

1    AV-1's at least at first?

2    A.    Yes.

3    Q.    And then how did that evolve?

4    A.    They led that portion of the investigation.  We then later,

5    in consultation with the District Attorney's Office, felt that it

6    was a -- chargeable as a federal offense.

7    Q.    Mr. Bertholf asked you about AV-2 missing an appointment and

8    being sleepy.  Has AV-2 been stressed by this process?

9    A.    Yes.

10   Q.    Has she struggled?

11   A.    Yes.

12   Q.    Has she at times been sick?

13   A.    Yes.

14   Q.    Afraid?

15   A.    Yes.

16   Q.    So Mr. Bertholf talked about some creation dates.  I believe

17   one was May 25th and July 17th.  This may be better addressed by

18   Special Agent Giovanetty, but is there a difference between the

19   original creation date of a video and then when something may be

20   downloaded or copied by another system?

21   A.    Correct.  Generally, the metadata will also log access, so

22   you can see when the photo was last accessed.  I'm not sure how

23   that date was derived, but I have seen those photos and I have

24   seen the date of May 25th, 2023, associated with those photos as

25   well.

1  Q.   And so the -- in fact, one of the dates, I believe, was --

2  was -- maybe was it July 17th?

3  A.   It was the day she was interviewed.

4  Q.   Okay.  So the day AV-2 was interviewed was July 17th, 2023?

5  A.   Correct.

6  Q.   And you're saying one of the dates associated with one of

7  those images was also July 17th, 2023?

8  A.   Yes.

9  Q.   But then were you in court when Special Agent Giovanetty ran

10 through metadata associated with all of the videos provided by

11 AV-2?

12 A.   I was.

13 Q.   And were you here when the dates and timestamps for all of

14 those were provided?

15 A.   I was.

16 Q.   Were those either -- were the vast majority of those -- were

17 they May 6th?

18 A.   Yes.  Looking at the report, I believe those were the

19 Snapchat videos, so those were ones she had to access and

20 download from her Snapchat.  And then once you download it from

21 Snapchat, you could see the metadata of the time the video was

22 actually created.

23 Q.   And Special Agent Giovanetty when he was testifying, those

24 became exhibits.  I believe they were -- let's pull them up.

25 529.  If we could just -- let me turn this back on.  I just want

1    to make sure that I'm not misunderstanding anything.  Okay.  So

2    let's just zoom in on the top part, getting the date.

3           Okay.  This photo was taken where?

4    A.    This appears to be the photo at The Pikey bar with all four

5    of the -- the friends.  And that is May 6th, 2023, at 12:48 a.m.

6    Q.    So this timestamp, then, what does -- what does this

7    timestamp reflect?

8    A.    This should be the Snapchat app.  I'm not very familiar with

9    it, but SA Giovanetty testified this was when they accessed and

10   downloaded the image from Snapchat to obtain the correct

11   metadata.

12   Q.    We won't go through all these, but let's go through -- let's

13   see.  Let's see dash 2 for just a minute, please.  And -- okay.

14   So that's the "Bro concussions be stupid."  Creation date?

15   A.    May 6th, 2023, at 10:11 p.m.

16   Q.    AV-2 may have said it was hours earlier, but did she say it

17   was May 6th, 2023?

18   A.    Yes.

19   Q.    Next video, please.  Dash -- 529-3, Snapchat photo of

20   injuries.  Date and time, please, creation?

21   A.    May 6, 2023, at 10:52 p.m.

22   Q.    Not July 17th or May 25th?

23   A.    Correct.

24   Q.    Next.  This one, please, 529-4.

25   A.    May 6th, 2023, at 10:53 p.m.

1    Q.   Next one, please.  That's all of them.

2         And then the other videos of her in the bathroom

3    saying -- expressing regret and showing her hands, those were not

4    taken on Snapchat.  Is that correct?

5    A.   I believe so.  I'm not certain.

6    Q.   One second.  All right.  Special Agent Giovanetty already

7    testified to the other ones.

8         So, Special Agent Gluesenkamp, based on your training,

9    experience, and your experience with videos and creation dates,

10   do you believe the creation dates for the videos that AV-2

11   provided and that we just showed in Snapchat was May 6th, 2023?

12   A.   Yes.

13        MR. SWEET:  Thank you.  Nothing further.

14        THE COURT:  All right.  Thank you.  You're free to step

15   down.

16        Any further witnesses for the Government?

17        MR. SWEET:  No, Your Honor.  The United States rests.

18        (The government rests)

19        THE COURT:  All right.  Folks, we're going to take a

20   break.  I need to talk to the attorneys about a number of

21   different matters.  And we'll have you back out in a bit, I'm not

22   sure how long, and we'll give you further instructions on where

23   we're going with the case.  So we'll please take a break.

24        (Jury leaving courtroom:  3:36)

25        THE COURT:  All right.  Please be seated.

1        All right.  First of all, with regard now to the

2   Government having rested its case, does the defense wish to make

3   any motions?

4        (Defendant's Motion for Directed Verdict)

5        MS. POTTER:  Your Honor, we would -- sorry.  Yes, Your

6   Honor, we would move.  We think there was insufficient evidence

7   on Counts 1, 2, and 3, specifically with Counts 1 to 2,

8   sufficiency, inconsistent statements.  I'm trying to -- anything

9   else?

10       And I would like to request that the Court allow me to

11  also brief this after the end of the case, but then with Count 3,

12  we also would re-raise the commerce argument as well as the

13  inconsistencies of victim testimony.  And we also believe that

14  they failed to show the ATM facilitated the kidnapping for

15  Count 3, though I believe we may be addressing that at the jury

16  instructions, assuming I -- or the verdict form, assuming I lose

17  this motion.

18       With Counts 4 through 7, we just re-raise our previous

19  argument.

20       THE COURT:  Okay.  Well, at this stage, in the light

21  most favorable to the Government, there are facts sufficient for

22  a trier of fact to find the defendant guilty if facts are

23  believed.

24       There are certainly some inconsistencies, as there are

25  in many cases, and credibility issues that need to be addressed,

1    but not such that a directed verdict would be appropriate.

2              With regard to the impact on interstate commerce,

3    again, I believe the law that we discussed earlier does allow the

4    Government to use both cellphones and ATM machines as

5    instrumentalities of interstate commerce, so any motion to

6    dismiss certain counts based on that argument would also be

7    denied.

8              Certainly the defense would be allowed to supplement

9    the record, and I guess it'll be with a motion, notwithstanding

10   the verdict if there is a verdict against Mr. Zuberi, based on

11   these general arguments.

12             Anything the Government wants to add to what I would

13   say is a fairly cursory motion for directed verdict?

14             MR. SWEET:  Nothing to add, Your Honor.  Thank you.

15             THE COURT:  All right.  Anything we need to talk about?

16             MR. BERTHOLF:  One quick thing, Your Honor.

17             THE COURT:  Sure.

18             MR. BERTHOLF:  Defense Exhibit 1001, because of the

19   sensitive nature of that, we're asking the Court to order the

20   Government to hold on to that.  We have one other copy that I

21   have in my office.  I will -- I will bring that tomorrow and

22   bring -- and give that back to the Government for its

23   destruction, but we're asking the Court to order that for the

24   pendency of any appellate issues.

25             THE COURT:  Okay.  For purposes of appeal, then, I

1   understand the Government will hold the only copy of that exhibit

2   sealed.

3           MR. SWEET:  Yes, Your Honor.

4           THE COURT:  And I suppose, then, being under the order

5   of the Court of Appeals to release it at that point.

6           MR. SWEET:  Yes, Your Honor.

7           MS. POTTER:  Your Honor, the defense would request a

8   brief colloquy with the Court without the presence of the

9   Government or members of the public.

10          THE COURT:  All right.  And the Government's position

11  on that?

12          MR. SWEET:  Your Honor, that's not something the

13  Government can agree to, however, we understand that the Court

14  has the ability to order that.

15          THE COURT:  Given that I do think it involves certain

16  privilege matters, I do think it's appropriate for that colloquy

17  to take place under seal.  And if we're prepared to do that now,

18  I'll ask that members of the public and the Government team exit

19  briefly the courtroom.

20          Obviously Mr. Zuberi is here in custody, so the

21  marshals and any other security folks would remain, as well as

22  our court reporter.

23          THE COURT:  Ms. Westfall, you're going to have to --

24  everybody is leaving now except the defense team.

25              (Government team and public leaving courtroom)

1    (Sealed proceedings filed separately)

2    THE COURT:  All right.  My understanding after our

3 sealed colloquy is that the defense is now resting.  So my

4 thought is we would bring -- unless there's more we need to

5 discuss, we'd bring in the jury, let them know -- I'll allow the

6 defense to rest, we'll let them know that they have heard all the

7 evidence in the case, then we would commence with closing

8 statements.

9    I'm assuming the parties would like to begin that

10 tomorrow morning at 9 o'clock.  All -- well, it would actually be

11 instructions followed by closing statements.

12    MS. POTTER:  That's fine with the defense.

13    MR. SWEET:  We do agree with all that, Your Honor.

14    And just -- just for the record, if -- if the Court can

15 inquire, Mr. Zuberi could state on the record that he is aware of

16 his right to testify, that he has the right to make that decision

17 solely, and he is electing not to do that.

18    THE COURT:  We have that on the record.

19    MR. SWEET:  That is on the record, Your Honor?

20    THE COURT:  Yes.

21    MR. SWEET:  Thank you, Your Honor.

22    THE COURT:  Okay.  Let's bring in the jury.  I need to

23 check (pause) -- Let's bring the jury in.

24    And I'll simply ask the defense how they wish to

25 proceed, and you can say you rest, unless you want me to say both

1   parties have rested.

2          MR. BERTHOLF:  I'll -- I'll -- we'd be happy to say

3   that we rest.

4          THE COURT:  Okay.

5          (Jury entering courtroom:  3:47)

6          THE COURT:  All right.  Please be seated, everybody.

7          Folks, as you know, the Government has rested, which

8   means they've presented all of their evidence.  And to the

9   defense.

10         MR. BERTHOLF:  The defense would rest at this time,

11  Your Honor.

12         (The defendant rests)

13         THE COURT:  All right.  So, folks, that means you have

14  heard all of the evidence in the case.  And I do want to thank

15  both sides for their organization and their preparation in

16  getting this case to you tomorrow rather than three weeks.  It

17  seems like we have been able to, at least in terms of finishing

18  the evidence, do that in now less than two weeks.

19         So tomorrow you will return at 9 o'clock.  At that

20  time, I'll instruct you as to the law that applies to this case

21  and to the individual counts that have been brought against

22  Mr. Zuberi.  You will then hear the closing statements of the

23  attorneys, and after the closing statements are finished, you

24  will begin your deliberations.

25         I will also excuse the alternate jurors at that time

1    and we'll have a discussion about what that means.

2            So this is not yet the time to begin those

3    deliberations.  Again, it is not time to talk to your friends or

4    family about the case.  Please wait until this case is completely

5    over.

6            Tomorrow, you will have as much time as you need to

7    continue your deliberations, and those deliberations certainly

8    have no deadline.  We can go into next week as well, so I don't

9    want you to feel pressured simply because it's Friday to complete

10    your deliberations.

11            My thought also is that Ms. Moore will get you a menu

12    list to order your lunch in tomorrow.  The government will cover

13    that.  We can only cover your lunch if you're -- it's part of --

14    it's part of deliberations.  So we tend to want to keep you here

15    and eating here.  So one of the first things you'll do tomorrow

16    morning probably is order your lunch for later in the day.

17            Again, don't look up any information, don't listen to

18    any media reports or read any media reports about the case.  If

19    anybody does contact you or you do inadvertently see or hear any

20    information, you do need to let me know.

21            But with that, we'll see you at 9 o'clock tomorrow for

22    instructions and closing argument.  Thank you very much.

23            (Jury leaving courtroom:  3:50)

24            THE COURT:  All right.  Please be seated.

25            Are the parties ready to talk about jury instructions?

1    I know there were only a couple of issues.

2              MS. POTTER:  Yes, Your Honor.

3              THE COURT:  And if I could start with one of my issues.

4    The "prior act" instruction seems oddly cumbersome here.  There

5    are so many acts, other acts that aren't being charged here.  I

6    mean, there are multiple allegations of assault, there were

7    misdemeanor assault to a felony assault, pistol whipping.

8              I just -- I don't know how this fits in to so many of

9    these uncharged acts are actually integral to the crime charged

10   itself.  They're not really part of the plot or planning.

11   They're part of the overall kidnapping and sexual assault charge.

12             So is it helpful to give "other act" evidence or is it

13   going to confuse the jury?  I guess, what are the other acts that

14   you're really going to tie this in to and do you really need to?

15             Let me start with the defense.

16             MS. POTTER:  Well, Your Honor, I mean, I think the

17   Court's right.  I don't think those are the other acts, but, I

18   mean, there have been allegations related to the dog, there have

19   been -- there has been an implication that maybe the guns were

20   stolen, some of the other sort of treatment of women generally.

21             I mean, I agree with the Court that the core acts in

22   the allegations related to May 5th into the 6th, and then the

23   14th into the 15th are not other acts, but obviously for obvious

24   reasons, I don't want to list out the few that would fall into

25   this, but I -- frankly, I think it would be ineffective

1  assistance of counsel if this instruction wasn't given, Your

2  Honor, so --

3          THE COURT:  All right.  I'll give it.  I just -- I hope

4  it's not going to confuse the jury that some of these acts that

5  are simply uncharged are acts that they're not to -- if they're

6  somehow to be considering differently when they are integral to,

7  you know, the specific kidnapping and sexual assault allegations,

8  but I'll give it.  It just seems awkward to me, but it sounds

9  like the Government wants it as well.

10         MS. MILES:  I'll defer to the defense on this.

11         THE COURT:  Okay.  All right.  Issues -- does the

12  Government have any issues with regard to the proposed

13  instructions?

14         MS. MILES:  I don't think so; not in addition to what

15  we've submitted.

16         THE COURT:  All right.  And the defense.

17         MS. POTTER:  Your Honor, in terms of objections to the

18  exhibits, we want to lodge an objection to the "any and all"

19  language contained in Counts 4 through 7.  We would like a

20  specific unanimity instruction that they have to agree on to each

21  and every one of the firearms.

22         I will acknowledge to the Court that is not the current

23  state of the Ninth Circuit law, but I do need to preserve my

24  record on that.

25         And then for Counts 1 and 3, we would object to the

1   Court specifically instructing the jury that a cellphone is an

2   instrumentality of interstate commerce even if the call is made

3   within state -- in the state.  That's significant to us, because

4   obviously a cellphone is one of the instrumentalities that's

5   being offered, particularly with respect to Count 3.  And,

6   frankly, with the verdict form the way it is for Count 1, I think

7   they're also asking whether they are thinking an instrumentality

8   was used in Count 1.

9        If the Court feels the need to instruct on an example

10  of instrumentality, and I don't have one off the top of my head,

11  because this just occurred to me, but maybe we could pick one

12  that wasn't being used in the case, but I'm sure I can come up

13  with something if I'm given a moment.

14       And I don't want to go too far ahead to the verdict

15  form, Your Honor, but it does feed into our significant concern

16  for Count 3.  Our original verdict form, which was filed probably

17  in August, we requested specific findings as to which

18  instrumentalities were used to further the kidnapping with

19  respect to Count 3.  We continue to seek that finding.  As the

20  Court's aware, we've made a legal argument regarding the use of

21  instrumentalities.

22       Again, I acknowledge the current state of the case law,

23  but there has been some concurrences or -- in cases, particularly

24  with respect to the motor vehicle, whether that, you know, should

25  be reconsidered.  If it were to be reconsidered, you know, that

1    would be -- to not have those specific findings where the jury is

2    going to create a significant issue in determining which, if any,

3    they found.  Again, I think it's back to ineffective assistance

4    of counsel if I don't ask for specific findings as to which ones.

5            And I -- I would say in this case, unlike some others,

6    I mean, I think we have an argument that the ATM didn't further

7    it.  It was at the end.  So to us, the actual findings are

8    significant.  The Court of Appeals may disagree, but that's what

9    our request would be.  And that's why going forward to the

10   instructions, specifically instruction on the cellphone, it's

11   basically making the finding already.

12           And I -- if I could just have one moment, Your Honor,

13   to make sure I didn't miss any.  (Pause).  No.

14           And I -- I just -- if I could confirm with Mr. Svelund.

15   I didn't get a chance to go line for line for the new one you

16   sent, but you accepted the highlighted changes that Ms. Miles had

17   made.

18           MR. SVELUND:  (Nodding head).

19           MS. POTTER:  Okay.  So, then, everything else is fine,

20   Your Honor.

21           THE COURT:  Okay.  Let me hear from the Government

22   on -- let's take -- let's not get to the verdict form quite yet,

23   but with regard to the objections to the instructions.

24           MS. MILES:  Yes, Your Honor.  With regard to the "any

25   and all" instruction for the 922(g)(1) charges, the Government

1   cited a number of cases when we filed our first amendment --

2   amended verdict form that specifies that in many circuits,

3   including the Ninth Circuit, there does not need to be jury

4   unanimity as to the particular firearm or round of ammunition

5   that is found.  That is a means, and not an element, in terms of

6   the specificity.  And so I believe that under the state of the

7   law, as the defense counsel states, that is an appropriate

8   instruction, and we would ask you to keep that.

9          It is also the reason driving, and I understand we'll

10  get to the verdict form in a minute, but it's driving the fact

11  that the Government has now asked for a more general verdict as

12  to the 922(g) counts rather than asking for a special verdict

13  specifying the firearm or round of ammunition for each count.  So

14  those two things go hand in hand.  I think they're both

15  appropriate under the current state of the law.

16         THE COURT:  All right.  And I will overrule the

17  objections with regard to that piece.

18         The instrumentality piece, am I getting too specific by

19  referencing a cellphone when it is part of the evidence in the

20  case?

21         MS. MILES:  I don't think so, given the recent Ninth

22  Circuit case that came out.  And we wouldn't be asking for it if

23  we didn't have a direct decision from the Ninth Circuit on that

24  specific example.  So that is why we're asking for it.  We think

25  it's legally appropriate.  And we do agree with Your Honor's

1    addition that it needs to be "in furtherance" of the actual

2    crime, that's absolutely legally true, but we think that that is

3    a correct statement of the law in terms of instrumentality.

4            THE COURT:  It is.  And I don't think it's naturally

5    apparent to jurors, but it is the law.  And I do think it's an

6    appropriate instruction on the law to tell them that a cellphone,

7    if used in furtherance of the offense, is an instrumentality of

8    interstate commerce.  So I'll overrule the objection with regard

9    to that definition.

10            I'm a little unsure why on Count 1 we do have them

11    choose what conduct it's based on.  And I realize it's different.

12            MS. MILES:  And I can explain that, Your Honor.  It's a

13    strategic choice.  We do think that each of those ways of

14    committing the kidnapping are means.  They're not elements, that

15    we don't have to have jury unanimity; however, because there's

16    been so much litigation around this question of

17    instrumentalities, the Government is asking to be able to

18    insulate Count 1 from Count 3 just in case we end up with an

19    appellate issue on instrumentalities.  And so if the jury finds

20    that the defendant committed Count 1 by travel, by transport,

21    then that makes an instrumentalities question, a legal

22    instrumentalities question moot as to Count 1, which is why we're

23    asking to insulate, but we do not think that either -- that we

24    need unanimity as to those three choices, and we certainly don't

25    think that we need unanimity as to which instrumentality.  All of

1    those things are means, and the jury does not have to agree as to

2    which one.

3           THE COURT:  In Count 3, really the only impact -- the

4    only interstate commerce issue would be using means, facility, or

5    instrumentality.

6           MS. MILES:  That's right, because it was an

7    intrastate --

8           THE COURT:  Yes.

9           MS. MILES:  -- crime.

10          THE COURT:  That makes sense.  So I --

11          MS. POTTER:  Your Honor, could I just add one thing to

12    that?

13          THE COURT:  Yes.

14          MS. POTTER:  I mean, to the extent the Government is

15    trying to insulate Count 1, we're trying to give Mr. Zuberi the

16    opportunity to litigate his commerce argument on Count 3.

17          If they have to decide either did the vehicle, did the

18    ATM, and did the phone, if they only pick the motor vehicle, that

19    does give him the opportunity to raise that issue separate and

20    apart from the cellphone.  And so we don't think we're asking for

21    too much to give him just a reasonable opportunity to preserve

22    his argument as to Count 3 the same way the Government wants to

23    insulate their Count 1, and that's why we're asking for it.

24          THE COURT:  So you would want -- you would want the

25    instrumentalities laid out as he used his vehicle, and you want

1   unanimity on each of those or (pause) --

2       MS. POTTER:  It would be similar to the findings -- so

3   I will say I was inartful in my initial drafting.  What I would

4   just say is if you find, you know, yes, guilty as to Count 3,

5   which of the following, if any, facilitated commission.  And it

6   would say, cellphone, motor vehicle, ATM.  Those are their three

7   choices.  And they can check them all, they can check none, much

8   like they're going to ask them to check did they find them all in

9   the garage.

10      We're not saying specific unanimity.  We're just saying

11  check the ones you think facilitated it.

12      THE COURT:  I mean, I don't see why we can't do that,

13  to be honest.  I mean, let's go ahead and preserve it.  I mean,

14  whether -- they're going to have to choose an instrumentality in

15  order to find guilty, we might as well ask them which

16  instrumentalities.  It may be that they'll find the ATM is an

17  after-the-fact issue.  If they found the ATM was the only issue,

18  then maybe that would be a factual appellate issue that would go

19  to the jury -- or go to the Ninth Circuit.

20      So I will allow the various instrumentalities to be

21  laid out as, I think, the defense proposed instructions had that.

22  If that's the right language, we'll add that.

23      MS. POTTER:  The verdict form.  I'll confer just to

24  make sure.  I think it was a little wordier when I first

25  submitted it, but we can figure that out.  I can work with

1   Ms. Miles to figure it out.

2        THE COURT:  Okay.  Anything else with regard to

3   instructions or the verdict form from the Government?

4        MS. MILES:  Not from the Government, Your Honor.

5        THE COURT:  From the defense?

6        MS. POTTER:  Not from the defense, Your Honor.

7        THE COURT:  Okay.

8        MS. POTTER:  Oh, I'm sorry, Your Honor.  I do need to

9   make one more.

10        THE COURT:  Sure.

11        MS. POTTER:  They had asked for specific findings with

12   respect to the firearms of the locations.  We're not going to

13   contest the findings they've asked for in terms of the garage,

14   the bedroom, but we are not waiving our argument that the garage

15   and the bedroom remain part of the same home for multiplicity.

16   That's a legal argument we might make later.

17        I just want to be clear that by allowing these separate

18   findings, we're not agreeing that if they find each of those

19   separate places, they're all separate counts.  We are preserving

20   that for later.

21        THE COURT:  Okay.

22        MS. MILES:  We understand that, Your Honor.  I think

23   it's a post-verdict issue.

24        THE COURT:  Okay.  Great.  Thank you.

25        In terms of the evidence going back to the jury,

1   certainly the firearms and the ammunition will be kept separate.

2   If they wish to view that, they'll be told they can come to the

3   courtroom, where the marshals agreed they would be present, but

4   the guns would be -- guns -- firearms would be viewed separately

5   of any ammunition, the ammunition would be viewed separately of

6   any of the firearms.

7           Anything else we need to --

8           MS. MILES:  Your Honor, I guess my only other issue

9   would be if they want to re-watch the video.  I mean, this is not

10  C-SAM, so it's not exactly the same procedure, but I think it

11  probably would be prudent to ask them to come back into the

12  courtroom to watch that as well.

13          THE COURT:  I think so.  Yes.

14          MR. BERTHOLF:  And we agree on that.

15          THE COURT:  And, you know, there is obviously

16  credibility issues there that may be one thing that they will

17  want to see it again, and we'll make it available if that's the

18  case.

19          Anything from defense?

20          MS. POTTER:  No.  Nothing further, Your Honor.

21          THE COURT:  The Government?

22          MS. MILES:  No.  Thank you, Your Honor.

23          THE COURT:  Okay.  We'll see everybody at 9 o'clock

24  tomorrow.  Thank you.

25          MR. SWEET:  Thank you, Your Honor.

1       (Proceedings adjourned at 4:05 p.m.)

2

3                   **C E R T I F I C A T E**

4

5       I certify, by signing below, that the foregoing is a

6  true and correct transcript of the record, taken by stenographic

7  means, of the proceedings in the above-entitled cause.

8       A transcript without an original signature, conformed

9  signature, or digitally signed signature is not certified.

10

11      DATED this 20th day of March 2025.

12

13

14                        /s/ Kellie M. Humiston

15                        Kellie M. Humiston, RMR, CRR
                          Official Court Reporter
16                        Certificates Expire:  9/2027

17

18

19

20

21

22

23

24

25