1     IN THE UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF OREGON

3       MEDFORD DIVISION

4

5

  UNITED STATES OF AMERICA,   )

6             )

         Plaintiff,  ) No.

7             ) 1:23-cr-00254-MC-1

     v.       )

8             ) October 18, 2024

  NEGASI ZUBERI, also known as   )

9  Justin Joshua Hyche, also known ) Medford, Oregon

  as Sakima Zuberi,     )

10            )

        Defendant.  )

11

12

13

14

15      **TRANSCRIPT OF PROCEEDINGS**

16      JURY TRIAL - DAY EIGHT

17

18   BEFORE THE HONORABLE MICHAEL J. MCSHANE

19   UNITED STATES DISTRICT COURT CHIEF JUDGE

20

21

22

23

  **COURT REPORTER:**

24 Kellie M. Humiston, RMR, CRR

  (503) 326-8186

25 Kellie_Humiston@ord.uscourts.gov

```
 1              A P P E A R A N C E S - i

 2

 3   FOR THE PLAINTIFF:
                          U.S. ATTORNEY'S OFFICE
 4                        By:  Jeffrey S. Sweet
                          405 E. Eight Avenue
 5                        Suite 2400
                          Eugene, OR 97401
 6

 7   FOR THE PLAINTIFF:
                          U.S. ATTORNEY'S OFFICE
 8                        By:  Marco Boccato
                          310 W. Sixth Street
 9                        Medford, OR 97501

10

11   FOR THE PLAINTIFF:
                          U.S. ATTORNEY'S OFFICE
12                        By:  Nathan J. Lichvarcik
                          405 E. Eighth Avenue
13                        Suite 2400
                          Eugene, OR 97401
14

15   FOR THE PLAINTIFF:
                          U.S. ATTORNEY'S OFFICE
16                        By:  Suzanne A. Miles
                          1000 SW Third Avenue
17                        Suite 600
                          Portland, OR 97204
18

19

20

21

22

23

24

25
```

**A P P E A R A N C E S - ii**

FOR THE DEFENDANT:

ANGELI LAW GROUP
By:  Amy Elizabeth Potter
121 SW Morrison Street
Suite 400
Portland, OR 97204

FOR THE DEFENDANT:

LAW OFFICES OF MICHAEL P. BERTHOLF
By:  Michael Bertholf
108 Mistletoe Street
Medford, OR 97501

1                              **INDEX**

2                                                              **PAGE NO.**

3    **PROCEEDINGS:**

4    Jury Instructions

5    Government's Closing Argument

6    Defendant's Closing Argument

7    Government's Rebuttal Argument

8    Jury Instructions

9    Verdict

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (October 18, 2024, 9:20 a.m.)

 2                    **P R O C E E D I N G S**

 3

 4         THE COURT:  All right.  We're ready to bring the jury

 5    in.  Is there anything we need to discuss before that?

 6         MR. SWEET:  Nothing for the Government, Your Honor.

 7         MS. POTTER:  Nothing for the defense.

 8         THE COURT:  All right.  We'll bring them in.  I will

 9    instruct and then we'll go -- do we need any break?  It looks

10    like we're set up, so we can go right into closing.

11         MR. LICHVARCIK:  We're all set up, Judge.

12         THE COURT:  All right.  Then we'll break after the

13    Government's closing.

14         (Jury entering courtroom:  9:20)

15         THE COURT:  All right.  Please be seated, everybody.

16         Folks, good morning.  We are prepared now.  Both sides

17    have rested, as you know.  I'm going to actually come down to the

18    podium to give you the legal instructions that apply to this

19    case, then we're going to hear the closing statements of the

20    attorneys.

21         Again, because the Government has the burden of proof,

22    they will go first, followed by the defense, and then the

23    Government would have a chance to provide rebuttal, but let's get

24    the legal instructions.  It's difficult to read across an entire

25    room, so it's much easier for me to come down here.

1          **JURY INSTRUCTIONS**

2          THE COURT:  Members of the jury, now that you've heard

3     all of the evidence, it is my duty to instruct you on the law

4     that applies.  A copy of these instructions will be provided to

5     each of you during your deliberations, so you do not have to

6     write down everything that I'm saying.

7               It is your duty to weigh and to evaluate the evidence

8     received in this case and, in that process, to decide the facts.

9     It is also your duty to apply the law as I give it to you whether

10    you agree with the law or not.  You must decide this case solely

11    on the evidence and the law.  You recall that at the beginning of

12    the case, you took an oath to do so.

13              You should also not be influenced by any person's race,

14    color, religious beliefs, national ancestry, sexual orientation,

15    gender identity, gender, or economic circumstances.  Also, do not

16    allow yourself to be influenced by personal likes or dislikes,

17    sympathy, prejudice, fear, public opinion, or biases, including

18    unconscious biases, those unconscious biases or stereotypes,

19    attitudes, or preferences that people may consciously reject but

20    may be expressed without conscious awareness, control, or

21    intention.

22              You must follow all of these instructions and not

23    single out some and ignore others.  They are all important.

24              Please do not read into these instructions or into

25    anything I may have said or done during the trial to suggest what

1 your verdict -- what verdict you should return. That matter is

2 entirely up to you.

3          The indictment against Mr. Zuberi is not evidence.

4 Mr. Zuberi has pleaded not guilty to the charge. Mr. Zuberi is

5 presumed to be innocent unless and until the Government proves

6 Mr. Zuberi's guilt beyond a reasonable doubt.

7          In addition, Mr. Zuberi does not have to testify or

8 present any evidence. Mr. Zuberi does not have to prove

9 innocence. The Government has brought the charges. They have

10 the burden of proving each and every element of the charges

11 beyond a reasonable doubt.

12          The defendant in a criminal case has a constitutional

13 right not to testify. In arriving at your verdict, the law

14 prohibits you from considering in any manner that Mr. Zuberi did

15 not testify.

16          Reasonable doubt: Proof beyond a reasonable doubt is

17 proof that leaves you firmly convinced that Mr. Zuberi is guilty.

18 It is not required that the Government prove guilt beyond all

19 possible doubt.

20          A reasonable doubt is doubt based on common sense. It

21 is not based purely on speculation. It may arise from careful

22 and impartial consideration of all of the evidence or from a lack

23 of evidence.

24          If after careful and impartial consideration of all the

25 evidence you are not convinced beyond a reasonable doubt that

1    Mr. Zuberi is guilty, it is your duty to find Mr. Zuberi not

2    guilty.  On the other hand, if after careful and impartial

3    consideration of all the evidence you are convinced beyond a

4    reasonable doubt that Mr. Zuberi is guilty, it is your duty to

5    find Mr. Zuberi guilty.

6             What is evidence?  The evidence you are to consider in

7    deciding what the facts are consist of:  first, the sworn

8    testimony of any witness; second, the exhibits that are received

9    into evidence; and third, any facts to which the parties have

10   agreed.  We call those stipulations, and I've read some of those

11   to you and I'll read those to you again when we get to certain

12   charges.

13            So, what is not evidence?  Questions, statements,

14   objections, and arguments by the lawyers are not evidence.  The

15   lawyers are not witnesses.  Although you must consider a lawyer's

16   questions to understand the answers of a witness, the lawyer's

17   questions are not evidence.  Similarly, what the lawyers have

18   said in their opening statements and will say in their closing

19   arguments and have said at other times are intended to help you

20   understand the evidence and interpret the evidence, but it is not

21   evidence.  If the facts as you remember them differ from the way

22   the lawyers state them, you must rely on your own memory.

23            Any testimony that I've stricken or instructed you to

24   disregard is not evidence.  I don't think we've done much of

25   that.

1    Anything you may have seen or heard when the court was

2    not in session is not evidence.  You are to decide this case

3    solely on the evidence received in trial.

4    Some of these are repeats from what I've told you at

5    the beginning of the case, but direct and circumstantial

6    evidence:  Evidence may be direct or it may by circumstantial.

7    Direct evidence is direct proof of a fact, such as the testimony

8    by a witness about what that witness may have personally seen or

9    heard or did.  Circumstantial evidence is indirect evidence; that

10   is, it is the proof of one or more facts from which you can find

11   another fact.

12   You are to consider both direct and circumstantial

13   evidence.  Either can be used to prove a fact.  The law makes no

14   distinction between the weight to be given to either direct or

15   circumstantial evidence.  It is for you to decide how much weight

16   to give any evidence.

17   Credibility of witnesses:  In deciding this case, you

18   may have to decide which testimony to believe and which testimony

19   not to believe.  You may believe everything a witness says or

20   part of it or none of it.

21   In considering the testimony of any witness, you may

22   take into account the following:  first, the opportunity and the

23   ability of the witness to see or hear or know the things

24   testified to; second, the witness's memory; third, the witness's

25   manner while testifying; fourth, the witness's interest in the

1  outcome of the case, if any; fifth, the witness's bias or

2  prejudice, if any; sixth, whether other evidence contradicted the

3  witness's testimony; seventh, the reasonableness of the

4  testimony -- witness's testimony in light of all of the evidence;

5  and eight, any other factors that bear on believability.

6         Sometimes a witness may say something that is not

7  consistent with what someone -- something else he or she said.

8  Sometimes different witnesses will give different versions of

9  what happened.  People often forget things or make mistakes in

10  what they remember.  Also, two people may see the same event but

11  remember it differently.

12         You may consider these differences, but do not decide

13  the testimony is untrue just because it differs from other

14  testimony; however, if you decide that a witness has deliberately

15  testified untruthfully about something important, you may choose

16  not to believe anything that witness said.  On the other hand, if

17  you think the witness testified untruthfully about some things

18  but told the truth about others, you may accept the part you

19  think is true and ignore the rest.

20         I've given you an instruction about conscious and

21  unconscious bias when evaluating witness testimony.

22         The weight of the evidence as to a fact does not

23  necessarily depend on the number of witnesses who testify.  What

24  is important is how believable the witnesses were and how much

25  weight you think their testimony deserves.

1        You've heard testimony that Mr. Zuberi made certain

2   statements.  It is for you to decide, one, whether Mr. Zuberi

3   made the statement, and two, if so, how much weight to give it.

4   In making those decisions, you should consider all the evidence

5   about the statement, including the circumstances under which

6   Mr. Zuberi may have made it.

7        You have heard evidence that Mr. Zuberi committed other

8   crimes, wrongs, or acts that are not charged here.  You may

9   consider this evidence only for its bearing, if any, on the

10  question of Mr. Zuberi's intent, motive, opportunity,

11  preparation, plan, knowledge, absence of mistake, absence of

12  accident, and for no other purpose.  You may not consider this

13  evidence as evidence of guilt of the crime for which Mr. Zuberi

14  is now on trial.

15       You have heard evidence that Mr. Zuberi has previously

16  been convicted of a crime.  You may consider that evidence only

17  as evidence of the third and fourth elements of Counts 4

18  through 7, so the felon in possession of a firearm counts, which

19  I will explain further.

20       You may not otherwise consider a prior conviction as

21  evidence of guilt of the crimes for which Mr. Zuberi is now on

22  trial.

23       You have heard testimony from witnesses who testified

24  about his or her opinions and the reasons for these opinions.

25  These opinion -- this opinion testimony is allowed because of the

1    specialized knowledge, skill, experience, training, or education

2    of the witness.  Such opinion testimony, we often call that

3    expert witness testimony, should be judged like any other

4    testimony.  You may accept it or reject it and give it as much

5    weight as you think it deserves, considering the witness's

6    knowledge, skill, experience, training, or education, the reasons

7    given for the opinion, and all other evidence in the case.

8            Certain charts and summaries have been admitted into

9    evidence.  Charts and summaries are only as good as the

10   underlying supporting material.  You should, therefore, give them

11   only such weight as you think the underlying material deserves.

12           During the trial, the Court may have received evidence

13   in a modified form.  This evidence may have been edited because

14   it contained irrelevant or otherwise inadmissible material.  Do

15   not speculate about the substance of what may have been removed

16   or modified or why it was modified.  You should not consider

17   evidence to be of greater or lesser evidentiary value based

18   solely on the fact that it has been modified.

19           A separate crime is charged against Mr. Zuberi in each

20   count.  You must decide each count separately.  Your verdict on

21   one count should not control your verdict on any other count.

22           "On or about" defined:  The indictment charges that the

23   offense alleged was committed on or about a certain date.

24   Although it is necessary for the Government to prove beyond a

25   reasonable doubt that the offense was committed on a date

1    reasonably near the date alleged in the indictment, it is not

2    necessary for the Government to prove that the offense was

3    committed precisely on the date charged.

4         Count 1 charges kidnapping, interstate transportation

5    under 18 United States Code Section 1201(a)(1).  Mr. Zuberi is

6    charged with -- in Count 1 with kidnapping in violation of

7    Section 1201(a)(1) of Title 18 of the United States Code.

8         For Mr. Zuberi to be found guilty of that charge, the

9    Government must prove each of the following elements beyond a

10   reasonable doubt:  that on or about July 14th to July 15th,

11   2021 (sic.), in the District of Oregon and elsewhere, Mr. Zuberi

12   unlawfully and willfully:  first, seized, confined, decoyed,

13   kidnapped, abducted or carried away AV-1; second, that he held

14   AV-1 against her will; and third, he did one or more of the

15   following:  he transported AV-1 across state lines from

16   Washington to Oregon; that he traveled in interstate commerce in

17   committing or in furtherance of the offense; that he used any

18   means, facility, or instrumentality of interstate commerce in

19   committing or in furtherance of the offense.

20        Your verdict form will ask you to specify which, if

21   any, of those actions you find the Government has proven beyond a

22   reasonable doubt.

23        A person acts willfully if he engages in the prohibited

24   conduct voluntarily and intentionally, knowing it to be wrongful,

25   and not because of mistake, accident, or other innocent reason.

1    The fact that AV-1 initially voluntarily accompanied Mr. Zuberi

2    does not necessarily prevent the occurrence of a later

3    kidnapping.

4            Facilities of interstate commerce are means of

5    transportation and communication across state lines, for example,

6    the Internet or telephone lines.

7            Instrumentalities are things that are used to move

8    people and things in commerce or to communicate across state

9    lines.  A cellphone, for example, is an instrumentality of

10   interstate commerce, even if it is used to make a call within a

11   single state when used in the furtherance of committing the

12   offense.

13           Count 2, transportation for criminal sexual activity.

14   Mr. Zuberi is charged in Count 2 with transporting a person with

15   the intent that the person engage in criminal sexual activity in

16   violation of Section 2421 of Title 18 of the United States Code.

17           For Mr. Zuberi to be found guilty of that charge, the

18   Government must prove each of the following elements beyond a

19   reasonable doubt:  that from on or about July 14th, 2023, to

20   July 15th, 2023, in the District of Oregon and elsewhere, that,

21   first, Mr. Zuberi knowingly transported AV-1 in interstate

22   commerce; second, Mr. Zuberi transported AV-1 with the intent of

23   sexually assaulting her; third, that Mr. Zuberi could have been

24   charged with a criminal offense under Oregon state law for that

25   sexual assault.

1    In Oregon, it is a criminal offense to subject a person

2    to sexual contact, oral sex, or sexual intercourse without their

3    consent and it is a criminal offense to subject a person to

4    sexual intercourse or oral sex by forcible compulsion.

5    A defendant transports with intent that such person

6    engage in criminal sexual activity if the intended criminal

7    sexual activity was a dominant, significant, or motivating

8    purpose of the transportation.

9    An act is done knowingly if a defendant is aware of the

10   act and does not act through ignorance, mistake, or accident.

11   The Government is not required to prove that Mr. Zuberi

12   knew that his acts or omissions were unlawful.  You may consider

13   evidence of Mr. Zuberi's words, acts, or omissions along with all

14   the other evidence in deciding whether Mr. Zuberi acted

15   knowingly.

16   Count 3:  Mr. Zuberi is charged in Count 3 with

17   kidnapping in violation of Section 1201(a)(1) of Title 18 of the

18   United States Code.

19   For Mr. Zuberi to be found guilty of this charge, the

20   Government must prove each of the following elements beyond a

21   reasonable doubt:  that on or about May 6, 2023, in the District

22   of Oregon, Mr. Zuberi unlawfully and willfully, first, seized,

23   confined, decoyed, kidnapped, abducted, or carried away AV-2;

24   second, that he held AV-2 against her will; and third, he used

25   any means, facility, or instrumentality of interstate commerce in

1    committing or in furtherance of the offense.

2         The fact that AV-2 may have initially voluntarily

3    accompanied Mr. Zuberi does not necessarily prevent the

4    occurrence of a later kidnapping.

5         "Willfully," "facilities," and "instrumentalities" have

6    the same meaning provided above for Count 1.

7         Counts 4 through 7:  Mr. Zuberi is charged in Counts 4

8    through 7 with the possession of firearms and/or ammunition in

9    violation of Section 922(g)(1) of Title 18 of the United States

10   Code.

11        For Mr. Zuberi to be found guilty, the Government must

12   prove each of the following elements beyond a reasonable doubt:

13   that on or about July 15th, 2023, in the District of Oregon,

14   first, for Count 4, that Mr. Zuberi knowingly possessed any of

15   the following -- any or all of the following:  an HS product

16   Springfield XDM 9x19-millimeter pistol, approximately eight

17   rounds of Blazer 9-millimeter Luger ammunition, approximately

18   four rounds of Hornady 9-millimeter Luger ammunition,

19   approximately four rounds of NovX 9-millimeter Luger ammunition,

20   and approximately three rounds of SIG 9-millimeter Luger

21   ammunition.

22        For Count 5, Mr. Zuberi knowingly possessed any or all

23   of the following:  a Remington Arms Company, Model 783 .308

24   Winchester caliber rifle, an Anderson Manufacturing, Model AM-15

25   multi-caliber rifle, an E.R. Amantino, or Stoeger, Model Condor

1  Competition 12-gauge shotgun, approximately 27 rounds of Lake

2  City Arsenal 5.56 ammunition, approximately 27 rounds of Blazer

3  9-millimeter Luger ammunition, two rounds of Remington Arms

4  9-millimeter Luger ammunition, one round of Hornady 9-millimeter

5  Luger ammunition, approximately 16 rounds of NovX 9-millimeter

6  Luger ammunition, approximately 17 rounds of SIG 9-millimeter

7  Luger ammunition, one Federal 12-gauge shotgun shell, and one

8  Winchester 12-gauge shotgun shell.

9          For Count 6, that Mr. Zuberi knowingly possessed any or

10  all of the following:  approximately 410 rounds of Lake City

11  Arsenal 5.56 ammunition, one round of Hornady 6-millimeter ARC

12  ammunition, one round of Tula Cartridge Works 7.62x39 ammunition,

13  approximately four Federal 12-gauge shotgun shells, and

14  approximately 14 Winchester 12-gauge shotgun shells.

15          And for Count 7, that Mr. Zuberi knowingly possessed

16  any or all of the following:  approximately 79 rounds of Tula

17  Cartridge Works 7.62x39 ammunition, approximately 246 rounds of

18  Remington Arms 9-millimeter Luger ammunition, approximately eight

19  rounds of Blazer 9-millimeter Luger ammunition, and approximately

20  30 rounds of Hornady 6-millimeter ARC ammunition.

21          Second, each charged firearm or round of ammunition had

22  been shipped or transported from one state to another or between

23  a foreign nation and the United States.

24          Third, at the time of Mr. Zuberi's -- at the time

25  Mr. Zuberi possessed the charged firearms or rounds of

1 ammunition, he had been convicted of a crime punishable by

2 imprisonment for a term exceeding one year.  That's the

3 definition of a felony.

4          Fourth, at the time Mr. Zuberi possessed the charged

5 firearm or rounds of ammunition, he knew he had been convicted of

6 a crime punishable by imprisonment for a term exceeding one year.

7          The parties have agreed to certain facts that have been

8 stated to you.  Those facts you can now take as having been

9 conclusively established.  The first stipulation of facts is that

10 all of the firearms and ammunition I listed off in Counts 4, 5,

11 6, and 7 are firearms and ammunition as defined by federal law,

12 and prior to July 15th, 2023, they had been shipped or

13 transported in interstate or foreign commerce.

14          The second stipulation is the parties stipulated that

15 Negasi Zuberi, also known as Sakima Zuberi, and had previously --

16 excuse me.  The parties stipulate that Negasi Ishaiah Zuberi is

17 also known as Sakima Zuberi and previously had the legal names of

18 Justin Joshua Hyche, H-Y-C-H-E, and Justin Kouassi,

19 K-O-U-A-S-S-I.

20          The parties further stipulate that on and prior to

21 July 15th, 2023, Negasi Ishaiah Zuberi knew that he had

22 previously been convicted of a crime punishable by imprisonment

23 for a term exceeding one year.

24          The verdict form will also ask you questions about the

25 location from which the charged firearms and ammunition were

1    recovered regarding any and all counts for which you will

2    return -- for which you may re- -- may have returned a guilty

3    verdict.

4            A person has possession of something if the person

5    knows of its presence and has physical control over it or knows

6    of its presence and has the power or intention to control it.

7    More than one person can be in possession of something if each

8    knows of its presence and has the power and the intention to

9    control it.

10            I will give you some further instructions about how to

11    deliberate and I will go over a verdict form with you after the

12    close of the closing statements.

13            A couple other instructions.  I have a few out of

14    order.  Some of you may have taken notes during the trial.

15    Whether or not you took notes, you should rely on your own memory

16    of what was said.  Notes are only to assist your memory.  You

17    should not be over-influenced by your notes or those notes of

18    your fellow jurors.

19            The punishment provided by law for these particular

20    counts is for the Court to decide.  You may not consider

21    punishment in deciding whether the Government has proved its case

22    against Mr. Zuberi beyond a reasonable doubt.

23            All right.  I'll give you some further instructions

24    regarding your deliberations after you've heard the closing

25    statements.  Again, the burden is on the Government completely to

1   prove any charges beyond a reasonable doubt, so you will hear

2   first from the Government.  Thank you.

3                    **GOVERNMENT'S CLOSING ARGUMENT**

4        MR. LICHVARCIK:  May it please the Court, counsel.

5        AV-1 told you what Negasi Zuberi did to her.  AV-2 told

6   you what Negasi Zuberi did to her, how they both got into the

7   Honda Pilot and did not come out the same.  The problem is not

8   with the Honda Pilot.  It's the man driving it.

9        If all you had in this case was the testimony of AV-1

10  and AV-2, their injuries, you have evidence beyond a reasonable

11  doubt to go find him guilty right now of Counts 1, 2, and 3 for

12  what he did to them.

13       If you took away the targets list, the women in their

14  20s, if you take away the "Operation Take Over" note, if you take

15  away his frenzied construction after kidnapping AV-2, when he

16  didn't have anywhere to keep her in the garage, if you take away

17  him fleeing his home after AV-1 escaped and never coming back to

18  North El Dorado, looking up Turkey flights, if you take away him

19  slicing himself in Reno, saying his life is over, he's trying to

20  kill himself, what the news from Oregon is, that he's fucked, if

21  you take all that away and you just focus on AV-1 and AV-2's

22  testimony, it's a powerful combination that shows his guilt.

23       Think about it this way:  AV-1 and AV-2 really had

24  nothing in common before they met him except for the fact that

25  they were both 21-year-old young women.  Other than that, from

1   different cities, different towns, different states, never met

2   each other, never spoke to each other, never saw each other.

3   AV-1 had never even been to Klamath Falls before.  AV-2, she went

4   up to Seattle once years ago.  Yet they both run into this man,

5   and they came in here and told you how he did to them the exact

6   same things.

7          I'll give you six for now:  yellow and black taser

8   pointed straight at them, both said that; cuffed the wrists, both

9   said that; cuffed them both by the ankles, both said that; drove

10  them both to the 1336 North El Dorado garage, both of them;

11  covered their faces with a sweatshirt backwards, both of them;

12  and raped them.

13         And to top it all off, law enforcement found all,

14  repeat that, all of the tools that he used to kidnap them.

15  Yellow and black taser, found it stashed in the trailer, found in

16  his Amazon purchase history.  That bizarre walkie-talkie things

17  with the spikes that Rachel described, found it stashed in the

18  trailer as well.  Also found the messages in his iCloud talking

19  about it, texts in his iCloud.  The cuffs on the legs that AV-1

20  described, found them on the workbench right outside the cell.

21  The cuffs that AV-2 described, found them in the trailer as well,

22  including the silver rigid ones that she stood right here in

23  front of you and showed how hard it was to walk, with AV-2's DNA

24  on them to a very, very, very high likelihood.  The firearm that

25  both women saw, found it.  AV-1 took it out of the garage when

1    she fled.  Found the case for it in the master bedroom.  Matches

2    the gun by serial number, make, model.

3           All the tools that AV-1 and AV-2 described are found.

4    And the links between them, the links between them, Mr. Zuberi,

5    and his victims are undeniable.

6           On behalf of the United States, my colleagues, I'm

7    honored to stand up here before you and summarize the evidence

8    about why Mr. Zuberi is so guilty.  I appreciate your time and

9    attention these last two weeks.

10          Let's walk through the charged offenses and the

11   elements.  You'll have a copy of the jury -- of the jury

12   instructions that Judge McShane just read, so there's no need to

13   memorize these.

14          Count 1, kidnapping of AV-1.  On or about July 14th to

15   July 15th, 2023, in the District of Oregon and elsewhere,

16   Mr. Zuberi unlawfully and willfully -- and you heard the jury

17   instructions when Judge McShane read them define "willfully."

18   It's essentially doing an act knowing it was wrong.  And you

19   heard what he did.  He knew all those things were wrong.

20          First element of Count 1, that he seized, confined,

21   decoyed, kidnapped, abducted, or carried away AV-1.  Yes, as AV-1

22   testified, after a hundred dollars of full service up in Seattle,

23   he seized and confined her in the alley.  That's where he pointed

24   the taser at her, disabled her phone, cuffed her, decoyed her by

25   pretending to be a police officer, and then when he drove her

1   down south from Seattle down to Klamath Falls, that's when he

2   kidnapped, abducted, and carried her away.  First element, met.

3          Second element, that he held her against her will.

4   Yes.  AV-1 asked time and again to be let go.  She didn't want to

5   be cuffed, trapped in that Honda Pilot for hours, taken down to a

6   town she'd never heard of.  Those were all against her will.

7   Second element, met.

8          I'll emphasize a point because the jury instructions

9   say it.  Even though a person, a woman here, gets into a car

10  voluntarily, that doesn't mean that it can't turn into a

11  kidnapping, and that's what happened with AV-1.

12         Third element, did one or more of the following.  Now,

13  this third element can be met in three different ways.  It

14  doesn't have to be met in all three ways, you just have to find

15  one, but the verdict form is going to ask you to answer the three

16  different ways.  The first one, that he transported AV-1 across

17  state lines from Washington to Oregon, yes, he did.  AV-1 told

18  you how it happened.  The cellular cell site analysis and the

19  maps show you that it happened.  The surveillance footage

20  capturing him show you that it happened.  AV-1's appearance down

21  in the Klamath Falls streets bloody show you that it happened.

22  That version of Count 3 is met.

23         Second way to meet Count 3 is traveling in interstate

24  commerce to commit the offense.  Very similar, and yes, it's met.

25  He traveled from Klamath Falls up to Seattle, snatched her off

1  the street, went back down to Klamath Falls, down to the waiting

2  garage.  That second way of meeting the third element is met.

3       And the third way that this element can be met is if

4  you find he used an instrumentality of interstate commerce.  Then

5  there's definitions in the jury instructions.  Essentially an

6  instrumentality is a thing that is used to move and connect

7  people between states:  cars, cellphones, things we use to

8  connect to the Internet.  It's that simple.  And the answer on

9  this is yes, the Honda Pilot and his phone.  Remember that phone

10  in Reno, the one he threw down on the concrete?  It's hard to

11  kidnap a woman up in Seattle and bring her all the way back down

12  to Klamath Falls without using a plane, train, or an automobile.

13  This Honda Pilot that he used, it's an essential instrumentality

14  in the travel for this crime, and that's how he uses it.

15       The second instrumentality he uses is the phone.  It's

16  also hard to go on a long road trip without the phone and GPS as

17  the guide, and that's what he does.  After he turns the jammer

18  off, after he secured AV-1's cellphone, he used his own phone and

19  the Maps app to bring her back cuffed in the back, at some point

20  he moved her up to the front, but cuffed in the car.  And she

21  told you how she saw his phone and the GPS Maps app running in

22  that wooded area.  She noticed it was about two hours from the

23  destination.  That last way of meeting the third element is also

24  met.  He's guilty for Count 1.

25       Count 2, transportation for criminal sexual activity.

1   This also involves AV-1.  On or about July 14th to July 15th,

2   2023, in the District of Oregon and elsewhere, first element,

3   that Mr. Zuberi knowingly transported AV-1 in interstate

4   commerce.  We've talked about this already.  Washington, Oregon.

5   Yes, he did.  That element's met.

6           Second, that Mr. Zuberi transported AV-1 with the

7   intent of sexually assaulting her.  Yes, sex was his intent.  For

8   any of these charges, a completed sexual act is not necessary,

9   but the fact that he does rape her in Oregon so soon after the

10  kidnapping, it shows his intent.  He'd just had sex with her up

11  in the Seattle alley.  He can't even wait till he gets her back

12  home.  But this time he's not paying, this time she's isolated,

13  she's restrained, and she's not consenting.

14          And AV-1 described for you what happened in that remote

15  pull-off.  After he went to the bathroom, he walked around, stood

16  over her and said, "Suck it."  Nowhere to run, nowhere to hide,

17  no choice.  She got down on her knees and complied.  Then he

18  turned her around and raped her.

19          In terms of sex being his intent, notice that he's not

20  kidnapping men in their 70s off the streets.  It's women in their

21  20s.  We know that because of what he did to AV-1 and AV-2.

22          And he drops some pretty strong hints about what he

23  plans to do, calling her a princess, too valuable to hurt.  He's

24  got plans for her, and it involves sex whether she agrees to it

25  or not.  The second element is met.

 1       Third element is whether Mr. Zuberi could have been

 2  charged with a criminal offense under Oregon state law for his

 3  intended sexual assault.  Yes.  Rape and sexual assault without

 4  consent on the side of the road are crimes in Oregon, and the

 5  instructions talked to you about that.  The last element is met.

 6  He's guilty of Count 2.

 7       Now, you notice what was not an element in Counts 1

 8  and 2.  There's no element in there asking you to decide whether

 9  this was a human cage or a place to make melodic chord

10  progressions.  It does not matter if Mr. Zuberi had been inside

11  of that thing making a Grammy album the week before.  It's still

12  not okay to lock a woman in it.  And, in fact, he's guilty of

13  Counts 1 and 2 up at the Oregon-Washington border way before he's

14  locked the dead bolt on her in the cell.  The cell is just a way

15  that he is continuing to commit the crimes.

16       Count 3, kidnapping of AV-2.  On or about May 6th,

17  2023, in the District of Oregon, Mr. Zuberi unlawfully and

18  willfully -- first element, same as Count 1 with AV-1 -- seized,

19  confined, decoyed, kidnapped, abducted, or carried away AV-2.

20  And like AV-1, AV-2, too, found herself in that Honda Pilot,

21  decoyed into thinking she was getting a ride from a nice guy,

22  decoyed by the Maps app on the phone that he showed her to try to

23  convince her he was just taking her to Jay's house but they had

24  gotten lost.  And when she screamed, he pulled over, that's where

25  the tase -- tasing happened, the punching, the cuffing.  These

1   are all different ways that he seized and confined her, and then

2   kidnapped, abducted, and carried her away back to the garage.

3   First element of Count 3 is met.

4        Second element, that he held AV-2 against her will, is

5   quickly met, too.  AV-2 had had a long day working at the

6   restaurant on Cinco de Mayo.  She barely wanted to go out with

7   Jenny that night, let alone be held and hurt by this man for 13

8   hours, 13 hours straight, almost all that time spent in the dirty

9   Honda Pilot.

10       The Ruelas's, remember meeting them, Christina Ruelas

11  was the mom, Geo was the son, Nayeli was one of the many

12  daughters, they all knew it as soon as they saw it.  Jenny, her

13  best friend, knew it as soon as she saw it.  The doctor at the ER

14  knew it as soon as he saw it.  Someone had hit her.  Someone had

15  put hands on her and caused injuries to her.  Undisputed.

16       And those aren't the marks of consensual, joyful sex,

17  either.  She took the stand and told you.  Those are the marks of

18  power, control, and sexual domination.  It's the marks of

19  forcible rape.  That second element is met.

20       The third element is the instrumentalities element

21  again for this one.  Now, since Zuberi did not cross state lines

22  with AV-2 like he did with AV-1, the third element does boil just

23  down to the instrumentalities question, and the answer again is

24  yes.  Like with AV-1, he used the Honda Pilot and the Maps app on

25  his phone as the instrumentalities.  The Honda Pilot is the

1    kidnapping rig.  Once he gets a woman inside, it's his mobile

2    cell on wheels.  It's even equipped with an extra handcuff key in

3    the visor, if you'll remember.

4            And his phone, he used the Maps app to try to calm her

5    down, make her think that they were going to Jay's house, they'd

6    gotten lost.  And law enforcement found in his iCloud the screen

7    shot, they found a screen shot at 1:20 a.m.  That was around

8    seven minutes after leaving The Pikey.  Then agents went and

9    recreated that route from the same point, and that's what you're

10   looking at now on your screen, and it matches exactly the

11   distance, the time from that location to Jay's house.  That --

12   that iCloud account came back to haunt Mr. Zuberi.

13           And there's a third instrumentality used for Count 3

14   with AV-2.  It's the ATM.  He got $300 and stuffed it in her

15   hand.  You remember that?  You heard from a witness from Chase,

16   told you that ATMs aren't just cardboard boxes that dish out

17   money; rather, they connect to the Internet, they connect to

18   out-of-state servers to complete a withdrawal.  That alone is

19   enough.  And that $300, it helped the crime.  Just like that

20   video that they played for you, that rape video, and we'll talk

21   about that in a moment, it's an insurance policy, a little bit

22   extra to keep her mouth shut in case the threats to kill her

23   aren't enough, in case the threats to kill her family aren't

24   enough, in case taking a photo of her ID that sends a message, "I

25   know who you are and I know where you live," in case that's not

1    enough, add a bonus, the $300 could make her look like a sex

2    worker, too, and then people may tend not to believe.  $300,

3    $3,000, $3 million, right, doesn't allow Zuberi to do whatever he

4    wants to AV-2's body.  That last element, Count -- for Count 3 is

5    met.

6          I do want to talk about a couple pieces of evidence

7    related to AV-2.  I touched on that video.  I want to talk about

8    it now.  That video was another way for that man to exercise

9    power and control over her.  He forced her to get up on top,

10   pretend as if he was really attractive, pretend as if she had

11   just enjoyed licking his entire body, and then videotaped it with

12   his phone and told her if she reported it, she'd be publicly

13   embarrassed, publicly humiliated, because other people were going

14   to see her.

15         You got a front row seat for Mr. Zuberi making good on

16   that threat.  He made sure others saw her naked.  He made her

17   fears come true.  Played it in court.  He just hadn't planned on

18   the mountain of evidence telling you exactly what that video is.

19   It's a rape video created by a rapist to silence the victim.

20         AV-2 walked straight down into this courtroom, took the

21   stand, testified regardless of that threat, and told Mr. Zuberi

22   there's no more power and control over her.

23         Another area about AV-2 I want to talk about is the

24   Land Air Sea data.  The Land Air Sea data, went over in detail

25   with the agent.  You'll have some of these on large boards that

1  you've seen throughout the trial.  I'd encourage you to use them.

2  The boards are a compilation of information in a digestible

3  piece, but what this data shows is that Mr. Zuberi, just like

4  AV-2 said, did leave The Pikey, did go out to a rural area where

5  she said she was tased, did then take her home, did then go back

6  out to the rural area where AV-2 said he had to pick up some

7  evidence related to the taser, and then went back to the house.

8  Just like the iCloud, the Land Air Sea pucks, those

9  came back to haunt him, too.

10  And then you heard from Special Agent Kennedy of the

11  cellular analysis, and his analysis of Zuberi's phone was

12  consistent with the same -- same movement in the middle of the

13  night and in the middle of the morning going back and forth

14  between the house and the rural area.

15  Another area I want to touch on, AV-2 told you how

16  Zuberi said some weird things:  wanted to impregnate a lot of

17  women, have kids with them, make them part of his army.  She

18  heard him say it.  And then his writings that are found in his

19  house say the same thing.  He wants to raise an army.  He's got a

20  target list of women right under -- underneath it.  That's not a

21  coincidence.

22  I want to touch on what AV-2 said to her friends and

23  the doctor right after she reported.  Does she lie?  Does she

24  tell them some fictional female friend did this to her, tased her

25  and hurt her and punched her?  Of course she does.  That's what

1    extreme threats, humiliation, fear does to a person.  There's not

2    many more ways that a man can break a woman down physically,

3    psychologically, emotionally than what he did to her.  So, yeah,

4    she didn't report exactly who did it right away, she didn't talk

5    about the rape and the sexual assault right away.  Of course she

6    didn't.

7            Watch AV-2's unvarnished, pure reaction when she

8    finally learns that Mr. Zuberi's in custody.  Watch the relief

9    wash down over her, watch the raw emotion spill through.

10           (Playing video)

11           Earlier, I said there were six things that were the

12   same about what Zuberi did with AV-1 and AV-2.  I'm going to give

13   you ten more, rapid fire.  Both women, 21 years old last summer,

14   small in stature, easier to take over, to borrow his phrase.

15   He's preying on people he thinks are weak, preying on people he

16   thinks are vulnerable, and he misjudged big time with AV-1 and

17   AV-2.  Lured both women into the Honda Pilot, late night hours.

18   Asked both women their Zodiac sign.  They both told you that.

19   Made sure both women knew he had a firearm.  Said he was a police

20   officer to both women.  Told them both -- both that their

21   cellphones wouldn't work and denied access to their cellphones.

22   Both saw Zuberi doing something with tinfoil in the Honda Pilot.

23   AV-1 couldn't tell exactly what it was, but he said it was a

24   police trick.  AV-2 saw him wrapping her phone and battery in the

25   tinfoil.  And then tinfoil's recovered under the Honda Pilot and

1  in the trailer.  Both said they had to pee in a bucket in the

2  garage.  Both described Mr. Zuberi's statements that he made to

3  them about his intended sexual plans:  AV-1, that she was too

4  precious, can't afford to hurt her; and AV-2, wasn't sure whether

5  to send her with the other girls or keep him for herself (sic).

6  And then the tenth additional one in addition to those six, the

7  tenth one, they both saw cinder blocks stacked in the garage.

8  AV-2 saw them stacked over near the wall, AV-1 saw them stacked

9  all around her.

10         A look at 2022 and 2023 shows what common sense also

11  shows, and that is that this man did not just walk into an Irish

12  pub in Klamath Falls on May 6th -- May 5th one night and all of a

13  sudden a kidnapping light bulb went off in his head, all of a

14  sudden he had a spontaneous urge to kidnap that night.  No.  That

15  idea formed beforehand, and the evidence shows his intent and

16  planning.

17         September 2022, looking for a taser for sale that

18  shoots, not a stun gun.  December 2022, cell jammer for $398.

19  Zuberi says, "I'm buying that shit," and he does.  January 2023,

20  buys the taser, Amazon.  Later in January, asks about building

21  concrete blocks for an underground house.  1st of February, he's

22  focused on prison and jail floors, not music studio floors, not

23  root cellar floors; prison jail floors.  March, he's buying

24  police patches.  April, wants to build a block structure without

25  making it permanent, make sure it's going to be strong enough so

1 that a person cannot destroy it with their hands.  Two days after

2 that, he's at Home Depot, 76 cinder blocks purchased there.  Same

3 month, in April, buys three pairs of handcuffs.

4          So when he goes to The Pikey on May 6th, he's already

5 had the taser, the jammer, the handcuffs, the firearm from

6 Prentice Smith, he's already been thinking and planning about the

7 concrete structure, he's already been thinking and talking about

8 prison and jail floors, about a place that a person cannot break

9 with their hands.

10          And May 15th, after the AV-2 kidnapping, after when

11 AV-2 can't walk in those stiff silver cuffs, remember that, he

12 had to throw her over his shoulder in the fireman's carry and

13 walk her around.  Then he adapts.  You can see him adapting,

14 evolving, learning.  Leg irons are purchased less than two weeks

15 after that.

16          And then after realizing it's difficult to keep a woman

17 locked in the car in the garage, he gets really busy at Home

18 Depot, 11 different times, sometimes more than once on the same

19 day, Home Depot, Home Depot, Home Depot, it continues.  Cinder

20 block by cinder block, he's building the cell, and very soon

21 after having trouble keeping AV-2 in the garage.  Double-key dead

22 bolts June 26th and 29th speak for themselves.  That cell's

23 timing and the design, it tells you what it's for.  There's no

24 door handles, there's no doorknobs.  It's just locks.  That's not

25 a design flaw, an architectural miscue by Mr. Zuberi.  That's an

1    intentional, purposeful design.  And then keep in mind, it's

2    created by the same mind who created the "Operation Take Over"

3    plan:  power, control, sexual domination.

4            July 7th, he's up to Aurora Avenue up in Seattle.

5    July 10th, he's at the mechanics, he's getting the kidnapping rig

6    seaworthy for the big trip.  The last thing he wants to do is

7    break down on the side of the road with a woman bound in the

8    back.

9            So seen in full context, it's easy to understand that

10   AV-1 and AV-2's kidnappings did not happen spontaneously.  They

11   developed over time.

12           We know this, too, from his writings, the "Operation

13   Take Over" note.  You know that "Operation Take Over" note.  You

14   know what should have been the first step in "Operation Take

15   Over"?  Don't write "Operation Take Over" down on a piece of

16   paper in blue pen and then end up keeping it in the bedroom night

17   right next to where he sleeps.  Why?  Because if he does that and

18   if people find it and read it, like we all have, then we're all

19   going to know what he's been thinking about.  All right?  Then

20   we're all going to know what he's been planning.  We're all going

21   to know and get to see some of the intimate thoughts that have

22   been swirling around in Mr. Zuberi's head.

23           And those simple words on that plan, they need no

24   deciphering, no decoding.  The United States has never come up

25   here and said this is some kind of a multi-point, Ph.D.-level

1    kidnapping plan.  It's not, but it's telling in its simplicity.

2    And the target list with the women in their 20s, raising an army,

3    those writings show his intent, his preparation, his planning.

4    You get to see a window straight into his head.

5            Counts 4 through 7, these are the felon in possession

6    of firearms and ammunition counts.  And these charges have four

7    elements to them, but the good news is, you only need to focus on

8    one.  And the one to focus on is whether or not he knowingly

9    possessed any or all of the firearms and ammunition that are

10   listed in each of those counts, and that's your only inquiry.

11           The parties have agreed that the other elements, which

12   I'll just touch on very briefly, are already established.  The

13   other elements are that the firearms and ammunition had

14   previously been shipped in interstate commerce, that Mr. Zuberi

15   had previously been convicted of a felony, and that Mr. Zuberi

16   knew that he had previously been convicted of a felony.  Those

17   last three elements, those are conclusively established by

18   agreement of the parties.  You don't need to consider those.  So

19   your only inquiry comes back to that first one, did he knowingly

20   possess them.

21           Let's go to Count 4.  That's the Springfield

22   9-millimeter that AV-1 took out of the garage, which was

23   recovered from her.  Again, it matches the firearms case that's

24   in the master bedroom by serial number, make, and model; had

25   Prentice Smith paperwork inside.  You may recall Prentice Smith

1    came to the stand and said that these guns were his and

2    Mr. Zuberi had them, and he attempted to get them back, and

3    Mr. Zuberi didn't give them back.

4         The 9-millimeter has Mr. Zuberi's DNA on it to a very,

5    very, very high likelihood.  The 9-millimeter has distinctive red

6    optics on it, the sight, as you can see in this photograph.  And

7    here's a still photo from Zuberi pointing a gun in one of the

8    selfie videos that he took that had the same red sight and the

9    same distinctive profile as that Springfield 9-millimeter.

10        The kitchen Blink cameras, you might remember those,

11   where he's running around, taking someone's phone, peering

12   through the blinds.  He's got a firearm by his side.  There's

13   photos of the Springfield pistol in his iCloud.  There's messages

14   in there saying, "I got these Springfield XD."  He's guilty of

15   Count 4.

16        Count 5, these are the guns and ammunition that are

17   found at the trailer.  Same thing.  They're the guns that Zuberi

18   kept from Prentice.  All three firearms in the trailer have his

19   DNA to a very, very, very high likelihood.  There's a photo of

20   them in his iCloud.  There's discussions that are in exhibits

21   about him trading the shotgun, trading the AR-15, and having

22   6-millimeter ammo.  Those aren't Prentice's guns anymore.

23   They're Zuberi's property now.

24        And the trailer's no doubt Mr. Zuberi's, right?

25   Paperwork of his was found, paperwork is found, a video was

1 found, a selfie photo of himself inside was found.

2      Alycia Westfall doesn't even know the gate pass code,

3 right?  You remember that call.  Real quick, play it.

4      (Playing audio)

5      He's guilty of Count 5.

6      Count 6, that's the ammunition that are in the cans,

7 ammo cans, and the closet in the master bedroom, found on his

8 side of the bed where the "Operation Take Over" note was.  One of

9 those ammunition cans has a signature of Mr. Zuberi's item in it,

10 handcuff key, and the key to the black security door.  Some of

11 the ammo boxes in the closet are right next to his police

12 patches.  He's guilty of Count 6.

13      Count 7, this is the ammunition on the workbench in the

14 garage right next to the cell he built, same workbench with the

15 handcuffs and the leg irons, same workbench with the drill, with

16 the drill bit in it.  It's his garage, his cell, his workbench,

17 his ammo.  He's guilty of Count 7, too.

18      He's guilty of all those firearms and ammunition

19 counts, which are Counts 4 through 7.

20      "Lots of reasons to say it's a guarantied conviction."

21 Not my words, his.

22      (Playing audio)

23      Another area of evidence that cements his guilt, and

24 that's what he did in the hours after AV-1 escaped.  "Operation

25 Take Over" did not have a contingency plan for what to do when a

1   woman breaks out of the cell, bloody, runs out into the streets

2   with his gun.  Keep in mind, too, at that point in time,

3   Mr. Zuberi is exhausted.  He's been going at a rabid pace.  He

4   burned a lot of energy just driving all the way up to Seattle,

5   kidnapping a woman, raping her, driving her back.

6           And so after AV-1 escapes, you hear what happens.  You

7   hear from neighbor Carlos Garcia.  Remember him?  He confirms the

8   screams for help.  He tells exactly what was happening outside

9   1336 after AV-1 escaped.  It's frenzied.  Zuberi leaves in the

10  Honda Pilot, comes back.  Cars going back and forth, switching

11  around, and then Zuberi and the family are gone.

12          And then Zuberi tried to get rid of evidence, tried to

13  stash stuff in the trailer, tried to clean -- clean up his

14  crimes, but there's just not -- not time to clean up all that

15  evidence.  He can't just snap his fingers, get rid of that

16  five -- five-ton cell that took him weeks to build.  It took

17  Kevin and Brenden Westfall hours, and that was two people with a

18  sledgehammer and a trailer.  Not to mention the scene it would

19  cause if Mr. Zuberi tried to take that thing apart.  Neighbor

20  Carlos Garcia, he'd be outside.  There wouldn't be a blade of

21  grass left in his yard.

22          There's no time to find all the blood stains, wipe them

23  away.  It's hard to remember where he stashed the purse, the

24  phone, the shoes.  Which notebooks did he write stuff down in?

25  What's he going to do with the expensive cell jammer and the

1    taser?  He can't just throw those away.  Those are valuable.

2    There's not enough time to deep clean the Honda Pilot.

3           And what about the digital accounts, the iCloud, the

4    Land Air Sea trackers, the Garmin GPS, the cellphones, the Blink

5    cameras?  There's no time to scrub all that.

6           It's impossible to go around and track down all the

7    places where surveillance videos have caught him in different

8    towns, cities, and states, places like Portland at the Safeway;

9    places like Woodland, Washington; places like Love's in Klamath

10   Falls; Merrill, Oregon; Tulelake, California; Home Depot; and

11   The Pikey.

12          He can't make all of his Amazon purchase history just

13   disappear, his credit card records vanish.

14          Mr. Zuberi has gone so deep for so long down this

15   kidnapping rabbit hole, that when it all comes crashing down,

16   there's only a fraction of time to do much, because on July 15th,

17   as AV-1's at the KFC, Mellissa "The Riveter" Geary is calling

18   911.  The clock is ticking and police are about to come knocking.

19          There's only time for one thing and one thing only:

20   run, run, and never come back to 1336 North El Dorado.  And

21   that's exactly what he does:  run to the trailer, buy the bleach,

22   go back to the trailer twice, look up flights to New York, look

23   up flights to Turkey, head down to California for the night, meet

24   up in Merrill, stash a car, and then get out of town and get to

25   Reno.

1    Let's end where Mr. Zuberi's crimes end:  Reno.  His

2  words and actions in that Wal-Mart parking lot confirm his guilt.

3  In Reno, you're seeing reality catch up with a man.  You watch as

4  he realizes he's left a dump truck of evidence behind him.  He's

5  desperate, he's caught red-handed, he's completely out of

6  options, and he just can't even help it.  He blurts it out:  "I'm

7  fucked."

8    The cutting, refusal to get out of the car, saying his

9  life is over, just wants to leave the country, sending his phone

10 to meet its maker in the hot Reno concrete, those are the words,

11 those are the actions, that's the conduct of a man who knows

12 exactly what he's done.

13   Find him guilty of all of those firearms and ammunition

14 counts, Counts 4 through 7.  Find him guilty for what he did to

15 AV-1.  Find him guilty for what he did to AV-2.

16   Thank you.

17   THE COURT:  All right.  Thank you, Mr. Lichvarcik.

18   We will take a morning break for 15 minutes, then we'll

19 hear from the defense.  Thank you.

20   (Jury leaving courtroom:  10:26)

21   THE COURT:  All right.  We'll be in recess until 10:45.

22   (Jury not present)

23   (Recess:  10:26 - 10:48)

24   THE COURT:  There are some corrections that need to be

25 made.  It's my understanding that the Government is pointing out

1    to Mr. Svelund with regard to Count 1, I gave dates July 14th to

2    July 15th, 2021, and that needs to be corrected to 2023.

3           And then is there another correction regarding the

4    stipulations?

5           MR. SWEET:  Your Honor, there was -- excuse me.  There

6    was a -- a limited variance between the stipulation that Your

7    Honor read either yesterday or the day before and the one that

8    was read today into the final, and it has to do with sort of the

9    phrasing of his prior felony conviction, whether he had been and

10   knew that he had been or similar language.

11          Your Honor, both have been now read.  The second

12   version is the one that's in the jury instructions.  The

13   Government presented additional evidence during the case

14   regarding that.  We're not concerned about it.  We just wanted to

15   let the Court know that there was a variance.

16          THE COURT:  Okay.  Sorry that we -- I think we may have

17   got confused as to which one we were using, obviously.

18          With regard to instructions, does the defense have any

19   concerns?

20          MS. POTTER:  No, Your Honor.  I heard the 2021 as well,

21   so we would request that.

22          I do have another request, though, Your Honor.

23          THE COURT:  Okay.

24          MS. POTTER:  Your Honor, Mr. Zuberi has advised us that

25   he wishes to testify and he -- well, he would like to testify.

1       THE COURT:  Okay.  Mr. Zuberi, the clock has run on

2   that.  I'm sorry.  We had that discussion yesterday.  It was on

3   the record.  I asked you if you had discussed this matter with

4   your attorneys.  You said you had.  I asked your attorneys, I

5   believe, if they had a discussion with you about the issue, and

6   they had.  I asked you if you needed any further time to speak

7   with them about your right to testify or not testify, and you

8   said no.  I advised you that you had a right to testify or not

9   testify.  And then I asked you if you wished to testify in this

10  case or not testify, and without hesitation, you unequivocally

11  said, "I will not testify."

12      Your attorneys then clarified with me that they would

13  be resting, that they had no further evidence to present to the

14  jury.  I had a discussion with your attorneys about whether they

15  wanted me to tell the jury that or whether they would.  The jury

16  came back out.  Your attorneys, I believe it was Mr. Bertholf,

17  said that the defense was resting.  And at that time, I told the

18  jury they had heard all of the evidence that will be presented in

19  the case, and that tomorrow morning, this morning, we would be

20  instructing the jury and going into closing statements.

21      We've now instructed the jury, we've gone into close --

22  the Government's closing statement.  This is not a time where I

23  can take additional evidence.  It doesn't -- it doesn't work that

24  way.

25      The reason why we had that discussion yesterday was to

1   determine whether you would testify.  I realize you may have

2   changed your mind at this stage, but you've changed your mind too

3   late.

4           THE DEFENDANT:  My attorneys told me that I -- I

5   would -- I could wait, because we -- I wouldn't be testifying

6   tomorrow even if I decided to.

7           THE COURT:  They did not tell you that.  We had a very

8   clear conversation about your right to testify in this case, and

9   you said you did not want to testify.  You didn't say, "I don't

10  want to testify today."

11          THE DEFENDANT:  I -- I said that because they told me

12  that that's the best thing to do, but I wanted to testify before

13  they told me that, and they just persuaded me not to.  I would

14  like to testify.  If you could please allow me that, please.

15          MS. MILES:  Your Honor, if I may.

16          THE COURT:  Yes.

17          MS. MILES:  So in a review of the case law that

18  controls this, my understanding is that the decision whether or

19  not the Court will allow a defendant to testify at this stage in

20  the proceeding is governed by a four-part test, and I think that

21  may be of aid to Your Honor.

22          THE COURT:  I think it would be.

23          MS. MILES:  Okay.  So -- so the four-part test is --

24  the first factor is the timeliness of the defendant's motion.

25  Obviously this is late in the game.

1    There are other instances where defendants have asked

2  to testify after the jury has already stated that it received a

3  verdict but hasn't yet reported the verdict.  There are cases

4  where a defendant has made a request at this point in the trial

5  as well, and so timeliness is one of the things for the Court to

6  consider.

7    The second is the character of the proposed testimony.

8  And so I think Your Honor is fully within its right to ask for a

9  proffer of what the testimony is for you to be able to evaluate

10  whether that testimony is properly coming in, whether it's

11  admissible at all.

12    The third factor is the disruptive effect on granting

13  the motion.  And obviously everything that Your Honor has already

14  talked about in terms of the colloquy about the voluntariness of

15  the waiver is relevant to that factor.

16    The fourth is whether the defendant has offered a

17  reasonable excuse for the untimely request.  And I think Your

18  Honor has just heard Mr. Zuberi's excuse for it.

19    But those are all factors that this Court can and

20  should take into consideration in exercising its discretion

21  whether to grant the motion.

22    THE COURT:  All right.  Does the Government have a

23  position?

24    MS. MILES:  The Government does not have a position,

25  Your Honor.

1          THE COURT:  Okay.  Well, Mr. Zuberi, prong two of this

2     test is for me to make some assessment of the proposed testimony.

3     What is it you would plan on testifying about?

4          THE DEFENDANT:  Testifying about AV-1 as well as AV-2

5     and what happened, my -- my version of the story, and -- and just

6     who I am as a person and the things like that.

7          THE COURT:  Okay.  Let's take a short break.  And I

8     need to give some thought to the matter.  We'll be in recess for

9     five minutes.

10          (Recess:  10:55 - 11:03)

11          (Jury not present)

12          THE COURT:  All right.  I have gone over the colloquy

13     that occurred yesterday when I discussed with Mr. Zuberi his

14     right to testify in this case.  We discussed whether he had a

15     need to discuss the matter further with his attorneys.  He said

16     no.  His attorneys had discussed the matter with him.

17          I asked him very specifically whether he wished to

18     testify or not testify.  I advised him that he had a right to

19     testify if he so chose, and he very clearly said he did not wish

20     to testify.

21          So today after closing statements and instructions,

22     closing statements of the Government and instructions, he now is

23     telling me that he was persuaded by his attorneys to not testify,

24     which is, of course, certainly common.  Attorneys often persuade

25     their clients not to testify.

1       Mr. Zuberi has now changed his mind, but he's changed

2   his mind too late.  I think this is, in fact, a ploy to disrupt

3   the case in some appellate manner, because Mr. Zuberi has never

4   had any problems asking me to do something.  He could have easily

5   have done this yesterday.  He could have done it this morning

6   before we began closing statements.

7       Mr. Zuberi has asked me in the past to appoint him new

8   counsel, and I've done so.  He's asked me to move him to

9   Sheridan, and I've done so.  He's asked me to move him back to

10  Jackson County, and I've done so.

11      He could have easily asked if, in fact, he had changed

12  his mind about testifying, to have contacted the Court yesterday

13  afternoon after we broke early and sent the jury home.  He could

14  have contacted me this morning before we had closing statements

15  of the Government, but instead, he chose to listen to the

16  Government lay out the Government's case against him, and he's

17  now asking me to allow him to rebut that by allowing him to

18  testify.

19      I do think that's inappropriate given the timeliness of

20  his motion.  I think it does have a disruptive effect on the

21  case, because it would require really the Government to then give

22  another closing statement.  I mean, this closing statement means

23  nothing if we just continue to add or present new evidence to the

24  jury.

25      At some point, there is a finality to the evidence.

1   That finality was very clear yesterday when the defense rested.

2   There was no surprise here, because in our colloquy outside the

3   presence of the Government, the defense made it very clear to me

4   in front of Mr. Zuberi that they would be presenting no more

5   evidence in the case.

6         There is no reasonable excuse other than Mr. Zuberi has

7   heard the closing arguments of the attorneys and now has second

8   thoughts about his decision.

9         So in weighing the four factors, the timeliness of the

10  motion weighs against Mr. Zuberi, the disruptive effect weighs

11  against Mr. Zuberi, the reasonableness of the excuse weighs

12  against Mr. Zuberi.  The character of the proposed testimony, you

13  know, yes, Mr. Zuberi wants to now say this is what actually

14  happened in light of the Government's closing statement.  He also

15  wants to talk about his -- what kind of person he is.

16        That testimony would open the door to the sexual

17  assault that occurred in California, requiring the Government to

18  bring forward a young woman who so far has not testified in this

19  case to talk about a sexual assault that occurred a number of

20  years ago.  So far, we've sterilized that only to the fact that

21  Mr. Zuberi has a prior felony conviction for purposes of the

22  felon in possession of a firearm counts.

23        So the character of the evidence, other than a denial

24  of the allegations, seems to me that Mr. Zuberi wants to present

25  the kind of person he is, which would open the door to a whole

1    host of issues that would have to be resolved evidentiary-wise,

2    it really would require a whole new -- well, it would require

3    rebuttal evidence, it would require witnesses from -- I believe

4    from out of state having to appear, and I believe it would put

5    the Government in a position where their closing statement that

6    they've just spent an hour and a half on in front of the jury

7    would be now rendered meaningless, and we'd have to start that

8    work.  I suppose I'd have to ask the jury to disregard the

9    Government's closing statement, because they haven't heard all

10   the evidence, and that's just not the way we conduct trials.

11          There is a reason why we have colloquies, careful

12   colloquies to make sure the waiver has been made intelligently,

13   knowingly, and voluntarily, and I believe Mr. Zuberi's waiver was

14   made under such conditions.  I realize he's had a change of

15   heart, but that decision has come too late.

16          So I am going to deny the motion to reopen the case and

17   allow Mr. Zuberi to testify.  So we will go into the closing

18   statement of defense.

19          Anything else that needs to be said on that issue?

20          MS. MILES:  No, Your Honor.  Thank you.

21          THE COURT:  All right.  We'll bring in the jury.

22          (Jury entering courtroom:  11:10)

23          THE COURT:  All right.  Please be seated everybody.

24          Folks, thank you.  I apologize for the delay.  I had to

25   address some legal issues.  I also need to just clarify, in the

1    instructions I read, I misread dates on Count 1.  That is

2    regarding one of the counts regarding AV-1.  I read the dates out

3    under the elements as July 14th to July 15th, 2021.  The correct

4    date is July 14th to July 15th, 2023.  So I want to make that

5    correction.

6            But with that, we've heard from the Government.  We

7    will now hear closing statements from the defense.

8                    **DEFENDANT'S CLOSING ARGUMENT**

9            MR. BERTHOLF:  If it please the Court, counsel.

10           Reviewing the evidence:  Both sides are asking you to

11   review the evidence in this case in a careful and impartial way.

12   Use your reason and your common sense.

13           Beyond a reasonable doubt is a high burden for the

14   Government to reach.  Look at each individual piece of evidence

15   to determine if that evidence, testimony submitted to you

16   throughout this trial from the Government and from our

17   questioning as well, does that piece of evidence, does that

18   testimony show guilt of Mr. Zuberi for the crime or does that

19   testimony or evidence show innocence.  Those are the pieces of

20   evidence that we're asking you to consider.

21           There's a lot of evidence in this case and testimony

22   that doesn't show whether or not Mr. Zuberi kidnapped either AV-1

23   or AV-2.  There's a lot of evidence and testimony about things

24   like some property in Bonanza, about the firearms from Mr. --

25   from Prentice Smith, all sorts of things that do not have

1    anything to do with whether or not he kidnapped either of those

2    two women.  You got to ask yourself why, why is this evidence

3    that has no bearing on whether or not Mr. Zuberi kidnapped these

4    women.

5         His writings don't show whether or not he did those

6    acts or not.  Those writings, some of them we don't even know

7    when they were written.  The Government wants you to think that

8    that's a plan.  If that was the plan, it sure wasn't followed.

9         Weigh the facts, not your emotions, not your sympathies

10   or prejudices or anything against Mr. Zuberi or anybody else in

11   the courtroom.  This case is not about anything other than the

12   credibility of AV-1 and AV-2.

13        As my co-counsel, Ms. Potter, told you at the beginning

14   of this case, this is a case of Government overreach.  They

15   brought in all of these other things that really had nothing to

16   do with the case.  Whether or not he subleted his house

17   unlawfully, not at issue here.  It's nothing to concern you.  It

18   doesn't show anything.

19        The Government talked about a lot of the things that

20   are similar between the stories, but there's a whole host of

21   differences.  With AV-2, she says that he forcibly anally raped

22   her.  AV-1 says when he tried to do that, she told him no, and he

23   stopped.

24        He hired AV-1 and he met AV-2 at a bar.  He underpaid

25   by $30, only $100, to AV-1, but just a couple months before, he

1  offers $300 for -- hands her $300.  Seems like an overreach

2  there, because she is not a sex worker.  That's another

3  difference.  One's a sex worker and one's not.  He took a video

4  with AV-2.  No videos.

5          He beat -- supposedly beat AV-2, punching her

6  repeatedly 20 times, smashing her in the head and the forehead

7  with a firearm.  No -- no mention of anything like that with

8  AV-1.

9          AV-1, he doesn't put in his contacts.  He puts AV-2

10  into his contacts list two days later.  I'll talk about that in a

11  little while.

12          AV-1 is a long distance and tried to make it, she says,

13  no witnesses.  There's a whole host of witnesses with AV-2.  Lots

14  of differences.

15          He -- she (sic.) supposedly used the taser on AV-2, but

16  only threatened AV-1.  He supposedly threatened AV-1 with the

17  gun -- or she -- he didn't even threaten her.  Showed her the

18  gun, but shot a gun with AV-2.

19          So AV-2, I want to start with her.  Her story is that

20  she's out on Cinco de Mayo, misses a ride, and is now looking for

21  friends to give her a ride.  She turns down a cab ride from some

22  unknown guy.  After only two drinks, somehow passes out and wakes

23  up in Mr. Zuberi's vehicle.

24          He supposedly tases her, fires a gun out the passenger

25  window, and then rapes her, takes her down the road, comes back,

1    rapes her again, takes a video after 12 hours of being brutally

2    beaten and raped, and then is taken home.

3            How do we know that her story doesn't make sense?

4    First of all, her clothing.  If we could put up Exhibit 425.  The

5    Government received her clothing that she was wearing that night,

6    I believe the flannel shirt, the jacket, pants, and shoes.  She

7    says that she was shot with a taser through this flannel shirt.

8    She did testify she was not wearing the jacket.

9            We heard from the taser expert about tasers.  And

10   tasers are barbed hooks kind of like fishing hooks.  If you've

11   ever gone fishing, you know what a barbed hook will do if it's

12   caught in flannel.  Now, you can remove a barbed hook from

13   flannel if you do it very carefully and not cause damage to that

14   flannel.  That's not what she says happened, though.  She says

15   they were ripped out of her.

16           The Government had this flannel shirt, still has it in

17   its possession.  It's never been tested, it's never been

18   reviewed.  If her story holds water, there would be holes in that

19   shirt.

20           She also testified and looked at evidence that she had

21   three entry wounds from a taser, that she testified that three or

22   four taser hooks came flying out of that taser at her.

23   Impossible.  It doesn't happen.  You heard from the expert, there

24   are no tasers, at least the taser that was found, that type of

25   taser does not have more than two barbs coming out.

1     She described being punched over and over and over and

2   over again 20 or more times, punched in the head, punched in her

3   neck, punched in her ribs, the ribs where she was supposedly

4   tased through clothing that apparently weren't examined.

5     She testified that a gun was fired out of this vehicle,

6   she's in the -- in the middle seat, and a shell casing lands on

7   her and burns her.  She's wearing these jeans.  You can look at

8   this picture and see if there's a burn mark on those jeans.

9   There isn't one.  If she was burned on her leg, it's the only

10  evidence -- only injury that she did not document.

11    And granted, she had some injuries, but they don't

12  match up with what she claims Mr. Zuberi did to her.

13    She claims that he pistol whipped her repeatedly, that

14  he hit her forehead with the barrel of this firearm, that he

15  smashed her nose repeatedly with the butt of that firearm.  She

16  told you that blood was streaming down her face, that blood was

17  in her eyes to the point where she couldn't see and she's wiping

18  it off.  However -- if we could bring up 528 -- she took a

19  photograph of herself.

20    And you heard from the doctor.  The only injury that he

21  noted on her head was the contusion, the bruising behind her ear.

22  The injury to her lip, he described as an abrasion, nothing that

23  is going to actively bleed.  He described some of the other

24  wounds on her face as acne.

25    What we don't see is any sort of laceration, a cut in

1    common parlance, as the doctor said.  We don't see any wound that

2    is open to the point where it's going to be bleeding.  The doctor

3    examined her head.  Did not find any bumps or abrasions or

4    anything on her head.

5         She told you that she told the doctor that her ribs

6    were feeling like they were poking out and hurting.  He says,

7    "She was describing to me exterior chest wall discomfort."

8         Her injuries do not match up with what -- her lack of

9    injuries is what it is.  It's her lack of injuries.  They don't

10   match up to what she says that Mr. Zuberi supposedly did to her.

11        And then we get to her story at the house.  You've seen

12   the pictures of the house.  We went through the search of the

13   house ad nauseam through several witnesses for -- again, this is

14   the Government overreach -- the only place where evidence was

15   found was in his bedroom and in the garage, but we spent a whole

16   long time going up and down the stairs.

17        So she testified that maybe from inside the garage or

18   maybe through the door, not a hundred percent sure, but she was

19   very adamant that she was carried upstairs.  There is no upstairs

20   from the garage.  It's only downstairs.  Maybe it was through the

21   garage, maybe it was through the one door, but certainly not

22   through another door.  She was very clear about that, too.  The

23   only way you're going to get to stairs without going around

24   through the gate and through the stairs on the side of the house

25   is through another door.

1    Mr. Zuberi created a contact for "girl from The Pikey"

2    two days later.  There's only one way that that makes any sense,

3    is if he thought, hey, we might get back together again and

4    interact again.

5    She initially wants to go to the ER, but then decides

6    to leave.  It's unsure if it was because it was taking too long

7    or if she just didn't want to interact with them anymore.

8    Unsure.  The Government and AV-2 want to say that it's because

9    she was so scared, she didn't want to tell the story.

10   And she did tell a different story right away, but

11   Ms. Ruelas, mother of her good friend Geo, she tells that -- the

12   story to her almost immediately.  If she's so scared of telling

13   what she told us, why is she telling the mother of her friend

14   right away?

15   And, again, we -- the doctor only notes on the second

16   day when they go back, only notes bruising behind the ear and

17   then the rib -- and then the sidewall issue.  There's no injury

18   to her head, maybe an abrasion on her face.  And she gets a

19   pregnancy test, she said the next day, her friend said the next

20   week.  She probably did get the pregnancy test, but what's

21   interesting is -- and another difference between AV-1 and AV-2 is

22   she didn't have any concerns about a sexually transmitted

23   disease.

24   She eventually talked to the police.  She was very

25   clear that the first police officer that she talked to was

1  Officer Herbst.  She clearly doesn't like Officer Herbst.

2  However, we know that Officer Young with the Klamath Falls Police

3  Department did try to talk to her on the 9th.

4        Now, the 9th, also significant.  She'd already told her

5  friends, she'd already told Ruelas, but she tells Officer Young,

6  who is there on a report of a kidnapping, tells him, "I don't

7  want nothing to do with you."  Two days later, now she's telling

8  the story to Officer Herbst.  And she continued to avoid contact.

9        July of this year, a year and a half later -- and you

10  got to see AV-2.  She was alert, she was responsive, she

11  understood every question, she had -- you get to establish -- you

12  get to make that determination.  But in July of 2024 when

13  Detective Yahwee wanted to talk to her, she didn't go, because

14  she was sleeping.

15        We do need to talk about the video.  I'm not asking you

16  to watch it again.  If you want to, please do, but I want to

17  summarize.  This video was taken at 1:05 p.m. on the 6th of May.

18  This is after 12 or so hours, if you take her story as absolute

19  gospel truth, it was after 12 or so hours of being horribly

20  beaten, pistol whipped repeatedly, raped anally and vaginally at

21  least twice, and now we've got the video.  She told you it was

22  because she was forced to do it; however, at the very

23  beginning -- oh, and that it's insurance.  However, at the very

24  beginning of the video, you can hear her say, "Please don't show

25  my face."  And we didn't see anybody's face.  We see the outline

1    of a woman's body.  We don't hear Mr. Zuberi say anything other

2    than, "You like that?  You like that?"  Doesn't give her

3    directions.  He doesn't tell her, "Tell me I'm handsome," which

4    is what she said he told her to do.  She says near the end,

5    "You're attractive," asks him to shut it off, and he shuts it

6    off.

7            If it wasn't for the context of her saying that she had

8    this video, that this video was taken, nobody would know who was

9    in that video other than Mr. Zuberi, because I think you can see

10   his face kind of, but you cannot tell who that person is.  It's

11   not a very good insurance policy if you can't say -- see who that

12   person on top of Mr. Zuberi is.

13           Her story is confusing and doesn't make sense and

14   doesn't match up with physical evidence.  There are things --

15   people's testimony can change.  What people tell you can change

16   over time.  People's memories are fallible.  We know that.

17   However -- oh, it's not up there.  It doesn't matter.  The

18   photographs that were taken are things that are immutable.  They

19   are not changing.

20           I don't know what happened and I can't explain it, but

21   at the same time, the Government has to prove to you beyond a

22   reasonable doubt that what AV-2 described to you is accurate and

23   happened; however, they can't do that, because what she described

24   to you didn't happen.  The physical evidence is otherwise.

25           AV-1, very sympathetic young lady.  We don't know her

1   entire life story, but we know that she at least at 18 started

2   doing sex work, and I think maybe the implication is maybe even

3   earlier.  She is a very sympathetic young lady.  She's on the

4   corner after putting on her one-piece body suit, getting her

5   nails done, trying to make money, her pimp just down the road.

6          Mr. Zuberi comes up, they make the transaction, and

7   then she says he whips out this taser, doesn't use it on her,

8   puts her in the handcuffs, and they take off, tells her he's a

9   cop; back and forth from the front seat to the middle seat to the

10  backseat, flopping over the back of the seats, in cuffs.

11         She describes him as being really nice for most of the

12  drive, which is kind of interesting considering that she's in

13  handcuffs supposedly at the time, but he's really nice.  He's

14  treating her decently, letting her play music on his phone.  And

15  then things take a dark turn, and he becomes really mean and

16  raped her again on the side -- raped her on the side of the road

17  and then brings her to Klamath Falls.

18         The fact that he allowed her to use his cellphone is

19  just an interesting fact.  She says that she didn't try to make a

20  911 call or text anybody, because they couldn't find her.  They

21  sure find everybody with the GPS.

22         She says that she saw the cellphone jammer, and she

23  testified that she never saw him touch it throughout the entire

24  time of the ride.  Now, I'm sure the Government's going to come

25  back and point out to you, and I'll point it out to you because

1   it's fact -- I'm not trying to -- I don't want you to hide

2   anything.  I want you to look at everything as an entirety.  The

3   Government's going to come back and say:  Well, yeah, the jammer,

4   you know, we know it was jammed, because both phones went off at

5   exactly the same time, and then Mr. Zuberi's came back on, you

6   know, like, ten minutes later, and hers didn't because she turned

7   it off, but she did tell you also that she never saw him touch

8   it.

9        She -- she saw the jammer.  It was in the middle row

10  seat.  Never saw him interact with it.  So either it was on the

11  entire time of that ride, which we know can't be the case if the

12  Government's theory that it affected both phones at the same

13  time, that it holds water, then his phone would be off the entire

14  ride, and we know that's not the case, because we got all the GPS

15  data and everything else from that.

16       323.  This is the garage.  Over here, we've got the

17  cell -- the door to the structure that's in that garage.  We've

18  got what appears to be maybe an air conditioning unit right here.

19  We've never gotten really any good pictures with the garage doors

20  open looking in.

21       It's kind of hard to say, but we can look at this.  We

22  know it's a two-car garage and we can see that we got the door's

23  coming down.  We know the structure's over here.  We don't know

24  the exact space there, because nobody ever did the measurements.

25  They measured the structure, but they didn't measure the garage.

1     She says that he backed that Pilot all the way into the

2  garage.  So maybe Mr. Zuberi in his effort to clean everything up

3  that the Government wants you to think was going on also

4  rearranged the garage so that it would look like a car can't fit

5  in there.  I don't know where a car's going to fit in there and I

6  don't -- I can't imagine somebody rearranging the garage to make

7  it look like it can.

8     The structure.  She says that she was locked in there,

9  that she had to pee in a bucket.  AV-2 also says she had to pee

10  in a bucket.  Where is the bucket?  They didn't seize this

11  bucket.  If it's so integral to both stories, why -- why did they

12  not seize this bucket?  I believe there's one picture of a white

13  bucket.  AV-2 described, "I think it was an orange bucket."  It's

14  just not there.

15     If we could bring up 38-2.

16     All right.  So these doors, for AV-1's story to hold

17  water, we have this distance here.  It looks like the frame of

18  this door kind of goes right here next to the door jam.  This

19  white door shut, it's going to shut there, we're going to have

20  maybe a hand's width of space between the metal door and the

21  wooden door with both doors shut and locked.  We know that

22  there's this Styrofoam on the inside of that wooden door.

23     AV-1 describes beating on this metal door repeatedly

24  over and over and over and pushing down the metal grating and

25  slamming open the wooden door.

1        Let's bring up 56-1.

2        This is the inside of that door with the Styrofoam.

3   The metal grating is up here, and we know the Styrofoam on that

4   was broken down.  Where did that go?  Maybe that was also cleaned

5   up by Mr. Zuberi.

6        What we don't see, though, is any -- well, there's a

7   minor ding here (indicating), but that metal screen is all the

8   way across that door.  We got this amount of space (indicating),

9   and she's scraping that metal grating down to the Styrofoam and

10  somehow magically only causing one small little dent.

11       56-2.  Now, granted, 56-2 does have a little bit more

12  damage.  Looks like a linear scrape there, but we can see the

13  metal grating.  She describes that she slammed open this door

14  to -- with enough force to break the wooden, because we got the

15  lock's still open, and we've seen plenty of pictures where that

16  dead bolt goes, broken out, but somehow no damage to this

17  Styrofoam.

18       And you don't -- you got to use your common sense and

19  reason in evaluating the testimony.  Special Agent Gluesenkamp

20  even said to open this type door, you kick it.  She said slamming

21  it, but you'd still have to hit it with enough force that that's

22  going to break that wood door jam and yet not enough force to

23  cause any damage to the Styrofoam.

24       Went through a great deal looking at AV-1's nails.

25  They were just manicured.  They're nice and glittery.  She chewed

1   them off, because she needed them chewed off to be able to bust

2   open the door, which that does make sense if that's what

3   happened, but the problem with it is, 35-4, in this photograph,

4   we see placard P, which is a water bottle, placard J, which is a

5   water bottle, placards N, O, Q, and L, which I believe they were

6   some swabbed areas.  What we don't see is any placards showing

7   where even a single glittery nail is found.  No glittery nails

8   were collected.  And, again, I'm sure the Government's going to

9   want you to think that, no, it's just a cleanup job.

10          Let's talk about all the things that Mr. Zuberi would

11   have to have gotten rid of for AV-1's story to hold water.

12   You've got the nails, we got her taser, we have her shoes.  In

13   fact, they said, we're looking for her taser, we're looking for

14   her shoes.  They never find them, not in his garbage, not

15   anywhere else.  Maybe -- I'm sure the Government is going to want

16   you to think he dumped all that stuff somewhere else, but there's

17   no documents that she supposedly saw and there's no pad of paper.

18   We heard from the handwriting expert we can look at the papers

19   underneath.  We don't have that.

20          If it was a cleaning job, it was a very poor cleaning

21   job, because we've got -- he's got her cellphone in his

22   possession.  There's the purse, there's the water bottles,

23   there's everything else.

24          The reason that we don't see those things is not

25   because they were cleaned, it's because they didn't exist.

1        The Government has as evidence of the cleaning job that

2   he bought this bottle of Clorox.  487-1.  They took out the

3   backseat and they see this (indicating).

4        You heard from the crime people that they have ways and

5   means and tools to analyze this gunky mess to determine if it had

6   been cleaned.  The FBI crime lab has the ways and means to test

7   this to see if it's been cleaned.  They were there, they were

8   analyzing this.  In fact, the FBI crime lab person said, "Oh, it

9   looked to me like maybe this was wiped off up here above where

10  the seat was," but didn't use the ways and means that they have

11  to test this.  We don't know what this stuff is.  We don't know

12  what this stuff is, because it's never been tested.

13       Again, this case, as we said at the beginning, is a

14  case of Government overreach.  The stories don't make sense.  And

15  if they don't make sense and they don't match physical evidence

16  that we have that you can see -- look through these exhibits,

17  look through them.  And do the physical evidences match up to

18  what AV-2 and AV-1 told you?  If they don't, the Government has

19  not met its burden.

20       And the Government can't meet its burden, because the

21  stories don't make sense, they don't match up to physical

22  evidence, and as such, because the Government cannot prove these

23  allegations beyond a reasonable doubt, you must find Mr. Zuberi

24  not guilty of kidnapping AV-1, not guilty of unlawful sexual

25  transport, not guilty of kidnapping of AV-2, because he's not

1     guilty, and the State -- the Government cannot prove anything

2     more than wild allegations.

3           Carefully review everything, and I think once you do,

4     you will make those findings of not guilty.  Thank you.

5           THE COURT:  All right.  Thank you.

6           Can we go right into rebuttal?

7           MR. SWEET:  Yes.

8           THE COURT:  All right.  We'll go into rebuttal.  Again,

9     the Government does have the burden of proof, so they do get a

10    chance to rebut.

11          Does anybody need to take a break?

12          Okay.  Mr. Sweet.

13                **GOVERNMENT'S REBUTTAL ARGUMENT**

14          MR. SWEET:  Thank you, Your Honor.  Counsel.

15          What doesn't make sense is that Mr. Zuberi thinks he

16    can kidnap two women, transport one of them across state lines,

17    and rape them and get away with it.  That's what doesn't make

18    sense.  And if Government overreach is the prosecution of him for

19    those crimes, we will do that each and every time, and you can

20    count on it.

21          Let's pull up 32-3, please.  32-3.  Now, could you zoom

22    in on the area of the post?

23          Mr. Bertholf said there's no room in that garage;

24    Mr. Zuberi must have done some rearrangement.  Look at -- look at

25    the hose, look at the flattening of the hose right there.  Now,

1    keep in mind you're looking at this from the door frame, so the

2    depth is going to be impacted.  Look and see if that looks like

3    tires going over that.  That's right where the far tire of the

4    vehicle would be.  There are other photos of that hose in the

5    garage.  You can take a look at it from other angles.  There was

6    plenty of room to park the Honda Pilot.

7            Let's take a quick look at 40, please.  So -- actually,

8    let me start with a different one.

9            56-2.  I'd like to bring up one that Mr. Bertholf

10   pointed out.  Sorry.  56-2.  So Mr. Bertholf talked about it

11   didn't make sense for her to be knocking -- for AV-1 to be

12   pounding and knocking out the metal screen, because it would have

13   damaged the Styrofoam on the interior of the door.

14           What -- what do you see on the outside of the metal

15   screen door?  What did AV-1 describe?  That there was, like, a

16   sandwich of Styrofoam.  There was Styrofoam on the outside of the

17   metal and then on the inside, this what is Mr. Bertholf is

18   talking about, of the white door.  And you can see what is left

19   of the outside of the Styrofoam.  And you can see running up the

20   side of that black frame all the way up, you can see where it was

21   glued or somehow affixed to that metal security door.  And so the

22   Styrofoam that she broke off, that probably took the brunt of the

23   damage.  Mr. Bertholf did acknowledge that you can see some

24   scrapes and scratches in there as well.

25           AV-1 said that it was hard.  She said it was not easy

1    to break through that.  She's dealing with two doors and two

2    pieces of Styrofoam.

3          Now, here's something else.  You know the doors were

4    dead bolted.  She described, for the metal door, getting on the

5    floor with her legs on each side and pulling on the bottom of the

6    door.  If that metal security door wasn't dead bolted, she would

7    have gotten out.  You know that this white door was dead bolted.

8    You can see the dead bolt extended.

9          And now let's take a look at -- let's take a look at

10   43-2.  Look at the door jam.  She broke out the door jam.  The

11   door jam would not have been broken out if the dead bolt was not

12   engaged.  The door would have simply swung open.

13         So the fact that this damage was done proves that she's

14   double dead bolted inside there.  She couldn't get out the metal

15   security door.  She had to -- she had to crawl through it after

16   beating it down, after beating down the grate, and then she was

17   able to kick -- to smash out this wooden door.

18         Now, it's fortunate, it doesn't -- it doesn't look like

19   it -- this was a wooden frame.  The other one was metal.  So she

20   was able to break that out.

21         There's something else.  Mr. -- Mr. Bertholf talked

22   about AV-1 being sympathetic.  How about powerful?  She doesn't

23   want Mr. Bertholf's sympathy, neither does AV-1.  They were

24   powerful.  AV-1 clawed her way out of that cell.  It was her

25   power that let her get out.

1    And AV-2, it was her power and strength that got her
2    out of the psychological cell that Negasi Zuberi put her in by
3    making that video, by threatening her, by beating her.  Powerful.
4    They don't need the sympathy.
5        Mr. Bertholf talked about differences and he talked
6    about how Mr. Zuberi stopped raping AV-1, that when she asked him
7    to not rape her anally, he stopped.  Well, only if he had done
8    that with AV-2, if only.  If only he had let them go when they
9    begged, both of them.  If only he hadn't raped them to begin
10   with.  If only he hadn't told AV-1 to get down and to suck it.
11       There's no points for Mr. Zuberi for only raping
12   somebody one way.  There are no points for tasing one woman, but
13   just showing the taser to the other woman, no points.  No points
14   for firing a gun out the window with one woman, but just showing
15   it to the other.
16       Mr. Bertholf talked about the writings and they're not
17   even knowing the date.  Well, the targets list, we do know the
18   date.  It says July.  We can't see which day in July, and we see
19   2023.  Keeping in mind that the kidnapping of AV-1 was on
20   July 14th.  That is remarkably close in time.
21       Mr. Bertholf also talked about the guns not being
22   involved in the kidnapping.  I assume he's excluding the pistol,
23   which was very much involved in both kidnappings, very much so.
24       And the others, no.  The other three guns that
25   Mr. Zuberi possessed, they're not involved in the kidnapping, but

1    they are involved in the felon in possession of a firearm counts.

2    Don't forget about those counts:  felon in possession of

3    firearms, felon in possession of ammunition.  He has ammunition

4    everywhere.  He's not allowed to have ammunition.  It's very

5    simple.  Mr. Zuberi can't have ammunition.  He can't have guns.

6    He shouldn't have had the gun that he was waving around in the

7    video, that he used in the kidnappings of both women, but he did,

8    and that's a crime.

9           Mr. Bertholf talked about -- he talked about AV-2 not

10   wanting to talk to the police the very first time an officer came

11   out, but he didn't ask AV-2 about that.  He didn't say, "Why

12   earlier when the police came to the door, you know, what did you

13   say, and why didn't you want to talk to them?"  Why not ask her?

14   Let her tell you what was said.  But he didn't ask her.

15          And when -- and when he said she didn't want to meet

16   with the officer, she didn't meet with the officer that one time

17   because she was sleeping, ask her.  Was she sick?  Was she

18   terrified?  Ask AV-2 and let her tell you why.

19          And fear, fear is a funny thing, as is perception, and

20   I want to talk about that for just a second.

21          If you took two people, and one of them had a stopwatch

22   and hit "Start" and pushed someone's head under the water and

23   then let them up, do you think the person who was being held

24   underwater is going to have a different perception of how long

25   than the person with the stop watch doing the holding?

1    Now, how about if the person who's pushing is kicking

2    them, kicking them repeatedly in the ribs, in the head, in the

3    face, and you ask, "How many times were you kicked?"  Do you

4    think the person who's underwater and being kicked is going to

5    view that differently?

6    Do you doubt that AV-2 was assaulted?  Look at her

7    face.  Look at her face.  Look at her injuries.  There was a --

8    there was a significant mark up on her forehead.  It looks like a

9    scab.  Forehead wounds bleed.  People's perception of what's a

10   lot of blood is different.  Some people really don't like blood.

11   A little blood can go a long way when it's on your face.  And I

12   mean whoever the person is who's talking.  When it's on the face,

13   when it's on your hands, it can seem like a lot.

14   And her head was injured.  She had a concussion, and

15   she's terrified, and she's 21.

16   Part of what makes this so difficult is this -- this

17   isn't a pick-pocketing or a cat burglar.  There's -- there's

18   nothing subtle about this.  This is brutal, this is raw, this is

19   in your face.  We're a society where people bump into each other

20   in the grocery store and people say, "Excuse me."  People aren't

21   used to being subjected to a taser in your face and just being

22   assaulted.

23   And AV-2 said she was fighting back.  She said she's

24   punching, sometimes she's hitting the car.  She motioned with a

25   blocking motion.  She said she was trying to hit back at him.

1   She said he shoved her back at one point, maybe she tried to get

2   out.

3           Your memory controls for all this.  Everything you

4   remember is what matters, not what I'm saying, but that -- that

5   was a fight.  She talked about some blows in the head, some blows

6   in the neck, some blows in the ribs.  If she misremembers the

7   count and how many hit her where, please excuse her.

8           Do you think she was trying to tell you what happened

9   to her as best she could?  She said she thought she was tased for

10  five or six seconds.  We know the taser could have gone for up to

11  30 before it would cut off.  Do you think she was trying to

12  overstate that?

13          Christina Ruelas is a nurse, and saw her and looked at

14  her.  Christina Ruelas's son, Geo, looked at her, and he used to

15  work at an ER, and needed to get her there.  And he also said

16  that when she was at the hospital, AV-2 forgot, she forgot that

17  she had the water, she forgot about water.  It didn't make any

18  sense.  She was struggling.

19          Concussions are tough.  Head injuries are tough.  And

20  so to nit-pick that there's not enough blood or -- or the

21  injuries aren't significant enough.

22          You know what else AV-2 had said at one point?  She

23  said something along the lines of, "He poked me in the face with

24  the firearm."  "He poked me."  When she's saying "pistol

25  whipped," it may be different from what most of us are thinking

1   in terms of, you know, either holding it -- just a full-on

2   direct, smashing blow to the skull, but if you're the one who's

3   being hit -- and, again, I'm not talking about you as jurors.

4   I'm talking about the recipient of the conduct.  If -- if -- if

5   you're being assaulted, it feels different when it's you.

6           Look at her face.  Take a -- take a look at 528, the

7   injuries on her face, and then look at the reaction of the people

8   that saw her.  Giovanni Ruelas:  concerned, hospital.  Christina

9   Ruelas:  watched her again, looked at her wrists, looked at her

10  ankles, and looked at her hands.  And then Nayeli, the daughter,

11  her friend, Jenny.  People saw her, they saw these injuries.

12          And as far as the number of taser prongs, she described

13  a yellow and black taser.  Mr. Zuberi had a yellow and black

14  taser in his trailer.  How would AV-2 know that if she hadn't

15  encountered that -- that taser?  How?  She knows it because he

16  used it on her.

17          I want to talk about the cell jammer for just a second.

18  Mr. Bertholf talked about that when Mr. Zuberi picked up AV-1,

19  AV-1 never saw him turn on the cell jammer, and so either he had

20  it on before or, you know, it doesn't make sense.

21          I mean, really?  Mr. Zuberi couldn't have had that down

22  by his left side and as he's driving, just flipped the switch?

23  Remember, it's on/off.  Not complicated.  On/off.  Simple switch.

24  You all can look at it.  That's all you have to do.

25          The fact that AV-1 didn't see him turn it on, I mean,

1    she described seeing the device.  And let's face it, if the -- if

2    we hadn't found it, wouldn't you all be kind of wondering what

3    that was, a giant walkie-talkie thing with spikes?  We find not

4    just one, but we find two, and a GPS jammer on top of it.

5         So the fact that AV-1, who observed and testified to

6    detail after detail after detail, didn't happen to see Mr. Zuberi

7    do that, Mr. Zuberi, there's a lot of things he didn't do right

8    in this case, not just criminally, but he didn't even pull off

9    what he was trying to do in a lot of ways, but he did seem to

10   manage to turn on the cellphone jammer without being detected by

11   AV-1, but then after that, she saw the cellphone jammer, she saw

12   the taser.

13        And as far as the taser, Mr. Bertholf pointed out how

14   AV-1 said that he was often nice during the trip.  Yes, nice in

15   the context of he's pointed a taser at her and said he's a police

16   officer, puts her in handcuffs and leg irons, and she's freaking

17   out at various points along the trip, begging to be let go,

18   unsure of what's going to happen to her, being told that she's

19   valuable and a princess, too valuable to harm.  She's asking him

20   if he's going to kill her.  So in the context of all of those

21   things, yes, she said he was at times nice and polite and engaged

22   in discussion, but do consider the larger context.

23        AV-2 said he engaged in conversation sometimes, too,

24   but he's still beating her, he's still raping them.

25        There were a long -- there's a long list of

1    similarities that Mr. Lichvarcik talked about.  I want to add one

2    more, and it's not a hoodie, it's not a taser.  It's fear; pure,

3    raw fear, the fear that these women experienced at the hands of

4    Mr. Zuberi.

5            And as I say the word "hands," I can't help but think

6    of AV-1's hands and AV-2's hands, injuries caused by their

7    desperate attempts to get away from him or to protect themselves

8    from him, because fear is another commonality, as is pain and

9    trauma, suffering that motivated them in their own way to escape,

10   AV-1 to physically escape, and AV-2 to come up with a story to

11   get him to let her go.

12           And whether it was really the story or the landlord's

13   son that was coming to collect rent and he's in the garage with

14   her, what actually motivated him to let her go, we don't know,

15   but we do know that they have in common fear, pain, suffering,

16   and bravery, because make no mistake, they knew what would happen

17   in court.  They knew they would be questioned.  Nobody likes to

18   speak in public in front of strangers about their bodies.  Is

19   there anything more personal than talking about sexual activity,

20   especially when you're being violated, non-consensual sexual

21   activity?

22           To have to discuss what they did, knowing, AV-1 knowing

23   that she had worked as a commercial sex worker, knowing that was

24   going to come out, and AV-2 knowing that the video was going to

25   come out, and then in spite of that and in spite of the fact that

1    when you're young, you're so much more self-conscious than when

2    you're older, knowing that they're going to have to do that, why

3    would they come in and put themselves through what they did?

4    Why?  To hold that man accountable (indicating).  That's why.

5         I want to point out something else about AV-2.

6    Mr. Bertholf talked about that video, the rape video.  It was

7    made a little after 1 o'clock.  You've already seen it before.

8    She was -- he let her go.  The Chase Bank, I believe that was

9    1:36.  The records are in evidence.  Just about 30 minutes before

10   that was the rape video, and he lets her go not long after Chase

11   Bank.

12        So I want to make sure, because this is what the

13   defense is saying, that on the video she talks about how -- she

14   says something like, "You're so attractive" or "You're

15   attractive."  They are sharing, if you were to believe this is

16   consensual, the most intimate physical experience that humans can

17   have, doing that, and then just a few hours later, she's

18   videotaping her injuries, calling her friend to go to the

19   hospital, and being at the hospital.

20        What changed between just after 1 o'clock and when

21   she's at the hospital?  What changed between just after 1 o'clock

22   and when she's documenting her injuries?  First video was

23   somewhere around 4:30, more to follow that night.  There were

24   just a few hours.  The only thing that changed is she got away

25   from him.

1     This isn't some 20-year marriage with a horrible

2   custody battle and allegations flying.  This is at right around

3   1:05 she's saying, "You're so attractive."  She made really clear

4   on the stand whether she believes that or not, really clear.  And

5   then very soon after, she's documenting her injuries and she's

6   going to the hospital.  The only thing that intervened in there

7   is now she is away from him.

8     The fact that the beginning of the video does not say,

9   "I'm going to make a blackmail video, and when I'm making this

10   blackmail video, I want you to say, 'You're so attractive,'"

11   he's not going to put the directions on it for her, he's not

12   going to capture videotaping of that.  That doesn't -- that

13   doesn't somehow make it not a blackmail video because he didn't

14   title it "Blackmail Video".

15     Mr. Zuberi is not here because he had cellphone

16   jammers, because he collects handcuffs or leg irons.  He's not

17   here because of what he bought.  He's not here because of what he

18   thought.  He's here because of what he did.  It is his actions.

19   That is why he is here.

20     I'm not going to repeat -- I'm not going to repeat the

21   long list of evidence, all the connections, everything that

22   Mr. Lichvarcik put together.  You all have heard this case for

23   over -- for over a week.  You know the evidence.  You have seen

24   the testimony.  You evaluate the testimony.  You evaluate

25   credibility.

1    But Mr. Zuberi, he liked to write, he liked his lists,

2    but he needed another list.  He needed different rules for

3    Mr. Zuberi, and it should start with, "Do not kidnap women", it's

4    a simple rule:  not AV-1 and not AV-2.  That's what he should

5    have had written down:  do not kidnap them; do not point a taser

6    at them; do not put them in handcuffs; do not put them in leg

7    irons; do not do these things, Mr. Zuberi; do not point a taser,

8    whether you discharge it or not; do not beat; do not rape; do not

9    put a hood over their face; do not lock them in a car; do not

10   imprison them in a cell, Mr. Zuberi; do not do those things.

11   That is what he should have written down.

12       He violated their bodies, he violated their freedom,

13   and he violated the law.  Hold Negasi Zuberi accountable.

14       Thank you.

15       THE COURT:  All right.  Thank you, Mr. Sweet.

16       Just some short instructions.

17                    **JURY INSTRUCTIONS**

18       THE COURT:  The verdict form has been prepared for you.

19   After you've reached a unanimous agreement on each count on the

20   verdict form, your foreperson should complete the verdict form

21   according to your deliberations, sign it and date it, and advise

22   the clerk that you are ready to return to the courtroom.

23       The verdict form is pretty self-explanatory.  Count 1

24   is kidnapping.  Your options, of course, are not guilty or

25   guilty.  It does have to be unanimous.

1           If you do check "Guilty", and only if you check

2   "Guilty", you would be then asked to choose at least one of the

3   following to explain which types of conduct your verdict is based

4   on, and you have three different explanations:  one is Mr. Zuberi

5   transported AV-1 across state lines from Washington to Oregon;

6   one is Mr. Zuberi travelled in interstate commerce in committing

7   or in furtherance of the offense; and one is that Mr. Zuberi used

8   any means, facility, or instrumentality of interstate commerce in

9   committing or in furtherance of the offense.

10          I think, David, we have to word it "in furtherance" of

11  the offense there.

12          On Count 2, transportation of criminal --

13  transportation for criminal sexual activity, your options are not

14  guilty or guilty.

15          Count 3, kidnapping, your options are not guilty or

16  guilty.  Again, if you -- there, if you only choose "Guilty", you

17  must choose at least one of the following instrumentalities that

18  you find Mr. Zuberi used in furtherance of that act, and those

19  options are cellphone, motor vehicle, or an ATM.

20          Count 4 is felon in possession of a firearm, and your

21  options are not guilty or guilty.  And if you check "Guilty" and

22  only if you check "Guilty", you'll be asked, "Do you find that

23  the firearm and/or rounds of ammunition were recovered from Adult

24  Victim 1?"  That would be Ms. -- we probably need to clarify

25  that.  That would be (pause) --

1          MR. LICHVARCIK:  AV-1, Judge.

2          THE COURT:  AV-1.  Thank you.

3          Count 5, felon in possession of a firearm, again your

4    options are not guilty or guilty.  And you will be asked, "Only

5    if you find "Guilty", do you find the firearms and rounds of

6    ammunition as to that count recovered from the Prowler trailer?"

7          Count 6, again, felon in possession of a firearm, your

8    options are not guilty or guilty.  And then only if you find

9    "Guilty", do you -- are you asked if the ammunition was recovered

10   from the bedroom of the El Dorado Avenue home.

11         Again, all of you have to agree "No" or "Yes" to these

12   questions.  They have to be unanimous.

13         And then Count 7, felon in possession of ammunition,

14   again, not guilty or guilty are your options.  And you will also

15   be asked there if you find "Guilty", whether the ammunition was

16   recovered from the garage of the El Dorado Avenue home.

17         So that's the verdict form you'll have with you.

18         When you begin your deliberations, you need to elect

19   one of your members as a foreperson who will preside over the

20   deliberations and speak for you here in court.  The presiding

21   juror, foreperson, does not have any greater voting weight than

22   any other juror.  You will then discuss the case with your fellow

23   jurors to reach agreement if you can do so.  Your verdict,

24   whether guilty or not guilty, must be unanimous.

25         Each of you must decide the case for yourself, but you

1    should do so only after you have considered all the evidence,

2    discussed it fully with other jurors, and listened to the views

3    of your fellow jurors.  Do not be afraid to change your opinion

4    if the discussion persuades you that you should, but do not come

5    to a decision simply because other jurors think it is right.

6           It is important that you attempt to reach a unanimous

7    verdict, but, of course, only if you can do so after having made

8    your own conscientious decision.  Do not change an honest belief

9    about the weight and effect of the evidence simply to reach a

10   verdict.

11          Perform these duties fairly and impartially.  You

12   should also not be influenced by any person's race, color,

13   religious beliefs, national ancestry, sexual orientation, gender

14   identity or gender, or economic circumstances.  Also, do not

15   allow yourself to be influenced by personal likes or dislikes,

16   sympathy, prejudice, fear, public opinion, or biases, including

17   unconscious bias.  And we've talked about that.

18          It is your duty as jurors to consult with one another

19   and to deliberate with one another with a view towards reaching

20   an agreement if you can do so.

21          During your deliberations, you should also not hesitate

22   to re-examine your own views and change your opinions if you

23   become persuaded that it is wrong.

24          Communication with the Court:  If it becomes necessary

25   during your deliberations to communicate with me, you may send a

1    note through the clerk signed by any one or more of you.

2           No member of the jury should ever attempt to

3    communicate with me except by a signed writing, and I will

4    respond to the jury concerning the case only in writing or only

5    here in open court.  If you send out a question, I will need to

6    consult with the lawyers before answering it, which can take some

7    time.  You may continue your deliberations while waiting for the

8    answer to any question.

9           Remember that you are not to tell anybody, including

10   me, how the jury stands numerically or otherwise on any question

11   submitted to you, including the question of the guilt of

12   Mr. Zuberi, until after you've reached a unanimous verdict or

13   have been discharged by the Court.

14          If you need to view evidence that is not with you in

15   the jury room, you simply need to let Rebecca know, and she will

16   bring you into the courtroom by yourselves, not with public

17   present or with the attorneys or even myself, to view any

18   evidence.  That includes things like firearm evidence, ammunition

19   evidence, or -- I assume you will have the ability to play

20   videos.  I believe one -- the one video -- there may be one video

21   that we would have to play only in the courtroom for you.  So let

22   us know if there is specific evidence you need to view that you

23   don't have with you in the jury room.

24          Only 12 of you are allowed to deliberate, and this is,

25   I think, always the difficult part about cases where, of course,

1    we're always concerned that if we do not have 12 jurors

2    deliberating, we need to start all over.  So there was obviously

3    at the beginning of this trial a concern that this case would

4    last three weeks.  It -- you know, we are now at week two, the

5    end of week two.  And it is not unusual when I have trials that

6    last even just a few days for us to lose jurors and need those

7    alternate jurors to step in.  I've had cases that have lasted

8    many weeks where we've had six alternate jurors, and we've seated

9    all six for the final 12 deliberating.  That tended to be more

10   during COVID, where we -- it was very difficult to hold on to

11   jurors.

12           You have all remained healthy and with us, on time and

13   attentive, so I appreciate that, but at this stage, I do need to

14   ask the alternate jurors to be excused.  The one odd thing about

15   this, too, is that the alternate jurors I'm still asking not to

16   discuss the case with anybody, not to look up information, not to

17   give up your role yet as a juror.  There are times, and it's

18   happened over the years, a couple of times in my courtroom, where

19   jurors are deliberating and an emergency occurs with one juror,

20   who has to leave in the middle of the deliberations, or in one

21   case, a juror went into early labor during deliberations, and

22   then we needed to call an alternate back and ask them to begin

23   deliberations over.  So the alternates are still on call, so

24   please do not look up information about the case or discuss it

25   with anyone.

1       The alternates are Mary Jo Cremisio.  You.  Yes.

2  Alternate 2 was Jonah Hakanson.  Mr. Hakanson.  Juror Number 3 is

3  Douglas Franklin.  Mr. Franklin.  Alternate Number 4 was Laura

4  Babb.  Ms. Babb.  Yes.

5       I just want to confirm with the attorneys that I've

6  correctly named the alternates?

7       MR. SWEET:  Yes, Your Honor.

8       MS. POTTER:  Yes, Your Honor.

9       THE COURT:  Okay.  So you four are on call.  You are

10  not allowed to express your opinion to the other jurors.  I know

11  that seems a little cruel and harsh, because I'm sure the

12  deliberations are an important piece of this that you were

13  anticipating, but you are not to deliberate with the other

14  jurors.

15       You can say your goodbyes in the jury room, and you

16  will then be -- you are then excused and can leave the

17  courthouse.  Please, though, make sure Ms. Moore knows how to get

18  ahold of you in the event we need you to return.  And certainly

19  if you wish to return if a verdict is reached, Ms. Moore can

20  contact you for that as well if you wish to be in the courtroom

21  at that time.

22       So with that, Ms. Moore, you are now the bailiff.  If

23  you would raise your right hand.  Do you solemnly swear to keep

24  this jury together in some private and convenient place; that you

25  will not permit any person to speak to or communicate with them,

1  nor do so yourself unless by order of the Court or to ask them

2  whether they have agreed on a verdict; and that you will return

3  them into court when they have so agreed or when ordered by the

4  Court?

5       THE BAILIFF:  I will.

6       THE COURT:  All right.  Ms. Pew (sic.) will get you set

7  up.  You'll have copies of instructions, you'll have the evidence

8  in the case.  You can begin your deliberations.

9       You can also set your own schedule.  If you decide you

10  need to take breaks, take breaks, but please deliberate as a

11  group.  Don't have people go out, take a break, and then some of

12  you deliberate while you're not there.  If you feel like you need

13  to break for the day, come back Monday, you need to let us know,

14  we will do that.  But with that, thank you.

15      Thank you to the alternates, who've helped out so much.

16  Thank you for your incredible really attentiveness and thought to

17  this.  I know decisions can be difficult.  I know you've listened

18  to some very difficult and lengthy testimony.  This is how we

19  resolve these issues in our community.  They're not resolved by

20  judges, they're not resolved by, you know, law enforcement

21  officers or the military.  They're resolved by people in the

22  community, not angry mobs, but people in our community come in

23  and make these decisions for us.  I still think it's an

24  incredible system that we have, and thank you for being part of

25  it.

1          All right.  You can begin your deliberations.

2          (Jury leaving courtroom:  12:27)

3          THE COURT:  All right.  Please be seated, everybody.

4          Anything, then, for the record?  For the Government?

5          MR. SWEET:  Thank you, Your Honor.  We have (pause) --

6          THE COURT:  I want to make some changes to the verdict

7     form.  First of all, I think we need an "in furtherance" and I

8     think we need to have AV-1 in as opposed to "AV-1".

9          MR. SWEET:  Yes, Your Honor, we do concur with that.

10    And then the parties did work regarding the exhibit list that we

11    will be filing shortly with the -- with the final version, Your

12    Honor.  The Government has removed a few of the physical exhibits

13    from that.  And Exhibit 240, which appears to have been

14    inadvertently left off the list but which was presented to the

15    jurors, we are asking that that be admitted.  The defense has no

16    objection.  So we'll submit that filing.

17         THE COURT:  240 will be admitted.

18         MR. SWEET:  I believe that is all the -- and then we'll

19    also address this, Your Honor.  The transcripts which were

20    previously admitted, the parties agreed would not be going to the

21    jury.  They're just being admitted so we can track them.  We'll

22    remove those from the final juror copy.  And then from the

23    exhibit list that goes to the jury, the description, we'll make

24    sure that that doesn't have transcripts in them.

25         THE COURT:  Okay.

1      MR. SWEET:  Thank you.

2      THE COURT:  All right.  Thank you.

3      Anything from the defense?

4      MS. POTTER:  No, Your Honor.  We agree.  I just -- you

5  saw the changes I sent this morning on the exhibit list to delete

6  the objection previously ruled on?  Okay.

7      MR. SWEET:  We concur with that.

8      MS. POTTER:  Okay.  So those were removed.  As long as

9  that's removed, I think (pause) --

10     MR. SWEET:  We'll make sure that that has been removed.

11     MS. POTTER:  Okay.  As long as that's removed, we had a

12  final edit.  We have no problem with the changes to the verdict

13  form.  Sorry we missed them initially.  And I don't believe we

14  have anything else at this time.

15     THE COURT:  Okay.  Well, first of all, I want to thank

16  both sides.  This case has been, you know, as is often the case

17  in federal court, very well presented.  Both sides were very

18  prepared.  And I think, really, I'm always proud of our

19  profession when I see attorneys working as hard as they're

20  working in a case such as this.  So thank you both very much.

21     MR. SWEET:  Thank you.

22     THE COURT:  All right.  We'll be in recess.  Please let

23  Ms. Moore know how to contact each of you, and we will contact

24  you if we have any questions or a verdict.

25     (Recess:  12:30 - 4:36)

```
 1                 (Jury not present)

 2                 THE COURT:  All right.  My understanding is the jury

 3      has reached a verdict, so we'll bring them in.  Do we know who

 4      the foreperson was?  Was it Wurzell?

 5                 THE BAILIFF:  Yes.

 6                 THE COURT:  Okay.  Do we need to confirm the process

 7      for the forfeiture matter?

 8                 MS. POTTER:  Your Honor, I was able to meet with

 9      Mr. Zuberi.  We reached an understanding with Mr. Boccato about

10      some remaining items that will be returned at differing points,

11      and he signed his waiver of the forfeiture and it was filed.  I

12      think it may not be clear what it is from the ECF, but if you

13      click on it, that's what it is.

14                 THE COURT:  Okay.

15                 MR. BOCCATO:  Our intent is at some juncture to file a

16      preliminary order of forfeiture.  We'll work with defense

17      counsel, but I don't think anything has to be done today.

18                 THE COURT:  Okay.  Wonderful.  Thank you.

19                 All right.  We'll bring the jury in.

20                 (Jury entering courtroom:  4:39)

21                 THE COURT:  Okay.  Please be seated, everybody.

22                                    VERDICT

23                 THE COURT:  My understanding is the jury has reached a

24      verdict.  Is that correct?

25                 PRESIDING JUROR:  Yes, Your Honor.
```

1     THE COURT:  Ms. Wurzell, you're the foreperson?

2     PRESIDING JUROR:  Yes, Your Honor.

3     THE COURT:  If you'd like to hand the verdict form to

4  Ms. Moore.

5          And I'll omit the caption, and the verdict reads that

6  the jury has found as follows:  Count 1 is guilty.  And with

7  regard to the explanation as to which type of conduct your

8  verdict was based on, all three boxes were marked with an X.

9          Count 2, transportation and criminal sexual activity,

10 the verdict is guilty.

11         Count 3, kidnapping, the verdict is guilty.  And,

12 again, all three instrumentalities have been checked.

13         Count 4, 5, 6, and 7, charging felon in possession of a

14 firearm and ammunition -- or ammunition, all counts are guilty.

15 And the boxes have been marked "Yes" as to where the firearms or

16 ammunition were found.

17         Does either side wish to have the jury polled for

18 (pause) --

19         MR. BERTHOLF:  We would request polling.

20         THE COURT:  All right.  Count 1, the verdict is guilty.

21 If this is your verdict, please raise your hand.  And I'm seeing

22 all 12 jurors raise their hand.

23         With regard to the first question -- or excuse me, the

24 first explanation of conduct, the first box is Mr. Zuberi

25 transported AV-1 across state lines from Washington to Oregon.

1   That's marked with an X.  Did everybody agree on -- if you agreed

2   with that statement, please raise your hand.  And I'm seeing all

3   12 jurors raise their hand.

4           The next statement is Mr. Zuberi travelled in

5   interstate commerce in committing or in furtherance of the

6   offense.  If that was a statement you agreed with, could you

7   raise your hand?  All 12 jurors have raised their hand.

8           The next statement under Count 1 is Mr. Zuberi used any

9   means, facility, or instrumentality of interstate commerce in

10  committing or in furtherance of the offense.  That's -- if you

11  agree with that statement, could you raise your hand?  All 12

12  jurors have raised their hand.

13          Count 2, transportation for criminal sexual activity,

14  the verdict is guilty.  If that is your verdict, please raise

15  your hand.  Again, that verdict is unanimous.

16          Count 3, kidnapping, the verdict is guilty.  If that is

17  your verdict, please raise your hand.  All 12 jurors again have

18  raised their hand, so Count 3 is unanimous.

19          With regard to instrumentalities, do you agree that

20  cellphone was an instrumentality?  Please raise your hand.  All

21  12 jurors.

22          The motor vehicle was an instrumentality, please raise

23  your hand.  All 12 jurors have raised their hand.

24          And whether you believe that an ATM was an

25  instrumentality, please raise your hand.  All 12 jurors have

1   raised their hand.

2          Count 4 is felon in possession of a firearm and

3   ammunition.  The verdict was guilty and that the -- well, first

4   of all, was that your verdict?  Please raise your hand.  That's a

5   unanimous verdict.

6          And it was -- the statement:  Do you find that the

7   firearm or rounds of ammunition were recovered from AV-1, that's

8   marked "Yes."  If "Yes" was your statement, please raise your

9   hand.  All 12 jurors have raised their hand.

10         Count 5, felon in possession of firearm and ammunition,

11  the verdict was guilty.  And this was ammunition recovered from

12  the Prowler trailer.  If guilty was your verdict and you believed

13  it was recovered from the Prowler trailer as well, please raise

14  your hand.  It's a unanimous verdict on Count 5.

15         Count 6, felon in possession of ammunition, this is

16  ammunition recovered from a bedroom in 1336 North El Dorado

17  Avenue home.  If your verdict was guilty and you further believe

18  that the items were recovered from that address, please raise

19  your hand.  It is a unanimous verdict.

20         And then, finally, Count 7, possession of ammunition,

21  the verdict is guilty.  This was ammunition that is marked that

22  you found was found at the 1336 North El Dorado Avenue home.  If

23  this was your verdict and your belief as to where it was found,

24  please raise your hand.  All 12 jurors have raised their hand.

25         So it is a unanimous verdict on each count and each

1    question put to the jury.  I will accept the verdict.

2           Folks, at this stage, you are discharged from further

3    duty.  I want to thank all of you for the work you've put into

4    this.  I know it was a long two weeks.  I know you listened to a

5    lot of witnesses and there were a lot of exhibits.  And I know

6    some of the evidence was probably hard to listen to, but you did

7    that.  It's a great accomplishment that you've done for the

8    community.  I want to thank each and every one of you.

9           I know some of you have to -- probably have to -- want

10   to get home very badly and celebrate a weekend.  If you do wish

11   to stay, I will be back in the jury room in just a matter of a

12   couple minutes.  If you have any questions, I can try to answer

13   them.  If you have any comments on how we can do a better job

14   taking care of our jurors, I'd love to hear that as well.  But I

15   will be back in just a moment if you want to stay, but you are

16   perfectly free to go as well.

17          I will also tell you that you are not required to speak

18   to anybody about the case.  The attorneys, under Oregon rules,

19   are not allowed to contact you and ask you questions.  Of course,

20   other people can ask you questions.  People in the media could

21   ask you questions.  It's entirely up to you whether you want to

22   speak to people or not speak to people, but you should not feel

23   bad about not speaking about your jury experience if that's what

24   you so desire, but you will not be hearing from the parties to

25   the case or from -- well, you won't be hearing from the lawyers

1   or the parties to the case at all.

2          So with that, thank you.  I'll be back shortly in the

3   jury room, but you are free to go.

4          (Jury leaving courtroom:  4:46)

5          THE COURT:  All right.  Please be seated.

6          I will order a pre-sentence report as soon as Ms. Moore

7   gets back.  We will set a sentencing date.  Are there other

8   things we need to discuss?

9          MS. POTTER:  Your Honor, Mr. Zuberi has requested to be

10  allowed -- permitted to talk to Ms. Westfall, Alycia Westfall

11  again, and we are requesting the Court lift that order

12  prohibiting that contact.

13         THE COURT:  Any objection to lifting the previous order

14  regarding phone calls between Mr. Zuberi and Ms. Westfall?

15         MR. SWEET:  We take no position on that, Your Honor.

16         THE COURT:  Well, just a reminder, of course these

17  calls are recorded, but I will lift that restriction.

18         MR. BERTHOLF:  Thank you.

19         THE COURT:  Okay.  Yes.

20         MR. BERTHOLF:  One other thing.  There is a pending

21  escape charge.  We were discussing, and we were thinking maybe

22  set a status hearing in about 30 days or so.

23         THE COURT:  Do you agree with that?

24         MR. SWEET:  We agree, Your Honor.  Thank you.

25         THE COURT:  Okay.  You want to file a status report or

1    an actual status conference?

2            MR. BERTHOLF:  Let's do a status report.

3            MR. SWEET:  That makes sense.

4            MR. BERTHOLF:  That -- mostly we were discussing it so

5    it stays in our minds and it doesn't get lost in the weeds.

6            THE COURT:  Okay.

7            MR. BERTHOLF:  So a status report is probably the best.

8            THE COURT:  All right.  A status report in 30 days.

9    And I'll make sure that Ms. Moore sets a 30-day date for that.

10            MR. BERTHOLF:  Thank you.

11            THE COURT:  Anything else from defense?

12            MR. BERTHOLF:  No.

13            THE COURT:  From the Government?

14            MR. SWEET:  No, Your Honor.  Thank you.

15            THE COURT:  Okay.  Thank you all.  I appreciate it.

16            THE COURTROOM DEPUTY:  I have a sentencing date.

17            THE COURT:  Oh.  Do you have a sentencing date?

18            THE COURTROOM DEPUTY:  January 16th at 10 o'clock.

19            THE COURT:  January 16th at 10 o'clock for sentencing.

20    And obviously if that date does not work for the victims in the

21    case, we can certainly alter that.  We can also accommodate them

22    via video or phone.  If that is more appropriate for them, just

23    let us know.

24            MR. SWEET:  Thank you, Your Honor.

25            THE COURT:  All right.  Thank you.  I'll make sure if

1    you wish to have a copy of the verdict form, we'll have that for

2    you.

3            MR. SWEET:  Thank you, Your Honor.

4            (Proceedings adjourned at 4:48 p.m.)

5

6                    **C E R T I F I C A T E**

7

8            I certify, by signing below, that the foregoing is a

9    true and correct transcript of the record, taken by stenographic

10   means, of the proceedings in the above-entitled cause.

11           A transcript without an original signature, conformed

12   signature, or digitally signed signature is not certified.

13

14           DATED this 20th day of March 2025.

15

16

17                    <u>/s/ Kellie M. Humiston</u>

18                    Kellie M. Humiston, RMR, CRR
                      Official Court Reporter
19                    Certificates Expire:  9/2027

20

21

22

23

24

25